H4AKTHIH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 CR 47 (DLC)

5   MAHMOUD THIAM,

6              Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        April 10, 2017
9                                       10:00 a.m.

10

    Before:
11
                        HON. DENISE COTE,
12
                                        District Judge
13

14                        APPEARANCES

15

    JOON H. KIM,
16       Acting United States Attorney for the
         Southern District of New York
17  ELISHA KOBRE
    CHRISTOPHER DiMASE
18       Assistant United States Attorneys

19  AARON M. GOLDSMITH
    MICHAEL DELAKAS
20       Attorneys for Defendant

21

    ALSO PRESENT:
22
    PATRICK KILLEEN, FBI Special Agent
23  STEPHANIE KRUG, FBI Special Agent
    LORINDA LARYEN, DOJ
24  ALEXANDER BEER, USAO Paralegal

25

H4AKTHIH

1          (Case called)

2          THE DEPUTY CLERK:  United States of America versus

3     Mahmoud Thiam.

4          Is the government ready to proceed?

5          MR. KOBRE:  Yes.

6          Good morning, your Honor.  Elisha Kobre, Chris DiMase,

7     and Lorinda Laryen, for the government.  With us at counsel's

8     table is a paralegal with our office, Alex Beer, as well as

9     Special Agents Stephanie Krug and Patrick Killeen, both of the

10    FBI.

11         THE DEPUTY CLERK:  For the Defendant Thiam, are you

12    ready to proceed?

13         MR. GOLDSMITH:  Ready to proceed, your Honor.  Aaron

14    Goldsmith, on behalf of Mr. Thiam.  Mr. Thiam is present at

15    counsel table.  And with me, also, is Michael Delakas, an

16    associate with me.  Thank you.

17         THE COURT:  Good morning, everyone.

18         We are here for a suppression hearing, but the

19    government filed motions in limine on Friday.

20         And, Mr. Goldsmith, have you had a chance to look at

21    those?

22         MR. GOLDSMITH:  I've had a chance to review them, yes.

23         THE COURT:  Okay.

24         MR. GOLDSMITH:  I can orally respond, but if the Court

25    would prefer written responses, I can get those to you

H4AKTHIH

1    tomorrow.

2           THE COURT:  Well, we actually have a schedule for

3    written responses.  I'm happy to take it before Friday, but

4    that's your scheduled due date.

5           MR. GOLDSMITH:  Yes.

6           THE COURT:  But I do think there are two things that

7    would be helpful for you to discuss with the government

8    tomorrow -- and feel free to discuss anything with them that

9    you think would be useful in connection with these motions in

10   limine -- but one is whether or not there are any disputes with

11   respect to the translations.

12          MR. GOLDSMITH:  Right.

13          THE COURT:  And if you could review that with the

14   government tomorrow, and we can just get that out of the way,

15   or perhaps get it resolved before Friday.

16          The second thing is with respect to the transcripts of

17   the interview, the FBI interview, which we have the suppression

18   hearing addressing today, if there are any disputes about

19   completeness issues, and you identify other sections of the

20   interview that you think, in fairness, under the rules of

21   evidence, need to be added, can you identify those to the

22   government tomorrow as well?

23          MR. GOLDSMITH:  I will.  And I will also represent to

24   the Court today that the government and I have already engaged

25   in conversations about translations, and I think that we have a

1    working model for how we're going to go forward.  At this

2    point, they have their translator, who's gone through several

3    documents, I have my translator, who's going through several

4    documents, and we believe we will likely stipulate to the

5    authenticity and accuracy of those translations going forward,

6    but would certainly notify the Court if, between the two of us,

7    we had some disagreements as to the proper translation on any

8    specific documents.

9            THE COURT:  Well, thank you, Mr. Goldsmith, but I'm

10   particularly interested in the documents that are subject to

11   the motion in limine; that is, the translation of the foreign

12   law sections and of the statement by the -- I'll call it the

13   expert on foreign law that is attached as Exhibit B2 to the

14   motions in limine.

15           MR. GOLDSMITH:  Yes, your Honor.  I'm waiting word

16   back from my translator on that, so we'll be in touch.

17           THE COURT:  Good.  Can you be back to the government

18   on that --

19           MR. GOLDSMITH:  Yes.

20           THE COURT:  -- tomorrow?

21           Thank you so much.

22           This is a hearing because of a motion to suppress a

23   statement.  I'm not sure, actually, that I needed to hold the

24   hearing.  The affidavit submitted by Mr. Thiam of March 24th

25   makes the following statements at paragraph 5:  "While being

H4AKTHIH

1  transported to 26 Federal Plaza, the agents began questioning

2  me about the allegations."  He does not recite what they said,

3  such that a custodial interrogation analysis is essential here,

4  but out of an excess of caution, I have scheduled this for a

5  hearing.  I have reviewed the transcript.  I don't think we

6  need to take testimony about the recorded portion of the

7  interview, so I think the focus on this hearing, as I

8  understand it, should be up to the point in time which the

9  recording began, but I just want to make sure that counsel see

10  it the same way.

11       Mr. Goldsmith, does that accord with what you

12  understand would be appropriate here?

13       MR. GOLDSMITH:  Yes, your Honor.

14       THE COURT:  Okay.  Good.

15       Let's talk about how many witnesses we'll have.  Is

16  the government calling witnesses here?

17       MR. KOBRE:  Yes, your Honor.

18       THE COURT:  And who are they?

19       MR. KOBRE:  They are Special Agent Christopher

20  Martinez of the FBI and Special Agent Brian Gander of the FBI.

21       THE COURT:  Gander?

22       MR. KOBRE:  Yes, your Honor.

23       THE COURT:  G-A-N?

24       MR. KOBRE:  G-a-n-d-e-r.

25       THE COURT:  Okay.  Are either of them in the

H4AKTHIH

1  courtroom?

2        MR. KOBRE:  No, your Honor.

3        THE COURT:  Okay.  Good.

4        Mr. Goldsmith, do you intend to call any witnesses?

5        MR. GOLDSMITH:  No, your Honor.

6        THE COURT:  Okay.

7        I've reviewed the parties' papers.  We'll begin with

8  opening statements, if you believe that's appropriate, if you'd

9  like.  Otherwise, the government will have an opportunity to

10  call its witnesses, they will be subject to cross, counsel will

11  have an opportunity to make their summation arguments to me,

12  and, if appropriate, I'll give you a ruling on the record

13  today.

14        Mr. Kobre, do you wish to make an opening statement?

15        MR. KOBRE:  Yes, just very briefly, your Honor.  But

16  if I can just have one point of clarification:  The government

17  was prepared to offer into evidence at the hearing today a disk

18  with the audio recording of the postarrest interview, the

19  transcript, and Miranda form.  Should we just -- based on your

20  Honor's discussion earlier, I take it we can just dispense with

21  that and focus on the factual dispute; is that correct?  It

22  would be brief if we do that, but we don't need to.

23        THE COURT:  I expect we could get those documents -- I

24  think they should be part of the record --

25        MR. KOBRE:  Okay.

H4AKTHIH

1          THE COURT:  -- because summation arguments may address

2    them, but we can probably, just on stipulation, accept them as

3    part of this record without calling a witness to authenticate

4    them.

5          Would you agree, Mr. Goldsmith?

6          MR. GOLDSMITH:  Agreed.

7          THE COURT:  Okay.

8          MR. KOBRE:  Your Honor, we have the witness anyway.

9    It will just take a moment, and we can just put it in through

10   the witness, so it will be very quick.

11         THE COURT:  Okay.  Good.

12         And, Mr. Goldsmith, do you wish to make an opening

13   statement?

14         MR. GOLDSMITH:  I don't think it's necessary.

15         THE COURT:  Okay.  Good.

16         So, Mr. Kobre, you may call your first witness.

17         MR. KOBRE:  Yes, your Honor.  The government calls

18   Special Agent Christopher Martinez of the FBI.

19    CHRISTOPHER DAVID MARTINEZ,

20       called as a witness by the Government,

21       having been duly sworn, testified as follows:

22         THE DEPUTY CLERK:  Please state your full name for the

23   record and spell out your last name.

24         THE WITNESS:  Christopher David Martinez,

25   M-a-r-t-i-n-e-z.

1              MR. KOBRE:  May I proceed, your Honor?

2              THE COURT:  Yes.

3    DIRECT EXAMINATION

4    BY MR. KOBRE:

5    Q.  Where do you work?

6    A.  At the FBI.

7    Q.  What is your position with the FBI?

8    A.  I'm a special agent.

9    Q.  How long have you been a special agent with FBI?

10   A.  About seven years.

11   Q.  Are you currently assigned to a particular unit or

12   division?

13   A.  Yes.

14   Q.  What's that?

15   A.  The International Corruption Unit located in Houston,

16   Texas.

17   Q.  When did you begin that assignment?

18   A.  The summer of 2015.

19   Q.  Prior to that, what was your assignment?

20   A.  I worked at public corruption and civil rights matters at

21   the New York field office at the FBI.

22   Q.  As part of your duties and responsibilities as a special

23   agent of the FBI, when you were based here in New York, did you

24   become involved in an investigation of an individual named

25   Mahmoud Thiam?

1   A.  I did.

2   Q.  Was Mr. Thiam arrested for money laundering charges?

3   A.  Yes, he was.

4   Q.  Did you participate in that arrest?

5   A.  I did.

6   Q.  When did that arrest occur?

7   A.  December 13th of 2016.

8   Q.  Where did you arrest Mr. Thiam?

9   A.  At his residence.

10  Q.  Do you see him in the courtroom today?

11  A.  I do.

12  Q.  Can you please point to him?

13          MR. KOBRE:  May the record reflect that the witness

14  has identified the defendant.

15          THE COURT:  I'm sorry, I missed that.

16  Q.  If you can just point to the defendant, please.

17          THE COURT:  And, counsel -- could you identify what

18  person you're pointing to, what table he's sitting at, and what

19  position at the table?

20          THE WITNESS:  Sure.  He's sitting at the table behind

21  where the prosecutors are seated.  He's right behind the

22  prosecutors, in between two other attorneys.

23          THE COURT:  Okay.  Sitting in the middle, the

24  defendant has been identified.

25          MR. KOBRE:  Thank you, Judge.

H4AKTHIH                        Martinez – Direct

1    BY MR. KOBRE:

2    Q.  Please briefly describe your activity the morning of

3    December 13th, 2016.

4    A.  Yes.  After departing from where I was staying at, I drove

5    to the FBI office and picked up a coworker, and we proceeded to

6    the arrest briefing site.

7    Q.  Was that near the defendant's residence?

8    A.  Yes, it was.

9    Q.  And what happened when you arrived near the defendant's

10   residence?

11   A.  Yes.  We met with the rest of the arrest team, and we

12   briefed the operation.

13   Q.  What happened after that?

14   A.  The arrest team went into or went up to the residence and

15   exacted the arrest.

16   Q.  About how many agents were members of this arrest team?

17   A.  I would say between six and eight.

18   Q.  What happened when you got up to the door of the

19   defendant's apartment?

20   A.  As we made --

21              THE COURT:  Were you part of the arrest team?

22              THE WITNESS:  I was.

23              THE COURT:  Did you go to the defendant's apartment?

24              THE WITNESS:  I did.

25   Q.  What happened when you arrived?

H4AKTHIH                        Martinez – Direct

A.   Yes.  We made an attempt to call his cell phone, and we did

not receive an answer.  And at that point, we knocked on the --

on Mr. Thiam's door and --

          THE COURT:  Are you describing things that you

personally did or observed?

          THE WITNESS:  Yes.

          THE COURT:  What did you do?

          THE WITNESS:  I made a call.  I made a phone call

to --

          THE COURT:  Okay.  And after there was no answer, what

did you do?

          THE WITNESS:  I observed another individual from the

arrest team knock on the door, and at that point, we were met

at the door by, I believe, the defendant.

BY MR. KOBRE:

Q.   What happened at that point?

A.   At that point, the defendant was placed under arrest.

Q.   Specifically, did you or other agents say anything to him

at that point about what he was being arrested for?

A.   No statement was made as to what he was arrested for, but

merely that he was under arrest.

Q.   At that point did you have any other conversation with him,

or did you hear any of the other agents having any conversation

with him?

A.   Yes.

1    Q.  And describe that, please.

2    A.  Myself and other agents explained to Mr. Thiam what would

3    be expected the rest of the day, and these things would include

4    having to be taken back to the FBI office for processing as

5    well as eventually being brought before the Court.

6    Q.  Were other law enforcement measures planned to take place

7    inside of the defendant's apartment that day?

8    A.  Yes.

9    Q.  What was that?

10   A.  A search warrant of the residence was planned subsequent to

11   the arrest.

12   Q.  Did you enter the apartment after you told the defendant he

13   was under arrest?

14   A.  Yes, we did.

15   Q.  Can you describe what you did once you were inside the

16   apartment?

17   A.  Yes.  I stayed close to the defendant and explained to him,

18   again, what would be expected and helped prepare him to the

19   transport back to the office, which included getting dressed in

20   the right clothes for the marshals and also gathering up

21   medicines for a stay, things like that.

22   Q.  Did you have -- while you were in the apartment that

23   morning, did you have any involvement in the execution of the

24   search warrant?

25   A.  Yes.

1           THE COURT:  Now, this isn't a motion to suppress the

2      fruits of the search?

3           MR. KOBRE:  Correct, your Honor.  It's just that the

4      defendant made some brief statements, and I thought -- while

5      they were in the apartment, and I thought that it may be useful

6      to elicit that.

7           THE COURT:  Okay.

8      BY MR. KOBRE:

9      Q.  Can you describe -- did you have any conversation with the

10     defendant in connection with your participation in the

11     execution of the search warrant?

12     A.  Yes.  I made the defendant know that we did have a search

13     warrant for the residence and explained to him that the length

14     of time at which the rest of the search warrant team would stay

15     at his house would be impacted by his degree of cooperation,

16     and to the extent he could help us locate items that were on

17     the search warrant, that would affect that time.

18     Q.  Did the defendant do anything or assist you in that regard?

19     A.  Yes, he did.

20     Q.  Just briefly, if you can describe?

21     A.  Yes.  He pointed out items within the house that were on

22     the search warrant as to where they were and gathered them.

23     Q.  Was there also a safe in the house that needed to be

24     accessed?

25     A.  Yes.

1  Q.  And describe the defendant's -- any statement the defendant

2  made in that regard?

3  A.  Yes.  He made attempts to open the safe and was

4  unsuccessful.

5  Q.  For a total of about how long were you in the defendant's

6  apartment, inside?

7  A.  Approximately 45 minutes.

8  Q.  At any point from the time you encountered the defendant at

9  the residence until you left the residence, did you engage in

10  any substantive conversation with him about the case or the

11  charges?

12  A.  No.

13  Q.  Did you hear any of the other agents or anyone else engage

14  with the defendant regarding the case or the charges during

15  that period of time when you were in the apartment?

16  A.  I did not.

17  Q.  Describe how it came to be that you left the apartment.

18  A.  Myself and Brian Gander, another agent on the arrest team,

19  escorted the defendant out of his residence and were assisted

20  by hotel personnel, one individual, I believe.  We took the

21  service elevator down to the parking lot, which, I believe, was

22  at the first level of the complex, and there, we were met by

23  another individual from the team that was driving the transport

24  vehicle.

25  Q.  You may have mentioned this, but who was the other agent

1  who accompanied you out of the apartment together with the

2  defendant?

3  A.  Brian Gander.

4  Q.  When you got outside, where did you go?

5  A.  We entered the vehicle.

6  Q.  When you say "we," who is the "we"?

7  A.  Myself, the defendant, and Brian Gander.

8  Q.  Describe where everyone was seated inside the vehicle.

9  A.  The defendant was seated on the passenger's side in the

10  back seat of the vehicle, I sat to his side on the driver's

11  side of the back seat, and Brian Gander drove the vehicle.

12  Q.  What was your intended destination?

13  A.  26 Federal Plaza, FBI.

14  Q.  I think you may have said this before.  You mentioned that

15  the address of the defendant's residence was 170 East End

16  Avenue.  Just roughly, where is that, on what street in

17  Manhattan?

18  A.  I believe it's close to 90th Street, 91st Street.

19  Q.  Before I ask you some questions about what happened inside

20  the car, do you recall, generally, what route you took from the

21  nineties on the Upper East Side of Manhattan to 26 Federal

22  Plaza?

23  A.  We took the FDR.

24  Q.  Do you recall, generally, what was traffic was like?

25  A.  Normal traffic.

H4AKTHIH                          Martinez - Direct

1   Q.  Do you remember about how long the trip took?

2   A.  I'd say around 25 minutes.

3   Q.  Now, while you were in the car riding from the Upper East

4   Side to 26 Federal Plaza, did you say anything to the

5   defendant?

6   A.  I did.

7   Q.  Could you describe that?

8   A.  Yes.  I spent some time reiterating the fact that -- like

9   kind of how the day would unfold in terms of going back to the

10  FBI office, which would consist of processing, as well as his

11  appearance before Court.  I also made what we would refer to as

12  a pitch in the car, which just consisted of a conversation in

13  which I explained to the defendant the opportunity for him to

14  cooperate.

15  Q.  Before we get to the pitch, did you say anything to the

16  defendant about why he was arrested or what he was arrested

17  for?

18  A.  Yes, I did.

19  Q.  Can you describe that?

20  A.  I advised the defendant that he had been arrested for money

21  laundering in relation to Hong Kong.

22  Q.  Now, you mentioned "pitch."  Can you just explain that a

23  little bit more and tell us specifically, or the best you can

24  recall, what you said to the defendant in this pitch?

25  A.  Sure.  I conveyed to the defendant that in large part,

1    because of his business career, his business savvy, and his

2    connections throughout the wider international finance world

3    and to various heads of state, that he could be of potential

4    use to the United States Government and the FBI.

5    Q.   Anything else in that regard?

6    A.   I did advise that the window for such cooperation was

7    rather short.

8    Q.   Do you recall mentioning the name Sam Pa during this

9    conversation?

10   A.   I do not.

11   Q.   Do you remember mentioning the name of any potential

12   targets during this interaction?

13   A.   I do not.

14   Q.   Did you say anything to the defendant during this

15   interaction about when or where this potential cooperation

16   would occur or be discussed further?

17   A.   Yes.   I conveyed that it would take place at the office,

18   the FBI.

19   Q.   While you were in the car riding from the defendant's

20   residence to FBI headquarters at 26 Federal Plaza, did you ask

21   the defendant any questions relating to the substance of the

22   case or the charges?

23   A.   No.

24   Q.   After you completed making your pitch, what occurred in the

25   car?

1   A.  I filled out U.S. marshals forms.

2              MR. KOBRE:  Your Honor, if my colleague, Mr. DiMase,

3   can approach the witness with what's marked as Government

4   Exhibit 4?

5              MR. DiMASE:  May I approach, your Honor?

6              THE COURT:  Yes.  You don't need to ask permission to

7   approach, that's just fine.  Thank you.

8              MR. DiMASE:  Thank you.

9              THE COURT:  And that's true for the trial, too,

10  counsel.

11  BY MR. KOBRE:

12  Q.  I'm showing you what's marked as Government Exhibit 4 for

13  identification.

14             Do you recognize that?

15  A.  I do.

16  Q.  What is that?

17  A.  The U.S. Marshals Form 312.

18  Q.  Specifically, is that the U.S. Marshals form filled out

19  with respect to the defendant?

20  A.  Yes.

21  Q.  Who filled that out?

22  A.  I did.

23             MR. KOBRE:  The government offers Government Exhibit

24  4.

25             MR. GOLDSMITH:  No objection.

1            THE COURT:  Received.

2            (Government's Exhibit 4 received in evidence)

3    BY MR. KOBRE:

4    Q.  Where did you fill this form out?

5    A.  In the transport vehicle.

6    Q.  So, you asked the defendant questions, the questions on

7    that form, in the vehicle?

8    A.  Correct.

9    Q.  Do you recall if in the car ride over, the defendant made

10   any spontaneous statements?

11   A.  He did.

12   Q.  Could you describe that?

13   A.  Yes.  While filling out the section in relation to the

14   defendant's bank accounts, the defendant expressed that -- his

15   opinion that because the FBI had been investigating, that we

16   should know that he at that moment has no money.

17   Q.  That spontaneous statement was made in response to what?

18   A.  In response to questioning about bank accounts, which is

19   located on, I believe, the second page of the marshals form.

20   Q.  Do you recall if the defendant made any spontaneous

21   statements during the pitch portion of the car ride, if we can

22   call it that?

23   A.  No.

24   Q.  No, you don't recall?

25   A.  No, he did not.

H4AKTHIH                          Martinez - Direct

1   Q.  Had you completed filling out Government Exhibit 4 of the

2   marshals form by the time you reached FBI headquarters?

3   A.  Yes.

4   Q.  Other than what you described, do you recall any other

5   words exchanged in the car ride by yourself and the defendant?

6   A.  No.

7   Q.  You mentioned earlier that Special Agent Gander was driving

8   the car.  Did he say anything to the defendant or ask any

9   questions during the car ride?

10  A.  No.

11  Q.  What happened after you arrived at 26 Federal Plaza?

12  A.  We were met by an officer of the FBI police in the

13  sallyport of the FBI office.  Then we were escorted up into the

14  processing center.

15  Q.  Describe what happened there.

16  A.  We took the defendant through the standard processing

17  protocol, which consists of fingerprinting, photos, and a DNA

18  swab.

19  Q.  Were you present with the defendant during that processing

20  procedures?

21  A.  I was.

22  Q.  After those were completed, what occurred?

23  A.  We moved with the defendant to interview rooms.

24  Q.  I'm sorry, "interview rooms"?

25  A.  An interview room.

1   Q.  From the time that you left the car that Agent Gander was

2   driving until the time you got the defendant into the interview

3   room, did you ask the defendant any substantive questions about

4   the case or the charges?

5   A.  No.

6   Q.  Did you hear anyone else ask the defendant any such

7   questions?

8   A.  No.

9          MR. KOBRE:  My colleague, Mr. DiMase, is approaching

10  the witness with what's marked as Government Exhibit 2.

11  Q.  Do you recognize that?

12  A.  I do.

13  Q.  What is it?

14  A.  It's a DVD of -- DVD recordings containing recordings of

15  the custodial interview --

16  Q.  How do you recognize --

17  A.  -- with the defendant.

18  Q.  I'm sorry?

19  A.  With the defendant.

20  Q.  Thank you.

21          How do you recognize that?

22  A.  Because I initialed it.

23  Q.  Before you initialed it, did you watch a portion of it?

24  A.  Yes.

25  Q.  Is that an accurate video recording of the interview of the

H4AKTHIH                     Martinez - Direct

defendant that occurred on December 13th, 2016, after he was

brought to the interview room, as you described?

A.  Yes.

         MR. KOBRE:  The government offers Government Exhibit

2.

         MR. GOLDSMITH:  Just briefly, your Honor, may I?

Thank you.

VOIR DIRE EXAMINATION

BY MR. GOLDSMITH:

Q.  Special Agent Martinez, there were multiple DVDs that were

the original videos of the interview that took place that day.

Are you aware of that?

A.  There would have been copies made, yes.

Q.  Does the disk that you have before you contain all of the

substance of the entirety of the interview that you recall?

A.  Does?  I'm sorry.

Q.  Have all of the substance of the entirety of when the

defendant was in the interview room?

A.  I don't know.

Q.  What portions were you able to review to confirm the

substance that is shown on that particular DVD?

A.  A small portion relevant to the hearing of today.

Q.  What small portion?

A.  The beginning of the custodial interview.

Q.  Anything after the beginning?

H4AKTHIH                          Martinez - Direct

1  A.  No.

2          MR. GOLDSMITH:  I have no objection to the

3  authenticity of the admission for the purposes of the beginning

4  of the interview.  If we get into questioning of what happens

5  later, I'll rely upon the judgment of the Court.

6          THE COURT:  Okay.

7          MR. KOBRE:  Your Honor, this is a hearing in which the

8  rules of evidence don't apply.  I can represent to the Court

9  that what's on this disk is the entirety of the video recording

10  of the defendant's postarrest interview.

11          THE COURT:  Good.  Thank you.

12          Received.

13          (Government's Exhibit 2 received in evidence)

14          MR. GOLDSMITH:  Nothing further.

15          MR. KOBRE:  Thank you.

16          My colleague, Mr. DiMase, is approaching the witness

17  with what is marked as Government Exhibit 3 for identification.

18  BY MR. KOBRE:

19  Q.  Do you recognize that?

20  A.  Yes.

21  Q.  What is it?

22  A.  This is a transcript of the recording of the custodial

23  interview.

24  Q.  And without having done a word-for-word comparison, is that

25  generally an accurate transcription of the interview you

1   conducted with the defendant as it's reported on Government

2   Exhibit 2?

3   A.  Yes.

4           MR. KOBRE:  The government offers Government Exhibit

5   3.

6           MR. GOLDSMITH:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 3 received in evidence)

9   BY MR. KOBRE:

10  Q.  As reflected on the video in Government Exhibit 2, prior to

11  questioning the defendant, did you provide him with Miranda

12  warnings?

13  A.  Yes.

14  Q.  Did you provide those warnings orally or in writing?

15  A.  Both.

16  Q.  Just so that we're all clear, was this the first time that

17  morning the defendant had been provided with his Miranda

18  warnings?

19  A.  Yes.

20  Q.  Did he waive his Miranda warnings?

21  A.  He did.

22          MR. KOBRE:  My colleague, Mr. DiMase is approaching

23  the witness with what has been marked Government Exhibit 1 for

24  identification.

25  Q.  Do you recognize that?

1    A.  I do.

2    Q.  What is it?

3    A.  It's an FD395, an Advice of Rights Form.

4    Q.  Is that an accurate copy of the Miranda waiver form that

5    you presented to the defendant --

6    A.  Yes.

7    Q.  -- before conducting the interview?

8    A.  Yes.

9           MR. KOBRE:  The government offers Government Exhibit

10   1.

11          MR. GOLDSMITH:  No objection.

12          THE COURT:  Received.

13          (Government's Exhibit 1 received in evidence)

14   BY MR. KOBRE:

15   Q.  After reading the defendant his Miranda warnings, did he

16   indicate that he understood them?

17   A.  Yes.

18   Q.  Did he agree to waive his rights?

19   A.  He did.

20   Q.  Did he so agree orally or in writing?

21   A.  Both.

22   Q.  Did he --

23          THE COURT:  Just take that mic and put it down under

24   your chin.  Don't speak directly into it.

25          THE WITNESS:  Great.

1          THE COURT:  Thank you.

2   BY MR. KOBRE:

3   Q.  Did he then sign the Miranda waiver, as indicated on the

4   video, to indicate that he had agreed to waive his Miranda

5   rights and speak with you?

6   A.  Yes.

7          MR. KOBRE:  Your Honor, if I could just have one

8   moment?

9          (Pause)

10          MR. KOBRE:  No further questions, your Honor.

11          THE COURT:  Cross-examination?

12  CROSS-EXAMINATION

13  BY MR. GOLDSMITH:

14  Q.  Special Agent Martinez, you met with Mr. Thiam for quite a

15  lengthy period of time on the day of the arrest; is that

16  correct?

17  A.  It is.

18  Q.  Do you recall, approximately, how long you actually met

19  with him prior to the presentment?

20  A.  I'd say over two and a half hours.

21  Q.  On the particular day of the arrest, you went with the

22  arrest team into his apartment; is that correct?

23  A.  That's correct.

24  Q.  When you arrived at the apartment, at that point, do you

25  recall -- well, withdrawn.

1          The team entered with approximately six agents; is

2    that correct?

3    A.   Yes.

4    Q.   Did you have your weapons drawn, or no?

5    A.   We did not.

6    Q.   As you entered into the apartment -- by the way, was

7    Mr. Thiam alone, or was he surrounded by others?

8    A.   Members of his family were present at the time.

9    Q.   Do you recall how many family members?

10   A.   His wife was present, and I believe his three children were

11   present at a later time.

12   Q.   Now, you had testified earlier that you had asked Mr. Thiam

13   to help identify some of the items in the search warrant that

14   had already been prepared in order to expedite the process at

15   his apartment; is that correct?

16   A.   That's correct.

17   Q.   How much time did you spend in the apartment that morning

18   prior to bringing Mr. Thiam to 26 Fed Plaza?

19   A.   I'd say between 45 minutes and an hour.

20   Q.   During those 45 minutes to an hour, it was yourself and

21   five other agents that were searching throughout the apartment;

22   is that correct?

23   A.   Yes.

24   Q.   And during that 45 minutes, you were not engaging in any

25   substantive conversation with Mr. Thiam; is that correct?

1   A.  That's correct.

2   Q.  And during that 45 minutes, was there any conversation

3   taking place with Mr. Thiam other than the assistance in

4   locating certain items for the search?

5   A.  No.

6   Q.  And other than those requests to help locate items, did you

7   or any other member, that you witnessed, have any conversations

8   with Mr. Thiam's wife?

9   A.  Not that I witnessed.

10  Q.  You don't recall informing Mr. Thiam's wife to not call

11  anyone at the time of the search, so that the process could be

12  expedited?

13  A.  That's true.  I should also add that we did speak to his

14  wife about, also, the necessity to provide medicine and other

15  things in preparation for a potential incarceration.  But, yes,

16  in addition to that, I explained to Mr. Thiam's wife that he

17  would be given an opportunity to cooperate with the United

18  States Government, and that ability could be affected by the

19  degree to which more individuals knew of his incarceration or

20  his arrest that day.

21  Q.  All right.  That took place in the apartment, correct?

22  A.  Yes.

23  Q.  So, that did not take place in the vehicle transport down

24  to 26 Federal Plaza as you had testified moments ago?

25  A.  Correct.

1    Q.  When you had also testified -- I'm sorry.  When you also

2    told Mr. Thiam's wife not to contact anyone, did you

3    specifically mention attorneys?

4    A.  I should be clear:  I did not tell her not to contact

5    anyone.  I made it clear that she was free to do as she

6    pleased, but explained that the degree of his cooperation would

7    be affected by how many people would know about his arrest.

8    Q.  All right.  So better to say that it was encouraged not to

9    contact anyone rather than explicitly telling her not to, is

10   that a better way to put it?

11   A.  That's a better way to put it.

12   Q.  And at that time, you encouraged her not to contact even

13   attorneys because that could impact his cooperation?

14   A.  I don't recall mentioning attorneys, no.

15   Q.  But you do recall telling her -- encouraging Mr. Thiam's

16   wife not to contact anyone?

17   A.  Yes.

18   Q.  Now, during the transport to 26 Federal Plaza, you

19   testified earlier that you had informed Mr. Thiam that he was

20   under arrest related to money laundering for Hong Kong; is that

21   correct?

22   A.  Correct.

23   Q.  During that moment when you informed him, you used the term

24   that it was related to Hong Kong, correct?

25   A.  Yes.

1    Q.  But you didn't use other terms related to CIF, or C-I-F,

2    did you?

3    A.  No.

4    Q.  So, when you testified moments ago that you specifically

5    did not mention the names of any targets of an associated

6    investigation, for cooperation, you did still mention Hong Kong

7    as a reference?

8    A.  Yes.

9    Q.  And, in your experience, as part of the investigation,

10   Hong Kong would surely mean CIF, or Chinese International Fund,

11   correct?

12   A.  I would not say it would surely mean it, but it would imply

13   potentially that that deal was at the center of the arrest.

14   Q.  And once Mr. Thiam was processed -- by the way, how long

15   did it take for the processing to occur once you got to 26 Fed

16   Plaza?

17   A.  I'd say approximately 45 minutes.

18   Q.  So, about 45 minutes in his apartment, followed by 25

19   minutes' transport, approximately -- although I think that

20   might be generous on the FDR -- and 45 minutes or so during

21   process, is that about right?

22   A.  About right.

23   Q.  And then -- so, after, fair to say, almost two hours, he is

24   brought into an interview room; is that correct?

25   A.  Correct.

H4AKTHIH                         Martinez - Cross

1   Q.  And at that point, that's when the portions of the

2   transcript and the video, which have been introduced as

3   Government Exhibits 2 and 3, start recording?

4   A.  Correct.

5   Q.  And to emphasize, the moment that you and the other five

6   agents entered his apartment that morning, you informed him

7   that he was under arrest?

8   A.  Correct.

9   Q.  So, he's been aware that he was under arrest for almost two

10  hours prior to the interview commencing, correct?

11  A.  Correct.

12  Q.  Now, I think the easiest way to go about asking any

13  questions in regards to the transcript is if I refer to the

14  Bates numbers on the bottom.

15          Do you recall Mr. Thiam hesitating about contacting

16  his attorney at the beginning of the interview?

17          THE COURT:  So, counsel, up to the advice of rights,

18  feel free, but after that, let's just rely on the transcript.

19  I thought that's what we agreed.

20          MR. GOLDSMITH:  Okay, your Honor.

21          THE COURT:  We're not going to go over -- we have the

22  transcript, we have the video recording.  You'll make your

23  arguments in summation, they're part of the record.

24          MR. GOLDSMITH:  That's fine, your Honor.

25

1    BY MR. GOLDSMITH:

2    Q.  Well, then, let's go to the advice of rights, which was

3    Government Exhibit 1.

4           When was Mr. Thiam given the Advice of Rights Form in

5    relation to the interview process starting?

6    A.  The form is signed at 9:04 a.m., and that appears to be

7    about nine minutes after we sat down, or at least when we

8    filled out the form.

9    Q.  So, let me direct your attention to the top of the form.

10   See it has "Location"?  Do you see it?

11   A.  I do.

12   Q.  And there are three entries for place, date, and time?

13   A.  Correct.

14   Q.  And you see in the time entry, it says, "8:55 a.m."?

15   A.  Yes.

16   Q.  And then at the bottom of the page, under the witness

17   section, it's timed at 9:04 a.m.

18           Do you see that as well?

19   A.  I do.

20   Q.  When you said that he was presented with the advice of

21   rights, was it at the 8:55 or at the 9:04?

22   A.  In between then, but closer to the time at which he signed

23   at 9:04.

24   Q.  Just below the location portion of the Advice of Rights

25   Form, you'll see another one entitled "Your Rights"?

H4AKTHIH                         Martinez - Cross

1   A.  Correct.

2   Q.  And under that portion, you'll see there is an articulation

3   of several aspects of what we call the Miranda rights.

4            Do you see that?

5   A.  I do.

6   Q.  Were those individually read to Mr. Thiam when presenting

7   the document?

8   A.  Yes.

9   Q.  Did you ask Mr. Thiam to initial or otherwise indicate that

10  he had been read those individual statements?

11  A.  I did.

12  Q.  But you'll note on Government's Exhibit 1, that there is no

13  initial next to each of those articulations under "Your

14  Rights."  Do you see that?

15  A.  I do.

16  Q.  There is a signature at the bottom under "Consent"; is that

17  correct?

18  A.  There is.

19  Q.  And you witnessed Mr. Thiam signing the advice of rights?

20  A.  Yes.

21  Q.  But, again, you did not have him initial or otherwise

22  indicate that he had received each and every one of those

23  articulated phrases under "Your Rights"; is that correct?

24  A.  I should clarify the question you asked before.  I

25  misunderstood and thought you were referring to the signature.

H4AKTHIH                      Martinez - Cross

1      I don't recall specifically whether I asked him to

2   initial on the side of each point on the Advice of Rights Form.

3   Q.   You've been in the FBI for seven years, correct?

4   A.   Yes.

5   Q.   Did you have any federal law enforcement prior to that?

6   A.   No.

7   Q.   In the seven years that you have been an FBI agent, you've

8   taken part in how many interviews of witnesses?

9   A.   Custodial or just witnesses in general?

10  Q.   Custodial.

11  A.   Oh, I'd say two or three.

12  Q.   In those two or three instances -- does that include

13  Mr. Thiam or total?

14  A.   That would be total.

15  Q.   So, in the other one to two interviews that you've taken

16  part in, have you or the agents around you insisted upon the

17  suspect in those cases initialing those portions of the Advice

18  of Rights Forms?

19  A.   I don't recall each specific instance, but I don't believe

20  so.

21  Q.   You also engaged in some regular training as part of your

22  practice at the FBI, correct?

23  A.   Yes.

24  Q.   And during that regular training, you've received training

25  on the Advice of Rights Forms, correct?

H4AKTHIH                        Martinez - Cross

1    A.  Yes.

2    Q.  And during those trainings, have you received any

3    instruction on having the suspects being questioned initial or

4    otherwise indicate that they received those individual

5    warnings?

6    A.  I don't recall.

7    Q.  After Mr. Thiam signed the Advice of Rights Form, that's

8    when the interview that has been memorialized took place; is

9    that correct?

10   A.  Correct.

11   Q.  Did you witness any of the other five agents question

12   Mr. Thiam while at his apartment?

13   A.  I did not.

14          MR. GOLDSMITH:  In light of the use of the transcript

15   as is, your Honor, I have no further questions.

16          THE COURT:  Thank you.

17          Any redirect?

18          MR. KOBRE:  No, your Honor.

19          THE COURT:  So let me ask you a question.  Was the

20   defendant arrested in his apartment pursuant to an arrest

21   warrant?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  Thank you.

24          Counsel, do you have any questions for this witness

25   based on the question I just placed to him?

1            Mr. Kobre?

2            MR. KOBRE:  No, your Honor.

3            MR. GOLDSMITH:  No, your Honor.

4            THE COURT:  Okay.  You may step down.

5            (Witness excused)

6            THE COURT:  Next witness.

7            MR. KOBRE:  The government calls Special Agent Brian

8    Gander.

9     BRIAN GANDER,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12            THE DEPUTY CLERK:  Please state your full name for the

13   record and spell out your last name.

14            THE WITNESS:  Sure.  Brian Gander, G-a-n-d-e-r.

15            THE COURT:  How do you spell your first name?

16            THE WITNESS:  Brian, B-r-i-a-n.

17   DIRECT EXAMINATION

18   BY MR. KOBRE:

19   Q.  Where do you work?

20   A.  With the FBI.

21   Q.  What is your position with FBI?

22   A.  Special agent.

23   Q.  When did join FBI?

24   A.  In September 2002.

25   Q.  So, you have been a special agent with the FBI for about 14

1   years?

2   A.   That's correct.

3   Q.   Are you currently assigned to a particular unit or

4   division?

5   A.   Yes, I am.

6   Q.   What is that?

7   A.   Violent Crimes Against Children and human trafficking

8   squad.

9   Q.   Prior to your current assignment, were you on a different

10  squad that investigated, among other things, violations of the

11  Foreign Corrupt Practices Act?

12  A.   Yes.

13  Q.   And as part of your work on that previous squad, did you

14  participate in an investigation of, among others, an individual

15  named Mahmoud Thiam?

16  A.   Yes.

17  Q.   Did you later participate in an arrest -- in the arrest of

18  Mr. Thiam?

19  A.   Yes, I did.

20  Q.   When did that occur?

21  A.   In approximately December 2016.

22  Q.   Do you see Mr. Thiam in the courtroom here today?

23  A.   Yes, I do.

24  Q.   Can you please point to him and describe where he's seated?

25  A.   Sure.  He's seated behind you, right in the middle of the

1    two gentlemen wearing suits.

2              MR. KOBRE:  May the record reflect that the witness

3    has identified the defendant?

4              THE COURT:  Yes.

5    Q.  Where did you arrest the defendant in December of 2016?

6    A.  At his residence.

7    Q.  And where is that?

8    A.  It's on East End Avenue close to Gracie Mansion.

9    Q.  Is that an apartment building or a house?

10   A.  It's an apartment building.

11   Q.  Describe the events of the arrest of the defendant, as you

12   recall them.

13   A.  Sure.  A smaller subset of a larger team of us went up in

14   the elevator to Mr. Thiam's floor.  We then approached the

15   door, somebody knocked on the door, Mr. Thiam answered the

16   door, and the team went inside.

17   Q.  Did that include you as well?

18   A.  Yes, it did.

19   Q.  What happened inside the apartment that you were able to

20   observe once you went inside?

21   A.  There were individuals that walked, obviously, in different

22   directions because we have to ensure the safety of the team

23   that's coming in.  I believe one or two people continued

24   walking with Mr. Thiam, and that was pretty limited at that

25   point.  That was it.

1    Q.  Was there also the execution of a search warrant scheduled

2    in the defendant's apartment that day?

3    A.  Yes, there was.

4    Q.  Inside the defendant's apartment, what did you do, or what

5    was your role?

6    A.  My role was very limited that day.  I spent most of my time

7    there assisting Mr. Thiam's daughters and family because the

8    girls had to get to school.

9    Q.  Did you have any conversation with the defendant, from the

10   time you entered the apartment until you subsequently left the

11   apartment, regarding the facts of the case?

12   A.  No, I did not.

13   Q.  Did you observe any of the other agents have any

14   conversation with the defendant during that time in the

15   apartment regarding the case or the allegations?

16   A.  No, I did not.

17   Q.  Did you yourself, or did you observe any other agents

18   having conversations with the defendant regarding the execution

19   of the search warrant?

20   A.  Yes.

21   Q.  Can you describe what occurred?

22   A.  At one point, there was some difficulty with Mr. Thiam

23   opening up his safe in his bedroom area.  At some point, I went

24   back there to see what was going on and see if there was any

25   way I could assist or help get the safe open.

H4AKTHIH                         Gander - Direct

1   Q.  What occurred?

2   A.  I think it was a really brief conversation as to kind of

3   what's going on and what is the difficulty to see if there's

4   any way I could help.

5   Q.  Did there come a time that you left the apartment?

6   A.  Yes.

7   Q.  And describe who you left with.

8   A.  Sure.  From what I recall, it was myself, Mr. Thiam,

9   Special Agent Martinez, and I believe one other agent exited as

10  well.

11  Q.  Where did you go?

12  A.  We went down to the lobby area, but instead of going out

13  the front door, we went to an entrance -- or an exit on the

14  north side of the building.

15  Q.  Once you got to that exit, where did you go then?

16  A.  We awaited the vehicle that we were going to transport

17  Mr. Thiam down to our office.  Once that was brought up from

18  the garage underneath the building, I then entered the vehicle

19  and assisted with putting Mr. Thiam inside the vehicle with

20  Special Agent Martinez.

21  Q.  Who else got inside the vehicle?  Just describe all the

22  people who got inside.

23  A.  Sure.  That would be myself, Special Agent Martinez, and

24  Mr. Thiam.

25  Q.  Where was everyone seated?

H4AKTHIH                          Gander - Direct

1  A.  I was seated in the driver's seat, as I was driving,

2  Special Agent Martinez was seated behind me, and Mr. Thiam was

3  seated next to Special Agent Martinez.

4  Q.  Where was your intended destination?

5  A.  26 Federal Plaza.

6  Q.  FBI headquarters?

7  A.  That's correct.

8  Q.  Before we get into what happened inside the car ride, do

9  you recall, roughly, how long the trip took?

10  A.  I couldn't tell you timewise, minuteswise, but I don't

11  recall it being all that long, as we were not that far from the

12  office.  I don't believe it was all that long.

13  Q.  Do you recall anything about what traffic was like that

14  morning?

15  A.  Traffic was nothing memorable, so it was neither light, nor

16  super heavy, but I do recall there being some level of traffic.

17  Q.  Once you got underway, did you hear Special Agent Martinez

18  talking to the defendant?

19  A.  Yes, I did.

20  Q.  Please describe what you heard.

21  A.  Sure.  In sum and substance, what I recall, Special Agent

22  Martinez was pitching the defendant.

23  Q.  What do you mean by "pitching"?

24  A.  He was seeking his cooperation.

25  Q.  Is there anything specifically that you recall about what

1    he said?

2    A.  I do recall that he initially started off with saying that

3    he had been waiting for some time for this day.

4    Q.  Anything else?

5    A.  I do not.

6    Q.  Do you recall if the defendant said anything in response to

7    this pitch?

8    A.  I do not recall.  I recall the defendant being relatively

9    silent for most of it.

10   Q.  Would you describe it as a one-sided conversation by Agent

11   Martinez?

12   A.  For the most part, yes.

13   Q.  To your recollection, did Agent Martinez ask the defendant

14   any substantive questions about the case or about the

15   allegations?

16   A.  Not that I recall.

17   Q.  From your observations or from what you were able to hear

18   from the driver's seat, did Special Agent Martinez say anything

19   to the defendant during this pitch that asked for or suggested

20   there should be a response?

21   A.  Not that I can recall.

22   Q.  Did you say anything to the defendant during the car ride

23   or ask the defendant any questions during the car ride?

24   A.  I believe I may have said something.

25   Q.  Do you remember what it is?

H4AKTHIH

1   A.   I don't recall.

2   Q.   Was it something regarding the substance of the case or the

3   allegations?

4   A.   No.

5   Q.   And I think I may have asked this, but just so we're clear,

6   do you recall whether, during the entirety of the car ride, the

7   defendant said anything?

8   A.   I do recall that he did say something or I believe he said

9   something at one point.   I can't recall what it was in regards

10  to.

11  Q.   What happened when you arrived at 26 Federal Plaza?

12  A.   I parked the vehicle, helped Special Agent Martinez take

13  Mr. Thiam out of the vehicle, and then I returned to the

14  vehicle and parked the vehicle on the street.

15  Q.   Did you have any further involvement with the defendant

16  that day after you dropped off Special Agent Martinez and the

17  defendant?

18  A.   No, I did not.

19         MR. KOBRE:  Nothing further, your Honor.

20         MR. GOLDSMITH:  I have no questions of this witness.

21         THE COURT:  You may step down.

22         THE WITNESS:  Thank you, your Honor.

23         (Witness excused)

24         THE COURT:  Does the government rest?

25         MR. KOBRE:  It does, your Honor.

1              THE COURT:  Mr. Goldsmith?

2              MR. GOLDSMITH:  We have no witnesses, your Honor.

3              THE COURT:  Thank you.

4              I'll hear summation argument.

5              Mr. Goldsmith.

6              MR. GOLDSMITH:  Thank you, your Honor.

7              The postarrest statement should be suppressed as being

8    involuntary under the standard that has been articulated, most

9    notably in McNeil versus Wisconsin, which is 501 U.S. 171, and

10   it has been followed up through United States versus Thompson,

11   which is 35 F.3d 100 in the Second Circuit, along with several

12   other cases that were included in my submissions.

13             The premise that those cases stand for is that when an

14   individual suspect invokes their right, that further

15   interrogation is null and void or is inadmissible even if those

16   subsequent assertions would otherwise pass a voluntariness

17   test.  As the Court has, no doubt, reviewed the transcripts of

18   this interview, we have that case here.  Mr. Thiam was

19   presented with, as both agents testified to this morning, a

20   pitch, a pitch to cooperate.  And as part of that pitch, it

21   consisted of their interrogation interweaved, and that pitch

22   continued throughout the morning in their interview.

23             If we look at Government Exhibit 3, which is the

24   transcript, at the minute mark 03:54 under Bates Number 38 --

25             THE COURT:  Okay.  Great.  Yes.

1          MR. GOLDSMITH:  -- Agent Martinez alludes to his

2     earlier or first attempted pitch in the transcript where he

3     says, "I spoke to you earlier."  On the following page, of 39,

4     at minute mark 4:48, they start to suggest the imposition of an

5     attorney -- I'm sorry, they notify the arrest and start to get

6     into the discussions regarding whether an attorney should be

7     brought in.

8          THE COURT:  Where are we?  I'm sorry.  I'm on page 39.

9          MR. GOLDSMITH:  39, at minute mark 4:48, he reiterates

10    the notice of arrest, and they start to commence their

11    conversation on the pages thereafter.

12          THE COURT:  Right.

13          MR. GOLDSMITH:  Page 43, at minute mark 9:54,

14    Mr. Thiam initially indicates "I'm willing to discuss."  It

15    says, "I have an attorney, and I don't feel comfortable going

16    too far without him being at least aware of my situation or

17    present, but as I've told you many times, I always seem to

18    volunteer to come in contact with the Justice Department."  So,

19    in that moment, Mr. Thiam has discussed his willingness and

20    openness to having further discussions, but I submit to the

21    Court, he's unequivocally informed the agents that he does not

22    wish to proceed without the presence of his counsel or, at the

23    very least, without discussing the nature of the interrogation

24    with his counsel.  That would be the triggering effect that we

25    see under the case law provided.

1           Over the several moments afterwards, Special Agent

2     Martinez continues to discuss with Mr. Thiam the prospect of

3     having those conversations.  That is the continuation of the

4     pitch that Special Agent Martinez testified about this morning.

5           On page 45, minute marker 11:13, followed by 11:27,

6     Mr. Thiam, in sum and substance, reiterates that he would

7     discuss, but if things got complicated, he would like his

8     lawyer present.  In response to that, Special Agent Martinez

9     simply states, "Okay.  Well, let's do this, then, let's have

10    you sign, sign this here," that being the waiver of rights that

11    Special Agent Martinez testified about earlier this morning,

12    Government Exhibit 1.

13          Again, this was after the triggering factor under case

14    law of Mr. Thiam stating that he would like his lawyer present

15    or, at the very least, to be aware to speak with the lawyer

16    about what was ensuing.  And after Mr. Thiam had reiterated to

17    Special Agent Martinez that while he had a willingness to be

18    open, he felt if things were getting complicated, he wanted his

19    attorney present.

20          THE COURT:  Okay.  Now, at page 38 -- again, we're

21    using Bates numbers -- I had understood that's where the

22    consent form was signed.

23          MR. GOLDSMITH:  Perhaps, your Honor.

24          THE COURT:  Okay.  At page 37, there's the advice of

25    rights read to him, "You have the right to remain silent,"

1    et cetera, and then at page 38, in the middle of the page, it

2    says, "Can you just sign right here?"  Do we have a disputed

3    issue of fact as to when the advice form was read and signed?

4             MR. GOLDSMITH:  I don't think it's an issue of whether

5    it was signed, but I think that from the reading, and certainly

6    from the questions the Court just posed, it does appear as

7    though Special Agent Martinez presented the Advice of Rights

8    Form around page 37, but, ultimately, again reiterated the need

9    for it to be signed later on, at page --

10            THE COURT:  45.

11            MR. GOLDSMITH:  -- 45, which was at that point --

12            THE COURT:  Okay.  So I hope the agent hasn't left.  I

13   didn't understand there was going to be a factual dispute about

14   this.

15            MR. KOBRE:  Your Honor, if I might?

16            THE COURT:  Mr. Kobre.

17            MR. KOBRE:  I don't believe there is a factual

18   dispute.  The government agrees that the -- and I think I

19   understand this to be what defense counsel is saying -- that

20   the form at -- the form was taken out and was initially -- and

21   I believe what occurs on the video, your Honor, is that the

22   form is placed in front -- another agent who's in the room

23   begins to place the form in front of the defendant, and at that

24   point, Special Agent -- it's withdrawn, essentially.  That's

25   Special Agent Martinez on page 38 at 3:49, "Oh, no, no, no,

H4AKTHIH                    Summation - Mr. Goldsmith

1   no," and so the form is not actually signed at that point, but

2   it's later re-presented to the defendant on page, I believe

3   it's 45.

4        THE COURT:  Okay.  Great.  So we don't have a factual

5   dispute that needs to be cleared up.

6        So, the signing took place -- the defendant's

7   signature was placed on the form at page Bates Number 45?

8        MR. KOBRE:  Correct.

9        THE COURT:  Thank you.

10        MR. GOLDSMITH:  Thank you.

11        So, your Honor, clearly, Mr. Thiam is a relatively

12   savvy and sophisticated man with a relatively strong

13   intelligence.  He's worked in banking fields in the past.  He's

14   well educated.  However, the circumstances prescribed over

15   those several minutes at the beginning of the interview, which

16   as we learned are now a couple of hours in his custody under

17   the agents, his relative intelligence is only one factor that

18   we looked at in deciding whether or not that waiver was

19   voluntary and intelligent at the time that he actually executed

20   it, despite what his words appear both in that recording and in

21   the transcript.  And the words are, essentially, that he wants

22   his attorney there, that he's willing to help, he's willing to

23   have further discussions, but he does wish to have his attorney

24   involved.  And that should be looked upon as a triggering

25   factor under the case law.

1    I think if we look further on into the transcripts of

2    the meeting or of the interview, on page 135, at minute mark

3    51:58, under what's labeled at the top "DVD 2," Mr. Thiam, in

4    fact, asks Special Agent Martinez whether you suggest I call my

5    lawyer now, keep talking.

6    So, in response thereto, Special Agent Martinez

7    carefully instructs Mr. Thiam that he cannot provide him

8    advice, and Mr. Thiam acquiesces and says he'd like to keep

9    talking, but as we look on page 136, he continues to discuss

10   and seems to vacillate, but reaffirmed his comfortability in

11   going forward.

12   Now, I'm not sure if there's a break in time -- I

13   don't believe there is -- between DVD 2 and DVD 3, because if

14   we look at page 138 of the transcript, Mr. Thiam is notified

15   that his attorney, Paul Summit, has contacted the government

16   and requested to speak.  They asked Mr. Thiam whether he wishes

17   to speak with Mr. Summit.  The ensuing discussion with Special

18   Agent Martinez on page 139 is where Special Agent Martinez,

19   very closely and carefully, deconstruct the relationship

20   between Mr. Thiam and Mr. Summit in that Special Agent Martinez

21   repeatedly requests of Mr. Thiam as to whether Mr. Summit, in

22   fact, represents him on this case, on this specific matter,

23   versus the Rio Tinto case, which is the civil racketeering case

24   for which Mr. Summit had already been representing Mr. Thiam

25   for quite some time and had official notices of appearance out.

1          This was the opportunity that the government took,

2     through Special Agent Martinez, to legitimize the previous

3     period of time that they had been questioning him.  It was the

4     initial instance where Mr. Thiam discussed the fact that he

5     wanted his attorney involved, but acquiesced.  There was a

6     lengthy period of interrogation, then at some point after

7     Mr. Thiam and Special Agent Martinez developed a disagreement

8     in their point of view over the actions that took place,

9     Mr. Thiam then questions whether or not his attorney should be

10    called.  In response to that, shortly after, Special Agent

11    Martinez informs Mr. Thiam that his attorney, Paul Summit, had

12    been contacting the government and asks again whether he should

13    be moving forward by means of whether this guy represents you

14    on this specific case or not.

15         So, within the scope of those two moments, the

16    beginning of the interrogation and when Special Agent Martinez

17    is asking for clarity on the representation, they are aware

18    that they should not have been questioning Mr. Thiam throughout

19    and are attempting to rehabilitate his waiver of his Miranda

20    rights fully to validate the entirety of the interrogation.

21         As moments further went on, even at page 142, Special

22    Agent Martinez again asked Mr. Thiam whether or not he wanted

23    to speak to Mr. Summit, and Mr. Thiam affirmed that he did not

24    and wanted to continue.  However, as I argued to the Court, a

25    look at the entirety of those transcripts, the entirety of that

1  meeting, and the entirety of that day, was precisely as Special

2  Agent Martinez put it, it was a pitch, and Special Agent

3  Martinez gave Mr. Thiam the same pitch psychologically that

4  we've all experienced in a car dealership or anywhere else

5  where it's like I want to do right by you, it's your decision,

6  but it's the classic of making the mark with that individual

7  or, in this case, the suspect feel as though they're in charge

8  of the conversation and feel as though they are the one in

9  power making the decision, but following up with a logic and

10  reasoning that will promote them to making the decision that

11  they wanted.  The entire morning was spent with Special Agent

12  Martinez giving Mr. Thiam the arguments, the logic, and the

13  reasoning that Special Agent Martinez wanted to have Mr. Thiam

14  refuse to bring his attorney in, waive his rights, and continue

15  that very lengthy interrogation toward the goals of what

16  Special Agent Martinez wanted, which was to engage Mr. Thiam

17  for further discussions towards cooperation.

18              And under the totality of those circumstances, I

19  believe that the case law will control, and that Mr. Thiam's

20  initial invocation of rights should be accepted by the Court,

21  and that the entirety of the interrogation --

22              THE COURT:  Should be rejected by the Court?

23              MR. GOLDSMITH:  Correct.

24              THE COURT:  You mean not accepted, rejected?

25              MR. GOLDSMITH:  Well, the Court should accept his

1   initial discussion as an invocation of the rights, and,

2   therefore, the entirety of the interrogation should be made

3   inadmissible by the Court.

4           THE COURT:  Thank you.

5           Just so I make sure I've captured your argument, it

6   essentially hinges on the passage at page 43 to 45, and you're

7   arguing that at that point, the defendant invoked his right to

8   counsel, and I should look at everything and the whole history

9   of what's been presented to me, but, in effect, you want me to

10  find that that's an effected invocation of the right to

11  counsel, and questioning should have stopped there?

12          MR. GOLDSMITH:  Correct.

13          THE COURT:  Great.  Thank you.

14          Mr. Kobre?

15          MR. KOBRE:  Yes, your Honor.

16          The government understands the defendant to be making

17  essentially three arguments.  I think two of them have already

18  been put to the side, but if I can briefly address them.

19          The first one was, I think, the purpose for the

20  Court's calling the hearing here today, which was the

21  defendant's allegation in his affidavit that he had been

22  questioned during the car ride where there was no video or

23  recording to capture the questioning that occurred.  The

24  government put on two agents, both of whom testified that no

25  such questioning occurred.  There was no custodial

H4AKTHIH                Summation - Mr. Kobre

1   interrogation during that period.  And I don't think that --

2   the government's view, and I think it's supported by the case

3   law, is that a pitch of the nature that was described, where it

4   was essentially a one-sided conversation explaining to the

5   defendant that the government was interested in their

6   cooperation, without any questioning, certainly that sort of

7   thing does not qualify as interrogation such that it would

8   violate Miranda.  So, that would be argument number one.

9          Turning to what actually occurred during the interview

10  as it was recorded in the video recording and the transcript, I

11  think it's very clear, your Honor, from the very pages that the

12  defense relies on, that the defendant, in fact, did waive his

13  Miranda warnings.  At page 43, in response to Agent Martinez's

14  statement if you're willing, in fact, to sit down and hash this

15  out today, his response is "I'm willing, but I don't feel

16  comfortable going too far without him."  The obvious

17  implication is that he's willing to sit down and begin talking.

18         It's the same sort of thing when you get to page 45,

19  where Special Agent Martinez -- essentially on the top, at

20  minute 10:57, Agent Martinez essentially offers him that if

21  he's comfortable talking about it or beginning to talk about it

22  without a lawyer present, and then if we get into territory

23  that, you know, you decide you want to stop, we can do it that

24  way, and the defendant's response is, "Okay, okay, we can give

25  it a try."  And then shortly thereafter, the defendant signs

1   the Miranda waiver, which, of course, includes the rights that

2   Special Agent Martinez had already read to him and which the

3   defendant indicated that he understood.

4          So, I think it's very clear that there was a very

5   clear waiver here.  But even to the extent that the defendant

6   may have expressed some limited uncertainty or concern, the

7   case law is quite clear, your Honor, and it's cited in our

8   brief at page 19, that -- and here I'm quoting from the

9   Medunjanin case at 752 F.3d 586 -- that a proper invocation of

10  the right to have an attorney present at questioning requires a

11  clear assertion of the right to counsel, and, in fact, citing a

12  Supreme Court case of Davis, that something of the nature of

13  "maybe I should talk to a lawyer" is not a request for counsel.

14  I don't think we get to even anything close to that here, quite

15  the opposite, the defendant expressly on the record agreed to

16  talk with counsel.

17         So, I think that waiver is sufficient to deny the

18  defendant's motion to suppress.

19         I would just add, because there was some discussion of

20  what happened with the attorneys and contacted the government,

21  that while under the case law -- and, again, those cases are

22  cited in our brief, they're that same Medunjanin case or Moran

23  versus Burbine, which is at 475 U.S. 412 -- an attorney cannot

24  invoke the right to counsel.  So, what was occurring outside of

25  the interrogation room is really not relevant to the question

H4AKTHIH

of suppression.  The reason why the government asked the agent to inquire of the defendant as to whether he was represented in this matter had nothing to do, in fact, with suppression or the Fifth Amendment, but, rather, it had to do with the Rules of Professional Responsibility and making sure the government was complying with its own obligations to not have contact with represented persons in the manner in which they were represented.  Even there, I think the government went well beyond sort of what was required in -- and this is reflected in the transcript at page 138 -- having the agent tell the defendant that they had been contacted by an attorney, giving the defendant the opportunity to contact the attorney himself to make a phone call with the attorney.  Those were refused, and the defendant made clear that Mr. Summit did not, in fact, represent him in this matter, had represented him in a prior matter, and that he had not yet involved Mr. Summit with this case at that point.

So, for all of those reasons, your Honor, based on the defendant's valid Miranda waiver, which was given orally and in writing, and based on the testimony of the witnesses here today, the defendant's motion should be denied.

THE COURT:  Thank you.

The defendant was arrested at his home or residence on December 13, 2016, pursuant to an arrest warrant.  At the time of the arrest, the agents were not only executing an arrest

1    warrant, but a search warrant for property in the apartment.

2    And the defendant and agents were in the apartment for roughly

3    45 minutes before the defendant was removed pursuant to the

4    arrest search warrant.

5         The defendant was then driven in a vehicle to FBI

6    headquarters.  That took roughly a half an hour or so.  And

7    then the defendant was processed at FBI headquarters, which

8    took roughly 45 minutes or so.

9         At that point, he was brought into an interview room

10   at FBI headquarters.  The principal agent responsible for the

11   interrogation was Agent Martinez.  He was one of two witnesses

12   at this hearing.  He is the agent who advised the defendant he

13   was under arrest, he was the agent who made the pitch for the

14   defendant's cooperation in the car, he was the agent who filled

15   out some of the processing form for use at FBI headquarters

16   when they arrived there, and he was the principal agent

17   responsible for the interrogation of the defendant, as

18   reflected in the DVD and transcript we have of the formal

19   interview.

20        During the time that the defendant was in the

21   apartment, he was not subject to custodial interrogation about

22   the substance of this case.  He was asked for his cooperation

23   in terms of identifying objects in the apartment that were the

24   subject of the search warrant.

25        During the car ride, he was not interrogated with

H4AKTHIH

respect to the subject matter of this case; however, the agent

took the opportunity to seek his cooperation, explaining that

the FBI was interested in his cooperation, and identifying the

fact that he would be taken to FBI headquarters and later to

court.

So, the only interrogation subject to Miranda and the

rules that follow Miranda took place on the record, videotaped

and transcribed, and the videotape and the transcript of that

videotape have been received in evidence.

At the very beginning of that process -- and you can

read this on the transcript, which was what I relied on -- at

Bates page 36, the agent moves almost immediately into advising

the defendant of his rights.  That is at page 37.  Each of the

Miranda rights is read to him.  The defendant answers "All

right."  And that advice of rights, including the right to stop

answering questions at any time, was given to him.

The agent then asked for the defendant's

cooperation -- well, I shouldn't say that.  The agent then

thanked the defendant for his cooperation that morning and

asked him to sign the waiver form.  As counsel have just

explained to me -- and, again, I haven't watched the DVD --

that signing of the form did not occur until a few minutes

later.  Instead, the agent then proceeded to continue the

pitch, asking the defendant for his cooperation, advising him

that he had been arrested for money laundering, and that it had

1    to do with the CIF deal, seeking his help with opening up some

2    cell phones, asking that the decision about cooperation be made

3    before news got around.  The defendant says -- and this is at

4    page 42 -- "You have to tell me what you want to know.  I was a

5    witness to many things."  He says at the top of page 43, "I

6    almost welcome this, fortunately, to get the record straight."

7    He adds that he considers himself law-abiding, and if there's

8    something illegal that he's been a witness to, he's happy to

9    discuss it.

10        Then at the bottom of 43 -- and this is the crux of

11   the motion, as it has survived this hearing -- the defendant

12   says, "I'm willing, but I'm -- I have an attorney, and I -- I

13   don't feel comfortable going too far without him being at least

14   aware of my situation or present, but I'm -- as I told you many

15   times, I always -- I seem to volunteer to come in contact with

16   Justice Department and say do you want to hear from me anytime,

17   so I have nothing to hide."  He continues, and then at the top

18   of page 45, the agent says, "But I need -- I need -- I would

19   need your consent that you would be comfortable talking about

20   that without a lawyer present, and then obviously if it got

21   into territory, or if you at any point in time, you wanted to

22   stop, we could do it that way."

23        And the defendant responds, "Okay, okay, we can give

24   it a try.  If there is something that I feel is -- is -- is

25   more complex than I should discuss for the sake of clarity

without my lawyer being present, we can call him in or I can

call him in and -- but we can -- we can start talking."  At

that point, the Miranda form is signed.

So, this hearing was brought on by a motion to

suppress.  There were different elements of the motion.  Some

of them didn't require live testimony here today, and one of

them did.  There was a passage in the motion to suppress that

asserted that there had been an interrogation in the car.

There was no interrogation in the car, and that allegation has

been largely abandoned -- it has been abandoned in the

defendant's summation argument.

There was an argument in the motion to suppress that

Sixth Amendment rights had been violated.  There is no

surviving argument about the Sixth Amendment here.

So, the crux of the defense motion comes down to the

passage that I have described in detail just now that appears

at pages 43 to 45.  And let me place on the record the

governing principles of law here.

Of course, the Fifth Amendment provides that no person

shall be compelled in any criminal case to be a witness against

himself.  And in Miranda, the Supreme Court held that the

prosecution may not use statements stemming from custodial

interrogation of the defendant unless the defendant has been

advised of his Fifth Amendment rights and voluntarily,

knowingly, and intelligently waived those rights.

H4AKTHIH

1         In order for the waiver to be knowing and intelligent,

2    prior to any questioning, a person must be warned that he has a

3    right to remain silent, that any statement he does make may be

4    used as evidence against him, and that he has a right to the

5    presence of an attorney.  This has been described most

6    recently, or at some detail, in the Second Circuit case.

7    Medunjanin, 752 F.3d 585:  "A suspect who knowingly and

8    voluntarily waives his right to counsel after having that right

9    explained to him has indicated his willingness to deal with the

10   police unassisted by counsel."  Ibid., at 586.

11        In order to conclude that there has been a waiver, I

12   must find by a preponderance of the evidence that the

13   relinquishment of the right was voluntary in the sense that it

14   was a product of a free and deliberate choice rather than

15   intimidation, coercion, or deception, and, second, that it was

16   made with the requisite level of comprehension; that is, a full

17   awareness of both the nature of the right being abandoned and

18   the consequences of the decision to abandon it.  Ibid.

19        "In determining whether or not the relinquishment of

20   the right was voluntary, knowing, and intelligent, I must, of

21   course, consider the totality of the circumstances surrounding

22   the interrogation."  Three factors are important in that

23   analysis:  The characteristics of the accused, the conditions

24   of the interrogation, the conduct of law enforcement officials.

25   The relevant characteristics of the individual are his

H4AKTHIH

experience and background, his youth or lack of education and

intelligence.  Green versus Scully, 850 F.2d at 901 to 902.

        Of course, here, we have an adult, a sophisticated

businessman, with admittedly high intelligence and a sufficient

education, that there is no suggestion that the characteristics

of the accused made him vulnerable in a way that is relevant to

a determination of voluntariness.

        The conditions under which a suspect is questioned

includes the place where the interrogation is held and the

length of detention."  There is no developed argument here that

the conditions of interrogation were coercive or resulted in a

less than voluntary statement by the defendant.

        Turning to the law enforcement officers' conduct,

factors that bear on that include the repeated and prolonged

nature of questioning or the failure to inform the accused of

his constitutional rights, whether there was physical

mistreatment, such as beatings or long restraint in handcuffs,

whether other physical deprivations occurred, such as depriving

an accused of food, water, or sleep, or even of clothing for a

prolonged period, and also includes psychologically coercive

techniques, such as brainwashing, or promises of leniency, or

other benefits."  Green 850 F.2d at 902.

        Vague promises of leniency for cooperation, however,

do not warrant a finding of coercion.  Corbett, C-O-R-B-E-T-T,

750 F.3d 253.

1          So, there's nothing here in the conditions of

2     interrogation or the conduct of the law enforcement which would

3     suggest that, from an analysis of the totality of the

4     circumstances, the relinquishment of rights was less than

5     voluntary, knowing, and intelligent.  There is no suggestion

6     that there was any physical mistreatment.  The length of the

7     interrogation was not prolonged in the circumstances.  It was a

8     matter of hours after the initial arrest, in the morning hours,

9     that the interrogation began.  During that time, the defendant

10    was permitted to get dressed, to leave the apartment

11    appropriately, assisted in the execution of the search warrant,

12    was driven to headquarters, and processed.

13          Now, let's turn to what is really the heart of this:

14    Was the defendant's invocation of a right to counsel, as

15    reflected on the pages, particularly at pages 43 to 45,

16    sufficient to stop further questioning of him.  To invoke the

17    right to counsel, a defendant must make a clear assertion of

18    that right.  Medunjanin, 752 F.3d at 586.  He must make a

19    clear, unambiguous affirmative action or statement.  Oehne 698

20    F.3d at 123.  He must, at a minimum, make a statement, some

21    statement that can reasonably be construed to be an expression

22    of a desire for the assistance of an attorney in dealing with a

23    custodial interrogation.  Ibid at 122 to 23.

24          Where the subject makes an ambiguous or equivocal

25    reference to an attorney, and his statement fails to meet the

1    requisite level of clarity, the officers are not required to

2    stop questioning the suspect or ask for clarification.

3    Medunjanin -- I'm sorry for slaughtering that name, I'm doing

4    my best here -- 752 F.3d at 587.

5          In Oehne, the Second Circuit rejected the defendant's

6    argument that he had invoked his right to counsel because he

7    informed law enforcement officers that he had an attorney in

8    another case.  698 F.3d at 123.  In other cases, statements

9    such as "Maybe I should talk to a lawyer," "do you think I need

10   a lawyer," or a suspect's statement that he was going to get a

11   lawyer" have also been found to be insufficient to constitute

12   an unambiguous request for counsel.  Oehne 698 F.3d at 123.

13   (Collecting cases).

14         And, of course, as counsel recognize, neither an

15   attorney, nor any third party may invoke a suspect's right to

16   counsel.  Medunjanin 752 F.3d at 587.  The Fifth Amendment

17   right to counsel is personal to the individual questioned and

18   must be affirmatively invoked by that suspect.  Ibid.  Nor is

19   an otherwise valid Miranda waiver undermined because the

20   suspect is not informed of an attorney's efforts to reach him.

21   Moran 475 U.S. at 422.  Of course, here, he was informed.

22         And, again, the Sixth Amendment right to assistance of

23   counsel is limited by its terms.  It does not attach until a

24   prosecution is mentioned.  United States against Reed, 756 F.3d

25   at 187.  And that does not commence when a defendant is

H4AKTHIH

1    arrested on a complaint prior to indictment.  United States

2    against Moore, 670 F.3d at 234.  And as counsel recognize, it's

3    offense-specific.  And that's also in the Moore case, at page

4    235.

5            There is no showing here that Mr. Summit was

6    representing the defendant with respect to the issues under

7    investigation during the interrogation, and, indeed, the

8    defendant, during the interrogation and on the videotape,

9    denied that Mr. Summit was representing him in connection with

10   this matter.

11           So, that brings us again to the remaining issue of

12   whether or not, in the passages that occur at page 43 to 45,

13   the defendant, having been advised of his Miranda rights and

14   showing an understanding of those rights, invoked the right to

15   counsel, such that all questioning should have ceased.  I do

16   not find a clear and unambiguous invocation of rights to

17   counsel at that passage or those pages.  The defendant,

18   exhibiting a clear understanding that he had a right to refuse

19   to answer questions without a lawyer being present, made a

20   decision to continue with the interrogation, knowing that at

21   any time, he could stop the interrogation and seek to have

22   counsel present.

23           I've read, I believe, all the pertinent passages in

24   the four documents which reflect the entirety of the videotaped

25   interrogation, and the issue of a knowing and voluntary waiver

H4AKTHIH

is, if anything, reinforced by examining later portions of the
interrogation.  They include page 135, where the defendant
indicates that he wants to keep talking.  He asked the agents
whether they suggest he should call his lawyer right now, and
the agents respond, "That's up to you," and the defendant says,
"No, let's keep talking."

        And starting at page 138, there's the discussion of
Mr. Summit having called the prosecutors.  The defendant
indicates he hadn't involved Mr. Summit at all in these
matters, but if he were to ask for a lawyer, "he would be my
lawyer," but he's not his lawyer yet.  And, again, at 141, the
agents ask him if he would like to call, make a call, and the
defendant says, "No, I'm happy to keep talking for a while.
I'll engage him later."  The agent clarifies on 142, "You don't
want to talk to Paul right now," referring to Paul Summit, and
the defendant says, "No, no.  I mean, let's talk and then see
where it leads."

        And then at page 225, it appears that the defendant
has placed a call to his attorney, and he informs his lawyer,
"I was aware that you called, and I told them I'm happy to
continue talking.  It was just a conversation."

        So, I think my reading of the passage that appears
at -- passages that appear at 43 to 45 is, if anything,
reinforced by what follows, but, standing on its own, I don't
find a clear and unambiguous invocation of the right to

H4AKTHIH

1    counsel, I find a knowing and voluntary waiver of the right to

2    counsel, and I deny the motion to suppress.

3              So, counsel, I appreciate your cooperation this

4    morning.  We'll be meeting at the final pretrial conference

5    next week.  I rely on counsel to try to narrow the issues in

6    dispute for me that might be presented in defense submissions

7    later this day, and I'll see you next week at the final

8    pretrial conference.

9              Thank you, all.

10                               * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25