H4l1thic

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        17 Cr. 47 (DC)

MAHMOUD THIAM,

             Defendant.            Final Pretrial
                                      Conference

------------------------------x

                                  New York, N.Y.
                                  April 21, 2017
                                  9:36 a.m.

Before:

                      HON. DENISE COTE,

                                  District Judge

                        APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  ELISHA J. KOBRE
     CHRISTOPHER J. DiMASE
     Assistant United States Attorney

U.S. DEPARTMENT OF JUSTICE
BY:  LORINDA I. LARYEA

LAW OFFICE OF AARON GOLDSMITH, PC
     Attorneys for Defendant
BY:  AARON M. GOLDSMITH, ESQ.

ALSO PRESENT:  KATHERINE BOSLEY, Paralegal Specialist, DOJ
                PATRICK KILLEEN, Special Agent, FBI

H4l1thic

1          (Case called)

2          THE DEPUTY CLERK:  Is the government ready to proceed?

3          MR. KOBRE:  Yes.  Good morning, your Honor.  Elisha

4     Kobre Lorinda Laryea, and Christopher DiMase for the

5     government.  With us at counsel table is Special Agent Patrick

6     Killeen of the FBI and Katherine Bosley, paralegal specialist

7     with the Department of Justice.

8          THE DEPUTY CLERK:  For the defendant Thiam, are you

9     ready to proceed?

10          MR. GOLDSMITH:  Ready, your Honor.  Aaron Goldsmith on

11     behalf of Mr. Thiam, who's present in court this morning.

12          THE COURT:  Welcome, everyone.

13          This is our final pretrial conference.  I understood

14     that the defendant might be delayed because of arrival from the

15     facility, but thankfully that did not happen, so we're able to

16     proceed pretty much on time.

17          As I said, this is our final pretrial conference

18     before Monday's trial, and I've just received defendant's

19     motion to take testimony by videoconference.  That's an

20     April 20th submission that came in sometime last night, I

21     guess.  And similarly, an April 20th submission from the

22     government that came in I guess sometime last night.  And we'll

23     get to those.

24          Let's march through the other issues that are on our

25     schedule for this final pretrial conference, and those include

H4l1thic

rulings on the motions *in limine* that were made by the

government.

Let me begin with just some housekeeping issues before

I get to the motions *in limine*.  I know the charging instrument

here, the indictment, seeks forfeiture.  Are counsel expecting

that to be submitted to the jury, or will that be an issue for

the Court, depending on the jury's resolution of guilt on the

two counts?

MR. KOBRE:  Your Honor, from the government's

perspective, it will be an issue for the Court at sentencing.

THE COURT:  And Mr. Goldsmith, do you agree?

MR. GOLDSMITH:  Yes, that was my expectation.

THE COURT:  Thank you so much.

Let's talk about the schedule.  We begin Monday.

We'll start at 9:30 in the morning, hopefully get a venire

sometime after 10, and do jury selection, opening statements,

testimony, and sit until 5:00.  Each day thereafter, we'll

begin at 9:00 with counsel and the defendant, giving us about a

half an hour to resolve any outstanding evidentiary or legal

issues.  Testimony will begin promptly at 9:30, and again,

we'll go until 5:00.  We'll take a lunch break each day from

roughly 12:45 to 2, midmorning and midafternoon recess at a

time that's not disruptive and hopefully meets everyone's needs

and desires.

So you are required to have all your witnesses

H4l1thic

1   available and prepared so we sit a full trial day.  If you

2   don't, you're deemed to have rested and we move on to the next

3   phase of the case.  For the government, that would be moving on

4   to the defense case; for the defendant, that would be moving on

5   to any rebuttal case or summations.

6          So in order to help us meet this schedule, I want to

7   advise you as well that generally there are no sidebars.

8   You're expected to discuss with each other well in advance of

9   the issue arising any evidentiary disputes that might, if they

10  are not resolved, require argument, oral argument to the Court,

11  and that's why we meet about a half an hour before testimony

12  begins, and I'm happy to stay at the end of the day, if that's

13  necessary, too.

14         So I know you've made motions *in limine*, and I've

15  gotten these letters from you last night which are very much in

16  the spirit of trying to frontload any legal issues that need

17  discussion with the Court, and I appreciate that.

18         What is the government's current estimate of the

19  length of the trial?

20         MR. KOBRE:  Your Honor, the government expects that it

21  will get its case in within the first three to four days, so we

22  believe that by Wednesday or Thursday -- it's hard to say

23  exactly which -- the government will have completed its

24  witnesses.

25         THE COURT:  Okay.  So I'm going to tell the jury that

H4l1thic

|    |    |
|----|----|
| 1  | this case is expected to take a little over a week and tell |
| 2  | them that it's our present expectation that it would take no |
| 3  | longer than two weeks.  I think that gives us the flexibility |
| 4  | we need.  Mr. Kobre, does that sound about right to you? |
| 5  | MR. KOBRE:  It does, your Honor. |
| 6  | THE COURT:  Mr. Goldsmith, does that sound about right |
| 7  | to you? |
| 8  | MR. GOLDSMITH:  Sounds about right. |
| 9  | THE COURT:  Thank you. |
| 10 | Last time we were together, I know the parties were |
| 11 | going to try to work on resolving any issues regarding |
| 12 | translations.  I know you resolved that with respect to the |
| 13 | government's expert on Guinean law, and I've relied on that |
| 14 | expert's statement of Guinean law provided to me in the |
| 15 | government's submissions to craft a jury charge on the contents |
| 16 | of Guinean law.  Are there any other disputes on translations |
| 17 | that we need to address? |
| 18 | MR. KOBRE:  Your Honor, could I just have one moment, |
| 19 | please. |
| 20 | Your Honor, the government received a number of |
| 21 | translations and produced them to the defense just last night. |
| 22 | I've had conversations with defense counsel.  We don't |
| 23 | anticipate that there will be any disputes over those, and we |
| 24 | will attempt to resolve any of them, but we don't believe this |
| 25 | is a case in which something turns on a subtlety in the |

H4l1thic

translation such that these matters would be disputed, and I

believe, in my conversations with defense counsel, that that's

agreed upon.

        THE COURT:  Mr. Goldsmith?

        MR. GOLDSMITH:  Yes, I think that we would continue in

the spirit that we have been, which is generally trying to work

it out amongst ourselves.  We'll flag something for the Court

if there's a dispute.  As Mr. Kobre just said, we got a bunch

last night that my people have to look at.  But I don't

anticipate there will be any contest about the translation, but

if one does come up, we'll certainly flag it for the Court.

        THE COURT:  Thank you so much.  I appreciate that

attitude and cooperation by all counsel in this case, and so

I'm going to expect that if there are any disputes on

translation about documents that either the government or the

defendant seeks to offer in its case in chief, that those

disputes will be brought to my attention at our Monday 9:30

conference.

        MR. KOBRE:  Yes, your Honor.

        THE COURT:  Thank you.

        Let's turn to the motions.

        Oh, I guess some other just housekeeping issues.  I

don't have counsel stand for the jury when they enter or leave

the courtroom, and you don't need to ask the Court's permission

to approach a witness to show them a document.  Just identify

H411thic

1    the document on the record as you are walking to the witness

2    and leave the document with them and then return to your

3    station to question the witness on the document.  Good.  So the

4    record will just be clear that you're showing the witness

5    Defense Exhibit C or Government Exhibit 4, and then you can

6    return and continue with your questioning.

7            Let's turn to the government's motions *in limine*.

8            MR. GOLDSMITH:  Your Honor, I'm sorry to interrupt --

9            THE COURT:  Mr. Goldsmith.

10           MR. GOLDSMITH:  -- but I wanted to bring up, obviously

11   the Court had addressed scheduling and the Court had also

12   addressed my letter from yesterday, which I notified the Court

13   that my written invitation to certain foreign witnesses was

14   based upon the government's earlier estimations of its case,

15   that at least one witness may not be available until next week.

16   The Court responded that defense witnesses should be prepared

17   for Thursday, based upon the government's current estimation,

18   and I just wanted to note an exception for the record.  These

19   are extraordinary circumstances for these witnesses coming from

20   very far lands and they did have specific requirements for my

21   request to have them come over by visa, which presented

22   problems which is not typical for our court to have to address.

23   So I just wanted to note that for the record.

24           THE COURT:  First of all, there aren't exceptions in

25   federal court.  If you have an objection, make an objection,

H4l1thic

1    and I'll give you an opportunity to be heard.

2           I don't understand the basis for any objection with

3    respect to my endorsement, but I'm going to give you an

4    opportunity to be heard when we address your second submission

5    of April 20th about the motion to take testimony by

6    videoconference.  Why don't we address all those issues

7    together.

8           MR. GOLDSMITH:  Very good.

9           THE COURT:  Thank you.

10          So turning to the motions *in limine*, the government

11   made six separate motions *in limine*.  There is consent on four

12   of them and certain disagreements or opposition with respect to

13   two of them.  So I'm going to list those on which I understand

14   there is consent.  And they are: the motion to instruct the

15   jury on Guinean antibribery law, as indicated in the

16   government's motion *in limine*; the motion to admit foreign

17   business records from Hong Kong pursuant to Section 3505; the

18   motion to admit records from two banks, HSBC and JPMorgan

19   Chase, as business records pursuant to 803(6); and lastly, the

20   motion to preclude defense from making arguments or presenting

21   evidence concerning the statute of limitations.  So those

22   motions then are granted on consent.

23          We have two motions that I'm prepared to discuss with

24   counsel and rule on, but I want to make sure that you had a

25   chance to add anything that you'd like to your written

H4l1thic

submissions.

The first motion that there is disagreement on is the motion to preclude defense counsel from offering certain evidence and testimony regarding a document called the shareholders agreement, and the defense, as I understand it, wants to offer evidence at trial on the impact and beneficial effect of the mining contract that was issued to a Chinese entity on behalf of Republic of Guinea, and I think it brings us to an interesting legal issue about the jury charge and whether or not a motive to accept a bribe because one has an internal belief that it will ultimately benefit your country is relevant or a defense, and so that's one level, and I'm prepared to give you some legal guidance with respect to what I understand the law to be on that issue.

There is a second issue, and that is, I don't precisely know what documents or testimony is implicated by the defense's opposition.  I can imagine, theoretically, a situation which, if the defendant took the stand, there would be broader scope for his testimony before the jury about what was in his mind and what motivated him.  So I think what I'd like to do is put that aside for the moment and give you guidance, give you an opportunity to be heard and then guidance, reserving the right to address these issues anew, if necessary, if the defendant decides to take the stand at trial.

And let me ask Mr. Goldsmith, just in terms of the

H4l1thic

```
 1    procedure, would that be helpful to just separate out the

 2    conversation for the moment as it might implicate the

 3    defendant's choice to take the stand?

 4              MR. GOLDSMITH:  Yes, your Honor.

 5              THE COURT:  Okay.  Good.

 6              MR. DiMASE:  Your Honor?

 7              THE COURT:  Yes.

 8              MR. DiMASE:  In terms of addressing the issue, I do

 9    think it makes sense to at least discuss the difference between

10    the defendant's subjective mind-set at the time of the

11    agreement and other evidence.  I think there is a separation

12    there, and there might be some agreement between the parties

13    about what might be appropriate were the defendant to testify.

14              THE COURT:  So, Mr. DiMase, you are agreeing with the

15    approach I'm taking --

16              MR. DiMASE:  Your Honor --

17              THE COURT:  -- to separate out --

18              MR. DiMASE:  To separate it out.

19              THE COURT:  -- the discussion of the defendant's

20    testimony and the scope of that testimony from what we're now

21    going to discuss.

22              MR. DiMASE:  I think that's fine, your Honor.  I would

23    like to add something about our view, if the defendant

24    testifies as well, but we can certainly separate them out.

25              THE COURT:  Okay.  Good.  So reserving, again, the
```

H4l1thic

1    issue of what the scope of proper testimony might be if it

2    comes from the defendant on the stand, putting that aside, does

3    anyone wish to be heard with respect to this issue, the

4    government's second motion *in limine* as it applies to other

5    evidence?

6            MR. DiMASE:  Briefly, your Honor, but would you like

7    to hear from the government first or from Mr. Goldsmith first?

8            THE COURT:  I don't think you put in a reply, which I

9    didn't invite reply, so that's not a criticism, but I just

10   think the ball is in your court, because you've heard now from

11   Mr. Goldsmith, so you get a chance to respond, and then of

12   course I'll give him a chance to be heard.

13           MR. DiMASE:  Very good, your Honor.  First, I just

14   want to make clear, the shareholders agreement, as the Court is

15   probably now aware from the submissions, is the ultimate

16   agreement that was negotiated between Guinea and the Chinese

17   conglomerate.  There were a series of other agreements leading

18   up to it, the memorandum of understanding, and then two,

19   quote-unquote, master agreements, and so I think to be clear,

20   what we're discussing is not just the shareholder agreement,

21   it's sort of all of the agreements together and their benefit,

22   or not, to the country of Guinea.  So just to make clear what

23   we're discussing.

24           Your Honor, I don't want to belabor the points that we

25   already made in our motion *in limine*.  I do think there is a

H4l1thic

difference between the subjective belief of the defendant at

the time of the agreement and his negotiation, which we'll get

to in a moment, and the defense counsel's, I would imagine,

interest in cross-examining government witnesses and putting on

his own witnesses to say one of two things: one, that they

subjectively believe that this agreement, and the series of

agreements, benefited Guinea or was in the best interest of

Guinea, particularly in hindsight, questioning them about

whether, looking back, this agreement was the right decision

for Guinea to make.  It's very clear under the case law, and

under the law of Guinea, as explained by Mr. Togba, that it

doesn't matter whether or not the decision or the acts that the

official took was fair or not.  I think that has a direct

corollary in US law to Section 201, the federal bribery

statute, which there's a lot of case law on the meaning of, on

this issue in particular, whether something is fair or not,

right or not, and the courts have made clear it doesn't matter

whether the act that the person took was something they would

have taken otherwise absent a bribe, whether it was an exercise

of appropriate discretion within their job description, or not.

The criminalization or the underlying policy issue that we're

trying to deal with here is substituting the judgment of an

unaffected public official, an unbiased public official, with

one who has received money to do something.  That is really the

core of the statute, and I think it applies with equal force to

H4l1thic

1    Guinean antibribery laws.  So it isn't about whether,

2    subjectively looking back, this agreement was good or bad for

3    Guinea.  I want to be clear.  I do think that the witnesses

4    that testify for the government will articulate their views at

5    the time of the agreement when the negotiations were taking

6    place about what benefits they foresaw coming from the

7    agreement, and in fact there will be testimony about Mr. Thiam

8    himself articulating to many other ministers the benefits of

9    this agreement, because he's promoting the agreement.  It is

10   the government's theory that he's doing that, at least in part,

11   because of the bribe money he received.  So it would be natural

12   to expect him to promote, articulate the benefits of the

13   agreement to other ministers in an effort to get that agreement

14   executed by the Guinean government.  But what I think is

15   problematic is questions about the subjective belief of the

16   government witnesses, and any defense witnesses that might be

17   called, about whether the agreement was in fact good for

18   Guinea, whether the result of the agreement benefited Guinea,

19   and also actual evidence of the fruits of the agreement.  It

20   does not appear to be relevant under the law as described in

21   Mr. Togba's affidavit and the corollary in US law under

22   Section 201 whether, for example, a train was built after the

23   agreement by the Chinese conglomerate.  There are some things

24   like that, actions that the Chinese company took following the

25   entry into the agreement, including a train being built,

H4l1thic

1  including the provision of buses to the country of Guinea, and

2  I think there were also some water treatment projects that were

3  worked on by the Chinese company.  I don't think it would be a

4  problem for witnesses or the defendant to testify about their

5  belief about what would happen when they were negotiating the

6  agreement, but as far as what did happen afterwards, it just

7  doesn't appear to be relevant under the standard, both in

8  Guinean law and in US law.

9       THE COURT:  So this is very helpful to me because I am

10  hearing a distinction being made that I think we should focus

11  on with care.

12       MR. DiMASE:  I agree.

13       THE COURT:  There is one thing about conversations, a

14  witness taking the stand and saying, assuming it's admissible

15  testimony, X said Y.  To me, there is a separate issue about

16  whether the witness should be asked about their own belief at

17  the time about benefits to Guinea.  And then there appears to

18  be a third issue about what actually did happen afterwards and

19  a fourth issue about a person's judgment in retrospect after

20  the fact.  Now as I understand it, the government is taking the

21  position that issues three and four, what happened after the

22  fact, and someone's current assessment of the benefits or lack

23  of benefits is irrelevant.  Am I understanding that correctly?

24       MR. DiMASE:  Yes, your Honor.

25       THE COURT:  But with respect to the first two issues,

H4l1thic

1    the government is taking the position that both are

2    admissible -- both the statements of who said what to whom with

3    respect to benefits but also the witness' belief at the time

4    about the benefits.  Is that relevant?

5              MR. DiMASE:  Give me one moment, your Honor.

6              Your Honor, I think, with respect to the second

7    category of evidence that you described, I think it would be

8    admissible testimony to the extent that it explains why they

9    decided to do what they did, i.e., in other words, why the

10   witness decided to enter into the agreement or sign the

11   agreement, and I think that has more to do with their

12   understanding of what the benefits would be under the agreement

13   rather than a broad subjective view about whether it would be

14   good for Guinea or not.  And it's a very fine distinction and

15   maybe a distinction without a difference.  But I think the key

16   point is, the witnesses are going to testify about their view

17   of the benefits of these agreements at the time they signed

18   into them to explain why they were willing to enter into the

19   agreement, and it's in part based on statements made by

20   Mr. Thiam and other people regarding the anticipated benefits

21   to the agreement.  So that testimony is going to be elicited.

22             THE COURT:  That's very helpful.  Very helpful,

23   Mr. DiMase.

24             So Mr. Goldsmith, you have heard from the government

25   that it will not object to evidence with respect to

1    conversations at the time of these events, the unfolding of

2    these events, regarding benefits, who said what to whom with

3    respect to perceived benefits that would inure to the Republic

4    of Guinea from entering into what we're calling the umbrella

5    shareholders agreement.  You've also heard that they will not

6    object to examination, during direct or cross-examination, of

7    witnesses with respect to their state of mind, at the time

8    these documents were executed or were being considered, about

9    the benefits.  But their objection is solely, as I understand

10   it, to what actually unfolded after, for Guinea, its experience

11   after the shareholders agreement was executed, what benefits

12   the country did or didn't derive from them; and secondly, what

13   a witness' current or subsequent evaluation was of the benefit

14   or lack of benefit from the shareholders agreement to Guinea.

15   So we have a lot of agreement now, I think, and I need to

16   understand whether there is disagreement with respect to the

17   latter two categories.

18            Mr. Goldsmith.

19            MR. GOLDSMITH:  Yes.  I thank the government for

20   clarifying its position this morning because, as the Court

21   mentioned, I think that does go to some of what my opposition

22   had argued.  In terms of, I guess we call it hearsay, I think

23   largely that comes in for state of mind for what those

24   witnesses were experiencing at the time; certainly what their

25   beliefs and understandings were as part of the negotiations.

H4l1thic

1    And I do agree that that's appropriate here in court.  So the

2    latter two aspects, I would agree that an opinion in retrospect

3    is not appropriate here.  However, I do still disagree on the

4    aspect of the actual events or the actual impact of the

5    agreement, for one reason and one reason only.  And more I

6    guess basic than I put in my papers, the jurors in this case

7    have heard three or four years of report after report of public

8    corruption cases where there is a stigma of deals being made to

9    individuals in the public, on behalf of public officials, that

10   are undeserved or that are obtuse or obese, and if the jury is

11   given what we thought, that this is going to benefit Guinea, we

12   thought that this was going to work out and we were told that

13   this was going to work out, but we leave off the denouement of

14   what actually happened as a result of the agreement, then we

15   open up the opportunity for the jurors to make speculative

16   inferences that somehow these are all empty lies, somehow the

17   Chinese conglomerate came in and didn't fulfill any of its

18   promises or gave very basic concessions to the country and

19   therefore bolsters the idea in their mind that a truly corrupt

20   deal was made without the benefit of actual evidence there to

21   support it.  So that is my concern.

22            THE COURT:  Thank you very much.

23            So let me give you my ruling and the basis for it, and

24   this is to guide your preparation for trial and the

25   examinations you conduct at trial, but if the trial, as it

H411thic

unfolds, gives you a belief that you should have a good ground

for revisiting these issues, feel free to discuss that with

each other.  If you reach agreement, great; if you don't, feel

free to raise it with me again.

So let's start with a description of what I think the

controlling legal principles are.  They're set forth, in the

first instance, in Rules 401, 402, and 403 of the Federal Rules

of Evidence.  Relevant evidence is evidence that has a tendency

to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than

it would be without the evidence.  And evidence that is not

relevant is inadmissible.  And of course, even if relevant,

evidence may be excluded if its probative value is

substantially outweighed by the categories of concern listed in

Rule 403.

Articles 192 and 194 of the Guinean Penal Code, like

United States bribery law, require only that the defendant

solicit or receive a thing of value in return for engaging in

an act or refraining from engaging in an act.  Under Guinean

law it is irrelevant whether the act in question was "fair...

or not."

United States bribery law is entirely consistent with

that approach.  It "makes it a crime for a public official...

directly or indirectly, corruptly to demand, seek, receive,

accept, or agree to receive or accept, anything of value in

H4l1thic

1    return for being influenced in the performance of an official

2    act," as the Supreme Court so recently described in the

3    *McDonnell* case, 136 S. Ct. 2365.  "[A] public official is not

4    required to actually make a decision or take an action on a

5    question, matter, cause, suit, proceeding or controversy; it is

6    enough that the official agreed to do so.  *Ibid*, 2370-71.

7           Under United States law, that the result of the bribed

8    official's action actually benefits the electorate does not

9    "insulate" a defendant from criminal liability.  *United States*

10   *v. Coyne*, 4 F.3d at 113.  Even if the receipt or tender of a

11   bribe was partially motivated by a valid purpose, the

12   participation in the act of bribery is criminal.  *Ibid*.  As

13   explained in *United States v. Biaggi*, "[a] valid purpose that

14   partially motivates a transaction does not insulate

15   participants in an unlawful transaction from criminal

16   liability."  909 F.2d at 683.  See also *City of Columbia,*

17   499 U.S. at 378, in which the Supreme Court noted that a mayor

18   in that case would be "guilty of accepting a bribe even if he

19   would or should have taken, in the public interest, the same

20   action for which the bribe was paid."  *United States v.*

21   *Orenuga*, 430 F.3d at 1165-66; and *United States v. Lopez-Lukis,*

22   102 F.3d at 1169 n. 13.

23          So I think the legal principles that apply here are

24   stable, well established under both Guinean law and American

25   law.  They're entirely consistent with each other, and they

H4l1thic

 1    give us the guidance that we need.

 2            So it is entirely irrelevant what the Chinese did or

 3    didn't do with respect to the shareholders agreement in terms

 4    of fulfilling any commitments that they made or giving any

 5    benefits to the Republic of Guinea.  If the jury finds beyond a

 6    reasonable doubt that a bribe was paid under Guinean law, it

 7    may take that information and apply it to the two crimes

 8    charged in the indictment and see whether the government's

 9    remaining requirements of proving guilt beyond a reasonable

10    doubt under those two statutes are met.  It would in fact be I

11    think highly prejudicial here to introduce into this trial and

12    try whether or not the Guinean people actually did benefit from

13    anything the Chinese did or didn't do after the agreement was

14    entered.  It would confuse the issues; it would mislead the

15    jury with respect to the legal standard; it is irrelevant.  And

16    therefore, based on the record before me now, and of course

17    without prejudice to counsel revisiting these issues if, as the

18    trial unfolds, they believe there is a basis to revisit them,

19    there will be no evidence received as to what the Chinese did

20    or didn't do following the execution of the shareholders

21    agreement that did or didn't benefit Guinea.  And there won't

22    be testimony with respect to any witness' views after the fact

23    as to whether or not actions that the Chinese took after the

24    alleged bribe payment did or didn't benefit Guinea.  And of

25    course, again, I return to the first issue.  This is all

H4l1thic

1    without reservation to revisiting these arguments if the

2    defendant takes the stand.  Very different standards may apply

3    in that context, and I will want to hear from both sides before

4    I give you guidance with respect to what the defendant may

5    testify to, should he take the stand.

6           So I think that gives you the ruling on the

7    government's second motion *in limine*.

8           Let's turn to the last motion *in limine* that I believe

9    the parties have not agreed upon, and that is the fourth motion

10   *in limine* in which the government identified statements --

11   these were in Exhibit D to its motion papers -- the statements

12   that it sought to offer as admissions by the defendant.  These

13   come from the FBI interview on the day of the defendant's

14   arrest and after he had been administered *Miranda* warnings.

15   And I've read all of the government's proposed sections that it

16   seeks to admit.  There is no argument, as I understand it, that

17   any of those sections aren't admissible.  The question is

18   whether the remainder of the interview should come in or not,

19   and very helpfully defense counsel, besides making that general

20   argument, also presented a letter to me outlining the specific

21   passages that the defendant believed were most worthy of

22   admission under the rule of completeness.  And let me just make

23   sure I have that document at hand.

24          So in the defendant's letter of April 16 -- this was a

25   two-page submission -- the defendant identified passages,

H4l1thic

1    beginning at page 46 and ending at page 185 to 186, that he

2    believed should be offered under the rule of completeness.

3            I'm prepared to rule on this.  I've gone through each

4    of these passages, but I want to make sure that if anybody

5    wanted to add anything to their submissions -- you know what,

6    why don't I do this.  Why don't I give you my ruling and then,

7    once you have that, give you an opportunity to be heard, okay?

8    So we're going to flip it.

9            First of all, let me give you the law as it applies to

10   this issue.

11           Of course a defendant's prior statement is admissible

12   under Rule 901(c), 801(d)(2), both as not hearsay because it's

13   a statement by a party opponent, and that's true even if it's a

14   false statement.  They are not offered for the truth, of

15   course.  And these principles are well established in the law.

16   I'll just read some Second Circuit citations.  *United States v.*

17   *Russo*, 302 F.3d at 43; *United States v. Marin*, 669 F.2d at 84.

18   And as the law recognizes, the defendant may not seek to

19   introduce his own prior statement for the truth of the matter

20   asserted.  It's hearsay and inadmissible.  *United States v.*

21   *Kadir,* 718 F.3d at 124.

22           There is an exception to all of these principles,

23   though, and that's set forth in Rule 106, and that's the rule

24   of completeness.  So if a party introduces all or part of a

25   writing or recorded statement, an adverse party may require the

H411thic

1    introduction at that time of any other part or any other

2    writing or recorded statement that, in fairness, ought to be

3    considered at the same time.  And as the Second Circuit

4    explained in *United States v. Johnson*, 507 F.3d 796,

5    application of this principle requires the Court to weigh

6    several factors.  Under this principle, even though a statement

7    may be hearsay, an omitted portion of a statement must be

8    placed in evidence if necessary to explain the admitted

9    portion, to place the admitted portion in context, to avoid

10   misleading the jury, or to ensure fair and impartial

11   understanding of the admitted portion.  The completeness

12   doctrine does not, however, require the admission of portions

13   of the statement that are neither explanatory of, nor relevant

14   to, the admitted passages.

15        And with that, let me rule first that the entire

16   statement is not coming into evidence, under the rule of

17   completeness.  And so let me turn my examination to the

18   individual passages.

19        There are three that the defendant has requested that

20   I'm going to grant or grant in part.  The others are denied.

21   So let me turn to the three that I'm going to grant.

22        Let's turn to page 57.  I'm referring to the Bates

23   numbers at the bottom of Exhibit D.  And on page 57, the

24   defendant requests admission of the following: the entirety of

25   the passage beginning at -- and these are time stamped, I

H4l1thic

1    think -- 20 minutes and 28 seconds on page 57, running to

2    page 58, 21 minutes and 48 seconds.  I'm denying that request

3    except for the following.  At the top of page 22, the

4    government seeks to offer the following statement:  "And the

5    president gave us instructions to proceed and try to

6    (inaudible) with him."  They offer nothing else with respect to

7    the highlighted portion -- that is, highlighted by the

8    defendant.  I'm going to allow the defendant to have received

9    before the jury at that same time the following phrase:  "If he

10   wanted to bring money to the country."  So it's the clause that

11   immediately follows the portion that the government seeks to

12   offer.

13         The next is page 64.  And I'm going to allow or grant

14   the defendant's request to admit the paragraph on page 64 that

15   begins at minute 28, 15 seconds, and begins with the phrase:

16   "Then there was another reason for four trips," down to the end

17   of that page, where he was just saying "Okay."

18         And then turning to page 185, the defendant seeks

19   admission of the remainder of page 185 and the first three

20   lines on the top of 186, and I grant that request as well.

21         So let's start with the government.  Do you want to

22   reargue any of the three passages I've ruled are admissible?

23         MR. KOBRE:  May I just have one moment, your Honor.

24         THE COURT:  Let's move on.  Let's move on.  I'll take

25   a brief recess later in the conference and then we'll return to

H4l1thic

1   this, and I'll give both the government and Mr. Goldsmith a

2   chance to revisit these rulings, but you can assume those are

3   my rulings unless you wish to revisit them.

4           The government's just handed up a memorandum in

5   opposition to the defendant's Rule 15 motion.  Mr. DiMase, has

6   this been filed on ECF?

7           MR. DiMASE:  Your Honor, we finished preparing it just

8   before the conference so we haven't had a chance to file it.

9   We will file it today.

10           THE COURT:  Good.  Thank you.

11           Okay.  So let's turn to the issues raised through the

12   submissions of April 20th.  And again, I just saw these

13   before I took the bench so I haven't had a chance to fully

14   incorporate these into my analysis of the legal issues that

15   might arise at the trial, but let's do our best and see if we

16   can make some progress.

17           Let's start with the government's April 20th motion,

18   or letter.  It has to do with two separate issues: whether

19   certain documents that they list, beginning with the memorandum

20   of understanding and ending with an executive power transfer

21   document, whether they should be received under Rule 803(8).

22   And Mr. Goldsmith, have you had a chance to reflect on that

23   issue?

24           MR. GOLDSMITH:  Yes, your Honor.  We discussed this

25   informally with the government yesterday and reviewed their

H4l1thic

1     letter last night.  We have no objection.

2             THE COURT:  Thank you.

3             And the second is concerning four agreements, and I

4     think this isn't necessary for us to go into because I think

5     it's then covered by the prior agreement of the parties

6     pursuant to Rule 803(8), but the government had made a separate

7     argument with respect to four of the documents in that longer

8     list and why they are admissible not as hearsay, but they're

9     coming in under the parties' agreement so that's taken care of.

10            Then I have the two submissions from defense counsel

11    of April 20th, the one that I said we'd return to -- that is,

12    the letter in which I understood the defendant to be asking me

13    for a precise date that could be entered in the visa

14    application as the date any defense witnesses must be present

15    to testify in this courtroom.  I gave the precise date of

16    April 27th, which is next Thursday, so that defense

17    witnesses, if they were available to testify next Thursday,

18    would be heard.  And then the motion made later in the day

19    yesterday, or at least I didn't receive it until this morning,

20    to take one witness' testimony by videoconference.  And that

21    witness is Momo Sakho.  He's described as an expert on Guinean

22    law and an expert on the Guinean mining industry.  Now I

23    understand from this submission that there is no dispute about

24    principles of Guinean law and so I understand from this

25    submission that the principal reason for his testimony is not

H4l1thic

```
 1    to testify or present evidence to me about Guinean law, because
 2    that's an issue of law for me, but instead to testify as an
 3    expert on the Guinean mining industry.  Do I understand that
 4    correctly?
 5              MR. GOLDSMITH:  That is correct, your Honor.
 6              THE COURT:  Thank you.  And did you make an expert
 7    disclosure for him?
 8              MR. GOLDSMITH:  Yes.  I provided the curriculum vitae
 9    to the government, I explained what we expect his testimony to
10    be, in more general terms, and I have provided, I think by
11    means of this motion, the arguments which I think support the
12    materiality of his testimony.  We've discussed this particular
13    witness on several occasions amongst the parties, and as I
14    included in the motion, really the only issue we have is
15    materiality.  So as I explained in the motion to the Court,
16    this is an individual who's worked in the mining sector, is
17    familiar with the mining sector, worked as a legal adviser to
18    the minister of mines for the Republic of Guinea, and worked as
19    an adviser to the president of the Republic of Guinea during
20    the relevant time and is going to be able to synthesize for the
21    jury the mining industry, the procedures that were in place,
22    and how they were procedures, protocols in Guinea at the time
23    when Mr. Thiam was acting as the minister.
24              THE COURT:  Procedures for what?
25              MR. GOLDSMITH:  For applying for the exploration
```

H4l1thic

1    rights, applying for the ultimate drilling rights, the

2    benefits -- I'm sorry, not the benefits, but the process that

3    was required for the mining, for the prospective mining

4    companies in order to obtain those rights, as it goes hand in

5    hand with the shareholder agreements and the other agreements

6    that are subject to this case.

7            THE COURT:  I don't have a written expert disclosure.

8    Did you --

9            MR. GOLDSMITH:  No, I did not provide a written

10   disclosure to that detail.

11           THE COURT:  Okay.  So why don't I take then, in as

12   much detail as you're able to give me, the expert disclosure.

13           MR. GOLDSMITH:  Sure.  Through his experience working

14   in the mining industry, he will discuss the necessary steps

15   that a mining company has to go through in order to receive the

16   exploration rights, who has the ability to give those

17   exploration rights, and how --

18           THE COURT:  Hold on one minute.

19           MR. GOLDSMITH:  Sure.

20           THE COURT:  Okay.

21           MR. GOLDSMITH:  -- and how those exploration rights

22   are granted.  He will also be able to describe, from the

23   perspective of the government of Guinea at the time, the

24   government's protocols and procedures as to how a mining

25   company would have applied for exploration rights.

H4l1thic

1     THE COURT:  How is that different from what you've

2  just said, the necessary steps?  Are these the necessary steps

3  from the government's point of view?

4     MR. GOLDSMITH:  Actually, for this particular witness,

5  both, because he's able to give the perspectives, both from a

6  private industry perspective as well as from his role as the

7  legal adviser of the minister of mines in 2009.

8     THE COURT:  So when you say then the necessary steps

9  for a mining company to get exploration rights, you're saying

10  from the perspective of the mining company and from the

11  perspective of the government.

12     MR. GOLDSMITH:  Correct.

13     THE COURT:  Thank you.

14     MR. GOLDSMITH:  He can also discuss within his role,

15  as the legal adviser, if there were any procedures that were

16  suspended or changed as a result of the current regime status

17  during that year.

18     THE COURT:  And what procedures were those?

19     MR. GOLDSMITH:  Essentially, as the Court will learn

20  more, is that a number of the procedures in place were

21  suspended temporarily during the relevant time by presidential

22  decree.  As the Court is already aware, there was a military

23  regime in power at the time.  It was seeking to influence a lot

24  of cash into a very cash-strapped nation.  And as a result,

25  that developed into a circumstance where the president was in

1  some instances calling the shots with his legal adviser, with

2  the advice, to a lesser degree, of the ministers in the

3  cabinet.  He can describe that process.

4          THE COURT:  And you're seeking to offer this all as

5  expert testimony.

6          MR. GOLDSMITH:  Correct.

7          THE COURT:  And when did you make this disclosure to

8  the government?

9          MR. GOLDSMITH:  We've been discussing the nature of

10  the witness for a couple of weeks.  Not only --

11          THE COURT:  Can you give me a date?

12          MR. GOLDSMITH:  Probably around April 10th or

13  11th.  I have not gone into all of this detail with them

14  because we've had some question mark as to whether he was even

15  going to be able to get here to be able to testify, which falls

16  in line with the videoconference.  If the Court may or may not

17  be aware, his visa was rejected pursuant to my request for him

18  to come over for the purposes of trial.  The justice

19  department, through the U.S. Attorney's Office here, made a

20  number of -- from my understanding, made a number of attempts

21  to see what, if any, influence they may have in trying to

22  secure his travels, and they were informed that they had no

23  authority or ability to influence that in any way.  He has

24  reapplied for his visa, but I have not heard from him in the

25  last three or four days as to whether or not that has been

H4l1thic

1    granted.  So that is really the only reason that's obviated the

2    need for the request.

3        THE COURT:  So have you told him that he must be here

4    on April 27th?

5        MR. GOLDSMITH:  I have not.  I initially, as of a

6    couple weeks ago, had put in my letter of invitation for the

7    week of May 2nd through 4th, which was in keeping with the

8    government's earlier estimates as to how long it was going to

9    take them to get through their case in chief.

10       THE COURT:  I didn't ever hear those estimates.  I

11   heard an estimate of a two-week trial.  So let's backtrack so I

12   can get some background here.  When did you make the request

13   for this witness to come here to testify?

14       MR. GOLDSMITH:  I believe the first request was on

15   April 7th or 8th.

16       THE COURT:  And then you notified the government on

17   April 10th or 11th.

18       MR. GOLDSMITH:  Yeah, it was the following week.

19       THE COURT:  And when you say you made a request for

20   him to come May 2nd or 3rd, what were you relying on in

21   making that?

22       MR. GOLDSMITH:  The government's estimate of a

23   two-week trial.  So in that thinking, knowing that the Court

24   would not sit on a Friday, unless juries were deliberating, I

25   assumed it would take a week for the government to get through

H4l1thic

1   its case in chief and then to have him as a prospective defense

2   witness come the following week.

3          THE COURT:  Okay.  So you did not ask the government

4   when it expected to rest.

5          MR. GOLDSMITH:  No.  Not at that time.  It was only

6   through our most recent conversations, and by that I mean the

7   last couple of days, that the government has informed me that

8   they expect to complete their case in chief roughly on

9   Thursday, which was the cause of the letter that I sent to the

10  Court last night.

11         THE COURT:  Okay.  And this letter that you sent

12  refers to witnesses attempting to travel to the United States,

13  and as I read the letter, you needed for them to have precise

14  dates to include in their visa applications, and I tried to

15  respond as quickly as I could, the very same day, giving you

16  that information, which would be next Thursday, the 27th.

17         MR. GOLDSMITH:  Right.

18         THE COURT:  Now what witnesses are you referring to in

19  the April 20th letter besides Mr. Sakho?

20         MR. GOLDSMITH:  There is also an individual named

21  Mohammed Aly Thiam, same spelling as the defendant although not

22  related, who also is a lawyer in Guinea and worked as an

23  adviser to the government at the time.

24         THE COURT:  And when did you first request him to

25  come?

H4l1thic

1        MR. GOLDSMITH:  Actually, my understanding as of

2   yesterday is that his visa application was approved.

3        THE COURT:  So he'll be here on Thursday.

4        MR. GOLDSMITH:  He will be here I believe the

5   following Monday, on the 1st.

6        THE COURT:  Okay.  He has to be here this Thursday,

7   counsel.

8        MR. GOLDSMITH:  I will do whatever I can to make that

9   happen.

10       THE COURT:  Okay.  Thank you.

11       So if the government rests Wednesday or Thursday, for

12  me to put this trial over until Monday morning at 9:30 for a

13  defense witness, I'm going to need a record of extraordinary

14  due diligence.

15       MR. GOLDSMITH:  Very well.

16       THE COURT:  And I will need every witness, including

17  the defendant, who plans to testify and is available to testify

18  Wednesday or Thursday to take the stand so that holding the

19  jury over until Monday morning to hear additional testimony

20  does not unnecessarily delay the trial.

21       So before I turn to the government, Mr. Goldsmith, is

22  there anything else you wanted to say to me about Mr. Sakho and

23  why his testimony should be taken by video teleconference?

24       MR. GOLDSMITH:  Well, as to the why, as I included in

25  my papers, I think his testimony is important for the jurors to

H4l1thic

1    understand, because this is a fairly novel and precise industry

2    that most people are not familiar with, that being the mining

3    industry and how organizations are able to get the rights to go

4    forward with a mine.

5         And in terms of the necessity for the videoconference,

6    in this particular case, he's in a position where he's in a

7    foreign country and he has, at least thus far, been denied the

8    opportunity to travel to the United States, and as I put in my

9    submission, the government agrees that he satisfies every other

10   prong of Rule 15(c) except, obviously, that they are contesting

11   the materiality aspect.

12        THE COURT:  And when did you give notice to the

13   government that you wished to take this deposition?

14        MR. GOLDSMITH:  We have been collaboratively speaking

15   over the last couple of weeks about whether he was getting the

16   visa on a reapplication, whether there was anything that the

17   justice department could do to help, and it was after the point

18   where it sort of became apparent to all of us as a group that

19   (A) justice couldn't do anything to help; and (B) I was unsure

20   as to what his status was in reapplying.  So it was the last

21   week that we discussed whether or not he satisfied the elements

22   of Rule 15, and to those ends, we were having those

23   conversations, and ultimately yesterday -- I'm sorry.  I had

24   informed the government earlier this week that I was intending

25   on filing a Rule 15 motion.  I wanted to get it done on

H4l1thic

1    Wednesday but was unable to so I had to file yesterday.

2              THE COURT:  So you gave notice to the government on,

3    what was it, Monday or Tuesday?

4              MR. GOLDSMITH:  Well, notice as to the circumstances

5    has been ongoing for the last couple of weeks.

6              THE COURT:  Right.  But notice that you decided to

7    take the deposition?

8              MR. GOLDSMITH:  Was I'd say probably Monday.

9              THE COURT:  Okay.  So that's the 17th.

10             So just to put this in context, on April 7th, you

11   requested the witness' presence for trial; on April 10th or

12   11th, you gave notice to the government that you had an

13   expert witness on the mining industry that you wished to call;

14   on April 17th, you gave notice to the government of a desire

15   to take the witness' deposition for use at trial in the event

16   the visa was not granted.

17             MR. GOLDSMITH:  Yes, your Honor.  Those are roughly

18   the dates.  I'm not sure if it's a day or two off, if the

19   government has a different or better recollection, but those

20   are the rough timelines.

21             THE COURT:  And you have not provided a written

22   disclosure of expert testimony but you have today given an oral

23   description which you believe to be its equivalent on the

24   record.

25             MR. GOLDSMITH:  Yes, your Honor.  That's a copy of the

H4l1thic

1    initial disclosure that I provided the government on

2    April 6th, which has Mr. Sakho's curriculum vitae, original

3    and translated form, which I had very briefly discussed those

4    two aspects.

5           THE COURT:  Okay.  I've been handed a document, an

6    April 6th letter from Mr. Goldsmith to the government.  Is this

7    what you filed on ECF?

8           MR. GOLDSMITH:  I will file it on ECF.  If the Court

9    recalls, you had placed an order so that we could not discuss

10   this particular witness or a couple of other potential

11   witnesses' identities because I feared some retaliation by the

12   local government.  That's sort of a mooted point at this point

13   as Mr. Sakho has been denied his opportunity to travel to the

14   United States seemingly through ends that are much different

15   than ours.  So I will file this retroactively.

16          THE COURT:  Thank you so much.

17          Okay.  So I haven't read the government's opposition

18   to the Rule 15 motion.  Just give me one second to briefly

19   glance at it.

20          Okay.  So I've briefly glanced at the government's

21   opposition.  I don't understand that the defendant is now

22   seeking to offer character evidence through Mr. Sakho.  Am I

23   correct, Mr. Goldsmith?

24          MR. GOLDSMITH:  Correct.

25          THE COURT:  Good.  So it's just the expert testimony

37

H4l1thic

1   we need to concern ourselves with.

2          The government indicates that you haven't made a

3   showing of this being material in the sense of being relevant

4   and exculpatory.  Do you want to add anything before I hear

5   from the government?

6          MR. GOLDSMITH:  No, your Honor.

7          THE COURT:  Okay.  So who's going to speak on behalf

8   of the government, if anyone?

9          MS. LARYEA:  Thank you, your Honor.

10          I'd like to begin, your Honor, with the expert

11   disclosure.  We handed you the letter from Mr. Goldsmith dated

12   April 16th that essentially --

13          THE COURT:  April?

14          MS. LARYEA:  April 6th -- I'm sorry -- that stated

15   that Mr. Sakho would testify regarding Guinea bribery laws in

16   effect during the relevant time period as well as the state of

17   the Guinean government while defendant Thiam held public office

18   and roles/responsibilities to the minister of mines.

19          As the Court knows, Rule 16 requires the defendant to

20   give the government a written summary of any testimony that

21   defendant intends to use under Rule 72, 73, or 75, and that

22   summary must describe the witness' opinions, the basis and

23   reasons for those opinions, and the witness' qualifications.

24   This letter on April 6th is inadequate and does not meet that

25   standard.  Today is the first time the government has heard

H4l1thic

1    this level of detail about the subject of Mr. Sakho's

2    testimony.  And moreover, during recent conversations with

3    defense counsel, the government was under the understanding

4    that since Mr. Sakho no longer will be testifying about the

5    Guinea bribery laws, the additional testimony that was being

6    proffered was being proffered as lay testimony and no longer as

7    expert testimony.  So that was the government's understanding

8    with respect to Mr. Sakho's testimony.

9         MR. GOLDSMITH:  I'll clarify, your Honor.  That is

10   correct.  That is a correct representation, that I informed

11   them last week that in light of our agreement as to the Guinean

12   bribery laws in effect, that he will not be used as an expert

13   on the aspects of laws, and therefore, it would be more of a

14   lay witness perspective from his roles.

15        THE COURT:  Well, this is a completely different,

16   then, analysis.  Obviously if this is lay testimony, then you

17   don't need to make an expert disclosure.  So that's one thing.

18   But if it's lay testimony, it would be coming in as someone who

19   participated in the underlying events in a way that would be

20   relevant and meaningful to the jury, and I don't hear that.  I

21   didn't hear that at all.  I heard a description orally from

22   defense counsel today about this person being called as an

23   expert, and setting aside a whole set of issues with respect to

24   whether that expert testimony was timely disclosed and

25   appropriate and not reaching those issues, now hearing that

H4l1thic

1     it's offered as lay testimony, I don't understand how it's

2     admissible at all.

3            So Mr. Goldsmith, let me return to you.  As lay

4     testimony, how is this admissible?  Was this witness,

5     Mr. Sakho -- please be seated, counsel.  Was this witness

6     involved in these transactions?  And if so, does he seek to

7     offer testimony about what he did in a way that is relevant to

8     the execution of the shareholders agreement or the

9     constellation of documents we're talking about?

10           MR. GOLDSMITH:  Yes, your Honor.  He was a legal

11    adviser to the minister of mines at the time, as well as the

12    adviser to the president at the time, so he can testify as to

13    what happened during the approval process for the exploration

14    rights and the negotiations and approval of the shareholder

15    agreement.

16           THE COURT:  Okay.  So this is a completely different

17    description of relevance than was made to me just a few minutes

18    ago.

19           Okay.  So I think there is a lack of meeting of the

20    minds here.  When we take our break, we'll give you all a

21    chance to reflect on this and I'll come back and give you

22    guidance.  If he's a lay witness, that's one thing; if he's an

23    expert witness, it's another.  I just have to know which rules

24    of evidence and principles of law I'd be applying here.  And to

25    the extent that there is a contention that any of this is

H4l1thic

1    exculpatory to the defendant, which I haven't heard that any of

2    it is, I want to make sure I hear that as well.

3           Good.  So I think before we move on to remaining

4    issues, I just want to clarify the schedule again.  When the

5    government rests, whatever day that is -- and they have

6    indicated Wednesday or Thursday -- the defendant must put on

7    its case, if it has a case.  And if it chooses not to put on a

8    case, that is just fine, but if it chooses to put on a case, it

9    must have its witnesses available in the court and ready to

10   proceed.  The only exception that might be made at this point

11   to the defendant being deemed to rest without calling a

12   particular witness is potentially Mohammed Aly Thiam, whose

13   visa has been approved.  Yesterday I gave counsel notice that a

14   defense witness had to be available on Thursday.  Apparently

15   that information has not yet been communicated to Mr. Thiam, so

16   I'll require his presence on Thursday or deem the defendant to

17   have rested unless I have a showing of due diligence with

18   respect to getting him here on Thursday, and the latest I would

19   receive defense testimony from him would be Monday morning at

20   9:30, assuming that the defendant had otherwise rested on

21   Wednesday or Thursday.

22          Okay.  So let's turn to other issues.

23          Let's talk about the status of plea discussions.  And

24   I'm required by the Supreme Court and the Second Circuit

25   jurisprudence to inquire with respect to the status of plea

H4l1thic

1    discussions, make sure that the defendant is well aware of any

2    plea offers that have been extended, and that defense counsel

3    has shared those with the defendant.  So I want to give you,

4    Mr. Thiam, an opportunity to hear about those now on the

5    record, and so it's important that you listen carefully to me

6    as I address questions to counsel, both the government and your

7    own attorney.  Do you understand that, Mr. Thiam?

8             THE DEFENDANT:  Yes, your Honor.

9             THE COURT:  Okay.  And by the way, Mr. Goldsmith, I

10   would very much like to pronounce your client's name correctly.

11   Could you give me instruction on that score.

12            MR. GOLDSMITH:  "Tee-om."

13            THE COURT:  "Tee-om."  Thank you very much.

14            So let me ask the government, did the government

15   extend a plea offer to the defendant?

16            MR. KOBRE:  Your Honor, the government did not extend

17   any formal plea offers to the defendant.  There were informal

18   plea discussions, and I can describe those for your Honor if

19   you'd like.

20            THE COURT:  Yes.

21            MR. KOBRE:  So what was first discussed between the

22   parties was the defense counsel's request that the defendant be

23   permitted to plead guilty, not to either of the counts in the

24   indictment but to some different or lesser charge.  And the

25   government rejected that out of right.  The government insisted

H4l1thic

1    that the defendant plead guilty to at least one of the counts

2    in the indictment.  The government explained to defense counsel

3    that we believe that the guidelines calculation that will apply

4    at sentencing -- and I can run through that for your Honor, but

5    essentially what it boiled down to, your Honor, was a

6    guidelines range of 97 to 121 months if the defendant is

7    convicted on both counts at trial.  Would your Honor like me to

8    walk through the guidelines calculation that leads to that?

9            THE COURT:  No.

10           MR. KOBRE:  Okay.  Your Honor, in conversations with

11   defense counsel, I asked if defense counsel had a proposal that

12   the government would consider, something short of that.  And

13   defense counsel did come back with a proposal, and the proposal

14   was a plea to Count One.  That's the 1957 count.  I'm sorry.  I

15   apologize, your Honor.  A plea to Count Two, which is the 1956

16   count, and a guidelines calculation resulting in an offense

17   level of 19 and, given the defendant's criminal history

18   category of I, a guidelines range of 30 to 37 months.  That was

19   the defense counsel's proposal.  And the reason that the

20   guidelines range is substantially lower is because, under the

21   defense counsel's proposal, the amount of the laundered funds

22   would be a lesser amount, because Count Two applies to a

23   discrete transaction, a portion of the bribery proceeds.  I

24   conveyed to defense counsel that if defendant was actually

25   willing to really consider such an offer, we would discuss it

H4l1thic

internally and we would get back to him, but we weren't going
to make such an offer unless the defendant was really prepared
to accept such an offer, and I conveyed that to Mr. Goldsmith.
And Mr. Goldsmith came back and said that the defendant would
not be interested in such an offer.

So that's where the plea discussions sort of left off
is that the defendant was not seriously interested in
considering the proposal, the best proposal, I would say, that
defense counsel was able to come back with.

THE COURT:  And Mr. Goldsmith, does that recitation
accord with your recollection?

MR. GOLDSMITH:  Yes, your Honor.

THE COURT:  And did you discuss these issues with your
client?

MR. GOLDSMITH:  I discussed the Sentencing Guidelines
as well as my proposal based upon Count Two.  I did.

THE COURT:  Thank you.  And I don't want to hear the
details of the discussions with your client, but have you
discussed your evaluation of the strength of the evidence
against him?

MR. GOLDSMITH:  Yes, I have.

THE COURT:  And again, I don't want to hear the
substance of your conversations with him, but have you conveyed
to him your own recommendation of what he consider doing with
respect to a plea or with proceeding to trial?

H4l1thic

1          MR. GOLDSMITH:  Yes.

2          THE COURT:  Thank you.  So Mr. Thiam, please stand.

3          Please place the defendant under oath.

4          (Defendant sworn)

5          THE COURT:  Now, Mr. Thiam, have you taken any drugs

6    or medicine or pills in the last 24 hours?

7          THE DEFENDANT:  Except for my prescription medication,

8    no.

9          THE COURT:  And what is that prescription medication

10   for?

11         THE DEFENDANT:  For diabetes, high blood pressure, and

12   high cholesterol.

13         THE COURT:  And does that medication affect in any way

14   your ability to understand what's happening in this proceeding?

15         THE DEFENDANT:  No, your Honor.

16         THE COURT:  Does it affect in any way your ability to

17   communicate with your attorney?

18         THE DEFENDANT:  No, your Honor.

19         THE COURT:  Okay.  Is your mind clear today?

20         THE DEFENDANT:  Yes, your Honor.

21         THE COURT:  Do you understand what's happening in this

22   proceeding?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  Okay.  Now did you hear the questions I

25   placed to the government and its responses to me with respect

H4l1thic

1     to the plea negotiations?

2                    THE DEFENDANT:  Yes, your Honor.

3                    THE COURT:  And did you hear the questions I placed to

4     your attorney and his responses to me concerning those plea

5     negotiations?

6                    THE DEFENDANT:  Yes, your Honor.

7                    THE COURT:  And was your attorney's account of his

8     discussions with you, to the extent that he disclosed them here

9     on the record, accurate?

10                    THE DEFENDANT:  Yes, your Honor.

11                    THE COURT:  Thank you.  You may be seated.

12                    Before we take our break, I know you have a couple

13     open issues to discuss.  Let me just turn to the voir dire, and

14     then I think I'm done with my list of things to cover with you.

15                    So the defendant requests, in his proposed voir dire

16     questions, inquiry as to whether or not an individual member of

17     the venire was born outside of the United States, and also

18     there are a series of questions, but I think that gets to the

19     heart of it.  There is another question about whether or not

20     the juror or the juror's parents immigrated to the United

21     States from a West African country.  And is there any objection

22     by the government to me inquiring of the potential jurors

23     regarding that?

24                    MR. KOBRE:  Just one moment, very briefly, your Honor.

25                    No objection, your Honor.

H4l1thic

1        THE COURT:  Okay.  Good.

2            So let's take our break.  When we come back, I'll hear

3    any other issues that you want to discuss with respect to this

4    final pretrial conference.  I'll hear you if you have any

5    desire to raise -- again, either the government or the

6    defendant -- on my rulings on the completeness issue with

7    respect to the defendant's statement, and then we'll hopefully

8    complete our discussion about Mr. Sakho's testimony.  I now

9    understand it's being offered as lay testimony, which has its

10   own requirements of relevance and materiality.  And I am

11   particularly interested now in understanding what role this

12   person played that he is competent to testify about and how

13   that would be relevant, in the first instance; and secondly,

14   exculpatory to the defendant in the second instance.

15       Okay.  Good.  Thank you.  Let Ms. Rojas know when

16   you're ready to proceed.

17       THE DEPUTY CLERK:  All rise.

18       (Recess)

19       (In open court)

20       THE COURT:  Thank you.  Counsel, I understand you're

21   ready to resume.

22           And I understand that, Mr. Kobre, you asked my deputy

23   to inquire whether I had any objection to you posing questions

24   to witnesses while seated.  Absolutely not.  The record should

25   reflect Mr. Kobre is in a wheelchair, and no one would expect

H4l1thic

```
 1   you to do anything other than sit comfortably wherever you'd
 2   like.  And because of the size of the podium, I think you can
 3   place questions, unless there is an objection from
 4   Mr. Goldsmith, from the government's counsel table.
 5            Mr. Goldsmith, is that agreeable to you?
 6            MR. GOLDSMITH:  Of course.
 7            THE COURT:  Thank you very much.
 8            MR. KOBRE:  Thank you very much, Judge.
 9            THE COURT:  Yes.  Okay.  So let's go march through our
10   items.
11            Let's first clean up, if there is anything to clean
12   up, with respect to the defendant's statement on the day of his
13   arrest.  Did you, Mr. Goldsmith, wish to revisit any of my
14   rulings in that regard?
15            MR. GOLDSMITH:  What I would prefer to do, if
16   agreeable to the Court, is reserve my right to renew my
17   objections to the Court's decision denying the excerpts that
18   I've proposed at such time as the government seeks to introduce
19   the portions of the transcript which it's introducing,
20   dependent upon what the context is at the time.  So in other
21   words, as the government seeks to introduce the portions of the
22   transcript, I would like the opportunity to object to the
23   Court's denial of my request, if I deem in the context it would
24   require, under the circumstances, the requested portions from
25   defense be added.
```

H4l1thic

| | |
|---|---|
| 1 | THE COURT:  Okay.  So let me just inquire.  Mr. Kobre, |
| 2 | is the government planning to play this as a videotape to the |
| 3 | jury? |
| 4 | MR. KOBRE:  It is, your Honor. |
| 5 | THE COURT:  And so you need rulings today in order to |
| 6 | create one seemless videotape presentation for the jury? |
| 7 | MR. KOBRE:  Yes, your Honor.  Actually what we were |
| 8 | planning on doing is creating clips of the video, so that there |
| 9 | wouldn't be any technical issues.  We can just play the clips |
| 10 | that have been ruled upon, agreed upon.  And so yes, it would |
| 11 | be helpful to have those rulings today. |
| 12 | THE COURT:  Okay.  So I've given you my rulings.  I've |
| 13 | given Mr. Goldsmith an opportunity to reargue with respect to |
| 14 | any of my rulings.  His objections are preserved, as made |
| 15 | through the April 16th letter and otherwise in his response |
| 16 | to the motions *in limine*.  So there's no need, Mr. Goldsmith, |
| 17 | for you to renew any objection.  Thank you. |
| 18 | And does the government wish to revisit any of my |
| 19 | rulings with respect to admitted portions of the defendant's |
| 20 | videotaped statement? |
| 21 | MR. KOBRE:  No, your Honor. |
| 22 | THE COURT:  Okay.  Fine. |
| 23 | Let's move on then to the issue with respect to |
| 24 | Mr. Sakho, whom I now understand is potentially a lay witness, |
| 25 | not an expert witness.  I do not understand anything about his |

H4l1thic

1    role in the underlying transactions and what competent evidence

2    he might have to offer, much less how it might be exculpatory

3    to the defendant.

4              MR. GOLDSMITH:  And if I may, after conferring with my

5    team and Mr. Thiam, again, I can clarify that.  Mr. Sakho was

6    the previous adviser, I should say he was the adviser to the

7    minister of mines immediately prior to Mr. Thiam.  When

8    Mr. Thiam was in office, Sakho was the adviser on mining to the

9    president.  Mr. Sakho was in attendance at the cabinet meetings

10   regarding the negotiations of the specific deal.  He was in a

11   position where he was a member, a ranking member of several

12   committees that oversaw the negotiations of that deal.  He was

13   also obviously engaged in discussions with the president at the

14   time on the presidential level and was privy to meetings with

15   the president and the president's opinion as to those

16   negotiations and the effectuation of the final voting and

17   approval of the CIF deal.  My expectation, from reading the

18   3500 material that's been coming in on a rolling basis, is that

19   a couple of the government's witnesses are going to testify

20   that Mr. Thiam was in a position to promote the CIF deal and to

21   advocate on its behalf, and had perhaps undue influence beyond

22   the role that he has as the minister of mines in order to make

23   that happen, and I think that Mr. Sakho will be in a position

24   to rebut that presumption, or to rebut that testimony.

25              THE COURT:  By saying what?

H4l1thic

1          MR. GOLDSMITH:  By testifying that there were

2     transparency, by testifying that the president was the one who

3     was promoting the deal rather than Mr. Thiam.

4          THE COURT:  So if I accept his testimony, when you say

5     rather than Mr. Thiam, is he going to be in a position to

6     testify that Mr. Thiam did not promote the deal?

7          MR. GOLDSMITH:  He would be in a position to testify

8     that while Mr. Thiam appropriately acted as the minister of

9     mines to present the deal and to have some level of

10    negotiations with the deal, that the decision making and that

11    the approval process ultimately rested with the president under

12    the circumstances in addition to the cabinet as a whole, and

13    that the force behind the negotiations came from the

14    presidential office rather than the minister of mines office.

15         THE COURT:  So --

16         MR. GOLDSMITH:  In other words --

17         THE COURT:  The witness was present at meetings and

18    heard conversations that would permit him to testify that the

19    defendant had a role in the negotiation and presentation of the

20    CIF transaction but that he was not the sole person who was in

21    favor of the transaction, nor was he the ultimate decision

22    maker, and that the ultimate decision maker was the president

23    and/or cabinet and that they strongly favored the CIF deal

24    themselves.  Do I summarize correctly what you're telling me?

25         MR. GOLDSMITH:  Correct.  And if I can synthesize it

H4l1thic

1    further, that Mr. Thiam was taking direction from the president

2    rather than the other way around.

3              THE COURT:  And what makes any of that exculpatory?

4              MR. GOLDSMITH:  It's necessary, under the

5    circumstances where the jury is going to hear from a couple of

6    witnesses that Mr. Thiam is promoting the deal beyond his role

7    as a minister of mines, because that fact in and of itself, and

8    unanswered, could possibly lead the jurors to create -- or as

9    circumstantial evidence to create a reasonable inference that

10   the bribes took place based upon Mr. Thiam's prior actions as

11   advocating more strongly than he should have been to have the

12   country of Guinea engage in the deal with CIF.

13             THE COURT:  Okay.  So there's no dispute between the

14   defense witness and the government's witnesses that the CIF

15   deal fell within the defendant's responsibilities as minister

16   of mines, to have a role in the negotiations and a view on the

17   project, as I understand it.  And I want to make sure I

18   understand this accurately.  You believe there will be a

19   disagreement about how much of that negotiation and promotion

20   fell properly within the defendant's role as minister of mines?

21             MR. GOLDSMITH:  Yes.  This is --

22             THE COURT:  Can you give me specifics on that so I

23   understand what the potential disagreement is, which would make

24   this testimony potentially relevant.

25             MR. GOLDSMITH:  This is a case ultimately about

H4l1thic

allegations of a bribe, so if there's a bribe there, then

somehow Mr. Thiam has to have the authority, and the ability,

as is in the Guinean law, to either act or fail to act, so if

we have witnesses for the government that are going to

describe, as I anticipate they're going to describe, that

Mr. Thiam was behaving in a manner and had authority that was

beyond the traditional scope of the minister of mines, then

Mr. Sakho's testimony that he was in fact getting directions

directly from the president would negate the government's

assertion through their witnesses that Mr. Thiam had the

authority and ability to act or fail to act.

THE COURT:  Okay.  So actually, I don't think there's

anything in the law that requires the bribe to be paid to the

ultimate decision maker to be unlawful.  So --

MR. GOLDSMITH:  I don't necessarily disagree with

that, but the individual does have to have some opportunity to,

again, either act or fail to act in furtherance of their role.

THE COURT:  But there's no dispute that as minister of

mines -- in fact I think you told me, if I remember correctly,

that the minister of mines had, at the relevant time, in Guinea

a role to play with respect to what we're now calling the

shareholders agreement.

MR. GOLDSMITH:  Yes, he did have a role, but this

isn't just a mining deal; this is a deal that involves several

infrastructure components to it.  This was something that

H4l1thic

|     |                                                                          |
|-----|--------------------------------------------------------------------------|
| 1   | Mr. Thiam –– while he had a role, was not something that could           |
| 2   | have been as controlling as I think the government's witnesses           |
| 3   | are going to testify about.                                              |
| 4   | THE COURT:  So let me ask the government to explain.                     |
| 5   | Are you calling any witnesses that have knowledge with respect           |
| 6   | to the role of the minister of mines in Guinea?                          |
| 7   | MS. LARYEA:  Yes, your Honor.                                            |
| 8   | THE COURT:  Who?                                                        |
| 9   | MS. LARYEA:  Mr. Camara and Mr. Sande.  Mr. Sande was                   |
| 10  | the minister of the economy and finance at the same time as the          |
| 11  | defendant, and he can speak as to the role of the minister of            |
| 12  | mines.  Mr. Camara was at different stages the chief of staff            |
| 13  | for the prime minister of Guinea, and he can also speak to the           |
| 14  | role of the minister of mines.                                           |
| 15  | THE COURT:  And how do you spell those names?                           |
| 16  | MS. LARYEA:  Sande, S-A-N-D-E.  Camara, C-A-M-A-R-A.                    |
| 17  | THE COURT:  Okay.  So I don't understand that there is                  |
| 18  | ultimately going to be any dispute here with respect to the              |
| 19  | role of the minister of mines with respect to this project.             |
| 20  | Have counsel discussed that issue with each other now that              |
| 21  | we're sort of drilling down to try to understand the relevance?         |
| 22  | Have you finished those conversations?                                   |
| 23  | MR. GOLDSMITH:  We have not had any conversations as                    |
| 24  | to the definition of roles specific to the minister of mines            |
| 25  | during the relevant time period.                                         |

H4l1thic

           THE COURT:  Okay.  So I don't understand the defendant

to have yet made a presentation to support a finding of

materiality or much less that the witness has exculpatory

information, but obviously this is an evolving issue.  It was

really on the eve of trial.  Of course we're having, for what

the Southern District normally does, a fast-track trial at

defense counsel's request, but on the eve of trial the

defendant has invited a witness to come to this country just a

little over two weeks before trial.  The request was made on

April 7th to attend a trial on April 24th.  There have been

visa issues, and now there's a request, as of last night, to

take a deposition that is opposed by the government.  I haven't

had a chance to investigate thoroughly the legal standards that

will apply to this videotaped deposition request.  Normally, of

course, a request for a video deposition is made long before

trial so people have the opportunity to travel abroad to take

the deposition if they wish.  Or maybe it's not a deposition;

maybe it's to take the testimony through video live.

           MR. GOLDSMITH:  That's a more precise

characterization, yes.

           THE COURT:  Okay.  Thank you.

           Anyway, I haven't had a chance to look at the legal

standards with the care I'd like to.  But I think our

conversations this morning have been very helpful in trying to

understand the nature of the request.  It's no longer a request

1    to take expert testimony; it's a request to have a lay witness

2    testify.  We're beginning to understand what the offer is with

3    respect to relevance.  So hold on just one second.  Let me give

4    you my schedule for this afternoon.

5           Okay.  So I'll give you an opportunity this afternoon

6    to discuss these issues in a fine-grain, detailed way so that

7    we can understand precisely what testimony of relevance this

8    witness may or may not have, how it fits in the context of the

9    trial testimony more broadly, and to what extent it's properly

10   understood as exculpatory, and that, of course, in part depends

11   upon what legal standard applies.  I don't think there's any

12   dispute about the legal standard -- I'm not hearing any -- with

13   respect to the violation of federal law charged in the

14   indictment.

15          So I'll see you at 4:00 on that single issue.

16          Now let's --

17          MR. GOLDSMITH:  Your Honor, I'd like to make a

18   different proposal.  Obviously this is a defense witness who

19   is -- I think we may have a little bit of time to make a

20   decision on this.  What I'd like to do is -- he is French

21   speaking and halfway around the world.  What I would propose is

22   that I have a conversation with him over the weekend, develop a

23   very detailed written submission to the government and to the

24   Court as to what his testimony would be on the issue so that it

25   can be detailed, and provide that by Monday morning.

H411thic

1          THE COURT:  I'll let you provide that to the

2    government by Sunday at noon --

3          MR. GOLDSMITH:  Very well.

4          THE COURT:  -- and, if the government is going to make

5    a written submission to me with respect to these issues, by

6    Monday morning at 9, so that we're all in a position to have a

7    meaningful conversation about this Monday at 9:30.

8          MR. GOLDSMITH:  Very well.  I'll provide a submission

9    to the Court as well on Sunday.

10          THE COURT:  Thank you.

11          MS. LARYEA:  Your Honor, one more issue with respect

12    to Momo Sakho.  The court ordered the government not to speak

13    with our witnesses or anyone in Guinea about Mr. Sakho.  I

14    believe Mr. Goldsmith said that request from the defense is now

15    moot as his visa was denied and he'd already applied and so his

16    request to attend this trial is now public.  We want to confirm

17    that we are now allowed to speak with our witnesses and others

18    about Mr. Sakho to gather information about him.

19          MR. GOLDSMITH:  Yes, your Honor.  I did have that

20    conversation with the government recently and would consent to

21    their ability to investigate.

22          THE COURT:  Thank you very much.

23          MS. LARYEA:  Thank you, your Honor.

24          THE COURT:  So does the government have any additional

25    issues we need to address at this final pretrial conference?

H4l1thic

1          MR. DiMASE:  Very briefly, your Honor.

2          As the Court is aware, the government submitted a

3     letter on April 18th along with its request to charge in this

4     case.  It addressed the issue of whether or not the two

5     articles, 192 and 194, represent felonies under Guinean law.

6          THE COURT:  I have not focused on that letter.  I

7     don't think I've read it.  Hold on.

8          MR. DiMASE:  Yes, Judge.

9          THE COURT:  Thank you for bringing this to my

10    attention.  I had not read it yet.

11          Any objection?

12          MR. GOLDSMITH:  I've reviewed the letter.  There is a

13    tier structure under the Guinean laws of punishment that is

14    similar to the tier structure for felonies and misdemeanors.

15    To those ends, I'd requested from my legal expert as to whether

16    he had any different opinion on whether it could be categorized

17    as a felony or not.  I have not gotten a response yet.

18          THE COURT:  Okay.  So Sunday at noon for that as well.

19    Thank you.  I'll assume that there is no objection unless I

20    receive notice of one Sunday at noon.

21          Okay.  Anything else from the government?

22          MR. KOBRE:  No, your Honor.

23          THE COURT:  Mr. Goldsmith, anything else?

24          MR. GOLDSMITH:  A very minor housekeeping issue, your

25    Honor.  I requested through CJA e-voucher to have authorization

H4l1thic

1    for daily transcripts.  That has not been authorized yet.  And

2    the reporter's office did contact me yesterday to follow up.

3              THE COURT:  Okay.  Thanks.  I'll try to turn to that

4    application today and I will approve it.

5              MR. GOLDSMITH:  Thank you.

6              THE COURT:  No problem.

7              Thank you, all.  So I'm not going to see you at 4, but

8    I'll see you Monday at 9:30.  I look forward to next week's

9    trial.  Thanks so much.

10              THE DEPUTY CLERK:  All rise.

11              (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25