H4o1thi1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          17 Cr. 47 (DC)

5    MAHMOUD THIAM,

6                  Defendant.              Trial

7    ------------------------------x

8                                          New York, N.Y.
                                           April 24, 2017
9                                          9 :28 a.m.

10
     Before:
11
                        HON. DENISE COTE,
12
                                           District Judge,
13                                          and a Jury

14                        APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     BY:  ELISHA J. KOBRE
17        CHRISTOPHER J. DiMASE
          Assistant United States Attorney
18
             -and-
19
     U.S. DEPARTMENT OF JUSTICE
20   BY:  LORINDA I. LARYEA

21   LAW OFFICE OF AARON GOLDSMITH, PC
          Attorneys for Defendant
22   BY:  AARON M. GOLDSMITH, ESQ.
          MICHAEL DELAKAS, ESQ.

23
     ALSO PRESENT:   PATRICK KILLEEN, Special Agent, FBI
24                   ALEXANDER BEER, Paralegal Specialist, USAO
                     KATHERINE BOSLEY, Paralegal Specialist, DOJ
25                   JENNIE CARMONA, Paralegal, LO of Aaron Goldsmith

H4o1thi1

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE COURT:  Good morning, everyone. |
| 3 | THE DEPUTY CLERK:  Is the government ready to proceed? |
| 4 | MR. KOBRE:  Yes.  Good morning, your Honor, Elisha |
| 5 | Kobre, Lorinda Laryea, and Christopher DiMase for the |
| 6 | government.  With us at counsel table is Special Agent Patrick |
| 7 | Killeen of the FBI and paralegal specialists Alex Beer and |
| 8 | Katherine Bosley. |
| 9 | THE DEPUTY CLERK:  And for the defendant, are you |
| 10 | ready to proceed? |
| 11 | MR. GOLDSMITH:  Ready, your Honor.  Aaron Goldsmith |
| 12 | and Michael Delakas on behalf of Mr. Thiam.  Ms. Carmona will |
| 13 | be with us very shortly. |
| 14 | THE COURT:  I'm sorry? |
| 15 | MR. GOLDSMITH:  Ms. Carmona, my paralegal, will be |
| 16 | joining us very shortly. |
| 17 | THE COURT:  Thank you very much. |
| 18 | So counsel have been given a copy of the voir dire |
| 19 | form, and we're going to mark that as a Court exhibit. |
| 20 | THE DEPUTY CLERK:  Court Exhibit 1. |
| 21 | THE COURT:  And let me read for you the very brief |
| 22 | introduction I plan to give in this case, and if you have any |
| 23 | requests for changes or additions, please let me know. |
| 24 | This is the statement I will give to the venire before |
| 25 | the voir dire process begins, and it reads as follows: |

H4o1thi1

1          The defendant in this case is Mahmoud Thiam.  During

2    2009 and 2010, he was the Minister of Mines and Geology for the

3    Republic of Guinea.  Guinea is a country in West Africa.

4          The indictment asserts that while he held that

5    position, he accepted bribes from a Chinese conglomerate in

6    exchange for using his position to promote the award of mining

7    rights in Guinea to the conglomerate.  The law of Guinea

8    prohibits public officials from accepting bribes in connection

9    with the performance of their public duties.  United States

10   laws against bribery contain the same kinds of prohibitions.

11   The indictment charges that after Thiam received these bribes,

12   Thiam violated two United States laws prohibiting money

13   laundering by transferring the proceeds of those bribe payments

14   to international banks and into the United States.  Thiam is a

15   United States citizen.

16          Mr. Kobre, any requests or objections?

17          MR. KOBRE:  No, your Honor.

18          THE COURT:  Mr. Goldsmith, any requests or objections?

19          MR. GOLDSMITH:  No.

20          THE COURT:  Thank you.

21          So we have one remaining issue that I'm aware of and

22   that is a request by defense counsel to have two-way

23   videoconferencing testimony from a witness abroad.  The witness

24   is Momo Sakho.  And let me give a little context to this

25   remaining legal issue.

H4o1thi1

1          The trial was scheduled at a February 13th

2     conference and it was scheduled on that date to begin today,

3     April 24th.  The defendant made a request for a speedy trial,

4     and as I've mentioned, this is a little speedier than is

5     customary in the Southern District of New York, but I quickly

6     accommodated his request.  And it certainly is well within his

7     rights to request a speedy trial, and that's not an issue.

8          On April 6 or around that date, defense counsel

9     notified the government that it wished to call Mr. Sakho as an

10    expert witness in this case, and it's my understanding that the

11    decision to use Mr. Sakho as an expert witness was made around

12    that time by the defendant and defense counsel.  And sometime

13    after that date, Mr. Sakho applied for a visa to come to

14    America from, as I understand it, Guinea, and that visa request

15    was denied.  Then defense counsel, as I understand it,

16    requested assistance from the United States Attorney's Office

17    and Department of Justice to see if the visa could be issued.

18    The Department of Justice gave its assistance, and the visa has

19    not been granted.  And it's not something within the control of

20    the Department of Justice; a different branch of our government

21    handles visas.

22         So on April 20th, defense counsel filed a motion to

23    take testimony through the videoconference hookup for Mr. Sakho

24    to be an expert witness at this trial because he was unable to

25    obtain a visa to travel to the United States, and that is the

H4o1thi1

1    first notice I had that this was an issue.

2            We had our final pretrial conference in this case on

3    Friday, and the colloquy from that conference is on the record.

4    And in the course of that colloquy, defense counsel abandoned

5    his request to call Mr. Sakho as an expert witness and instead

6    substituted a request that he be called as a fact witness at

7    this trial and requested an opportunity to make a submission in

8    support of that application.  That request by defense counsel

9    was granted, and defense counsel provided a letter of

10   April 23rd, which is filed on ECF, explaining the basis for

11   the request that Mr. Sakho testify as a lay witness.

12           I have to say, there is a portion of that that

13   suggests that there are still some remnants of expert testimony

14   being sought here.  I'm focusing on the proposed testimony

15   about what is a common practice in the mining industry with

16   respect to a joint venture arrangement.  But I'll just make

17   that note that the bulk of the presentation is in support of a

18   request that he testify as a lay witness.

19           At the end of the day on April 23rd, the government

20   filed its response.  That's also on ECF.  And the government

21   contends that the proposed testimony for Mr. Sakho is

22   irrelevant and immaterial and does not meet the Rule 15

23   standard.

24           And before we get to argument on this issue, let me

25   just put some context in terms of the legal standard on the

H4o1thi1

record.

        Of course the Sixth Amendment of the Constitution
provides that in all criminal prosecutions, the accused shall
have the right to be confronted with the witnesses against him,
and the common law tradition has been one of live testimony,
subject to adversarial testing.  *Crawford*, 541 U.S. at 43.  The
central concern of the confrontation clause is to ensure the
reliability of the evidence against a criminal defendant by
subjecting it to rigorous testing in the context of an
adversary proceeding before the trier of fact.  *Maryland v.*
*Craig*, 497 U.S. at 845.

        Of course, these concerns weigh very differently when
it is the defendant that seeks to receive testimony without a
witness' presence in the courtroom during his criminal trial.
*United States v. Gigante*, 166 F.3d 75.  The Second Circuit
permitted testimony from a crucial government witness via
two-way closed-circuit television where the witness was too ill
to travel to court.  *Ibid* at 79-81.  Applying the standard
articulated in Rule 15, the court required a showing of
exceptional circumstances and that receipt of the testimony
would further the interest of justice.  *Ibid*.  The court
warned, however, that closed-circuit television should not be
considered commonplace substitute for in-court testimony by a
witness.  There may well be intangible elements of the ordeal
of testifying in a courtroom that are reduced or even

H4o1thi1

1    eliminated by remote testimony.  *Ibid.*

2            Rule 15, then, is where I must go next.  It authorizes

3    a party to move that a prospective witness be deposed in order

4    to preserve trial testimony, and a court may grant the motion

5    because of exceptional circumstances in the interests of

6    justice.  We know then from *Gigante* that this Rule 15 procedure

7    which applies to pretrial depositions can also be used when

8    assessing the need for videoconferencing during the trial

9    proceeding itself.  Under Rule 15(a), a trial court may, in its

10   discretion, order the deposition of a witness for use at trial

11   whenever, due to exceptional circumstances of the case, it is

12   in the interests of justice.  A movant must show that the

13   prospective witness is unavailable for trial, the witness'

14   testimony is material, and the testimony is necessary to

15   prevent a failure of justice.  United States v. *Cohen*, 260 F.3d

16   at 78.  In *Cohen*, the Court of Appeals found that the district

17   court did not abuse its discretion in denying an adjournment of

18   the trial to depose a witness where the proffered testimony was

19   not relevant to the question of the defendant's guilt.  260

20   F.3d at 78.  The Court of Appeals found, in *United States v.*

21   *Johnpoll*, 739 F.2d at 709, that the testimony from the

22   government's witnesses was clearly material since it was

23   unlikely that the defendant could have been convicted without

24   their testimony and therefore permitted such testimony to be

25   taken other than through live testimony in the courtroom during

H4o1thi1

1    the trial proceeding.

2            So I'm not going to spend time now trying to define

3    precisely what "materiality" means in the context of a Rule 15

4    proceeding, and if necessary, of course, we'll get into that,

5    but I think the issues that will drive this inquiry at least in

6    the first instance are relevance and the cumulative nature of

7    the testimony.  And Mr. Goldsmith, I wanted to make sure, since

8    I heard from the government last, that you had a chance to be

9    heard before I give further guidance to the parties.

10           MR. GOLDSMITH:  Thank you, your Honor.  I just wanted

11   to highlight for the record that it's been expressed, in my

12   understanding, that of the several factors of Rule 15, the only

13   one in contest is that of materiality.  So without

14   extrapolating too much from what has already been said and what

15   I included in my letter of yesterday, the reality of this case

16   is that the fact witnesses that the government are going to

17   present, I believe are going to testify to Mr. Mahmoud Thiam's

18   ability to influence the deal with CIF.  Mr. Sakho's testimony

19   is one of very few individuals alive who can rebut that

20   testimony and who can say that Mr. Thiam was not in a position

21   to give the influence at a level that I suspect the government

22   witnesses are going to paint a picture of, in creating or

23   killing this deal, and it is those circumstances, aside from

24   the others I've mentioned in the letter, that are I believe the

25   thrust of the materiality and the necessity of this witness.

H4o1thi1

| | |
|---|---|
| 1 | THE COURT:  So as I understand it, Mr. Goldsmith, |
| 2 | there is no dispute by the defense that you can violate the |
| 3 | laws against money laundering as charged here by receiving a |
| 4 | bribe payment in connection with the transmission of mining |
| 5 | rights whether or not you are the final decision maker.  You're |
| 6 | not arguing that the government has the burden to prove that |
| 7 | the defendant is the final decision maker on that decision. |
| 8 | MR. GOLDSMITH:  I'm sorry.  Too many decisions. |
| 9 | THE COURT:  Okay.  So let me just simplify with that |
| 10 | background.  You are not contending that the government has a |
| 11 | burden of proving that it was the defendant's decision whether |
| 12 | or not to grant the mining rights. |
| 13 | MR. GOLDSMITH:  No, I don't necessarily agree with |
| 14 | that assertion. |
| 15 | THE COURT:  As a matter of law. |
| 16 | MR. GOLDSMITH:  As a matter of law, the witnesses are |
| 17 | going to say that in order to effectuate the rights under the |
| 18 | agreement, that there were several members of the cabinet that |
| 19 | were required to vote on that. |
| 20 | THE COURT:  Yes.  But you're not suggesting that the |
| 21 | law requires the government to show that the defendant was the |
| 22 | sole or final decision maker. |
| 23 | MR. GOLDSMITH:  No, I'm not suggesting that. |
| 24 | THE COURT:  Okay.  So is the government disputing that |
| 25 | others were involved or had responsibility with respect to |

H4o1thi1

making the final or ultimate decision about giving Guinea's

mining rights to the conglomerate?

          MR. DiMASE:  The government does not dispute that

there were other parties involved in that decision-making

process, and the government agrees with the Court and I think

the Court very appropriately summarized the substance of the

Guinean antibribery law.  The law doesn't require that a person

be the ultimate decision-making authority.  The law simply

criminalizes the payment of a bribe to influence somebody to

perform an act within the scope of their official duties, and

Mr. Thiam clearly had a great deal of involvement in this

negotiation and the ultimate passage of the deal.  The law

simply does not require that he was the architect or the final

decision maker, and as the government points out in its letter,

if the bribery laws were going to be interpreted this way,

many, if not almost all, public officials would be exempt from

the antibribery laws because only the very top person involved

in every decision would be subject to those laws.

          THE COURT:  Okay.

          MR. GOLDSMITH:  If I may, your Honor, I'm not

suggesting a carveout.  What I'm arguing is that what I put in

my letter is that the government witnesses in this case -- we

don't have a cooperating witness.  We don't have direct

evidence of someone who was in a room who can say, I saw the

discussions between Mr. Thiam and Mr. Pa and they talked about

H4o1thi1

the bribe.  The government is relying upon these Guinean

governmental witnesses that they're calling to testify about

the influence that Mr. Thiam had in his involvement with the

CIF deal.  They are bringing those witnesses in to develop

circumstantial evidence.  That could possibly lead a jury to

have the opportunity to make a reasonable inference about other

circumstantial evidence in the case.  So when we are brought to

a circumstance where the thrust of the evidence in this case is

going to be, for these witnesses, the governmental witnesses, a

discussion of Mr. Thiam's influence to allow the government to

create a circumstance where it can have the possibility of a

reasonable inference, that that is the focus and the necessity

for Mr. Sakho to testify as to what the circumstances were in

fact in Guinea at the time and as to Mr. Thiam's ability or

inability to influence that deal.

THE COURT:  Well, the defense is not taking the

position that as minister of mines, he had no role in this

issuance of a contract.

MR. GOLDSMITH:  Correct.

THE COURT:  Okay.  So what this is is a desire to put

before the jury, as I hear it, more nuanced testimony about the

extent of the role.  Do I capture that right?

MR. GOLDSMITH:  Yes.  I wouldn't quite say it's more

nuanced, because I think when the governmental witnesses

testify in a manner I suppose they're going to, I think it will

H4o1thi1

1    be quite straightforward and quite obvious as to what the

2    issues of fact may be.

3              THE COURT:  Okay.  But since there's no dispute he had

4    a role, whether or not he did or didn't influence the final

5    decision is not going to be a defense, and I would charge the

6    jury, if that were required, based on how the evidence plays

7    out at trial, indeed, no action need be taken.  You can pay a

8    bribe and have it be a criminal act and engage in money

9    laundering in violation of American law even if no contract had

10   been issued.  And I don't understand that, as a legal matter,

11   to be disputed, either.

12             So it comes down to, as I understand it, the defendant

13   wishes to call a witness to say that the defendant's influence

14   with respect to this transaction was less significant than what

15   the defense expects, upon its review of the government's 3500

16   material, its witnesses will describe.  So the defense fears

17   that the government witnesses from Guinea will describe the

18   defendant as a far more influential person in connection with

19   its ultimate decision and they wish to call someone who will,

20   so to speak, correct the record and say that the defendant was

21   less influential with respect to this decision.  Is that a fair

22   characterization, Mr. Goldsmith?

23             MR. GOLDSMITH:  Yes.

24             THE COURT:  Thank you.

25             MR. GOLDSMITH:  And --

H4o1thi1

1           THE COURT:  So I don't think that meets the test of

2     materiality, okay?  But I'm going to do this.  I'm going to

3     reserve decision and allow the defendant to renew this

4     application based on the testimony of these witnesses.

5     Obviously this disagreement about the extent of the defendant's

6     influence is not material in a sense that it does not have an

7     impact on whether the defendant was guilty or not.  It's not

8     exculpatory.  It would be a violation of Guinean law to receive

9     a bribe in connection with this transaction whether or not the

10    defendant had little or no influence.  There's no dispute he

11    had a role in connection with the transaction.  So the issue is

12    really -- I think nuanced is actually a helpful term, at least

13    for me, in thinking about this.  It's a concern about whether

14    the defendant's influence in the transaction will be described

15    accurately, from the defendant's point of view, through the

16    government witnesses.  And as a result, I'll let the defendant,

17    after testimony from those witnesses, renew his application if

18    he believes that his cross-examination of those witnesses and

19    the evidence put before the jury at that point in the trial

20    permits him to make an argument that Mr. Sakho's testimony

21    would be material.

22          MR. GOLDSMITH:  Thank you.

23          THE COURT:  Now there is a caveat here, though,

24    Mr. Goldsmith, and that is, I do not want any delay in this

25    trial.

H4o1thi1

1          MR. GOLDSMITH:  That was what I was about to say is

2     that the logistics of arranging for a videoconference will not

3     happen very quickly, but as a result of the Court's permission

4     to reserve, we will seek the earliest opportunity to reraise

5     this issue --

6          THE COURT:  Well, if he's going to testify, he has to

7     be prepared to testify on Thursday.

8          MR. GOLDSMITH:  Right.

9          THE COURT:  And so I am not going to delay this trial

10     to address technological issues with respect to

11     videoconferencing.

12          MR. GOLDSMITH:  Understood.

13          THE COURT:  Okay.  Where do we stand with respect to

14     the other defense witness?  Is he going to be here on Thursday

15     to testify?

16          MR. GOLDSMITH:  Yes.

17          THE COURT:  Thank you very much.  I very much

18     appreciate that, Mr. Goldsmith, and more than me; the jury.

19     That's the whole point here, obviously.  I'm here day in, day

20     out.  It's the jury and the fair presentation of the evidence

21     by both the government and the defendant to the jury that has

22     to be my concern and my focus.

23          Good.  Let's talk about the number of alternates.

24          Yes, Mr. DiMase.

25          MR. DiMASE:  Yes, Judge.  There was just the one other

H4o1thi1

1    issue regarding the government's letter, the cover letter,

2    request to charge on the issue of the two Guinean bribery

3    offenses being felonies.  I believe the Court asked the defense

4    to submit something by yesterday at noon.  I didn't see

5    anything in the submission regarding that particular issue.

6              MR. GOLDSMITH:  We have no objection to the

7    characterization as a felony.

8              THE COURT:  Thank you.

9              I saw something else in the parties' requests to

10   charge, or at least the government's, and that has to do with

11   financial institutions in the United States being FDIC insured.

12   If that's a requirement with respect to money laundering that

13   the definition of a financial institution in the United States,

14   domestic financial institution, is that it has to be FDIC

15   insured, if that's a requirement for money laundering, then the

16   government is going to have to prove that.  I'm not going to

17   instruct the jury that any bank is FDIC insured.

18             MR. DiMASE:  Your Honor, with respect to that aspect

19   of the jury instructions, that paragraph was addressing the

20   different ways in which the jury could find interstate commerce

21   has been affected.  It is not a requirement, to my knowledge,

22   that the bank be FDIC insured.  However, if they are and they

23   are involved in the transactions, that can support a finding

24   that interstate commerce has been affected.  Obviously, to the

25   extent that there isn't evidence in the trial of FDIC insurance

H4o1thi1

1    regarding the banks in question, then it's probably not

2    necessary to instruct the jury on that particular way of

3    finding interstate commerce influence.

4            THE COURT:  Are you saying that a transaction through

5    a financial institution in America is not sufficient to support

6    a finding of an effect on interstate commerce unless the bank

7    is FDIC insured?

8            MR. DiMASE:  No, your Honor.  I'm not saying that.

9            THE COURT:  So why are we getting into that?

10           MR. DiMASE:  It's probably not necessary, your Honor.

11           THE COURT:  Okay.  Good.

12           So I'll instruct the jury as a matter of law that the

13   two violations of the two articles of Guinean law with respect

14   to bribery -- I think they're Articles 192 and 194 -- are

15   felony charges under Guinean law.  Good.

16           So in terms of peremptories, we need to decide how

17   many alternates we're going to have, and I think I'm going to

18   choose to have four alternates here.

19           MR. KOBRE:  That's acceptable to the government.

20           THE COURT:  Okay.  Good.

21           So does the government have any additional issues to

22   raise?

23           MR. KOBRE:  No, your Honor.

24           THE COURT:  And Mr. Goldsmith, do you have any

25   additional issues to raise?

H4o1thi1

1          MR. GOLDSMITH:  No further issues at this time.

2          THE COURT:  Good.  Thank you so much.

3          So Ms. Rojas is going to tell the jury clerk that

4   we're ready for our venire, and so she'll let you know as soon

5   as they're available.

6          All the benches have to be cleared and those in the

7   courtroom must be seated at the very back of the courtroom so

8   we can seat members of the venire in the benches.  Good.  And

9   obviously, as soon as we have a jury chosen, there will be

10  plenty of seating area in the courtroom, but I know you'll all

11  cooperate with Ms. Rojas as we get a jury pool.

12         So Ms. Rojas has talked to the jury clerk, and you

13  should feel free to take a 15-minute recess.  Be back here at

14  10:15, and we'll get a pool, a venire, as soon as we can.

15         Thanks so much.

16         THE DEPUTY CLERK:  All rise.

17         (Recess)

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  Please be seated.  Bring in the jury.  Who

3       is giving the opening statement for the government?

4              MR. KOBRE:  Ms. Laryea.

5              MS. LARYEA:  I am, your Honor.

6              (Jury present)

7              THE COURT:  Ladies and gentlemen, please stand to be

8       sworn.

9              (A jury of twelve and four alternates was impaneled

10      and sworn)

11             THE COURT:  I have some opening remarks for you, and

12      then we'll turn to the parties' opening statements.

13             As I mentioned already, the judge and the jury have

14      separate roles in our American system of justice.  My job is to

15      instruct you as to the law that governs and controls this case,

16      and I will largely give you those instructions at the very end

17      of the trial.  Your job, as jurors, is to determine all the

18      fact issues based on the evidence presented during the course

19      of this trial.  You are the only triers of the fact issues, and

20      your decisions on the factual issues will determine the outcome

21      of this trial, so please don't take anything that I say or do

22      during the course of the trial as indicating that I have a view

23      as to what your decision should be.  I have no view.  I'm going

24      to be taking lots of notes, but it's for me to do my job.  It

25      has nothing to do with your job.

1          Now, I know you're going to pay close attention to all

2     the evidence that comes in during the course of this trial, so

3     let me describe to you what the evidence consists of.  The

4     first thing it consists of is the testimony given by the

5     witnesses from this witness stand, under oath, in this

6     courtroom.  This is the evidence from the witnesses, their

7     testimony.  Another kind of evidence is documents or exhibits

8     that are received into evidence.  There may also be in this

9     case a third kind of evidence, stipulations -- that is,

10    agreements that the parties have reached among each other or

11    between each other.  That's it.  That's all there is to the

12    evidence.

13         Let me describe to you some things that are not

14    evidence and cannot be the basis of your verdict.  Statements

15    made by counsel, arguments made by counsel are not evidence.

16    They're going to make opening statements to you.  They're going

17    to make closing arguments to you.  They're going to pose

18    questions to witnesses.  None of that is evidence.

19         Occasionally, the lawyers will object to a question

20    that another lawyer asks.  They're just doing their duty.  If I

21    sustain the objection, that means the witness can answer -- if

22    I sustain the objection, that means the witness cannot answer.

23    If I overrule the objection, that means the witness can answer.

24         Now, if there's any testimony given when I sustain an

25    objection, it's not part of the record and should be

disregarded by you.  On occasion, I may strike evidence from
the record.  Also, that means it's not part of the evidence in
this case and you cannot rely on it in reaching your verdict.

          Of course, anything you've read or heard or seen
outside this courtroom is not evidence and may not be
considered by you.

          You know, I told you just a moment ago that the
questions that the lawyers put to a witness are not evidence,
and that's true, but that doesn't mean you wouldn't pay close
attention to the question, because obviously by listening to
the question, it gives you context to the witness's answer.  So
while the answer is the evidence and the question is not,
listen carefully to the question so you can understand what the
answer means.

          One of the important jobs you'll have as a juror is
deciding on the credibility or believability of the witnesses.
I'm going to give you more instructions about that at the end
of the case, so let me just say a few brief things now.  The
bottom line is you can use the same tests here that you use in
your everyday life when you decide whether you can rely on
something someone has told you.  You can ask, Did they have a
motive to tell you about events truthfully or falsely?  Did
they seem to have a good recollection of the events?  Did what
they say fit in with other things that you know; did it make
sense when you consider the whole picture?  You can use those

H4oWthi2

1   same tests when considering the credibility of the witnesses

2   who will testify here.

3           Sometimes, of course, it's not what a witness says but

4   how a witness says something that is important to you in

5   deciding whether or not it's believable.

6           Now, as the trial progresses, you're going to start to

7   get some impressions about what might have happened.  I'm going

8   to ask you to do something that's really very hard.  I'm going

9   to ask you to keep an open mind, because the evidence can only

10  come in one piece at a time, one witness at a time, one

11  document at a time.  And I think you'll discover that sometimes

12  your impressions of what happened shift.  Sometimes you have an

13  impression about what happened when you listen to a witness's

14  testimony on direct examination, and then you hear

15  cross-examination and you get a very different view.  Sometimes

16  you think you have an impression based on one witness's

17  testimony, and later on in the trial, you hear testimony from

18  another witness and get a very different impression, so it's

19  only fair that you keep an open mind until all the evidence is

20  in and you have a complete basis to make a judgment about what

21  happened here.

22          Now, there are a couple of rules that we follow to

23  make sure that you're focusing on the evidence and not

24  something you should not focus on, and one of those rules is

25  that you are not to discuss this case with anyone, even with

H4oWthi2

each other, during the trial.  You may only discuss this case
with each other when it comes time to deliberate, at the end of
the trial.  And why do we have that rule?  It's a hard rule to
follow, but it's a very important rule.  We have that rule
because we know from human experience if you begin to discuss
the case, you're going to present a point of view, you're going
to defend that point of view, you're going to argue about that
point of view, and we do not want you to do that.  We want you
to keep an open mind until you have all the evidence and can
make a fair and reliable assessment of what happened here.  So
tell your friends and family tonight that you've been chosen to
serve as a juror on a criminal case in federal court, but the
judge, Judge Cote, has told you you may not discuss the case at
all until it's over.  And when it's over, you'll tell them all
about it.  OK?

You're also not to do any research.  You're not to
read anything about this case or anything about the country of
Guinea or mining rights or any participants in this trial.
You're not to go on the Internet and do any research.  You are
to rely on the lawyers to present the evidence that you need
during the course of this trial, when all of us are gathered
together to hear that same body of evidence.  It's on that and
nothing else that you must render your verdict.

Now, if someone approaches you during the course of
this trial and wants to ask you a question or something, just

H4oWthi2

1      tell them, kindly, that Judge Cote has said that you can't

2      discuss the case, but then tell Ms. Rojas, because I may have

3      some additional instructions for you if someone's approached

4      you to talk about the case.

5              Now, because I don't want anyone to talk to you about

6      the case, if you pass the lawyers or anyone participating in

7      this trial in the hallway, they are not going to wish you good

8      morning, they're not going to wish you a good night.  They're

9      not going to say anything to you, and they're not being rude.

10     They're just following my instructions to have no contact with

11     you outside of this courtroom when I am on the bench and able

12     to preside over these proceedings.

13             Now, this is a public courtroom.  People can come here

14     and watch our proceedings.  That's how it works in America, but

15     if you know someone who's coming to watch this trial, that's

16     just fine.  Just let Ms. Rojas know, though, because then I may

17     have some additional instructions for you.

18             The bottom line is, the point of all of this is that

19     the parties are entitled to have a jury render a decision based

20     solely on the evidence that comes in during the course of this

21     trial, and nothing else.  They want a fair jury.  They want an

22     impartial jury.  They want a jury discussing and thinking about

23     the evidence that comes in during the course of this trial in

24     this courtroom.

25             Let me talk a little bit about trial procedure.  The

H4oWthi2

1    lawyers are going to have opening statements for you.  They're

2    going to be fairly brief, but they're important.  They are the

3    opportunity for the lawyer to sort of give you a preview of

4    what they think the evidence will show, because it only comes

5    in witness by witness and document by document, and it's

6    sometimes helpful to have an overview before the trial begins.

7    What they say is not evidence, but it's helpful, and I know

8    you'll give them your attention.

9            Then the government has an opportunity to call its

10   witnesses.  I've told you several times already the burden of

11   proof is on the government here.  It must prove, to carry that

12   burden, that the defendant is guilty beyond a reasonable doubt

13   of each of the elements of each of the crimes with which he's

14   charged, so the government starts first.  It presents its

15   evidence.  It calls a witness, it asks that witness questions,

16   and that's called direct examination.  Then defense counsel has

17   an opportunity to ask questions.  That's called

18   cross-examination, and we go redirect and recross until the

19   witness's testimony is complete.

20           After the government has called all its witnesses,

21   then the defendant has an opportunity to present evidence.  The

22   defendant has no burden at this trial.  The defendant is

23   presumed innocent, but of course, the defendant has an

24   opportunity to call witnesses and present evidence if he wishes

25   to do so.  After all the evidence is presented, the lawyers

1    have a second opportunity to speak to you.  That's called

2    closing argument, and summation.  Then I'll give you my charge

3    as to the law, and then the jury will deliberate.

4            Let's talk a little bit about our schedule.  We're

5    going to meet each day, including Friday, from 9:30 until 5:00

6    to hear testimony.  There is a chance that we won't sit this

7    Friday, depending on our schedule, but I can't make that

8    assessment until Wednesday.  But you should be prepared to be

9    here every day from 9:30 to 5, Monday through Friday, until the

10   trial ends.  I meet with the lawyers at 9:00 so we can discuss

11   legal issues outside your presence so we're ready to proceed

12   promptly at 9:30, so that I ask each of you, please, make every

13   effort to be here on time.  Come early.  You have the jury room

14   to go to to wait before 9:30, but we cannot begin until all of

15   you are gathered together, and so it's important that each of

16   you make the effort to be here on time.  We'll have a luncheon

17   recess each day from 12:45 to 2, a midmorning break and a

18   midafternoon break at a time that seems convenient to one and

19   all.  If you need a break in addition at any time if I haven't

20   yet called one, just raise your hand.  We're happy to

21   accommodate you and have an additional break.  As I said, we'll

22   end promptly each day at 5:00 so you can make your

23   transportation plans in reliance on that.

24           Now, because we're living in the age of the Internet,

25   I have a specific charge for you about the Internet.  As I

1    mentioned already, you must decide this case -- you who are

2    sworn as jurors -- based solely on the evidence that comes in

3    in this courtroom during this trial, so you can't do any

4    independent research about this case, about the participants in

5    the trial, about the people or entities mentioned during the

6    trial, about any of the events that are discussed in this

7    trial.  You can't go on the Internet or websites or blogs or

8    use any electronic tools or reference materials whatsoever

9    concerning this trial.  This means you can't look for profiles

10   of any of the people in this case on any social media website.

11   And because I've told you you can't discuss this case, that

12   includes through electronic media.  You can't communicate with

13   each other or with anyone by telephone, by email, text

14   messages, Twitter, Facebook, any other media.  You may not

15   update your status on any website to tell anyone you're a juror

16   on a trial or to give them any information whatsoever about

17   this trial.  Once the trial's over, that's a different matter,

18   but while the trial is on, these rules are very important, and

19   I need you to follow my instructions as to the law to have no

20   such communication with anyone in any way about this trial

21   while it's ongoing.

22            With that, we will turn to the opening statements.

23   The government has the burden of proof here, and of course, as

24   I've told you many times, that burden is on the government

25   during the entire trial.  The first opening statement will be

1    by the government.  Again, it's not evidence, but I know you'll

2    give the government your full attention.  Then defense counsel

3    has an opportunity to make an opening statement, if he wishes

4    to do so.  Again, that's not evidence, but I'm sure you'll give

5    him your full attention as well if he chooses to make an

6    opening statement.

7              Ms. Laryea.

8              MS. LARYEA:  Thank you, your Honor.

9              In 2009, the defendant Mahmoud Thiam, that man, was

10   asked to serve as a government official in the country of

11   Guinea, one of the poorest nations in the world.  But instead

12   of honestly serving the people of Guinea, he used this

13   government position to line his own pockets with $8-1/2 million

14   in bribes.  He then spent that bribe money on a mansion in

15   Dutchess County, New York City private schools for his

16   children, and other luxuries.  When banks and FBI agents asked

17   him how he made those millions of dollars, he lied, and for

18   spending that money in the United States and for trying to hide

19   the source of that money, the defendant has been charged with

20   the federal crime of money laundering.

21             Ladies and gentlemen, this opening statement is the

22   government's opportunity to present you with an overview, a

23   road map, of the evidence in this case.  Over the next few

24   minutes, I will first describe the evidence that proves that

25   the defendant took millions of dollars in bribes and then

1   laundered and spent that money here in the United States.

2   Second, I will explain how the government is going to prove

3   that the defendant is guilty of money laundering.  So let's

4   start with some background.

5          During the trial, you will hear that the defendant is

6   a U.S. citizen.  He lived and worked in Manhattan.  He worked

7   as an investment banker.  The defendant is also a dual citizen

8   of Guinea, since that is the country of his birth.  The

9   Republic of Guinea is located in West Africa and is one of the

10  poorest countries in the world.  Many parts of the country lack

11  functioning roads, public transits, electricity, and indoor

12  plumbing.  Many of the 12 million people who live there don't

13  have drinkable water or enough food to eat.  In one way,

14  though, Guinea is rich, incredibly rich.  It has one of the

15  world's largest reserves of minerals: diamonds, gold, and the

16  raw materials used to make aluminum and steel.  It is estimated

17  that these minerals are worth billions and billions of dollars.

18  And here is where the defendant comes in.

19         In 2009, the defendant returned to Guinea when he was

20  appointed as its minister of mines.  You'll hear that in

21  Guinea, the minister of mines is a cabinet-level government

22  position.  It is an extremely important job.  You see, as

23  minister of mines, the defendant was entrusted with overseeing

24  Guinea's most valuable assets: the gold, the diamonds, and the

25  other raw materials.  As minister of mines, the defendant was

1    supposed to serve the people of Guinea and the people of Guinea

2    alone.  What the defendant was not supposed to do was use his

3    government position to enrich himself.  But that is exactly

4    what he did.

5            You'll hear that in 2009, a Chinese country came to

6    Guinea.  Guinea needed money, and the Chinese company wanted

7    access to Guinea's riches.  A negotiation began between Guinea

8    and the Chinese company over how and to what extent the Chinese

9    company would get access to Guinea's mines.

10           Now, the defendant was not the only government

11   official in Guinea who was involved in these negotiations, but

12   you'll hear that as minister of mines and one of the few

13   English-speaking, high-level government officials, he was one

14   of the main contacts with the Chinese company and a key player

15   in the deal.  You'll hear that in his role as minister of

16   mines, the defendant traveled to Asia to negotiate directly

17   with the leaders of the Chinese company.  Back in Guinea, the

18   defendant was a key proponent of the deal.  Thanks in part to

19   the defendant's efforts, an agreement was signed in October

20   2009 between Guinea and the Chinese company.  That agreement

21   gave the Chinese company exclusive rights to the minerals and

22   mining in Guinea, exclusive rights to the diamonds, the gold,

23   and the other raw materials, exclusive rights that, by

24   definition, no other company had.  But ladies and gentlemen,

25   you will learn something else, something very important about

1    this agreement.

2            You'll learn that in exchange for helping the Chinese

3    company get exclusive rights to Guinea's vast mineral wealth,

4    the defendant received $8-1/2 million in bribes.  The evidence

5    will show that about two weeks before the signing of the

6    agreement, the defendant opened an account in Hong Kong at a

7    bank located in the very same building where the Chinese

8    company was based, and just one day later, the defendant got

9    his first bribe payment, $3 million, from the chairman of the

10   Chinese company.

11           Shortly after the agreement was signed, the defendant

12   received another $5-1/2 million from executives of the Chinese

13   company.  When all was said and done, the Chinese company got

14   exclusive rights to Guinea's riches and the defendant got

15   $8-1/2 million in bribe money.

16           So what did the defendant do with all that money?

17   Remember, the defendant lived here in Manhattan before and

18   after he was Guinea's minister of mines, so he brought the

19   bribe money here.  He laundered it.  You'll hear that the

20   defendant spent that bribe money to support his lavish

21   lifestyle, luxury hotels, jewelry, clothing, spa treatments,

22   New York City private schools for his children, and a mansion

23   in Dutchess County, New York.  He also transferred over a

24   million dollars from his Hong Kong account to his New York bank

25   accounts.  And what happened when the defendant transferred the

money into New York?  People asked questions.  And the

defendant lied to cover his tracks.

You'll hear that the defendant did not just tell one

lie, he told three different stories.  He told one bank that he

got that money from his prior business dealings from before he

was minister of mines.  He told a second bank that he got that

money from his prior employment and from selling land in

Africa.  You'll hear that he never told the banks the truth,

that he had gotten the money from the executives of the Chinese

company.  In fact, he never mentioned the Chinese company to

the banks at all.

After the defendant was arrested, he told the FBI yet

a third story.  This time, the defendant admitted that he

received money from an executive of the Chinese company, but

the defendant claimed that the bribe money was just a loan.

You'll hear that the defendant told the FBI it was a loan from

people he met just months before, an $8-1/2 million loan that,

according to the defendant, had no documents, no interest, no

collateral, and no repayment plan, an $8-1/2 million loan that

the defendant admitted he has never actually paid back, over

six years after he got the money.

The evidence will show that by taking that bribe, the

defendant violated Guinea's laws against corruption, and when

the defendant transferred and spent that bribe money here in

the United States, he violated our own laws that prohibit

1    people from spending and transferring money made from crimes.

2    The defendant also took elaborate steps to hide his use of the

3    money to buy a mansion in Dutchess County.  And when he hid the

4    source of that money, the defendant violated our

5    money-laundering laws a second time.

6           So how are we going to prove that the defendant is

7    guilty of money laundering?  First, you'll hear witnesses.

8    These witnesses will include a former government official from

9    Guinea who will testify about the critical role the defendant

10   had in the negotiations and the agreement with the Chinese

11   company.  You will also hear from witnesses from two banks

12   about the lies the defendant told when he transferred over a

13   million dollars from Hong Kong to his New York bank accounts.

14          Second, you'll see documents.  You'll see the actual

15   agreements and the provisions within those agreements that gave

16   the Chinese company exclusive rights to Guinea's riches.

17   You'll also see emails that show the defendant's role in those

18   negotiations.

19          What other evidence will you see of the defendant's

20   scheme?  Bank records.  You will see the bank records that show

21   the transfer of millions of dollars from the executives of the

22   Chinese company to the defendant.  You'll also see records of

23   how the defendant spent those bribe proceeds.  You'll also see

24   emails between the defendant and one of his associates plotting

25   the lies that the defendant was going to tell one of the banks

H4oWthi2                          Opening - Mr. Goldsmith

1   about the money.

2           Third, you'll also hear the defendant's own story

3   about how the $8-1/2 million was just a loan.

4           Now, the evidence here will not come to you in neat,

5   chronological order.  Different witnesses will give you

6   different pieces of the puzzle, but when the trial is over, all

7   those pieces will come together to reveal a story of the

8   defendant's greed, corruption, and lies; that the defendant

9   took $8-1/2 million in bribes; and that he laundered the money

10  here in the United States.  But between now and the end of the

11  trial, we ask you to do three things.  First, pay close

12  attention to the witnesses and the evidence; second, follow

13  Judge Cote's instructions on the law; and third, use your

14  common sense, the same common sense that you use every day when

15  making important decisions in your own lives.  If you do those

16  three things -- pay close attention to the evidence, follow

17  Judge Cote's instructions, and use your common sense -- at the

18  end of the trial, you will reach the only verdict that is

19  consistent with the evidence, that the defendant is guilty as

20  charged.  Thank you.

21          MR. GOLDSMITH:  May I, your Honor.

22          THE COURT:  Mr. Goldsmith, yes.

23          MR. GOLDSMITH:  I agree with the government on a

24  couple of their points.  Pay attention to what the witnesses

25  say, follow the laws that the judge gives you at the end of

1    this trial.  When you do that, at the end, you will find only

2    one conclusion: that the government has not proved its case

3    beyond a reasonable doubt against Mr. Thiam; that the

4    government has not proved its case beyond a reasonable doubt

5    that Mr. Thiam accepted bribery payments in Guinea and then

6    took the proceeds of those bribery payments and laundered them

7    through his bank accounts in New York.

8         Ladies and gentlemen, I'm Aaron Goldsmith.  We met

9    this morning.  My colleagues, Michael Delakas, Jennie Carmona

10   and I have the pleasure of representing Mahmoud Thiam in this

11   particular case.  He's a U.S. citizen.  You will hear in this

12   case evidence about how Mr. Thiam worked in New York for a

13   number of years.  He is a Guinean citizen by birth.  He worked

14   his way in New York as an adult; you will hear about the

15   financial industry.  You will hear that he became a naturalized

16   U.S. citizen.

17        As you have heard reference to, and you will hear

18   testimony about this case, in the late 2000s, Mr. Thiam was

19   invited to return back to Guinea to become a member of the

20   cabinet there, as the minister of mines, and to help the

21   country of Guinea in that moment, to help the country of Guinea

22   that badly needed resources at the time, regain those resources

23   and build those resources and infrastructure, and as the

24   government pointed out in its opening argument, a country that

25   lacked a lot of logistics, that lacked a lot of infrastructure,

H4oWthi2                     Opening – Mr. Goldsmith

1   that has a tremendously high population that is impoverished.

2           However, the crux of this case, the aspect of this

3   case that you need to pay the closest attention to, is whether

4   or not Mr. Thiam took a bribe, whether he got paid money to do

5   something or not to do something in that role as minister of

6   mines for the Republic of Guinea in or around 2009, surrounding

7   a deal with a Chinese conglomerate.  They don't have a witness

8   for that.  They're not going to have a witness for that.  You

9   will hear testimony from bank employees about Mr. Thiam opening

10  bank accounts.  You'll hear witnesses from banks who will

11  testify about the process of opening those accounts, of

12  answering questions about opening those accounts.  You will

13  hear testimony about his receipt of a lot of money in those

14  accounts.  But those witnesses cannot tell you what that money

15  is for, why Mr. Thiam got that money.

16          And as you heard the government also tell you, you

17  will hear that he told the FBI that it was a loan from someone

18  in that Chinese company.  You will hear testimony about that.

19  You won't hear testimony that it was a bribe.  You're going to

20  hear testimony from members of the Guinean government at the

21  time that Mr. Thiam was acting as the minister of mines for

22  that company.  They can tell you about this deal between the

23  government and the Chinese conglomerate that included mining as

24  part of it, that also included aspects of building

25  infrastructure as part of it.

1          You will hear testimony from those witnesses about the

2     roles and responsibilities of certain cabinet ministers, of the

3     discussions and negotiations as part of that deal.  You will

4     hear testimony about Mr. Thiam's role in those negotiations.

5     You will not, from any of those government witnesses, hear any

6     testimony that anyone knew and that anyone saw, that anyone

7     heard and that anyone witnessed, that the money that Mr. Thiam

8     got was a bribe.

9          The judge has instructed you preliminarily, but she's

10    going to give you more instructions at the end of this trial,

11    about the burden of proof and about presumption of innocence.

12    You are familiar with it and you will be instructed on it, that

13    the government has the burden to prove every element of the

14    crimes charged against Mr. Thiam beyond a reasonable doubt.

15    They have to prove to all of you beyond a reasonable doubt that

16    the bribe took place, and they can't.  They have to prove to

17    you beyond a reasonable doubt every element of the money

18    laundering as it came through related to that bribe, that they

19    cannot prove and will not prove.

20         The government in this case, as you heard, has that

21    burden throughout, and Mr. Thiam is presumed innocent.  As you

22    heard the judge say, he pled not guilty in this case.  As we

23    sit here today at 4:30 in the afternoon on Monday the 24th, he

24    is not guilty, and he remains not guilty until the government

25    has proven every element, and of the witnesses that they are

H4oWthi2                   Opening - Mr. Goldsmith

 1   going to bring in this courtroom, as they have told you that

 2   they are going to bring into this courtroom, they will not be

 3   able to satisfy that burden.

 4           The government lawyers told you to pay attention to

 5   the witnesses, to what they saw, what they heard, what they

 6   knew, to pay attention to the documents, the evidence in this

 7   case that you can see in front of you and hold and read, to pay

 8   attention to all of that and put it together with what the

 9   judge instructs on the law.  Do that.  Go through every witness

10   that the government is going to call up here.  Pay attention to

11   what they saw, what they heard, what they read, what they knew.

12   Read the documents that the government's going to introduce.

13   Take the law that the judge gives you, and at the end, I submit

14   you will find that the number of dots that the government wants

15   to connect in this case to show that a bribe took place and

16   that the proceeds of that bribe were brought into the United

17   States, they cannot connect those dots.  Those witnesses that

18   they are going to call and the documents that they are going to

19   show you will and cannot connect those dots.  And you will at

20   the end find Mr. Thiam not guilty.  Thank you.

21           THE COURT:  The government may call its first witness.

22           MS. LARYEA:  Yes, your Honor.  Before the government

23   calls its first witness, the government would like to read two

24   stipulations into the record.

25           THE COURT:  What numbers?

1          MS. LARYEA:  Government Exhibit No. 1405 and 1409.

2          "It is hereby stipulated and agreed, by and between

3     the United States of America, by Joon H. Kim, Acting United

4     States Attorney, Christopher J. DiMase and Elisha J. Kobre,

5     Assistant United States Attorneys, of counsel, Andrew

6     Weissmann, chief, fraud section, criminal division, Lorinda

7     Laryea, of counsel, and Mahmoud Thiam, the defendant, and by

8     his counsel, Aaron M. Goldsmith, Esq., that:

9          "1.  Google Inc. operates a web-based electronic mail

10    (hereinafter 'email') service known as gmail.  In or about

11    January 2015, a search warrant (hereinafter 'the search

12    warrant') issued by a United States magistrate judge for the

13    Southern District of New York was served on Google.  The search

14    warrant directed Google to produce all stored emails and other

15    stored content information in the email account

16    mahmoud.thiam@gmail.com.  Google complied with the search

17    warrant by providing a true and accurate copy of the stored

18    emails and other stored content information in that account to

19    the Federal Bureau of Investigation in New York, New York.

20          "Government Exhibit 500 is a thumb drive containing

21    true and correct copies of emails from the email account

22    mahmoud.thiam@gmail.com produced by Google in response to the

23    search warrant.  Government Exhibits 501 through 506 and

24    Government Exhibits 508 through 545 are certain emails copied

25    from Government Exhibit 500.  Government Exhibits 506-T, 509-T,

510-T, 511-T, 512-T, 514-T, 517-T, 519-T, 525-T, 527-T, 530-T,

531-T, and 536-T are true and accurate English translations of

the French-language portions of the corresponding government

exhibits.

     "Google user information records show that the email

account mahmoud.thiam@gmail.com has, since on or about April 8,

2005, been registered to Mahmoud Thiam.

     "It is further stinted and agreed that this

stipulation that is marked as Government Exhibit 1405 and

Government Exhibits 501 through 506, Government Exhibits 508

through 545, and Government Exhibits 506-T, 509-T, 510-T,

511-T, 512-T, 514-T, 517-T, 519-T, 525-T, 527-T, 530-T, 531-T,

and 536-T may be received in evidence as Government Exhibits at

trial."

     At this time, your Honor, the government offers those

exhibits.  Would the Court like me to read that again?

     THE COURT:  No.  I think twice was enough.  1405 and

the enumerated exhibits are received into evidence.

     (Government Exhibits 1405 and 501-506 received in

evidence)

     (Government Exhibits 508-545 and 506-T, 509-T, 510-T,

511-T, 512-T, 514-T, 517-T, 519-T, 525-T, 527-T, 530-T, 531-T,

and 536-T received in evidence)

     MS. LARYEA:  Thank you, your Honor.  Now for the

second stipulation:

1          "It is hereby stipulated and agreed, by and between

2     the United States of America, by Joon H. Kim, Acting United

3     States Attorney, Christopher J. DiMase and Elisha J. Kobre,

4     Assistant United States Attorneys --"

5          THE COURT:  You know what?  I should tell everyone,

6     and I apologize, counsel, I didn't tell you this before.  I

7     think reading that preliminary once will probably be

8     sufficient.  It's in the document.

9          You'll have the document available to you.

10         MS. LARYEA:  Great.  Thank you, your Honor.

11         THE COURT:  Yes.

12         MS. LARYEA:  "Government Exhibit 103 is a CD

13    containing true and correct records maintained by J.P. Morgan

14    ChaseBank ("J.P. Morgan") pertaining to J.P. Morgan account

15    number 26722089 and associated savings account number 26297817,

16    both in the name of Mahmoud Thiam, which will be referred to as

17    Thiam J.P. Morgan accounts.

18         "Government Exhibit 104 consists of true and correct

19    due diligence records maintained by J.P. Morgan in connection

20    with the Thiam J.P. Morgan accounts.  The information contained

21    in Government Exhibits 103 and 104 was recorded by someone with

22    knowledge at J.P. Morgan at or near the time that the activity

23    took place, was kept in the course of regularly conducted

24    activity of J.P. Morgan, and was made as a regular practice of

25    that activity.

1          "It is further stipulated and agreed that this

2    stipulation, which is marked as Government Exhibit 1409, and

3    Government Exhibits 103 and 104 may be received in evidence as

4    Government Exhibits at trial."

5          At this time, the government offers those exhibits,

6    your Honor.

7          THE COURT:  They are received.

8          (Government Exhibits 1409, 103 and 104 received in

9    evidence)

10          MR. KOBRE:  The government calls Remi Aring.

11    REMEDIOS ARING,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MS. LARYEA:

16    Q.  Ms. Aring, where do you live?

17    A.  I live in Dallas, Texas.

18    Q.  Are you currently employed?

19    A.  No.

20    Q.  What do you do?  Are you currently retired?

21    A.  Yes, I'm retired.

22    Q.  When did you retire?

23    A.  I retired from Chase in 2014.

24    Q.  What did you do before you retired?

25    A.  I was an, a senior compliance officer with J.P. Morgan

1    Chase in AML operations.

2    Q.   What was your last position at J.P. Morgan Chase?

3    A.   As senior compliance officer with the department.

4    Q.   When did you begin in that role?

5    A.   I started out in October of 2006.

6    Q.   What were your responsibilities?

7    A.   Mainly are assigned or investigated cases with customer

8    transactions involving money laundering or just unusual

9    transactions.

10   Q.   How were those cases brought up to your attention?

11   A.   When alerts are escalated into cases, they're created into

12   a case and they are assigned to different case investigators,

13   and one of them is -- and I'm one of the case investigators.

14   Q.   You mentioned alerts.  What are these alerts?

15   A.   Chase generates reports systematically when they list

16   accounts that have transactions that have certain high-risk

17   elements to them, they thought that, you know, transactions

18   that may meet high-risk criteria.

19   Q.   Can you give examples of some of these high-risk criteria?

20   A.   For example, I got, most common alert are, for instance,

21   cash alerts like are there transactions that are repetitive,

22   cash transactions that are right below the reporting threshold

23   of 10,000 and below, or for instance, cash deposit activity in

24   one state followed by immediate cash withdrawal in another

25   state, or, or something like repetitive wire activity to and

1   from a high-risk jurisdiction.  Those are just examples of the

2   many examples of alerts.

3   Q.  Why did Chase have this kind of alert system?

4   A.  Regulations require us to, require financial institutions,

5   for that matter, to, to watch or investigate or ask questions

6   for potentially suspicious or unusual activity as part of our

7   money-laundering -- AML policies and procedures.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. LARYEA:

2    Q.   You mentioned AML.   What is AML?

3    A.   I'm sorry.   AML stands for antimoney laundering.

4    Q.   What happens after an alert is issued?

5    A.   An alert is assigned to various investigation -- alert

6    analysts, and the analyst would then review the alerting

7    account for whatever the reason that they alerted for, do an

8    overall transaction review, and if they're not able to, you

9    know, determine or if there is some activity that cannot be

10   explained, then they deem it escalatable to a case, and at that

11   point then they create the case.

12   Q.   Once an alert is escalated to a case, what happens to it?

13   A.   The analyst creates a case in our system called HALO, and

14   then the case is assigned to case investigators.

15   Q.   You mentioned a system called HALO.   What is the purpose of

16   HALO?

17   A.   The HALO is if a case -- JPMorgan Chase case management

18   system that, where alert -- the alerts are called events --

19   where events and cases are entered in there, so it becomes like

20   a central repository for -- for the alerts, or the cases that

21   are being investigated.

22   Q.   What kind of information is input into HALO?

23   A.   Pretty much every type of investigation comments, findings,

24   transactional review; any kind of comments that's relevant to

25   the case investigation.

1   Q.  What kind of work did you do in your time in this period at

2   JPMorgan?

3   A.  I was one of the case investigators.

4   Q.  You investigated these cases that were escalated?

5   A.  That were assigned to me, yes.

6   Q.  What did you do when you received a new case?

7   A.  First I reviewed the reason that the alert -- or the case

8   was initially -- or why it was escalated, the case, to begin

9   with, and then from there, I -- because assigned to a case, it

10  just means it involves possibly needing to do a deeper dive or

11  further investigation, so I would look at the different systems

12  or download transactions from different transactional databases

13  and look at the customer's profile through different customer

14  records and databases or do some other research on internet,

15  etc.

16  Q.  Do you remember an investigation, investigating a matter

17  involving an individual named Mahmoud Thiam?

18  A.  Yes.

19  Q.  Approximately when was that investigation?

20  A.  I believe sometime around March of 2010.

21  Q.  As you sit here today, do you remember every single detail

22  about that investigation?

23  A.  Not without going through reading my case comments.

24  Q.  You mentioned case comments.  Did you document the steps

25  and information you gathered in your investigation?

H4o1thi3                        Aring - Direct

1   A.  Yes.

2   Q.  Where did you put that information?

3   A.  I would have entered any kind of case findings or comments

4   or any kind of determination in the HALO case management

5   system.

6   Q.  When you put that information into the HALO system, did you

7   record that information accurately?

8   A.  To the best of my ability, yes.

9   Q.  And before testifying today did you review the HALO record

10  of your investigation of Mahmoud Thiam?

11  A.  Yes.

12  Q.  I'm going to show you what has been admitted as

13  Government's Exhibit 104.  Do you recognize that document?

14  A.  Yes.

15  Q.  What is it?

16  A.  This is the case that -- in HALO that I've made notations

17  in as far as the case for Mahmoud Thiam.

18  Q.  How did the investigation into Mahmoud Thiam begin?

19  A.  I'm sorry?

20  Q.  How did the investigation into the defendant begin?

21  A.  It began as a -- an alerting event, the subtype of which is

22  account security blanket.  Based on the subtype, I'm thinking

23  it's because of an overall -- a spike in the overall activity

24  on the account.

25  Q.  Do you remember what kind of activity it was?

1    A.  Due to mostly outgoing and incoming wires and overall, and

2    other little activities.

3    Q.  Where were these wires coming in from?

4    A.  The -- according to the security blanket comments or

5    analyst comments, that they were from HSBC Bank.  The incoming

6    wire credits, you mean?

7    Q.  Yes.

8    A.  Are from HSBC bank in Hong Kong.

9    Q.  Who owned this account that you were investigating?

10   A.  The account, the alerting account that we were

11   investigating?

12   Q.  Yes.

13   A.  Is owned -- was owned by Mahmoud Thiam and a co-owner Fatim

14   Thiam.

15   Q.  What was the period of time that your investigation focused

16   on?

17   A.  My investigation or the alert analyst's investigation?

18   Q.  Your investigation.

19   A.  My investigation?

20   Q.  What was the period of time of account activity that you

21   were reviewing?

22   A.  I reviewed the period from November of 2009 to February

23   2010, 2010.

24   Q.  What did you do when you first received this case?

25   A.  I reviewed the customer profile from different bank records

H4o1thi3                          Aring - Direct

1   and databases, and I also reviewed the transactions on the

2   account, alerting account.

3   Q.  What did you determine after doing that initial review?

4   A.  I determined that the customer is -- and the account has --

5   has been opened in 1993 and that he has other account

6   relationships with Chase and -- and I reviewed the

7   transactions.

8   Q.  As part of your investigation, did you review the account

9   activity in the bank account?

10  A.  Yes.

11  Q.  Let's start with that account activity.  What city was the

12  bank account based in, just the city?

13  A.  The city is -- I mean, the account is based in New York.

14  Q.  Did you review any incoming wires?

15  A.  Yes.

16  Q.  Did you document your review of the incoming wires?

17  A.  Yes.

18  Q.  All right.  I'd like to point you to the entry for March 15

19  at 6:29 p.m.

20         MS. LARYEA:  Your Honor, permission to publish this

21  section of the HALO records?

22         THE COURT:  Yes.  You don't need to ask permission,

23  but of course you'll reflect on the record what we're looking

24  at.

25         MS. LARYEA:  Yes.  At this time the government will

1     publish the HALO record entry for March 15 at 6:29 p.m.

2                 THE COURT:  Is there a year associated with this?

3                 MS. LARYEA:  Yes.  March 15, 2010.

4                 THE COURT:  Ladies and gentlemen, to the extent that

5     you can't read the document, that's fine.  That's an attorney's

6     issue.  But if there is nothing on your screen, would you

7     please raise your hand.

8                 Okay.  There is one screen that has nothing on it.

9     Okay.  We're going to call technical assistance and hopefully

10    get that fixed.  So take it off all screens, please.

11                Okay.  Continue your examination.

12                MS. LARYEA:  Yes, your Honor.

13    BY MS. LARYEA:

14    Q.  What does that entry say about what you found out about the

15    incoming wires?

16    A.  The review of the alerting account from November 2009 to

17    February 2010, I find -- I found that there were seven wire

18    credits, high-value wire credits, approximately 800,000,

19    originated by the client, Mahmoud Thiam, from his HSBC account

20    based in Hong Kong.

21    Q.  Thank you.  Did you notice anything about outgoing wires?

22    A.  I noticed similar high-value wires, outgoing wires going

23    to -- to benefit various individuals in United States and to

24    other countries.

25    Q.  What did you do after you reviewed this account activity?

H4o1thi3                              Aring - Direct

1    A.  I researched the -- some more -- I gathered some more

2    information just to determine the client's profile as to the

3    relationship between the customer's account here and the

4    originating funds from Hong Kong.  I researched that through

5    the internet and -- and through eventually further contact --

6    or contact with the customer.

7    Q.  I want to first discuss the research you did before you

8    spoke to the customer.  Did you write down what you discovered

9    in your research?

10   A.  Yes.

11   Q.  I'd like to point you to the entry for March 16, 2010, at

12   4:21 p.m.  What did you find during your research about the

13   defendant's possible occupation?

14   A.  Based on research on the internet, specifically, the

15   searches yielded information according to -- indicating the

16   subject is potentially the newly appointed senior foreign

17   government official, specifically, as Guinea mines and energy

18   minister; and as president of the Guinea Development

19   Corporation mining oil and gas; and also as former investment

20   banker, senior VP, UBS New York.

21   Q.  What did you do after your internet research?

22   A.  I proceeded to review other information regarding the

23   customer on -- again, on the internet, for potential negative

24   media or any other related matter to the customer.

25   Q.  You mentioned that you spoke with the customer?

1   A.  Yes.  I eventually did contact the customer.

2   Q.  Who was the first person you spoke to?

3   A.  I -- my first initial -- my initial contact, successful

4   contact was to Fatim Thiam.

5   Q.  And remind us, who is Fatim Thiam?

6   A.  She is the co-signer or co-owner on the account.

7   Q.  And did you document your conversation with Fatim Thiam?

8   A.  Yes.

9   Q.  I would like to point you to the entry for March 22, 2010,

10  at 12:48 p.m.  What is that entry?

11  A.  This documents a conversation, the phone conversation or

12  phone interview I -- I had with Fatim.

13  Q.  What did you ask her during that phone conversation?

14  A.  The first question I asked her was the nature and the

15  purpose of the incoming wire credits of approximately 900,000.

16  Q.  What did she say?

17  A.  Her response is that this is income of husband.

18  Q.  What else did you ask her?

19  A.  So I asked her:  What is husband's occupation?

20  Q.  And what was her answer?

21  A.  She responded a financial adviser and consultant for

22  various mining companies worldwide.

23  Q.  What else did you discuss?

24  A.  I asked her:  What is the funding source of the wires from

25  Hong Kong and why is it coming from Hong Kong?

H4o1thi3

1    Q.   Why did you ask that question?

2    A.   I'm trying to understand the -- the source of the income or

3    what the -- what is the funding source of those wires that came

4    to Chase.

5              THE COURT:  So counsel, we're going to end there for

6    the day.

7              Ladies and gentlemen, it's 5:00.  I remind you, do not

8    discuss the case.  We'll start with this testimony again

9    promptly at 9:30, so please be here before then.

10             Have a good night.  Thank you.

11             Please, counsel, be seated.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

H4o1thi3

1          (Jury not present)

2          THE COURT:  So Mr. Kobre, is there anything we need to

3     discuss?

4          MR. KOBRE:  Just one moment, your Honor.  If I might

5     just have 30 seconds, 20 seconds?

6          No, your Honor.  Thank you.

7          THE COURT:  And Mr. Goldsmith, anything we need to

8     discuss?

9          MR. GOLDSMITH:  Nothing at this time.

10          THE COURT:  Good.  See you at 9.  Thanks so much.

11          THE LAW CLERK:  All rise.

12          (Adjourned to April 25, 2017, at 9:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25