H4pWthi1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                      17 Cr. 47 (DC)

MAHMOUD THIAM,

           Defendant.          Trial

------------------------------x

                                New York, N.Y.
                                April 25, 2017
                                9 :00 a.m.

Before:

                  HON. DENISE COTE,

                                District Judge,
                                 and a Jury

                        APPEARANCES

JOON H. KIM
     Acting United States Attorney for
     the Southern District of New York
BY:  ELISHA J. KOBRE
     CHRISTOPHER J. DiMASE
     Assistant United States Attorneys

      -and-

U.S. DEPARTMENT OF JUSTICE
BY:  LORINDA I. LARYEA

LAW OFFICE OF AARON GOLDSMITH, PC
     Attorneys for Defendant
BY:  AARON M. GOLDSMITH, Esq.
     MICHAEL DELAKAS, Esq.

ALSO PRESENT:  Patrick Killeen, Special Agent, FBI
                 Alexander Beer, Paralegal Specialist, USAO
                 Katherine Bosley, Paralegal Specialist, DOJ
                 Jennie Carmona, Paralegal, LO of Aaron Goldsmith

H4pWthi1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Good morning, everyone.  Let me get two

 3     quick issues out of the way.  Is the defendant calling a

 4     character witness?

 5              MR. GOLDSMITH:  No, your Honor.

 6              THE COURT:  Just so I know whether I have to prepare

 7     that charge.

 8              MR. GOLDSMITH:  No.

 9              THE COURT:  OK.  Thank you very much.  I noticed it in

10     your request.

11              And secondly, one of the jurors asked Ms. Rojas last

12     night as they were leaving whether it was OK to take notes.

13     Any objection to me giving the standard charge in this circuit

14     for juror note taking?

15              MR. KOBRE:  No objection, your Honor.

16              MR. GOLDSMITH:  No, your Honor.

17              THE COURT:  Thank you.  Yesterday, busy day for

18     Ms. Rojas, as a juror was leaving, she indicated that her

19     employer was concerned about her being selected on jury service

20     and wanted to confirm that she had been selected to serve on a

21     jury, and so Ms. Rojas asked me if she could call the employer

22     since it seemed like it was an urgent concern as opposed to

23     something I handle in the normal course by giving a letter

24     confirming selection on a jury.  So I said, Yes, call the

25     employer to confirm orally that the juror had been selected,
```

H4pWthi1

and that led to a conversation between the employer and

Ms. Rojas, which then I asked Ms. Rojas to call counsel jointly

and relate so you would have that information as soon as I did.

    The employer indicated that she runs a day care center

and must maintain a state-ordered ratio, that the law requires

that.  And she will have to hire a full-time permanent employee

to replace the juror while the juror is on jury duty, although

she will be happy to take the juror back as a part-time

employee when her jury service is completed.  Let me just

confirm with Ms. Rojas I've correctly described the

conversation.

    OK.  I think I've captured it correctly, and that's

what I expect you heard from Ms. Rojas when she spoke to you

jointly, I think, at about ten to six last night.  So there's a

statute.  I don't know if you folks have done some legal

research in the interim.  It's something that gets litigated

from time to time, often in the context of an employment

discrimination action.  In fact, I had one such case some time

ago.  The statute is 28 U.S.C. Section 1875.  It says, "No

employer shall discharge, threaten to discharge, intimidate, or

coerce any permanent employee by reason of such employee's jury

service or the attendance, or scheduled attendance, in

connection with such service in any court of the United

States," and then it has penalty provisions, but I think this

is the critical language.  As I understand, it's broadly

H4pWthi1

1    construed, and I also have the right to appoint an attorney to

2    represent the juror.  The case in which I've written about this

3    is Gleason v. Department of Homeland Security, 2007 WL 1597955,

4    and Arnold v. Beth Abraham Health Services, 2011 WL 2416877.

5    There's not a lot of circuit authority on this statute, but

6    there is the Second Circuit case Shea v. Rockland, 810 F.2d 27.

7            Have counsel had an opportunity to consult with each

8    other, and do you have a joint recommendation to the Court?

9    And if you haven't consulted with each other, please do so now.

10           MR. DiMASE:  Your Honor, we'll do that.  Just one

11   quick question for the Court.  We are continuing to work on the

12   computer system and the monitors.  Would it be all right if the

13   U.S. Attorney's Office tech folks continue to do that as we

14   have this discussion?

15           THE COURT:  Yes.

16           MR. DiMASE:  At the table here?

17           THE COURT:  Yes.

18           MR. DiMASE:  Thank you.

19           We'll talk very briefly, your Honor.  Thank you.

20           THE COURT:  Counsel.

21           MR. DiMASE:  Yes, your Honor.  We've conferred with

22   Mr. Goldsmith.  I think what the parties would propose is to

23   briefly have a brief colloquy with the juror without the rest

24   of the jury present and essentially inform the juror of this

25   statute, to the extent that she's not already aware of it, and

1    ask her to communicate that her employer's actions are not

2    consistent with the law, and if she continues to have a

3    problem, I think at that point the Court could inform her that

4    the Court can appoint her an attorney to represent her in

5    connection with a suit with her employer.  I don't know if it's

6    ripe for that at this point, but we do have different thoughts.

7         MR. GOLDSMITH:  And I think it would be helpful, your

8    Honor, because I think the last thing that any party wants or

9    the Court wants, is one of our jurors to not be paying

10   attention to the witnesses because they're concerned about,

11   What's going to happen with my job today?  So I think the

12   Court's colloquy will help to at least settle that particular

13   juror's anxiety and allow her to focus on what we're doing in

14   court rather than what may happen with the job.

15        THE COURT:  We have four alternates.  As these trials

16   go, this is a relatively short one.  I'm happy to proceed as

17   counsel request, advising the juror of the statute.  As I

18   understand the statute, for an employer to deprive an employee

19   of a full-time position because of jury service would be a

20   violation of the statute.  I think we're all agreed on that.

21   If you know of any authority to the contrary, I'm sure you'll

22   let me know.  I of all people believe, and of course we all do

23   in this courtroom, that jury service is such a significant

24   responsibility of citizenship, we want to protect our jurors

25   and support them in their jury service, and that's the message

H4pWthi1

of this statute.  And I admit that I don't know the size of
this day care business.

Ms. Rojas tells me, I didn't understand this before,
that the employer has four employees.  I don't know what the
breakdown is between permanent and part time.  Telling the
juror that she's protected by law is, I'm sure, partly helpful
to her.  I'm not sure that it's actually going to give her the
level of comfort that counsel are trying to give her here.  I
think it would be more helpful to directly communicate with the
employer and advise the juror that the employer has been
advised that it is a violation of the law to deprive the juror
of permanent employment due to jury service and, of course,
advise the juror that the employer has been so advised.

I don't know the terms of this juror's employment.  As
I remember, she has just very recently begun this job.  The
statute, as you no doubt saw, gives protections to permanent
employees.  I do not know if this juror is a permanent employee
or probationary employee.  I don't know what defenses the
employer will have under the statute.

Why don't I leave the bench for a moment and let
counsel reflect further on these issues that I have described
to you that I see as implicated by this problem.  Thanks so
much.

(Recess)

THE COURT:  Counsel, thank you for taking this

1    additional time to reflect on these important issues.  Do you

2    have a joint position, or do you have different views that I

3    should hear?

4              MR. KOBRE:  We do, your Honor.  I think we heard in

5    your Honor's remarks two additional possibilities to what we

6    suggested.  One was either the Court, directly itself, or

7    through the deputy clerk, could get in contact with the

8    employer and explain the importance of jury duty and also

9    explain the law and see if it could be worked out through those

10   means.  And obviously the other alternative is just to go with

11   one of the alternate jurors.  I think the preference of the

12   parties would be the first of those two, see if it can be

13   worked out directly with the employer, and if it seems at that

14   point that the employer still has a problem with it or if it

15   seems like there would be some negative impact on the juror

16   going forward, then at that point, we would just go with the

17   alternate.

18             THE COURT:  OK.  Just responding to this very quickly,

19   I'll give this some thought, I don't think I can have anyone on

20   my staff make that call.  I think I would have to make that

21   call.  I don't want to make that call without counsel being

22   involved, so I'll ask Ms. Rojas to try to get the employer on

23   the phone in the next five minutes, if that's possible.  We'll

24   go into the robing room with counsel, and I'll have the

25   conversation with the employer, and that would permit us to

H4pWthi1

1   understand better what is appropriate to say to the employee.

2          Is that agreeable, Mr. Kobre?

3          MR. KOBRE:  It is, your Honor.

4          THE COURT:  Mr. Goldsmith.

5          MR. GOLDSMITH:  Yes.

6          THE COURT:  Thank you.  Ms. Rojas will make efforts

7   here to get her on the phone.

8          Now, I understand also that someone informed Ms. Rojas

9   after court yesterday that we're going to have witnesses that

10  need interpreters and that the language that will be

11  interpreted is French, so I will advise, I have to certify the

12  interpreters, or qualify them -- I shouldn't say certify them,

13  qualify them.  They should be prepared to be qualified in front

14  of the jury, and I have to instruct the jury that if any one of

15  them knows French, can speak or read French, they must take the

16  translations provided through the interpreter.

17         Any objection?

18         MR. KOBRE:  Not from the government, your Honor.

19         MR. GOLDSMITH:  No.

20         THE COURT:  Thank you.

21         Mr. Kobre, any issues?

22         MR. KOBRE:  Just one moment, your Honor?

23         No, your Honor.

24         THE COURT:  Mr. Goldsmith.

25         MR. GOLDSMITH:  Not at this time, no.

```
 1              THE COURT:  OK.  So stand by, and we'll see if we can

 2     get the employer on the phone.  I think everyone knows we're

 3     talking about juror No. 1, Jannel Mauge, because she was the

 4     juror who advised us that her current employment is infant

 5     care.  She'd worked as a personal trainer before that, and I

 6     think she told us that she'd been on the job roughly two weeks.

 7              Good.  Thank you, all.

 8              MR. KOBRE:  Your Honor, if I might?

 9              THE COURT:  Yes.

10              MR. KOBRE:  Just to propose for the Court, would it

11     make sense to let the juror know of this proposed contact

12     before the Court does it?  I'm just throwing that out there,

13     whether that would somehow be appropriate.

14              THE COURT:  OK.  Let's just think this through.  If

15     we're concerned about the juror's relationship with her

16     employer in a brand-new job -- I just want you to play that

17     out, think that through -- that I'm not going to call the

18     employer until I advise the employee and, in essence, although

19     not explicitly, ask her permission?

20              I'll give this some thought, but I think that is not

21     the way to proceed.  We have two concerns here:  The juror's

22     participation as a juror in this trial and the way we want her

23     to participate, with full attention and commitment to the

24     trial.  We have a separate concern, enforcement of the law,

25     protecting jury service for permanent employees.
```

1          Any call with the employer, I think, should begin by

2    inquiring, Is this a permanent employee?  If it's not a

3    permanent employee, then she doesn't have protection of the

4    statute, and while I can encourage jury service and try to

5    advocate on behalf of the juror retaining her permanent job, I

6    cannot advise the employer as a matter of law that it would be

7    a violation of law to not give her a permanent job upon her

8    return from jury service.  I don't think asking the employee,

9    juror No. 1, whether she's a permanent employee or not is a

10   useful way to proceed.  She's not a lawyer.  She's not an

11   employment law expert.  In this circumstance, the only one who

12   knows the answer to that question, potentially, is the

13   employer.

14          MR. KOBRE:  Yes, your Honor.  Thank you.

15          THE COURT:  So I either call the employer and try to

16   sort these things out and make a better judgment, with

17   counsels' assistance, or not.  And if not, I think what I

18   should be doing is giving our thanks to the juror and

19   dismissing her.

20          Does that seem right, Mr. Kobre?

21          MR. KOBRE:  It does, your Honor.

22          THE COURT:  Does that seem right, Mr. Goldsmith?

23          MR. GOLDSMITH:  Yes.

24          THE COURT:  Thank you.

25          (Recess)

H4pWthi1

1          THE COURT:  We don't have a jury.  I'm going to make a

2     quick report.  I haven't had a full conversation with Ms. Rojas

3     about this yet, so there may be more detail for us to learn,

4     but the owner isn't available until midday when she comes into

5     work, so we'll have to deal with this at the lunch hour, if

6     necessary.  But the person with whom Ms. Rojas spoke gave a

7     different impression, the bottom line being that they can

8     manage this week, but next week will be difficult.  So I think

9     we'll just take this one step at a time.  I'll keep you

10    apprised, and if I understand the conversation differently

11    after Ms. Rojas and I have a chance to talk in more detail,

12    I'll immediately let you know.

13          She's checking on the jury now to see where we stand.

14    Thanks so much.

15          (Recess)

16          THE COURT:  Please be seated.  Bring in the witness.

17    Put the witness on the stand.

18          Bring in the jury.

19    REMEDIOS ARING, resumed.

20          THE COURT:  We're not ready.  We're missing one juror.

21    It happens to be juror No. 1.

22          The witness may step down.

23          (Witness not present)

24          THE COURT:  The jury had a question for Ms. Rojas,

25    which is why they turned on the light indicating they were

H4pWthi1

1   ready to proceed, and the question was, What do we now do that

2   we're waiting for one juror?  All the jurors but two were here

3   on time.

4          This is the situation.  Ms. Rojas has been checking

5   her messages, to just make sure, as she regularly does, if

6   we've received a message regarding any delay or reason for

7   delay.  It is now -- we're all going by the courtroom clock,

8   since that's the timepiece we have in common -- about seven

9   minutes to ten.  I'm going to propose to counsel that we wait

10  until 10:00 for Ms. Mauge, and I'd like you to discuss what we

11  do in the event she does not show up by 10:00 and whether or

12  not we should excuse her at that time.

13         Good.  Ms. Rojas will let us know when we're ready to

14  proceed.

15         (Recess)

16         THE COURT:  Counsel, we still have no jury.  Ms. Mauge

17  has not appeared.  Is there any objection to excusing her?

18         MR. KOBRE:  No, your Honor.

19         MR. GOLDSMITH:  No, your Honor.

20         THE COURT:  OK.  Bring in the jury.

21         Bring in the witness, please.

22         (Continued on next page)

23

24

25

1              THE COURT:  Bring in the jury, please.

2              (Jury present)

3              THE COURT:  Good morning, everyone.

4              THE JURORS:  Good morning.

5              THE COURT:  I want to thank so many of you who were

6      here on time, and I want to advise you again how important it

7      is that you're here promptly.  And I know that's an odd thing

8      to say, that so many of you made great effort to be here on

9      time.  It's a rainy day.  I know transportation can be

10     difficult.  But I've been here with the lawyers since 9, and

11     we're anxious to use your time well and present the evidence to

12     you as smoothly as possible and we're all working hard to do

13     that, so again, thank you to all of you who made the effort to

14     be here.

15             I'm excusing one of your members, Juror No. 1, because

16     it's important we continue with this trial, and we've made

17     efforts to try to reach her and have been unable to, so that

18     means that one of our jurors who was an alternate juror is no

19     longer an alternate juror.  We have three alternate jurors.

20     Only 12 will deliberate.  We choose alternate jurors just for

21     this kind of problem, because the trial cannot proceed without

22     the jury here present in the courtroom to hear all the

23     evidence, so thank you for your participation.  And alternates,

24     listen as carefully as everyone else because we really depend

25     on you and need you.  So thank you.

1          One of you had a question for Ms. Rojas last night,

2   and it was about whether or not you could take notes during the

3   trial, and I have an instruction for you in that regard.

4          Of course if you want to take notes, you may do so,

5   but keep this in mind if you decide to take notes.  The notes

6   may not interfere in any way with you listening to and

7   understanding all of the evidence to the best of your ability.

8   Also, if you do take notes, you may not discuss them with

9   anyone at any time during the trial or during your

10  deliberations.  They are instead to be used solely to assist

11  you, and your notes may not substitute in any way for your

12  recollection of the evidence.  During deliberations the fact

13  that an individual juror has chosen to take notes, if any one

14  of you does decide to do so, will give that juror's views no

15  greater weight than the views of any other juror during the

16  deliberations process.  And of course, as you've noticed, we

17  have a court reporter here.  In fact, we have a team of court

18  reporters.  So we have a transcript that's being made of

19  everything said in this courtroom, so if during your

20  deliberations you collectively decide that you're not sure of

21  what some of the testimony was, you have the right to send me a

22  note and for that testimony to be provided to you so you can

23  use that to remind yourselves of what the testimony actually

24  was during the course of this trial.

25          So I hope that responds to your question.

1              I'm going to remind the witness she is still under

2      oath.

3              Counsel.

4              MS. LARYEA:  Thank you, your Honor.

5       REMEDIOS ARING, resumed.

6      DIRECT EXAMINATION CONTINUED

7      BY MS. LARYEA:

8      Q.  Good morning, Ms. Aring.

9      A.  Good morning.

10     Q.  How are you today?

11     A.  I'm good.  Thank you.

12     Q.  Thank you for coming back to speak with us.

13         Yesterday you testified that you are currently retired, is

14     that correct?

15     A.  Yes.

16     Q.  And you testified that before your retirement you worked at

17     JPMorgan Chase Bank?

18     A.  Yes.

19     Q.  And your last position at JPMorgan Chase Bank was as a

20     senior compliance officer between 2006 and 2014, is that

21     correct?

22     A.  Yes.

23     Q.  And in that position you stated yesterday you reviewed

24     accounts that had been flagged because of certain activity, is

25     that right?

1    A.  Yes.

2    Q.  And did you document those investigations?

3              MR. GOLDSMITH:  Objection.

4              THE COURT:  Excuse me one second.

5              I'm sorry.  I did not hear the question.  Could you

6    repeat your question, please.

7              MS. LARYEA:  I asked:

8    Q.  During your investigation, did you document any findings?

9    A.  Yes, I did.

10   Q.  And you mentioned that you had an investigation relating to

11   the defendant Mr. Thiam?

12   A.  Yes.

13   Q.  Was this a sole account?  Was it a joint account, as you

14   stated yesterday?

15             MR. GOLDSMITH:  Objection.

16             THE COURT:  Sustained.

17   Q.  What kind of account was this?

18   A.  The alerted account is a checking account, consumer

19   checking account.

20   Q.  And who owned this checking account?

21   A.  Fatim and a co-owner of -- and Mr. Thiam.

22   Q.  What was the relationship between Fatim and Mr. Thiam?

23             MR. GOLDSMITH:  Objection.

24             THE COURT:  Sustained.

25   Q.  Did you come to discover the relationship between Fatim and

1    Mr. Thiam?

2    A.   Yes.

3    Q.   How did you discover that relationship?

4    A.   During a phone conversation with Fatim.

5    Q.   And what was that relationship?

6    A.   Fatim stated that Mr. Thiam is her husband.

7    Q.   And what was the reason you were investigating this

8    checking account?

9              THE COURT:   Counsel, we did this yesterday.  Do you

10   want to pick up from where we left off.

11             MS. LARYEA:   Yes, your Honor.

12   Q.   Ms. Aring, I'm giving you back Government Exhibit 104.

13        What is that exhibit?

14   A.   This is a copy of the case notes on -- on the

15   investigations.

16   Q.   I would like you to go to entry March 15, 2010, 6:29 p.m.

17             THE COURT:   I think we were at March 22nd.

18             MS. LARYEA:   Yes, your Honor.  We did not get a chance

19   to look at those exhibits because the AV was not working

20   yesterday.

21             THE COURT:   Okay.

22             MS. LARYEA:   Could you publish March 15, 2010, at

23   6:29 p.m.

24   BY MS. LARYEA:

25   Q.   What is this entry?

1  A.  This is noting the review of the -- the account, the

2  checking account's transactions.

3  Q.  What did you notice about incoming wires into this checking

4  account?

5  A.  For the period of the review, there were -- I've noticed

6  seven wire credits or seven wires credited to the account

7  originating from the client's account at HSBC Hong Kong.

8  Q.  Can you read the last four -- what are the last four digits

9  of that HSBC Hong Kong account?

10 A.  It's ending 0888.

11 Q.  How much money came from the HSBC Hong Kong account during

12 this period?

13 A.  During this period there were a total -- seven wire credits

14 totaling approximately 800,000.

15 Q.  And what is a wire credit?

16 A.  It's -- it's when a customer instructs one bank to transmit

17 funds via a wire or electronically to credit another account or

18 to deposit to another account.

19 Q.  Okay.  I want to go through that first wire credit that's

20 listed in this entry.  Can you explain what that means.

21 A.  The one on -- dated November 16 transaction?

22 Q.  Correct.  Correct.

23 A.  On November 16, 2009, there was a wire credited to this

24 checking account for 119,975.

25 Q.  And where we left off, Ms. Aring, yesterday, was that you'd

1   had a conversation with Mrs. Thiam about this account, is that

2   correct?

3   A.  Yes.

4           MS. LARYEA:  Please publish entry March 22, 2010, at

5   12:48 p.m.

6   Q.  When did you have this conversation with Mrs. Thiam?

7   A.  On March 22nd, we successfully connected via phone.

8   Q.  What was your purpose -- what did you want to get out of

9   this conversation with Mrs. Thiam?

10  A.  I needed to understand the incoming wire activity on the

11  account, the high-value wire activity on the account, as far as

12  ultimate funding source or the nature or the purpose of the

13  transactions.

14  Q.  What did you ask Mrs. Thiam during that conversation?

15  A.  The first question was the -- regarding the nature and the

16  purpose of the incoming wire credits of approximately 900,000.

17  Q.  What did she say?

18  A.  And her response was, this is income of husband.

19  Q.  What did she say about how her husband got that income?

20  A.  When I asked her what is the husband's occupation, she said

21  he's financial adviser and consultant for various mining

22  companies worldwide.

23          MR. GOLDSMITH:  Objection.

24          THE COURT:  Overruled.

25  Q.  What else did you ask her?

1   A.  I asked her what is the funding source of the wires

2   originated from Hong Kong, and the -- why is it coming from

3   Hong Kong.

4   Q.  Why did you ask her that question?

5   A.  The -- well, originally, we have to understand the funding

6   source, because they're unusually large, and the -- the -- the

7   jurisdiction or the -- of the customer has, you know, has no

8   bearing in Hong Kong, and so we were trying to understand that

9   part.

10  Q.  What was her response?

11          MR. GOLDSMITH:  Objection.

12          THE COURT:  Overruled.

13  A.  She said she does not -- well, I ask her, you know, why

14  were the funds coming from Hong Kong and the name of the

15  companies, and her response was that she does not know why the

16  funds are coming from Hong Kong and she does not know the name

17  of the companies of the funding sources, that she will get --

18  ask her -- she will ask her husband.

19  Q.  What did you ask her next?

20  A.  I asked her if her husband is the same person as the

21  minister of mines of Guinea.

22  Q.  Why did you ask her that question?

23  A.  In my research and investigation of the customer's profile

24  in order to understand the activity further, I determined

25  through research that he may be the person holding the position

1    in Guinea.

2    Q.  What was her response when you asked her whether he was

3    Guinea's minister of mines?

4    A.  She said yes.

5    Q.  And you mentioned before that she said he was also a

6    consultant for a mining company?

7    A.  I'm sorry?

8    Q.  You just testified that during your conversation,

9    Mrs. Thiam also said he was a consultant for various mining

10   companies, is that correct?

11   A.  Correct, yes.

12   Q.  What did you ask her about the interaction between

13   consulting for mining companies and being Guinea's minister of

14   mines?

15   A.  I'm sorry.  I didn't understand the question.

16   Q.  Did you ask her anything about the fact that he was working

17   as Guinea's minister of mines and working as a consultant for

18   mining companies?

19   A.  Well, I asked her how long she's been -- he's been in that

20   position.

21   Q.  What did she say?

22   A.  And she said about a year.

23   Q.  And how did your conversation with Mrs. Thiam end?

24   A.  She said that -- I ask her if the wires or activity coming

25   from Hong Kong are expected to continue, and she said yes and

1    that she will call her husband, she will call me back to answer

2    the questions after she calls her husband.

3    Q.  After the conversation what did you determine about whether

4    you should close the investigation or continue to investigate?

5    A.  Given the situation that there might be a risk of potential

6    conflict of interest because of his position in the ministry

7    and consulting -- as well as consulting work for various mining

8    companies, I deemed that this account relationship needed

9    further, you know, evaluation and possibly further escalation

10   to the line of business of retail financial services because of

11   that, because of the information that I've gathered.

12   Q.  I would like to point you to entry March 23, 2010, at

13   12:25 p.m.

14       What is that entry?

15   A.  This was my evaluation of the -- of the review or

16   investigation that I've conducted.

17   Q.  And can you read your conclusion.

18   A.  And since I didn't have enough understanding of the -- the

19   ultimate source of funds of the wire activity and based on the

20   customer's wife's explanation of the wire credit activity

21   stating that the customer was involved in a consulting business

22   related to mines, that there appears to be a potential conflict

23   of interest.

24   Q.  What else did you determine?

25   A.  In that same determination, like I said, since there's

1    research that this could be a potential -- a high risk, as

2    Guinea's minister of mines, at about the same time the customer

3    has negotiated a 7 billion minerals and infrastructure deal

4    with China International Fund, a Hong Kong registered firm, and

5    I have reason to -- there may be possibility that is the

6    connection to Hong Kong, and so --

7    Q.  You mentioned China International Fund.  Why did you

8    mention that in this entry?

9    A.  In my internet research for media related to the customer,

10   those are information that I found, that in my trying to

11   understand the connection to Hong Kong.

12   Q.  What was that information that you found?

13   A.  Exact -- exactly that -- that he's minister, current

14   minister of mines of Guinea as also confirmed by his wife and

15   that there were negotiations conducted with that company.

16   Q.  And can you read for the jury the section that begins

17   "Furthermore," till the end of that paragraph.

18   A.  I said, "Furthermore, this could be a potential risk since

19   client, as Guinea's minister of mines, has negotiated a

20   7 billion minerals and infrastructure deal with China

21   International Fund, a Hong Kong registered Chinese firm.

22   JPMorgan Chase --" did you want me to continue there?

23   Q.  Yes.

24   A.  Okay.  "JPMorgan Chase does not know if the source of funds

25   from Hong Kong were inappropriately obtained by misuse of his

1    ministry position."

2              MR. GOLDSMITH:  Objection.  Document speaks for

3    itself.

4              THE COURT:  Overruled.

5    Q.  Continue, please, Ms. Aring, that last sentence.

6    A.  "As an abundance of caution, however, so the bank is

7    reporting this matter as there is potential risk involved and

8    there is lack of transparency involved in the source of funds."

9    Q.  Thank you, Ms. Aring.  After you made this determination

10   you mentioned that the conversation with Mrs. Thiam ended with

11   her talking, speaking with her husband and giving you a call

12   back.  Did she call you back?

13   A.  No.

14   Q.  Did you speak to anyone else about this account?

15   A.  I eventually ended up getting a call from Thiam.

16             MS. LARYEA:  I'd like to publish March 25, 2010, at

17   6:05 p.m.

18   Q.  What is this, Ms. Aring?

19   A.  This is the notes on the conversation that I conducted with

20   Mr. Thiam.

21   Q.  When did this conversation take place?

22   A.  On March 25, 2010.

23   Q.  What was your purpose of speaking with Mr. Thiam?

24   A.  Since Fatim was unable to answer my questions, questions,

25   specifically, the ultimate funding source, and that since

1   she -- she said she was going to obtain those answers from him,

2   so apparently instead of her calling back, he's the one that

3   called me back.

4   Q.  During your conversation, what did you ask him?

5   A.  I asked him what his occupation or line of business is.

6   Q.  What did he say?

7   A.  He said he took a hiatus from banking and that he is

8   currently minister of mines of Guinea.

9   Q.  What else did you ask him?

10  A.  And I proceeded to ask the ultimate funding source of the

11  wires he sent from his account in Hong Kong.

12  Q.  How did he respond?

13  A.  He responded that this is a personal account in my name

14  funded for several -- funded by several sources of income and

15  business transactions and prior years' consulting jobs.

16  Q.  What did you ask him next?

17  A.  And so I asked him what year did he earn the income.

18  Q.  What did he say about when he earned that income?

19  A.  He said over the past ten years.

20  Q.  And did he say how he earned this income?

21  A.  And so I asked him if this is from consulting contracts for

22  mining and oil companies.

23  Q.  Why did you ask him that specific question?

24  A.  Pretty much just to, you know, ensure or eliminate the --

25  the -- the question that there might be a conflict of interest.

1    Q.  What did he say in response to that?

2    A.  He said no, there were not consulting contracts for mining

3    and oil companies.  He has not done any consulting in the past

4    15 months.

5    Q.  When did he say his last consulting contract was?

6    A.  He said his last consulting contract was about three to

7    four years ago with an oil and refinery company.

8    Q.  Did he provide you any names of companies?

9    A.  Yes.  So I asked him what is the name of the company, and

10   he said Gabon.

11   Q.  What else did the defendant say about the money in the Hong

12   Kong account?

13   A.  He said the money in the account in Hong Kong is from

14   personal income from business with his partner.

15   Q.  Did he mention the name of the partner?

16   A.  He said his partner had to go through answering similar

17   questions from the banks and so I asked him what his partner's

18   name and he said Baker Al-Sadi.

19   Q.  What else did you ask the defendant?

20   A.  So I asked him what are the names of the company, of the

21   business with his partner.

22   Q.  And did he provide you with names?

23   A.  He said there are many companies and one of them is

24   Bellvue, another is Upper Side Management.

25   Q.  What did the defendant say about whether he had any

1    business in Hong Kong?

2    A.  Well, when I asked him if his business is based in Hong

3    Kong, he said no.

4    Q.  What did he say about why he had the funds in Hong Kong?

5    A.  So when I asked him if there's any reason that his deposit

6    account is in Hong Kong, he said they tried -- he's tried to

7    diversify -- the response is, we try to diversify our account

8    holdings in different countries, that we have accounts in

9    Luxembourg, in Switzerland, and Hong Kong, and since I already

10   have a business account in Hong Kong, I also decided to open a

11   personal account there as well.

12   Q.  What did you think of this answer?

13               MR. GOLDSMITH:  Objection.

14               THE COURT:  Sustained.

15   Q.  What else did you ask the defendant?

16   A.  I asked him if the activity is expected to continue.

17   Q.  What did he say?

18   A.  And he said yes and that in fact we have projects started

19   three years ago that are just now in completion and anticipate

20   receiving payments soon.

21   Q.  Did you ask the defendant anything about his citizenship?

22   A.  I asked him if he is a US citizen or a citizen of Guinea.

23   Q.  What did he say in response to that?

24   A.  He said he is both.

25   Q.  Now you just testified that in speaking with the defendant

1    about the source of the money in Hong Kong, he mentioned

2    business with an individual named Baker Al-Sadi, is that

3    correct?

4    A.  Yes.

5    Q.  Did the defendant during this conversation mention anything

6    about a company named China International Fund?

7    A.  No.

8    Q.  Did he mention anything about a company named China

9    Sonangol?

10   A.  No.

11   Q.  Did he mention any individuals named --

12          MR. GOLDSMITH:  Objection.

13          THE COURT:  Overruled.

14   Q.  Did he mention any individuals named Sam Pa?

15   A.  No.

16   Q.  Did he mention an individual named Lo Fung Hung?

17          MR. GOLDSMITH:  Objection.

18          THE COURT:  Overruled.

19   A.  No.

20   Q.  Did he mention an individual named Wei Xian Fei?

21   A.  No.

22   Q.  During the conversation did the defendant mention anything

23   about the money in the Hong Kong account being a loan?

24   A.  No.

25   Q.  How do you know that he didn't mention any of these things?

1    A.  Well, those are pretty significant information that's

2    relevant, or that would be relevant to the case, so I would

3    have written them down during the interview.

4    Q.  Do you see anything in your notes about that?

5    A.  No.

6    Q.  How did the conversation with the defendant end?

7    A.  I may have potentially -- if I have forgotten any -- just

8    in case I'd forgotten to ask any other questions, I asked him

9    if he's going to be out of town, how can he be contacted, and

10   he said that he will be out -- in town for about another week

11   or ten days but that he can be reached by his email that he

12   provided to me and that he will email me the documents that I

13   requested.

14   Q.  What did you do after this conversation?

15   A.  In order to get the documents, to ensure that I get the

16   documents, I sent him an email with -- so that he would get my

17   correct email address.

18            MS. LARYEA:  Your Honor, may I give her all the

19   exhibits I plan to use in one?

20            THE COURT:  Yes.  Just identify for the record what

21   you're giving her.

22   Q.  I'm approaching you with Government's Exhibits 532, 534,

23   535, 536, and 536-T.

24       Ms. Aring, please look at Government's Exhibit 532.

25            MS. LARYEA:  Please publish Government Exhibit 532.

1  Q.  Have you seen this document before?

2  A.  Yes.

3  Q.  What is it?

4  A.  This is the email that I sent to Mahmoud to give him my

5  email address.

6  Q.  When did you send this email?

7  A.  I sent this on March 25, 2010.

8  Q.  Was that the same day as your conversation with him on the

9  phone?

10  A.  Correct, after the conversation.

11  Q.  You said you sent the email to give him your email address.

12  A.  Correct.

13  Q.  Did you have any other reason for sending that email?

14  A.  As I was typing the email, I realized I'd forgotten some

15  other questions that Fatim could not answer, so I listed those

16  transactions for further explanation.

17  Q.  Did you get a response from the defendant?

18  A.  Yes.

19  Q.  I'd like you to look at Government's Exhibit 535.

20        MS. LARYEA:  Please publish Government's Exhibit 535.

21  Q.  Have you seen this document before?

22  A.  Yes.

23  Q.  What is it?

24  A.  This is an email from Mahmoud responding to -- well, in

25  that it says, "Please find the attached answers to your

1   questionnaire."

2   Q.  What date was it sent?

3   A.  This was sent on March 26, 2010.

4   Q.  You just testified that he instructed that you could find

5   attached the answers to your questionnaire.  Was there an

6   attachment?

7   A.  Yes.

8   Q.  I'd like you to turn to the next page.  What is this?

9   A.  The -- this appears to be responses to my list of

10  questions.

11  Q.  How is this document organized?

12  A.  From -- it appears to be where my questions -- my list of

13  questions were cut and pasted into the document and then

14  responses in bold, his responses in bold were typed after the

15  question.

16  Q.  I'd like to turn to the second page of that attachment, so

17  the next page.

18      Do you see a paragraph on top of that attachment, a single

19  paragraph?

20  A.  Yes.

21  Q.  Can you please read that paragraph to the jury.

22  A.  The paragraph says, "Over the past 15 months, I have taken

23  a leave from my banking job at UBS and accepted an 18-month

24  position as Minister of Mines and Energy in the Republic of

25  Guinea.  I take no salary for that job and have been

1   maintaining my family in New York from my savings.  Hence the

2   wires from my HSBC account to my chase account.  The funds in

3   that account are derived from business transactions done over

4   the years with Mr. Al-Sadi."

5   Q.  The last sentence that mentions the funds in that account,

6   what did you understand that account to refer to?

7   A.  He's referring to the funds from the originating account at

8   HSBC.

9   Q.  Why did you think that?

10  A.  That's the sentence prior to the state -- to that sentence,

11  so it says the wires from HSBC accounts to my Chase account.

12  Q.  Thank you.  Did you receive any other emails from the

13  defendant?

14  A.  Yes.

15  Q.  I'd like you to look at Government's Exhibit 536 and 536-T.

16          MS. LARYEA:  Can you please publish Government's

17  Exhibit 536.

18  Q.  Have you seen Government's Exhibit 536 before?

19  A.  Yes.

20  Q.  What is it?

21  A.  This is an email containing attachments -- well, an email

22  that states, "Please find attached additional information

23  pertaining to the longstanding business relationship between

24  Baker Al-Sadi and myself."

25  Q.  Who is the email from?

1    A.  This is from -- email from Mahmoud.

2    Q.  When was it sent?

3    A.  It was sent on March 27.

4    Q.  Did you review this email?

5    A.  Yes.

6    Q.  After you reviewed this email, what happened to the

7    account?

8    A.  This was escalated to the line of business for further,

9    like I said, evaluation and disposition of the account

10   relationship with Chase.

11   Q.  What was the determination once it was escalated?

12   A.  The line of business and the compliance concurred that the

13   account relationship, due to the risk factors involved, need to

14   be terminated.

15   Q.  What were the risk factors?

16   A.  The risk factors of the known lack of transparency of the

17   funding source and -- and potential conflict of interest due to

18   his high-ranking position in the minister of mines -- as

19   minister of mines in Guinea.

20   Q.  You said the account would be exited?  What does that mean?

21   A.  The relationship will be terminated.

22   Q.  Sorry.  Terminated.

23   A.  Meaning it will be closed.

24   Q.  Closed.  Give me one second.

25       One more question, Ms. Aring.

1      During your conversation with Mr. Thiam did he ever mention

2   whether the money in the Hong Kong account was from sale of

3   land in Africa?

4   A.  No.

5            MS. LARYEA:  Thank you.  No further questions.

6   CROSS EXAMINATION

7   BY MR. GOLDSMITH:

8   Q.  Ms. Aring, did you ultimately receive any responses from

9   Baker Al-Sadi?

10  A.  I'm sorry?  Baker?

11  Q.  Yes.

12  A.  If I received responses from?

13  Q.  Or further information from that individual?

14  A.  I received information, attachments from Mahmoud, not from

15  Baker.

16  Q.  Do you recall if that email included an attachment with

17  communique from Baker?

18  A.  On March 27, I received an email from Mahmoud regarding his

19  longstanding business with -- relationship with Baker.

20  Q.  If you look at Exhibit 535 that you just testified about a

21  few moments ago.  Generically, in those responses provided by

22  Mr. Thiam, do you see references to personal loans?

23  A.  Personal loans from -- you mean personal loans by him or to

24  him or --

25  Q.  Either way.

1   A.  Either way.  Yes.  He loaned a person named Sami Idliby

2   some money.

3   Q.  I want to take you back to Government Exhibit 104.  This

4   was your notes under the HALO system that you used for your

5   investigation, that's correct?

6   A.  Correct.

7   Q.  And there was a particular entry that you were testifying

8   about earlier today on March 15, 2010, at 6:29 p.m.  Do you

9   recall that?

10  A.  Yes.

11  Q.  Do you recall that in that entry there are a number of

12  notes about several wires, seven to be exact, that had come

13  into the account that were subject to the investigation?

14  A.  Yes, for the period November 2, 2009 to February 26, 2010.

15  Q.  And at the top of that entry, are there further notes that

16  show roughly the account activity in terms of debits and

17  credits?

18  A.  Yes, there are credits totaling 1,000,024 and debits

19  totaling 1,000,059.

20  Q.  So roughly the debits are equaling the credits, right?

21  A.  Correct.

22  Q.  And in the entries that you've been discussing under the

23  HALO system, which is Government Exhibit 104, when you were

24  examining the outgoing payments, there were a number of

25  payments that were being used for what will be classified as

1  personal expenditures, correct?

2  A.  Some of the payments appear to be personal expenditures.

3  Q.  Like utility bills?

4  A.  Correct.

5  Q.  Mortgage payments?

6  A.  Yes.

7  Q.  And you also testified about the entry at March 22, 2010,

8  12:48 p.m.  That's the conversation you had with Mr. Thiam's

9  wife.

10  A.  Yes.

11  Q.  And as part of that conversation, Mr. Thiam's wife

12  explained that some of the wires receiving in payments were

13  related to family and family support, correct?

14  A.  Correct.

15  Q.  You also testified about an entry for March 23, 2010, at

16  12:25 p.m.  And that was the final SAR determination, correct?

17  That's what it's entitled, the notes?

18  A.  Yes.

19  Q.  Now at this point of the investigation you made a judgment

20  call that you characterized as being an abundance of caution.

21  Is that correct?

22  A.  Correct.

23  Q.  It was abundance of caution because you did not have

24  conclusory evidence, is that correct?

25  A.  Correct.

1    Q.   Now I'd like to discuss with you generally, as part of your

2    investigation, did you review Mr. Thiam's bank activity with

3    Chase prior to 2009?

4    A.   No.   I reviewed the transactions during the alerting period

5    because that's the time frame that the account alerted.

6    Q.   So you made your decisions, on your level, without any

7    information regarding Mr. Thiam's prior account activity.

8    A.   Yes, because the transactions in question were highly

9    questionable.

10   Q.   And you would not have been able to determine at that

11   point, because you did not look into, whether or not Mr. Thiam

12   had a history of receiving large incoming wires into that

13   account.

14   A.   Correct.

15   Q.   The account that was used -- withdrawn.

16        The account that was being investigated, that was in

17   Mr. Thiam's name, correct?

18   A.   In Mr. Thiam's name and Fatim.

19   Q.   In other words, it wasn't through a corporate name or

20   something else; it was him.   It was identifiable as him.

21   A.   Yes.

22   Q.   And the address that was connected with the account was a

23   personal address, is that correct?

24   A.   Correct.

25   Q.   And the account that was the source of those suspicious

1   wires that triggered your investigation was also in Mr. Thiam's

2   personal name, correct?

3   A.   The account from the -- the originating source?

4   Q.   The HSBC account.

5   A.   Yes, that's what it said on the wire details.

6   Q.   Now you explained yesterday what a PEP is.

7   A.   I'm sorry?

8   Q.   Do you recall yesterday explaining what a PEP is?

9   A.   I don't recall --

10          MS. LARYEA:   Objection.

11  A.   -- having a conversation.

12          THE COURT:   Overruled.

13  Q.   What's a PEP?

14  A.   A PEP, just according to our -- our compliance definition,

15  is politically exposed person.

16  Q.   Is that a term that's used commonly in banking?

17  A.   Sometimes.

18  Q.   Okay.  And a politically exposed person can be anyone who

19  the bank feels may have ties to a government or political

20  source, correct?

21  A.   Yes.

22  Q.   And the bank treats PEPs differently from people who are

23  not under that category, correct?

24  A.   Yes.  For compliance, as a compliance policy, we -- they

25  are subject to a more intense scrutiny, because of the

1   high-risk status.

2   Q.  So as soon as someone who may be an account holder with

3   Chase may accept a position with a government agency, they

4   immediately draw higher scrutiny, correct?

5   A.  Correct.

6   Q.  And the bank scrutinize PEPs for any possible sanctions

7   that may be in place?

8   A.  Yes.

9   Q.  And if there are sanctions in place, then -- well, let me

10  rephrase.

11      If there are sanctions that may impact an individual

12  account holder, that account holder may have their accounts

13  restricted or closed, correct?

14  A.  Not necessarily.

15  Q.  It would cause a higher level of scrutiny even for that

16  PEP, correct?

17  A.  Correct.

18  Q.  Were you familiar in your capacity at the time as an

19  investigator about any possible sanctions stemming from West

20  African countries?

21  A.  At the time of my investigation?

22  Q.  Yes.

23  A.  At a later stage I was able to locate some kind of internet

24  information that there was a --

25  Q.  And without getting into that specific information, did it

1    draw you to the conclusion that there may be sanctions involved

2    with Guinea?

3    A.  Yes, because in that information Mahmoud's name was listed

4    as one of the sanctioned entities.

5    Q.  And if the sanctioning existed, would that also have

6    contributed to your decision making in closing Mr. Thiam's

7    account?

8    A.  Not -- no.  The decision was based on risk on the

9    unidentifiable, unknown source of funds.  This is -- there were

10   no transparency, no source of funds, and I was told that the

11   funds were expected to continue, the transactions, and we --

12   the bank deemed that as potential high-risk activity.

13   Q.  And it was a concern of the bank that there seemed to be,

14   in your opinion, a lack of transparency because of Mr. Thiam's

15   status as a PEP.

16   A.  No.  No transparency because there was no definitive

17   explanation as to where -- what the source of funds.  There was

18   general information that came from the business, but I was

19   never provided any kind of documentation to support that

20   transaction.

21   Q.  So it's your testimony now that the decision to escalate

22   the investigation was generally just because of lack of

23   transparency, not because of the PEP status.

24   A.  It's all these factors of risk elements that are all

25   together involved -- involved in the -- this particular case.

1   Q.  Right.  So you needed to take all of those factors into

2   consideration, right?

3   A.  Correct.  But not exclusively just because he was a PEP.

4   Q.  And as you testified earlier, part of that analysis was a

5   potential conflict of interest, correct?

6   A.  Correct.

7   Q.  The part of that analysis was him being a PEP status.

8   A.  Yes, partly.

9   Q.  And as you'd even testified, some of your concerns about

10  that potential conflict of interest stemmed from the source of

11  the funds while he was acting in an official capacity for

12  Guinea, correct?

13  A.  There was no definitive way to know that because I don't

14  have documents, I don't have definitive answers to get that

15  information.

16  Q.  You had absolutely no evidence that would draw you to

17  conclusively determine at that time that there was a conflict

18  of interest from those sources, right?

19  A.  No.

20              (Continued on next page)

21

22

23

24

25

1              MR. GOLDSMITH:  No further questions.

2     REDIRECT EXAMINATION

3     BY MS. LARYEA:

4     Q.  Ms. Aring, when the investigation first started, did you

5     know whether the defendant was the minister of mines in Guinea?

6     A.  No.

7     Q.  Did you know about his PEP status?

8     A.  No.

9     Q.  Was the alert issued because of the defendant's PEP status?

10    A.  No.  The alert had to do with the wire -- definitive

11    high-value wire activity that were unexplained.

12    Q.  Thank you.  We looked at the HALO report, Government

13    Exhibit 104, the March 23, 2010, entry at 12:25, which

14    explained your determination after you spoke with the

15    defendant's wife.  Is that correct?

16    A.  OK.  March 23?

17    Q.  Page 11 in that report.

18    A.  OK.  Can you repeat that question?

19    Q.  That was your determination you made after speaking with

20    the defendant's wife, is that correct?

21    A.  Correct.

22    Q.  And in that determination, did you mention -- in that did

23    you mention anything about sanctions?

24    A.  No.

25    Q.  Did you mention anything about making a determination

1    because, simply because of the defendant's PEP status?

2    A.  No.

3    Q.  In fact, what was the reason you made the determination to

4    continue to investigate?

5    A.  There's, the risk, there was the risk involved in the lack

6    of transparency that involved in the ultimate use, source of

7    funds.

8    Q.  And when the bank decided to close the account, did the

9    bank close the account because of sanctions?

10   A.  Oh, no.

11   Q.  And why did the bank close the account?

12   A.  Again, based on this, on those risks, that we were told was

13   expected to continue, the incoming wire activity from

14   unverifiable funding source.

15   Q.  What was the bank's concern about unverifiable funding

16   sources?

17   A.  We have to understand the nature and the purpose of the

18   transactions.  If we're not able to understand the ultimate

19   funding source, then we cannot explain the nature of the

20   activity.

21   Q.  Taking you to Government Exhibit 535, the attachment, this

22   is the responses the defendant sent you to your questions.

23   Now, defense counsel asked whether this attachment mentioned

24   any loans, and you said it did.  Is that correct?

25   A.  Yes.

H4pWthi3

1    Q.  Now, the section that you read to the jury about the HSBC

2    account and specifically where the money from that account came

3    from, did that section mention any loans?

4    A.  No.

5            MS. LARYEA:  No further questions, your Honor.

6            MR. GOLDSMITH:  One.

7    RECROSS-EXAMINATION

8    BY MR. GOLDSMITH:

9    Q.  I just want to be clear.  The ultimate decision, from your

10   perspective, to close the account was based upon several

11   factors that not only included the lack of transparency but

12   also took into account the PEP status and the potential for a

13   conflict of interest.  Is that correct?

14   A.  Correct, because of the unknown ultimate funding source,

15   there, there is a risk that, that -- because we could not

16   explain the funding source, there is the risk that that could

17   be occurring.

18   Q.  Taken into consideration with his PEP status?

19   A.  And his position in the minister of mines and possibly

20   income from mines consulting.

21           MR. GOLDSMITH:  Thank you.

22           MS. LARYEA:  No further questions, your Honor.

23           THE COURT:  You may step down.

24           (Witness excused)

25           THE COURT:  Next witness.

H4pWthi3

1          MR. KOBRE:  Your Honor, at this time, the government

2     would like to read a stipulation before calling its next

3     witness.

4          THE COURT:  Yes.

5          MR. KOBRE:  Thank you, Judge.

6          I'm reading from a stipulation marked Government

7     Exhibit 1416:

8          "The following exhibits are true and correct public

9     records maintained by the Republic of Guinea pertaining to

10    agreements between the Republic of Guinea and China Sonangol,

11    China International Fund and its affiliates and subsidiaries.

12         "2.  Government Exhibit 401 is a true and correct

13    memorandum of the understanding, dated June 6, 2009.

14         "3.  Government Exhibit 402 is a true and correct

15    record of the master agreement, dated June 12, 2009.

16         "4.  Government Exhibit 403 is a true and correct

17    record of the loan agreement, dated June 12, 2009.

18         "5.  Government Exhibit 404 is a true and correct

19    record of the joint venture agreement, dated June 12, 2009.

20         "6.  Government Exhibit 405 is a true and correct

21    record of a letter from the Guinea prime minister to the

22    minister of state, dated July 10, 2009.

23         "7.  Government Exhibit 406 is a true and correct

24    record of the master agreement, dated July 18, 2009.

25         "8.  Government Exhibit 407 is a true and correct

H4pWthi3

record of minutes of a meeting of the council of ministers,
dated October 8, 2009.

"9.  Government Exhibit 408 is a true and correct
record of the shareholders agreement, dated October 10, 2009.

"10.  Government Exhibit 409 is a true and correct
record of the loan agreement, dated October 21, 2009.

"11.  Government Exhibit 410 is a true and correct
record of a letter from the Guinea prime minister to the
minister of state, dated November 4, 2009.

"12.  Government Exhibit 411 is a true and correct
record of a document transferring certain executive powers from
the minister of economy and finance to the minister of state,
dated July 13, 2009.

"13.  Government Exhibits 401 through 411 consist of
records or statements of a public office that set out the
office's activities or a matter observed while under a legal
duty to report.

"14.  Government Exhibits 402-T, 403-T, 404-T, 405-T,
407-T, 410-T and 411-T are true and accurate English
translations of the French-language portions of the
corresponding exhibits."

And finally, "it is further stipulated and agreed that
this stipulation, which is marked as Government Exhibit 1416,
Government Exhibits 401 through 411, and Government Exhibits
402-T" --

H4pWthi3

1              THE COURT:  I think we have the list.

2              MR. KOBRE:  Your Honor, at this time the government

3     offers this stipulation, which is Government Exhibit 1416, and

4     the exhibits referenced therein into evidence.

5              THE COURT:  Received.

6              (Government Exhibits 1416 and 401-411 received in

7     evidence)

8              (Government Exhibits 402-T, 403-T, 404-T, 405-T,

9     407-T, 410-T and 411-T received in evidence)

10             MR. KOBRE:  Your Honor, at this time the government

11    calls Daouda Camara.

12             THE COURT:  Will the interpreter please identify

13    herself for the record.

14             THE INTERPRETER:  My name is Isabelle Duchesne, and

15    I'm a French interpreter.

16             THE COURT:  How did you learn French; is it your

17    native language?

18             THE INTERPRETER:  This is my native language, your

19    Honor.

20             THE COURT:  And how did you learn English?

21             THE INTERPRETER:  I learned English when I was in

22    France.

23             THE COURT:  Was that in school or otherwise?

24             THE INTERPRETER:  It was in school, and I did, I have

25    a B.A. in English as well.

H4pWthi3

```
1          THE COURT:  How long have you served as an interpreter

2    between English and French?

3          THE INTERPRETER:  For 17 years.

4          THE COURT:  Does that include serving as an

5    interpreter in federal court proceedings?

6          THE INTERPRETER:  Yes, your Honor.  That's where I

7    started, here in this court.

8          THE COURT:  Any objection to receiving this

9    interpreter as qualified to interpret between French and

10   English?

11         MR. KOBRE:  No, your Honor.

12         MR. GOLDSMITH:  No, your Honor.

13         THE COURT:  Please place the interpreter under oath.

14         (Interpreter sworn)

15         THE COURT:  Ladies and gentlemen, I have an

16   instruction for you.  Some of you may understand French.  You

17   must take the translation that is offered through this

18   interpreter.  You may not substitute your own view of what the

19   translation should be or may be.  All jurors must be working

20   from the same evidentiary basis, and we are going to rely upon

21   the translation given by this interpreter.

22         Thank you.

23    DAOUDA CAMARA,

24         called as a witness by the Government, having

25         been duly sworn, testified through the
```

1          French-language interpreter as follows:

2              THE COURT:  Counsel.

3    DIRECT EXAMINATION

4    BY MR. KOBRE:

5    Q.  Good morning, Mr. Camara.

6    A.  Good morning, sir.

7    Q.  What country are you a citizen of?

8    A.  From the Republic of Guinea.

9    Q.  And where do you currently reside?

10   A.  I reside in Conakry.

11   Q.  And what is Conakry?

12   A.  It's the capital of the Republic of Guinea.

13   Q.  And have you lived in the Republic of Guinea for the

14   majority of your life?

15   A.  Yes, for the majority of my life.

16   Q.  Now, you're speaking in French.  Is that the language that

17   you were educated in?

18   A.  Yes, I was educated in that language.

19   Q.  Do you speak some English?

20   A.  Yes, I speak a little bit of English, but my English is not

21   very perfect.

22   Q.  Are you more comfortable speaking in court here today in

23   French?

24   A.  Yes, I am more at ease in speaking in French.

25   Q.  What is your current occupation?

1  A.  Currently I am an international consultant for mining

2  matters, energy matters, water matters.

3  Q.  And the company that you do consulting for, who owns that

4  company, or who runs it?

5  A.  It's my own company.  I'm the one who is the director of

6  that company.

7  Q.  Have you ever held a position with the government of the

8  Republic of Guinea?

9  A.  I had different positions with the government of Guinea.

10  Q.  And we're going to get to that a little bit later, but in

11  total, for about how many years did you serve in various

12  positions with the government of the Republic of Guinea?

13  A.  Approximately 20 to 25 years.

14  Q.  Focusing on years 2009 and 2010, were you working for the

15  government at that time?

16  A.  Yes, I was working for the government of Guinea.

17  Q.  And what was your position in those years?

18  A.  I was the senior adviser for the prime minister in charge

19  of international institutions and financial institutions.

20  Q.  Through your work during that period of time, have you

21  become familiar with an entity called China International Fund?

22  A.  Yes, this company was introduced to us as a group of

23  investors coming from China.

24  Q.  And were you personally involved in meetings relating to

25  this potential investment by China International Fund?

1    A.  Yes, during different meetings.

2    Q.  And as an adviser to the prime minister, did you learn who

3    in the government of Guinea was primarily responsible for

4    directly negotiating with individuals from China International

5    Fund?

6    A.  It was the minister of mines and geology.

7    Q.  And who was that at that time?

8    A.  It was Mr. Mahmoud Thiam.  I would like to clarify a little

9    bit, that Mr. Thiam was in charge of the negotiations and the

10   contacts with the Chinese people, but he was assisted by other

11   ministers as well as project minister of research.

12   Q.  Thank you.  We'll talk about that a little bit later.

13       When you refer to the Chinese people, are you referring to

14   representatives of China International Fund?

15   A.  Yes.  It's the china investment fund.

16   Q.  Just to clarify, China International Fund or China

17   investment fund?

18   A.  China -- literally speaking, it's China International Fund.

19   Q.  And do you see Mr. Thiam in the courtroom here today?

20   A.  Well, I haven't looked at the court and the people here

21   today to look for Mr. Thiam.  Please give me a second, please.

22   Q.  Of course.

23   A.  Well, on the right side I cannot see Mr. Thiam.

24   Q.  You're welcome to stand up if that would give you a better

25   view.

1  A.  Well, I can't see Mr. Thiam.

2  Q.  OK.  Now, through your work with the government of Guinea,

3  have you become generally familiar with the background and the

4  economy of Guinea?

5  A.  Yes.

6  Q.  And let's talk a little bit about that.  Where is the

7  Republic of Guinea located?

8  A.  It's in West Africa.

9          MR. KOBRE:  And my colleague, Ms. Laryea, is

10  approaching the witness now with what is marked Government

11  Exhibit 1701.

12  Q.  Do you recognize that, what's marked Government Exhibit

13  1701?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's the map of the Republic of Guinea.

17          MR. KOBRE:  Your Honor, the government offers

18  Government Exhibit 1701.

19          MR. GOLDSMITH:  No objection.

20          THE COURT:  Received.

21          (Government Exhibit 1701 received in evidence)

22          MR. KOBRE:  Could we just publish that to the jury.

23  Q.  You mentioned earlier you reside in a city called Conakry.

24  A.  Yes.

25  Q.  Can you just direct us verbally to where we can find that

1   on the map?

2   A.   Verbally, yes.

3   Q.   On which side should we look for the city of Conakry?

4   A.   It's by the sea.

5   Q.   OK.   Is it on the left-hand side, sort of in the middle?

6   A.   On the left-hand side.

7   Q.   OK.   What's the approximate population of the Republic of

8   Guinea?

9   A.   According to the last census, I think it reached 12 million

10  people.

11  Q.   And you mentioned that one of the languages spoken in the

12  Republic of Guinea is French.   Is that because Guinea had been

13  a French colony at some point?

14  A.   Yes, it was a French colony for 60 years.

15  Q.   And what are some of the major exports of the Republic of

16  Guinea?

17  A.   Among the major exports, there is bauxite, a little bit of

18  diamond, gold plus some agricultural products, like coffee,

19  banana, and grapefruit.

20  Q.   You mentioned bauxite.   What is bauxite used for?

21  A.   We use bauxite in the aluminum industry in order to

22  manufacture planes, ships, and cars, every single of those that

23  need aluminum.

24  Q.   What about iron ore?

25  A.   The iron ore is at the development stage, but we didn't

1    start to put it on the international market.

2    Q.  Could you describe briefly how the Republic of Guinea ranks

3    compared to other countries in terms of the volume of the

4    minerals that it contains, these minerals?

5    A.  Well, in comparison to the other countries, Guinea has

6    two-thirds of the reserves in bauxite, approximately 40 to 45

7    billions of tons in the iron ore plus reserves in diamonds and

8    gold as well.

9    Q.  Can you give us some estimate of the value of the mineral

10   reserves that are contained in the Republic of Guinea?

11   A.  Well, more or less, it amounts to at least hundreds of

12   billions of dollars.

13   Q.  And what importance is there, if any, to the mining of

14   these minerals to the economy of the Republic of Guinea?

15   A.  First of all, these, for the Republic of Guinea, those

16   mining reserves, they help to improve the lifestyle of the

17   population of Guinea, to have the elements necessary to

18   constitute an industrial basis for the country, and to be able

19   to enter the international competition in order to be part of

20   the international market.

21   Q.  Is it fair to say that mining is very important to the

22   economy of Guinea?

23   A.  I would say that the mining industry is important, and I

24   would say even very important for Guinea, because I also forgot

25   to say that it is very important in order to bring forth the

1   budget of the government.

2   Q.  OK.  Now let me change topics a little bit and ask you a

3   little bit about the population of the Republic of Guinea.

4   Could you describe the financial condition of the population in

5   Guinea?

6           MR. GOLDSMITH:  Objection.

7           THE COURT:  Sustained.

8   Q.  In your work in the government, have you come to be

9   familiar with the condition of the infrastructure that exists

10  throughout Guinea?

11  A.  Yes.

12  Q.  In terms of water supply, electricity?

13  A.  Yes, regarding water, electricity, roads and everything

14  which is fundamental infrastructure.

15  Q.  Can you describe whether those things exist in the majority

16  of the Republic of Guinea?

17  A.  Yes.  The infrastructures exist in the majority of the

18  Republic of Guinea in the field.  But their condition is still

19  very insufficient for the needs of, to develop the country.

20  Q.  What percentage of the population has access to

21  electricity?

22  A.  I would say about 7 percent have access to electricity.

23  Q.  What percentage of the population has access to plumbing

24  and water supply?

25  A.  It's about, it's about the same percentage, the same

1    proportion.

2    Q.  Let's discuss a little bit about the structure of the

3    government in Guinea.  Is the government divided into separate

4    and discrete branches?

5    A.  Yes.  According to the constitution.

6    Q.  OK.  And in the broadest sense, what are the branches of

7    the government?

8    A.  The branches of the government are the executive branch,

9    the judiciary branch, and the legislative branch.

10   Q.  Let's focus for a moment on the executive branch.  Can you

11   describe briefly what that consists of, starting from the

12   highest level?

13           MR. GOLDSMITH:  Objection.  Time frame.

14           THE COURT:  Sustained.

15   Q.  Focusing on the period in the late 2000s, in 2009 and 2010,

16   can you describe the structure of the executive branch?

17   A.  Yes.  In 2009, 2008, 2010, there was a particular situation

18   in the government, because there was a lot of trouble and it

19   was very unstable, and so the executive branch was under the

20   supervision of the president of the republic, and he was

21   appointed and nominated by the CNDD, National Council for

22   Democracy, and under him was the prime minister.  And under

23   that there were the members of the government, and then under

24   that there were entities that acted in a parallel way in

25   different regions, and they were run by the governors, and then

1    under that the prefects, and under that the subprefects.

2    Q.  OK.  I'm going to just ask you briefly about that.  So

3    there was the president, is that right?

4    A.  Yes.

5    Q.  And there was, under that there was the prime minister?

6    A.  Yes.

7    Q.  Were there, under the prime minister, were there also

8    ministers of various, in various sectors?

9    A.  Yes.

10   Q.  And then you mentioned that there were governors as well

11   under them?

12   A.  Yes.

13   Q.  And were those, that structure, that particular structure

14   and those officials all also in place in today's government in

15   the Republic of Guinea?

16          MR. GOLDSMITH:  Objection.

17          THE COURT:  Sustained.

18   Q.  Could you describe how, what is the executive branch of the

19   Republic of Guinea as constituted today?

20          MR. GOLDSMITH:  Objection.

21          THE COURT:  Overruled.

22   A.  Under the current system there is the president of the

23   republic, the prime minister.  There are ministers and there

24   are the governors, the prefects, and the subprefects.

25   Q.  OK.  Now, in both periods, today and back in 2009, there

H4pWthi3                              Camara - Direct

1   was a president and a prime minister and ministers, is that

2   right?

3   A.   Correct.

4   Q.   Now I'm going to focus on the current period.  Are the

5   president and the prime minister each assisted in their work by

6   others?

7              MR. GOLDSMITH:  Objection.

8              THE COURT:  Excuse me one second.  I think the sight

9   lines in the last row are very bad.  I'm going to ask the last

10  row of our jurors if they could stand up and move over a seat

11  or two.  Good.  Good.

12             Ladies and gentlemen, I know we got started a little

13  bit late today, closer to a little after 10.  We're going to

14  break at 12:45, but I want to make sure that we take a

15  midmorning recess if that's necessary for anyone's comfort.

16  Would anyone like a recess at this point?  No -- yes.

17             OK.  We're going to take a recess, a brief recess,

18  ladies and gentlemen.  Let Ms. Rojas know as soon as you're

19  ready to resume.  And when the jurors in the last row come

20  back, you can take the seats that are comfortable for you.

21  Good.

22             (Continued on next page)

23

24

25

1          (Jury not present)

2          THE COURT:  Sir, you may step down.

3          (Witness not present)

4          THE COURT:  There's been an objection with respect to

5   a question about the current government structure and the

6   current state of affairs in Guinea.  Can you explain the

7   relevance to me, Mr. Kobre.

8          MR. KOBRE:  Sure, your Honor.  First of all, he's

9   going to describe some of his background and some of the

10  positions that he held that allowed him to gain familiarity

11  with some of the background information that he's going to

12  provide.

13         THE COURT:  I don't think competence is the issue.

14  The issue is relevance with respect to the current government

15  structure, the current state of affairs in Guinea and the

16  current government structure.

17         MR. KOBRE:  I think, your Honor, it's useful to

18  contrast the state of the government now versus the state of

19  the government back in 2009 and 2010 when the events in this

20  case took place, and I think that as he already mentioned,

21  there was instability.

22         THE COURT:  Try to be a little less mysterious.  OK.

23  What is the relevance, as the government sees it?

24         MR. KOBRE:  Your Honor, I think it's just to give the

25  jury some context.

1              THE COURT:  Context for what?

2              MR. KOBRE:  Context for the government at the crucial

3      time, in 2009, 2010, when there was a military coup d'etat and

4      the government as it exists in a more ordinary state.  That's

5      all.

6              THE COURT:  When was the coup d'etat?

7              MR. KOBRE:  It was in late 2008, early 2009.

8              THE COURT:  OK.  So the coup d'etat was before the

9      period at issue here, 2009 and 2010?

10             MR. KOBRE:  I would say it was concurrent with that

11     time.  In other words, the evidence will be that the defendant

12     became minister of mines as part of the government that began

13     as a result of the coup d'etat.

14             THE COURT:  OK.  So I return to the question.  What is

15     the relevance of today's government structure in Guinea?

16             MR. KOBRE:  It simply gives some context for the jury

17     to compare what the government was like then versus how it now

18     exists.

19             THE COURT:  Why?

20             MR. KOBRE:  Because the period's different in some

21     degree in terms of their stability and in terms of the

22     structure.

23             THE COURT:  OK.  There have been objections.

24             I take it, Mr. Goldsmith, you don't want the jury to

25     have information about the current government structure in

1   Guinea.

2          MR. GOLDSMITH:  It's irrelevant.

3          THE COURT:  Fine.  Sustained.

4          MR. KOBRE:  Your Honor, if I might be heard a moment

5   further?

6          THE COURT:  Certainly.

7          MR. KOBRE:  At the time, your Honor, currently there's

8   a national assembly, there's a legislative branch that oversees

9   decision-making.  There's a supreme court in place.  There's

10  going to be testimony, your Honor, that the agreement that was

11  entered into was entered into without any of that oversight

12  process, and that, your Honor, the government would argue is

13  relevant to the regularity by the decision-making process that

14  happened at the time.  It's as though certain procedural

15  safeguards were suspended, in essence, that typically would

16  have been in place.

17         THE COURT:  I don't know about typically in place, but

18  you're free to explore the situation as it existed in 2009 and

19  2010.  Whether that situation had prevailed up until today or

20  it was changed as of today, I think, is irrelevant.  I don't

21  understand the relevance and there's been an objection.

22         OK.  Anything else that we need to address at this

23  break?  Does the government have anything?

24         MR. KOBRE:  No, your Honor.

25         THE COURT:  Does the defendant?

H4pWthi3                              Camara - Direct

1                    MR. GOLDSMITH:  No, your Honor.

2                    THE COURT:  By the way, with respect to the objections

3      during the last witness's testimony, there was a motion *in*

4      *limine* with respect to the documents from the Chase Manhattan

5      SAR review process, and in the April 13 submission by defense

6      counsel, there was an explicit statement that no objection was

7      being made to the admissibility of those records.

8                    MR. GOLDSMITH:  My objections were not on

9      admissibility.  Going back to each individual one, I'd have to

10     recall, but most of them were based on form and repetition.

11                   THE COURT:  OK.  Good.  Thank you.  Then I'm

12     comfortable I didn't miss anything.

13                   Thanks so much.

14                   (Recess)

15                   THE COURT:  Please be seated.  Bring in the witness.

16                   Bring in the jury.

17                   (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Counsel.

3    BY MR. KOBRE:

4    Q.  Mr. Camara, as you were leaving the courtroom just now for

5    the break, did you recognize anybody in the courtroom?

6    A.  Yes.

7    Q.  Who did you recognize?

8    A.  Minister Mahmoud Thiam.

9    Q.  And why was it, if you could explain, that you didn't

10   recognize him earlier?

11   A.  Because he was a little far away from me, and I didn't have

12   my glasses.

13   Q.  Are you able to see Mr. Thiam here in the courtroom today

14   from where you're sitting?

15   A.  Yes.

16   Q.  Can you please point to him and identify an item of

17   clothing that he's wearing?

18   A.  I think he's at the, in the row behind yours.

19   Q.  If I can interrupt you for a moment, would it be helpful

20   for you to actually stand up and walk closer in order to be

21   able to see better?

22              MR. GOLDSMITH:  Objection.

23              THE COURT:  Overruled.

24   A.  Yes, but I can say I can actually currently see him much

25   more clearly.  He's sitting in the second row, the row behind

1     you, and he's in the second position starting from the right.

2              MR. KOBRE:  Your Honor, may the record reflect that

3     the witness has identified the defendant?

4              THE COURT:  Yes.

5     Q.  Now, we were discussing a little bit about the structure of

6     the government of Guinea as it existed in 2009 and 2010.

7     A.  Yeah.

8     Q.  And you had mentioned that the executive branch consisted

9     of a president, prime minister, and ministers as well.  At that

10    time was there an assembly, a national assembly in place?

11    A.  There was a national council and it was constituted in

12    majority by the military, and it was called CNDD.

13    Q.  Was there a court system or a supreme court?

14    A.  Yes.  There was a supreme court.  And there were judiciary

15    courts that were existing at the time.

16    Q.  Now, you mentioned that in addition to the prime minister,

17    there were other ministers as well.  Can you give us some

18    examples of the types of ministers that there were?

19    A.  There were the ministers member of the government that had

20    been nominated under a decree, such as the minister of public

21    works, the minister of finance, the minister of mines and

22    geology, and other ministers who were there as well.

23    Q.  And was there a body or a group in the executive branch

24    that was composed of these ministers?

25    A.  There was the council of ministers.

1  Q.  And what was the role of the council of ministers in the

2  government?

3  A.  The council of ministers was regulating the policies of the

4  government.  It was directing the main orientations of the

5  government, and it was implementing the plans and the programs

6  of the government.

7  Q.  And the council of ministers consisted of all the

8  ministers?

9  A.  Yes.  Yes, the council of ministers included all the

10  ministers, whether it was during a regular session or in an

11  extraordinary session.

12  Q.  When you say regular session or extraordinary session, do

13  you mean the period in 2009 and 2010 versus other periods of

14  time?

15  A.  No.  It is following the general practice of the

16  organization of the government's work.

17  Q.  OK.  Are there certain ministers within the government of

18  Guinea who have a higher status?

19  A.  Yes.  Same as in all the governments, there were ministers

20  of state.

21  Q.  And which ministers were those?

22  A.  There was the minister of defense, the minister of public

23  works.  There were other ministers, I believe, like the

24  minister of mines and geology.  And there were the minister of

25  urbanism and habitat.

H4pWthi3                          Camara - Direct

1   Q.  Why was it that the minister of mines was among those

2   ministers with the higher status?

3   A.  Because of the importance and the position of the mining

4   sector in the national economy of Guinea.

5   Q.  Let's briefly discuss your background.  First of all, if

6   you could just tell us a little bit about your educational

7   background.

8   A.  I have a degree from the highest school of administration.

9   I am a member of the third promotion in that school.  At the

10  beginning of my professional career, I had various activities,

11  various jobs.  And to complete my training, I went to the

12  highest school of mines in Paris.  And a little later, I went

13  to Georgetown University in the United States.

14  Q.  About how long did you spend at Georgetown University?

15  A.  It was a short period.  It was about three months.

16  Q.  OK.  And you said, I think, earlier that you went to the

17  high school for administration in Guinea?

18  A.  Yes.

19  Q.  And when did you graduate from there?

20  A.  In 1972.

21  Q.  And what was your job out of that, after graduating?

22  A.  My first job was to work as a director of the judicial

23  department for the ministry of exterior -- external trade.  And

24  then I went to the department of mines to work with a mining

25  company.

1   Q.  OK.  So if I understand you correctly, you worked for the

2   government and then you left to go to a private company?

3   A.  Yes.

4   Q.  And did you at some point reenter the government for a

5   longer period of time?

6   A.  I reentered into the government, yes, for a longer period

7   of time.

8   Q.  In what position was that?

9   A.  It was in my position of judicial and tax adviser, in my

10  position for the ministry of natural resources.

11  Q.  What years were you the legal, I think you said the legal

12  and tax adviser in the ministry of natural resources?

13  A.  It was from 1987 to 1997.

14  Q.  And you said it was called the ministry of natural

15  resources.  Did that later become the ministry of mines or

16  later come to include the ministry of mines?

17  A.  Yes, it included the ministry of mines, and later it became

18  the ministry of mines and energy, and after that the ministry

19  of mines and geology.

20  Q.  Are there laws in the Republic of Guinea governing mining

21  rights?

22  A.  Yes.  There was a law in 1995 that was the mining code.

23  Q.  Were you involved in the drafting of that law?

24  A.  Yes, I was the main person drafting this mining code, and I

25  organized and supervised the teams that were doing that work.

H4pWthi3                          Camara - Direct

1   Q.  Now, at some point did you leave your job as a legal and

2   tax adviser in the ministry of natural resources?

3   A.  Yes.

4   Q.  And just briefly -- first of all, what year was that that

5   you left that position?

6   A.  In 1997.

7   Q.  And very briefly, what did you do at that point?

8   A.  I was appointed as a general director of the national

9   electricity company.

10  Q.  And how long did you serve in that position for?

11  A.  For seven years.

12  Q.  At some point did you reenter the government in now a

13  different position?

14  A.  Yes.  I reentered, reentered as a director of the cabinet

15  of the prime minister.

16  Q.  And what year did you take on that position?

17  A.  It was in 2004.

18  Q.  And who was the prime minister at the time?

19  A.  Yes, it was Mr. François Fall.

20  Q.  And how long did you remain in the position as the cabinet

21  director of the prime minister?

22  A.  It was from 2004 to 2009, to the end of 2008.

23  Q.  How many different prime ministers did you serve during

24  that period of time?

25  A.  Well, five to six prime ministers.

1    Q.  And what was your -- briefly, if you can, describe what the

2    job of the cabinet director to the prime minister entails.

3    A.  I was helping the prime minister to help him to prepare the

4    elements for the policies of the government, to prepare the

5    government's program of action, to prepare the projects and the

6    guidelines to do those projects, to evaluate the performance of

7    members of the government, to report to the president of the

8    republic, and to prepare the speeches and the conferences to

9    which the prime minister was attending to.  I was managing

10   administration of the prime minister's cabinet.

11   Q.  OK.  So you said that you remained in that position from

12   about 2004 until late 2008?

13   A.  Correct.

14   Q.  And then what position did you take on at that point?

15   A.  You mean at that point or after that moment?

16   Q.  When you changed positions after leaving your position as

17   cabinet director.

18   A.  I was the senior adviser for the minister in charge of

19   America and the institute -- finance institutions,

20   internationally speaking.

21   Q.  Thank you.  And just so we're clear, the senior adviser to

22   whom?

23   A.  For Mr. Prime Minister.

24   Q.  And you took this position on roughly in late 2008?

25   A.  Yes.  At the end of 2008.

H4pWthi3                           Camara - Direct

 1  Q.  Around the same time, was there also a change in the regime
 2  of the Republic of Guinea?
 3  A.  Yes.  At that time the president of the republic passed
 4  away and the military took power toward the end of the year.
 5  Q.  And who became president at that point?
 6  A.  Captain Moussa Dadis Camara.
 7  Q.  For short, do you refer to that president as Dadis?
 8  A.  Correct, it is President Dadis.
 9  Q.  And did President Dadis take power through an election?
10  A.  No.  It was through a coup d'etat.
11  Q.  Now, when President Dadis took power, did he appoint the
12  prime minister?
13  A.  Yes, he appointed a prime minister.
14  Q.  Who is the first prime minister that he appointed?
15  A.  It's Mr. Kabine Komara.
16  Q.  You mentioned at the time that the government had ministers
17  who were -- did President Dadis appoint ministers?
18  A.  Yes, the president named the, nominated the other ministers
19  because he's the only one who was in that position.
20  Q.  Who did the president at the time nominate or designate as
21  the minister of finance?
22  A.  He designated Mr. Mamadou Sande.
23  Q.  And who did he designate as the minister of housing?
24  A.  Well, it's Mr. Barry.
25  Q.  And what's Mr. Barry's name, his first name?

1    A.   His name is Barry Boubacar.

2    Q.   And who did President Dadis designate as the minister of

3    mines?

4    A.   It was Mr. Mahmoud Thiam.

5    Q.   That's the defendant here, right?

6    A.   Correct, exactly, behind you.

7    Q.   Now, you testified a little bit earlier that President

8    Dadis took power through a coup d'etat?

9    A.   Correct.

10   Q.   What is a coup d'etat; what does that mean?

11   A.   For coup d'etat, when the military is changing the

12   constitutional system, it changes the constitutional regime of

13   the country, and it removes the law, the constitution, and all

14   the structures that are related to standard condition.

15   Q.   OK.  And essentially it's a military takeover, correct?

16   A.   Yes, it's a military takeover.

17   Q.   OK.  So after this coup d'etat, President Dadis appoints

18   the ministers that you mentioned earlier, and when did this new

19   government take power?

20   A.   The takeover happened around the last week of December.

21   Q.   Of 2008?

22   A.   Of 2008.

23   Q.   And when did the new ministers, such as the defendant,

24   Mr. Thiam, take office?

25   A.   Well, Mr. -- the minister of mines, like Mr. Thiam, he was

1    part of a whole team, and I believe they were designated by the

2    president of the republic around January the 14th, 2009.

3    Q.   OK.   And you mentioned that during this period of time, you

4    were an adviser to the prime minister, and that was Komara, is

5    that right?

6    A.   Correct.

7    Q.   Where was your office located as compared to where the

8    prime minister's office was located?

9    A.   My office was in the second floor and the prime minister's

10   office was in the fourth floor.

11   Q.   You mentioned earlier the council of ministers.   Was there

12   also a council of ministers in place during this regime?

13   A.   Well, yes, there was a council of ministers.

14   Q.   And did the council of ministers meet to formulate the

15   policies of the government?

16   A.   Yes, the council of ministers was meeting in a regular way

17   under the supervision of the prime minister, and also at the

18   level of the government, and that was directed by the president

19   of CNDD.

20   Q.   And in your role as an adviser to the prime minister, did

21   you attend some of those council of minister meetings?

22   A.   Well, I was invited from time to time to come to the

23   meeting of the ministers, the council of ministers, according

24   to the importance of the agenda, but I was not participating in

25   the same way.

H4pWthi3                    Camara - Direct

1    Q.  OK.  Now let's turn to discuss a little bit about the

2    minister of mines during this period.  First of all, who was

3    the highest government official in the government of Guinea in

4    charge of overseeing mining and the development of minerals in

5    the country?

6    A.  It was the minister of mines and geology.

7    Q.  And in 2009, that was Mr. Thiam, the defendant?

8    A.  Correct.

9    Q.  And if you could, just briefly describe the organization

10   that constituted the ministry of mines.  And let me just first

11   ask you, how many people were in the ministry of mines; how

12   many employees?

13   A.  There were between 800 and 1,000, 1,200 people, roughly.

14   Q.  And who oversaw these people?

15   A.  It was the minister of mines and geology.

16   Q.  And if you could tell us, what were some of the powers and

17   responsibilities of the minister of mines during this period?

18   A.  Well, he was, the minister of mines was defining the

19   elements of the policy of the government regarding the mining

20   sector.  He was helping to promote the development of the

21   mining sector to allow to take part, to participate in what was

22   his allocated duties in the mining sector, and he was

23   contributing during, to the position of Guinea in the mining

24   sector, and he was also working on the activities --

25            THE INTERPRETER:  The interpreter cannot remember the

1   last --

2   A.  The activity of the mining industries, companies, and of

3   the regional services that are in charge.

4   Q.  Did the minister of mines also have some powers in

5   connection with the granting of the rights to mine minerals in

6   the Republic of Guinea?

7   A.  Yes, he had his powers that were acknowledged under the

8   law.

9   Q.  And in particular, and briefly, what sorts of powers, what

10  sorts of rights could the minister of mines himself grant to

11  private companies to mine?

12  A.  Well, the minister of mines had the power to grant the

13  license for research and exploration based on the

14  recommendations of the national direction of the mines.  He had

15  also the power and the right to grant the license of mining

16  exploitation, but he couldn't grant concessions because that

17  was relevant to the capacity and the authority of the president

18  of the republic.

19  Q.  OK.  So he could grant exploration licenses?

20  A.  Correct.

21  Q.  And exploitation licenses?

22  A.  Correct.

23  Q.  But he could not alone grant concessions?

24  A.  No.  He didn't have that authority.

25  Q.  Could you briefly describe the difference between these

1  three types of licenses?

2          THE COURT:  Excuse me.

3          MR. KOBRE:  Yes.

4  Q.  Sorry, Mr. Camara.  I'm just going to ask you --

5          THE COURT:  I'm going to ask the interpreter, please,

6  to interrupt the witness so that you can --

7          THE INTERPRETER:  Yes, your Honor.

8          THE COURT:  -- translate portions of the longer

9  answers to make sure you capture everything that's said.

10         THE INTERPRETER:  Yes, your Honor.

11         (Interpreter and witness conferred)

12         THE WITNESS:  Yes, your Honor.

13 A.  So the minister of mining, the exploration and research

14 licenses were connected to a certain surface of the area up to

15 1,400 square kilometers, and it would allow the stakeholders to

16 conduct all the research and the activities according to the

17 mining code that is concerning digging, extracting, the air and

18 magnetic system, etc.  Secondly, there is the license of

19 exploitation.  That also applies to restricted surface, and it

20 relates to investments that are also restricted.  The timing

21 usually lasts between five to ten years.

22 Q.  And if I could just interrupt, what would the exploitation

23 license allow the company to do?

24 A.  The exploitation license allowed the company to extract the

25 minerals and to put them on the market in order to make some

1    money on the market.

2    Q.  OK.  And how did the exploitation license differ from the

3    third type, which you mentioned was concession?

4    A.  The concession covers a much larger surface area than the

5    exploitation license, and it applies to the investments that

6    are required for the concessions that are much larger than for

7    the exploitation, and the timeline is also much longer.

8    Q.  Other than the size and the timeline, do the exploitation

9    licenses and the concessions basically both allow the company

10   to do the same thing, to extract and sell the minerals?

11   A.  Absolutely, yes.

12   Q.  Now, you talked about some of the powers and

13   responsibilities of the minister of mines during this period.

14   Would important decisions about mining be taken without the

15   involvement of the minister of mines?

16   A.  According to the law, no.

17   Q.  And as far as you know?

18   A.  The mining companies that were concerned could eventually

19   present their disagreement to the prime minister if they think

20   their capacities were being violated.

21   Q.  If they didn't agree with the minister of mines?

22   A.  If they don't agree with the minister of mines, they go a

23   little, slightly higher level.

24   Q.  OK.  Now, you testified earlier that at some point you

25   became familiar with a potential investor called China

1  International Fund.

2  A.  Yes.

3  Q.  How did you first learn about this potential Chinese

4  company that was proposed to invest in Guinea?

5  A.  It's the prime minister who called me, and he gave me a

6  file regarding Chinese, the Chinese investors, and he asked me

7  to take care of that and to make sure that there would be good

8  practices and I would be in charge of the followup of all of

9  these activities.  And he said it was on the basis of my own

10 experience and of the trust that he had in me.

11 Q.  And what did you do with the file that he handed you that

12 related to China International Fund?

13 A.  I started to review the file.  I gave my first conclusions.

14 Some other documents came also.  They were sent to me.  I also

15 did some surveys and some outcomes.  Progressively there was a

16 committee that was put in place.

17 Q.  OK.  Let me ask you about that.  Did you, following your

18 getting these documents and reviewing them, participate in

19 meetings concerning this potential investment?

20 A.  Yes.  I participated in various meetings.  I would say four

21 or five meetings.

22 Q.  Let's discuss the first meeting that you remember attending

23 concerning this potential investment.

24 A.  The first meeting I took part in, it was to present the

25 components, the elements of the project, the benefits of the

1    project for Guinea, and it was represented with a group of

2    people who were invited.  It was a restricted group of

3    concerned ministers.

4    Q.  When you say concerned ministers, what do you mean by that?

5    A.  These were the ministers who were connected to the projects

6    regarding those investments, such as transportation,

7    agriculture, mines, etc., etc.

8    Q.  Thank you.  So in other words, the ministers whose sectors

9    would be directly affected by the potential agreement?

10   A.  Correct.

11   Q.  And so I understand that it was attended by the concerned

12   ministers, and you mentioned that one of those was the minister

13   of mines.

14   A.  Correct.

15   Q.  OK.  That was Mr. Thiam, the defendant?

16   A.  Yes, it was Minister Mahmoud Thiam.

17   Q.  Was the prime minister at this meeting?

18   A.  Yes, the prime minister was present and with other

19   ministers as well.

20   Q.  And you mentioned a minister by the name of Barry, who was

21   the minister of housing?

22           MR. GOLDSMITH:  Objection.

23           THE COURT:  Sustained.  Form.

24   Q.  Could you tell us the names of some of the other ministers

25   who were present at this initial meeting that you're

1    describing?

2    A.   Yes.   There was Mr. Boubacar Barry.   There was Mr. Sande,

3    the minister of finance.   There was Mr. Loholamou, the minister

4    of justice.   There were other ministers, and of course

5    Mr. Thiam, who was also present.

6    Q.   OK.   And were there any people who attended this meeting

7    who were not from the government of Guinea?

8    A.   Well, there was the Chinese investors team that was

9    supervised by Mr. Sam, and Mr. Sam's representatives in Conakry

10   and in Guinea.

11   Q.   Let me ask you a little bit about that.   First of all, who

12   was Mr. Sam?

13   A.   Well, for us he was the president, he was the chair of the,

14   the boss of the new Chinese investors.

15   Q.   China International Fund?

16   A.   Yes, correct.

17   Q.   And you mentioned -- so Sam was the head, is that correct?

18   A.   Yes.

19   Q.   And I think you said that as well Sam's representative in

20   Guinea also attended this meeting?

21   A.   Yes.

22   Q.   What's that person's name?

23   A.   Next to Mr. Sam, I think it was also Mr. Jack.   And there

24   were also other Chinese people, but I can't quite recall their

25   names.

1          MR. KOBRE:  My colleague, Ms. Laryea, is approaching

2    the witness with what is marked Government Exhibits 901 through

3    903.

4    Q.  If you can just take a look through those photographs and

5    tell me if you recognize the individuals in those photographs.

6    A.  Yes, for the people on these photographs, there was a later

7    prime minister, Mr. Jean-Marie Doré.

8    Q.  If I can just ask you to identify, are you looking at

9    Government Exhibit 901 right now?

10   A.  Yes.  That's it.

11   Q.  And who else do you recognize in that photograph?

12   A.  There is Mr. Mahmoud Thiam, who is next to him.  There is

13   Mr. Sam, who is also present.  And he's probably with a

14   translator.

15   Q.  And do you, looking at Government Exhibits 902 and 903,

16   recognize Mr. Sam in those photographs?

17   A.  Well, yes.  I, I can recognize Mr. Sam.  He's there in each

18   of these pictures.

19          MR. KOBRE:  Your Honor, the government offers

20   Government Exhibits 901 through 903.

21          THE COURT:  Received.

22          (Government Exhibits  901-903 received in evidence)

23          MR. KOBRE:  Could we publish, Mr. Beer, Government

24   Exhibit 901.

25          Is it possible for us to rotate?

1              THE COURT:  Let's keep going while they experiment, I

2    guess.

3              MR. KOBRE:  Sure.

4    Q.  Looking at this photograph --

5              THE COURT:  Perhaps we'll come back to it.

6              MR. KOBRE:  Sure, your Honor.  That makes sense.

7    Q.  Now, if you could describe what happened at this initial

8    meeting that was attended by the defendant, yourself, and some

9    of the concerned ministers and some of the representatives of

10   the Chinese company.

11             THE COURT:  You can take the photograph down if we're

12   not going to adjust it.  Thanks.

13             MR. KOBRE:  Thank you, your Honor.

14   A.  So it's like such a project of this kind of project, the

15   project was presented and then the justifications and then the

16   elements of the project were presented to that meeting.

17   Q.  Who was the main person --

18   A.  The benefits of that project.  Well, that's it.  That's how

19   I can summarize the main aspects of that.

20   Q.  Who was the main person speaking to present the benefits of

21   the investment?

22   A.  It's Mr. Mahmoud Thiam, who was in a better position for

23   that.  And he was supported during his presentation, sometimes

24   by Mr. Barry Boubacar and sometimes by the prime minister.

25   Q.  But Mr. Thiam was the primary presenter?

1    A.   Yes.

2    Q.   And specifically, what do you recall Mr. Thiam saying about

3    the benefits of the investment?

4    A.   Well, he was presenting the benefits of the investment as

5    something that would allow to improve the society on the basis

6    of certain elements, like access to water, electricity, the

7    restoration of certain roads, and also to allow big, to impart

8    a bigger transportation sector, and to do so that Guinea would

9    become a hub for West Africa between, through which the

10   Guineans and other investors from Africa would be connected to

11   Asia.

12             THE COURT:   Thank you.   Thank you.   We're going to

13   break now for lunch.   Thank you very much.

14             Ladies and gentlemen, do not discuss the case.   We'll

15   see you back at 2:00 when we'll resume.

16             (Continued on next page)

H4pWthi3                              Camara - Direct

1                    (Jury not present)

2              THE COURT:  You may step down.

3              If I could ask the witness to leave the courtroom,

4    please.

5                    (Witness not present)

6              THE COURT:  I'm going to ask the government to work

7    with the interpreter, please, to be able to signal to the

8    witness so that the answers can be taken in shorter blocks and

9    translated more contemporaneously with the witness's statement.

10             MR. KOBRE:  Yes, Judge.  I've been working on it, but

11   we will redouble our efforts on that one.

12             THE COURT:  Thank you.  I very much appreciate that.

13             Mr. Kobre, is there anything we need to discuss during

14   lunch or right now?

15             MR. KOBRE:  I don't believe so, your Honor.

16             THE COURT:  And Mr. Goldsmith, anything we need to

17   discuss right now?

18             MR. GOLDSMITH:  I don't believe so.

19             THE COURT:  OK.  I'd like Mr. Goldsmith and an

20   attorney for the government to approach the sidebar with the

21   court reporter for just a moment here, and then we're done and

22   we can break for lunch.

23                    (At sidebar)

24             THE COURT:  Mr. Goldsmith, I have a request.

25             MR. GOLDSMITH:  Sure.

H4pWthi3                           Camara - Direct

1              THE COURT:  If you could speak to your paralegal to

2     make her a little less reactive in the courtroom.

3              MR. GOLDSMITH:  Will do.

4              THE COURT:  And a little more professional in her

5     demeanor.

6              MR. GOLDSMITH:  Will do.

7              THE COURT:  Thank you so much.

8              (In open court)

9              THE COURT:  Have a nice lunch.

10             (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            AFTERNOON SESSION

 2                               2:00 p.m.

 3               (In open court; jury present)

 4               THE COURT:  Thank you.  Counsel.

 5               MR. KOBRE:  Thank you, Judge.

 6   BY MR. KOBRE:

 7   Q.  Mr. Camara, before the break, you were telling us about the

 8   initial meeting that you attended regarding the investment by

 9   China International Fund.  And I believe that you were in the

10   process of telling us some of the items that the defendant,

11   Mr. Thiam, was saying would benefit the Republic of Guinea

12   through this investment.

13   A.  Yes.

14   Q.  Now specifically, did he say anything during this meeting

15   about how the investment would benefit the budget of Guinea?

16   A.  I don't think he gave very specific details, but he said

17   that it would bring benefits to the budget of the government

18   because it was very imbalanced and we would need some specific

19   things like that to support the Guinean budget.

20   Q.  And during this meeting did he also say anything about

21   whether the agreement would benefit mining in the Republic of

22   Guinea?

23   A.  Yes.  He said it would bring some benefits to the mining

24   sector that was a practical benefit for that sector that was in

25   a bad condition.
```

 1   Q.  Is it fair to say the defendant was promoting the benefits

 2   of the agreement?

 3             MR. GOLDSMITH:  Objection.

 4             THE COURT:  Overruled.  You may answer.

 5   A.  Sorry?

 6   Q.  Is it fair to say that during this meeting the defendant

 7   was promoting the benefits of the investment by China

 8   International Fund?

 9   A.  Yes, to the extent that the government had budget problems

10   in terms of taking power, that we didn't need any particular

11   promotions for the project.  The company was promoting its own

12   budget.  Because they were -- there was a real need in the

13   field and it was very concrete.  All the populations were very

14   enthusiastic about it, as the administration of the country

15   were about receiving that project.

16   Q.  Okay.  And so you've described this initial meeting.  What

17   was the next official meeting that you attended regarding this

18   potential investment?

19   A.  If I remember correctly, there was a second meeting at the

20   presidential palace, if I believe, where we have the Council of

21   Ministers meeting.

22   Q.  Okay.  And so the first meeting was just a subset, a

23   subgroup of the ministers, is that right?

24             MR. GOLDSMITH:  Objection.

25             THE COURT:  Sustained.

1   Q.   The initial meeting you described, was that the entire

2   Council of Ministers?

3   A.   No, it was only with the ministers who were directly

4   concerned by the project.

5   Q.   And so the second meeting that you're describing now was

6   the entire Council of Ministers?

7   A.   It was the entire Council of Ministers because we needed

8   transparency.

9   Q.   And what was the purpose of this full Council of Ministers

10  meeting?

11  A.   It was reiterating the presentations that was presented in

12  the former restricted meeting.

13  Q.   Other than ministers, was there anyone outside of the

14  government of Guinea who attended?

15  A.   Yeah, I think that the Chinese were there.

16  Q.   Specifically, which Chinese are you referring to?

17  A.   It was Mr. Sam and his team.

18          MR. KOBRE:  And if we can just publish for the members

19  of the jury Government Exhibit 901, which is already in

20  evidence.

21  Q.   If you could take a look at that.  You can look at the

22  screen as well, Mr. Camara, if that's easier.

23      Can you tell us what we're looking at, identify the

24  individuals in this picture?

25  A.   There's the prime minister, there's Mr. Mahmoud Thiam,

1   there's Mr. Sam, and his interpreter.

2   Q.  Okay.  And just so we're clear, let's start from the left

3   side of the picture.  Who is the individual all the way to our

4   left?

5   A.  That's Mr. Thiam -- or Mr. Sam.

6   Q.  Okay.  And the female right next to him?

7   A.  That's probably the translator, interpreter.

8   Q.  You don't know who that is.

9   A.  No, I don't know that person.

10  Q.  Okay.  And then moving to the second person from the right?

11  A.  It's the minister Mahmoud Thiam.

12  Q.  And then finally, all the way on the right-hand side?

13  A.  It is the prime minister, Jean-Marie Doré.

14  Q.  Now I think that's a name that we hadn't heard before.  Was

15  the Prime Minister Jean-Marie Doré before or after Prime

16  Minister Komara who you mentioned earlier?

17  A.  Mr. Jean-Marie Doré came after Mr. Komara.

18  Q.  The prime minister that followed Mr. Komara?

19  A.  Precisely.

20  Q.  Okay.  We can take that down now.  Thank you.

21      Now could you describe what happened during this second

22  meeting, the meeting of the full Council of Ministers.

23  A.  Starting with the repetition of the first meeting, and

24  there were also other topics in English that were mentioned, in

25  order to make the project progress, but I don't quite remember

1   in details all that was said on this occasion.

2   Q.  Did Mr. Thiam say anything about the potential investment

3   during this second meeting?

4   A.  Well, Mr. Thiam continued to play the same role.  He

5   continued to explain the project, and to present this project.

6   Q.  Okay.  Turning now to -- we discussed two official

7   meetings, you've described.

8   A.  Correct.

9   Q.  Other than these official meetings, have you ever seen the

10  defendant, Mr. Thiam, coming to meet with -- engaging in a less

11  formal meeting?

12  A.  Well, as a minister, he had the capacity to come, but from

13  a formal point of view, I believe I only saw him meeting the

14  prime minister about twice.

15  Q.  Are those two times different or the same as the two

16  meetings you just described earlier in your testimony?

17  A.  No, it's different.

18  Q.  The two times that he came to meet with the prime minister,

19  was he with anyone else?

20  A.  Well, I didn't see him from my own eyes that he came with

21  someone else, but I knew that he came with at least Mr. Sam to

22  visit the prime minister.

23  Q.  And did you see that?

24  A.  Well, I saw him, but I was not present during the

25  discussions and I probably had some more specific matters to

1    discuss with Mr. Prime Minister.

2    Q.  So you saw the defendant with Mr. Sam coming to meet the

3    prime minister but you didn't participate.

4    A.  Correct.

5    Q.  What language did Mr. Sam and the other Chinese officials

6    speak?

7    A.  They speak English.

8    Q.  Did they speak any French?

9    A.  No.

10   Q.  So at the time how were the defendant Mr. Thiam's English

11   skills?

12              MR. GOLDSMITH:  Objection.

13              THE COURT:  Sustained.

14   Q.  Did you learn in your interactions with Mr. Thiam during

15   the time that he was minister of mines whether he spoke any

16   English?

17   A.  Well, from a general manner, he certainly was the one who

18   had the most perfect English among all our team.

19   Q.  And from what you could observe as an adviser to the prime

20   minister, was he the primary point of contact with the Chinese?

21   A.  Yes.

22   Q.  Now at some point were you asked to participate in a

23   committee that was formed concerning the potential investment

24   by China International Fund?

25   A.  I was asked to participate in a technical committee.

H4p1thi4                    Camara - Direct

1    Q.  And what was the job or what was the role to be on the

2    technical committee?

3    A.  It was to review and to examine all the documents regarding

4    the financial, legal matters in order to review the connection

5    between the Guinea and China International Fund.

6    Q.  And aside from yourself, about how many other members were

7    on the technical committee?

8    A.  It was a significant number of people, from 15 to 17

9    people.

10   Q.  And where were these people drawn from?

11   A.  These people came from the various ministers that were

12   interested or concerned by this particular project.

13   Q.  I'm going to ask you some questions about the work of the

14   technical committee, but before I do that, let me ask you, who

15   did the technical committee report to?

16   A.  Well, the technical committee, everything was structured,

17   was reporting to the prime minister, and then the prime

18   minister get instructions to report regularly to the minister

19   of mines, Mr. Thiam.

20   Q.  The prime minister directed you and the committee to report

21   its results to Mr. Thiam.

22   A.  Yes.

23   Q.  Now I want to talk a little bit about the work of the

24   technical committee.

25       During the course of your work on the technical committee,

1    did the technical committee receive draft agreements for the

2    potential deal with the Chinese?

3    A.   Yes.

4    Q.   And how many different draft agreements was the committee

5    provided?

6    A.   The first project, there were always draft projects to

7    agreements.  It was, we present the shareholders agreement;

8    after the shareholder agreement, in English, there was the

9    framework agreement; after the framework agreement, there was

10   the memorandum.

11   Q.   And what was the purpose of having three -- why were there

12   three separate agreements?

13   A.   And it was part of the administrative way of operating and

14   it was also to progress for the purpose of these agreements and

15   so it was going stage after stage.

16   Q.   Which one was the most preliminary agreement?

17   A.   Is the memorandum.

18   Q.   And then second, in terms of formality?

19   A.   Is the framework agreement.

20   Q.   And then what was the final, ultimate agreement?

21   A.   It was the shareholders agreement.

22   Q.   And we're going to take a look at those in a moment, but

23   first let me ask, how were these documents, in their draft

24   form, conveyed to the technical committee?

25   A.   It was the other prime minister.

1   Q.  And did the prime minister ever tell you where he got these

2   drafts from?

3   A.  The first time that the prime minister called me and to

4   give me the whole files, including the project, he told me that

5   it came from our Chinese friends and that it came via the

6   minister of mines.

7   Q.  And that was the defendant Mr. Thiam, right?

8   A.  Correct.

9   Q.  My colleague, Ms. Laryea, is approaching you, Mr. Camara,

10  with what's marked Government Exhibits 401, 402, and 408, all

11  of which are in evidence.  If you can take a look first at

12  Government Exhibit 401.

13      Do you recognize that?

14  A.  Yes.

15          MR. KOBRE:  And if we can publish the first page of

16  Government Exhibit 401.  Thank you, Mr. Beer.

17  Q.  And looking at that, Mr. Camara, have you seen that

18  document before?

19  A.  Yes, I had seen this previously but not with signatures.

20  Q.  Okay.  And was this one of the documents that was given to

21  you by the prime minister for review on the technical

22  committee?

23  A.  Yes.

24  Q.  And who had given it to the prime minister?

25  A.  From the institutional point of view, it's the minister of

H4p1thi4                        Camara - Direct

1    mines who gave it to the prime minister.

2    Q.  Okay.  And just looking at the front, the first page here,

3    what's the date of this agreement?

4    A.  It's June 6.

5    Q.  Of what year?

6    A.  2009.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. KOBRE:

2    Q.  Again, referring to the first page, who are the parties to

3    this agreement?

4    A.  It's China International Fund limited and the government of

5    the Republic of Guinea.

6             MR. KOBRE:  If we could go now to take a look at page

7    2, and if we could just enlarge the first half or first third.

8    Great.

9    Q.  Referring to subparagraph (A) here, what is being agreed

10   upon here?

11   A.  It was mentioned that we agreed to send high-level

12   delegation to Singapore and also to undertake into the, to

13   enter into the framework agreement.

14   Q.  And taking a look at paragraph (B), does paragraph (B)

15   describe what the parties are ultimately agreeing to do in the

16   framework agreement?

17   A.  And so, first of all, the establishment of the company is

18   mentioned and also the ownership of the company appears as well

19   as the object of this holding and financial company.

20   Q.  And this paragraph refers to the company as a joint

21   venture.  Could you explain what you understood when you

22   reviewed this document the idea of a joint venture to be?

23   A.  Well, the concept of joint venture there meant that there

24   had to be a joint venture between China, China International

25   Fund and the Republic of Guinea.

1    Q.   OK.

2    A.   To get investments and funding.

3    Q.   Now, I recognize when you reviewed the document in the

4    technical committee, it was not signed, but if we could just

5    take a look at the signatures here, who signs this document on

6    behalf of the government of Guinea?

7    A.   It's Mr. Mamadou Sande.

8    Q.   And what is his position?

9    A.   He's the minister of finance.

10   Q.   And who signs the document on behalf of China International

11   Fund?

12   A.   On, on behalf of the China International Fund, it's

13   Mr. Jimmy Leung.

14   Q.   And in this document, just looking at the document, what is

15   Mr. Jimmy Leung's position with China International Fund?

16   A.   He's CEO.

17   Q.   Now, in your work in the technical committee, did you have

18   direct interactions with Mr. Jimmy Leung?

19   A.   Yes.

20   Q.   And could you describe a little bit about that?

21   A.   Well, Mr. Jimmy Leung was in charge of presenting the

22   administrative and legal project of the CIF and also to present

23   it to the technical committee to be reviewed by them.

24   Q.   Did Mr. Jimmy Leung -- have you ever seen Mr. Jimmy Leung

25   with a computer?

1   A.  It was his daily companion.

2   Q.  And did you see any documents on that computer?

3   A.  All the documents that were in the draft form were in that

4   computer.

5   Q.  And in terms of -- you mentioned Mr. Sam and now we're

6   talking about Mr. Jimmy Leung.  Who was more senior in China

7   International Fund?

8   A.  Of course it's Mr. Sam.

9   Q.  I'm going to ask you to take a look now at what's in front

10   of you, which is Government Exhibit 402.

11           MR. KOBRE:  And Mr. Beer, if you could publish

12   Government Exhibit 402-T, which is the translation of 402.

13   Q.  Do you recognize Government Exhibit 402?

14   A.  Yes.

15   Q.  And what is it?

16   A.  It's an agreement regarding holding company for the

17   investments in the Republic of Guinea.

18   Q.  And where have you seen this document before?

19   A.  In the cabinet of the prime minister, and after that, at

20   the technical committee.

21   Q.  Who provided it to the technical committee?

22   A.  It's Mr. Prime Minister.

23   Q.  Do you know how the prime minister got it?

24   A.  No.

25   Q.  OK.  And is this the framework agreement that's described

1    in the MOU we just looked at?

2    A.  Yes.

3    Q.  OK.  Let's just look at a few items in this agreement.

4    First of all, what is the date of this agreement?

5    A.  It's June 12, 2009.

6    Q.  Is that about six days after the MOU we just looked at?

7    A.  Correct.

8    Q.  And who are the parties to this framework agreement?

9    A.  There is the China International Fund and the government of

10   the Republic of Guinea.

11   Q.  Do you know who drafted this agreement?

12   A.  It's the Chinese team of Mr. Jimmy.

13   Q.  And do you know how it got from the draft from Mr. Jimmy to

14   the technical committee?

15   A.  It was through the ministry of mines that sent it to the

16   prime minister and then the prime minister send it to our

17   committee.

18   Q.  OK, so from the minister of mines?

19               MR. GOLDSMITH:  Objection.

20               THE COURT:  Overruled.

21   A.  Yes.

22   Q.  Now, we're not going to look through this agreement in any

23   detail, but I just want to point you to two provisions and ask

24   you about them.

25               MR. KOBRE:  If we could go to page 3.  I don't believe

1   the pages are actually numbered, so it's the third page, and if

2   we could just enlarge the first portion through paragraph (B).

3   Just referring first to paragraph (A), if we could enlarge

4   that, that would be great.

5   Q.   What's being agreed upon here?

6   A.   It's to create the holding company that belongs to both

7   parties regarding investment in the financing of projects in

8   the Republic of Guinea.

9   Q.   According to paragraph (A), where is this company going to

10  be incorporated?

11  A.   It would be Singapore.

12  Q.   OK.  And who is this company going to be owned by under

13  paragraph (A)?

14  A.   The two owners would be China International Fund and the

15  Republic of Guinea.

16  Q.   And what is going to be, under this agreement, the main

17  business activity of this holding company?

18  A.   It's the financing and the implementation of the projects

19  that are mentioned under paragraph (B).

20  Q.   And what are those, if you could just look at paragraph

21  (B), and you could read that for us?

22          THE COURT:  Why don't you read that into the record,

23  counsel, if you want part of this, so we don't translate it

24  from English to French to English.

25          MR. KOBRE:  That makes sense, your Honor.  Thank you.

1   I'll just read directly from paragraph (B):  The parties will

2   cooperate as part of specific project identified --"

3          THE COURT:  Go slowly so it can be translated to the

4   witness.

5          MR. KOBRE:  Yes.

6          "The parties will cooperate as part of specific

7   projects identified by common agreement to invest, among

8   others, in energy, water treatment, electricity,

9   transportation, housing, agriculture, fishing, farming, or in

10  any other sectors of common interest, pursuant to the terms and

11  conditions of this master agreement (hereinafter designated as

12  the 'project')."

13  Q.  Am I correct that it's all of these sectors that would be

14  part of this investment, this holding company?

15  A.  Correct.

16  Q.  Now, if we can go to page 4, and I want to ask you to focus

17  on a provision, section 2.3.

18         MR. KOBRE:  And if we can just enlarge that bottom of

19  page 4, 2.3.

20  Q.  Now, this is titled "shareholders agreement," right?

21  A.  Yes.

22  Q.  And what is this provision, if you can summarize what's

23  being agreed upon here?

24  A.  This specific provision that the parties will apply for the

25  joint venture.  These are the following terms and conditions.

1    Q.  Does it describe here what's called a shareholders

2    agreement?

3    A.  Yes, it's the shareholders agreement.

4    Q.  In this framework agreement, the parties are agreeing that

5    they will enter into another agreement called the shareholders

6    agreement, is that right?

7    A.  Yes.

8              MR. KOBRE:  OK.  If we could go to the next page, just

9    a continuation of 2.3, and just enlarge through the table

10   there.

11   Q.  Does this agreement provide what the ownership interests

12   will be in the holding company that's going to invest in the

13   sectors that we read a moment ago?

14   A.  Not only the ownership, but also the proportions.

15   Q.  OK.  And what proportion of this holding company will be

16   owned by CIF?

17   A.  75 percent.

18   Q.  And what percentage will be owned by the government of

19   Guinea?

20   A.  It's 10 percent and -- 15 percent and 10 percent, so that

21   means 25 percent.

22   Q.  So 75/25, correct?

23   A.  Yes.

24             MR. KOBRE:  And now let's just look at the signature

25   page, if we can, page 11 in Government Exhibit 402, which is

1   the French version.  Could we just enlarge that portion of it.

2   Q.  So who signs this agreement on behalf of the government of

3   Guinea?

4   A.  Mr. Sande.

5   Q.  And do you know whose signature it is that appears on this

6   framework agreement on behalf of China International Fund?

7   A.  No.

8   Q.  So we've looked at two agreements.  We've looked at the

9   memorandum of understanding and then we've looked at this

10  framework agreement.  I want to ask you about the shareholders

11  agreement.  Were you presented as part of the technical

12  committee a shareholders agreement to review?

13  A.  The shareholders agreement was not presented, but it was

14  debated and we discussed about it.

15  Q.  Well, was the technical committee presented with a draft of

16  the shareholders agreement?

17  A.  No.  It's a draft project received on the part of the

18  Chinese people.

19  Q.  But you did receive a draft of the shareholders agreement?

20  A.  Yes, we received the -- an agreement, yeah.

21  Q.  OK.  And if you could take a look at Government Exhibit

22  408.

23  A.  Yes.

24  Q.  Do you recognize that?

25  A.  Yes.

1    Q.  What is it?

2    A.  It's the shareholders agreement.

3    Q.  And in terms of the form, does it appear similar to the

4    draft that was presented to you, to the technical committee for

5    review?

6    A.  Yes, on the point of view of the structure, the context of

7    the document, yes.

8    Q.  But some of the provisions are different now in Government

9    Exhibit 408?

10   A.  Yes, during the final presentation to the technical

11   committee or during the discussion so the technical committee

12   would notice there are some differences.

13           MR. KOBRE:  OK.  If we could publish Government

14   Exhibit 408.

15   Q.  And before I ask you some questions about this agreement,

16   do you know how the technical committee, who the technical

17   committee got the shareholders agreement from?

18   A.  From the prime minister.

19   Q.  And where did the prime minister get it from?

20   A.  From the ministry of mines.

21           MR. KOBRE:  OK.  Let's take a look, if we could, just

22   expand or enlarge the first portion of the page, the center.

23   That's fine.

24   Q.  What is the date of this shareholders agreement?

25   A.  October 10, 2009.

1   Q.  And who are the parties to the shareholders agreement?

2   A.  On the one hand, there is the Republic of Guinea.  Well,

3   the China Investment Fund of Singapore and China Sonangol

4   International Singapore.

5   Q.  And what do you understand CIF Singapore Pte, what is its

6   relationship with CIF or China International Fund, if any?

7   A.  These are two companies that are subsidiaries that were

8   created in Singapore to manage the space of China International

9   Fund and China Sonangol International.

10  Q.  If I understand you correctly, CIF Singapore is a

11  subsidiary of China International Fund?

12  A.  Correct.

13  Q.  And China Sonangol, that's an entity that we haven't seen

14  before in the previous two agreements that we looked at,

15  correct?

16  A.  Yeah.

17  Q.  Do you know how it came to be that this party, China

18  Sonangol International Singapore, became part of this potential

19  investment?

20  A.  Well, given the extent and the scope of the, and the

21  project of the agreement, we decided we needed an extra

22  investors in order to, to take care of the basic projects.

23  Q.  Were you yourself part of the discussion that resulted in

24  the adding of China Sonangol International to this agreement?

25  A.  Perhaps we didn't pay attention too much to China Sonangol

1    International.  It's only on the day of the signature of these

2    agreements that we realized that the China Sonangol

3    International was one of the three shareholders.  But

4    otherwise, everybody was focusing on China International Fund.

5    Q.   OK.  And if you'd just flip through the agreement, are

6    there initials that appear on each page of this agreement?

7    A.   The initials that appear on this, they are variously --

8    they are the initials of Mr. Boubacar Barry, of Mr. Mahmoud

9    Thiam, of Mr. Loholamou, and of -- there are four, four, four

10   initials that I cannot identify.

11          MR. KOBRE:  Mr. Beer, if we can just enlarge, go to

12   page 18, just picking any page at random, really, and just

13   enlarge the lower right-hand corner.  Try to include the page

14   numbers so we can see that.  Thank you.  That's great.

15   Q.   I'm looking at page 18, if you don't mind.

16   A.   Yes.

17   Q.   Do you have that in front of you?

18   A.   Yes.

19   Q.   Are those the initials of Mr. Thiam, MT, that's there?

20          MR. GOLDSMITH:  Objection.

21          THE COURT:  Sustained.  You can lay a foundation.

22   Q.   You testified a few moments ago that you saw that each page

23   of the document contains initials of several ministers, is that

24   right?

25   A.   Yes.

1   Q.   And you mentioned that one of them was the initials of

2   Mr. Thiam, correct?

3   A.   Yes.

4   Q.   Looking at the bottom, lower right-hand corner of page 18,

5   can you describe for us which ones are the initials of

6   Mr. Thiam?

7   A.   It's the third signature on page 18.

8   Q.   The third from the left-hand side?

9   A.   Yes.  From the left-hand side, it's the third initials.

10  Q.   The one that kind of looks like an MT?

11  A.   Correct.

12  Q.   OK.

13          MR. KOBRE:   Now, if we can go to page 3 of Government

14  Exhibit 408.

15  Q.   And if you could take a look at page 3.  I'm going to ask

16  you a little bit about the three paragraphs that appear on this

17  page.  First looking at paragraph (A).

18          MR. KOBRE:   Could we just enlarge that briefly.

19  Q.   The framework agreement that we looked at earlier had

20  described the incorporation of a company in Singapore.  Does

21  this paragraph here describe that company?

22  A.   Yes.

23  Q.   And what's the name of the company in Singapore?

24  A.   Well, we didn't find a final name for it, but we started

25  with the name of Africa Development Corporation to give it

1    legal status to start with.

2    Q.  OK.  And that's what's reflected here in paragraph (A),

3    that the name of the company would be Africa Development

4    Corporation?

5    A.  Correct.

6    Q.  And based on this paragraph here, what would be the

7    division of ownership in Africa Development Corporation?

8    A.  They are 1,000 regular shares, including 425 regular shares

9    for CIF and 424 -- 25 ordinary shares for China Sonangol

10   International, and finally, 150 ordinary shares for the

11   Republic of Guinea.

12   Q.  So CIFS stands for China International Fund Singapore and

13   CSIS is China Sonangol International Singapore?

14   A.  Yes.

15   Q.  So in total, what percentage would these two entities own

16   of ADC?

17   A.  425 plus 425 amounts to 850, so that represents 85 percent.

18   Q.  OK.  So the two, these two Chinese entities would own 85

19   percent, and how much would be owned by the government of the

20   Republic of Guinea?

21   A.  15 percent.

22   Q.  OK.  If we could now turn to paragraph (B).  Please take a

23   look at that.  What is being agreed to here?

24   A.  It was agreed to that the shareholders of ADC would take

25   the necessary measures to incorporate the various subsidiaries

1   in Guinea, each of them being GDC.

2   Q.   What does GDC stand for, even though it's not in this

3   paragraph?

4   A.   It means Guinea Development Corporation.

5   Q.   And we're going to get to a provision that describes what

6   these companies will do, but before we get to that, who will

7   own these GDC subsidiaries?

8   A.   The subsidiaries, the GDC subsidiaries are the shareholders

9   of ADC, and the shareholders of ADC are China International

10  Fund and China Sonangol International.

11  Q.   Do you need a drink of water?  Sure.

12       And so I was asking you who, these GDCs are subsidiaries,

13  but who are the owners of GDC?  Are they -- if you look at the

14  provision here --

15  A.   It's the shareholders of ADC.

16  Q.   And is the Republic of Guinea also a direct owner of each

17  GDC in a certain percentage?

18  A.   Yes.

19  Q.   OK.  Let's now turn to the final paragraph on this page,

20  which is paragraph (C).  Does this paragraph provide what

21  sectors of the Guinean economy will be assigned to ADC?

22  A.   If you allow me, I would like to go backward a little bit.

23  Q.   Of course.  To?

24  A.   Under paragraph (B).

25  Q.   Sure.

1           MR. KOBRE:  If we could just enlarge that.

2     Q.  Yes?

3     A.  It was mentioned that 15 percent direct, directly owned by

4     the Republic of Guinea and all the other percentages that can

5     be agreed between the parties.  What does this mean?  It means

6     flat 15 percent plus the 10 percent that we mentioned before in

7     the framework agreement, so that's 25 percent.

8     Q.  OK, but so what we have is, just to summarize, we have ADC

9     and we have its subsidiaries, GDCs, correct?

10    A.  Correct.

11    Q.  And ADC is owned 85 percent by these two Chinese companies

12    and 15 percent by the Republic of Guinea?

13    A.  Yes.

14    Q.  Now, can you just return to paragraph (C)?

15    A.  Yes.

16    Q.  Does this paragraph describe what sectors of the Guinean

17    economy will be the subject of this joint venture ADC?

18    A.  Yes.

19    Q.  And I recognize there's a long list, so I won't read it out

20    loud, but does it include diamonds, iron, bauxite, gold, oil,

21    and gas concessions?

22    A.  It's the whole value of the mining resources that

23    represents a common state.

24    Q.  OK.  Now, I want to focus on two particular provisions of

25    this agreement, of the shareholders agreement.  First, in the

1   draft agreement that was provided to you as part of the review

2   process on the technical committee, did that draft include an

3   exclusivity provision?

4   A.  Which draft are you talking about, the draft of the

5   framework agreement or the other agreement?

6   Q.  I'm talking about a draft of this shareholders agreement

7   that we're looking at now.

8   A.  Yes.

9   Q.  It did contain an exclusivity provision, correct?

10          MR. GOLDSMITH:  Objection.

11          THE COURT:  Overruled.

12  A.  Yes.

13  Q.  And just briefly, can you explain what that provision said,

14  to the best of your recollection?

15  A.  Could we read that provision clearly for everybody?

16  Q.  Yes.  Before we get to that, in your review of this final,

17  signed shareholders agreement, did you see the same exclusivity

18  provision, Mr. Camara?

19  A.  Yes, we saw the same exclusivity provision.

20  Q.  OK.  And if we could go to page 12 and look at, enlarge

21  section 2.4.9 --

22  A.  Yes.

23  Q.  -- is that the exclusivity provision that you recall seeing

24  in the draft agreement of this and the draft shareholders

25  agreement that was presented to the technical committee?

1   A.   Yes.

2   Q.   And I'm just going to read that first sentence of 4.2.9.

3   It says, "Subject to the laws and regulations in force, the

4   Republic of Guinea shall give full exclusivity to ADC and the

5   GDCs in respect of the sectors identified and approved by the

6   parties, as set out in the proposed projects to be undertaken

7   by the GDCs in this agreement and the master agreement."

8   A.   Yes.

9   Q.   Could you explain what giving full exclusivity to the ADC

10  means, as reflected in this agreement?

11  A.   It means that the full exclusivity, there will be the

12  ownership of the investment rights and development rights in

13  this project, and that apart from them, nobody else will have

14  access to that unless they decide to, to leave some of the

15  rights to some other companies.

16            MR. KOBRE:   Mr. Beer, if we can put up side by side

17  this provision and page 3 of subparagraph (C).

18  A.   Yes.

19  Q.   So the projects that are subject to this exclusivity

20  provision are all the projects -- where can we find the

21  provision describing those projects?

22  A.   It's in the provision (C).

23  Q.   OK.   And if you look at your screen, is that the list that

24  we looked at earlier in paragraph (C) on page 3?

25  A.   Yes.

1    Q.  When you reviewed this as part of your review process on

2    the technical committee, did this exclusivity provision concern

3    you?

4    A.  Yes.  It created some concerns.  Many concerns.

5    Q.  What concerns?

6    A.  The sovereign rights of the Republic of Guinea regarding

7    its natural resources were practically removed from Guinea.

8    Q.  OK.  Thank you.  Did you later address those concerns to

9    anyone else in the government of Guinea?

10   A.  Yes, those concerns were presented to the council of

11   ministers that was regrouping the concerned ministers, and it

12   was also -- they were also presented equally to the president

13   of the steering committee plus to the minister of mines,

14   Mr. Thiam.

15   Q.  And who was it who presented these concerns to, let's take

16   the minister of mines, Mr. Thiam?

17   A.  Well, Mr. Thiam welcomed us in his cabinet of ministers

18   cabinet, and I presented some of these certain objections.  I

19   would say that there were more or less three or four objections

20   that I presented to Mr. Thiam.

21   Q.  OK.  Thank you.  And I want to just discuss one other main

22   provision of this agreement.  Do you recall in the draft that

23   you were provided for review of the shareholders agreement a

24   provision concerning the creation of a national mining company?

25   A.  Yes.

1   Q.  And I'll point you to the provision as it exists in this,

2   Government Exhibit 408, but before I do that, can you describe

3   what you recall about what was in the draft concerning the

4   national mining company?

5   A.  This national mining company -- corporation was supposed to

6   be an asset company, national asset company that would hold all

7   the shares of the government in the current mining companies,

8   and also for the future companies, that would exert, implement

9   their commercial rights of retrievement and that would own the

10  exploration rights, potential rights of exploration, etc., etc.

11  Q.  Let me ask you, what is the value of the rights that you

12  just described, the existing mining rights and future mining

13  rights to these natural resources?

14  A.  Well, that means that we grant the licenses to the

15  investors to develop the sectors.  If their research lead to

16  positive outcome, then some companies of exploitation are being

17  created.  And the government of Guinea will get an off-take of

18  getting 15 percent for free.  That's the first benefit.  The

19  second benefit will be that the government from Guinea will

20  have the rights to remove some of the rights to, from

21  production, or part of the production, which is a very

22  significant commercial benefit.

23  Q.  OK.

24  A.  And the government will have the opportunity to obtain some

25  dividends.

1    Q.  OK.  And so this national mining company that you're

2    recalling would get all of these mining rights, correct?

3              THE INTERPRETER:  Sorry.  The interpreter didn't hear.

4    Q.  This national mining company would be given substantial

5    mining rights, is that correct?

6              MR. GOLDSMITH:  Objection.

7              THE COURT:  Overruled.

8    A.  Regarding mining rights.  The mining rights cannot be owned

9    by the national company.  It's only the national company does

10   its own research and finds some things that it can obtain some

11   of those mining rights.  The mining rights belong to the

12   company that found the mining sites.

13   Q.  OK.  I understand that, and we're going to return to that

14   in a moment.

15             THE COURT:  Excuse me, Mr. Kobre.  Can you choose a

16   good time for a midafternoon recess.

17             MR. KOBRE:  I think now would be just fine, your

18   Honor.

19             THE COURT:  OK.  Good.

20             Ladies and gentlemen, let Ms. Rojas know when you're

21   ready to return.  Feel free to take ten minutes or so.

22             (Continued on next page)

23

24

25

1           (Jury not present)

2           THE COURT:  Step down.

3           (Witness not present)

4           THE COURT:  Counsel, Mr. Kobre, do you need to raise

5    anything during the break?

6           MR. KOBRE:  No, your Honor.

7           THE COURT:  Mr. Goldsmith.

8           MR. GOLDSMITH:  No.

9           THE COURT:  Mr. Kobre, this is an older gentleman, who

10   is moving slowly as he walks through the courtroom, and it

11   would be just fine with me, and I'm sure with everyone, if you

12   wanted to have him escorted by someone, because I think he's

13   moving slowly in part out of fear of tripping or falling, and I

14   don't want that to happen.  I'm sure none of us want that to

15   happen, so if you want to have someone walk with him back and

16   forth to the witness stand, that's fine with me.

17          MR. KOBRE:  Thank you, Judge.  We've been cognizant of

18   it, and I'll raise it with him again.

19          THE COURT:  Thank you, all.

20          (Recess)

21          THE COURT:  Please be seated.  Bring in the witness.

22          Bring in the jury.

23          (Continued on next page)

24

25

1              (In open court; jury present)

2              THE COURT:  Counsel.

3              MR. KOBRE:  Thank you, Judge.

4    Q.  Mr. Camara, right before the break, we were discussing the

5    provision in the shareholders agreement concerning the national

6    asset company.

7    A.  Yes.

8    Q.  And I think you testified that the national asset company

9    was going to hold many valuable mining rights, is that correct?

10   A.  Yes, assets of great value, current assets and future

11   assets.

12   Q.  And under the draft shareholders agreement, as you recall

13   it, were the Chinese companies given any -- what were their

14   rights going to be in that asset company?

15   A.  As we said before, it's the strategic partners, China

16   International Fund and China Sonangol International fund, that

17   were supposed to be regrouped together in order to facilitate

18   the investments.

19   Q.  OK.

20             MR. KOBRE:  Could we take a look, Mr. Beer, at page 16

21   of Government Exhibit 408.

22             THE WITNESS:  Yes.

23             MR. KOBRE:  And I'm going to start with just, if we

24   can expand or enlarge section 4.4.

25   Q.  We'll look at the English portion of it, but Mr. Camara,

1    you'll look at the French.  And it's entitled "Republic of

2    Guinea's obligations," and I'll just read the first paragraph.

3    It says:  "The Republic of Guinea hereby undertakes to, in

4    conformity with the regulations in force and at the cost of ADC

5    and the GDCs, where such fees are applicable:" and then there

6    are certain provisions that come after that.  Right?

7    A.  Yes.

8    Q.  And if you look at 4.4.2, subparagraph (A), what is the

9    Republic of Guinea obligated to do under this portion of the

10   agreement?

11   A.  Yes, this obligation under provision 4.4.2, so it says it

12   will, a company's evaluation of the obligations of China

13   International Fund S and China International Sonangol S, if

14   they fulfill their obligations.  If they fulfill their

15   obligations, according to evaluation of the government, they

16   will be granted mining concessions in the oil industry, gas,

17   and in other mining sectors.  And it will also be granted

18   mining rights, rights of take, of take rights, and marketing

19   rights.

20   Q.  So the Republic of Guinea will be obligated to grant those

21   rights to these two companies, correct?

22   A.  If the evaluation is satisfactory and positive.

23           MR. KOBRE:  OK.  Now let's look at page 17, which is

24   subparagraph (B), if we can just enlarge that.

25   Q.  Is this the provision concerning the national asset company

1    that you were referring to?

2    A.  Yes, that's it.

3    Q.  OK.  And it talks here about granting to these two entities

4    the rights, and I'm reading here, "The right to be the first

5    and strategic shareholder with the Republic of Guinea of a

6    national mining company."

7    A.  Yes.

8    Q.  And what rights would the national mining company have

9    under this provision?

10   A.  The national mining corporation would get the rights

11   attached to the shares that are already associated with the

12   current mining operations.  And rights for the new projects,

13   the dividends that might come from that, and for the

14   operational and the future projects, the commercial and

15   taking-off rights, and the commercial rights of marketing, it

16   represents an incredible and enormous amounts of rights and

17   benefits.

18   Q.  And what does it mean that the Chinese companies would have

19   the right to be the first and strategic shareholder in that

20   company that has incalculable value?

21   A.  Well, given the strategic character of the development of

22   all these resources, the government cannot do that by itself.

23   It is, it has to have some partners who have very important

24   means to support the government, so those are the ones to whom

25   we are going to grant the first opportunities.  If they are

1   interested in it, they will seize those opportunities.

2   Otherwise they will reject them.

3   Q.  And when you say those opportunities, it would be an

4   opportunity to obtain the profits from these mining rights?

5   A.  Yes, and not only that it concerned the current rights, but

6   also the future rights.

7   Q.  OK.  So when you saw this provision in the draft

8   shareholders agreement, did it cause you some concern?

9   A.  Yes, it created concerns for us.

10  Q.  Particularly what?

11  A.  Yes, it really represented a real threat on to the

12  government regarding operational projects that were already in

13  place and to projects that would be developed in the future.

14  From a logical point of view, it was first estimated that it

15  would be a good way to regroup the investments and the various

16  actions in which the government would be interested in.

17  Everything would have been right if it would be under the

18  control of the government 100 percent.  But if there is a third

19  party that intervenes in that, then it creates problems.

20  Q.  And who was the third party here?

21  A.  It was China Sonangol and China International Fund.

22  Q.  OK.  Let's just talk a little bit about what happened as a

23  result of the technical committee's work.  First of all, about

24  how many times in total did the technical committee meet?

25  A.  I believe four or five times.

1    Q.  Over what period of time?

2    A.  Over a period of two and a half months.

3    Q.  And you testified earlier that you had been told by the

4    prime minister that the results should be reported to the

5    defendant, Minister Thiam?

6    A.  Yes, we were told to report back to Mr. Thiam, but we had

7    some kind of constraints.  We were not always able to go see

8    Mr. Thiam.  Sometimes Mr. Thiam was too busy with his own

9    activities, or maybe he was traveling, so we had to wait to

10   have this opportunity to meet Mr. Thiam, and I believe we had

11   one such opportunity to do so.

12   Q.  OK.  And did you, in fact, present your results to

13   Mr. Thiam?

14   A.  Yes.  Mr. Thiam received us and we presented the summary of

15   our concerns --

16   Q.  And --

17   A.  -- that were related to two or three points.

18   Q.  Are any of those points the points we've discussed earlier

19   here during your testimony?

20   A.  Apart from the points regarding the asset company --

21   Q.  Was that one of the concerns --

22   A.  The points regarding its guidelines, instructions, and its

23   exclusivity.  I think there were two other, additional points

24   that were added to that.  They were the payment of the heads of

25   investors, either from the tax outcomes or the payment, and it

1   was not allowed, according to the finance law.

2   Q.  OK.  So if I have you right, you presented to Mr. Thiam the

3   concerns about the exclusivity.  Is that correct?

4   A.  Yes, we did that briefly.  Yes.

5   Q.  And the national asset company, the concerns regarding

6   that?

7   A.  Yes.

8   Q.  And you also presented a third concern, which you just

9   mentioned now, about something relating to the way the Chinese

10  company would receive payments?

11  A.  Yes.

12  Q.  And where did this meeting take place?  Where was it that

13  you met with Mr. Thiam to present these concerns?

14  A.  It was in the work cabinet of Mr. Thiam.

15  Q.  Was it just you alone who went to meet with him, or were

16  there others present there too?

17  A.  No.  I believe there were five to six people present.

18  Q.  Who were those other five to six people?

19  A.  It was Mr. Fofana, Mohamed Lamine; Mr. Baomah; there was

20  Mr. Habid Ahn.  There were other people, but I don't recall

21  their names.  But those were the most important ones.

22  Q.  Were those people also members of the technical committee?

23  A.  They were all members of the technical committee.

24  Q.  OK.  And do you remember anything that Mr. Thiam said in

25  response to your raising these concerns with him?

1   A.  Well, when we presented those concerns, we didn't get very

2   detailed response.  It was very quick, and he only said that it

3   would be the object of discussions at the higher level, either

4   with the prime minister or Minister Boubacar Barry, regarding

5   these questions.

6   Q.  OK.  So he said it would be the subject of further

7   discussions among the other ministers?

8   A.  Exactly.

9   Q.  OK.  Mr. Camara, it's OK.  We'll arrange those papers

10  later.

11      Let me ask you, we've looked over three separate agreements

12  this afternoon, the memorandum of understanding, a framework

13  agreement, and now the shareholders agreement.  Is that right?

14  A.  Yes.

15  Q.  I want to focus for a minute back on the framework

16  agreement, the one that we looked at right before the final

17  shareholders agreement.  At some point during your work with

18  the technical committee, did you learn that another version of

19  the framework agreement had been entered into with the China

20  International Fund?

21  A.  Yes.

22  Q.  And one that you had not worked on in the technical

23  committee?

24  A.  No, we didn't even work on that one.

25  Q.  OK.  My colleague, Ms. Laryea, is approaching you,

1    Mr. Camara, with Government Exhibit 406.  Mr. Camara, if you

2    could take a look at that --

3         MR. KOBRE:  And Mr. Beer, if you can post that or

4    publish that to the jury.

5    Q.  Mr. Camara, prior to last week, late last week, when I

6    showed that to you, had you ever seen this agreement before?

7    A.  No.

8    Q.  Let's just look over briefly some of this agreement.  First

9    of all, when is it dated?

10   A.  July 18.

11   Q.  Of what year?

12   A.  2009.

13   Q.  And let's look at page 3.

14        MR. GOLDSMITH:  Objection.

15        THE COURT:  Overruled.

16        MR. KOBRE:  And if we can enlarge the first portion of

17   the page through paragraph (B).

18   Q.  Does this appear similar to the page 3 of the framework

19   agreement that you worked on that we looked at earlier today,

20   in terms of the format?

21   A.  Could you reformulate your question, please?

22   Q.  Sure.  Does the form of this page, of this July 18

23   framework agreement, appear similar to the form of the page

24   that we looked at earlier of the framework agreement that you

25   worked on, the June 12 agreement?

1              MR. GOLDSMITH:  Objection.

2              THE COURT:  Overruled.

3   A.  The format is the same.

4   Q.  OK.

5   A.  The structure.

6   Q.  OK, but is there, does this agreement contain an additional

7   party that was not contained in the June 12 framework

8   agreement?

9   A.  Yes.  The party regarding the mining sector is a very

10  significant difference.

11  Q.  I'm going to get to that in a moment, but right now I'm

12  just focusing on the actual parties to the agreement.

13  A.  Oh, yes.  The parties, yes.  There's a big difference

14  because China Sonangol is a bidder here.

15             MR. KOBRE:  I think what would be helpful, Mr. Beer,

16  if we could put up side by side this portion of Government

17  Exhibit 406 and then 402-T, which is the framework agreement

18  that you worked on, the June 12 agreement.

19  Q.  And so the June 12 agreement had just the two parties,

20  China International Fund and the Republic of Guinea.  The July

21  18 agreement, which you had not seen before, has the additional

22  China Sonangol, is that right?

23  A.  Yes.

24             MR. KOBRE:  Mr. Beer, if we can now just enlarge the

25  section (B) of each of those two agreements, page 3 of each of

1   those two agreements.

2   A.   Before we look at that, I would like to mention some kind

3   of difference.  There is a material, concrete difference.  They

4   repeated the same No. 2 twice.

5          THE COURT:  Excuse me one second.  You may only answer

6   questions that are placed to you.  If you can answer the

7   question simply with a yes or a no, please do so.  If you

8   require a further explanation to answer the question fairly,

9   you may do so.

10         Mr. Kobre.

11         MR. KOBRE:  Thank you, Judge.

12  Q.   I just want to point out to you, we have, looking at

13  paragraph (B) on page 3 of each of the two agreements, and if

14  you're looking at the screen, the top enlarged portion is an

15  enlarged portion from Government Exhibit 406, and the bottom

16  portion is an enlarged portion from Government Exhibit 402-T

17  which is a translation of the master agreement -- or the

18  framework agreement, rather, that you worked on.  What are

19  these paragraphs generally; what are they describing?

20  A.   These paragraphs describe the sectors in which the parties

21  have to cooperate on.

22  Q.   And in particular, are these the sectors that were also

23  subject to the exclusivity provision, that exclusive rights to

24  these sectors would be awarded to the joint venture?

25  A.   In the first project, there was no exclusivity that was

1   mentioned, but in the second one, exclusivity was mentioned.

2   Q.  OK.  And in looking at these two paragraphs, the one on

3   top, which is the framework agreement in July, and the one on

4   the bottom, which is in June, are there additional sectors that

5   are referred to in the July framework agreement?

6           MR. GOLDSMITH:  Objection.

7           THE COURT:  Sustained.

8   Q.  Do you see a difference, Mr. Camara, in the list of sectors

9   listed in these two agreements?

10          THE COURT:  That's a yes or a no.

11  A.  Yes.  Yes, there is a difference.

12  Q.  What is different?  Which additional sectors, which sectors

13  are described in Government Exhibit 406, the top portion,

14  versus the ones that are in Government Exhibit 402?

15  A.  It's the mining and mineral sector.

16  Q.  And in particular, minerals and mining, and I'm reading

17  from Government Exhibit 406, "Minerals and mining (including

18  diamond, coal, bauxite, cobalt, iron ore)" are all contained in

19  Government Exhibit 406?

20  A.  Correct.

21  Q.  Other than that, does the list of sectors appear to be the

22  same?

23  A.  Yes, as regards the remaining things, it's the same.

24          MR. KOBRE:  We can take that down.  Thank you.

25  Q.  Now, after you presented the work of the technical

1   committee to Mr. Thiam and had the meeting you described

2   before, were there additional meetings concerning the

3   shareholders agreement?

4   A.  There was one meeting with the directly concerned

5   ministers.

6   Q.  And what date was that meeting?

7   A.  On the 7th.

8   Q.  Of what month and what year?

9   A.  It was in October, I believe.

10  Q.  October 7 of what year?

11  A.  I believe it was in 2009.

12  Q.  And you said that that meeting was attended by the

13  concerned ministers.  Would that include the defendant,

14  Mr. Thiam?

15  A.  Yes.

16  Q.  Where did that meeting take place?

17  A.  In the cabinet of the prime minister.

18  Q.  And what happened during this meeting of concerned

19  ministers on October 7, 2009?

20  A.  We presented the various projects, and we presented project

21  after project, the observations.  We brought in the projects,

22  the amendments, and all these aspects.

23  Q.  Did you present any of the concerns that you had previously

24  presented to the defendant?

25  A.  Yes.  Yes, it was presented.

1    Q.  OK.  Who actually did the presenting?

2    A.  It's myself.

3    Q.  OK.  And which of the concerns do you recall presenting at

4    that October 7 meeting?

5    A.  It was the provision regarding exclusivity.  There was the

6    one concerning the assets company.  There was the one regarding

7    the reimbursement of the loan by the investors.  There was the

8    issue of the validity of the agreement that had not followed

9    the internal procedures.

10   Q.  Which agreement are you referring to that had not followed

11   the internal procedures?

12   A.  It's the whole, all the three agreements, but in particular

13   the shareholders agreement.

14   Q.  OK.  My colleague, Mr. DiMase, is approaching you,

15   Mr. Camara, with Government Exhibit 407, which is in evidence.

16   Do you recognize that?

17   A.  Yes.

18   Q.  And what is it?

19   A.  Is the minutes of a meeting regarding the finalization of

20   the shareholders agreement -- well, the shareholders agreement.

21   Q.  And am I correct that these minutes describe meetings on

22   two different days?

23   A.  Yes, there was a meeting prior to the meeting of the 7th to

24   prepare with technical committee, and then there was the

25   meeting of the 7th, and then there was the meeting of the 8th.

1    Q.  OK.  And which two meetings are described in this document?

2    A.  Those are the meetings of the 7th and the 8th.

3              MR. KOBRE:  Mr. Beer, if you could publish Government

4    Exhibit 407-T, which is the translation.  And if we can go to

5    page 2 and if we could just enlarge the portion starting from

6    "the recommendations of the negotiating committee," right

7    before the 1.  From there to the bottom, that would be great.

8    Q.  Are these two of the points that you raised during the

9    meeting of October 7 at the meeting of concerned ministers?

10   A.  Yes.

11   Q.  And in particular, is point 2 the point that you were

12   describing, the concern with the exclusivity provision?

13   A.  Yes.

14   Q.  And if I can point you to the second sentence of point 2,

15   and I'll just read it, "It should be noted that this clause,"

16   referring to the exclusivity provision, "cannot be applied

17   because of the right of preemption granted by law and mining

18   conventions."

19   A.  Yes.

20   Q.  And if you can just briefly explain to us what that means.

21   A.  According to the practice of mining conventions signed by

22   the government, once a company is ready to go into effect,

23   within the attributive clause of the shares, there is an

24   additional clause applying to the rights of transmission.  And

25   the rights of the, the session rights, that is, to sell the

H4pWthi5                          Camara - Direct

1    shares.  In that particular case, the right of preemption is

2    attributed to the initial shareholders.  If the initial

3    shareholders refuse, then we open the opportunity to other

4    companies that then can take part in the company.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. KOBRE:

2    Q.  So am I right that the exclusivity provision would violate

3    what you're referring to right now?

4    A.  I didn't quite understand what you were meaning with your

5    question.

6    Q.  Would the exclusivity provision violate the rights of these

7    prior shareholders?  Is that what you're referring to?

8    A.  Absolutely, yes.

9    Q.  Okay.  And now if we can go to the next page and go to

10   point 3.

11        You mentioned that one of the other concerns that you

12   raised at this meeting was an issue concerning the framework

13   agreement.  Is that described here?

14   A.  Yes.

15   Q.  And explain what the concern is as reflected here and what

16   your recommendation was.

17   A.  Well, we explained that it was different between the

18   framework agreement that was signing Conakry with the one

19   signing Singapore.

20   Q.  Are those the two that we looked at a moment ago where

21   there was a difference in the list of projects?

22   A.  That there was a difference, of course, in the list of

23   projects and at other levels as well.

24   Q.  Okay.

25   A.  But we had to make a decision.  The committee recommended

1  that the Conakry signed version would be the final version.

2  Q.  Why?

3  A.  Because it was coming much closer to our concern.

4  Q.  Did the other agreement, the one that was signed in July,

5  come through your committee?  Was it reviewed by the technical

6  committee?

7  A.  You mean July 17?

8  Q.  Yes.  July 18th.

9  A.  No.

10 Q.  Were you concerned with the level of transparency that

11 existed with respect to that agreement?

12 A.  Of course.

13 Q.  Can you explain that.

14 A.  It's applied to the internal work procedures.  We cannot be

15 given a mission and go around it to do something else.

16 Q.  So you felt that whoever had concluded that other July

17 agreement had gone around the proper procedures?

18         MR. GOLDSMITH:  Objection.

19         THE COURT:  Sustained.

20 Q.  So after this October 7th meeting was there a meeting the

21 following day as well regarding the shareholders agreement?

22 A.  There was a Council of Ministers on October 8th.

23 Q.  The full council.

24 A.  The full council.

25 Q.  And among the ministers was Minister Thiam, the defendant,

1   in attendance?

2   A.  Well, yes, I must say he was present, Mr. Thiam.

3   Q.  And what happened during this full Council of Ministers

4   meeting on October 8, 2009?

5   A.  All the concerns that I have mentioned were presented

6   during that October 8th meeting.

7   Q.  Let's take them one at a time.  Was your concern about

8   granting exclusive rights to the Chinese companies presented to

9   the full council?

10  A.  Yes.

11  Q.  And was a decision taken by the Council of Ministers about

12  how to deal with that concern?

13  A.  Well, I don't quite recall what was the decision that was

14  taken at the Council of Ministers regarding that issue.

15  Q.  Okay.  Can you refer to Government Exhibit 407 and in

16  particular to the fourth page.

17      Is there anything in Government Exhibit 407 regarding the

18  exclusivity, in the final page of Government Exhibit 407?

19  A.  Well, I cannot see.  Give me a minute, please.

20  Q.  Sure.

21  A.  I see the exclusivity only in paragraph 2, but I don't see

22  it on the paragraph that is being displayed.

23  Q.  Why don't I ask you about whether you expressed concerns

24  about the National Asset Company.

25  A.  Yes.

1    Q.  And do you recall what the Council of Ministers decided

2    about that?  Referring to point 3 on the last page of

3    Government Exhibit 407.

4    A.  To be clear, the exclusivity was rejected, but the strategy

5    partner was given the opportunity to participate in the process

6    of privatization and restructuring of the capital for these

7    mining companies.

8    Q.  Okay.  So if I'm clear, when you say the exclusivity was

9    rejected, do you mean that the Council of Ministers decided

10   that that exclusivity provision should be stricken from the

11   agreement?

12            MR. GOLDSMITH:  Objection.

13            THE COURT:  Overruled.

14            MR. KOBRE:  Do you want me to repeat the question?

15            THE INTERPRETER:  Yes, please.

16   Q.  When you say that the exclusivity provision was rejected,

17   do you mean that the Council of Ministers decided to strike the

18   exclusivity provision from the agreement?

19   A.  Yes.  Yes.  It required that this clause would be replaced

20   by the clause of participation to privatization and

21   restructuring of the capital of mining companies, whether they

22   are the current ones or the ones who come forward.

23   Q.  Okay.  In your review of Government Exhibit 408, which is

24   the final signed shareholders agreement, was in fact the

25   exclusivity provision still in that?

1    A.  It is featured in the final document.

2    Q.  Despite the fact that the Council of Ministers rejected it.

3    A.  Absolutely.

4    Q.  Now at some point after -- were you present, by the way, at

5    the signing of the shareholders agreement?

6    A.  Yes.

7    Q.  And when did that occur?  What date was that?  If you want

8    to refer to Government Exhibit 408.

9    A.  It happened on the 10th.

10   Q.  Of what month and what year?

11   A.  October 10, 2009.

12   Q.  And after the signing of that agreement, did you have a

13   further conversation about that agreement with Prime Minister

14   Komara?

15   A.  Mr. Komara was not present when this agreement was signed,

16   but after he returned and saw the remarks that we presented, he

17   asked us to prepare a letter to Mr. Boubacar Barry, and we

18   prepared that letter.  We wrote in that letter, included all

19   the observations that had to be taken into account, and he

20   asked that this procedure takes into account all these

21   observations.

22   Q.  Okay.  We're going to go through the letter in a moment,

23   but who was the letter actually sent to?

24   A.  To Mr. -- the chair of the steering committee.

25   Q.  Okay.  And was it copied to anyone else?

1    A.  We sent a copy -- a copy was sent to the three people, the

2    president and Mr. Mahmoud Thiam, the minister of mines, and a

3    third person, I don't quite recall; and there was also another

4    person, but I don't quite remember who received that copy, the

5    other person.

6    Q.  Okay.  And who drafted the letter?

7    A.  I drafted that letter.

8    Q.  At the direction of who?

9    A.  It was under the instructions of Mr. -- the prime minister.

10   Q.  And did the prime minister tell you what he wanted in the

11   letter or was it your thoughts?

12   A.  It was our own thoughts that had been validated by the

13   prime minister.  And it was reflecting the outcomes of the

14   meeting, the previous meetings of the ministers.

15   Q.  Okay.  My colleague, Mr. DiMase, is approaching you,

16   Mr. Camara, with Government Exhibit 410.

17          MR. KOBRE:  And at this point, Mr. Beer, if you could

18   publish for the jury Government Exhibit 410-T, which is the

19   translation.

20   Q.  Mr. Camara, is that the letter that you drafted on behalf

21   of the prime minister, Mr. Komara, expressing concern after the

22   signing of the shareholders agreement?

23   A.  Correct.

24          MR. KOBRE:  Okay.  And Mr. Beer, if we can just

25   enlarge the first paragraph after Mr. President, or the first

1    two paragraphs.

2    Q.  I'll just read that, and then we'll go to the next page.

3    It says, "You will remember that in the context of the

4    relations between the Republic of Guinea and China

5    International Fund Singapore PTE LTD, the various documents

6    that govern the relationship between the parties have been

7    regularly discussed by the council that provides guidance

8    before any finalization and signature."

9         And now I'm going to refer you, if I might, Mr. Camara, to

10   the second page.

11             MR. KOBRE:  And if we can just enlarge points II and

12   III.

13   Q.  This is part of the letter as well, is that right,

14   Mr. Camara?

15   A.  Yes.

16   Q.  It says, "I have just now been able to learn about the

17   document that was finally signed.  Some of the provisions go

18   well beyond the mandate granted to our committee by the

19   council."  When it says council, is that referring there to the

20   Council of Ministers?

21   A.  Yes, this is the Council of Ministers.

22   Q.  And when it refers to "the mandate granted to our

23   committee," is that the mandate of the Council of Ministers on

24   October 8, 2009?

25   A.  Yes, October 2009.

H4p1thi6                        Camara - Direct

 1   Q.   Okay.  And --

 2   A.   On October 8, 2009.

 3   Q.   Thank you.  And when it refers to "our committee," which

 4   committee is it referring to?

 5        You're free to refer, Mr. Camara, to the French version

 6   that you have.  When it says committee in point II of the first

 7   paragraph.

 8   A.   Yes, it's referring to the steering committee.

 9   Q.   Okay.  Is that the technical committee?

10   A.   Yes, because it's the technical committee that did the

11   work.

12   Q.   Okay.  And then the second sentence there says, "These

13   concern the creation of an asset-holding public company in the

14   mining sector."

15   A.   Yes.

16   Q.   And is that the concern that you've talked about a number

17   of times earlier in your testimony?

18   A.   Correct.

19   Q.   And now we can skip the rest of that point.  Why don't we

20   go to point III.

21        It says in your letter there, "Other provisions that are no

22   less important such as those relating to the total exclusivity

23   granted to the CDG and ADG for management and for granting all

24   contracts."

25   A.   Yes.

1    Q.  Is that referring to your concern about the granting of

2    exclusive rights to the Chinese companies that you described

3    earlier?

4    A.  Yes.

5            MR. KOBRE:  And Mr. Beer, if we can just now enlarge

6    the final paragraph of the letter.

7    A.  Yes.

8    Q.  What is that?  Without my reading it, what is the final

9    paragraph there?  What is the prime minister asking to take

10   place in light of these concerns?

11   A.  The prime minister is asking to start again the

12   negotiations regarding the aforementioned points in order to

13   validate the results by the council before the final signature

14   of the shareholders agreement.

15   Q.  Well, let's look at the date of this letter, if we can go

16   back to the prior page.  What is the date on this letter?

17   A.  November 4.

18   Q.  So based on your review of Government Exhibit 408, had the

19   shareholder agreement already been signed at the time of this

20   letter?

21   A.  Yes.

22   Q.  So how could changes now be made to it if it had already

23   been signed?  Can you explain that.

24   A.  So when there is a procedure for the negotiation of

25   agreements, when an agreement doesn't completely fulfill the

1    requirement possible to all the parties, we can, even after the

2    agreement has been signed, we can modify this agreement.

3    Q.  So if it doesn't conform with the law or the requirements,

4    it can be changed even after the signing?

5    A.  Yes.  Because there is safety principle in the law that say

6    that we cannot disturb by procedural convention the laws

7    applying to public conventions in a good -- the public order

8    and good behavior.

9    Q.  If I can refer you just one more time to page 2, there are

10   a number of cc's on the bottom of page 2.  Can you just tell us

11   what these letters stand for here.

12   A.  The presidency of the republic, the minister of mines and

13   geology, the minister of economy and finance.

14   Q.  Okay.

15   A.  And wait.  Ah, it is the minister of mines, geology, and

16   hydraulic energy.

17   Q.  So this letter was copied to Mr. Thiam, the defendant?

18   A.  In principle, yes.

19   Q.  And to your knowledge, what happened after this letter was

20   sent?  Were changes made in light of the concerns that you

21   reiterated numerous times?

22   A.  No.  To my knowledge, the dynamics of the negotiation of

23   the project stopped there.

24   Q.  And the provisions regarding exclusivity and the National

25   Asset Company remained in the final agreement?

H4p1thi6                          Camara - Direct

1                MR. GOLDSMITH:  Objection.

2                THE COURT:  Overruled.

3    A.   Yes.

4                MR. KOBRE:  No further questions, your Honor.

5                THE COURT:  Thank you.

6                Ladies and gentlemen, we're going to break for the

7    day.  I remind you, do not discuss the case, and I want to urge

8    you again to be on time tomorrow morning so we can start

9    promptly at 9:30.

10               And with that, I thank you.  You are excused.  You may

11   return to the jury room.

12               (Jury not present)

13               THE COURT:  Mr. Kobre, is there anything else we need

14   to discuss?

15               MR. KOBRE:  There is not, your Honor.

16               THE COURT:  And Mr. Goldsmith.

17               MR. GOLDSMITH:  No, your Honor.

18               THE COURT:  Good.  See you tomorrow morning, 9:00.

19               THE LAW CLERK:  All rise.

20               (Adjourned to April 26, 2017, at 9:00 a.m.)

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    REMEDIOS ARING

 4    Direct By Ms. Laryea . . . . . . . . 69.  Resumed.

 5    Cross By Mr. Goldsmith . . . . . . . . . . . .88

 6    Redirect By Ms. Laryea . . . . . . . . . . . .96

 7    Recross By Mr. Goldsmith . . . . . . . . . . .98

 8    DAOUDA CAMARA

 9    Direct By Mr. Kobre  . . . . . . . . . . . . 103

10                          GOVERNMENT EXHIBITS

11    Exhibit No.                              Received

12     1416 and 401-411  . . . . . . . . . . . . . 101

13     402-T, 403-T, 404-T, 405-T, 407-T,  . . . . 101

14            410-T and 411-T

15     901-903  . . . . . . . . . . . . . . . . . 134

16     1701     . . . . . . . . . . . . . . . . . 106

17

18

19

20

21

22

23

24

25
```