H4q1thi1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        17 Cr. 47 (DC)

MAHMOUD THIAM,

          Defendant.          Trial

------------------------------x

                              New York, N.Y.
                              April 26, 2017
                              9:36 a.m.

Before:

                 HON. DENISE COTE,

                              District Judge,
                               and a Jury

                        APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  ELISHA J. KOBRE
     CHRISTOPHER J. DiMASE
     Assistant United States Attorney

       -and-

U.S. DEPARTMENT OF JUSTICE
BY:  LORINDA I. LARYEA

LAW OFFICE OF AARON GOLDSMITH, PC
     Attorneys for Defendant
BY:  AARON M. GOLDSMITH, ESQ.
     MICHAEL DELAKAS, ESQ.

ALSO PRESENT:  PATRICK KILLEEN, Special Agent, FBI
               ALEXANDER BEER, Paralegal Specialist, USAO
               KATHERINE BOSLEY, Paralegal Specialist, DOJ
               JENNIE CARMONA, Defense Paralegal

H4q1thi1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  So we'll put on the record there was a
 3   lockdown at the MCC and as a result, the defendant was not
 4   produced from the facility on time and has essentially just
 5   arrived.  Ms. Rojas had inquired, and I understand there were
 6   no issues that either the government or defendant had to raise
 7   with me.  Is that true, Mr. Kobre?
 8              MR. KOBRE:  It is, your Honor.
 9              THE COURT:  Mr. Goldsmith?
10              MR. GOLDSMITH:  I have a relatively minor issue that
11   developed as a result of the defendant's delay.
12              THE COURT:  Sure.
13              MR. GOLDSMITH:  I also got an email a short while ago
14   that all legal visits are suspended at MCC for today.  Last
15   night Ms. Carmona and I attempted to see him, and at about
16   6:15, 6:30, we were kicked out with all other legal counsel
17   because of a lockdown.  So because we haven't been able to see
18   him yesterday, won't be able to see him at MCC tonight, I'd
19   request the Court reach out to the Marshals to see if we could
20   be accommodated after the close of sessions today to visit with
21   him downstairs on the fourth floor.
22              THE COURT:  Great.  I'm certainly happy to do that.
23   And approximately how long, Mr. Goldsmith, would you like; an
24   hour or so?
25              MR. GOLDSMITH:  Like an hour and a half, just to be
```

H4q1thi1

1     safe.

2              THE COURT:  Okay.  Hour and a half.  Great.  And

3     Ms. Rojas is checking on the status of the jury right now.

4              And I had a quick question for the government.  There

5     is a request to charge about aiding and abetting which I'm not

6     planning to give.  Am I correct that that shouldn't have been

7     included in your request?

8              MR. KOBRE:  That is correct, your Honor.

9              THE COURT:  Okay.  Let me talk to Ms. Rojas.

10             Okay.  Well, we're missing two jurors.  They had

11    called Ms. Rojas earlier to give her a heads up that they would

12    be delayed.  They are still not here.  This will give the

13    defendant and counsel some time to chat.  I'll ask Ms. Rojas to

14    see if arrangements can be made with the Marshals to keep the

15    defendant in the courthouse until 6:30 this evening.

16             MR. GOLDSMITH:  Thank you.

17             THE COURT:  Yes.  So there can be further

18    communication with the defendant.

19             And Ms. Rojas will let us know as soon as we have a

20    jury, but I'm going to look at the situation by 10:00.  If we

21    don't have both jurors, I want counsel to reflect on what we

22    should do.  I'm not taking any action before I consult with

23    you, but let's see how it goes.  Thanks.

24             THE DEPUTY CLERK:  All rise.

25             (Recess)

H4q1thi1                    Camara - Cross

1              (In open court; jury not present)

2              THE COURT:  So this is the situation.  We're missing

3     one juror.  Let me ask Ms. Rojas when this juror contacted us

4     this morning.

5              She contacted us roughly two hours ago, 8:03, and that

6     she was on her way from the Bronx.  This is now two hours

7     later.  We have three alternates at this point.

8              She is walking towards the building right now, so

9     we'll of course wait for her.  And she was profusely apologetic

10    in both phone calls.  The second one occurred as I was

11    describing events to counsel.

12             Okay.  So Ms. Rojas will let us all know when we have

13    every juror here.  Thanks so much.

14             THE DEPUTY CLERK:  All rise.

15             (Recess)

16             (In open court; jury not present)

17             THE COURT:  Bring in the jury, bring in the witness.

18             And Mr. Goldsmith, the Marshals are making

19    arrangements for you to be with the defendant until 6:30.

20             MR. GOLDSMITH:  Great.  Thank you.

21             (Jury present)

22             THE COURT:  Good morning, ladies and gentlemen.

23             THE JURORS:  Good morning.

24             THE COURT:  I want to thank all of you for being here

25    on time.  We've lost a lot of time in this trial yesterday and

1    then again today, and I just want to stress again how important

2    it is that everyone make the effort to be here on time so we

3    can start promptly at 9:30 in the morning.  And I thank all of

4    you for your cooperation and working to achieve that.

5              I want to remained the witness you are still under

6    oath.  Counsel.

7              MR. GOLDSMITH:  Thank you.

8     DAOUDA CAMARA, resumed.

9    CROSS EXAMINATION

10   BY MR. GOLDSMITH:

11   Q.  Mr. Camara, you said yesterday that Guinea was a French

12   colony, is that correct?

13   A.  Yes.

14   Q.  And it gained its independence in 1958, is that correct?

15   A.  Yes.

16   Q.  In 2008 there was a coup d'état that changed the

17   government, is that correct?

18   A.  Yes.

19   Q.  And the government that was put in place was referred to as

20   the CNDD.

21   A.  Yes.

22   Q.  And at the time the military regime, called the CNDD, had

23   aspirations of creating a democratic government.

24   A.  Yes.

25   Q.  And when they came into power, they announced that they

H4q1thi1                        Camara - Cross

1    expected to take one or two years to transition to a democratic

2    government.

3    A.  Yes.

4    Q.  The president under the CNDD we've called Dadis, is that

5    correct?

6    A.  Yes.

7    Q.  When Dadis came into power, one of his primary concerns was

8    cleaning up drug trafficking that was occurring in Guinea.

9    A.  Yes.

10   Q.  He also developed a reputation as being very strict against

11   corruption.

12   A.  Yes.

13   Q.  In fact, he even threatened ministers associated with the

14   previous government on national television.

15   A.  Yes.

16   Q.  At the time that the CNDD took over as the government,

17   President Dadis ultimately appointed the ministers of the

18   cabinet.

19   A.  Yes.

20   Q.  And the ministers of the cabinet were several, correct?

21   A.  Yes.

22   Q.  Under the organization at the time, the president was the

23   most powerful executive, is that correct?

24   A.  Yes.

25   Q.  The most powerful minister was the prime minister, is that

H4q1thi1                         Camara - Cross

1    correct?

2    A.  Yes.

3    Q.  Some of the other ministers that you testified about

4    yesterday included Loholamou, who was the justice minister.  Do

5    you recall that?

6    A.  Yes.

7    Q.  You also discussed Mr. Sande, who was the finance minister.

8    A.  Yes.

9    Q.  And you discussed Boubacar Barry, who was the housing

10   minister.  Do you recall that?

11   A.  Yes.

12   Q.  Beneath the prime minister, the cabinet ministers were next

13   in power in the overall government of Guinea, is that correct?

14   A.  Yes.

15   Q.  And there was a hierarchy in the power of the cabinet

16   ministers, is that correct?

17   A.  Yes.

18   Q.  Because certain cabinet ministers held more power and

19   influence with the president than others did.

20   A.  Yes.

21   Q.  And then of course, as you described yesterday, beneath the

22   central government was the local governors.

23   A.  Yes.

24   Q.  At the time that Dadis took over as president and the CNDD

25   took over, Guinea had very little cash, is that correct?

H4q1thi1                              Camara - Cross

1    A.  Yes.

2    Q.  Guinea was also subject to international sanctions.

3    A.  Yes.

4    Q.  As part of his efforts to clean up the country of Guinea,

5    President Dadis also needed to address the issue of cash when

6    they took over, is that correct?

7    A.  Yes.

8    Q.  In fact, it was looked upon by most of the cabinet as

9    perhaps the most important issue for the government.

10   A.  Yes.

11   Q.  You also testified about Mr. Thiam, my client, who at the

12   time was the minister of mines.

13   A.  Yes.

14   Q.  And the minister of mines was one that was required to

15   report to the president.

16   A.  Yes.  Like any minister.

17   Q.  And on the meeting minutes of the cabinet meeting that you

18   testified about yesterday in October, shortly before --

19           MR. GOLDSMITH:  Sorry.  I'll wait for Madam

20   Interpreter.

21           THE INTERPRETER:  No, that's fine.

22   Q.  -- shortly before the voting on the shareholder

23   agreement --

24   A.  Yes.

25   Q.  -- at that meeting there were minutes taken.

H4q1thi1                          Camara - Cross

1    A.  Yes.

2    Q.  And in the minutes of those meetings it recorded who was in

3    attendance.

4    A.  Yes.

5    Q.  And in those minutes the minister of mines -- if you'd like

6    to review Government Exhibit 407.

7    A.  Yes.

8    Q.  Do you see the minister of mines and energy listed,

9    correct?

10   A.  Yes.

11   Q.  And he is referred to in title as the Minister at the

12   Presidency in Charge of Mines and Energy?

13   A.  Yes.

14   Q.  And he is the only minister that is given that specific

15   title.

16   A.  Yes.

17   Q.  Let me clarify.  That may be confusing.  He is the only

18   minister who is referred to as a minister at the presidency.

19   A.  Yes.

20   Q.  And is that because he was not considered the same as the

21   regular ministers of state?

22   A.  Yes, he was different from the other ministers of state,

23   from his status.

24   Q.  The minister of mines, as it applies to the CIF investment

25   agreement, was in part responsible for engaging in

H4q1thi1                          Camara – Cross

1    negotiations, is that correct?

2    A.   Yes.

3    Q.   He was --

4            THE INTERPRETER:  It's for my throat, your Honor.

5            THE COURT:  I'm going to ask you then please to keep

6    your voice up so the court reporters can hear you.  Thank you.

7            THE INTERPRETER:  Okay, your Honor.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. GOLDSMITH:  Do we have a microphone available?

2          THE INTERPRETER:  I asked for a microphone before.

3          THE COURT:  Give me one second.

4          THE INTERPRETER:  I'm going to use that as well?  Yes,

5    I asked yesterday for a microphone, and I wasn't provided a

6    microphone.

7          MR. GOLDSMITH:  Sorry, your Honor.

8          THE COURT:  I think we've rearranged the microphone

9    situation which will hopefully assist one and all.

10         MR. GOLDSMITH:  Great.  Thank you.

11   Q.  The minister of mines was the point of contact for those

12   CIF investment negotiations, is that correct?

13   A.  Yes.

14   Q.  But the minister of mines' authority regarding those

15   negotiations was limited?

16   A.  Well, yes.

17   Q.  He was under the direction of President Dadis during those

18   negotiations?

19   A.  First of all, under the prime minister.

20   Q.  Correct, but he was also, as far as you were aware, taking

21   direction from the president about the investment agreement.

22   Correct?

23   A.  He probably followed some of the guidelines, but as far as

24   I know, I was not aware of it.  I am aware of what was

25   happening with the prime minister.

1   Q.  All right.  So you were not personally aware of any

2   communications back and forth between the president's office

3   and Mr. Thiam's office when he was the minister of mines?

4   A.  No.

5   Q.  Now, the CIF investment agreement was not the only

6   agreement that the country of Guinea had regarding mining

7   during the year of 2009, is that correct?

8   A.  Yes.

9   Q.  In fact, there were a number of very significant agreements

10  between the country of Guinea and private companies regarding

11  mining rights during that year?

12  A.  Yes.

13  Q.  Those included the companies Rio Tinto and BSGR, regarding

14  iron ore?

15  A.  Yes.

16  Q.  And the company BHP for bauxite?

17  A.  Yes, BHB, BAB.

18  Q.  As well as the company Bellzone, also regarding iron ore?

19  A.  Yes.

20  Q.  And aside from your experience in government, you also had

21  experience within the mining industry?

22  A.  Yes, a little bit of experience.

23  Q.  So within those roles, you have some understanding of the

24  differences between exploration, exploitation, and concessions

25  within the country of Guinea during 2009?

1    A.  Yes.

2    Q.  So I'm going to simplify what I think I heard you testify

3    about those rights yesterday.  Would you agree with me that

4    exploration permits allow a company to dig to see if there's

5    anything valuable underground?

6    A.  Yes.  Yes, to establish the currently value of the resource

7    that's going to be extracted and the exploitation character.

8    Q.  And it can take a company several years to determine if a

9    particular deposit is valuable enough to pursue?

10   A.  It can take from six to ten years.

11   Q.  And when the government of Guinea would give exploration

12   permits, those permits had a specific time period that they

13   were valid?

14   A.  Yes, and if you need some explanations, I can give you

15   explanations later.

16   Q.  Thank you.

17       Exploitation is different than exploration?

18   A.  Yes.

19   Q.  Exploitation is when that company has decided that whatever

20   reserve underground is valuable enough to pursue, they now have

21   the right to mine it and sell it?

22   A.  Yes.

23   Q.  And I believe you testified yesterday that exploitation

24   permits are only for a specific size of surface area?

25   A.  Yes.

1    Q.  1,400 kilometers square, I believe?

2    A.  No.  1,400 square kilometers is for research.  There is a

3    first retrocession representing half of 1,400 square kilometers

4    for the first renewal, and there's a second retrocession which

5    represents the half of the first half for the second renewal.

6    So if you have 1,400 square kilometers, so if you are renewed,

7    you only supposed to get 700 square kilometers, and if you

8    renewed a second time, you must have a half of those 700 square

9    kilometers that represents 350 square kilometers.  These are

10   the 350 square kilometers that you can use for your

11   exploitation and your exploration.

12   Q.  Thank you.

13   A.  And that's it.

14   Q.  And your right to exploit only lasts for a specific period

15   of time?

16   A.  Yes, with potential extensions of renewal, renewals.

17   Q.  There was also a third category that you testified about

18   yesterday called concessions.

19   A.  Yes.

20   Q.  And would you agree with me when I characterize concessions

21   as being much larger and longer-term rights to exploit?

22   A.  Yes, but it also involves bigger investments.

23   Q.  And under the law in operation of Guinea in 2009, the

24   president was required to approve any concession.

25   A.  That's the 1995 law.

1   Q.   That was in effect in 2009?

2   A.   That was in effect, and it was the president who had to

3   grant the concessions.

4   Q.   Most of your day yesterday was spent testifying about the

5   CIF investment project?

6   A.   Yes.

7   Q.   When did the negotiations start?

8   A.   The negotiations started during the first four months,

9   between the end of the first quarter and the beginning of the

10  second one, and they extended toward October, toward the

11  beginning of the last quarter of 2009.

12  Q.   So if you can, tell us a month and a year when the

13  negotiations started.

14  A.   I don't quite recall about that, but it's probably during

15  the first quarter of 2009.

16  Q.   And when was the first quarter of 2009?

17  A.   It's between the appointment of Mr. Thiam that happened on

18  January 14, 2009, and the month of April 2009.

19  Q.   So January to April of 2009?

20  A.   Yes.

21  Q.   And the negotiations, as far as your testimony yesterday,

22  concluded in October of 2009?

23  A.   Yes.

24  Q.   And you testified yesterday -- withdrawn.

25       In your testimony yesterday, you referred to this agreement

H4qWthi2                          Camara - Cross

 1    with CIF as an investment project.  Do you recall that?

 2    A.  Yes.

 3    Q.  You called it an investment project because it was about

 4    CIF investing in Guinea?

 5    A.  In various economic sectors.

 6    Q.  And that included not just mining but also agriculture,

 7    correct?  As well as fishing?

 8    A.  Yes.

 9    Q.  Transportation?

10    A.  Yes.

11    Q.  Water?

12    A.  Yes.

13    Q.  Electricity?

14    A.  Yes.

15    Q.  And of course, providing the country of Guinea with cash?

16    A.  Yes.

17    Q.  All projects --

18    A.  To the budget.

19    Q.  So that the country could operate?

20    A.  Yes.

21    Q.  All very important to the country?

22    A.  Yes.

23    Q.  You testified about an aspect of the shareholders agreement

24    whereby Guinea would give up future mining profits?

25    A.  Can you explain a little bit more?

1   Q.   Sure.   This was an investment project, but it was an

2   agreement that CIF was giving money for, correct?

3   A.   Yes.

4   Q.   And in exchange for its investment in Guinea, it wanted to

5   have some financial returns?

6   A.   Of course.

7   Q.   Nothing extraordinary about that?

8   A.   It's in the logistics of all the investments, it's the

9   rationale of the investments.

10   Q.   Of all investments?

11   A.   Except for philanthropic investments.

12   Q.   Of course.

13         At the time that Mr. Thiam came to work for the Republic of

14   Guinea, he was recruited by President Dadis, correct?

15   A.   How was he recruited?   At least it was President Dadis who

16   nominated him in his government.

17   Q.   OK.   And Mr. Thiam was recruited because he had a number of

18   international business contacts?

19               MR. KOBRE:   Objection.

20               THE COURT:   Sustained.

21   Q.   Do you know why the president recruited Mr. Thiam over

22   other candidates?

23               MR. KOBRE:   Objection, your Honor.

24               THE COURT:   Sustained.

25   Q.   Were you included in the process of the recruitment of

1    Mr. Thiam?

2    A.   No.  As I mentioned before, I don't know how he was

3    recruited, how he was selected.

4    Q.   You testified yesterday about the technical committee that

5    was established to review the agreements?

6    A.   Yes.

7    Q.   The technical committee was including between 15 and 17

8    people, is that correct?

9    A.   Yes, if I can recall correctly.

10   Q.   And those people were made up of ministers as well as

11   advisers?

12   A.   No.  It was mostly advisers and directors.

13   Q.   Were there any ministers on the committee?

14   A.   No.  It was a technical committee.  There was no minister.

15   Q.   And the individuals on the technical committee were

16   advisers from within the country of Guinea, or did it include

17   people from the outside as well?

18   A.   They were people from Guinea.  We had asked to get some

19   foreign law firms to assist our team, but the government didn't

20   have the money to pay for their services.

21   Q.   When was the technical committee created?

22   A.   It's during the first semester of 2009.  I don't know the

23   exact date, and there's not a recent decree that indicates

24   that.

25   Q.   What do you mean by first semester?

H4qWthi2                          Camara - Cross

1    A.  First semester, by that, it is -- I mean until the month of

2    June or July, of 2009.

3    Q.  So the technical committee did not have a chance to --

4    well, withdrawn.

5         Do you recall if it was the early part of the first half of

6    2009 or the latter part of the first half of 2009?

7    A.  No, I don't have any documents to look at, so I can't tell

8    you exactly.

9    Q.  You don't have any independent recollection as a member of

10   the technical committee?

11   A.  No, I don't have any independent recollection.  Maybe I

12   need a little bit more time to, to look at my memory -- into my

13   memory.

14   Q.  OK.  Did you have an independent recollection of all these

15   negotiations without having reviewed all the documents that you

16   testified about yesterday?

17   A.  I have a few recollections.

18   Q.  But not too much?

19   A.  Not very detailed recollections.

20   Q.  I'd ask you to take a look at Government Exhibit 401.

21   A.  Yes.

22   Q.  OK.  This is the memorandum of understanding, correct?

23   A.  Yes.

24   Q.  Make sure you've got your glasses on.

25        And this version of the memorandum of understanding is

1    dated from June of 2009?

2    A.  Yes.

3    Q.  And as you testified about yesterday, the memorandum of

4    understanding is the first in the series of agreements?

5    A.  Yes.

6    Q.  This was a simple outline of what CIF and the Guinean

7    government wanted to do together?

8    A.  Yes.  It was the intentions that were expressed there

9    regarding certain activities that were supposed to be

10   implemented by both parties.

11   Q.  This agreement was -- well, withdrawn.

12        You testified earlier that you believed the negotiations on

13   the investment projects started sometime in the first quarter

14   of 2009.  Do you recall that?

15   A.  Yes.

16   Q.  And so this agreement represents, at the very least,

17   several weeks of negotiations between Guinea and CIF?

18   A.  No.  This memorandum of understanding didn't take several

19   weeks.  The project was presented to the prime minister, and

20   the prime minister gave instructions to review it very quickly.

21   And then we did the procedures and then we reported to him.

22   Q.  OK.  The memorandum of understanding would not have been

23   drafted until both parties had a firm understanding of their

24   intention to engage in the investment project together,

25   correct?

1    A.  Yes.

2    Q.  And it would not have been created until both sides had had

3    the opportunity to meet and discuss their intentions regarding

4    that investment project?

5    A.  Yes.

6    Q.  And so this dated as June would represent a significant

7    time period where those does discussions between Guinea and CIF

8    took place?

9    A.  There were certainly some discussions at the very high

10   level, and perhaps we were not involved in those discussions,

11   and we received it as a draft.  Perhaps there were some

12   internal discussions between the prime minister and the

13   concerned ministers on this project and it's the result of

14   several discussions that didn't take too much time.  Perhaps it

15   would represent several weeks, but not several months.

16   Q.  Do you have personal knowledge of what happened in those

17   discussions between the prime minister and the concerned

18   ministers?  Prior to this being signed?

19   A.  No.

20   Q.  And it's acknowledged by Minister Sande.  Do you see that

21   on page 2?

22   A.  Yes.

23   Q.  Is that because he was the minister of finance?

24   A.  Yes.  He was the most concerned at that stage.

25   Q.  In tandem with the memorandum of understanding was the

H4qWthi2                         Camara - Cross

1    master agreement?

2    A.   Yes.

3    Q.   Could you take a look at Government Exhibit 402?

4    A.   Yes.

5    Q.   This was also the agreement that you referred to yesterday

6    as the framework agreement, is that correct?

7    A.   Yes.

8                   (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. GOLDSMITH:

Q.   And Exhibit 402 represents the version of that agreement

dated June of 2009, is that correct?

A.   June 12, 2009.

Q.   This version of the master agreement states that the

investment project belongs to both CIF and Guinea, correct?

A.   Yes.

Q.   It is a joint venture, is that the appropriate

characterization?

A.   Yes.

Q.   And in this version of the master agreement, it describes

the necessity for investments and financing for projects in

Guinea.

A.   Yes.

Q.   And ultimately those were about cash for the government and

building infrastructure from the point of view of the Guinean

government.

A.   The cash for the support to the Guinean budget was in a

separate agreement as well as a reinforcement of the

structures.   It was in a different agreement.   But in this

agreement, beyond the question of infrastructure, there were

also mentioned questions regarding the common interest.

Perhaps under this point of view one can talk about the

liquidity, the cash matters.

Q.   Now there was a loan that was provided to the government of

1   Guinea from CIF.  Do you recall that?

2   A.  Yes.

3   Q.  Do you recall that it was $75 million?

4   A.  It was $78 million.

5   Q.  I apologize.  Thank you for your clarification.

6       And that money was given to the country of Guinea prior to

7   the execution of the shareholders agreement in October of 2009,

8   correct?

9   A.  Well, I assume it was given to Guinea, but it's the

10  ministry of finance -- minister of finance who will be able to

11  confirm that, since he is present here.

12  Q.  Okay.  And do you know if that was funded through the

13  Central Bank of Guinea?

14  A.  Well, yes, after the loan agreement was signed.

15  Q.  If you take a look at the signatory page on that exhibit --

16  A.  Yes.

17  Q.  -- was that executed by Minister Sande?

18  A.  Yes.

19  Q.  And following that page, there are others, correct?

20  A.  No.  That's the last page of the frame agreement.

21  Q.  In Government Exhibit 401 -- sorry -- 402 --

22  A.  Yes.

23  Q.  -- are there two pages that follow that are mandates?

24  A.  No.  The only last page is regarding the provisions

25  regarding what has to be provided to the CIF; for example, the

1   land that has to be provided to CIF.

2   Q.  Do you see two pages --

3   A.  I can see only one page.

4   Q.  Does it have a number on it, 1426?

5           THE COURT:  Mr. Goldsmith, if you can approach the

6   witness and look at the document he's looking at, if you'd

7   like.

8   Q.  Take a look at these two pages.

9           THE COURT:  What are you handing him, Mr. Goldsmith,

10  for the record?

11          MR. GOLDSMITH:  After discussions with the government,

12  they are part of 402, but not included with the package that

13  the witness had been provided.

14          MR. KOBRE:  That's correct, your Honor.

15          THE COURT:  Thank you.

16  A.  Yes.

17  Q.  Would you tell us which minister executed those mandates.

18  A.  It's Boubacar Barry.

19  Q.  And Mr. Barry was the minister of housing at the time,

20  correct?

21  A.  Yes.

22  Q.  None of the drafts of documents that you and I have

23  discussed today were signed by Mr. Thiam as minister of mines,

24  correct?

25  A.  No.

1    Q.  If you can take a look at Government Exhibit 408.

2    A.  Yes.

3    Q.  408, does that represent the shareholder agreement that was

4    executed in October of 2009?

5    A.  Yes.

6    Q.  Prior to October, you reviewed other drafts of the

7    agreements that we testified about today, correct?

8    A.  Yes.

9    Q.  Would you look at Exhibit 406, please.

10   A.  Yes.

11   Q.  406 represents the master or framework agreement as it was

12   revised for July of 2009.

13   A.  This agreement, practically, we didn't see it; we didn't

14   review it in our committee.

15   Q.  I did not ask that question.

16   A.  Then I didn't understand what you meant.

17   Q.  Does this agreement represent a revised version of the

18   master or framework agreement that is dated for July of 2009?

19   A.  It represents a revised version with new provisions, or

20   different provisions from the framework agreement.

21   Q.  That you testified about yesterday.

22   A.  Yes.

23   Q.  And the earlier version of that agreement was dated

24   approximately a month earlier than this one, correct?

25   A.  Of which agreement?

H4q1thi3                        Camara - Cross

1   Q.  The master agreement.  Feel free to look if you need to.

2   A.  No, I can't recall, or I don't understand your question.

3   Q.  If you could look at Government Exhibit 406, as well as

4   Government Exhibit 402.

5   A.  You mean 402 or 400?

6   Q.  I would like you to take a look at both of them quickly,

7   side by side.

8           THE COURT:  Counsel, he asked:  Did you mean 402 or

9   400?

10          MR. GOLDSMITH:  I'm sorry.

11  Q.  402.

12  A.  Okay.  402 and 408?

13  Q.  402 and 406.

14  A.  Yes.

15  Q.  Take a look at them briefly.

16  A.  Yes.

17  Q.  They both represent different versions of the master or

18  framework agreement, correct?

19  A.  Yes.

20  Q.  402 is dated in June of 2009, correct?

21  A.  Yes.

22  Q.  And -- I'm sorry.  Do you need a minute?

23  A.  No, it's okay.

24  Q.  406 is dated July 2009.

25  A.  Yes.

H4q1thi3                          Camara - Cross

1    Q.   And does it appear from your review of those two documents

2    that 406, or the July version, is a revision of 402?

3    A.   Provisions?

4    Q.   Does the agreement itself, under 406, appear to be a

5    revised version of the 402 agreement?

6    A.   Certain provisions.

7    Q.   Not all of it was changed, right?

8    A.   No.

9    Q.   Some of it was changed.

10   A.   Yes.  Including the parties.

11   Q.   Right.  And you recall testifying yesterday about your

12   noting the change in the parties.

13   A.   Yes, but not for the master agreement that I didn't see.  I

14   know that China Sonangol entered into the process at some point

15   or another, for reasons obviously to reinforce the investors.

16   Q.   Do you recall that that decision was from Guinea, that more

17   investors were needed because of the size of the project?

18               MR. KOBRE:  Objection.

19               THE COURT:  Sustained.

20   Q.   Did you know if Guinea felt that more investors were needed

21   because of the size of the project?

22               MR. KOBRE:  Objection.

23               THE COURT:  Overruled.

24   A.   That's a decision by the parties.

25   Q.   Yesterday do you recall being asked this question and

```
 1    providing this answer --

 2    A.  Yes.

 3    Q.  "Q.  Do you know how it came to be that this party, China

 4    Sonangol International Singapore, became part of this potential

 5    investment?

 6         "A.  Well --"

 7         I'll start again slower.

 8         "Q.  Do you know how it came to be that this party, China

 9    Sonangol International Singapore, became part of this potential

10    investment?"

11              THE INTERPRETER:  There are two people speaking at the

12    same time, your Honor.

13    A.  We only knew China investment fund.

14    Q.  Right.  Mr. Camara, I'm going to read for you part of your

15    testimony from yesterday and ask if you recall saying that,

16    okay?

17    A.  Okay.

18    Q.  It's a bit awkward, so I understand it can be difficult.

19    Please refrain from answering until I've finished, okay?

20    A.  Mm-hmm.

21    Q.  So I will repeat the exchange again.

22         "Q.  Do you know how it came to be that this party, China

23    Sonangol International Singapore, became part of this potential

24    investment?

25         "A.  Well, given the extent and the scope of the -- and the
```

1    project of the agreement, we decided we needed an extra

2    investor in order to take care of the basic project."

3    A.   We estimated.

4    Q.   "We," meaning?

5    A.   Is the parties.  It means the government, China Sonangol,

6    and the China investment fund.

7    Q.   I'd like you to focus now back on Government Exhibit 406.

8    A.   Okay.

9    Q.   Do you remember testifying yesterday about the repayment of

10   part of CIF investment?

11   A.   Yes.

12   Q.   And you remember that you testified that you had expressed

13   concerns about the repayment of any fees from taxes and

14   royalties.

15   A.   Yes.

16   Q.   Would you please take a look at subsection 2.3, letter D as

17   in David.  I'm sorry, letter E as in elephant.

18   A.   On which document?

19   Q.   406.

20   A.   I can't see a subsection E.  It starts at D.  If it is the

21   master agreement.

22   Q.   Yes.

23   A.   Signed by Guinea, CIF and China Sonangol International

24   Singapore.

25   Q.   Yes.  So --

1   A.  There's only A, B, C, D.  There is no E.

2   Q.  Okay.  If you look below that, there are definitions and

3   interpretations.

4   A.  Yes.

5   Q.  If you look at subsection 2.3E, under that portion.

6   A.  Yes.

7   Q.  Please read it.

8   A.  I have to say, it's in English.

9   Q.  Do you have a French version?

10  A.  I don't have the French version.

11  Q.  Okay.  Are you capable of reading it?

12  A.  I'll let you read it.

13  Q.  No, no, no.  I would like to know if you are capable of

14  reading it.

15  A.  2.3.  Shareholders agreement.

16  Q.  Under subsection E only.

17          THE COURT:  Counsel, do you want to approach and point

18  to the section of the document you're inquiring about.

19  A.  Okay.

20          MR. KOBRE:  Your Honor, I think the government objects

21  to having the witness read from a document that's not in his

22  native language.

23          THE COURT:  What is your question?

24          MR. GOLDSMITH:  I want to know if he's capable.

25          THE COURT:  Do you wish him to read out loud or do you

1    wish the interpreter to translate the passage to him?

2              MR. GOLDSMITH:  I'd just like him to read it.

3              THE COURT:  To himself quietly.

4              MR. GOLDSMITH:  So that he may be able to answer my

5    next question.

6              THE COURT:  Oh.  So, sir, if you can just read the

7    passage quietly to yourself and then the attorney may have a

8    question for you.  We understand it is in English, and

9    depending on what the question is, if you don't feel able to

10   answer it fairly because what you've read to yourself is in

11   English, you may say that.  Thank you.

12             THE WITNESS:  (In English) Thank you.

13             (Through the interpreter) Thank you, your Honor.

14   A.  Okay.

15   Q.  Okay.  Did you read a provision that stated that CIF should

16   be reimbursed from future profits?

17   A.  Yes.

18   Q.  I would also --

19   A.  For the profits, for the profits.  But it's only for future

20   profits.

21   Q.  Right.  I would ask if you could look at subsection 7.1 of

22   the same agreement.  Same as the last question.  Just read it,

23   if you are capable of reading it, and I'll ask you questions.

24             THE COURT:  Quietly to yourself.

25   A.  Okay.

1    Q.  Did you read a part of that provision that states that if

2    the project agreement with CIF violates existing laws that

3    those portions would also be illegal?

4    A.  Regarding the party that is violating the right.

5    Q.  So as you testified about yesterday, you and others

6    informed Prime Minister Komara, after the vote on the -- I'm

7    sorry -- after the signing of the shareholder agreement in

8    October of 2009, that you believed certain aspects of that

9    agreement violated existing Guinean laws and contracts.

10   A.  Yes.

11   Q.  Would the provision of Exhibit 406 that you just read allow

12   any provision of that agreement that was illegal to be

13   nullified while preserving the rest of the agreement?

14   A.  Yes.

15   Q.  If you take a look at the signature page of 406, please,

16   who signed that agreement on behalf of the Republic of Guinea?

17   A.  Boubacar Barry.

18   Q.  And is he signing for himself or on behalf of someone else?

19   A.  It's signed as a PO.

20   Q.  For?

21   A.  For Mr. Mamadou Sande, so that means that Mr. Mamadou Sande

22   was either not available nor present.

23   Q.  And when you said PO, does that mean that Mr. Barry was

24   given the power and authority to sign on Mr. Sande's behalf?

25   A.  He was supposed to have a kind of proxy or a kind of

1  mandate.

2  Q.  Like a power of attorney?  Are you familiar with that word?

3  A.  No.  According to French administration, we use another

4  term for that.

5  Q.  Okay.  But --

6  A.  But it reaches the same result.

7  Q.  Right.  So in more simple terms, Mr. Barry was given

8  permission and authority to sign the document on Mr. Sande's

9  behalf.

10  A.  Correct.

11  Q.  Do you know who granted Mr. Barry that authority?

12  A.  It's Mr. Sande.

13  Q.  Do you know why it was granted?

14  A.  It was granted because Mr. Sande was not available.  He had

15  other duties.

16  Q.  Mr. Sande was quite busy at the time, correct?

17  A.  Very busy.

18  Q.  Because he was helping to rebuild the finance structure for

19  Guinea at the time, right?

20  A.  Mainly, fundamentally, but also dealing with other concerns

21  that the government had, because it was a military government.

22  Q.  And Mr. Thiam was not given the power and authority to sign

23  406 on behalf of Mr. Sande.

24              MR. KOBRE:  Objection.

25              THE COURT:  Sustained.

1    Q.  From your review of that document.

2              MR. KOBRE:  Objection.

3              THE COURT:  Sustained.

4    Q.  Do you recall testifying about the technical committee

5    holding at least two meetings in October on the eve of the

6    signing of the shareholder agreement marked as Exhibit 408?

7    A.  Yes.

8    Q.  During those meetings there were several ministers that

9    attended, is that correct?

10   A.  Yes.

11   Q.  Did the prime minister attend?

12   A.  Yes.

13   Q.  He was the highest-ranking minister at the meeting.

14   A.  Yes.

15   Q.  There were other differences in ranks amongst the ministers

16   that were at that meeting, correct?

17   A.  Yes.

18   Q.  And do you recall testifying about concerns that the

19   technical committee raised during that meeting about the

20   shareholders agreement?

21   A.  Yes.

22   Q.  Do you recall testifying that one of those concerns was

23   that the exclusivity provision of the shareholder agreement

24   violated Guinean law?

25   A.  Yes.

1  Q.  Could you take a look at Exhibit 408.

2  A.  Yes.

3  Q.  Could you direct your attention to paragraph 20.6.  It's on

4  page 48.  Is this document in French for you?

5  A.  Yes.  20.6?

6  Q.  Correct.  Would you please read that provision to yourself.

7  A.  Yes.

8  Q.  Is this provision one which allows for the removal of any

9  aspect of the agreement that is illegal under Guinean law?

10 A.  Yes, because according to the law, it says that one cannot

11 go against the -- with particular agreements, one cannot go

12 against the laws regarding the public order and the good

13 behavior.  And here, the public order that is mentioned is the

14 economic public order.  Because there are various public

15 orders.  It's an overall concept in law.

16 Q.  And is it your understanding that this provision,

17 paragraph 20.6, would have allowed the agreement to remain in

18 effect if one portion of it was found to be illegal?

19 A.  Yes.

20 Q.  This is one of the reasons why it was appropriate for Prime

21 Minister Komara to write his letter after the agreement was

22 signed that you testified about yesterday.

23 A.  Yes.

24 Q.  Also, is it, in your experience, common for such a clause

25 to be included in contracts that the government of Guinea would

1  have engaged in?

2  A.  What clause?

3  Q.  The one like this, 20.6.

4          MR. KOBRE:  Objection, your Honor.

5          THE COURT:  Sustained.

6  Q.  Now you also testified about yesterday, as I said, the

7  concerns the committee had over the exclusivity provision.

8  A.  Yes.

9  Q.  And you also recall testifying that the committee would

10  have preferred the privatization and restructuring of that

11  aspect of the agreement.

12  A.  Yes.

13  Q.  So in that sense, the committee was not rejecting the whole

14  shareholder agreement.

15  A.  Yes.

16  Q.  And in that sense, the committee was favoring a different

17  way to resolve the exclusivity portions of the shareholder

18  agreement.

19  A.  No.

20  Q.  Okay.  At the meeting on October 10th of 2009, are you

21  aware if the shareholder's agreement was executed?

22  A.  No.

23  Q.  Take a look at Exhibit 408, if you could.

24  A.  When you mean executed, what do you mean?

25  Q.  No.  Exhibit 408.

H4q1thi3

1    A.  Executed.

2    Q.  Executed.  Signed.

3    A.  Yes, it was signed.

4    Q.  Okay.

5         MR. GOLDSMITH:  Your Honor, I just want to note, it's

6    almost 12.  When would the Court prefer to take a morning

7    break?

8         THE COURT:  Because we got a late start, let me just

9    ask, does anyone need a break?  I'm happy to take one if anyone

10   would like one.

11        Yes.  We'll take a break right now.  Thank you so

12   much, counsel, for raising that.

13        Please be seated.  The jury may join Ms. Rojas at the

14   jury room.  The witness may step down.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H4q1thi3

1          (Jury not present)

2          THE COURT:  Thank you so much, Mr. Goldsmith.  I

3   appreciate that.  And roughly how much longer on your cross?

4          MR. GOLDSMITH:  Half hour?

5          THE COURT:  Great.  Thank you for that estimate.

6          MR. GOLDSMITH:  Maybe 45 minutes because of the

7   translations, but I'm trying to go slowly to avoid as many

8   misunderstandings as possible.

9          THE COURT:  Thank you.  And I'm not rushing you.  I

10  just want an estimate.

11         And Mr. Kobre, anything to discuss?

12         MR. KOBRE:  No, your Honor.

13         THE COURT:  Mr. Goldsmith, anything to discuss?

14         MR. GOLDSMITH:  I'm sorry, your Honor?

15         THE COURT:  Anything you'd like to discuss?

16         MR. GOLDSMITH:  Nothing at this time.

17         THE COURT:  Thank you.

18         THE DEPUTY CLERK:  All rise.

19         (Recess)

20         (In open court; jury not present)

21         THE COURT:  Mr. Goldsmith, I understand you have an

22  issue.

23         MR. GOLDSMITH:  Yes.  I have a technical issue.  My

24  client --

25         THE COURT:  I'm sorry?

H4q1thi3

1          MR. GOLDSMITH:  A technical issue.  My client and to a

2     degree family members watching the court noticed during my

3     cross-examination --

4          THE COURT:  Excuse me.  That door is open back there.

5     Please close the door.

6          THE DEPUTY CLERK:  Please be seated.  Thank you.

7          THE COURT:  Thank you.

8          MR. GOLDSMITH:  Thank you.  That there were --

9          THE COURT:  Wait one minute.  It's open again.

10          THE DEPUTY CLERK:  Sir, please close the door.

11          THE COURT:  Thank you.

12          MR. GOLDSMITH:  There were some instances --

13          THE COURT:  Sir.

14          We'll give it another try.

15          MR. GOLDSMITH:  Thank you.  That there were some

16     instances when the translation of my questions were truncated

17     or seemed to have been summarized in a form that were not

18     entirely accurate and may have led to a response that was,

19     accordingly, not entirely accurate.  I asked Mr. Thiam if he

20     had noted which particular questions and responses.  He had

21     not.  I also asked him if they were of particularly significant

22     import.  He said generically some of the responses were, he

23     felt, important but overall nothing that was overwhelmingly

24     crucial at this stage.

25          I have discussed this with the government.  I will

H4q1thi3

1    also note that I mentioned this morning to the government that

2    we noticed yesterday during the direct a couple of minor

3    inconsistencies but in my opinion were entirely inconsequential

4    to the translation.  In response to my telling the government

5    just now during the break, they suggested that they have no

6    objection to me continuing my examination from counsel table so

7    that I might more readily be available to have Mr. Thiam notify

8    me if there was any change in the translation that he was able

9    to perceive.  Would that be acceptable with the Court?

10            THE COURT:  Well, I have no objection to you standing

11   at counsel table to conduct your examination.  That's fine with

12   me.

13            The jury is ready.

14            Obviously we qualified this interpreter.  No counsel

15   has objected.  Is this interpreter going to be with us for

16   another witness?

17            MR. KOBRE:  No, your Honor.  So the next -- one

18   moment, your Honor.  I thought I had the answer to that

19   question, but just one moment.

20            THE COURT:  That's a yes or no.  Is she or not?

21            MR. KOBRE:  She is available.  However, she needs to

22   leave 45 minutes early today so --

23            THE COURT:  No.  Do we only have this interpreter for

24   this witness, yes or no?  Is she also the interpreter for

25   another witness?

H4q1thi3

1          MR. KOBRE:  Yes.  In part, yes.

2          THE COURT:  Okay.  So counsel, I think it would be

3    helpful if I bring in the interpreter alone without the witness

4    and, as gracefully and carefully as I can, review with the

5    interpreter the necessity of making sure that each word and

6    clause is translated, both of a question and an answer, and

7    that there is no summary given by the interpreter of either a

8    question or an answer.

9          MR. GOLDSMITH:  Thank you.

10          THE COURT:  Would that be acceptable to counsel?

11          MR. KOBRE:  Yes, your Honor.

12          MR. GOLDSMITH:  Yes, your Honor.

13          THE COURT:  Okay.  Would you ask the interpreter,

14    please, to join us without the witness.

15          THE DEPUTY CLERK:  Yes, your Honor.

16          THE COURT:  Obviously, counsel, to do a translation is

17    a work of art, and to convey meaning effectively, you don't

18    translate a word but you translate a phrase containing words,

19    and sentence structure impacts how you effectively translate,

20    so we all I think are in agreement about that.

21          Thank you so much for joining us, and I just have a

22    few remarks to make to you.

23          THE INTERPRETER:  Yes, your Honor.

24          THE COURT:  We're all appreciative of how challenging

25    it is to serve as an interpreter between one language and

H4q1thi3                          Camara - Cross

1    another and to effectively convey meaning from one language to

2    another, and we don't mean to suggest in any way that it's

3    important to translate every word in the same order in which it

4    is conveyed by a questioner or a witness in order to

5    effectively convey meaning.  But that said, counsel wished me

6    to raise with you the following:  It's important that no

7    summary of either a question or an answer be given in your

8    interpretation so that every word, every phrase, the complete

9    question is translated and, similarly, every word, every

10   phrase, the complete answer is translated.

11              THE INTERPRETER:  Yes, your Honor, of course.

12              THE COURT:  Okay.  Good.  Thank you.  And we also know

13   how tiring it is to stand and to be an interpreter for these

14   very lengthy proceedings.  And of course if you'd like to use a

15   chair or otherwise if at any point you need a break in order to

16   make sure that you are doing what you want to do as an

17   interpreter here, please let us know.

18              THE INTERPRETER:  Yes, your Honor.

19              THE COURT:  Thank you very much.

20              Bring in the jury.  Bring in the witness.

21              (Continued on next page)

22

23

24

25

H4q1thi3                              Camara - Cross

1              (Jury present)

2              THE COURT:  Counsel.

3              MR. GOLDSMITH:  Thank you.

4    BY MR. GOLDSMITH:

5    Q.  When we broke just now, do you recall testifying that

6    Exhibit 408, the shareholder agreement, had been executed or

7    signed?

8    A.  Yes.

9    Q.  And it was signed by the ministers who had the authority to

10   sign it, correct?

11   A.  Yes.

12   Q.  And who were the ministers that signed the document?

13   A.  There is the minister of justice, Minister Loholamou; the

14   minister of finance, Mr. Mamadou Sande.

15   Q.  Now at the meeting that was held with the technical

16   committee and the ministers the day before, would there have

17   been a reason to tell those ministers to not sign the

18   agreement?

19             MR. KOBRE:  Objection.

20             THE COURT:  Sustained.  Form.

21             MR. GOLDSMITH:  Okay.

22   Q.  Did the committee at the meeting on October 9th or 8th

23   tell those ministers not to sign the agreement?

24   A.  The meeting was to provide observations and amendments and

25   focus on the provisions that were not acceptable.  And the

1   minister had to make a decision that was important to him.

2   Q.   Which minister?

3   A.   The concerned minister.  And following that, the Council of

4   Ministers.

5   Q.   So all of those ministers collectively would have had to

6   make a decision about the shareholder agreement, correct?

7   A.   Absolutely.

8   Q.   And in your experience at that time, the prime minister

9   approved the agreement?

10          MR. KOBRE:  Objection.

11   Q.   Well, withdrawn.  Let me clarify that.

12       At the time the prime minister approved of the agreement.

13          MR. KOBRE:  Objection.

14          THE COURT:  Overruled.

15          THE INTERPRETER:  The interpreter couldn't hear.

16          THE WITNESS:  Can your Honor allow me to continue?

17          THE COURT:  So if a question can be answered fairly

18   with a yes or a no, then it should be answered with a yes or a

19   no.  If it cannot be fairly answered with a yes or a no, then

20   you may give an explanation.

21          Please place the question again.

22   BY MR. GOLDSMITH:

23   Q.   Do you recall if the prime minister approved of the

24   shareholder agreement?

25   A.   No.

1   Q.  No, you do not recall or no, he did not approve?

2   A.  He didn't approve, because the decision that had to be

3   made, it's the Council of Ministers that approves it.  It's a

4   collective decision.  Once the question had been raised to the

5   council, the decision of the minister cannot overrule what was

6   decided at the council.

7   Q.  So in other words, the decision of the ministers as a whole

8   is more powerful than the opinion of the prime minister.

9   A.  Absolutely.

10  Q.  But is it your testimony today that the prime minister,

11  Komara, did not approve of this shareholder agreement?

12  A.  Yes.

13  Q.  Mr. Camara, prior to testimony here today in court and

14  yesterday in court, you had occasions to meet with agents of

15  the United States government, correct?

16  A.  Yes.

17  Q.  And you discussed with them what happened in Guinea in

18  2009, correct?

19  A.  Yes.

20  Q.  And you discussed with them a lot of what you testified

21  about here in court, right?

22  A.  Yes.

23  Q.  And you were honest with them, right?

24  A.  Yes.

25  Q.  Do you remember meeting with members of the United States

1    government as it relates to this trial, on August 5th of

2    2016?

3    A.  Yes.

4    Q.  And do you recall informing them at that meeting that you

5    believed that Komara gave verbal approval for the documents at

6    a cabinet meeting?

7    A.  Well, I don't recall, but if they said so, maybe there's a

8    confusion.  They probably didn't -- they might not have

9    understood properly what I was meaning.

10   Q.  So your position is that any prior understanding that you

11   had told the US government --

12              MR. GOLDSMITH:  Do you want to break that up for him?

13              THE INTERPRETER:  No.  I need the whole context to

14   translate.

15   Q.  -- that the agreement was verbally approved by the prime

16   minister would have been a misunderstanding?

17   A.  There were some bad understandings regarding certain

18   matters, not everything.

19   Q.  Misunderstandings by whom?

20   A.  On behalf of the American agents that I meet in the month

21   of August.

22   Q.  Do you recall testifying yesterday about a letter that was

23   drafted from the prime minister after the shareholder agreement

24   was executed, signed?

25   A.  Yes.

1    Q.  That letter is Exhibit 410, is that correct?

2    A.  Can you repeat your question.

3    Q.  Document 410, do you recall testifying yesterday about the

4    letter?

5    A.  Yes, that document, Exhibit 401, it's not a letter, it's a

6    memorandum.

7    Q.  No, 410, not 401.

8    A.  Ah, sorry.

9        You said 410?

10   Q.  Correct.

11   A.  Yes.

12   Q.  This was the letter that was sent from Prime Minister

13   Komara after the shareholder agreement was signed, correct?

14   A.  Yes.

15   Q.  And it expresses concerns about some of the provisions in

16   the signed shareholder agreement, correct?

17   A.  Yes.

18   Q.  And it was sent to whom?

19   A.  It was sent to the president of the republic, it was sent

20   to the minister of mines and geology, the minister of mines for

21   energy and geology, and to the minister of finance.

22   Q.  But it was addressed to Minister Barry, correct?

23   A.  It was addressed to Mr. Barry, yes.

24   Q.  And it was addressed to Minister Barry because he had

25   authority to deal with the concerns of the prime minister?

1    A.  Because he was the chair of the steering committee of the

2    president's China investment fund.

3    Q.  And when you testified a moment ago that the letter had

4    been sent to the president, the minister of mines, and the

5    minister of finance, those individuals were just sent copies,

6    correct?

7    A.  Yes.

8    Q.  The letter was not specifically addressed to them.

9    A.  Yes.

10   Q.  Minister Barry, did he have a role in the negotiations

11   process for the CIF investment project?

12   A.  Yes, his role was he was the chair of the steering

13   committee of the investment.

14   Q.  Does that give him a higher stature or authority than

15   others in this negotiation?

16   A.  Yes, because he's directly responsible to the Council of

17   Ministers regarding the decisions and the orientations of the

18   China International Fund.

19   Q.  And he was also the same Minister Barry who signed the

20   master's agreement dated July, as a proxy for Mr. Sande.

21   A.  Hmm.

22           THE COURT:  Is that yes?

23           THE WITNESS:  (In English) Yes.

24   Q.  Do you know if Mr. Barry participated on a regular basis in

25   discussions with the Chinese?

H4q1thi3                        Camara - Cross

1    A.  Well, each time he was available he would go to the

2    meetings, and each time he was in Conakry, the prime minister

3    would contact him to participate in the meetings.

4    Q.  Regarding the CIF investment project, correct?

5    A.  Yes.

6    Q.  Do you know if Mr. Barry traveled to Hong Kong or

7    Singapore?

8    A.  Yes.

9    Q.  For the purpose of discussions related to the CIF

10   investment project?

11   A.  Yes.

12   Q.  And do you know who appointed Mr. Barry as the chair of the

13   steering committee on this investment project?

14   A.  For that, I believe it's the prime minister.

15   Q.  Do you know if Mr. Barry was in conversation with President

16   Dadis about the discussions with the Chinese?

17   A.  Yes, Mr. Barry was the minister at the presidency, like

18   Mr. Thiam, so he had a high-level status.  And even better, he

19   had personal and privileged relationship with the presidential

20   committee.

21          THE INTERPRETER:  Sorry.  The interpreter's mistake.

22   With the president of the republic.

23   Q.  Meaning that they would have meetings with the president,

24   right?

25   A.  Probably, but I was not informed about those meetings and I

1   didn't participate in those meetings.

2   Q.  Do you know if they had meetings individually with the

3   president regarding the Chinese investment project?

4          MR. KOBRE:  Objection.

5          THE COURT:  Sustained for form.  And foundation.

6   Q.  Do you know if President Dadis had any meetings with

7   Minister Barry regarding the discussions with the Chinese?

8   A.  No.  No, I'm not aware of this, but it's part of the

9   standard procedures of the dealing because it is a development

10  of the affairs with the government and the president cannot be

11  indifferent and he has to be aware of the various procedures.

12  Q.  And would it also be standard procedures for the president

13  to have meetings with Mr. Thiam when he was the minister of

14  mines related to the Chinese investment project?

15  A.  Yes, Mr. Thiam was, first of all, a minister at the

16  presidency so it was normal that he would meet Mr. Thiam or

17  rather that Mr. Thiam would meet the president.

18  Q.  As part of his job related to the minister of mines and the

19  Chinese investment project, Mr. Thiam was required to follow

20  directions of the presidency.

21  A.  Yes.

22  Q.  And no one -- withdrawn.

23       And you never felt that Mr. Thiam did not fulfill his

24  obligations as the minister of mines as it relates to the

25  Chinese investment project.

1          MR. KOBRE:  Objection.

2          THE COURT:  Sustained.  I'll certainly let you ask

3     with respect to a time frame.

4          MR. GOLDSMITH:  Oh, sure.

5     Q.  You never felt -- let me clear it up.

6          You felt that Mr. Thiam performed his job appropriately as

7     minister of the mines in discussions related to the Chinese

8     investment project during 2009.

9          THE COURT:  Excuse me.  Counsel, could you just begin

10    that differently.  In 2009...

11         MR. GOLDSMITH:  Absolutely.

12    Q.  In 2009 -- thank you, your Honor -- did you feel that

13    Mr. Thiam had performed his job as minister of mines

14    appropriately in regards to the discussions with the Chinese

15    investment project?

16    A.  Partly.

17    Q.  And is it fair to say that had Mr. Thiam gone against or

18    acted against the shareholders agreement in 2009 that it would

19    have been contrary to his job as the minister of mines?

20         THE COURT:  Do you understand that question?

21         THE WITNESS:  Could you reformulate this question,

22    please.

23    Q.  If Mr. Thiam, in 2009, had opposed the shareholder

24    agreement with CIF, that would have gone against his

25    responsibilities as the minister of mines.

1              MR. KOBRE:  Objection.

2              THE COURT:  Sustained.

3   Q.  Would you have considered it abnormal for Mr. Thiam to have

4   voiced opposition to the shareholder agreement in 2009?

5              MR. KOBRE:  Objection.

6              THE COURT:  Overruled.

7   A.  There were provisions that were not following the

8   directions and orientation of the government.

9   Q.  I'm going to ask again, would it have been abnormal --

10              THE COURT:  Counsel, I think you need to rephrase the

11   question.  But I'll let you inquire.

12   Q.  It was Mr. Thiam's obligations in part, as the minister of

13   mines, to engage in discussions with the Chinese regarding the

14   investment project, correct?

15   A.  It was the government.  But he had an important role, a

16   really preponderant role.

17   Q.  And Mr. Thiam was a point of contact in the discussions

18   between the Chinese and the Republic of Guinea in furtherance

19   of the investment project, correct?

20   A.  Yes.

21   Q.  And as a result of that relationship, would it have been

22   abnormal for Mr. Thiam to have objected or opposed the

23   shareholder agreement that was ultimately signed in this case?

24              MR. KOBRE:  Objection.

25              THE COURT:  Sustained.

H4q1thi3                        Camara - Cross

1   Q.  Would it have been abnormal from the perspective of the

2   Chinese if the minister of mines opposed the deal?

3            MR. KOBRE:  Objection.

4            THE COURT:  Sustained.

5   Q.  Would it have been abnormal if the minister of mines, from

6   the perspective of the Guinean Republic, opposed the deal?

7            MR. KOBRE:  Objection.

8            THE COURT:  Sustained.

9   Q.  In this particular deal would it have seemed abnormal if

10  Mr. Thiam opposed the shareholder agreement that was executed

11  in October 2009?

12           MR. KOBRE:  Objection.

13           THE COURT:  Sustained.

14  Q.  Do you recall if Mr. Thiam voiced any opposition to the

15  shareholder agreement to the prime minister's office?

16  A.  To my knowledge, no.

17  Q.  Do you recall if Mr. Thiam voiced any opposition to the

18  agreement to the steering committee?

19  A.  Regarding the connection, the relationship between

20  Mr. Thiam and the steering committee, I was not there so I

21  don't know what happened during these steering committee

22  meetings.  It was at the ministerial level.  It was between two

23  ministers, and each of them had a role regarding that project.

24  Q.  Do you recall testifying yesterday that the ministers, as a

25  group, were in favor of the investment project with CIF?

1   A.  They were in favor of this investment, yes.

2   Q.  And you recall testifying yesterday in fact that as a

3   group, the ministers of the Republic of Guinea were

4   enthusiastic about the arrangement with CIF?

5              MR. KOBRE:  Objection.

6              THE COURT:  Overruled.

7   A.  Yes, all the ministers were enthusiastic, and the overall

8   population as well.

9   Q.  And that was your word yesterday in testimony in open

10  court, "enthusiastic," right?

11  A.  Yes.

12  Q.  Having testified about all of the agreements that you did

13  yesterday and today, there was a difference in those agreements

14  from June until July and ultimately October of 2009.  Is that

15  correct?

16  A.  Yes.

17  Q.  Is it fair to say that those -- withdrawn.

18       Is it fair to say that any changes in those agreements

19  reflected the ongoing negotiations and discussions between CIF

20  and the Republic of Guinea?

21  A.  For certain changes, yes, but not for all the changes.

22  Q.  And at the time in 2009 did you consider Mr. Thiam to have

23  done a good and professional job?

24  A.  Yes.  He did a good job.

25  Q.  And he did not have the authority to sign --

H4q1thi3                          Camara - Cross

1   A.  Yes, it was a good job, but it was not achieved, completely

2   achieved.  He stopped in his pathway.

3              MR. GOLDSMITH:  Move to strike the latter portion of

4   that.

5              THE COURT:  I'm going to strike the whole answer from

6   beginning to end because I think to strike half would be

7   potentially misleading, but you may inquire further.  The jury

8   shall disregard the answer in its entirety.

9              MR. GOLDSMITH:  Thank you, your Honor.

10  BY MR. GOLDSMITH:

11  Q.  Regardless of what may have happened after October 2009, do

12  you believe that Mr. Thiam performed a good professional job in

13  regards to this agreement?

14             MR. KOBRE:  Objection, your Honor.

15             THE COURT:  Overruled.

16  Q.  In other words --

17             THE COURT:  Well, it's withdrawn then.  Place a

18  question.

19             MR. GOLDSMITH:  I'll withdraw and try to clarify.

20  Q.  Up until --

21             THE COURT:  In your view.

22  BY MR. GOLDSMITH:

23  Q.  In your view, from January to October of 2009, Mr. Thiam

24  did a good professional job.

25  A.  Yes, he did a good job.

H4q1thi3

1    Q.  And Mr. Thiam did not have the authority, in his position

2    as minister of mines, to execute the shareholder agreement?

3    A.  I'm a little confused because Mr. Thiam wrote his initials

4    on the shareholder agreement.  Why didn't he sign it?  I don't

5    know.

6    Q.  Okay.  But my question is, he did not actually sign the

7    agreement, right?

8    A.  Yeah, he didn't sign the agreement.

9    Q.  He did not sign any of the agreements that you discussed

10   yesterday and today, correct?

11   A.  Well, yes.

12          THE COURT:  Counsel, how much longer?

13          MR. GOLDSMITH:  One or two questions.

14   Q.  You never witnessed Mr. Thiam do anything inappropriate in

15   relation to this agreement.

16   A.  Never.

17          MR. GOLDSMITH:  No further questions.

18          THE COURT:  So, ladies and gentlemen, we're going to

19   break for lunch.  And we'll see you back here at 2:00.  Thank

20   you.  Don't discuss the case.  You may step down.

21          (Jury not present)

22          (Continued on next page)

23

24

25

H4q1thi3

1           MR. GOLDSMITH:  Your Honor --

2           THE COURT:  Yes.

3           MR. GOLDSMITH:  I apologize for the last couple

4     questions.  I didn't intend to elicit a response that would

5     violate the Court's prior ruling about after-effects.

6           THE COURT:  Mr. Goldsmith, I didn't think you were

7     attempting to circumvent any ruling whatsoever.

8           MR. GOLDSMITH:  Thank you.

9           THE COURT:  Thank you for saying that, but it wasn't

10    in my mind.  I think if it were, I'd probably raise it with you

11    directly.

12          So Mr. Kobre, anything to discuss right now?

13          MR. KOBRE:  No, your Honor.

14          THE COURT:  Mr. Goldsmith, anything to discuss right

15    now?

16          MR. GOLDSMITH:  No, your Honor.

17          THE COURT:  Okay.  So it may be premature for the

18    government to give an estimate with respect to the length of

19    the trial, but I think we've seen the length of time it takes

20    to question a witness through an interpreter, and we've had

21    some delays in getting started these last two mornings.  Do you

22    have a current estimate?

23          MR. KOBRE:  Could we just have a moment, your Honor?

24    It would take 30 seconds.

25          THE COURT:  Sure.

1           MR. KOBRE:  Realistically, your Honor, I think our

2     best estimate at this point would be the end of the day

3     tomorrow or it would spill over onto the following day and that

4     would be Monday, and then it would be at some point on Monday.

5           THE COURT:  Okay.  So I probably will want to give the

6     jury guidance about whether we're sitting Friday as soon as I

7     can comfortably and reliably give that guidance.  So I'll raise

8     this issue again and let counsel talk about it at lunchtime.  I

9     think I'd like to let them know they won't be sitting Friday if

10    we're comfortable in deciding that.  And I think, in all

11    honesty, with respect to that decision, you should know that

12    we'd need to get this case submitted to the jury by midday on

13    Thursday, with all the evidence in.

14          MR. GOLDSMITH:  You mean next Thursday.

15          THE COURT:  This coming, tomorrow.

16          MR. GOLDSMITH:  Submitted to the jury for

17    deliberations?

18          THE COURT:  Submitted to the jury in terms of

19    testimony, that all testimony concluded, so tomorrow afternoon

20    we could do summations and charge.  So if that's not in the

21    cards, that all the testimony would be in by around noon

22    tomorrow so we could have summations -- well, let me say this.

23    I think 3:00.  I would like to tell the jury today, at the end

24    of the day, whether we're going to sit Friday or not.  We're

25    not going to get to sit Friday if all the testimony isn't

H4q1thi3

1    concluded by 3 p.m. on Thursday.

2              MR. GOLDSMITH:  I was confused on that point.  Thank

3    you, your Honor, for clarifying it, yes.

4              THE COURT:  Okay.  So we'll let you reflect on that

5    and I'll raise it with you again later today.

6              I also wonder if it wouldn't be appropriate to

7    instruct the jury this afternoon that the government has the

8    burden of proving a variety of things in this trial.  I'll give

9    the jury detailed instructions about this later on, but

10   assuming the government carries its burden of proof with

11   respect to each of the things I'm going to talk to them about,

12   they should understand that it is not the government's burden

13   to prove whether or not the agreement reached between Guinea

14   and the Chinese entities was beneficial to Guinea or not and

15   it's not the government's burden to prove that the defendant

16   had ultimate decision-making authority with respect to whether

17   Guinea should enter into that agreement or not.  So reflect on

18   that and I'll hear from you before I give that charge.

19             See you at 2:00.

20             THE DEPUTY CLERK:  All rise.

21             (Luncheon recess)

22

23

24

25

```
 1                          AFTERNOON SESSION

 2                              2:00 p.m.

 3              (In open court; jury not present)

 4              THE COURT:  Counsel, two issues.  Any idea what I

 5    should be instructing the jury about with respect to Friday?

 6              MR. KOBRE:  Your Honor, with almost absolute

 7    certainty, the government expects that we could say we would

 8    not be able to have all the evidence submitted before the jury

 9    by tomorrow afternoon at 3:00.

10              THE COURT:  Good.  Thank you.  That's the guidance I

11    needed.  Any objection to me telling the jury as they leave

12    today that we will not be sitting Friday?

13              MR. KOBRE:  No objection.

14              MR. GOLDSMITH:  No objection.

15              THE COURT:  Great.

16              Second thing, is there going to be redirect of this

17    witness?

18              MR. KOBRE:  There will, your Honor.

19              THE COURT:  At the conclusion of this witness's

20    testimony, is there any objection to me instructing the jury as

21    I described just before our break?

22              MR. GOLDSMITH:  No, your Honor, from the defense.

23              MR. KOBRE:  No, your Honor.

24              THE COURT:  Good.  Thank you.

25              MR. KOBRE:  Could I just raise one issue, your Honor,
```

1    very quickly?

2              THE COURT:  Sure.

3              MR. KOBRE:  I don't think this presents a problem, but

4    I just wanted for the Court's information, the witness, Mr.

5    Camara, mentioned during the break that while he had been in

6    the bathroom during the lunch break up here, he was approached

7    by a family member of the defendant and they engaged in very

8    brief conversation that, from my brief interview of Mr. Camara,

9    did not touch at all on the substance of his testimony or

10   relate to it.  It was a discussion about family and it was a

11   several minute-long conversation, and again, aside from the

12   fact of it, nothing of that conversation that I learned from

13   Mr. Camara suggests anything particularly concerning.

14             THE COURT:  Thank you.  And I'm sure you shared that

15   with defense counsel.

16             MR. KOBRE:  I certainly have, your Honor.

17             MR. GOLDSMITH:  Yes.  Before we had left, I had

18   mentioned to the family to keep their tones quiet in the

19   hallways.  They speak French amongst themselves, which normally

20   is not a problem, but obviously the witness is French speaking,

21   so he understands what they're saying.  I was informed by Mr.

22   Kobre to go admonish the family to not have any interaction

23   with witnesses.  They have not returned, so if time permits,

24   I'll go do that now.

25             THE COURT:  I'll let you have your team take care of

H4qWthi4

```
 1   that.
 2              MR. GOLDSMITH:  Thank you.
 3              THE COURT:  Thank you.  I appreciate that.  There
 4   obviously should be no contact whatsoever between witnesses and
 5   family members.
 6              OK.  We have a jury.  Bring in the witness.
 7              Bring in the jury.
 8              (Continued on next page)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          (In open court; jury present)

2          THE COURT:  Counsel.

3          MR. KOBRE:  Thank you, Judge.

4    DAOUDA CAMARA, resumed.

5    REDIRECT EXAMINATION

6    BY MR. KOBRE:

7    Q.  Mr. Camara, on cross-examination, defense counsel asked you

8    some questions about some other agreements between the Republic

9    of Guinea and other mining companies.  Do you remember that,

10   those questions?

11   A.  Yes.

12   Q.  In particular, some of those that he mentioned were Rio

13   Tinto and BHP?

14   A.  Yes.

15   Q.  Did any agreements with those companies involve the

16   creation of a national asset company or a national company

17   containing mining rights?

18   A.  No.

19   Q.  You described on both direct and on cross-examination the

20   different types of licenses.  What type of licenses did those

21   agreements involve?

22   A.  The research license leaves the permit to realize all the

23   activities on the, on the ground and underground to do research

24   in order to start to be a mode to extract minerals.

25   Q.  And what --

1   A.  From a commercial, an economic point of view.

2   Q.  My specific question is, the Rio Tinto and BHP agreements

3   that you talked about on cross-examination, what types of

4   licenses were those; which category does that fall into?

5   A.  It was applying to the concessions.

6   Q.  And are concessions typically limited to a particular

7   geographical area?

8   A.  What -- could you reformulate your question?  What did you

9   mean by geographic area?

10  Q.  In other words, are concessions typically confined to a

11  particular area within the Republic of Guinea as opposed to

12  applying generally to all, the entire Republic of Guinea, the

13  entire landmass?

14  A.  It's -- no.  It's the whole Republic of Guinea, that

15  includes mining land.

16  Q.  Right.  And are concessions typically in designated areas

17  that are agreed upon, or do they apply -- a particular

18  concession would be covering the entire Republic of Guinea?

19  A.  No.  The concession applies to a restricted reserve in

20  determining zone for determined period of time.

21  Q.  And when there's a concession, where is it described what

22  the particular geographical area is that is the subject of the

23  concession?

24  A.  The concession is granted within the limitations of some

25  restrictions in the longitude and the latitudes.

1  Q.  And where are those longitudes and latitudes spelled out,

2  if anywhere?

3  A.  It's formulated in the act that grants the concession; that

4  is, the decree that grants the concession.

5  Q.  The shareholders agreement that we've talked about,

6  Government Exhibit 408, does that contain any geographical

7  limitations with respect to the assets of the national mining

8  company?

9  A.  No, but if you need some comments, I can give you some

10  comments.

11  Q.  Well, let me just ask, are there geographic limitations

12  with respect to the mining rights that would be granted under

13  the shareholders agreement?

14  A.  Could you ask that again?

15  Q.  Sure.  Are there geographic limitations to the rights that,

16  the mining rights granted to the national mining company under

17  the shareholders agreement?

18  A.  No, but if you want me to provide you with comments, I can

19  add some comments.

20  Q.  Sure.

21        THE COURT:  No.

22        MR. KOBRE:  I understood the witness's question to

23  be -- OK.  Let me ask another question.

24  Q.  So if I'm understanding you correctly, the rights that are

25  granted under the shareholders agreement apply to all mining

1   rights in the Republic of Guinea?

2            MR. GOLDSMITH:  Objection.

3            THE COURT:  Overruled.

4   A.  It's the whole Republic of Guinea where there are

5   activities in the mining areas.

6   Q.  OK.  You were also asked some questions on

7   cross-examination relating to the granting of extensions for

8   exploitation permits.

9   A.  Yes.

10  Q.  And can you just briefly describe, why would an extension

11  to an exploitation permit be necessary?

12  A.  An exploitation license?

13  Q.  Yes.

14  A.  And regarding the license of exploitation, it's a license

15  that allows extensions if the reserves, which are being

16  determined and agreed with *pari pari*, if it's still the

17  reserves need to be extended to be exploited.

18  Q.  And is that because there's a time limitation to the

19  initial license?

20  A.  Yes, it regards the timing because it, within the time

21  limit it has expired and there are still reserves on that, in

22  the perimeter and the area of that mineral, then the government

23  gets an extension to continue the exploitation.  So referring

24  to Anglo-Saxon terms, the mines are not exhausted.  So in

25  French now, if the mines are not exhausted, we can get an

264

1   extension to continue the exploitation.

2   Q.  And who had the power to grant those extensions?

3   A.  It's the minister of mines, when there is a license of

4   exploitation.

5   Q.  Could the minister of mines grant that extension solely, by

6   himself?

7   A.  According to the mining code, yes.

8   Q.  And you were also asked some questions specifically about

9   concessions, and I think you testified that the president would

10  need to sign off on a concession?

11  A.  He's the only one who has the right to sign for

12  concessions.

13  Q.  Does the minister of mines have a role in the granting of

14  concessions?

15  A.  He prepares the technical file and also the argumentation

16  in order to facilitate the president of the republic's

17  decision.

18  Q.  Does that include giving advice about whether a concession

19  should be granted or not?

20  A.  Yes, naturally it's within the conclusions of the report of

21  the minister of mines.

22  Q.  You were asked some questions regarding Government Exhibit

23  401.  Can you take a look at that, please?

24  A.  Yes.

25  Q.  And the date, what's the date on that agreement?

H4qWthi4                        Camara - Redirect

1    A.  It's June 6, 2009.

2    Q.  And you were asked some questions about how long before

3    that date negotiations with CIF had begun.  Do you recall that?

4    A.  Yes.

5    Q.  Were you personally involved at all in any negotiations

6    that preceded this agreement, any negotiations with

7    representatives of CIF?

8    A.  No.

9    Q.  Now, if you could just take a look at Government Exhibit

10   402.

11   A.  Yes.

12   Q.  And in particular, if you could focus on the two pages that

13   defense counsel showed you, the two pages that come after the

14   signature page.  Do you see those two pages that defense

15   counsel handed up earlier?

16   A.  Yes.

17   Q.  And if I'm correct, you're looking at the two decrees?

18   A.  Yes.

19   Q.  Could you describe, what are those two decrees?  Just, what

20   are they?

21   A.  This decree regards the granting of a group of villages

22   that CBG, another mining company, had organized.

23   Q.  Can you explain that?  Why --

24   A.  Those installations were provided to China International

25   Fund in order to facilitate the construction and the better

1    usage -- to a better management.

2    Q.  What was China International Fund being given in that

3    document?

4    A.  It's the group of buildings and facilities that are within

5    that group of buildings.

6    Q.  Do you know what China International Fund would use these

7    buildings for?

8    A.  It would be to let its own stuff stay there and to organize

9    offices and other facilities.

10   Q.  So it would be like a base for their operations in Guinea?

11   A.  Yes, like a live base.

12   Q.  And the second decree, is that for similar purposes?

13   A.  Yes.  It's more or less similar because it is to give a

14   space to CIF to stock its materials and its tools to work on

15   the project.

16   Q.  Now, on cross-examination, defense counsel pointed out that

17   those documents are signed by Boubacar Barry.  Is that right?

18   A.  Yes.

19   Q.  Why would Boubacar Barry be signing these decrees?

20   A.  Because he's the minister in charge of construction, the

21   management of the land, and also the public assets.

22   Q.  Would that be a document that would be signed by the

23   minister of mines on occasion, that sort of document?

24   A.  Under normal conditions, the minister of mines was a --

25   would have to sign this document with CIF, and it would be --

1    it would have to be signed -- Minister Boubacar Barry, these

2    others, with Minister Boubacar Barry.  These are the two

3    ministers that had to sign that because the facilities of CBG

4    village are under the supervision of the minister of mines.

5    Q.  So --

6    A.  So if he's involved, he has to sign with Mr. Boubacar

7    Barry.

8    Q.  But I'm focused just on these two decrees.  Just the two

9    decrees that relate to CIF, based on your experience with the

10   government, which minister would be most appropriate to sign

11   those documents?

12              MR. GOLDSMITH:  Objection.  Asked and answered.

13              THE COURT:  Overruled.

14   A.  As I mentioned, for the first document, which is the decree

15   No. 1426, it's the two ministers who were supposed to sign,

16   sign this.  And to the extent perhaps the minister of finance

17   might be also able to sign, because a decree can be signed by

18   two or three ministers.

19   Q.  OK.

20   A.  For the second decree, normally it's only the Minister

21   Boubacar Barry.

22   Q.  And why is that?

23   A.  Because he's in charge of and is a co-owner of the

24   installations that are in charge for the CIF.

25   Q.  OK.  You were asked on cross-examination whether the

1    defendant, Mr. Thiam, properly performed his role or duty as

2    minister of mines.  Do you remember that?

3    A.  Yes.

4    Q.  And you said, your answer was "partly."

5    A.  Yes.

6    Q.  Can you explain in what part you do not believe that the

7    defendant, Mr. Thiam, properly performed his role as minister

8    of mines?

9    A.  There are two main parties.  They are the guidelines and

10   instructions that were given by the prime minister, following

11   the council of ministers of October.  These instructions should

12   have been mentioned in a new document in order to be submitted

13   to other signatures.

14       Secondly --

15   Q.  Could I stop you there.  Could you just explain that?  What

16   should have been done differently?

17   A.  As I mentioned, the modifications that were suggested at

18   the council of ministers and that were presented to

19   Mr. Boubacar Barry, the minister of mines and the minister of

20   finance were not mentioned in the finalized document and

21   reviewed and corrected.

22       Secondly, secondly, the document didn't follow the legal

23   procedure of, under Guinean law, in order to make a document

24   applicable and presentable to all parties.  And it's a matter

25   of the supreme court, of the approval by the parliament, of the

1  signature by the president of the republic, and the publication

2  of the whole agreement in the official journal of the Republic

3  of Guinea.

4  Q.  And what part of these issues that you're talking about now

5  do you believe Mr. Thiam, the defendant, should have done

6  differently?

7  A.  He cannot do in a different way; that's what is presented

8  by the law.  That's what the law says, he doesn't do anything

9  that apply or what is the law or under the instructions of the

10 council of ministers.

11 Q.  And what was the instruction of the council of ministers in

12 this case?

13 A.  The instructions are the instructions that are mentioned in

14 the letter of Mr. Prime Minister and the guidelines.

15 Q.  OK.  Why don't we just take a look at that.  If you can

16 take a look at Government Exhibit 410.

17         MR. KOBRE:  And if we can publish for the jury,

18 Mr. Beer, Government Exhibit 410-T.  And if we can just enlarge

19 starting from Roman numeral I down to the end, the exhibit

20 sticker.

21 Q.  Do you see that, Mr. Camara?

22         THE COURT:  It's not on the screens.

23         THE INTERPRETER:  It's not on the screen here.

24         THE COURT:  So take it off the screens -- OK.  It came

25 back on the screens now.  Thank you very much.

1    BY MR. KOBRE:

2    Q.  Mr. Camara, do you see -- you can feel free to look at the

3    French version, Government Exhibit 410, if that's easier for

4    you.

5    A.  Yes.

6    Q.  And let me focus you on Roman numeral I where it says,

7    "Following this presentation, directives were given on the

8    essential issues that would be the subject of new discussions."

9    Do you see where I'm reading from?

10   A.  Yes.

11              THE COURT:  It has to be translated.

12              THE INTERPRETER:  OK.

13   A.  Yes.

14   Q.  And what were those directives?

15   A.  These are the directives that are, guidelines that are

16   listed under point 1, 2, 3, 4, until point No. 5.

17   Q.  OK.

18   A.  Plus 2 and 3.

19   Q.  OK.  On page 2 of that document --

20   A.  Yes.

21              MR. KOBRE:  And Mr. Beer, if we can just go to page 2

22   and enlarge points 2 and 3.

23   Q.  And are these the directives concerning the national asset

24   company and the exclusivity provision?

25   A.  Yes.

1   Q.  And so when you said before -- what was it that the

2   defendant, Mr. Thiam, should have done differently with respect

3   to these directives?

4   A.  No.  It's the guidelines -- he didn't have to do anything

5   differently; he just had to put them in the application.

6   Q.  He had to do what?

7   A.  To apply them.

8   Q.  He should have applied these directives?

9   A.  Yes.

10  Q.  And based on your review of the final, signed shareholder

11  agreement, did he?

12  A.  Yes, he didn't do.  He didn't do.  That's why I said he

13  worked well, but he didn't finish this job.

14  Q.  OK.  And is that because he didn't apply these directives?

15          MR. GOLDSMITH:  Objection.

16          THE COURT:  Overruled.

17          You must translate.

18          THE INTERPRETER:  Is that because?

19  BY MR. KOBRE:

20  Q.  Is that because he did not apply these directives?

21  A.  Yes, precisely.

22  Q.  Do you know if the defendant, Mr. Thiam, during the period

23  of negotiations with CIF in 2009, received any money from,

24  personally, personally from CIF?

25  A.  No, I didn't see and I didn't hear anything.

1    Q.  Do you know if the defendant, Mr. Thiam, during that same

2    period of time, received any money personally from Mr. Sam?

3              MR. GOLDSMITH:  Objection.  Asked and answered.

4              THE COURT:  Overruled.

5    A.  No, I don't know either.

6    Q.  And you were asked about your view of the defendant,

7    Mr. Thiam's fulfillment of his professional responsibilities as

8    minister of mines of the Republic of Guinea from what you were

9    able to see in 2009.  Do you remember being asked about that?

10   A.  Yes, I remember.

11   Q.  If I were to tell you that just weeks before the signing of

12   the shareholders agreement Mr. Thiam personally --

13             MR. GOLDSMITH:  Objection.

14             THE COURT:  Let the question be placed.

15   Q.  If I were to tell you that just weeks before the signing of

16   the shareholders agreement Mr. Thiam personally received money

17   from either CIF or from Mr. Sam, would that change your view on

18   whether Mr. Thiam was acting in the proper, professional role

19   as minister of mines of the Republic of Guinea during the

20   period of time we're discussing?

21             MR. GOLDSMITH:  Objection.

22             THE COURT:  Overruled.

23   A.  If I have the evidence, yes.

24   Q.  And why?

25   A.  Yes, because the mandate and the trust that is, that he is

1    supposed to have don't fulfill these ethical perspective.

2    Q.   Just a few more questions, Mr. Camara.  You were asked on

3    cross-examination about some meetings that were attended by

4    Mr. Barry concerning the CIF deal?

5    A.   Yes.

6    Q.   Were those meetings that you personally attended as well?

7    A.   Some of those meetings.

8    Q.   OK.  And the meetings that you were personally at that

9    Mr. Barry also attended, I'm going to focus on those, was

10   Mr. Thiam also in attendance at those meetings?

11   A.   Yes, at the few meetings that I mentioned earlier.

12   Q.   The meetings that you testified about during your direct

13   examination when I questioned you earlier?

14   A.   The questions that the defendant's attorney asked me about,

15   that's what I'm referring to.

16   Q.   OK.  And Mr. Thiam -- the meetings that you were personally

17   present at, Mr. Thiam was at as well?

18   A.   Yes.

19   Q.   If I could just ask you to take a look at Government

20   Exhibit 410-T -- 410, rather.

21              MR. KOBRE:  And Mr. Beer, if we could go to point 3 on

22   page 1.

23   A.   Yes.

24   Q.   You were asked some questions about whether the prime

25   minister, Mr. Komara, agreed that the shareholders agreement

1    should be signed.

2    A.   Yes.

3    Q.   Did that come along with certain directives as well?

4    A.   The directives came over to bring amendments to the

5    agreement that had been signed.  If those amendments were not

6    integrated, if they were not mentioned, the document had no

7    value on the legal plan at the level of the government.

8    Q.   And were those directives -- when were those directives

9    first given to the people doing the negotiations?

10   A.   They were presented during the council of ministers of the

11   8th.

12   Q.   And looking at point 3 on Government Exhibit 410-T, was

13   that one of the directives?  And let me just read it.

14   A.   Yes, that's it.

15   Q.   So one of the directives was that, and I'll just read, "The

16   right of first refusal that the partner requests shall not be

17   granted."

18   A.   Yes.

19   Q.   And the partner refers here to CIF?

20   A.   Yes.  It refers to the partner, yes, CIF, and also China

21   Sonangol.

22            MR. KOBRE:  Thank you.  No further questions.

23            THE COURT:  Recross.

24            MR. GOLDSMITH:  Thank you, your Honor.

25   RECROSS-EXAMINATION

BY MR. GOLDSMITH:

Q.  On redirect, you were asked questions about concessions?

A.  Yes.

Q.  The shareholders agreement is not a concession agreement, correct?

A.  It is not.  The shareholder agreement is not an agreement for the concessions, but it mentions some of the matters that are related to the existing concessions, because regarding the national asset company and regarding the right of exclusivity, all the companies in which the government obtains shares are companies that have concessions, and what comes from those concessions is redeposited into the national asset company.  So it's true that there are no concessions in the shareholders agreement, that's true, but the stakes mentioned by the shareholders agreement for the companies that are in action, it relates to the consequences of the concession or the concessions.

Q.  In other words, the shareholders agreement does not specify a concession; it just discusses the parties' intent about what they may want to do in the future?

A.  Absolutely.  It doesn't mention the concessions, because there is a long pathway before reaching a concession.  It takes a lot of work and a lot of money, and it requires a lot of time, so there are no concession mentioned in the shareholders agreement, apart from the benefits that are coming out of

1    the -- from the existing concessions.

2    Q.  Thank you.

3        You also testified on redirect about your beliefs of

4    Mr. Thiam's performance while he was the minister of mines.  Do

5    you remember that?

6    A.  Yes, yes.

7    Q.  You testified earlier today you felt Mr. Thiam did a good

8    job as the minister --

9    A.  Yes.

10   Q.  -- but you testified on redirect that you feel he could

11   have done a better job on --

12   A.  Yes.

13   Q.  -- on including this technical committee's comments in the

14   final shareholders agreement?

15   A.  Of the ministerial directives.

16   Q.  And the concerns of the technical committee --

17   A.  That's it.

18   Q.  Those concerns of the technical committee were presented at

19   a meeting on October 8 of 2009, correct?

20   A.  Yes, that's it.

21   Q.  And at that meeting, it was the council of ministers,

22   right?

23   A.  Precisely.

24   Q.  And Minister Loholamou was at the meeting?

25   A.  Yes, Mr. Loholamou was at the meeting.

1    Q.  Mr. Sande was at the meeting as well?

2    A.  Mr. Sande was there too.

3    Q.  Ministers Loholamou and Sande both signed the shareholders

4    agreement on October 10, correct?

5    A.  Yes.

6    Q.  You also stated that you felt the final shareholder

7    agreement had not gone through all of the normal steps under

8    parliamentary procedure that it should have gone, right?

9    A.  Yes, but not only the parliamentarian procedures, but also

10   the legal procedures and because it involved the supreme court

11   and the presidency as well.

12   Q.  Do you recall testifying yesterday that in 2009, the normal

13   government procedures were not in place?

14   A.  In fact, I said all the institutions.  I didn't say all the

15   procedures.  All the institutions of the republic were not in

16   place.

17   Q.  You also testified on redirect that if you had been given

18   evidence, only if you had given evidence that the defendant had

19   taken some money personally in 2009 would you have felt that he

20   did not do a professional job.  Do you recall saying that?

21   A.  Yes.

22   Q.  You had no evidence that he had taken any such payments in

23   2009, correct?  Let me rephrase that.

24       In 2009, you had no evidence that he had taken such

25   payment?

1    A.  No.

2    Q.  And in 2009, you had no reason to suspect that he had taken

3    such a payment?

4    A.  Well, yes.

5              MR. GOLDSMITH:  No further questions.

6              THE WITNESS:  But I would like to clarify.

7              THE COURT:  I'm sorry.  No.  You need a question in

8    order to provide an answer.

9              THE WITNESS:  OK.

10             MR. KOBRE:  No further questions.

11             THE COURT:  You may step down.

12             (Witness excused)

13             THE COURT:  Ladies and gentlemen, before the

14   government calls its next witness, I want to give you a brief

15   instruction, if I could have your attention.  Thank you.

16             At the end of this case, I'm going to give you

17   detailed instructions as to the law, and I will be describing

18   to you all of the things that the government bears the burden

19   of proof of showing to you.  As I've told you before, it

20   carries the burden of proving things to you beyond a reasonable

21   doubt, and I'm going to list each of those things it must prove

22   to you beyond a reasonable doubt before you would be able to

23   determine whether or not the defendant was guilty of the crimes

24   with which he's charged here.

25             There are a couple of topics, though, that have been

1    raised in the examination of this witness that I want to make

2    sure you understand are not going to be part of the

3    government's burden of proof.

4            The government has no burden to prove whether or not

5    the agreement between the Republic of Guinea and any Chinese

6    person or entity or group of entities was good or bad for

7    Guinea.  You will not have to determine that.  The government

8    has no burden of proving to you beyond a reasonable doubt

9    whether those agreements were good or bad for Guinea.

10           Second thing, the government will have no burden of

11   proof with respect to showing you that the defendant was, for

12   instance, the final decision maker with respect to any of those

13   events that this witness has testified about; that is, the

14   entry into any agreements between the Republic of Guinea and

15   these Chinese entities.  There's no burden of proof here that

16   the government show that the defendant was the final decision

17   maker with respect to whether Guinea should enter into those

18   agreements.

19           OK.  Thank you.

20           The government may call its next witness.

21           MR. KOBRE:  Yes, your Honor.  The government calls

22   Special Agent Brian Ennesser.

23    BRIAN ENNESER,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

1   DIRECT EXAMINATION

2   BY MR. KOBRE:

3   Q.  Where do you work?

4   A.  I'm employed at 26 Federal Plaza with the FBI.

5   Q.  And how long -- what is your position with the FBI?

6   A.  I'm a special agent.

7   Q.  How long have you been a special agent with the FBI?

8   A.  11 years now.

9   Q.  Are you currently assigned to a particular unit or

10  division?

11  A.  Yes, I'm assigned to squad C42, the international

12  corruption unit.

13  Q.  And in that squad, what are some of your duties and

14  responsibilities?

15  A.  We investigate the Foreign Corruption Practice Act, FCPA,

16  kleptocracy, and the antitrust.

17  Q.  You mentioned earlier that you work at 26 Federal Plaza.

18  Are you based here in New York?

19  A.  Yes.

20  Q.  Can you tell us what you did before joining FBI about 11

21  years ago?

22  A.  I was employed -- well, I was a United States Army officer,

23  and I was discharged approximately around 2006, honorably.

24  Q.  What rank did you obtain in the military?

25  A.  Captain.

1   Q.  Special Agent Ennesser, calling your attention to the date

2   of December 13, 2016, were you working that day?

3   A.  Yes.

4   Q.  Generally speaking, can you describe what you did that day?

5   A.  I was part of an arrest that took place with the squad.  I

6   provided -- my details during, my duties during the arrest was

7   I was providing security, and then I also partook in the

8   movement and transportation of the arrest, arrested subject.

9   Q.  Thank you.  And who did you arrest that day?

10  A.  Mr. Mahmoud.

11  Q.  Do you know his last name?

12  A.  Thiam, Mr. Thiam, Mahmoud Thiam.

13  Q.  Do you see that person in the courtroom here today?

14  A.  Yes, I do.

15  Q.  Can you please point him out and identify an item of

16  clothing?

17  A.  He's wearing a gray suit with a dark blue tie, directly

18  right behind you.

19          MR. KOBRE:  May the record reflect, your Honor, that

20  the witness has identified the defendant.

21          THE COURT:  Yes.

22  Q.  We're not going to talk about the arrest, but after that,

23  what was the next part of your day in terms of relating to this

24  investigation?

25  A.  After the arrest took place?

1    Q.  Yes.

2    A.  We were back at 26 Federal Plaza, and I set up the

3    interview room where Mr. Thiam was interviewed.

4    Q.  Did you participate in an interview with the defendant?

5    A.  Yes.

6    Q.  And was that interview recorded?

7    A.  Yes.

8    Q.  Via video or audio?

9    A.  It was a closed-circuit video and audio system.

10   Q.  And where did the interview take place?

11   A.  It took place at 26 Federal Plaza on the 23rd floor.

12   Q.  Did you have any involvement in the recording of that

13   video?

14   A.  Yes.  I, I went and prepared the video-recording equipment

15   prior to the interview taking place, made sure that the camera

16   was on and worked and the room was set up, and then I waited

17   for Agent Martinez to bring the subject to the room, and then

18   once he was set up in the room I went, stepped back out and

19   pressed the record button.

20   Q.  Were you present during the entirety of that interview?

21   A.  Yes.

22   Q.  After the interview was concluded, what did you do in terms

23   of the recording?

24   A.  We downloaded it to a disk and then I gave those disks to

25   Agent Martinez.

1    Q.   When you say we downloaded it, who downloaded it?

2    A.   Correction.  I downloaded the disk from the digital

3    recorder, and then I gave those disks to Mr. Martinez, Agent

4    Martinez.

5           MR. KOBRE:  At this point, my colleague, Ms. Laryea,

6    is approaching the witness with both Government Exhibits 801

7    and 801A, what are marked as those exhibits.

8           THE WITNESS:  Uh-huh, yes.

9    Q.   Do you recognize those?

10   A.   Yes, I do.

11   Q.   And what are they?  Tell us by number, please.

12   A.   801 is two DVDs, and 801A is a single DVD, both initialed

13   by me.

14   Q.   What is 801, starting with that?

15   A.   801 is a disk that has copies of -- well, that has a copy

16   of the interview.

17   Q.   Does 801 taken together with those two disks contain the

18   entirety of the video recording of the interview that you

19   conducted on December 13, 2016?

20   A.   Yes.

21   Q.   And what is 801A?

22   A.   801A is excerpts, or clips, that were taken from 801.

23   Q.   So they're simply copied segments?

24   A.   Yes.

25   Q.   And how do you know that that's what is contained on those

1   disks?

2   A.  I viewed 801, both disks, and then I viewed 801A and the

3   clips, and the clips match up from 801.

4   Q.  Do the video and audio recordings on both 801 and 801A

5   truly and accurately reflect what you observed when you

6   personally participated in the interview of defendant on

7   December 13, 2016?

8   A.  Yes.

9           MR. KOBRE:  Your Honor, the government at this point

10  offers Government Exhibit 801A.

11          THE COURT:  Received.

12          (Government Exhibit 801A received in evidence)

13          MR. KOBRE:  Nothing further.

14          THE COURT:  Cross-examination.

15          MR. GOLDSMITH:  No questions.

16          THE COURT:  You may step down.

17          (Witness excused)

18          THE COURT:  We'll take our midafternoon recess, ladies

19  and gentlemen.

20          You can leave those right there.

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  Ladies and gentlemen, let Ms. Rojas know

23  when you're ready to resume.

24          (Continued on next page)

25

1                    (In open court; jury not present)

2                    THE COURT:  Mr. Kobre, anything else we need to

3        discuss?

4                    MR. KOBRE:  Yes, your Honor, briefly.

5                    MR. DiMASE:  Your Honor, I just wanted to alert the

6        Court that there was an article published in the New York Times

7        today that does reference this case.  It's not primarily about

8        this case, but there is a reference to it in several, maybe a

9        paragraph, approximately, concerning the case.  The article is

10       not clearly about this case, so there's a possibility that a

11       juror might wind up reading it without knowing that it

12       addresses the case.  So I wanted to let your Honor know so you

13       can take any appropriate measures.

14                   THE COURT:  OK.  Counsel, why don't I instruct the

15       jury as they're leaving today.  Can you tell me what the

16       general topic of the article is, or a headline.

17                   MR. DiMASE:  Yes, your Honor.  If you want me to pull

18       it up, I can give that to you.

19                   Your Honor, the name of the article or the title of

20       the article is "Bribe Cases, a Secret Jared Kushner Partner and

21       Potential Conflicts."  At least that's what the digital version

22       of the story is entitled.

23                   THE COURT:  OK, counsel.  I'm wondering how I instruct

24       the jury with respect to that.  I think perhaps a general

25       instruction about avoiding any news coverage whatsoever about

H4qWthi4

1    the general topic of bribery would not only capture this but be

2    entirely appropriate in the case and not suggest that there's

3    anything about Guinea or the defendant and would keep it nice

4    and vague and yet be protective.  Does that sound about right?

5              MR. GOLDSMITH:  Sounds good.

6              MR. DiMASE:  That's fine, your Honor.

7              THE COURT:  OK.  I'll do that.  Please, at 5:00, I'm

8    going to tell them about our schedule and I'll include this

9    instruction, and if I forget, please feel free to stand and

10   remind me.

11             Mr. Goldsmith, anything?

12             MR. GOLDSMITH:  I just wanted to know if the

13   government plans on showing 801A this afternoon.

14             MR. KOBRE:  No, we do not, your Honor.

15             MR. GOLDSMITH:  OK.  Fine.  I just wanted to get a

16   chance to see it before.

17             THE COURT:  Good.  I assume since everybody's

18   cooperating so well together that you'll feel free to tell each

19   other in advance about the order of witnesses and length of

20   time, etc., so everyone can feel prepared.

21             MR. KOBRE:  Of course, your Honor.

22             MR. GOLDSMITH:  Thank you, your Honor.

23             THE COURT:  Thank you.  Good.  Let's take a brief

24   recess.

25             (Recess)

H4qWthi4

1           THE COURT:  Please be seated.

2           Bring in the jury.

3           (In open court; jury present)

4           The government may call its next witness.

5           MR. DiMASE:  Your Honor, prior to calling its next

6    witness, the government would like to read two stipulations

7    into the record.  First is Government Exhibit 1407, and I'll

8    start after the introductory paragraph.

9           "Government Exhibit 301 is a CD containing true and

10   correct records maintained by the Hong Kong and Shanghai

11   Banking Corporation in Hong Kong, HSBC Hong Kong, pertaining to

12   HSBC Hong Kong premiere account No. 607121480888, in the name

13   of Mr. Thiam Mahmoud and an associated HSBC premiere credit

14   card account, No. 5185420006889766, also in the name of

15   Mr. Thiam Mahmoud, and containing the following:

16          "a.  A folder labeled Government Exhibit 301A

17   containing true and correct records pertaining to the

18   opening-account records for HSBC Hong Kong premiere account No.

19   607121480888 in the name of Mr. Thiam Mahmoud;

20          "b.  A folder labeled Government Exhibit 301B

21   containing true and correct records pertaining to the bank

22   account statements for HSBC Hong Kong premiere account No.

23   607121480-888 in the name of Mr. Thiam Mahmoud;

24          "c.  A folder labeled Government Exhibit 301C

25   containing true and correct records pertaining to the wire

H4qWthi4

transfer records and supporting documentation for HSBC Hong

Kong premiere account No. 607121480888 in the name of Mr. Thiam

Mahmoud;

          "d.   A folder labeled Government Exhibit 301D

containing true and correct records pertaining to HSBC premiere

credit card account number 5185 4200 0688 9766, also in the

name of Mr. Thiam Mahmoud.

          "Government Exhibit 302 is a CD containing true and

correct records maintained by HSBC Hong Kong pertaining to HSBC

Hong Kong premiere account No. 047565429888 in the name of

Mr. Pa Sam Nang and containing the following:

          "a.   A folder labeled Government Exhibit 302A

containing true and correct records pertaining to the

opening-account records for HSBC Hong Kong premiere account

number 047565429888 in the name of Mr. Pa Sam Nang;

          "b.   A folder labeled Government Exhibit 302B

containing true and correct records pertaining to bank account

statements for HSBC Hong Kong premiere account number

047565429888 in the name of Mr. Pa Sam Nang;

          "c.   A folder labeled Government Exhibit 302C

containing true and correct records pertaining to the wire

transfer records and supporting documentation for HSBC Hong

Kong premiere account No. 047565429888 in the name of Mr. Pa

Sam Nang;

          "3.   Government Exhibit 303 is a CD containing true

H4qWthi4

and correct records maintained by HSBC Hong Kong pertaining to
HSBC Hong Kong premiere account No. 627830581-888 in the name
of Ms. Lo Fung Hung and Mr. Pa Sam Nang, and containing the
following:

"a.  A folder labeled Government Exhibit 303A
containing true and correct records pertaining to the
opening-account records for HSBC premiere account No.
627830581888 in the name of Ms. Lo Fung Hung and Mr. Pa Sam
Nang;

"b.  A folder labeled Government Exhibit 303B
containing true and correct records pertaining to the bank
account statements for HSBC Hong Kong premiere account number
627830581888 in the name of Ms. Lo Fung Hung and Mr. Pa Sam
Nang;

"c.  A folder labeled Government Exhibit 303C
containing true and correct records pertaining to the wire
transfer records and supporting documentation for HSBC Hong
Kong premiere account No. 627830581888 in the name of Ms. Lo
Fung Hung and Mr. Pa Sam Nang;

"4.  Government Exhibit 304 is a CD containing true
and correct records maintained by HSBC Hong Kong pertaining to
HSBC Hong Kong asset vantage account No. 485278956888 in the
name of Mr. Wang Xiang-Fei and containing the following:

"a.  A folder labeled Government Exhibit 304A
containing true and correct records pertaining to the

1   opening-account records for HSBC Hong Kong asset vantage

2   account No. 485278956888 in the name of Mr. Wang Xiang-Fei;

3        "b.   A folder labeled Government Exhibit 304B

4   containing true and correct records pertaining to bank account

5   statements for HSBC Hong Kong asset vantage account No.

6   485278956888 in the name of Mr. Wang Xiang-Fei;

7        "c.   A folder labeled 304C containing true and correct

8   records pertaining to wire transfer records and supporting

9   documentation for HSBC Hong Kong account 485278956888 in the

10  name of Mr. Wang Xiang-Fei.

11       "Government Exhibits 305A through 305Q are hard-copy

12  records consisting of selected records from Government Exhibits

13  301 through 304.  The information contained on Government

14  Exhibits 301 through 305Q was recorded by someone with

15  knowledge at HSBC Hong Kong at or near the time that the

16  activity took place, was kept in the course of regularly

17  conducted activity of HSBC Hong Kong, and was made as a regular

18  practice of that activity.

19       "It is further stipulated and agreed that this

20  stipulation, which is marked as Government Exhibit 1407, and

21  Exhibits 301 through 305Q may be received in evidence as

22  government exhibits at trial."

23       At this time, your Honor, the government would offer

24  the aforementioned exhibits into evidence.

25       THE COURT:  Granted.

H4qWthi4

1          (Government Exhibits 1407 and 301-305Q received in

2     evidence)

3          MR. DiMASE:  Moving on to the second stipulation, your

4     Honor, this is marked Government Exhibit 1401, and skipping

5     again the preliminary paragraph:

6          "Government Exhibit 201 is a true and correct copy of

7     a Dutchess County clerk recording page and deed, dated November

8     13, 2010, for the sale of the real property located at 771

9     Duell Road, Millbrook, New York 12545, which is in the town of

10    Stanford, New York (hereinafter 'the Dutchess County

11    property');

12         "Government Exhibit 202 is a true and correct copy of

13    a form RP5217, New York State real property transfer report,

14    dated November 19, 2010, for the November 13, 2010, sale of the

15    Dutchess County property;

16         "Government Exhibit 203 is a true and correct copy of

17    a Dutchess County clerk recording page and deed" -- let me

18    start that over;

19         "Government Exhibit 203 is a true and correct copy of

20    a Dutchess County clerk recording page and deed dated May 11,

21    2012, for the sale of the real property located at 771 Duell

22    Road, Millbrook, New York, 12545;

23         "Government Exhibit 204 is a true and correct copy of

24    a form RP5217, New York State real property transfer report,

25    dated May 11, 2012, for the May 11, 2012, sale of the Dutchess

1    County property;

2              "Government Exhibit 205 is a true and correct copy of

3    an application for a building permit for the Dutchess County

4    property, which was filed with the town of Stanford, New York;

5    and

6              "Government Exhibit 206 is a true and correct copy of

7    formation documents for a New York State limited liability

8    corporation named 771 Duell Road LLC.

9              "It is further stipulated and agreed that this

10   stipulation, which is marked as Government Exhibit 1401, and

11   Government Exhibits 201 through 206 may be received in evidence

12   as government exhibits at trial.

13             Your Honor, the government would further offer those

14   exhibits into evidence, including the two stipulations

15   themselves, 1401 and 1407.

16             THE COURT:  Received.

17             (Government Exhibits 1401 and 201-206 received in

18   evidence)

19             MR. DiMASE:  Thank you.

20             MS. LARYEA:  The government calls Mr. Larry Scardaci.

21    LARRY SCARDACI,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MS. LARYEA:

H4qWthi4                           Scardaci - Direct

1    Q.   Mr. Scardaci, where do you live?

2    A.   58 Dutchess Hill Road, Poughkeepsie, New York.

3    Q.   What do you do?

4    A.   General contractor, remodeler.

5    Q.   How long have you been working as a general contractor?

6    A.   Since 1980.

7    Q.   Who do you work for?

8    A.   Myself.

9    Q.   Do you have a company?

10   A.   Yes.

11   Q.   What is the name of that company?

12   A.   Scardaci Building Company Incorporated.

13   Q.   How many employees do you have?

14   A.   Right now just three.

15   Q.   What kind of contracting work do you do?

16   A.   Remodeling, restoration, occasionally new additions,

17   kitchens, bathrooms.

18   Q.   What kind of properties do you work on; residential,

19   commercial?

20   A.   A little of both, mostly high-end residential.

21   Q.   Where are most of your projects based?

22   A.   Dutchess County.

23   Q.   Do you know a Mr. Mahmoud Thiam?

24   A.   Yes, I do.

25   Q.   How did you meet him?

1   A.  I met him from Eileen Quinn, who was the real estate broker

2   for his home.

3   Q.  How did you come to meet him through Ms. Quinn?

4   A.  She referred me to him.

5   Q.  Why did she refer you to him?

6   A.  Well, because I've done other projects for her in the past

7   for other clients.

8   Q.  You mentioned Ms. Quinn introduced you to the Thiams?

9   A.  Correct.

10  Q.  Were they looking to have work done on a property?

11  A.  Yes, they were.

12  Q.  What property was that?

13  A.  771 Duell Road, Millbrook.

14  Q.  What county was that property based in?

15  A.  Dutchess.

16  Q.  After the referral from Ms. Quinn, did you meet the Thiams?

17  A.  Yes, I did.

18  Q.  Approximately when did you meet them?

19  A.  20 -- probably the end of 2010, beginning of 2011.

20  Q.  Where was this first meeting with the Thiams?

21  A.  At their home on 771 Duell Road.

22  Q.  And who was present at this meeting?

23  A.  Mahmoud Thiam and his wife Fatim Thiam and Jimmy Crisp, the

24  architect.

25  Q.  Do you see Mr. Thiam in the courtroom today?

1   A.  Yes, I do.

2   Q.  Can you describe him and where he is sitting?

3   A.  Sitting next to the gentleman on the left, second row,

4   first table -- second table back.

5           MS. LARYEA:  Will the record reflect that Mr. Scardaci

6   has identified the defendant?

7           THE COURT:  Yes.

8   Q.  What did you discuss at this meeting with Mr. Thiam and

9   Mrs. Fatim Thiam?

10  A.  First off, just a review of, of the project that they had

11  designed, and what type of work was going to be involved and

12  possibly -- you know, approximate time frame which they would

13  like to start it.

14  Q.  Let's take that one at a time.  You mentioned you discussed

15  the kind of project that they designed.  What property was this

16  project for?

17  A.  771 Duell Road, Millbrook.

18  Q.  What kind of work did they want done on 771 Duell Road?

19  A.  It was a whole, entire-home renovation.

20  Q.  Specifically what kind of renovation did they want

21  performed?

22  A.  We demoed the entire interior of the home, new electrical,

23  new plumbing, new heating and air-conditioning and, of course,

24  all new interior finishes, kitchen, bathrooms, bedrooms.

25  Q.  Did you provide them during this meeting with a budget of

1    how much that work would cost?

2    A.   Well, in the beginning, just on first glance, I was

3    considering -- obviously broad numbers, like maybe between a

4    million five and possibly two million, but not knowing all the

5    details for one meeting, it was just a guesstimate.

6    Q.   I want to take a step back and talk about the property.

7    You mentioned that the first meeting was at the 771 Duell Road

8    property, is that correct?

9    A.   Correct.

10   Q.   Could you describe the property?

11   A.   It's a, a large home.  Probably seven bedrooms, seven

12   bathrooms, in-ground swimming pool, pool house, two-car

13   detached garage with a suite above, tennis court, approximately

14   maybe 30 acres of land.

15   Q.   What did you understand to be the relationship between the

16   Thiams and this property?

17   A.   Well, they were the owners of the property.

18   Q.   Why did you believe they were the owners of the property?

19   A.   Well, their name was on the blueprints, and they introduced

20   themselves as Mr. Mahmoud Thiam and Fatim Thiam, and Jimmy

21   Crisp, the architect, same.  And Eileen Quinn introduced me as

22   Mr. and Mrs. Thiam, so that was -- I had no reason not to

23   believe.

24   Q.   After this meeting, did you get the job for the renovation?

25   A.   Yes, I did.

1    Q.  What did you do after the Thiams hired you?

2    A.  Well, we, of course, had to go acquire building permits and

3    then, of course, discuss what was the first phase of the

4    project to be started, and then went from there.

5    Q.  So let's start with the building permit that you mentioned.

6    I'm showing you what has been admitted as Government Exhibit

7    205, page 16 of 205.

8            MS. LARYEA:  Mr. Beer, would you publish page 16 of

9    Government Exhibit 205.  Can you enlarge the top half of that

10   document, please.

11   Q.  Mr. Scardaci, do you recognize this document?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  Application for a building permit.

15   Q.  I'm sorry.  I did not hear that.

16   A.  Application for a building permit.

17   Q.  OK.  Who filled out this application?

18   A.  I did.

19   Q.  I want to start with the first line of the application.  It

20   requests the names of the owners of record.  Do you see that

21   line?

22   A.  Yes, I do.

23   Q.  What is written in response to that question?

24   A.  Mahmoud and Fatim Thiam.

25   Q.  And who wrote that down?

1   A.  Myself.

2   Q.  Why did you write down that Mahmoud and Fatim were the

3   owners?

4   A.  I had no other reason to believe they weren't.

5   Q.  And what is the property that this building permit

6   application is for?

7   A.  771 Duell Road.  Of course, I put Standfordville, New York,

8   but I believe it might be Millbrook, New York.

9           MS. LARYEA:  Can you enlarge -- sorry.

10  Q.  Before I move on, there's a section that describes what is

11  to be constructed.  Can you see that section?

12  A.  Yes.

13  Q.  Can you explain what kind of work was to be done on the

14  property?

15  A.  Renovate -- well, renovate kitchen; add a bump-out addition

16  off the kitchen; remodel mud room; guest bathroom, and can't

17  see the part --

18  Q.  Mr. Scardaci --

19  A.  Living room, library.

20  Q.  I'm sorry.  There was some feedback.  Could you repeat

21  that?

22  A.  Renovate kitchen; add bump-out addition off kitchen;

23  remodel mud room; guest bedroom, with -- I'm not sure what the

24  BOW, maybe bump-out addition; renovate living room and library.

25          MS. LARYEA:  Mr. Beer, could you please enlarge the

1    middle part of that from the "please include the following," so

2    right before the section that says "this building permit is

3    valid for one year."

4    Q.  No. 6, does it say the contractor name?

5    A.  Yes, it does.

6    Q.  And who is the contractor?

7    A.  Scardaci Building Co. Inc.

8    Q.  Is that your company?

9    A.  Yes, it is.

10   Q.  What is the date of this application?

11   A.  2/11 -- 2/15/11.

12   Q.  After you got this building permit, did you fill out any

13   other forms in connection with this renovation?

14   A.  Along the way, probably a certificate of capital

15   improvement form.

16   Q.  I'm approaching you with what has been marked for

17   identification as Government Exhibit 601A -- sorry, 1601A.

18   Have you seen this form before, Mr. Scardaci?

19   A.  Yes, I have.

20   Q.  What is it?

21   A.  A certificate of capital improvement.

22   Q.  Who filled out the form?

23   A.  I filled out the form.

24   Q.  And who kept that form?

25   A.  Say it again.

1   Q.  Who keeps that form?

2   A.  I usually keep that form, and of course, sometimes the

3   owner requests a copy.

4   Q.  As the owner of Scardaci construction, are you familiar

5   with how your company keeps this kind of record?

6   A.  Yes.

7   Q.  Was this record created at or near the time when you

8   gathered the information on that record?

9   A.  Yes.

10  Q.  Was this record regularly kept to properly maintain records

11  relating to your construction projects?

12  A.  Yes.

13  Q.  Was filling out this form a regular practice of your

14  company?

15  A.  Yes, it was.

16          MS. LARYEA:  At this point, your Honor, the government

17  offers Government Exhibits 1601A into evidence.

18          MR. GOLDSMITH:  May I see a copy of it?

19          THE COURT:  Received.

20          (Government Exhibit 1601A received in evidence)

21          MR. GOLDSMITH:  Your Honor, I'd just like to see a

22  copy of it first.

23          THE COURT:  OK.  Well, I think all of these have been

24  provided already.

25          MR. GOLDSMITH:  That's fine.

1          THE COURT:  Thank you.

2          MR. GOLDSMITH:  Well, actually -- OK.  Fine.  No

3   objection.

4          THE COURT:  Thank you.

5   BY MS. LARYEA:

6   Q.  What is the purpose of this form?

7   A.  Well, it's a form that I keep on file when doing

8   renovation, remodeling work as a capital improvement, not a

9   repair.  So I keep those on file so that it shows that I'm not,

10  I'm not -- well, responsible for collecting sales tax on, on

11  the work, because it's not repair; it's a renovation or a

12  capital improvement.

13  Q.  The contractor listed on this form -- first let's start

14  with who filled out this form.  You said you did, correct?

15  A.  Correct.

16  Q.  And the contractor listed --

17          MS. LARYEA:  Mr. Beer, could you please publish

18  Government Exhibit 1601A.  Can you enlarge the first part of

19  that, the first section.

20  Q.  Let's start with the right-hand side.  It asks for the name

21  of the contractor.  Is that your company, Scardaci Building Co.

22  Inc.?

23  A.  Yes.

24  Q.  And the left side, it asks for the name of the customer.

25  Who is the customer listed there?

```
1    A.   Mahmoud and Fatim Thiam.

2    Q.   And what is the address of the property that is being

3    renovated?

4    A.   771 Duell Road, Stanford, New York.

5    Q.   And the work that's to be done is described in the section

6    that is to be completed by customer, is that correct?

7    A.   Correct.

8            MS. LARYEA:   Mr. Beer, can you please enlarge the

9    second part of that document.

10   Q.   And the project name there, what's the project name?

11   A.   Project name is Mahmoud and Fatim Thiam, 771 Duell Road.

12   Q.   Do you see any certifications listed underneath the street

13   address?

14   A.   Street address?

15   Q.   Under the 771 Duell Road, do you see a section that says "I

16   certify that"?

17   A.   Oh, I'm the owner, yes.

18   Q.   Can you read that line?

19   A.   "I first certify that I'm the owner of the real property

20   identified on this form."

21   Q.   And now do you see a signature block, the first signature

22   block?

23   A.   Yes, I do.

24   Q.   Do you see a sentence before it that starts "I will be

25   subject to"?
```

1    A.  Yes.

2    Q.  Can you please read that as well?

3    A.  "I will be subject to civil or criminal penalties, or both,

4    under the tax law if I issue a false or fraudulent

5    certificate."

6    Q.  Now, Mr. Scardaci, do you see a signature under the section

7    titled "signature of customer"?

8    A.  Yes, I do.

9    Q.  Whose signature is that?

10   A.  Fatim Thiam.

11   Q.  So the first part when we were looking at this document,

12   who filled out the form, the part that had the name of the

13   customer, the project name, the street address, etc.?

14   A.  I did.

15   Q.  And did you fill it out in the presence of Ms. Thiam or by

16   yourself?

17   A.  In the presence.

18   Q.  And after you filled it out, did you give the form to

19   Mrs. Thiam?

20   A.  Yes, I did.

21   Q.  And that signature, you mentioned before, is the signature

22   of Ms. Thiam.  Did you actually see her sign it?

23   A.  Yes.

24   Q.  And next to the signature of customer there's a section

25   called "title."  What does it say there?

1    A.  Owner.

2    Q.  And who wrote that down?

3    A.  Fatim.

4    Q.  And then on the very bottom of the form, is that your

5    signature?

6    A.  Yes, it is.

7    Q.  OK.  Now, Mr. Scardaci, I want to talk a bit about the work

8    you did on the house.  About when did you start working on the

9    house?

10   A.  Somewheres in the first part of 2011.

11   Q.  Did you meet the Thiams to discuss the project, exactly

12   what was to be done?

13   A.  Yes, I did.

14   Q.  About how many times did you meet with the Thiams during

15   the pendency of the project?

16   A.  Oh, many times, on weekends.

17   Q.  On weekends; how many times per month?

18   A.  As needed, probably sometimes two, three times a month.

19   Q.  And where did you meet them for these discussions?

20   A.  At the residence of 771 Duell Road.

21   Q.  And during these discussions, during these meetings, what

22   did you discuss?

23   A.  Details of the renovation.

24   Q.  How long did this project last for?

25   A.  From 2011 to somewheres, August 2016.

1    Q.  And during this period, could you describe the work that

2    you actually completed on the house?

3    A.  We actually completed, of course, the demolition; framing

4    of all the lower level; theater room; personal gym area;

5    roughing in of all the new electrical; installation of heating

6    and air-conditioning; bump-out addition off the kitchen;

7    Sheetrocking; trim throughout; all new flooring; tiling of

8    bathrooms; painting of all trim work and doors; sanding of

9    floors through staircase and hallways; all new, install all new

10   windows and doors throughout the whole, entire home; siding

11   exterior.

12   Q.  Did you build a Jacuzzi?

13   A.  No, we did not.

14   Q.  Was there a design to build a Jacuzzi?

15   A.  Yes.

16   Q.  A sauna?

17   A.  Yes.

18   Q.  A game room?

19   A.  Correct.

20   Q.  Movie theater room?

21   A.  Yes.

22           MR. GOLDSMITH:  Objection.

23           THE COURT:  Sustained.

24   Q.  What kind of work did the Thiams want done on the house, in

25   terms of was it high end, was it low end?

1   A.  Well, they certainly appreciated high-end workmanship and

2   high-end materials.

3   Q.  When you say high end, what does that mean?

4   A.  Well, of great -- of good quality.

5   Q.  What kind of good quality?

6   A.  I guess you could say the best the money could buy with the

7   product they were purchasing.

8   Q.  Were there any specific high-end projects that you

9   witnessed?

10  A.  Repeat that.

11  Q.  Were there specific high-end projects that you witnessed?

12  A.  Well, high-end kitchens; bathrooms; trim work; moldings;

13  flooring; toilets; fixtures; everything was pretty much

14  upscale: windows, doors.

15  Q.  Have you heard of something called lime wash painting?

16  A.  Yes.

17  Q.  What is lime wash painting?

18  A.  Well --

19          MR. GOLDSMITH:  Objection.

20          THE COURT:  Overruled.

21  Q.  You may answer.  What is lime wash painting?

22  A.  Lime wash painting is a hand applied, hand-brush applied

23  finish.  It's quite labor intensive and quite unique in its

24  character that not many people do.

25  Q.  And did you witness this lime wash painting at the property

1   on 771 Duell Road?

2   A.   Yes, I did.

3   Q.   Was that lime wash -- who did that lime wash painting?

4   A.   Some -- a couple from Belgium.

5   Q.   So they came in from Belgium to do that painting, is that

6   correct?

7   A.   Yes, with their crews.

8   Q.   Did you ever see the Thiams using the house?

9   A.   Yes.

10  Q.   How did they use the house?

11  A.   Just for weekends, like weekend retreats, occasionally

12  vacationing, whatever.

13  Q.   Now, you mentioned a lot of work that you did on the house.

14  How did the Thiams pay you?

15  A.   In the beginning probably some, a few checks but mostly

16  wire transfers.

17  Q.   I want to talk about the wire transfers.  Where did these

18  wires come from; what accounts, from where?

19  A.   Well, Dubai and other countries where -- I didn't really

20  study every country they came from.  I just knew that they came

21  from all different locations.

22  Q.   Did you ever receive any wires from Hong Kong?

23  A.   There is one in there from Hong Kong, yes.

24       MS. LARYEA:  Mr. Beer, will you please publish

25  Government Exhibit 301C, page 247.  Can you enlarge the second

1  half of that form, please.  Sorry.  Just the second half, the

2  part that starts with 57.

3  Q.  Do you see the name of your company on this form?

4  A.  Yes, I do.

5  Q.  And do you see, can you point out where on the page is it?

6  A.  Right hand --

7  Q.  Describe it.

8  A.  Right, upper right-hand corner.

9  Q.  What does it say?

10  A.  Scardaci Building Co. Inc.

11  Q.  And above that there is an account number.  Do you

12  recognize that account number?

13  A.  Yes, I do.

14  Q.  What account number is that?

15  A.  That's my Scardaci Building Company ChaseBank account

16  number.

17          MS. LARYEA:  Mr. Beer, will you please enlarge the top

18  half of that page.

19  Q.  Mr. Scardaci, do you see who was sending you that

20  account -- I mean, that wire?

21  A.  Mr. Mahmoud Thiam -- Mr. Thiam Mahmoud, actually, it says

22  on it.

23  Q.  Do you see the bank where this wire is coming from?

24  A.  Hong Kong and Singapore banking corporation.

25  Q.  Is it Hong Kong and Shanghai Banking Corporation?

1    A.  Oh, excuse me.  Hong Kong and Shanghai, yeah.  Sorry.

2    Q.  What city is this wire coming from?

3    A.  Hong Kong.

4    Q.  Now, going up to the top of this wire, on the right-hand

5    side, there's a section called amount.  Do you see that

6    section?

7    A.  Yes.

8    Q.  How much is being sent?

9    A.  $52,092.

10   Q.  And what is the date that this wire is being sent?

11   A.  17/03, 2011.

12   Q.  Is that March 17, 2011?

13   A.  Yes.

14   Q.  And during March 2011, were you doing work on 771 Duell

15   Road?

16   A.  Yes.

17          MS. LARYEA:  Mr. Beer, will you please publish

18   Government Exhibit 301C, page 386.  Will you enlarge the second

19   part of that page.

20   Q.  Mr. Scardaci, do you see the name of your company on this

21   wire transfer?

22   A.  Yes.  Upper right-hand corner, Scardaci Building Co. Inc.

23   Q.  Do you see the account number above it?

24   A.  Yes, I do.

25   Q.  What account number is that?

H4qWthi4                                    Scardaci - Direct

1    A.  That's my business, Chase account number.

2               MS. LARYEA:  Can you enlarge the top half of the form,

3    please, Mr. Beer.

4    Q.  Who is the wire coming from?

5    A.  Mr. Thiam Mahmoud.

6    Q.  And what bank is the wire coming from?

7    A.  Hong Kong -- sorry.

8    Q.  What bank?

9    A.  No.  The Hong Kong bank corporation.

10   Q.  And what city is the bank wire coming from?

11   A.  Well, Hong Kong, Saigon.  Saigon?  Hong Kong.  What's that,

12   Saigon?

13   Q.  Hong Kong Shanghai Banking Corporation?

14   A.  Shanghai banking corporation.  Yeah.

15   Q.  Is the wire coming from Hong Kong?

16   A.  Hong Kong, yes.

17   Q.  Do you see the amount?

18   A.  70,556.66.

19   Q.  And the date that the wire's being sent?

20   A.  3/05, 2011.

21   Q.  Thank you.  Mr. Scardaci, you mentioned that you were

22   receiving wires from Dubai and some other international

23   locations.  Did you ever have an issue with receiving those

24   wires?

25   A.  As far as?

1   Q.  Were you ever called in to your bank because you were

2   receiving those wires?

3   A.  Yes, I was called in to my bank for questioning to ask me

4   whether I was involved in international business.

5   Q.  What did you say?

6   A.  No, I was not.

7   Q.  And why did your bank call you in to discuss these wires?

8   A.  Just kind of, I guess, must be a system that flags them on

9   when you get multiple wire, continuous multiple wires from all

10  different countries.

11  Q.  Now, you mentioned that you were paid with wire transfers

12  and personal checks.  Were you paid any other ways?

13  A.  One time paid cash.

14  Q.  How were you paid in cash?

15  A.  He sent a gentleman up from New York and paid me in cash,

16  all in hundred-dollar bills.

17  Q.  Where did you meet this gentleman?

18  A.  We met on Route 44 in Pleasant Valley at, I think it was

19  called the Cottonwood Hotel or motel.

20  Q.  And how did he give you the cash?

21  A.  In a bag, all in hundred-dollar bills, which we counted.

22  Q.  How much was paid to you in cash at that time?

23  A.  17,000.

24  Q.  Did you ever speak with Mr. Thiam about what kind of work

25  he did?

1   A.  Very briefly.

2   Q.  What kind of work did you understand him to be engaged in?

3   A.  I guess minerals, mining exploration type businesses.

4   Q.  Did Mr. Thiam ever mention whether he was ever a government

5   official?

6   A.  As we got to know each other a little further along, yes.

7   Q.  I'm sorry, Mr. Scardaci --

8   A.  As our relationship developed, later on in time, yes, he

9   mentioned to me he was involved in government.

10  Q.  And what government position did he hold?

11  A.  Guinea minister of mining.

12  Q.  I'm sorry?

13  A.  Guinea minister of mining.

14  Q.  Was there ever a time when the work on the house stopped?

15  A.  Yes.

16  Q.  How many times?

17  A.  At least three or four times.

18  Q.  Why did the work on the house stop?

19  A.  Due to lack of funds or difficulties getting funds.

20  Q.  What do you mean by lack of funds?

21  A.  Well, not funds being wired when we were, we needed the

22  money to continue the project.

23  Q.  You mean you weren't getting paid?

24  A.  Correct.

25  Q.  And did you ever speak with Mr. Thiam about why you weren't

1    getting paid?

2    A.   Well, multiple times, yes, questioning him when we were

3    going to get paid and he was waiting for, I guess, accounts

4    that he was working with to pay him.

5    Q.   Did you ever get fully paid by Mr. Thiam?

6    A.   No.

7    Q.   During the period of time when you weren't getting paid,

8    how did you pay your employees or anyone else you were working

9    with?

10            MR. GOLDSMITH:   Objection.

11            THE COURT:   Sustained.

12   Q.   How did the fact that you weren't getting paid affect the

13   work you were doing?

14   A.   We had to seek, everyone had to go seek work elsewhere and

15   find a new way to generate a revenue stream so we could all pay

16   our bills.

17   Q.   Now, are you still working for Mr. Thiam?

18   A.   Not at the moment, no.

19   Q.   When did you stop working for him?

20   A.   Approximately, must have been around August of 2016.

21   Q.   And why did you stop working for him?

22   A.   No funds being forwarded.

23   Q.   When you say no funds being forwarded, do you mean not

24   getting paid?

25   A.   Correct.

1    Q.  How much approximately did Mr. Thiam pay you for the

2    project?

3    A.  Approximately a million 450, a million 500-and-some

4    thousand, somewhere in that range.

5    Q.  Are you still owed money?

6    A.  Yes.

7    Q.  How much are you owed?

8    A.  Oh, approximately 25 to 30.

9    Q.  Now, Mr. Scardaci, did you ever find out whether Mr. Thiam

10   actually owned the house on paper?

11   A.  Never found out until later on when I guess he had gotten

12   into some kind of difficulty at some point where he transferred

13   the ownership of the house to another entity, but I always

14   assumed he owned the house, so I wasn't sure what that was all

15   about, but, I assumed he owned the house.

16           MR. GOLDSMITH:  Objection.

17   A.  Not until later on did I know that he --

18           THE COURT:  Overruled, but I'm going to ask you to

19   lead here.

20           MS. LARYEA:  Yes, your Honor.

21           THE COURT:  At least initially.

22           MS. LARYEA:  Yes, your Honor.

23   Q.  You mentioned that you found out that he transferred the

24   house to someone else, is that correct?

25   A.  Correct.

1    Q.   Did you ever finish working on the 771 Duell Road property

2    renovation project?

3    A.   No.

4              MS. LARYEA:   One second, your Honor?

5    Q.   Now, Mr. Scardaci, you mentioned that you eventually

6    discovered that Mr. Thiam didn't own the house and that you

7    tried to put a lien on the house?

8    A.   Correct.

9    Q.   Why did you try to put a lien on the house?

10   A.   Because I was not paid.

11   Q.   Was this lien effected?

12   A.   No.

13   Q.   Why not?

14   A.   Because I didn't file it under the right ownership.

15   Q.   How did you find out that the lien wasn't effected?

16   A.   From the attorneys.

17             MS. LARYEA:   No further questions, your Honor.

18   CROSS-EXAMINATION

19   BY MR. GOLDSMITH:

20   Q.   Mr. Scardaci, you testified a moment ago that when the

21   Thiams had difficulty paying you and your crew, you sought work

22   elsewhere, is that correct?

23   A.   Occasionally, yes.

24   Q.   And in the years of general contracting that you've done,

25   do you only work on one project at a time?

1    A.  Well, his project was pretty much a "one project at a time"

2    because of the, the details of the project, consumed my every,

3    every bit of attention.

4    Q.  In your ordinary practice, through the years of being a

5    general contractor, you would do more than one project at a

6    time?

7    A.  In the past years, yes.

8    Q.  But only during that period with Mr. Thiam you focused on

9    his only project at the time?

10   A.  Until we ran out of funds to continue the project.

11   Q.  You had the opportunity to have other projects while you

12   were working on Mr. Thiam's house?

13   A.  Yeah, but I wasn't large enough to take on other projects.

14   His project was my sole interest.

15   Q.  And you said you put a lien or attempted to put a lien on

16   the house over the $25,000 that was left over, right?

17   A.  I didn't -- well, I believe I did not do that on that last

18   part, no.

19   Q.  You attempted to, right?

20   A.  Yes.

21   Q.  What was the total amount due on the lien?

22   A.  I don't remember the exact number.

23   Q.  All right.  And you're pretty confident you got about 1.45

24   million for the project so far?

25   A.  Well, I have to again look back at my records to see what

1  the exact amounts were.

2  Q.  For the record, you don't have an accounting of all of the

3  money you got versus the work that was performed and the

4  expenses laid out, right?

5  A.  I have that, yes.

6  Q.  You have that?

7  A.  I believe so, yes.

8  Q.  Did you provide it to the government?

9  A.  It was all in my records that I -- I gave them everything

10 that I had.

11 Q.  Did you ever provide all that information to the Thiams

12 when you were working on the project?

13 A.  As the project went along, I billed them as the project

14 progressed, yes.

15 Q.  And you gave them printouts of all the expenses and all the

16 labor and everything?

17 A.  Yes.

18 Q.  And you testified a few moments ago that there was one

19 occasion that you received cash.  Do you remember that?

20 A.  Yes.

21 Q.  And you testified about a man coming up from New York and

22 meeting you at a hotel, and that was because you told the

23 Thiams that you wanted cash, right?

24 A.  No.

25 Q.  No?

1    A.  No.

2    Q.  Sure about that?

3    A.  Sure about that.

4    Q.  Now, you've met with the government in the past, right?

5    A.  Yes.

6    Q.  Before testifying here today?

7        And you were pretty honest with them during those meetings,

8    right?

9    A.  Yes.

10   Q.  And as you sit here today, is your memory the same or

11   better than it was during those meetings where you already met

12   with the government?

13   A.  I assume it's the same.

14   Q.  And it's your testimony today that you did not call the

15   Thiams and ask for cash?

16   A.  No, I did not call and ask for cash.  I asked for payment,

17   and he said he had a friend coming down from somewhere, Would

18   you take cash.  I said, Of course I will; I'll pay the bills.

19   Q.  All right.  So if I were to tell you that it appears as

20   though you told the government that you called Mr. Thiam and

21   said that you needed cash, that would be incorrect, right?

22   A.  I needed payment.  He offered.  He said something about he

23   had a friend with cash.  I never asked for cash.

24   Q.  So you did not specifically ask for cash on that deal?

25   A.  No.

1  Q.  That was something that was a misunderstanding, right?

2  A.  Yes.

3           MR. GOLDSMITH:  No further questions.

4           THE COURT:  Redirect.

5           MS. LARYEA:  Yes, your Honor.

6  REDIRECT EXAMINATION

7  BY MS. LARYEA:

8  Q.  Mr. Scardaci, when did you -- we just discussed the cash

9  payment you received, is that correct?

10  A.  Correct.

11  Q.  When you told the Thiams you needed payment, is it possible

12  you said "I need cash"?

13  A.  No.

14  Q.  And if you needed payment, you were willing to take that

15  payment in any form they gave it to you?

16  A.  Correct.

17  Q.  Because you needed to pay your bills?

18  A.  Yes.

19  Q.  So you would have accepted cash?

20  A.  Yes.

21           MS. LARYEA:  No further questions.

22           THE COURT:  Recross?

23           MR. GOLDSMITH:  No, your Honor.

24           THE COURT:  You may step down.

25           (Witness excused)

H4qWthi4                                Sande - Direct

1            THE COURT:  Next witness.

2            MR. DiMASE:  Yes, your Honor.  The government calls

3   Mamadou Sande.

4            THE COURT:  Counsel, do you want to come up and take

5   those documents?

6            MR. DiMASE:  Yes.

7    MAMADOU SANDE,

8        called as a witness by the Government, having

9        been duly sworn, testified, through the

10       French-language interpreter, as follows:

11  DIRECT EXAMINATION

12  BY MR. DiMASE:

13  Q.  Good afternoon.

14  A.  Thank you.

15  Q.  What country are you a citizen of?

16  A.  I'm a citizen of the Republic of Guinea.

17  Q.  And where do you live?

18  A.  I live in Conakry.

19  Q.  Is that the capital of Guinea?

20  A.  Yes.

21  Q.  And Mr. Sande, what is your current occupation?

22  A.  I am a military.

23  Q.  What is your rank -- withdrawn.

24      Is that the Guinean military?

25  A.  Yes.

1   Q.  And what is your rank?

2   A.  I am a colonel.

3   Q.  Could you briefly explain for the jury your current duties

4   in your position?

5   A.  I am currently the financial and economic adviser for the

6   minister of state, who is in charge of the national defense.

7   Q.  So you are an economic adviser to the minister of defense,

8   is that right?

9   A.  Yes.

10  Q.  Have you held other positions within the Republic of

11  Guinea's government?

12  A.  Yes, in the past.

13  Q.  Let me focus specifically on the time period of December

14  2008 to February of 2010.  Were you working for the Republic of

15  Guinea government during that period?

16  A.  Yes.  At the end of 2008 until February '10, I was

17  precisely the ministry of -- the minister of economy and

18  finance and then the minister of energy.

19  Q.  So beginning in February 2010, you became the minister of

20  energy after having served as the minister of finance, is that

21  right?

22  A.  Yes.

23  Q.  Are you familiar with an entity called China International

24  Fund, or CIF?

25  A.  Well, familiar with that would be a little bit too much,

1    but we had to work with them within the framework of the

2    government.

3    Q.  And when you say "we had to," you mean in your position as

4    a minister, you were involved in working with that company?

5    A.  Yes, it was while I was a minister of two following

6    governments.

7    Q.  In particular, did the government of Guinea enter into

8    various agreements, without getting into the details of those

9    agreements, in 2009 with CIF?

10   A.  Yes.

11   Q.  Was a commission set up to negotiate with CIF in 2009?

12   A.  Yes.

13   Q.  Who were the members of that commission?

14   A.  There was a ministerial commission that was established of

15   which the chair was Mr. Boubacar Barry.

16   Q.  And who else was on the committee other than Mr. Barry, or

17   commission?

18   A.  I was a member myself as well as Minister Thiam.

19   Q.  And what was -- was that Mahmoud Thiam?

20   A.  Yes, Mahmoud Thiam.

21   Q.  What was Mr. Thiam's position at that time?

22   A.  He was minister of mines and energy.

23   Q.  If you saw Mr. Thiam in the courtroom today, would you be

24   able to recognize him?

25   A.  Yes, of course.

1    Q.  Do you see him here?

2    A.  Yes, of course.  He's the one in front of me wearing the

3    glasses.

4              MR. DiMASE:  May the record reflect that the witness

5    has identified the defendant, your Honor?

6              THE COURT:  Yes.

7              THE WITNESS:  Yes, that's the one who is sitting over

8    there with the glasses.

9              MR. DiMASE:  Thank you.

10             THE WITNESS:  The second.

11   BY MR. DiMASE:

12   Q.  Let me move on to your background.  You discussed the fact

13   that you were a minister in 2009?

14   A.  Yes.

15   Q.  Let me briefly cover your education.  Where did you attend

16   university?

17   A.  I studied at the University of Kankan.  This is the main

18   town of the region of natural, of high Guinea.

19   Q.  When you say high Guinea, is that an area of Guinea?

20   A.  Yes, it is Guinea because geographically speaking, Guinea

21   has four natural regions.

22   Q.  Kankan is located in one of those regions?

23   A.  Yes, Kankan is the main town of high Guinea.

24   Q.  What was your degree after you finished your studies at

25   that university in Kankan?

1    A.   My degree was in geographical science.

2    Q.   What year did you graduate from university?

3    A.   In 1992.

4    Q.   Now, in 1993, did you begin working?

5    A.   Yes, in the military.

6    Q.   What was your rank initially in the military?

7    A.   I was first a soldier.

8    Q.   Now, did there come a time several years later when you

9    went to live in another country?

10   A.   Yes, in 1998, I got a scholarship to continue my training,

11   my military training, in Germany.

12   Q.   So very briefly, in those years between 1993 and 1998, were

13   you working in the military for that entire time period?

14   A.   Yes, I was in the battalion of military engineering.

15   Q.   And what kind of projects did you work on?

16             MR. DiMASE:   I'll stop you there to allow the

17   interpreter.

18   A.   So when you are in the military engineering, it's not like

19   other country.   During the years where I was working for the

20   military engineering in Guinea, the army was working on the

21   development of a social aspects, economic aspects of the

22   country, and in the restructuration of the country and the

23   infrastructure and the roads.

24   Q.   So were you working --

25             THE COURT:   Excuse me one second.

1              Mr. Sande, because you are giving your testimony with

2     the help of an interpreter, could you please, when you have a

3     longer answer, break it up into smaller units.

4              THE WITNESS:  OK.

5              THE COURT:  Thank you.

6              MR. DiMASE:  Thank you, your Honor.

7     Q.  So is it fair to say that part of your work during those

8     years was on infrastructure projects in Guinea?

9     A.  Yes.

10    Q.  And you went to Germany in 1998.  How long were you there?

11    A.  Yes.  I went there, I went to Germany in two phases.

12    Q.  Please describe those phases, briefly.

13    A.  The first step was in the, within the framework of the

14    military training.  I was, I went to the military academy.  And

15    the second step was for my studies in economics.

16    Q.  And what years were you studying economics in Germany?

17    A.  From 2004 to 2008.

18    Q.  Did you earn a degree at the conclusion of those studies?

19    A.  Yes, a university degree in economics.

20    Q.  Did you have a specialization in any particular area?

21    A.  Yes, in public finance.

22    Q.  When in 2008 did you graduate, approximately?

23    A.  I finish my exams on September 30, so following that, I got

24    my degree in October.

25    Q.  And did you return to Guinea after receiving your degree?

H4qWthi4                         Sande - Direct

1   A.   Yes, I returned to Guinea on November 7.

2   Q.   And I think you've already testified that not long after

3   that, in December of 2008, you began serving as the minister of

4   finance in Guinea, is that right?

5   A.   Yes, on December 25.

6   Q.   I'll come back to your appointment to that position in a

7   moment, but I just want to very briefly focus on the years from

8   the end of that position until the present.  Could you very

9   briefly --

10             THE COURT:  Excuse me.

11             MR. DiMASE:  Would you please translate that.  Thank

12   you.

13   Q.   But I would first like to briefly address the positions

14   you've held since then.  I believe you said you served as

15   minister of energy under another administration.  Is that

16   right?

17   A.   Yes.

18             (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. DiMASE:

2    Q.  And was that between approximately 2010 and 2011?

3    A.  It's from February 2010 until December 2010.

4    Q.  Okay.  And in 2011 did you return to the military?

5    A.  Yes, after the change, there was another government.  I

6    returned to my initial structure, which is the military.

7    Q.  When you say structure, do you mean function or government

8    structure?

9    A.  No, it's the military.

10   Q.  And when did you begin serving in your present position of

11   economic adviser to the minister of defense?

12   A.  It's in half of 2015.

13   Q.  In the middle of 2015?

14   A.  Yes.

15   Q.  And you've been serving in that position since then.

16   A.  Yes, up to now.

17   Q.  Let me ask you some questions, general questions about the

18   Republic of Guinea.

19       Where is the country located?

20   A.  Guinea is located in the western part of Africa.

21   Q.  And are you familiar with the natural resources that are

22   present in the Republic of Guinea?

23   A.  Well, we started that.

24   Q.  And do some of those resources include iron ore, bauxite,

25   diamonds, and gold?

1    A.  Yes.

2    Q.  Are there also oil resources in Guinea?

3    A.  Well, at the moment, we're prospecting upon that, but we

4    cannot say yet that we have reserves of oil, but we are -- in

5    Guinea, but we are conducting research on that.

6    Q.  And what part of Guinea are those reserves believed to be

7    in, the oil reserves?

8    A.  It's along the coastline.

9    Q.  Offshore in the ocean or at sea?

10   A.  Yes, it's toward the lower part of Guinea, Conakry.

11   Q.  Now as the former minister of finance in Guinea, are you

12   familiar with the economic conditions of the country?

13   A.  Yes, we follow that.

14   Q.  Are you familiar with the term for per capita income?

15   A.  Well, it's approximately 500, 560, in terms of US dollars.

16   Q.  And when you say it, you mean the per capita income in

17   Guinea?

18          MR. GOLDSMITH:  Objection.

19          THE COURT:  Sustained to form.

20   Q.  What do you mean when you say "it"?

21   A.  It's the income per capita.

22   Q.  And what does that mean?

23          MR. GOLDSMITH:  Objection.

24          THE COURT:  Overruled.

25   Q.  What does that mean?

1    A.   You asked me about the income per capita for the Republic

2    of Guinea.   According to the statistics of the World Bank,

3    because these are the most reliable ones, the income is about

4    $560 per capita.

5    Q.   Okay.   And what does that dollar amount refer to?

6             MR. GOLDSMITH:   Objection.

7             THE COURT:   What does the term "per capita" mean?

8    Excuse me.   What does the term "per capita" mean?

9             THE WITNESS:   So per capita, it means Guinea has about

10   12,500,000 inhabitants.   So that's about the average of the --

11   average income of a Guinean person.

12   BY MR. DiMASE:

13   Q.   For what time frame?

14   A.   Per year.

15   Q.   So somewhere in the $550 range per year per person.

16   A.   Per capita, yes.

17   Q.   And that amounts to around 1 to $2 a day, is that right?

18             MR. GOLDSMITH:   Objection.

19             THE COURT:   Overruled.

20   A.   Yes, yes.

21   Q.   And Mr. Sande, are you also familiar with the term "poverty

22   line"?

23   A.   Yes.

24   Q.   Based on your knowledge as a former minister of finance of

25   Guinea, can you tell the jury about what percentage of Guinea's

1   population lives below the poverty line.

2           MR. GOLDSMITH:  Objection.

3           THE COURT:  Let's put a year on it.

4   Q.  If you can, Mr. Sande, would you be able to tell the jury,

5   in 2009, approximately, what part of Guinea's population lived

6   below the poverty line.

7   A.  In 2009?  It would represent approximately 60 percent.

8   Naturally, it evolved a little bit.  Now we're reaching

9   55 percent.

10  Q.  Let me direct your attention to that time frame around

11  December 2008.  You testified that you were appointed as

12  minister of finance late in that month, is that right?

13  A.  Yes.

14  Q.  And what happened immediately before you were appointed?

15  A.  Before I was appointed?

16  Q.  Yes.  What happened with respect to the Guinean government

17  before you were appointed?

18  A.  On December 22, 2008, the former president who had been the

19  president of Guinea for 24 years, General Lansana Conté, passed

20  away.  So directly there was a group of military people who

21  were directly after to go into power, and following two days

22  later, they took the power effectively.  And that's what placed

23  the president that is at the top of the Republic of Guinea.

24  Q.  So what you've just described, was that effectively a

25  military coup?

1   A.  Well, that's a takeover of power from an unconstitutional

2   point of view.

3   Q.  I think you mentioned Dadis Komara.  What was his position

4   in the coup, or how was he involved in the coup?

5   A.  He was one of the leaders, but in the end, he was chosen in

6   order to be the leader.

7   Q.  And when you say leader, did he become the president?

8   A.  Yes, of course.

9   Q.  And following this coup, was there still a national

10  assembly or legislature in place in Guinea?

11  A.  Yes, before the coup.

12  Q.  How about after the coup?

13  A.  But after the coup the assembly was dissolved.

14  Q.  Now did you know President Dadis prior to the coup?

15  A.  Yes, I knew him previously.

16  Q.  And when did you meet him?

17  A.  Well, when I was in CDND, my stay in Germany was in two

18  stages.  The first phase was my purely military training, and

19  when I returned to Guinea for a few months, that during that

20  period that we met each other.

21  Q.  And did you come to know him better after first meeting him

22  in that period of a few months between your two phases in

23  Germany?

24  A.  Well, yes, when I returned to Germany to study at the

25  university, he also got a scholarship to study in the military,

1    studies, so during that period our connections were reinforced.

2    Q.  Now when the coup occurred in December 2008, how did you

3    come to be appointed as the minister of finance?

4    A.  Well, after he took power, there was a matter of

5    constituting the -- doing the government.  And among that

6    group, I was the one who was designed to be the minister of

7    finance.

8    Q.  And was that in part based on your prior relationship with

9    President Dadis?

10   A.  There were approximately two factors playing to my favor.

11   Not only was it the university degree that I had obtained,

12   because the matter was, if one wants to adopt changes regarding

13   financial matters, should we go toward the older people or

14   should we choose a new person in order to implement this change

15   in the financial sector, and in the end, people decided to make

16   a very radical change and I was the most appropriate person

17   within that group for that.

18       And the second factor was the relationship and also the

19   trustship, trustship which was between me and the President

20   Dadis.

21   Q.  As minister of finance during that period, what

22   subdepartments or areas did you oversee in your ministry?

23   A.  So first of all, I was the minister of finance, so that was

24   a department.  And as the minister of finance, my first job was

25   government discipline, and the government that was present had

1   objectives that each of -- single level, each of all -- for

2   each sector, so like the other ministries or other ministers,

3   it is to implement the government's policy regarding financial

4   matters.

5   Q.  Now specifically, what areas or subdepartments were there

6   within the ministry?

7   A.  So the department of finance was a big department and it

8   had directions at its level, and as you know, as the minister

9   of finance, it's also you who are the person who manages the

10  budget of the government, and in order to manage the budget,

11  you have to find the means as well.  So the arbitrage there is

12  between the resources and the expenses, you have to put in

13  place for this in order to make things move forward, so in

14  order to achieve that objective, that's why I had the national

15  direction of the budget, and the national direction of the

16  treasury, there is a national direction of taxes, the national

17  direction of customs, and there is a national direction for the

18  debt, because it's a country that always needs support from

19  exterior sources, but also the national direction of

20  investments.  Those are roughly the main directions of the

21  department.

22  Q.  Now in your capacity as minister of finance, did you have

23  authority to sign agreements involving issues of finance and

24  Guinean economy on behalf of Guinea?

25  A.  Yes.  And as I explained so well, one minister has to

1  follow and to obey the government's discipline.  Generally

2  speaking, those agreements have been adopted by the government,

3  and as a minister, you have to sign for the government.

4  Q.  Are you familiar with the term Council of Ministers?

5  A.  Yes.

6  Q.  Did President Dadis appoint ministers in other sectors

7  beyond economy and finance?

8  A.  Yes, the structure of the government follows the structure

9  of some governments, like the French government, and so there

10  are various representations that apply to certain sectors.  So

11  we had the minister of education, of health, we have the

12  minister of mines, we had, naturally, a minister of defense.

13  Q.  So those are some examples of various different ministers.

14  A.  Yes.  But they are coordinated by the chief of the

15  government who is, in our case, called the prime minister.

16  Q.  And then you also have the president, who in this case was

17  President Dadis, is that right?

18  A.  Yes, of course.

19  Q.  Now what does the term Council of Ministers refer to?

20  A.  So the Council of Ministers is a council where ministers

21  can present their own priorities and the things that they want

22  to achieve, and so these are where most decisions are made as

23  representatives of the government.

24  Q.  Now you testified earlier that Boubacar Barry was one of

25  the members of the commission to negotiate with the Chinese.

1   A.   Yes, he was the chair.

2   Q.   And what was his position in the government at that time?

3   A.   Yes, he was the minister of state in charge of construction

4   of the territory and the reconstruction.

5   Q.   And you also testified earlier that Mr. Thiam served as a

6   member of that commission to negotiate with the Chinese.

7   Correct?

8   A.   Yes, according to the decree that was promulgated, I was

9   also part of that group.

10  Q.   And who issued the decree to create that commission?

11  A.   The decree is under the discretional power of the president

12  of the republic.

13  Q.   So the president ordered the creation of that commission.

14  A.   Yes.

15  Q.   Could you remind the jury again, what was Mr. Thiam's

16  position at the time in the government?

17  A.   He was the minister of mines, and as I said before, he was

18  the minister of mines and energy.

19  Q.   And very broadly speaking, was he in charge of implementing

20  government policy in the area of mining in that role?

21  A.   Yes.

22  Q.   The same way you worked on finance in your role as minister

23  of finance.

24  A.   Of finance, yes.

25  Q.   And speaking of that, how was the government of the

1    Republic of Guinea doing financially in early 2009 shortly

2    after you took your position?

3    A.  I didn't quite understand what you meant.

4    Q.  Let me repeat that question.  What was the financial

5    condition of Guinea's government when you began as minister of

6    finance in late 2008?

7    A.  Well, first of all, Guinea is one of the poorest countries

8    in the world, but particularly when people went into power in

9    2008, what was left over by the former president or the former

10   system was something very heavy.  And especially the last years

11   of the mandate of President Conté were really characterized by

12   his sickness, so the situation was very deteriorated at every

13   single level.  So that when the power changed, we were facing a

14   very serious economic and financial situation.

15   Q.  And just to be clear, I think you said that the former

16   president was sick.  Do you mean he was in poor health for the

17   years leading up to his death?

18   A.  Yes, he died from that very precise disease.  He was ill

19   for many years.

20   Q.  And as a result, the financial condition of the government

21   deteriorated over the last few years of his presidency.

22   A.  Yes, they deteriorated a lot during the last years of his

23   mandate.

24   Q.  Did there come a time in 2009 when the government of Guinea

25   began discussions with a company from China?

1    A.  Regarding investments, yes.

2    Q.  And was that company called CIF, as you've already

3    testified?

4    A.  Yes, yes.

5    Q.  And how did you first come to learn about the discussions

6    in 2009 with CIF, between the government and CIF?

7    A.  Well, its people went to meet the president, and who

8    introduced them, I can't tell you.  And within the framework of

9    their meetings, then we received some instructions to prepare

10   some agreements between the government and the CIF.

11   Q.  Well, let me first ask you, do you know what kind of

12   company CIF was?

13   A.  Well, at the time being, according to the information that

14   they gave us, it was a company which was very important and it

15   represented a very big financial area.  And it was supposed to

16   help Guinea, which was in a very difficult situation, to

17   resolve the problems which the population was exposed to.

18   Q.  Did CIF have a particular interest, any particularly strong

19   interest, in any particular sector in Guinea?

20           MR. GOLDSMITH:  Objection.

21           THE COURT:  Sustained.

22   Q.  You said that you learned that the president had met with

23   people from CIF, is that right?

24   A.  Yes.

25   Q.  And do you know when that meeting, that first meeting took

1    place?

2    A.  It was around June.

3    Q.  Do you know exactly when it was?

4    A.  No.  I cannot give you a clear date because I was not

5    present during the meeting.

6    Q.  You mentioned the president was in the meeting.  Do you

7    know if any other officials from Guinea were in the meeting or

8    not?

9    A.  No, I cannot affirm because I was not even there.

10   Q.  Do you know of a person named Sam Pa?

11   A.  I know that Sam Pa is the leader of CIF.

12   Q.  And do you know whether or not he was involved in that

13   early meeting with President Dadis?

14   A.  Yes.  From what I was told, he was the one who came at the

15   first level.

16   Q.  Did CIF have any other representatives in the country of

17   Guinea at the time?

18   A.  Representatives where?

19   Q.  That were actually in Guinea.

20   A.  CIF representatives?

21   Q.  Yes.  Was there anyone in CIF who was based in Guinea, or

22   who came to be based in Guinea?

23   A.  Well, yes, there was a certain Jack who was there.

24   Q.  Do you know his last name?

25   A.  No.  It's Jack.  That's his name, Jack.

1           THE COURT:  Counsel, we're going to break for the day.

2           MR. DiMASE:  That's fine, your Honor.

3           THE COURT:  Thank you.

4           The witness is excused.  Thank you.

5           THE WITNESS:  Okay.

6           THE COURT:  Ladies and gentlemen, I just have two

7    short things to tell you before excusing you for the day.

8           First, I want to let you know that we are not going to

9    be sitting on Friday, so we'll have trial tomorrow, all day

10   tomorrow, and we will resume with proceedings on Monday.

11          I'm going to ask you again to make every effort to be

12   on time tomorrow so we can start promptly at 9:30.

13          And the second thing is, I know I've told you

14   repeatedly at the very beginning not to do any research about

15   this case and to rely on the lawyers to present you the

16   evidence that you will need in order to make a decision in this

17   case.  But I want to make that even a broader instruction.  In

18   your day-to-day life, it may be that you read newspapers or

19   watch news or listen to the radio or whatever.  I think it's

20   important that you not read anything about bribery, okay?

21   Bribery overall.  So if you turn the page of the newspaper and

22   see a story about bribery, just skip over it.  Turn the page.

23   Go on to something else.  If there is a television program and

24   all of a sudden there's a story about bribery, switch the

25   channel.  If on the radio station there is all of a sudden a

H4q1thi5

story about bribery, turn the channel.  Okay?  So we don't want

you to be coming into contact in any way, even inadvertently,

about any story about bribery.  Okay?

       JUROR:  Okay.

       THE COURT:  Thank you so much.  And with that, do not

discuss the case.  Have a nice evening.

       (Continued on next page)

1                  (Jury not present)

2                  THE COURT:  So counsel, I've had a chance to read this

3      New York Times article which has today's date, April 26.  It

4      was pulled off the internet.  I don't know exactly what's in

5      the hard-copy version of the paper of today.  It does make

6      reference to the defendant.  It says Mahmoud Thiam, Guinea's

7      former minister of mines, is facing corruption charges

8      involving a Chinese company.  The article is lengthy and as has

9      already been reported, it bears the following title:  Bribe

10     Cases, a Secret Jared Kushner Partner, and Potential Conflicts.

11     There are several mentions about Guinea, and individuals whose

12     names I don't think have been mentioned here at all are

13     included in the article.  So this trial is not the focus of the

14     article, but there is that brief mention of the trial and of

15     course there is other commentary about Guinea and corruption

16     issues, besides many other topics.  I don't think it's

17     necessary for me to do anything more than I've done.  We began

18     this trial with several instructions about not doing any

19     research about the case.  I've now given this general

20     instruction about turning the page or turning the channel.  I

21     don't think I need to make an inquiry generally about whether

22     any juror has tripped across this article.  It would be a

23     little hard to believe they would, since we've been on trial

24     all day.  But I'll give you overnight to think about this, and

25     if you want me to pursue anything else with respect to these

1    issues, you'll let me know in the morning.  But beyond that,

2    right now do you have any further requests?

3              MR. KOBRE:  No, your Honor.

4              MR. DiMASE:  Actually, I'm sorry, your Honor.  I just

5    want to inform the Court that there was apparently also a

6    Bloomberg article that referenced Mr. Thiam directly and

7    possibly this case in some respect.  I have not read it, but

8    another member of the government who's been working on this

9    case just told me about that, so I wanted to let the Court know

10   as well.

11             THE COURT:  Thank you.  Does that again bear today's

12   date?

13             MR. DiMASE:  If you'll give me one moment, I can find

14   out more details, your Honor.

15             MR. GOLDSMITH:  Your Honor, I also know that the

16   matter has been reported about in Reuters and Wall Street 360

17   online, but those have appeared over the last couple of days.

18   I'm not as concerned about those publications as they do tend

19   to be focused more on financial and legal industrial

20   subscription readers, as well as other publications, again,

21   financial and legal industrial subscription only.  I think the

22   Bloomberg and the New York Times become a bit more concerning

23   than those, obviously because of local exposure.

24             THE COURT:  Okay.  And again, without prejudice to

25   making a different request tomorrow morning after you have had

1   the evening to think about this, Mr. Goldsmith, do you have any

2   request to make of me right now?

3              MR. GOLDSMITH:  Not at the moment, your Honor.

4              THE COURT:  Okay.  Good.  So let's just see what other

5   issues there might be apart from this and then we'll, at 9:00

6   tomorrow, revisit the issue about press inquiry.

7              Excuse me one minute.  Ms. Rojas had something to

8   share with me.

9              So I have something in addition to raise with you, but

10  let's just see what else you might have to raise with me.

11             Does the government have anything to raise this

12  evening?

13             MR. DiMASE:  Judge, I would just add, regarding the

14  Bloomberg article, I've looked at it.  It does not appear to

15  specifically reference Mr. Thiam or this case.  It seems to

16  more broadly refer to the subject matter of the New York Times

17  article but not this particular case.

18             THE COURT:  That is Mr. Kushner.

19             MR. DiMASE:  Correct.

20             THE COURT:  Okay.  And Mr. Goldsmith, anything we

21  should discuss this evening?

22             MR. GOLDSMITH:  No, your Honor.

23             THE COURT:  Thank you.

24             So our last alternate has a course that he would like

25  to attend in the evenings and he would like us to end, if

H4q1thi5

1    possible, at 4:00 on Monday.  Now this is a trifle frustrating

2    since the very first question in the voir dire is whether you

3    have any commitments that would interfere with your serving as

4    a juror in a trial that is expected to end no longer than

5    May 5th.  And this was not raised by that juror.  And so

6    we'll revisit this later, but my inclination is that we will

7    deny his request, that this is jury service and he didn't raise

8    this with us in a timely manner, and he'll be late for that

9    Monday class.  But I want to share this with you, and we can

10   revisit this as well.

11            Good.  So I'll see you tomorrow morning, 9:00.

12            THE DEPUTY CLERK:  All rise.

13            (Adjourned to April 27, 2017, at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    DAOUDA CAMARA

 4    Cross By Mr. Goldsmith . . . . . . . . . . . 201

 5    Redirect By Mr. Kobre  . . . . . . . . . . . 260

 6    Recross By Mr. Goldsmith . . . . . . . . . . 275

 7    BRIAN ENNESER

 8    Direct By Mr. Kobre  . . . . . . . . . . . . 280

 9    LARRY SCARDACI

10    Direct By Ms. Laryea . . . . . . . . . . . . 292

11    Cross By Mr. Goldsmith . . . . . . . . . . . 315

12    Redirect By Ms. Laryea . . . . . . . . . . . 319

13    MAMADOU SANDE

14    Direct By Mr. DiMase . . . . . . . . . . . . 320

15                    GOVERNMENT EXHIBITS

16    Exhibit No.                             Received

17     1407 and 301-305Q  . . . . . . . . . . . . 291

18     1401 and 201-206  . . . . . . . . . . . . . 292

19     801A   . . . . . . . . . . . . . . . . . . 284

20     1601A   . . . . . . . . . . . . . . . . . . 300

21

22

23

24

25
```