H4r1thi1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          17 Cr. 47 (DC)

5   MAHMOUD THIAM,

6                 Defendant.               Trial

7   ------------------------------x

8                                          New York, N.Y.
                                           April 27, 2017
9                                          9:32 a.m.

10

    Before:
11
                        HON. DENISE COTE,
12
                                           District Judge,
13                                            and a Jury

14                          APPEARANCES

15  JOON H. KIM
         Acting United States Attorney for the
16       Southern District of New York
    BY:  ELISHA J. KOBRE
17       CHRISTOPHER J. DiMASE
         Assistant United States Attorney
18
            -and-
19
    U.S. DEPARTMENT OF JUSTICE
20  BY:  LORINDA I. LARYEA

21  LAW OFFICE OF AARON GOLDSMITH, PC
         Attorneys for Defendant
22  BY:  AARON M. GOLDSMITH, ESQ.
         MICHAEL DELAKAS, ESQ.

23
    ALSO PRESENT:  PATRICK KILLEEN, Special Agent, FBI
24                 ALEXANDER BEER, Paralegal Specialist, USAO
                   KATHERINE BOSLEY, Paralegal Specialist, DOJ
25                 JENNIE CARMONA, Defense Paralegal
                   JOANNA DEZIO, Interpreter (French)

H4r1thi1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Good morning, everyone.  We have a jury.

 3    And I understand from Ms. Rojas that there were no issues to

 4    raise with me now but there may be an issue to raise with me

 5    later.  Great.

 6              And we have a new interpreter.  Why don't I qualify

 7    her before bringing in the jury.

 8              I'd ask the interpreter please to stand.

 9              THE INTERPRETER:  Certainly.

10              THE COURT:  Please describe for me how you learned

11    French.

12              THE INTERPRETER:  Ah.

13              THE COURT:  Is it your native language?

14              THE INTERPRETER:  No, it is not.  I have a PhD in

15    French and Italian from New York University.  I was trained as

16    an interpreter by the State Department in 1981, worked for them

17    for about 20 years, and then went back to university teaching

18    and interpreting.  But I have spoken French for most of my

19    life.  I've studied in French -- in France, and I work a great

20    deal in France on conferences.

21              THE COURT:  Thank you so much.

22              THE INTERPRETER:  You're welcome.

23              THE COURT:  Counsel, any objections to me finding this

24    interpreter qualified to interpret between English and French?

25              MR. KOBRE:  No.
```

H4r1thi1

1          MR. GOLDSMITH:  No.

2          THE COURT:  I ask that the interpreter be sworn.

3          (Interpreter sworn)

4          THE COURT:  Please bring in the jury.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2               THE COURT:  Good morning, ladies and gentlemen.

3               THE JURORS:  Good morning.

4               THE COURT:  And you have the thanks on behalf of all

5     of us, my thanks and the parties' thanks, for your efforts to

6     be here on time.  Thank you so much.

7               We have a new interpreter who has been found qualified

8     to serve as an interpreter and been placed under oath.  Again,

9     her translation which will be provided of the questions and

10    answers of the witness controls, so those of you who know

11    French, you must rely on what the interpreter states as the

12    witness' answer.  Thank you.

13              Counsel?  Oh, I'm sorry.  I remind the witness you are

14    still under oath.

15              THE WITNESS:  Yes.

16     MAMADOU SANDE, resumed.

17    DIRECT EXAMINATION CONTINUED

18    BY MR. DiMASE:

19    Q.  Good morning, Mr. Sande.

20    A.  Good morning, Mr. Prosecutor.

21    Q.  So I believe where we left off yesterday was that you were

22    talking about Jack, the first name Jack?

23              THE INTERPRETER:  Talking about?

24              MR. DiMASE:  A person named Jack.

25    A.  Yes, it was when you asked me if there had been a

H4r1thi1                          Sande – Direct

1    Chinese –– a CIF representative in Guinea.

2    Q.  And you said that that person's name was Jack?

3    A.  Yes, Jack.

4    Q.  And you testified that you didn't know his last name.

5    A.  I don't recall it.

6    Q.  And you also were testifying about an individual named Sam

7    Pa.  Do you recall testifying about him?

8    A.  Yes.  Sam Pa is the boss of CIF.

9    Q.  And you also testified very briefly about how in 2009 the

10   president had met with Sam Pa.

11            MR. GOLDSMITH:  Objection.

12            THE COURT:  Overruled.

13   A.  Yes, it was around the month of June.

14   Q.  And you said that you didn't know who else attended that

15   meeting.

16            MR. GOLDSMITH:  Objection.

17            THE COURT:  Overruled.

18   A.  Yes, that's correct, because I wasn't part of it.

19   Q.  Was there, to your knowledge, a second meeting involving

20   Sam Pa and the president?

21   A.  Yes.

22   Q.  Do you recall where that occurred?

23   A.  I didn't attend that second meeting either, so I can't be

24   absolutely certain, but when I met Sam Pa, he was in the

25   president's office.

1   Q.  And when you say office, do you mean the building where the

2   president's office was located or in the president's office

3   itself?

4   A.  During the reign of President Dadis, there was a sort of a

5   neighborhood where all of the military commanders lived, and in

6   that neighborhood the president occupied one part of an

7   apartment building.  He slept there but he also worked there.

8   And it was in that building and in fact in his office that I

9   myself met Sam Pa.

10  Q.  Was that the first time you met Mr. Sam Pa?

11  A.  Yes, it was the first time.

12  Q.  And you testified yesterday about serving as the minister

13  of energy after your term as minister of finance concluded.  Do

14  you remember that?

15  A.  Yes.

16  Q.  And did you also meet with Sam Pa on occasion in 2010 in

17  your capacity as minister of energy?

18  A.  Yes.

19          MR. DiMASE:  I'd ask Mr. Beer now to publish

20  Government Exhibit 901 in evidence.

21  Q.  Can you see that on the screen, Mr. Sande?

22          THE INTERPRETER:  May I have that again?

23  Q.  Can you see that on the screen, Mr. Sande?

24  A.  Yes.

25  Q.  And who is pictured in that photograph?

H4r1thi1                         Sande - Direct

1   A.  Sam is on the left; on the right is the former prime

2   minister Jean-Marie Doré, who is deceased, and then -- with the

3   red tie; and beside him is Mahmoud Thiam.

4           MR. DiMASE:  You can take that down, Mr. Beer.

5   Q.  After these initial meetings between the president and Sam

6   Pa, what happened?

7   A.  Within the framework of our government, we received

8   instructions to prepare documents, these regarding agreements

9   between Guinea and CIF.

10  Q.  Was the issue of working with CIF raised in meetings of the

11  Council of Ministers?

12  A.  We received instructions to have agreements drawn up in the

13  Council of Ministers, and, yes, that subject was brought up

14  then.

15  Q.  Was there discussion of how that collaboration would go

16  with CIF, in the Council of Ministers?

17  A.  The instructions were clear.  After the meeting with the

18  president, it was a question of CIF being a large company which

19  had a great deal of financial capacity, and which had promised

20  Guinea to help Guinea with the development of all of those

21  sectors which would contribute to improving the lives of our

22  population.  And so it was with that basic idea that we were

23  told to draw up documents which would permit us to begin to

24  have negotiations with the Chinese.

25  Q.  And is it fair to say that there were discussions in the

1   Council of Ministers about these issues?

2   A.  Yes, the Council of Ministers, those meetings were used in

3   order to discuss that.

4   Q.  Did you attend some of those meetings?

5   A.  Yes, of course, I did.  It is an obligation on the part of

6   ministers to attend those meetings.

7   Q.  And do you have a clear memory of those particular meetings

8   in which the issues surrounding CIF were discussed, as you sit

9   here today?

10  A.  Well, things were very clear.  And in the context of the

11  Council of Ministers meetings, it's always the prime minister

12  who chairs the meeting.  And so it was always in that context

13  of all of the ministers being together to discuss that.  Now as

14  for me personally, I was not part of the actual putting

15  together of these negotiations.

16  Q.  Was there a particular committee tasked with reviewing

17  documents in connection with the CIF deal?

18  A.  Yes, it was a technical commission that was under the

19  direction of the prime minister.

20  Q.  Are you yourself, Mr. Sande, a specialist or expert in the

21  area of mining or mining agreements?

22  A.  No, I am not a specialist.

23  Q.  And is it fair to say that you were not a part of that

24  technical committee?

25  A.  No.  It's fair to say that, officially speaking, the

1    technical commission consisted of councilors, rather than

2    ministers, advisers.

3    Q.  And you were not part of that.

4    A.  No.

5    Q.  In this deal with CIF, was CIF focused on any particular

6    sectors in the Guinean economy?

7    A.  The first agreements that were developed, most especially

8    the master agreement, identified all of the sectors that were

9    supposed to help the Guinean population, and so therefore, the

10   agreement had to be based on sectors which were present in

11   Guinea.  Among these sectors were energy, agriculture, mines,

12   and also the sector of transportation, where there are

13   considerable problems.  In other words, in short, these were

14   the sectors that were involved entirely in the development of

15   Guinea.

16   Q.  Did CIF have a particular interest in any one of those

17   sectors you mentioned?

18   A.  In the beginning we were talking about a power plant, an

19   energy power plant, but there was also research going on for

20   oil, but also mining research.  And so you might say, generally

21   speaking, that there was not one sector alone that was totally

22   focused on.  In transportation, for example, there was a

23   concern not just to invest in transportation but also to create

24   the networks of transportation, according to the master

25   agreement.

1    Q.  Let me turn to the agreements that you mentioned.

2          Did the government enter into a preliminary agreement

3    with CIF?

4    A.  There was, first of all, the memorandum of understanding.

5    Q.  Mr. Sande, I'm going to hand you what's been admitted into

6    evidence as Government Exhibit 401.  What is that?

7    A.  That is the memorandum of understanding.

8    Q.  And what date was it signed on?

9    A.  Referring to my signature, it's the 6th of June.

10         MR. DiMASE:  And I'd ask Mr. Beer to publish the

11   second page of Government Exhibit 401.

12   Q.  Mr. Sande, were you directly involved in negotiating the

13   memorandum of understanding?

14   A.  No, I was not involved.

15   Q.  And you mentioned that you signed it?

16   A.  Yes, I signed on behalf of the government.

17   Q.  Who else signed it?

18   A.  There is also the Guinean ambassador to China who signed it

19   as well, Mr. Diare.  The others are the representatives of CIF.

20   Q.  Okay.  And do you recall whether they signed it first,

21   meaning the representatives of CIF, or whether you signed it

22   first?

23   A.  I signed on the 6th of June.

24   Q.  Had the Chinese executives already signed it when you

25   signed it?

1    A.  I think they did, yes.

2    Q.  Did you sign it in the same room together?

3    A.  No.

4    Q.  So you believe the signatures from the Chinese executives

5    were on it and then you subsequently signed it.

6    A.  Yes, I really think so.

7    Q.  Okay.  Who asked you to sign this agreement?

8    A.  As I've already said, we had received the president's

9    instructions through the prime minister to prepare documents

10   which would go in the direction of our collaboration.  And the

11   memorandum of understanding was the legal document which would

12   permit us to pursue these ends.  And so it was under the

13   instructions of the president that I signed.

14   Q.  Now after this memorandum of understanding was executed

15   were there additional agreements reached?

16   A.  Yes, there was the master agreement.

17   Q.  Let's talk about that for a moment.

18           I'm going to show you what has been admitted into

19   evidence as Government Exhibit 402.  One moment.

20           Take a quick look at that, please.

21           Do you recognize that document?

22   A.  Yes.

23   Q.  Is that the master agreement that you were discussing a

24   moment ago?

25   A.  Yes.

H4r1thi1                          Sande - Direct

1    Q.  And did you sign this document?

2    A.  Yes, indeed I signed this document.

3            MR. DiMASE:  At this point I would ask Mr. Beer to

4    publish the final page of Government Exhibit 402.

5    A.  Yes.

6    Q.  And --

7    A.  There you go.

8    Q.  I take it the signature at the bottom of the page there is

9    yours, right?

10   A.  Yes.

11   Q.  And what date did you sign it?

12   A.  This was the 12th of June.

13   Q.  Of 2009?

14   A.  2009, yes.

15   Q.  Who else signed it?

16   A.  The representative of CIF.

17   Q.  Do you know which representative it was in particular?

18   A.  No, I don't know.

19   Q.  All right.  And again, do you know whether the Chinese

20   representative signed first or if you did?

21   A.  I think that in this case he signed after I did.

22   Q.  Were you together, you and the representative of the

23   Chinese company CIF?

24   A.  No, we were not together.

25   Q.  And who asked you to sign this document?

1   A.  Yes, it always goes -- it always has the same pace.  Once

2   the agreement had gotten off the ground, we had precise

3   instructions of things to do, and it was in that exact context

4   that I signed this document on behalf of the government.

5   Q.  Did the president ask you to sign it?

6   A.  He asked me to, yes.

7          MR. DiMASE:  I'm going to turn to just the page prior

8   to the final page, prior to the signature page, ask Mr. Beer to

9   publish that.

10         And Mr. Beer, if you could just expand the bottom

11  portion of the document -- of that page, I mean.  Just the very

12  bottom portion, Mr. Beer.

13  Q.  Do you see the initials at the bottom of that page,

14  Mr. Sande?

15  A.  Yes.

16  Q.  And do you know whose initials those are?

17  A.  I initialed on the left again on behalf of the government,

18  and the one on the other side on the right is that of the

19  Chinese representative.

20  Q.  Were there other agreements also entered into on the same

21  day as the master agreement?

22  A.  Yes.

23  Q.  I'm going to turn now to Government Exhibit 403, which I'm

24  handing you now.

25         Do you recognize that document, Mr. Sande?

1    A.  Yes.

2    Q.  What is it?

3    A.  Within the same initiative, it had also been planned to

4    have a loan agreement, and we were supposed to be the happy

5    recipients of that on behalf of CIF.  And the sum total of that

6    was supposed to be $76 million.

7    Q.  Was that $78 million?

8    A.  It's written here somewhere.

9            Forgive me.  It is 78.

10           MR. DiMASE:  Turning to the last page of this

11   agreement, and I'll ask Mr. Beer to publish that page, the last

12   page of Government Exhibit 403.

13   A.  Yes.

14   Q.  Did you sign this document, Mr. Sande?

15   A.  Yes, that's my signature.

16   Q.  And what date did you sign it on?

17   A.  Once again, it's the 12th of June.

18   Q.  And again, is this, below your signature, the signature of

19   a representative from CIF?

20   A.  Yes.

21   Q.  And do you know exactly who that was?

22   A.  No.  It was a representative, but I don't know who signed

23   as a representative.

24   Q.  And I take it, again, that you were not in the same room

25   with the CIF representative when you signed this document.  Is

1   that right?

2   A.  No, I wasn't.

3   Q.  I'm drawing your attention to the page before, which I'll

4   ask Mr. Beer to publish and expand the very bottom.

5          Whose initials are those at the bottom of the page?

6   A.  That's me on behalf of the government.

7   Q.  And there are two sets of initials.  Whose are the others?

8   A.  Yes, the other one is that of the Chinese representative.

9   Q.  And did the president also ask you to sign this document?

10  A.  Yes, I was executing his instructions.

11  Q.  And did Guinea in fact receive $78 million from CIF

12  pursuant to this agreement?

13  A.  I can't personally say that I witnessed that because the

14  money was automatically transferred to the Central Bank.  And

15  in the contract, it was clearly specified, $50 million was to

16  be set aside for purely budgetary reasons, and in my role as

17  minister of finance, that was supposed to have been put at my

18  disposal within the context of budgetary concerns.  Now the

19  rest was supposed to be used in the energy sector.

20  Q.  Let me ask you this:  Did Guinea actually receive the

21  entire 78 million, to your knowledge, into the Central Bank of

22  Guinea?

23  A.  I can attest to the fact that the 50 million was there.

24  But the remaining 28 was put at the disposal of a commission

25  which was supposed to work within the context of emergency

1   measures in the sectors of water and electricity.  As to

2   whether they actually received 28 or less than 28, that's

3   something I cannot confirm.

4   Q.  With respect to the master agreement, going back to

5   Government Exhibit 402, were you directly involved in the

6   negotiation of that agreement?

7   A.  Not directly in the negotiation, but the development of

8   agreements falls under the purview, under the responsibility of

9   the government, the ministers.  And I was part of that.

10  Q.  Understood.  But you were not personally involved in

11  negotiating the master agreement.

12  A.  There was a technical commission which worked under the

13  umbrella of the government.  And after the drafting, the

14  document was submitted to all of us in the government to

15  examine it.  And that's where it was examined.

16  Q.  But just to ask the very direct question again, you were

17  not personally involved in negotiating the agreement with the

18  Chinese.

19  A.  No, I was not personally and directly involved.

20  Q.  And that also applies to the loan agreement, Government

21  Exhibit 403, is that right?

22  A.  It was the same process.  We received instructions from the

23  president.  The document was drafted for the $78 million, and

24  the paper, once it was drawn up, was submitted to us for

25  examination.

H4r1thi1                    Sande - Direct

1  Q.  And ultimately the president asked you to sign it, is that

2  right?  Ultimately the president asked you to sign it?

3  A.  Yes, all of these documents were done under his

4  instructions.

5  Q.  Let me turn to -- well, withdrawn.

6        Was there a third agreement entered into on June 12,

7  2009?

8  A.  Yes.

9  Q.  I'm showing you what's been admitted into evidence as

10  Government Exhibit 404.  Do you recognize that?

11  A.  Yes, this is an agreement relating to -- yes.

12  Q.  Sorry.  What is it?  You said it was an agreement relating

13  to, what?

14  A.  This is the document that was supposed to permit the

15  Chinese to do research in the oilfield.

16  Q.  Within Guinea?

17  A.  Yes, in Guinea.

18  Q.  I'm going to ask you to look at the signature page of this

19  document, Exhibit 404.

20        MR. DiMASE:  And I'd also ask Mr. Beer to publish the

21  signature page to the jury.

22  Q.  Who signed this document?

23  A.  Yes.

24  Q.  Who signed it?

25  A.  On the Guinean side there is also Minister Thiam.

H4r1thi1                      Sande - Direct

1   Q.  Well, did you sign it?

2   A.  Yes.

3   Q.  Okay.  And Mr. Thiam also signed?

4   A.  Yes.

5   Q.  Do you recall if you were together with him when you signed

6   the agreement?

7              THE INTERPRETER:  Do you recall?

8              MR. DiMASE:  Do you recall if you were together with

9   him when you signed the agreement?

10  A.  No, we were not together.

11  Q.  And then it was also signed by two representatives from the

12  Chinese companies, is that right?

13             THE INTERPRETER:  I'm sorry.  Can I have that again?

14             MR. DiMASE:  It was also signed by the representatives

15  of the two Chinese companies.

16  A.  Yes.

17  Q.  And that was both China International Fund and China

18  Sonangol.

19  A.  Yes.

20  Q.  And looking at the page before the signature page.

21             MR. DiMASE:  And I'll ask Mr. Beer to publish that and

22  to expand the bottom portion.

23  Q.  Do you recognize the initials on that document?

24  A.  Yes, they are my initials.  I think MT is Mahmoud Thiam.

25  And the others are the Chinese representatives.

1    Q.  And when you're referring to MT, could you describe where

2    on the document you see those initials.

3    A.  It's on the extreme right.

4    Q.  Okay.  The bottom right?

5    A.  Yes, it looks like MT.

6    Q.  Now at around the time of the execution of these documents,

7    was a commission created to negotiate with CIF?

8    A.  Yes.  As I already said yesterday.

9    Q.  Yes, you testified about that early in your testimony.

10   Could you remind the jury who were the members of that

11   commission to negotiate with CIF?

12   A.  There are two things that I have to clarify.  The

13   ministerial commission, which, as I said, was created by a

14   presidential decree, but, in parentheses, as for me, I did not

15   actually see the decree.  It was State Minister Boubacar Barry

16   who told me about it.  And he was president of the commission.

17   This was a commission tasked with negotiating with the Chinese.

18   And he said to me:  There are two vice presidents in this

19   commission, Mr. Thiam and yourself.  So, so much for the

20   creation of the commission.

21        Now as far as the negotiations are concerned, I myself

22   cannot say that such and such a person or such another person

23   negotiated because myself, I never attended any negotiations

24   with the Chinese.  I do know that negotiations took place.  But

25   I can't say to you this one or that one negotiated.

1   Q.   So let me pause you now and move on to another question,

2   and try to break down what you said.

3           So you testified that you learned from Mr. Barry that

4   this commission was created.

5   A.   Yes.  He was the president of the commission.

6   Q.   And you learned that you and Mr. Thiam were also members of

7   the commission from Mr. Barry.

8   A.   Yes, Minister Thiam was one of the vice presidents.

9   Q.   And despite the fact that you were a member of the

10  commission, you didn't have any personal involvement in

11  negotiating with the Chinese companies.

12  A.   No, I was never included in any negotiations.

13  Q.   Okay.  Did there come a time when a trip was arranged to

14  conduct negotiations with CIF?

15  A.   Yes.

16  Q.   And approximately when was that?

17  A.   It was around the month of July.

18  Q.   How did you first learn about that trip?

19  A.   It was from Prime Minister Komara.  He said that there was

20  a delegation that was supposed to go to China.  But I was asked

21  to sign the power of attorney giving Boubacar Barry the right

22  to sign on my behalf.  In the beginning I refused, because I

23  said, there's nothing in the way of my going myself.  Why not

24  me?  And that was it between him and me.  That was the end of

25  that conversation.

1   Q.  Let me pause you there for a moment.  Did you have a

2   conflict at that time that would have prevented you from

3   traveling to negotiate?

4   A.  No, nothing at all.

5   Q.  Well, were you directed that you were not to go on the

6   trip?

7   A.  No.  I was simply asked to be part of the commission, and I

8   was told that I was part of the delegation and asked to sign a

9   power of attorney.  Didn't work with the prime minister.  I

10  refused.  So from that point on I behaved, as you will, as

11  myself a military man.  I refused, according to conscience, but

12  I knew that if the president asked me, that's the chain of

13  command and so I would submit to the will of the president.

14  The president asked me, and that's how it took place.  That was

15  done the night before the departure -- right before the

16  departure.

17  Q.  Why didn't you want to sign the power of attorney?

18  A.  These were my duties.  After all, I am the minister of

19  finance representing Guinea, and what falls under my purview is

20  the responsibility for all economic and financial matters.  And

21  if I don't have anything in the way, if I don't have an

22  impediment or an obstacle, I can't imagine anything would

23  prevent me from going.  So that was the dust-up, in a word.

24  Q.  Mr. Sande, I'm now handing you what has been admitted into

25  evidence as Government Exhibit 411.  Please take a look at

1     that.

2     A.  Yes, this is the power of attorney.

3     Q.  Okay.  And could you describe --

4              MR. DiMASE:  And I'll ask Mr. Beer to publish to the

5     jury 411T, please.  And if you could focus in on the portion

6     below Full Powers, Mr. Beer, and capture it down to the bottom.

7     Q.  Mr. Sande, is this the power of attorney you were just

8     describing?

9     A.  But this is in English.  I have the French in front of me.

10    Q.  Would you look at the exhibit that's in front of you,

11    actually, the paper exhibit.

12    A.  Yes.

13    Q.  And that one is in French?

14    A.  Yes.

15    Q.  Is this the power of attorney that you were just

16    describing?

17    A.  Yes.

18    Q.  And what date did you sign it?

19    A.  13th of July 2009.

20    Q.  You mentioned that you had a conversation with the

21    president.  What did he say?

22             THE INTERPRETER:  A conversation with?

23             MR. DiMASE:  The president.  What did he say?

24    A.  He requested that I give power of attorney to Boubacar.  So

25    finally, that's what I carried out.

1    Q.  Over your objections.

2    A.  Yes.

3    Q.  And you said that this was the day before the trip, is that

4    what you said?

5    A.  I can't be exact about the date because I don't know the

6    exact date that they left, but yes, it was part of that

7    initiative for their trip.

8    Q.  Who traveled on this trip?

9    A.  According to what I was told, it was supposed to be

10   Minister Boubacar Barry and Minister Thiam.

11   Q.  And did you attend the trip?  Did you go on the trip?

12   A.  No, I didn't.  That's why I signed the power of attorney.

13   Q.  Were you directed to go somewhere else?

14   A.  Yes.  At that time the minister of education was supposed

15   to go to Tunis, in Tunisia, because there were meetings

16   regarding Guinea with the IMF and the World Bank.  So the

17   minister of finance was supposed to be present as well.  And so

18   I did go to attend that conference.

19   Q.  Okay.  Was that around the same time that Mr. Barry and

20   Mr. Thiam traveled on the trip you described?

21   A.  I believe so, and if memory serves, I made the trip from

22   Conakry to Paris with Mr. Barry, then I continued on to Tunis.

23   Q.  And was it your understanding Mr. Barry was continuing on

24   to another location from there?  Is it your understanding

25   Mr. Barry was continuing on to the location of the

H4r1thi1                        Sande - Direct

1   negotiations?

2   A.  Yes, indeed.

3   Q.  And do you specifically recall whether Mr. Thiam came at

4   the same time or not?

5   A.  I don't remember Thiam's presence specifically.  In any

6   case, they did make the trip together.

7   Q.  Do you know where they went?

8   A.  We were told that this was a trip for China.

9   Q.  Do you know if they also went to Singapore on that trip?

10  A.  I have no knowledge of that.

11  Q.  While Mr. Thiam, Mr. Barry were on this trip, were you kept

12  informed of what was occurring in the negotiations?

13  A.  No.

14  Q.  I'm showing you now what's been admitted into evidence as

15  Government Exhibit 406.  Do you recognize that document?

16  Withdrawn.

17          Have you seen that document before?

18  A.  I saw this document in the context of your investigation.

19  Q.  Well, when is the first time you saw that document,

20  approximately?

21  A.  When I came here, last week.

22  Q.  Okay.  And so were you shown that document by the

23  government, by the prosecutors?

24  A.  Yes, indeed.

25          (Continued on next page)

1   BY MR. DiMASE:

2   Q.  And you'd never seen it before last week, is that right?

3   A.  No, I never saw that document.

4   Q.  What is it, the document?

5   A.  It's written in English, but according to your

6   explanations, it's --

7           THE COURT:  I'm sorry.  We're not going to go there.

8   Thank you very much.

9           Next question.

10  Q.  Did you look at the last page of the document?

11          MR. GOLDSMITH:  Objection.

12          THE COURT:  Overruled.

13  Q.  Can you look at it?

14  A.  Yes.

15          MR. DiMASE:  And I'll just ask Mr. Beer to publish the

16  final page of Government Exhibit 406.

17  Q.  Drawing your attention to the bottom signature --

18  A.  Yes.

19  Q.  -- to the left it says your name and title, is that right?

20  A.  Yes.

21  Q.  Is this your signature?

22  A.  No, that is not my signature.

23  Q.  Whose is it?

24  A.  Boubacar Barry, signed by order.

25  Q.  And what does it say to the upper left of that signature

1    there?

2    A.  It's the letters PO.  It's what we call by order.

3    Q.  So does that mean that Mr. Barry signed this document

4    pursuant to the power of attorney?

5    A.  Yes, certainly, because he possessed the power of attorney,

6    he signed in my name.

7    Q.  And drawing your attention to the very first page of the

8    document, which I'd ask Mr. Beer to publish, what's the date on

9    this agreement at the top?

10   A.  It's the 18th of July 2009.

11   Q.  Did there come a time when Mr. Thiam and Mr. Barry returned

12   from the trip?

13   A.  Yes.

14   Q.  Did Mr. Barry or Mr. Thiam discuss with you what had

15   occurred during the trip?

16   A.  No.

17   Q.  Did Mr. Barry or Mr. Thiam tell you that they had signed

18   any agreement on that trip?

19   A.  No.  I knew that they had left on a trip in order to

20   negotiate on behalf of Guinea, but I didn't know about any

21   agreement whatever.

22   Q.  Now, was there another agreement that was entered into with

23   CIF subsequent to July 2009?

24   A.  Yes.

25   Q.  I'm showing you now what has been admitted into evidence as

1   Government Exhibit 408.  Do you recognize that document?

2   A.  Yes.

3            MR. DiMASE:  And Mr. Beer, I'd ask that you publish

4   the first page of Government Exhibit 408 for the jury.

5   Q.  What is this document, Mr. Sande?

6   A.  This is the shareholders pact.

7   Q.  When was it -- what is it dated, or when is it dated?

8   A.  I see the 2nd of October 2009.  Yes, and I signed on the

9   same day.

10  Q.  Was that the 10th of October?

11  A.  Yes.  10th of.

12           THE INTERPRETER:  Sorry.  That was interpreter's

13  mistake.  10th of October.

14           MR. DiMASE:  Of 2009?

15  Q.  Of 2009?

16  A.  2009.

17  Q.  Did you have any involvement in the negotiation of that

18  agreement?

19  A.  No.

20  Q.  Did you have any involvement in the drafting of that

21  agreement?

22  A.  No, no, no.

23  Q.  Did you -- how did you come to sign it?

24  A.  I signed it in the same manner as I signed the other

25  documents.  Ever since the very beginning, up to this one, as

1   for me the specific instructions that I received came directly

2   from the president.  OK.  As for me, my influence -- I had no

3   influence whatever on the draft, drafting of this document, but

4   my signature as per usual would be required.

5   Q.  So the president directed you to sign it?

6   A.  Yes.

7   Q.  Did you read it carefully before you signed it?

8   A.  I read it, but not with that degree of attention because

9   there was no way that I would have been able to bring any

10  modification to it.

11  Q.  And again, you're not, you've testified that you're not an

12  expert in the area of mining or mining agreements.  Is that

13  correct?

14  A.  No, no, no.

15  Q.  Who else signed it?

16          MR. DiMASE:  At this point, I would ask Mr. Beer to

17  publish the signature page of Government Exhibit 408 for the

18  jury.

19  A.  On the Guinean side, the minister of justice also signed.

20  Q.  And who signed from the Chinese company's side?

21  A.  I see Jack's name here.  And I don't know the others.

22  Q.  So you don't know Mr. Manuel Vicente?

23  A.  The name of?

24  Q.  Manuel Vicente.

25  A.  Yes, but I didn't know him.

1   Q.   He represented China Sonangol in signing this agreement?

2   A.   According to what is written here, yes.

3   Q.   And it says here Jack Cheung, group chief representative

4   for Guinea?

5   A.   What was that again?

6   Q.   It says Jack Cheung, group chief representative for Guinea?

7   A.   Yes, that's Jack there.

8   Q.   That's the same Jack you testified about earlier, who was a

9   representative of CIF in Guinea?

10  A.   I believe so.

11  Q.   Let me turn two pages before that page.

12          MR. DiMASE:   And I'll ask Mr. Beer to publish that for

13  the jury and expand the bottom portion of that page.

14  Q.   Do you see the initials there?

15  A.   Yes.

16  Q.   Do you recognize them?

17  A.   On the extreme left --

18  Q.   Right.

19  A.   That's General Siba's initials.  He was the minister of

20  justice.  In the middle, that's me.  Again, I think that MT is

21  Mr. Thiam, but I don't know if he initialed or not, because he

22  is not one of the signatories.  And I think the remaining one

23  is the Chinese representative.

24  Q.   The one on the far right?

25  A.   Yes.

1    Q.  Did you, Mr. Sande, attend any meetings relating to this

2    agreement, the shareholders agreement?

3    A.  Personally, no, I did not.

4    Q.  I'm showing you what's been admitted into evidence as

5    Government Exhibit 407, already in evidence.  Do you --

6    withdrawn.

7            Does that represent the minutes of the meeting that

8    occurred on October 8 of 2009?

9    A.  Yes, that's what I see here.

10           MR. DiMASE:  And I would ask Mr. Beer to publish the

11   first page of Government Exhibit 407-T for the jury.  And if

12   you could just focus on the list of attendees and expand that

13   for the jury.

14   Q.  Mr. Sande, did you attend this meeting on October 8 of

15   2009?

16   A.  No, I did not attend.

17   Q.  Does your name or title appear in the list of attendees on

18   Government Exhibit 407?

19   A.  No, I don't see it there.

20   Q.  And you don't recall attending this meeting?

21           THE INTERPRETER:  And you --

22           MR. DiMASE:  Don't recall attending this meeting?

23   A.  No.  If I had attended the meeting, my name would be on the

24   list.

25           MR. DiMASE:  May I have one moment, your Honor, very

1 | briefly?  Thank you.

2 |         No further questions.

3 | CROSS-EXAMINATION

4 | BY MR. GOLDSMITH:

5 | Q.  Captain Sande, you just testified about a meeting of the

6 | cabinet that you were not in attendance for.

7 | A.  Yes.

8 | Q.  Do you recall why you were not in attendance at that

9 | meeting?

10 | A.  I don't recall.  It was only here that I saw this report.

11 | So when it was shown to me, not only could I not recall it at

12 | all, I don't even recall where I was at the time.

13 | Q.  OK.  Do you recall where you were when you signed the

14 | shareholder agreement dated October 10?

15 | A.  Yes, I was already asked that question by the prosecution,

16 | and my answer was that I don't recall where I was when I

17 | signed, but I am certainly the one who signed.

18 | Q.  Right.  Do you remember if you were out of the country?

19 | A.  No.  I signed that in Guinea.

20 | Q.  You testified yesterday and today about the change in

21 | government that happened at the end of 2008.  Do you remember

22 | that?

23 | A.  Yes.

24 | Q.  And in the end of 2008, the military took over, is that

25 | correct?

1    A.  Yes.

2    Q.  And the president, Dadis, came from the military?

3    A.  Yes.

4    Q.  You also testified that there were some changes in how the

5    government worked in 2009.  Do you remember that?

6    A.  At the seizing of power, there was a new government.

7    Q.  Did the Guinean government operate the same in 2009 as it

8    should have operated?

9              MR. DiMASE:  Objection.

10             THE COURT:  Sustained.

11   Q.  You were appointed as the minister of finance, correct?

12   A.  Yes.

13   Q.  Who appointed you?

14   A.  As, as I said yesterday, the --

15             (Interpreter and witness conferred)

16   A.  Mr. -- President Dadis gave the decree.

17   Q.  When you say President Dadis gave the decree, meaning he

18   appointed you as the minister?

19   A.  Yes.  In Guinea, it's the president of the republic who,

20   through a decree, appoints his ministers.

21   Q.  Under the hierarchy of the government of Guinea in 2009,

22   the president was the most powerful figure?

23   A.  It's always that way in Guinea, according to our system.

24   Q.  Underneath the president was the prime minister, correct?

25   A.  Yes.

1    Q.  Underneath the prime minister was the council of ministers,

2    correct?

3    A.  I wouldn't say under the prime minister.  The -- it's the

4    prime minister who chairs the council of ministers.

5    Q.  OK.  Does the prime minister have any additional authority

6    that the individual ministers do not have?

7    A.  The prime minister is the head of the government.  So on

8    the executive level, in the executive branch, you have the

9    president of the republic, the prime minister, and it is the

10   prime minister who is the head of government.  And so normally

11   speaking, the individual ministers would report to the prime

12   minister before that report is passed on to the presidency.

13   Q.  So the president appointed the majority of ministers that

14   were in place in 2009?

15   A.  Yes.

16   Q.  And the president established the committee or the

17   delegation that was responsible for negotiating with the

18   Chinese on the CIF investment project, correct?

19   A.  Yes, the ministerial commission.

20   Q.  And that included yourself, with Mr. Barry and Mr. Thiam?

21   A.  Yes.  That's it.  Theoretically.

22   Q.  Theoretically, because you did not participate with a lot

23   of the discussions, right?

24   A.  Of course.

25   Q.  And within that subcommittee, you testified earlier that

1   Boubacar Barry was the president?

2   A.   Yes.

3   Q.   And yourself and Mr. Thiam were vice presidents?

4   A.   Yes.

5   Q.   As part of the presidential decree, President Dadis wanted

6   Barry to be the president, right?

7   A.   That's what Barry explained to me.

8   Q.   You testified earlier that you did not participate a lot

9   with the discussions with the Chinese.  Do you recall that?

10  A.   Yes, I recall.

11  Q.   And it was because you were quite busy as the finance

12  minister?

13  A.   It depends.  You participate in a negotiation when you have

14  been invited to do so.  If you have not been invited, you may

15  not participate.

16  Q.   Now, when you say invited to do so, you were on the

17  subcommittee for the Chinese investment deal?

18  A.   That's why I was careful to say "theoretically."

19  Q.   Very good.

20          Now, you discussed at one point earlier today that you

21  were called upon to attend a meeting in Tunis.  Do you recall

22  that?

23  A.   Yes.  That was related to education.

24  Q.   Were there -- I believe you said the meeting was with the

25  IMF.

H4rWthi2                          Sande - Cross

1    A.  With the World Bank, I believe.

2    Q.  And that was because of your capacity as the finance

3    minister?

4    A.  Yes.

5    Q.  At the time, in 2009, Guinea was the subject of sanctions,

6    was it not?

7    A.  Yes.

8    Q.  And the cash reserves for the country were very low?

9    A.  Yes, the country was in financial and economic difficulty.

10   Q.  And those matters were of your highest priority?

11   A.  As minister of finance, I say yes.

12   Q.  Now, you testified earlier this morning about a $78 million

13   loan.  Do you recall that?

14   A.  Yes.

15   Q.  Do you recall when that loan was provided to the Republic

16   of Guinea?

17   A.  I signed the document on the 12th of June, and I think that

18   it was upon that signature that the entire process got under

19   way.  And then during the weeks that followed, the money was

20   deposited in the central bank in Guinea.

21   Q.  Do you remember when the funds were actually provided to

22   Guinea?

23   A.  Not exactly, no.

24   Q.  But as you said, you recall signing the loan agreement in

25   June of 2009?

1  A.  Yes.

2  Q.  Now, you also testified this morning about those funds that

3  were part of the loan were intended to go toward water and

4  electricity?

5  A.  Yes.  This was an emergency program.

6  Q.  You also characterized the loan as being part of the

7  investment project with CIF?

8  A.  Yes.

9  Q.  And you had that understanding because CIF was providing

10  the money?

11  A.  The agreement that you have here is witness to that.

12  Q.  Why did you feel that the loan of $78 million was part of

13  the CIF investment project?

14  A.  Because it is clearly set out in the loan agreement.

15  Q.  Now, you also testified about the first time that you met

16  Mr. Sam Pa.  Do you recall that?

17  A.  Yes.

18  Q.  And you said that at that moment, Mr. Pa was meeting with

19  President Dadis?

20  A.  Yes.

21  Q.  You said that as far as you were aware, that was the second

22  time that Mr. Pa had met with President Dadis?

23  A.  I think so, yes.

24  Q.  Why do you think so?

25  A.  Because the first time I had heard about it, but I wasn't

1    present.  I hadn't even seen him.  It's the second time that I

2    saw him.

3    Q.  So in the second time, when you actually met Mr. Pa, that

4    was at the president's office building?

5    A.  Yes, as I have already explained.

6    Q.  Do you recall who else was at that meeting?

7    A.  In fact, we were not there in the context of any meeting,

8    and I can't say who actually attended the meeting itself, but

9    their clients were there and we were aware of the context in

10   which they had arrived.  The place where they were is a place

11   where everybody shows up, everybody goes.  And it was in that

12   context that I saw him.  That was a place where all the

13   ministers came and went regularly.

14   Q.  All right.  So let's break this down.  When you saw Sam Pa,

15   it was in a more public area?

16   A.  Within the president's offices.

17   Q.  And you said it's a place where lots of ministers come and

18   go?

19   A.  Yes, ministers came there.

20   Q.  And at the time where you saw Sam Pa with the president,

21   there were other ministers there?

22   A.  Yes, there were ministers there.  I can't confirm to you

23   today exactly which ones.

24   Q.  And you don't recall if Mr. Thiam was there?

25   A.  No, I don't recall.

H4rWthi2                          Sande - Cross

1   Q.  Now, you testified this morning about a photograph.  In

2   this photograph you identified --

3            THE COURT:  Is that 901, counsel?

4            MR. GOLDSMITH:  It is, your Honor.  Sorry.

5            THE COURT:  Thank you.

6            MR. GOLDSMITH:  901.

7   Q.  You identified Mr. Sam Pa on the left?

8   A.  Yes.

9   Q.  And you identified Mr. Thiam on the right?

10  A.  Yes.

11  Q.  You also identified the Prime Minister Doré?

12  A.  Yes.

13  Q.  That's the other gentleman in the picture.

14           THE INTERPRETER:  The other gentleman --

15           MR. GOLDSMITH:  In this photograph.

16  A.  Yes.

17  Q.  When did Prime Minister Doré take power?

18  A.  It was during the transition, about the month of February

19  2010.

20  Q.  OK.  So February of 2010 is when Mr. Doré took over;

21  Mr. Komara was the prime minister before him?

22  A.  Yes, Prime Minister Kabine Komara.

23  Q.  You testified this morning on several occasions that in

24  regards to the several agreements in this case, that there were

25  clear instructions on what to do?

H4rWthi2                          Sande - Cross

1    A.  Yes.  In any case, the three agreements that we were

2    talking about at that moment -- that is to say, the master

3    agreement, the oil agreement, and the loan agreement -- were,

4    corresponded to what you described, and that they were

5    elaborated by a commission that was under the umbrella of the

6    government.

7    Q.  And you said that there was clear instruction with them?

8    A.  Yes, clear instructions for going in the direction of

9    establishing cooperation with the Chinese.

10   Q.  From President Dadis?

11   A.  Of course.

12   Q.  And the clear instructions for every one of those

13   agreements came from President Dadis?

14   A.  Yes, going through the prime minister as head of the

15   government.

16   Q.  And the prime minister was reflecting President Dadis'

17   desire to have those agreements implemented?

18   A.  Yes, indeed, but you have to clarify.  At the time that we

19   were going into negotiations with the Chinese, so a great

20   desire was there, because when you take into consideration the

21   enormous difficulties that we were under, we were of course

22   eager to enter into such negotiations, especially considering

23   the big sum of that loan.  So there was a great desire involved

24   there; everybody was on the side of it.

25   Q.  You testified about the power of attorney --

1    A.   Yes.

2    Q.   -- that was given to Boubacar Barry?

3    A.   Yes.

4    Q.   Boubacar Barry was the minister of housing at the time,

5    correct?

6    A.   He was in charge of three departments.

7    Q.   Which three?

8    A.   There was public works, construction, and the public

9    heritage.

10   Q.   Within the context of the CIF investment project, he was a

11   concerned minister?

12   A.   The concerned minister?  With respect to what?

13   Q.   The projects that were going to happen under the CIF

14   investment.

15   A.   Several departments were concerned by this.

16   Q.   Right.  And the several departments included agriculture,

17   right?

18   A.   Yes.

19   Q.   And transport, as you stated earlier?

20   A.   Yes.

21   Q.   In fact, as you discussed earlier, mines was but one aspect

22   of the CIF investment project?

23   A.   In the investment, yes.

24   Q.   Now, getting back to the power of attorney for Mr. Barry,

25   you testified that initially, you told the prime minister you

H4rWthi2                        Sande - Cross

1   did not want to give him that power?

2   A.  Yes.

3   Q.  And after you told the prime minister that you were not

4   going to assign your power of attorney to Mr. Barry, the

5   president then instructed you to give the power?

6   A.  Yes.

7   Q.  There also was a meeting that you were asked not to attend.

8   Do you recall that?

9   A.  What meeting?

10  Q.  The meeting in China.

11  A.  The meeting in China?

12  Q.  Yes.

13  A.  Are you talking about the power of attorney, because I

14  don't understand you?

15  Q.  Let me back up.  In your testimony earlier today, there

16  were a number of times where you testified that you were asked

17  to act in a certain manner as the minister of finance on the

18  subcommittee for CIF.

19  A.  I don't understand.

20  Q.  This morning in your testimony, there were several

21  occasions where you used the term that you were asked --

22  A.  Yes.

23  Q.  -- and you were -- and you testified in that fashion

24  regarding certain actions or inactions as part of that CIF

25  subcommittee.  Do you recall those instances?  From your

1    testimony this morning.

2    A.  Do you think that you could rephrase your question, because

3    I'm just not managing to understand what you mean?

4    Q.  Under the subcommittee related to CIF, you were requested

5    to take action.

6              MR. DiMASE:  Objection.

7              THE COURT:  Sustained.

8    Q.  Under the subcommittee regarding CIF, you took direction

9    from the president?

10   A.  Yes, as I explained, when those, when the first meetings

11   took place, we were given instructions, those of us in the

12   government.  We were given certain instructions to be able to

13   enter into these agreements with the Chinese, and these

14   directions came directly from the president and were given to

15   the prime minister.  That's what motivated our meeting in the

16   governmental context, and the agreements were developed.  This

17   is work that came directly from the president and was developed

18   in the name of the government, and I signed the agreements on

19   behalf of the government.

20   Q.  At the direction of the president?

21   A.  That's what I just explained.

22   Q.  And you did things like providing the power of attorney to

23   Minister Barry at the direction of the president?

24   A.  Upon the request of the president.

25   Q.  You were in a position to reject the request of President

H4rWthi2                          Sande - Cross

1   Dadis?

2   A.  If it's something that's not good, you say it's not good,

3   even as a minister.  It is part of your responsibility to

4   explain to the president when something is not correct.

5   Q.  Despite your testimony earlier that as a military man, you

6   considered it chain of command.

7             MR. DiMASE:  Objection.

8             THE COURT:  Overruled.

9   A.  Yes, chain of command is respected in the army.

10  Q.  Now, you were asked some questions about a meeting that

11  took place with the council of ministers on October 8 of 2009

12  that you did not attend?

13            THE INTERPRETER:  Could I have that date again?

14            MR. GOLDSMITH:  October 8.

15            THE INTERPRETER:  Thank you.

16  A.  Yes, you asked me that question.

17  Q.  There was a shareholders agreement that was executed two

18  days afterward?

19  A.  Yes, according to what I saw.

20  Q.  That you had signed?

21  A.  Of course.

22  Q.  And that you signed at the direction of the president?

23  A.  Yes, I signed at the direction of the president.  He -- the

24  document came to me.  I consulted the president.  The

25  commission had been established and developed the work, and

1    document's correct and I signed it.

2    Q.   What's the difference between a minister of state and a

3    minister at the presidency?

4              THE INTERPRETER:  Minister of the presidency?

5              MR. GOLDSMITH:  At the presidency, in 2009.

6    A.   A minister of state is perhaps one degree higher than a

7    typical minister, normal minister, so according to French

8    nomenclature and structure, a minister of state has a number of

9    other departments that are under his responsibility and duties.

10   So for example, if we take the case of Boubacar Barry, he was

11   the state minister in charge of three departments.  And so

12   there was a secretary of state who was a minister but who

13   reported to him.

14             Now, a minister to the presidency, that's a minister

15   which comes directly under the presidency because the president

16   has a very particular interest in the particular sector, and so

17   keeps an eye on it.  That's the difference.

18   Q.   Did Minister Barry speak English in 2009?

19   A.   I have no knowledge of that.

20   Q.   Do you ever remember hearing him speak or read English?

21   A.   Our official language is French, so among one another,

22   generally speaking, we're speaking French.

23             MR. GOLDSMITH:  No further questions.

24             THE COURT:  Is there redirect or not?

25             MR. DiMASE:  Yes, your Honor.  Very briefly.

1          THE COURT:  Ladies and gentlemen, we could take a

2     break now or see if we can complete this witness's testimony,

3     since this is going to be brief questioning.  Would anyone like

4     to take a break now, or can we wait a few minutes?  Break now

5     anyone?  We can wait, then.

6          Counsel.

7     REDIRECT EXAMINATION

8     BY MR. DiMASE:

9     Q.  Mr. Sande, just a couple of follow-up questions for you.

10    A.  Yes.

11    Q.  Those agreements that were signed in June 2009 --

12    A.  Yes.

13    Q.  -- were they discussed in the council of ministers?

14          THE INTERPRETER:  Were they?

15          MR. DiMASE:  Discussed in the council of ministers.

16          MR. GOLDSMITH:  Objection.  Timing.

17          THE COURT:  Overruled.

18    A.  The first three agreements?

19    Q.  Correct.

20    A.  Yes.

21    Q.  And did those agreements have the approval of the council

22    of ministers?

23    A.  Yes.

24    Q.  To your knowledge, was the second -- was that document that

25    was dated July 2009, the document that you reviewed dated July

H4rWthi2                              Sande - Recross

1    2009, was that discussed by the council of ministers?

2    A.  No.  I have no knowledge of that.  As I have already said

3    regarding this document, this is a document that I became aware

4    of only when I saw you.

5    Q.  And with respect to the shareholders agreement, you

6    indicated that you did not participate in meetings regarding

7    that agreement?

8    A.  No, I did not.

9    Q.  So you did not have direct input into that agreement?

10   A.  Personally, no.

11   Q.  And were you aware of objections by the technical committee

12   regarding the shareholders agreement?

13   A.  Personally, I was not in contact with that technical

14   commission.

15   Q.  So you were not aware of objections made by that technical

16   committee to the shareholders agreement?

17   A.  No.

18           MR. DiMASE:  One moment, your Honor.

19           No further questions.

20           THE COURT:  Recross?

21           MR. GOLDSMITH:  Thank you.

22   RECROSS-EXAMINATION

23   BY MR. GOLDSMITH:

24   Q.  But you signed the shareholder agreement at the president's

25   wishes?

1                THE COURT:  Yes or no?

2                THE INTERPRETER:  Oh, did you --

3                MR. DiMASE:  Yes.

4      A.  Yes, I signed.  Yes, I signed according to the instructions

5      received.

6                MR. GOLDSMITH:  No further questions.

7                THE COURT:  Any redirect?

8                MR. DiMASE:  No.

9                THE COURT:  You may step down.

10               (Witness excused)

11               THE COURT:  Ladies and gentlemen, we'll take our

12     midmorning recess.  Let Ms. Rojas know when you're ready to

13     resume.

14               (In open court; jury not present)

15               THE COURT:  You can leave.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  Mr. Kobre, anything to discuss?

3            MR. KOBRE:  We do have one brief matter for the Court

4    that will relate to the next witness, although it's not likely

5    to come up before lunch.  But it's an evidentiary issue.

6            MS. LARYEA:  Your Honor, may I approach with the

7    documents.

8            Your Honor, the government plans to use three summary

9    exhibits with the next witness.  There is, under the

10   government's understanding, no dispute with defense counsel as

11   to whether these summary exhibits can be used as demonstratives

12   in court.  The dispute is about whether the summary exhibits

13   can be admitted under 1006 as summary exhibits into evidence.

14   And the government's position is that it should be admitted

15   into evidence because it meets all four requirements under

16   1006.

17           THE COURT:  These are exhibits 1001, 1002, and 1003

18   that we're talking about?

19           MS. LARYEA:  Correct, your Honor.  They relate to the

20   HSBC Hong Kong bank records of the defendants and the China

21   International Fund executives.  Those records are voluminous.

22   They are about 2600 pages long, and they're not conveniently

23   subject to examination by the Court.

24           Further, these summary exhibits are an accurate

25   compilation of those voluminous bank records.

H4r1thi3

1          Third, those bank records have been admitted into

2     evidence by stipulation of the parties.

3          And fourth, these summary exhibits have been given to

4     the defense for examination and review.

5          So because these exhibits meet the four requirements

6     under 1006, the government wishes to offer them into evidence.

7          THE COURT:  Mr. Goldsmith.

8          MR. GOLDSMITH:  As the government stated, I have no

9     objection to the special agent using these as demonstrative

10    pieces during his testimony to ease the jury's understanding of

11    some of the details of that testimony, but I do not think they

12    should be admitted as exhibits for the jury to review during

13    the deliberation process.  As the government said, all of the

14    underlying evidence has already been stipulated to.  It will be

15    available for the jury if they so wish to review.  But beyond

16    that, these documents represent a -- while it is a visual, for

17    lack of a better word, a flow chart, they represent the aspect

18    of testimony that is best reflected by the agent's testimony in

19    person or through the transcript.

20         And moreover, at least for the exhibit marked as 1001,

21    while the flow chart goes into how the expenses were made from

22    the defendant's bank account, it is totally immaterial and

23    irrelevant to the elements of the case at hand, and I don't

24    believe that that would be appropriate for the jury to review

25    during deliberations.

H4r1thi3

1          So under those reasons, as I said, I have no problem

2     with the government publishing it during the agent's testimony,

3     but I don't think it should go back during deliberations.

4          THE COURT:  Okay.  So let's focus on 1001.  What is

5     your specific objection to 1001?

6          MR. GOLDSMITH:  In terms of actual evidence for the

7     jury to review in deliberation?

8          THE COURT:  Yes.

9          MR. GOLDSMITH:  It is, the right half of the page

10    articulates the specific expenses of the defendant.  In other

11    words, it says airfare, luxury hotel, transportation, with

12    logos of British Airways and Four Seasons, interior design and

13    houseware, a logo of Steinway & Sons pianos, designer apparel,

14    Louis Vuitton and Barney's logos.  Again, all of the underlying

15    bank statements are in evidence by stip, but the condensing and

16    the review in this particular fashion of how the defendant

17    spent any money is irrelevant and immaterial to the elements of

18    whether he accepted a bribe and then as that foundation of

19    whether the bribe was ultimately laundered into his bank

20    account.  If there was testimony in evidence that third parties

21    made luxury purchases that were then gifted to the Thiams, I

22    might accept that as being more relevant or material to the

23    aspect of bribes, but there's been no such testimony and won't

24    be any such testimony.  This is purely a pictograph of how

25    funds were spent from the Thiam account.  I think that it is

H4r1thi3

1    prejudicial in that respect because they are highlighting

2    luxury discretionary purchases that may impact and influence

3    the jury's decision by making an estimate of the defendant's

4    character about how he spends his money rather than focusing on

5    the elements of the case, which are: did he accept a bribe and

6    did he then take that bribe money and bring it into a US

7    account.

8            THE COURT:  Okay.  So let me start with finding that

9    these three exhibits -- 1001, 1002, and 1003 -- meet the

10   requirements of Federal Rule of Evidence 1006.  The underlying

11   documents reflecting financial transactions are voluminous.  It

12   would be beyond any human being's ability, in the course of

13   this trial and service as a juror, to plow through them and try

14   to make sense of them, so the only sensible way to present the

15   relevant portions of the documents is through a summary

16   exhibit.

17           And so I understand that the only real objection is

18   with respect to what might be presented under Rule 403, and it

19   concerns Exhibit 1001.  Now I understand with respect to that

20   objection there is no dispute with respect to the accuracy and

21   the objection is not to presenting this information to the

22   jury, because defense counsel agrees that could be done by a

23   witness on the stand giving testimony orally that summarizes

24   this same information.  So again, the objection is to having

25   that easily accessible to the jury through a presentation of a

H4r1thi3

1    single page.

2            In terms of prejudice, of course, the concern of 403

3    is one of unfair prejudice.  Much evidence that comes in during

4    the trial is prejudicial in the sense that it's relevant in

5    tending to show guilt.  So I don't understand there to be any

6    unfair prejudice here.  It's fair for the jury to consider why

7    one would take a bribe.  There has already been testimony that

8    the jury might find that bribe money perhaps, assuming other

9    evidence comes in, that was used to buy and renovate a home in

10   a luxurious manner, is possibly considered by it.

11           So Mr. Goldsmith, I want to make sure I captured your

12   argument correctly, but I think your concern is with the fact

13   that the jury will have evidence that, if they find bribe money

14   came into the United States, it was used for the purpose of

15   purchasing luxuries, among other things.  Is that really the

16   nub of it?

17           MR. GOLDSMITH:  Yes, your Honor, that it would be

18   unfairly prejudicial in the sense that the jurors would be

19   examining characteristics and traits of the defendant rather

20   than the strict elements.

21           THE COURT:  Okay.  Much of the evidence, of course,

22   that comes in at any trial is beyond the strict elements.  It

23   provides circumstantial evidence for the jury to infer many

24   things.  That's typical at a trial.  And here, how the

25   defendant used money, if the jury finds that he did receive a

1    bribe and brought that money into this country, would be

2    relevant, indeed highly relevant, and so as long as there's no

3    argument that there is an unfair or inaccurate presentation of

4    information in 1001, that the specific expenditures are not

5    accurately described on the document, I will permit 1001 to be

6    used.

7              Okay.  Anything else, Mr. Goldsmith, we need to

8    address at the break this morning?

9              MR. GOLDSMITH:  Not at this time.

10             THE COURT:  Thank you.

11             So counsel, I want you to be prepared at 5:00 to

12   address the open issue of the videotaped testimony, now that we

13   have had the discussion or the presentation of testimony from

14   the two Guinean witnesses.

15             I'll give you a very brief chance to take a recess.

16   The jury is ready.

17             THE DEPUTY CLERK:  All rise.

18             THE COURT:  Come back as soon as possible to the

19   courtroom, please.

20             (Recess)

21             (In open court; jury not present)

22             THE COURT:  Bring in the jury.

23             (Continued on next page)

24

25

H4r1thi3                          Killeen - Direct

1           (Jury present)

2           THE COURT:  Government may call its next witness.

3           MS. LARYEA:  The government calls Special Agent

4    Patrick Killeen.

5           THE DEPUTY CLERK:  Agent Killeen, if you'd please come

6    forward and take the witness stand.

7           (Witness sworn)

8     PATRICK KILLEEN,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MS. LARYEA:

13   Q.  Agent Killeen, where do you live?

14   A.  I live in New York City.

15   Q.  Where do you work?

16   A.  I work with the FBI here in New York.

17   Q.  How long have you been with the FBI?

18   A.  Approximately 14½ years.

19   Q.  What is your current assignment with the FBI?

20   A.  I'm currently a special agent assigned to the international

21   corruption squad here in New York.

22   Q.  When did you join that squad?

23   A.  October of 2015.

24   Q.  What did you do before you joined that squad?

25   A.  I worked in two previous FBI offices in Milwaukee and

H4r1thi3                          Killeen - Direct

1    Detroit.

2    Q.  How long were you in Milwaukee?

3    A.  I was there for three years.

4    Q.  And how long were you in Detroit?

5    A.  Approximately nine and a half.

6    Q.  What kind of cases did you investigate while you were in

7    Milwaukee and in Detroit?

8    A.  I worked a variety of criminal violations but primarily

9    white collar crime, public corruption, and organized crime.

10   Q.  Before you were an FBI agent what did you do?

11   A.  I worked -- I earned a CPA, I worked in public accounting

12   for two years, and then I worked at a hedge fund for three and

13   a half.

14   Q.  Agent Killeen, in your current position what kind of cases

15   do you investigate?

16   A.  We investigate primarily violations of the Foreign Corrupt

17   Practices Act, kleptocracy, and associated money laundering.

18   Q.  Have you investigated a money laundering case?

19   A.  Yes, I have.

20   Q.  Are you familiar with Mahmoud Thiam?

21   A.  I am.

22   Q.  How are you familiar with him?

23   A.  Shortly after arriving in New York and joining the squad, I

24   was assigned as a co-case of the investigation of the

25   defendant.

1   Q.  Around when were you assigned as a co-case agent in the

2   investigation of the defendant?

3   A.  Approximately November 2015.

4   Q.  Why was the FBI investigating the defendant?

5        THE COURT:  Sustained.

6   Q.  Why were you investigating Mr. Thiam?

7        THE COURT:  Sustained.

8   Q.  While you were working on this case did you gather

9   electronic evidence?

10  A.  We did.

11  Q.  What kind of records did you gather?

12  A.  Multiple different types of records.  We obtained bank

13  records, emails, toll records.

14  Q.  Let's start with the emails.

15  A.  Okay.

16  Q.  How did you get those records?

17  A.  Those were obtained via search warrant.

18  Q.  And you mentioned other records as well.  You mentioned

19  bank records.

20  A.  Yes.

21  Q.  How did you get those bank records?

22  A.  Those records were obtained through standard legal

23  requests, including a grand jury subpoena.

24  Q.  Any other ways you obtained those records?

25  A.  Requests, and then we also obtained records, financial

1    records, through a search warrant.

2    Q.  Were all the financial records you obtained based in the

3    United States?

4    A.  No, they weren't.

5    Q.  Where else were they based?

6    A.  We obtained records from Hong Kong, financial records.

7    Q.  Did you obtain any other kinds of evidence in your

8    investigation of this case?

9    A.  Yes, we did.

10   Q.  What kind of records?

11   A.  We obtained property records related to certain properties.

12   Q.  The property records, what properties were they related to?

13   A.  Primarily the defendant's residence on the Upper East Side

14   of New York and the property located up in Dutchess County.

15   Q.  Mr. Killeen, I actually want to return to the financial

16   records that you obtained.  Whose financial records were those?

17   A.  We obtained financial records of multiple individuals,

18   but -- including the defendant's.

19   Q.  Any other individuals?

20   A.  We also obtained records for -- related to executives of

21   CIF.

22   Q.  Who were those executives?

23   A.  Sam Pa, Lo Fung Hung, and Wei Xian Fei.

24   Q.  Agent Killeen, did you obtain any other records in this

25   case?

H4r1thi3                    Killeen - Direct

1    A.  We did.

2    Q.  What were those records?

3    A.  We obtained -- we obtained the records through a search

4    warrant, so we obtained various governments, through the search

5    warrants, and on the international side we also received

6    government documents from the Republic of Guinea.

7    Q.  What kind of documents did you receive from the Republic of

8    Guinea?

9    A.  We obtained multiple types of documents, but primarily

10   documents related to the CIF joint venture.

11   Q.  What did you do when you received all these records that

12   you have mentioned today?

13   A.  Well, we received the records and then they were basically

14   reviewed and analyzed, we tried to connect the dots.

15   Q.  When Mr. Thiam was arrested --

16   A.  Yes.

17   Q.  -- were you present?

18   A.  I was.

19   Q.  Do you see Mr. Thiam in the courtroom today?

20   A.  I do.

21   Q.  Can you describe where he is sitting.

22   A.  Second gentleman from the right wearing glasses and a blue

23   suit.

24          MS. LARYEA:  Your Honor, may the record reflect that

25   the witness has identified the defendant.

H4r1thi3                      Killeen - Direct

1             THE COURT:  Yes.

2    Q.  After the defendant was arrested, did he speak with law

3    enforcement?

4    A.  He did.

5    Q.  When did the interview occur?

6    A.  Same day as his arrest, shortly after his arrest.

7    Q.  Were you present for that interview?

8    A.  I was not.

9    Q.  Was that interview videotaped?

10   A.  It was.

11   Q.  Did you review the video of that interview?

12   A.  I did.

13   Q.  I'd like to start with some information, some discussion

14   about the defendant's relationship with CIF.

15   A.  Okay.

16   Q.  During the investigation did you determine approximately

17   when the defendant first met executives of CIF?

18   A.  Approximately May or June of 2009.

19            THE COURT:  Excuse me.  I'm going to strike that.

20   Stricken.

21            MS. LARYEA:  Okay.

22   Q.  Agent Killeen, when did the defendant first meet executives

23   from CIF?

24            THE COURT:  Sustained.

25   Q.  Agent Killeen, did you review emails in connection with

H4r1thi3                          Killeen - Direct

1   this?  You mentioned you reviewed emails in connection with

2   this investigation, is that correct?

3   A.  I did.

4        MS. LARYEA:  Mr. Beer, will you please publish what

5   has been admitted as Government's Exhibit 502.  Can you enlarge

6   the written text.

7   Q.  Agent Killeen, have you seen this document before?

8   A.  I have.

9   Q.  What is it?

10  A.  This is an email from the defendant to an email account

11  under the name of Bao-Wen Chen.

12  Q.  And who is Bao-Wen Chen?

13  A.  He is a business executive in China.

14       THE COURT:  I'm sorry, counsel.  I'm going to have

15  that stricken.

16       MS. LARYEA:  All right.

17  Q.  Agent Killeen, does the email mention when it was sent?

18  A.  It does.

19  Q.  Can you read the email into the record.

20  A.  The email was sent on June 6, 2009.

21  Q.  Can you read the email.

22  A.  Oh, okay.  "It's Mahmoud.  How are you?  I am now in

23  Guinea, Conakry, as minister of mines and energy.  We have a

24  visit from a group called China Investment Fund, headed by Sam

25  Pa and Lo Fung Hung.  Can you tell me if you know them or can

H4r1thi3                        Killeen - Direct

1   you find out.  Much appreciated.  Mahmoud Thiam."

2   Q.  This email mentions Guinea, Conakry.

3   A.  Yes.

4   Q.  Do you know what Guinea, Conakry is?

5   A.  Yes, Conakry is the capital of Guinea.

6   Q.  How do you know that?

7   A.  Well, through investigation, and I've also been to Conakry.

8   Q.  The email mentions China Investment Fund.

9   A.  Yes.

10  Q.  It also mentions a Sam Pa.

11  A.  Yes.

12  Q.  And a Lo Fung Hung.

13  A.  Yes.

14  Q.  Agent Killeen, you mentioned that you reviewed the

15  postarrest statement.

16  A.  I did.

17  Q.  When the defendant was interviewed by FBI agents after his

18  arrest, did he say whether he met Sam Pa or Lo Fung Hung?

19  A.  He did.

20          THE COURT:  Sustained.

21          MS. LARYEA:  Mr. Beer, will you please play clips 1

22  and 3 of the meeting -- of the postarrest statement.

23          THE COURT:  Is there an exhibit number with this?

24          MS. LARYEA:  Yes.  It's part of Exhibit 801-A.

25          (Video played)

H4r1thi3                        Killeen - Direct

1          MS. LARYEA:  Mr. Beer, please publish clip 1 from

2     Government Exhibit 801-A.

3          (Video played)

4          MS. LARYEA:  Mr. Beer, will you please publish

5     Government Exhibit 503.

6          Can you enlarge the top part of the document.

7     BY MS. LARYEA:

8     Q.  Agent Killeen, did you review this document?

9     A.  I did.

10    Q.  What is it?

11    A.  This is an email from the defendant to an email account

12    for -- of Baker Al-Sadi.

13    Q.  What is the date of this email?

14    A.  June 13th of 2009.

15         MS. LARYEA:  Mr. Beer, will you enlarge the bottom

16    email.

17    Q.  Agent Killeen, could you read the section starting with,

18    "Had chairman of Sonangol."

19    A.  "Had chairman of Sonangol here for two days with chairman

20    of China International Fund.  Great prospects.  More

21    important --"

22    Q.  Sorry.

23         MS. LARYEA:  Next page, please.

24    A.  "-- developed great relationship with both, and you know

25    how hard it is to get Sonangol guy."

1   Q.  And the date you said was June 13th?

2   A.  Yes.

3          MS. LARYEA:  Mr. Beer, will you please publish

4   Government's Exhibit 402.

5   Q.  Have you ever seen that document?

6   A.  I have.

7          MS. LARYEA:  Sorry.  402-T, please.

8   Q.  What is it?

9   A.  This is the master agreement that was signed on June 12,

10  2009, between CIF and the Republic of Guinea.

11         MS. LARYEA:  Mr. Beer, will you please publish page 4

12  of this document.  Actually -- sorry -- please publish page 3

13  of the document.  Please enlarge the section A.

14  Q.  What does this document say that the parties have agreed

15  to?  If you can just read that first section, just the part

16  until JVC, that first line.

17  A.  Okay.  "The parties have agreed to create a joint venture

18  through the incorporation of a company under the laws and

19  regulations of Singapore, provisionally entitled Sino-Guinean

20  Development Company SA, hereafter abbreviated as JVC."

21         MS. LARYEA:  Mr. Beer, could you please go to page 5

22  of this document.

23         Could you please enlarge Section B.  Including the

24  table underneath it.

25  Q.  What is the percentage of interest in the JVC that CIF is

1   supposed to have, according to this document?

2   A.   75 percent.

3   Q.   What is the percentage of the JVC that the government of

4   Guinea is supposed to have, according to this document?

5   A.   Total of 25 percent.

6           MS. LARYEA:  Mr. Beer, please publish the signature

7   page, which is the third to last page of this document.

8   Actually, please publish Government Exhibit 402.  And the

9   signature page of this document, the third to last page.

10  Q.   Does the signature page say who signed for --

11          MS. LARYEA:  Can you enlarge the signatures, Mr. Beer,

12  please.

13  Q.   Does it say who signed for Guinea?

14  A.   For Guinea?

15  Q.   Yes.

16  A.   Yes, it's Captain Mamadou Sande.

17  Q.   Does it have a name written of who signed for China

18  International Fund?

19  A.   No, it does not.

20  Q.   Okay.

21          MS. LARYEA:  Mr. Beer, will you please publish

22  Government's Exhibit 504.

23  Q.   Have you seen this email before?

24  A.   I have.

25  Q.   What is it?

1   A.  This is an email -- well, it's an email string originally

2   from Jimmy Leong to the defendant and then the defendant

3   forwards on this email to -- I believe back to Guinea.

4   Q.  What is the date of this email?

5   A.  The date of this email is July 2, 2009.

6   Q.  And does the email --

7            MS. LARYEA:  Mr. Beer, will you please publish the

8   first full paragraph of the email from Jimmy Leong.  First

9   page.  First full paragraph.

10  Q.  Does this paragraph mention a visit?

11  A.  Yes, it does.

12  Q.  What does it say about a visit?

13  A.  It reads, "In view of your coming visit to Singapore with

14  Mr. Sam Pa, we have taken the opportunity to organize some

15  documentation material for your advice and implementation for

16  the purpose of establishing our cooperation structure."

17  Q.  Thank you.  And who is this email to?

18  A.  This email is to the defendant.

19  Q.  This mentions a visit.  During your investigation did you

20  determine whether the defendant actually took such a visit?

21           THE COURT:  Sustained.

22           MS. LARYEA:  Mr. Beer, will you please publish

23  Government's Exhibit 506.  506-T.

24  Q.  Agent Killeen, did you review this document?

25  A.  I have.

1    Q.  What is it?

2    A.  This is an email from the defendant to the prime minister

3    of Guinea.

4    Q.  Does it mention prime minister on this email?

5    A.  Yes, it does.

6            MS. LARYEA:  Mr. Beer, will you please enlarge the top

7    of the email through the second paragraph, the end of the

8    second paragraph.

9    Q.  Does the email say the purpose of the email?  Can you read

10   the sentence that says, "I have the honor."

11   A.  "I have the honor to report back to you on our current

12   mission to Asia at the CIF."

13   Q.  What date is this email?

14   A.  This is July 9th of 2009.

15   Q.  Does the defendant in this email say where he is?

16   A.  He advised that he was in Singapore.

17   Q.  Does the defendant in the email say when he arrived in

18   Singapore?

19   A.  He advises that he was -- arrived in Singapore two days

20   prior to this email.

21           MS. LARYEA:  Mr. Beer, will you please enlarge the

22   remainder of that email.

23   Q.  In the email, does it mention anything that was supposed to

24   take place in Singapore?

25   A.  Yes.

H4r1thi3                          Killeen - Direct

1    Q.   What does it say?

2    A.   The signing of required -- signing of some documents.

3    Q.   Does it mention a ceremony?

4    A.   Yes.

5    Q.   What does it say about a ceremony?

6    A.   It reads, "During the ceremony, the different corporate

7    partners of the group, which will be responsible for the

8    execution of different types of projects, gave a presentation

9    of their respective capacities and their views on the task to

10   be completed in Guinea as well."

11   Q.   You mentioned the email said something about signing of

12   documents.

13   A.   Yes.

14   Q.   According to the email, reading the email, does it indicate

15   whether these documents have been signed?

16   A.   It indicated that they had been signed by one party --

17            THE COURT:  I'll let you direct the witness to the

18   passage.

19            MS. LARYEA:  Okay.

20   Q.   Can you read the section that starts with "Because."

21   A.   "Because the documents required for Guinea's stake holding

22   in the company to be created have not arrived from Conakry yet,

23   it was decided to authorize Mr. Vincente to sign these

24   documents so we could return home.  The Guinean and Chinese

25   parties decided to postpone signing these documents and to wait

1   for the arrival of the minister of state, along with the

2   required documents."

3   Q.   Can you also please read the next paragraph.

4   A.   "Another variable made this wait necessary.  The documents

5   presented were again listing the initially discussed sharing of

6   85 percent for CIF and 15 percent for Guinea.  It seemed to me

7   that the commission eventually chose -- eventually chose to

8   offer 20 or 25 percent.  When I brought this up, I was told

9   that considering they will deploy or raise hundred percent of

10  the funding, this sharing out is imposed on them.  I then

11  suggested as compensation that ADC not own 100 percent of these

12  local GDG subsidiaries but only up to 80 or 90 percent.

13  Therefore, it would allow the state to recover what was given

14  apropos the holding company.  I left the board to assess the

15  situation and notify us of their decision.  Mahmoud Thiam."

16          MS. LARYEA:  Mr. Beer, will you please publish

17  Government's Exhibit 408.  Could you please go to -- sorry.

18  Before you do that.

19  Q.   Special Agent Killeen, have you reviewed this document?

20  A.   I have.

21  Q.   What is it?

22  A.   This is the shareholder agreement between CIF Singapore,

23  China Sonangol International Singapore, and the Republic of

24  Guinea.

25  Q.   What is the date on this document?

1    A.  This is October 10th of 2009.

2              MS. LARYEA:  Mr. Beer, will you please publish page 3.

3    Can you please enlarge Sections A and Section B.

4    Q.  In this document could you please read the section A.

5    A.  "Africa Development Corporation PTE LTD is a private

6    company with a limited liability incorporated in Singapore and

7    having a share capital of 1,000 USD and with 1,000 ordinary

8    shares of which 425 ordinary shares are legally and

9    beneficially owned by each of CIFS and CSIS and 150 ordinary

10   shares are legally and beneficially owned by the Republic of

11   Guinea."

12   Q.  Does the email mention GDCs?

13   A.  It does, in the next paragraph.  "The ADC shareholders will

14   take all necessary steps to incorporate various subsidiaries in

15   the Republic of Guinea, each a "GDC" and collectively the

16   "GDCs," as wholly owned subsidiaries of ADC or as the parties

17   may agree, each of which shall be 85 percent directly owned by

18   ADC and 15 percent directly owned by the Republic of Guinea, or

19   such other percentages as may be agreed between the parties."

20             MS. LARYEA:  Mr. Beer, will you please publish

21   Government's Exhibit 514-T.

22   Q.  Agent Killeen, did you review this email?

23   A.  I have.

24             MS. LARYEA:  Can you please enlarge the text of the

25   email, Mr. Beer.

1    Q.  What is this email?  What is the first email in the chain?

2    A.  The first email in the chain is from Lamine Fofana to the

3    defendant.

4    Q.  What date is that email?

5    A.  July 13th of 2009.

6    Q.  Can you please read that first paragraph.

7    A.  From the --

8    Q.  Yes, the email which starts, "Attached herein."

9    A.  "Attached herein please find the amendments to the ADC

10   bylaws.  We would like to draw your attention to the fact that

11   the bylaws will be sent for comments to a law office already

12   selected by the government, so we need to wait for the latest

13   amendments before the signing.  The same will apply to the

14   shareholders agreement that we will completed today before noon

15   UT."

16   Q.  What is the subject of this email?

17   A.  Subject are basically the ADC bylaws in the shareholder

18   agreement and the structure of the JVC.

19   Q.  Now the second email in the chain.  Who is it from?

20   A.  It's from the defendant.

21   Q.  And who is it to?

22   A.  To Jimmy Leong.

23   Q.  What is the subject of this email?

24   A.  It's a --

25              THE COURT:  Excuse me.  Is the agent reading a

```
 1   particular phrase or --

 2            MS. LARYEA:  Yes.

 3            THE COURT:  When he's answering that question, is he

 4   reading from the document?

 5            MS. LARYEA:  He will.  I will make that clear in my

 6   question.

 7            THE COURT:  Okay.  I don't want the witness'

 8   characterization.  I will permit him to read something.

 9            MS. LARYEA:  Understood.

10   BY MS. LARYEA:

11   Q.  Can you read from the document, the email the defendant

12   sent to Mr. Jimmy Leong?

13   A.  Okay.  "Hi Jimmy.  Please review attached proposed

14   amendments received from Guinea (in bold character).  It's in

15   French but very superficial changes, it seems.  Could you have

16   them check and give us your opinion.  I am with Mme. Lo.

17   Minister Thiam."

18            MS. LARYEA:  Mr. Beer, please publish Government's

19   Exhibit 516.

20   Q.  Agent Killeen, have you reviewed this document?

21   A.  I have.

22            MS. LARYEA:  Mr. Beer, please go to the second page,

23   bottom email.

24   Q.  On the bottom, do you see a From written?

25   A.  I do.
```

1   Q.  Can you read from the email who this email is from?

2   A.  Mdm Lo.

3   Q.  Just read what it says.

4   A.  "Dear Friend, Attached is the --"

5   Q.  I'm sorry.  Just read next to the From what it actually

6   says.

7   A.  Okay.  I apologize.  Lo FH.

8   Q.  What is the date of this email?

9   A.  This is August 4th of 2009.

10  Q.  And next to the To, who is it written to?

11  A.  It's to the email address of the defendant and Jack Cheung

12  at e-mail address reading jack@chinasonangol.com.

13  Q.  What is the subject of this email?

14  A.  It just says "Information."

15  Q.  Can you please read the email.

16  A.  "Dear friends, Attached is an email for your information.

17  Regard, Mdm Lo."

18          MS. LARYEA:  Mr. Beer, will you please go to the third

19  page of this document.  Can you enlarge the email.

20  Q.  Can you read from the bottom.  Is there a signature of who

21  sent that email?

22  A.  Yes.  The signature is of Andrea Hotter.

23  Q.  Can you read the next two lines after that signature.

24  A.  "News Editor, Commodities (EMEA) Dow Jones Newswires."

25  Q.  Now returning to the top of this paragraph, this document.

1  Can you please read the beginning until the end of that first

2  paragraph.

3  A.   Okay.  "As mentioned on the telephone, I have some

4  questions regarding your work in Guinea.  I have seen a copy of

5  the accord between yourselves and the Guinean government and

6  understand that you are creating a joint venture company to

7  develop projects in energy, water, electricity, transport,

8  housing, agriculture, fishing, and mining, as well as other

9  areas of common interest."

10  Q.   Can you read the last paragraph starting with "Can I."

11  A.   "Can I arrange to have a chat with someone at CIF about

12  this for a story I am writing for the Wall Street Journal."

13        MS. LARYEA:   Mr. Beer, will you please go back to the

14  second page.  Could you enlarge the middle of that page.  Yes.

15  Q.   Can you please read slowly the section that starts with,

16  "Dear Madame Lo."

17  A.   "Dear Madame Lo, I am currently in New York visiting my

18  family for a few days and might come straight to HK from here.

19  I would like to bring a set of my wife's bedsheets for you and

20  Mr. Pa.  Please visit her site saheliahome.com and pick a model

21  that you like.  Best, Mahmoud."

22        MS. LARYEA:   Mr. Beer, please go to the first page of

23  this email.  Please enlarge the bottom email.  What is the

24  first -- sorry, the bottom email.  The email on the bottom of

25  the page.  Starting with the -- no, above that.  The whole

H4r1thi3                         Killeen – Direct

1  email.  Yes, right there.

2  BY MS. LARYEA:

3  Q.  What does the first line of this email say?

4  A.  The address or the text?  The text portion?

5  Q.  The text.  The text.  No, the address.  Who is the first

6  line you see on this enlargement?

7  A.  That is the email address of the defendant.

8  Q.  And what is the next line, if you could just read it?

9  A.  "Lo FH.  Lo@chinasonangol.com."

10  Q.  What is the date of this email?

11  A.  August 30, 2009.

12  Q.  What is the subject of the email?

13  A.  "Re: Information."

14  Q.  Can you read the text of that email.

15  A.  Yes.  Dear Mme Lo.  It has been a long time since we last

16  communicated and I thought I would inquire.  I hope all is well

17  with you.  We are a bit concerned about the silence from CIF

18  side and the president is starting to ask questions.  Could you

19  please advise us as to Sam's whereabouts."

20          MS. LARYEA:  Mr. Beer, please enlarge the email right

21  above the one we reviewed.

22  Q.  Who is this email from?

23  A.  From Lo FH.

24  Q.  And what is the date?

25  A.  The date is August 31, 2009.

1   Q.  And next to the To sign, what is written?

2   A.  That's the email address of the defendant.

3   Q.  And next to the subject?

4   A.  Re: Information.

5   Q.  Can you please read the email.

6   A.  "Dear Mahmoud, How are you?  I'm okay.  In Hong Kong.  Hope

7   see you very soon.  Mr. Sam was busy with family issue in the

8   last week.  His father was very, very sick.  This morning the

9   old man passed away.  I hope he recovering from the hurt and

10   coming back to us."

11        MS. LARYEA:  Mr. Beer, please publish the email on the

12   top of this document.

13   Q.  Next to the From, what is written?

14        Next to the From --

15   A.  Okay.

16   Q.  -- what is written?

17   A.  That is the email address of the defendant.

18   Q.  And who is it to?

19   A.  Lo FH.

20   Q.  And what is the subject?

21   A.  Condolences.

22   Q.  What is the date of this email?

23   A.  August 31st of 2009.

24   Q.  Can you please read the email.

25   A.  Yes.  Dear Mme Lo.  Please accept our deepest condolences

1    for the passing of Sam's father.  Both the president and

2    Mr. Barry join me in this.  Sincerely, Mahmoud."

3              MS. LARYEA:  Mr. Beer, please publish Government's

4    Exhibit 517-T.

5              Could you please enlarge the text.

6    Q.  On this email next to the From, can you please read what

7    that says.

8    A.  The email address of the defendant.

9    Q.  And next to the To, what does it say?

10   A.  Bouba2.

11   Q.  And the date of the email?

12   A.  September 22nd of 2009.

13   Q.  Can you please read the email.

14   A.  Yes.  "Tried to reach you from Conakry and throughout the

15   flight.  I'm leaving Istanbul now.  I'm calling you from HK.  I

16   hope that everything is going well there."

17   Q.  Agent Killeen, you mentioned that you reviewed some bank

18   records in this case, is that correct?

19   A.  I did.

20   Q.  And you mentioned that some of the bank records came from

21   HSBC Hong Kong, is that correct?

22   A.  That's correct.

23             MS. LARYEA:  I'd like, Mr. Beer, if you could please

24   publish Government's Exhibit 301-A.

25   Q.  Agent Killeen, I am showing you what has been marked as

1    Government Exhibit 301-A.

2    A.   Thank you.

3    Q.   Have you seen this document before?

4    A.   I have.

5    Q.   And what is that document?

6    A.   This is an account opening document for a bank account at

7    HSBC in Hong Kong.

8    Q.   On that document does it say what date the account was

9    opened?

10   A.   Yes, it does.  It's September 24th of 2009.

11   Q.   Again, looking at that document, does it say who the

12   account is for?

13   A.   The account is listed under the name Mr. Thiam, Mahmoud.

14   Q.   Does the document list the nationality of --

15   A.   It does.

16   Q.   What does it say next to Nationality?

17   A.   It says France.

18   Q.   Does the document list the address of the person opening

19   the account?

20   A.   Yes.

21   Q.   And what is the address listed on that document?

22   A.   340 East 64th Street, Apartment 14H, New York, New York

23   10065.

24   Q.   Does the document list the email address?

25   A.   It does.

1   Q.  What is the email address listed on that document?

2   A.  The address we've seen before, mahmoud.thiam@gmail.com.

3   Q.  Does the document list the occupation of Mr. Thiam?

4   A.  It does.

5   Q.  What does it say next to Occupation?

6   A.  Consultant.

7   Q.  Does the document list the employer of the defendant?

8   A.  Yes.

9   Q.  What does it list as the employer?

10  A.  The employer is Mahmoud Thiam.

11  Q.  Does the document state whether this employment,

12  consultant, which is what you said before, does it state

13  whether that is a part-time or full-time job?

14  A.  It states that it's a full-time job.

15  Q.  Does the document list the income of the defendant?

16  A.  It does.

17  Q.  What does it say next to income?

18  A.  Per month, under the -- it's listed as indicated, income

19  per month, 200,000 or above.

20  Q.  Does the document say what HSBC branch that account was

21  opened?

22  A.  It does.

23  Q.  What is the HSBC branch listed on that document?

24  A.  Pacific Place HPC Branch.

25  Q.  Please, does the document have identification of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    defendant?

2    A.   It does.

3    Q.   Any kind of ID?

4    A.   Yes, it does.

5    Q.   Can you find that in the document.

6    A.   It's indicated on the first page.  Passport number, and it

7    provides the passport number of 08A153130, issued by France.

8    Q.   Thank you.

9          MS. LARYEA:  Please, Mr. Beer, go to page 5 of this

10   document.  Please enlarge the bottom.

11   Q.   And what is that?

12   A.   That is a signature of the defendant.

13         MS. LARYEA:  Mr. Beer, please go to page 6 of this

14   document.

15   Q.   And what is that?

16   A.   That is a copy of the passport presented at the account

17   opening.

18   Q.   What country is that passport from?

19   A.   France.

20         MS. LARYEA:  Mr. Beer, will you please return to

21   page 1 of this document.  Could you please enlarge the top part

22   of the document, up until --

23   Q.   Now, Special Agent Killeen, you just testified about

24   nationality, occupation, income.  Is this where you were

25   reading it from?

1    A.  Yes, I was.

2    Q.  Okay.

3         MS. LARYEA:  Mr. Beer, will you please publish

4    Government's Exhibit 305-A.

5         Could you please enlarge the top third of this

6    document.

7    Q.  Agent Killeen, have you reviewed this document?

8    A.  I have.

9    Q.  What is it?

10   A.  This is the account statement for the HSBC Hong Kong

11   account opened by the defendant on September 24th of 2009,

12   for the period ending October 23, 2009, the month.

13   Q.  Does this statement have the defendant's name actually

14   written on it?

15   A.  It does.

16   Q.  And what is the address written?

17   A.  340 East 64th Street, Apartment 14H, New York, New York.

18         MS. LARYEA:  Mr. Beer, please go to the second page,

19   and if you could please enlarge the section under Foreign

20   Currency Savings.

21   Q.  Do you see the date September 25th written on this

22   document?

23   A.  I do.

24   Q.  What does it say next to September 26th?

25   A.  Deposit.

H4r1thi3                          Killeen - Direct

```
 1   Q.  And next to Deposit, does it say the amount that was
 2   deposited?
 3   A.  Yes, it does.  It says 3 million.
 4   Q.  It says 3 million was deposited.
 5           THE COURT:  Is that a question, counsel?
 6   Q.  Does it say 3 million was deposited?
 7   A.  Yes.
 8           MS. LARYEA:  Mr. Beer, will you please publish
 9   Government's Exhibit 305-B.
10   Q.  Agent Killeen, did you review this document?
11   A.  I have.
12           MS. LARYEA:  Mr. Beer, will you please enlarge the
13   first half of this document.
14   Q.  Agent Killeen, could you please read -- under Hong Kong
15   Shanghai Banking Corporation, could you please read the section
16   that says Foreign Currency.
17   A.  Foreign currency Counter Withdrawal Form.
18   Q.  Does it have an account number listed on this document?
19   A.  It does.
20   Q.  Can you please read the last four digits of this account
21   number.
22   A.  1888.
23           Actually, my apologies.  That's a 9.  9888.
24   Q.  Under name of account to be credited, is there a name
25   written there?
```

1   A.  Yes.

2   Q.  Can you please read that name.

3   A.  Thiam, Mahmoud.

4   Q.  Under the amount to be credited, can you please read that

5   amount.

6   A.  3 million.

7   Q.  Now in the bottom, the next box, does it say the date that

8   this transfer took place?

9   A.  If you go down, you can see the date.  It's September 25,

10  2009.

11  Q.  And next to that does it say the amount next to the date

12  that was transferred?

13  A.  It does.

14  Q.  What does it say?

15  A.  US dollars, 3 million.

16  Q.  And again, does it say who transferred that amount?

17  A.  It does.  Pa, Sam Nang.

18  Q.  The next line, does it again have a date?

19  A.  It does.

20  Q.  What is that date?

21  A.  September 25th of 2009.

22  Q.  Does it have an account number that's receiving that money?

23  A.  Yes, it does.

24  Q.  Can you please read the last four digits of that account

25  number.

H4r1thi3                          Killeen - Direct

1    A.   0888.

2    Q.   Does it have the amount that's being deposited?

3    A.   Yes, it does.

4    Q.   Can you please read that amount.

5    A.   US dollars 3 million.

6    Q.   Does it mention who that amount is going to?

7    A.   Yes, it does.

8    Q.   Can you please read that name.

9    A.   Thiam, Mahmoud.

10   Q.   Does it have the signature?  Going back up, under signature

11   of account to be deposited, does it have a signature?

12   A.   It does.

13         MS. LARYEA:  Mr. Beer, will you please publish side by

14   side Government's Exhibit 402-T -- sorry.  402, yes.  Could you

15   go to the signature page of 402.  Could you please enlarge the

16   signature of 402.

17         Can you please enlarge the signature on the account

18   withdrawal form.  No, not that signature.  The signature above.

19         Sorry, Mr. Beer.  Can you enlarge horizontally the

20   whole section that includes that signature.  Thank you.

21         Now, Mr. Beer, can you go to the -- thank you.  Now,

22   Mr. Beer, could you go to the first page of Exhibit 402.

23   BY MS. LARYEA:

24   Q.   And the document we just reviewed with that signature, what

25   is it?

H4r1thi3                        Killeen - Direct

1    A.  On the right?

2    Q.  Yes, on the right.

3    A.  That is the, I believe -- if you could remove that.  I just

4    want to make sure.

5           I believe that's the master agreement, dated June 12,

6    2009.

7    Q.  Thank you.

8           MS. LARYEA:  Mr. Beer, will you please publish

9    Government's Exhibit 305-C.

10   Q.  Agent Killeen, did you review this document?

11   A.  Yes, I did.

12          MS. LARYEA:  Mr. Beer, will you please enlarge the

13   first third of this document.

14   Q.  What is the document?

15   A.  This is the account statement for another account at HSBC

16   Bank in Hong Kong, and the account holder is Mr. Pa, Sam Nang.

17   Q.  Are you reading that from the document?

18   A.  I am.

19   Q.  Does it list the address under Mr. Pa, Sam Nang?

20   A.  Pacific Place 2, Pacific Place, Hong Kong.

21   Q.  Does it list the date of this account statement?

22   A.  Yes, the date is for the month ending of 10 October of

23   2009.

24          MS. LARYEA:  Mr. Beer, will you please go to page 2 of

25   this document.  Will you please enlarge the section titled

H4r1thi3

Foreign Currency Savings.

1    Q.  Do you see a date September 25th?

2    A.  I do.

4    Q.  Next to that date what is written?

5    A.  There is a withdrawal.

6    Q.  What is written as the amount of the withdrawal?

7    A.  3 million.

8    Q.  Do you see a date September 3rd written?

9    A.  September 30th?

10    Q.  30th.

11    A.  Yes, I do.

12    Q.  What is written next to September 30th?

13    A.  Deposit.

14    Q.  Does the document have written the amount that was

15 deposited?

16    A.  Yes.  $2,999,999.03.

17         THE COURT:  Counsel, is this a good time for our

18 luncheon recess?

19         MS. LARYEA:  Yes, your Honor.

20         THE COURT:  Ladies and gentlemen, we'll break for

21 lunch.  We'll resume at 2:00.  Remember, do not discuss the

22 case.  Thank you.

23         (Continued on next page)

24

25

H4r1thi3

1              (Jury not present)

2              THE COURT:  Mr. Kobre, anything we need to discuss?

3              MR. KOBRE:  No, your Honor.

4              THE COURT:  Mr. Goldsmith?

5              MR. GOLDSMITH:  No, your Honor.

6              THE COURT:  Okay.  So thank you, Ms. Laryea.  You

7    understand, I think, what I'm doing.

8              MS. LARYEA:  Yes.

9              THE COURT:  We're not going to have any testimony

10   about the investigation.  This is a witness to display

11   documents, the records that are otherwise received in evidence.

12             MS. LARYEA:  Yes, your Honor.

13             THE COURT:  Thanks so much.

14             Have a good lunch.

15             THE LAW CLERK:  All rise.

16             (Luncheon recess)

17

18

19

20

21

22

23

24

25

H4r1thi3

|    |                                                              |
|----|--------------------------------------------------------------|

AFERNOON SESSION

2:00 p.m.

1

2

3          THE COURT:  Please be seated.

4          Bring in the jury.

5          (Jury present)

6          THE COURT:  Counsel.

7          MR. DiMASE:  Your Honor, before we continue with the

8   testimony of Agent Killeen, we do have several stipulations

9   we'd like to read into the record.

10          THE COURT:  Great.  Do you want to use the mike; do

11   you want to go over there?

12          MR. DiMASE:  I'd be happy to, your Honor.

13          THE COURT:  Thank you.

14          MR. DiMASE:  I have six stipulations, and I'll

15   indicate the exhibit number and then go through each one.  The

16   first is Government Exhibit 1402, or marked as Government

17   Exhibit 1402, and it reads, after the introductory paragraph:

18          "Government Exhibit 106 is a CD containing true and

19   correct records maintained by Bank of America, N.A.

20   (hereinafter 'Bank of America') containing the following

21   folders:

22          "A folder labeled Government Exhibit 106A containing

23   true and correct records pertaining to Bank of America checking

24   account No. 483031390526 in the name 771 Duell Road LLC;

25          "A folder labeled Government Exhibit 106B containing

H4r1thi3

true and correct records pertaining to Bank of America checking

account No. 483031391172 in the name 771 Duell Road LLC.

"The information contained on Government Exhibit 106

was recorded by someone with knowledge at Bank of America at or

near the time of the activity that took place, was kept in the

course of regularly conducted activity of Bank of America, and

was made as a regular practice of that activity.

"It is further stipulated and agreed that this

stipulation, which is marked as Government Exhibit 1402, and

Government Exhibits 106, 106A, and 106B may be received in

evidence as government exhibits at trial."

The government would offer this stipulation,

Government Exhibit 1402, along with Government Exhibits 106,

106A and 106B into evidence.

THE COURT:  Received.

(Government Exhibits 1402, 106, 106A and 106B received

in evidence)

MR. DiMASE:  Moving to the second stipulation, marked

for identification as 1404, after the introductory paragraph,

it states:

"Government Exhibit 601 is a silver and white Apple

iPhone model A1633.  Government Exhibit 601 was recovered on

December 13, 2016, from the defendant's residence and is in the

same, or substantially the same, condition as when it was

recovered from the defendant's residence on December 13, 2016.

H4r1thi3

1    A special agent with the FBI's computer analysis response team

2    conducted a forensic analysis of the cellular telephone

3    contained in Government Exhibit 601.

4           "Government Exhibit 601A is a screenshot of messages

5    sent through WhatsApp, an instant-message application, which

6    were recovered from the cellular telephone contained in

7    Government Exhibit 601.

8           "Government Exhibit 601B are screenshots of phone

9    contacts, which were recovered from the cellular telephone

10   contained in Government Exhibit 601.

11          "It is further stipulated and agreed that this

12   stipulation, which is marked as Government Exhibit 1404, and

13   Government Exhibits 601A through 601B may be received in

14   evidence as government exhibits at trial."

15          Your Honor, the government would offer the

16   stipulation, Exhibit 1404, along with 601A and 601B into

17   evidence.

18          THE COURT:  And not 601?

19          MR. DiMASE:  Correct.

20          THE COURT:  Received.

21          (Government Exhibits 1404, 601A and 601B received in

22   evidence)

23          MR. DiMASE:  Moving on to the stipulation marked as

24   Government Exhibit 1410, it reads, after the introductory

25   paragraph:

H4r1thi3

1    "Government Exhibit 1503 consists of true and correct

2    records maintained by Louis Vuitton relating to the purchase of

3    merchandise from the defendant, Mahmoud Thiam, on or about

4    April 16, 2011.  The information contained in Government

5    Exhibit 1503 was recorded by someone with knowledge of Louis

6    Vuitton at or near the time the activity took place, was kept

7    in the course of regularly conducted activity of Louis Vuitton,

8    and was made as a regular practice of that activity.

9         "It is further stipulated and agreed that the

10   stipulation, which is marked as Government Exhibit 1410, and

11   Government Exhibit 1503 may be received in evidence as

12   government exhibits at trial."

13        Your Honor, the government offers the stipulation

14   marked as 1410 along with Exhibit 1503 into evidence.

15        THE COURT:  Received.

16        (Government Exhibits 1410 and 1503 received in

17   evidence)

18        MR. DiMASE:  Moving on to the stipulation marked for

19   identification as Exhibit 1413, it states, after the

20   introductory paragraph:

21        "Government Exhibit 1502 consists of true and correct

22   records maintained by The Mark, a luxury hotel located at

23   Madison Avenue and East 77th Street, New York, New York 10075,

24   (hereinafter 'The Mark') representing various charges billed

25   for lodging, meals, and other services provided by the hotel.

H4r1thi3

The information contained in Government Exhibit 1502 was

recorded by someone with knowledge at The Mark at or near the

time the activity took place, was kept in the course of

regularly conducted activity of The Mark, and was made as a

regular practice of that activity.

"It is further stipulated and agreed that this

stipulation, which is marked as Government Exhibit 1413, and

Government Exhibit 1502 may be received in evidence as

government exhibits at trial."

The government would now offer Government Exhibit

1413, the stipulation, and Exhibit 1502 into evidence.

THE COURT:  Received.

(Government Exhibits 1413 and 1502 received in

evidence)

MR. DiMASE:  Moving along, the next stipulation is

marked for identification as Government Exhibit 1412, and it

begins, after the introductory paragraph:

"Government Exhibit 1501 consists of true and correct

records maintained by Steinway & Sons."

THE COURT:  Am I right, counsel, that the rest of the

body includes what you've read to us already in terms of

authentic business records declarations?

MR. DiMASE:  Yes, the second paragraph contains the

same business-record language regarding how the records were

kept, your Honor, but I didn't finish paragraph 1, actually.

H4r1thi3

1          THE COURT:  Great.  Keep going.

2          MR. DiMASE:  I'll skip paragraph 2.

3          THE COURT:  Thank you.

4          MR. DiMASE:  "Government Exhibit 1501 consists of true

5     and correct records maintained by Steinway & Sons relating to

6     the order, purchase, and delivery of a Steinway piano in or

7     about 2010."

8          The second paragraph is the business records language,

9     which I won't reread.

10          "It is further stipulated and agreed that this

11     stipulation, which is marked as Government Exhibit 1412, and

12     Government Exhibit 1501 may be received into evidence as

13     government exhibits at trial."

14          And your Honor, the government now offers Exhibit

15     1412, the stipulation, and Exhibit 1501 into evidence.

16          THE COURT:  Received.

17          (Government Exhibits 1412 and 1501 received in

18     evidence)

19          MR. DiMASE:  And finally, the stipulation marked for

20     identification as Exhibit 1415, after the preliminary

21     paragraph, states:

22          "Government Exhibit 105 is a CD containing true and

23     correct records maintained by Wachovia Bank, a division of

24     Wells Fargo Bank, N.A., pertaining to account No.

25     2000052634901, in the name Thomas C. McGregor, Esq. P.C. IOLA,

H4r1thi3

1    attorney special account."

2            The second paragraph contains the same language

3    regarding business records, so he I won't reread it.

4            "It is further stipulated and agreed that this

5    stipulation, which is marked as Government Exhibit 1415, and

6    Government Exhibit 105 may be received in evidence as

7    government exhibits at trial."

8            And your Honor, the government offers the stipulation,

9    Exhibit 1415, along with Government Exhibit 105 into evidence

10   at this time.

11           THE COURT:  Received.

12           (Government Exhibits  1415 and 105 received in

13   evidence)

14           MR. DiMASE:  May I just have one moment, your Honor?

15   Thank you.

16           Your Honor, that concludes the stipulation we'd like

17   to read now, so we can proceed with the witness.

18           THE COURT:  Thank you.

19   PATRICK KILLEEN, resumed.

20           MS. LARYEA:  Mr. Beer, would you please publish

21   Government Exhibit 305 and please enlarge the top third of that

22   document.

23   Q.  Agent Killeen, before the break, we were reviewing

24   Government Exhibit 305C, is that correct?

25   A.  Yes.

H4r1thi3

1    Q.  And you testified that this government exhibit is a bank

2    statement of a Mr. Pa Sam Nang, is that correct?

3    A.  Yes.

4    Q.  And that it was a statement for the date October 10, 2009,

5    is that correct?

6    A.  Yes.

7            MS. LARYEA:  Mr. Beer, please turn to the second page

8    of this exhibit, and please enlarge the section titled "foreign

9    currency savings."

10   Q.  Agent Killeen, before the break, you testified that there

11   was a withdrawal on September 25 mentioned on this account

12   statement, is that correct?

13   A.  Yes, I did.

14   Q.  And the withdrawal was for $3 million, is that correct?

15   A.  Yes.

16   Q.  Do you see a deposit on September 30?

17   A.  I do.

18   Q.  How much is that deposit for?

19   A.  The deposit is for $2,999,999.03.

20           MS. LARYEA:  Mr. Beer, please enlarge the top third of

21   this page.

22   Q.  Agent Killeen, do you see an account number written on the

23   top third of this page?

24   A.  I do.

25   Q.  Can you read the last four digits of that account number?

H4r1thi3

A.  9888.

MS. LARYEA:  Mr. Beer, will you please publish
Government Exhibit 305D.  Could you please enlarge the text on
that exhibit.

Q.  Do you see a section called value date CCY code and amount?

A.  I do.

Q.  And what is the value date listed on this document?

A.  It says September 30 of 2009.

Q.  And what is the currency listed on this document?

A.  U.S. dollars, USD.

Q.  What is the amount listed on this document?

A.  3 million.

Q.  Now, at the very top of the text, does it have an account
number listed?

A.  Yes, it does.

Q.  What are the last four digits of this account number?

A.  9888.

Q.  Are those the last four digits of the bank account
statement we just reviewed?

A.  They are.

MS. LARYEA:  Mr. Beer, please go to the second page of
the exhibit.

Q.  Agent Killeen, do you see a section titled "ordering
customer," under tag 50K, ordering customer and --

MS. LARYEA:  Oh.

H4r1thi3

1  Q.  Agent Killeen, I'm handing you what has been marked as

2  Government Exhibit 305D; second page of that exhibit, please.

3  A.  Yes.

4  Q.  Do you see a section that reads "ordering customer NA"?

5  A.  I do.

6  Q.  Who sent this deposit?

7  A.  China Sonangol International Holding Ltd.

8  Q.  And who is the deposit to?

9  A.  Pa Sam Nang.

10 Q.  And can you again read the last four digits of the account

11 number that received this deposit?

12 A.  9888.

13 Q.  And next to tag 70, it provides some additional

14 information.  What does it say about this deposit; what is

15 written?

16 A.  Cash advance in Guinea.

17 Q.  And on the top, does it say the date again?

18 A.  September 30 of 2009.

19 Q.  Agent Killeen, did you have an opportunity to examine all

20 of the HSBC Hong Kong records?

21 A.  I did.

22 Q.  How many pages were those records, approximately?

23 A.  I believe between 2- and 3,000.

24 Q.  After you examined those bank records, did you also examine

25 some summary charts depicting relevant transactions in those

H4r1thi3

1   records?

2   A.  I did.

3   Q.  Did the summary charts fairly and accurately duplicate and

4   summarize the information contained in the HSBC bank records?

5   A.  They did.

6           MS. LARYEA:  Your Honor, let the record reflect that

7   the Court has made HSBC bank records available to defense

8   counsel for examination --

9           THE COURT:  That's OK, counsel.  We do not need that

10  statement.  Thank you very much.

11          MS. LARYEA:  The government at this time offers

12  summary exhibits, Government Exhibit 1001, Government Exhibit

13  1002, and Government Exhibit 1003 into evidence.

14          THE COURT:  Received.

15          (Government Exhibits 1001-1003 received in evidence)

16          MS. LARYEA:  Mr. Beer, can you please publish

17  Government Exhibit 1002.

18  Q.  Agent Killeen, on the right-hand side it depicts the

19  defendant's name, Mr. Thiam, M. Thiam, is that correct?

20  A.  It does.

21  Q.  And there's an account number listed underneath.  What is

22  that account number?

23  A.  Account number ending in 0888.

24  Q.  With what bank?

25  A.  HSBC.

H4r1thi3

1   Q.  And it has a date underneath.  What is that date?

2   A.  The date is September 24 of 2009.

3   Q.  And in the exhibits we reviewed just recently, September

4   24, 2009, what does that date signify?

5   A.  That was the day that the HSBC account was opened.

6           MS. LARYEA:  Mr. Beer, can you please go to the

7   following page.  The next page, page 2.

8   Q.  On this page, do you again see the defendant's name, M.

9   Thiam, listed?

10  A.  I do.

11  Q.  With that same HSBC account number, the last four digits?

12  A.  I do.

13  Q.  Do you see a Sam Pa listed?

14  A.  I do.

15  Q.  And the last four digits of the account number listed under

16  that name, can you please read that?

17  A.  HSBC, last four digits of 9888.

18  Q.  And that HSBC account last four digits 988, was that the

19  Sam Pa Nang account we just reviewed?

20  A.  It was.

21  Q.  Now, next to the name Sam Pa, there is an arrow that goes

22  to the box for Mr. Thiam.  What does that -- does that arrow

23  have $3 million listed?

24  A.  It does.

25  Q.  What is the date above that number?

H4r1thi3

1    A.   September 25 of 2009.

2    Q.   And does that reflect the $3 million transfer that we just

3    reviewed in HSBC account records?

4    A.   It does.

5    Q.   Under Mr. Thiam's name, it has September 25, 2009, is that

6    correct?

7    A.   It does.

8    Q.   And $3 million underneath that?

9    A.   Yes.

10   Q.   Does that represent the $3 million deposit that we saw in

11   the HSBC account we just reviewed on September 25?

12   A.   Yes.

13         MS. LARYEA:   Mr. Beer, please publish Government

14   Exhibit 408.

15   Q.   Agent Killeen, have you seen this document?

16   A.   I have.

17   Q.   What is it?

18   A.   This is the shareholders agreement signed by the Republic

19   of Guinea, CIF Singapore, and China Sonangol International

20   Singapore.

21   Q.   What is the date written on this agreement?

22   A.   October 10 of 2009.

23   Q.   Is that about two weeks after September 25 --

24   A.   It is.

25   Q.   -- that the $3 million was transferred?

H4r1thi3

1   A.  It is.

2          MS. LARYEA:  Mr. Beer, would you please publish

3   Government Exhibit 305E.

4   Q.  Have you reviewed this document?

5   A.  I have.

6          MS. LARYEA:  Mr. Beer, can you please enlarge the

7   top-third part of the document.

8   Q.  What is this document?

9   A.  This is an account statement for the month ending March 23

10  of 2010 for the Hong Kong HSBC account of the defendant.

11  Q.  Do you see an account number listed on this document?

12  A.  I do.

13  Q.  Can you please read the last four digits of that account

14  number?

15  A.  0888.

16         MS. LARYEA:  Mr. Beer, can you please enlarge the

17  second half of this document.  No, from below the pie chart.

18  Q.  Under other accounts, can you read what is listed there?

19  A.  HSBC premiere credit card.

20  Q.  And can you please read the last four digits of that credit

21  card number?

22  A.  9766.

23         MS. LARYEA:  Mr. Beer, can you please go to the second

24  page of this document, and can you please enlarge the section

25  foreign currency savings.

H4r1thi3

1   Q.  Do you see a March 15?

2   A.  Yes, I do.

3   Q.  And what does it say next to March 15?

4   A.  Deposit.

5   Q.  How much was deposited into this account on March 15?

6   A.  $3 million.

7          MS. LARYEA:  Mr. Beer, can you please show Government

8   Exhibit 305F.  Could you please enlarge the text.

9   Q.  Agent Killeen, did you review this document?

10  A.  I did.

11  Q.  What is it?

12  A.  It's a foreign currency account counter withdrawal form.

13  Q.  And does it list the name of the account customer?

14  A.  It does.

15  Q.  Could you please read that name?

16  A.  Wang Xiang-Fei.

17  Q.  Does it list the account number?

18  A.  It does.

19  Q.  Could you please read the last four digits of that account

20  number?

21  A.  6888.

22  Q.  Does this form list who is receiving the money?

23  A.  It does.

24  Q.  Could you please read that name?

25  A.  Thiam Mahmoud.

H4r1thi3

Q.   Going to the typed text, does it say the date when this

transfer was sent?

A.   March 15, 2010.

Q.   And what are the last four digits of the account that sent

the transfer?

A.   The account that received the money?

Q.   That sent the transfer.

A.   Oh, that sent the transfer, was 6888.

Q.   And how much was sent?

A.   $3 million.

Q.   Can you read the name of the person who sent the transfer?

A.   Wang Xiang-Fei.

Q.   Next line, what is the date that the transfer was received?

A.   March 15, 2010.

Q.   Can you read the last four digits of the account that

received the transfer?

A.   0888.

Q.   And how much did that account receive?

A.   $3 million.

Q.   And what is the name of the individual who received that

money?

A.   Thiam Mahmoud.

      MS. LARYEA:  Mr. Beer, could you please publish

Government Exhibit 305H.  Sorry.  Can you please publish

Government Exhibit 305G.  Could you please enlarge the top

H4r1thi3

1   third.

2   Q.   Special Agent Killeen, have you reviewed this document?

3   A.   I have.

4   Q.   What is it?

5   A.   This is the account statement for an HSBC bank account

6   number name of Mr. Wang Xiang-Fei.

7   Q.   And what are the last four digits of the account number?

8   A.   6888.

9   Q.   What is the date of this account statement?

10  A.   March 18 of 2010.

11       MS. LARYEA:   Mr. Beer, can you please go to the third

12  page.

13  Q.   Focusing on the section titled "foreign currency

14  savings" --

15  A.   Yes.

16  Q.   -- do you see a deposit on March 15?

17  A.   I do.

18  Q.   How much is that deposit for?

19  A.   $2,999,999.03.

20  Q.   And on that same date, was a withdrawal made from this

21  account?

22  A.   Yes.

23  Q.   How much was withdrawn?

24  A.   $3 million.

25       MS. LARYEA:   Mr. Beer, could you please publish

H4r1thi3

Government Exhibit 305H.

Q.  Agent Killeen, have you reviewed this document?

A.  I have.

          MS. LARYEA:  Mr. Beer, can you please publish the top half of this document.

Q.  Agent Killeen, what is this document?

A.  This is a, actually a general activity report for a transfer of funds from HSBC.

Q.  Now, the section that displays the amount, how much was transferred?

A.  $3 million.

Q.  What is the date of that transfer?

A.  The date of that transfer was March 15 of 2010.

Q.  And who is the name of the individual who transferred the money?

A.  You'd have to go down.

Q.  Does it say account, credit account?

A.  Yes, it shows the location of the account.  The account is at HSBC or Hong Kong Shanghai Banking Corporation that made the transfer.

Q.  Next to it, do you see a credit account?

A.  I do.

Q.  What does it list as the last four digits of that account?

A.  6888.

Q.  And who is the name of the person receiving that money?

H4r1thi3

1    A.  Mr. Wang Xiang-Fei.

2    Q.  And above that do you see debit account?

3    A.  I do.

4            MS. LARYEA:  Mr. Beer, can you please go to the second

5    page of this document.

6    Q.  Do you see the section that says original instruction date?

7    A.  I do.

8    Q.  What is the date listed?

9    A.  March 15, 2010.

10   Q.  Does it have the name of the person sending the account,

11   the originator name?

12   A.  Yes.

13   Q.  What is the originator name listed?

14   A.  China Sonangol limited -- international limited.

15   Apologies.

16   Q.  Do you see the section called remittance account?

17   A.  Remittance amount?

18   Q.  Remittance amount.

19   A.  Yes, I do.

20   Q.  How much was sent?

21   A.  $3 million.

22   Q.  Who received this money; does it say the beneficiary

23   account number?

24   A.  Yes, it does.

25   Q.  What are the last four digits of that account number?

H4r1thi3

1    A.  6888.

2    Q.  Does it say the beneficiary's name?

3    A.  It does.

4    Q.  And who received this money?

5    A.  Wang Xiang-Fei.

6           MS. LARYEA:  Mr. Beer, can you please publish

7    Government Exhibit 1002, page 4.

8    Q.  Now, Special Agent Killeen, we recently just went through

9    the top part of this exhibit, is that correct?

10   A.  We did, yes.

11   Q.  Now, focusing on the bottom part, do you see the name

12   Xiang-Fei?

13   A.  I do.

14   Q.  Do you see the account number listed under it?

15   A.  I do.

16   Q.  Can you please read the digits listed of that account

17   number?

18   A.  HSBC account ending in 6888.

19   Q.  Is that the same account number that we just saw in the

20   exhibits we went through?

21   A.  It is.

22   Q.  Next to Wang Xiang-Fei, do you see a March 15, 2010, date?

23   A.  Yes.

24   Q.  And do you see an amount underneath?

25   A.  Yes.

H4r1thi3

1    Q.  What is that amount?

2    A.  $2,999,999.

3    Q.  Is that the same deposit into this account that we just saw

4    in the documents?

5    A.  It is.

6    Q.  And did that deposit, as we just saw in the documents, come

7    from China Sonangol International Ltd.?

8    A.  It did.

9           MS. LARYEA:  Mr. Beer, can you please go to the

10   following page, page 5.

11   Q.  And on the right-hand side of Wang Xiang-Fei, do you see

12   that same date, March 15, 2010?

13   A.  I do.

14   Q.  And a $3 million underneath?

15   A.  Yes.

16   Q.  And there's an arrow pointing to the defendant's account,

17   is that correct?

18   A.  That's correct.

19   Q.  And is that $3 million sent on March 15, 2010, the same

20   transfer we just reviewed in the documents we just went

21   through?

22   A.  Yes, it is.

23   Q.  On the far right corner, underneath the defendant's name,

24   do you see a date?

25   A.  Yes, I do.

H4r1thi3

1    Q.  And what is that amount -- what is that date?

2    A.  March 15, 2010.

3    Q.  What's the amount listed underneath that date?

4    A.  $6 million.

5    Q.  What does that amount represent?

6    A.  That represents both wires that -- received in the account,

7    both the one above from the HSBC account in the name of Sam Pa

8    and the $3 million received from the account of Wang Xiang-Fei.

9    Q.  So does this represent, as of March 15, 2010, the defendant

10   had received a total of $6 million from these two --

11   A.  Yes.

12          MS. LARYEA:  Mr. Beer, can you please publish

13   Government Exhibit 305I.  Please enlarge the top third of this

14   document.

15   Q.  Agent Killeen, have you seen this document?

16   A.  I have.

17   Q.  What is it?

18   A.  This is a account statement for the bank account at HSBC

19   Hong Kong for the defendant.

20   Q.  And what are the last four digits of this bank account?

21   A.  0888.

22   Q.  What is the time period for this account statement?

23   A.  For the month ending June 23, 2010.

24          MS. LARYEA:  Mr. Beer, can you please go to the second

25   page.  Could you please enlarge the section titled "foreign

H4r1thi3

1    currency savings."

2    Q.  Agent Killeen, do you see a deposit on June 2?

3    A.  I do.

4    Q.  How much did this account receive on June 2?

5    A.  $2 million.

6    Q.  And this is the account of the defendant, is that correct?

7    A.  Correct.

8            MS. LARYEA:  Mr. Beer, would you please publish

9    Government Exhibit 305J.

10   Q.  Agent Killeen, have you seen this document?

11   A.  I have.

12   Q.  What is it?

13   A.  This is a foreign currency account with -- counter

14   withdrawal form.

15   Q.  Does this represent a transfer of money?

16   A.  It does.  It represents a transfer of funds from one HSBC

17   account to another.

18           MS. LARYEA:  Mr. Beer, can you please enlarge the text

19   of this document.

20   Q.  Now reading on the typed section, what is the date of this

21   transfer?

22   A.  The date of this transfer is June 2 of 2010.

23   Q.  What are the last four digits of the account sending the

24   money?

25   A.  1888.

H4r1thi3

1    Q.  What is the name of the individual who holds that account?

2    A.  It's, if you look to the right, it's Lo Fung Hung and Pa

3    Sam Nang.

4    Q.  And what is the amount being transferred?

5    A.  $2 million.

6    Q.  Going to the following line, what is the date that this

7    transfer was received?

8    A.  June 2, 2010.

9    Q.  What are the last four digits of the account that received

10   this $2 million?

11   A.  0888.

12   Q.  And how much did this account receive?

13   A.  $2 million.

14   Q.  And who received this $2 million?

15   A.  Thiam Mahmoud.

16         MS. LARYEA:  Mr. Beer, can you please publish

17   Government Exhibit 305K.

18   Q.  Agent Killeen, have you seen this document?

19   A.  I have.

20   Q.  What is it?

21   A.  This is an account statement for the HSBC Hong Kong account

22   in the name of Lo Fung Hung and Pa Sam Nang.

23         MS. LARYEA:  Mr. Beer, can you please enlarge the top

24   third of this exhibit.

25   Q.  The names you just mentioned, do you see them on this

H4r1thi3

1  document?

2  A.  I do.

3  Q.  And what are the last four digits of the account number?

4  A.  1888.

5  Q.  What is the date of this account statement?

6  A.  June 7, 2010.

7       MS. LARYEA:  Mr. Beer, can you enlarge the bottom of

8  the page that is titled "foreign currency savings."

9  Q.  Agent Killeen, do you see a withdrawal from this account on

10 June 2?

11 A.  I do.

12 Q.  And how much was withdrawn on that date?

13 A.  $2 million.

14      MS. LARYEA:  Mr. Beer, can you please publish

15 Government Exhibit 305L.

16 Q.  Agent Killeen, have you seen this document before?

17 A.  I have.

18 Q.  What is it?

19 A.  This is a bank account statement for the account of HSBC

20 Hong Kong bank account in the name of Lo Fung Hung and Pa Sam

21 Nang.

22      MS. LARYEA:  Mr. Beer, can you please enlarge the top

23 third of this exhibit.

24 Q.  What are the last four digits of the account number?

25 A.  1888.

H4r1thi3

1    Q.  What is the date of this account statement?

2    A.  November 7 of 2009.

3              MS. LARYEA:  Mr. Beer, can you please enlarge the

4    section called foreign currency savings.

5    Q.  Agent Killeen, do you see a deposit into this account on

6    October 9, 2009?

7    A.  I do.

8    Q.  How much did this account receive on that date?

9    A.  $19,999,999.03.

10             MS. LARYEA:  Mr. Beer, will you please publish

11   Government Exhibit 305M.  Can you please enlarge the text.

12   Q.  Do you see an account -- Agent Killeen, have you seen this

13   document before?

14   A.  I have.

15   Q.  What is it?

16   A.  This is a summary of an account transfer.

17   Q.  Do you see an account number listed on the top?

18   A.  I do.

19   Q.  What is that account number, last four digits?

20   A.  Account ending in 1888.

21   Q.  Do you see a section called value date currency code and

22   amount?

23   A.  I do.

24   Q.  What is the date this transfer was made?

25   A.  It appears October 9 of 2009.

H4r1thi3

1    Q.  How much was transferred?

2    A.  $20 million.

3    Q.  Who sent the money?

4    A.  China Sonangol International Ltd.

5    Q.  Does it list the beneficiary who received the money?

6    A.  It does.

7    Q.  What are the names listed of the person who received the

8    money?

9    A.  Lo Fung Hung and Pa Sam Nang.

10   Q.  Does it have a section called remittance information, rem

11   info?

12   A.  I do.

13   Q.  And what does it say next to the remittance information?

14   A.  It says cash advance in West Africa.

15          MS. LARYEA:  Mr. Beer, could you please publish

16   Government Exhibit 1002, page 6.

17   Q.  Agent Killeen, we've already walked through the top and

18   bottom part of this document, is that correct?

19   A.  That's correct.

20   Q.  Now, focusing on the middle section --

21   A.  OK.

22   Q.  -- do you see a Sam Pa/Hung?

23   A.  Yes.

24   Q.  Do you see an account number listed under the names?

25   A.  I do.

H4r1thi3

1    Q.  What are the last four digits of that account number?

2    A.  1888.

3    Q.  Are they the same last four digits of the account belonging

4    to Lo Fung Hung and Sam Pa Nang that we just reviewed?

5    A.  It is.

6    Q.  To the left, do you see a date listed?

7    A.  I do.

8    Q.  What is that date?

9    A.  October 9, 2009.

10   Q.  What is the amount listed under that date?

11   A.  $19,999,999.

12   Q.  Is that the same amount we saw deposited into the account

13   of Sam Pa Nang and Lo Fung Hung from China Sonangol on October

14   9, 2009?

15   A.  It is.

16        MS. LARYEA:  Mr. Beer, can you please go to the

17   following page.

18   Q.  Now, to the right of Sam Pa and -- Sam Pa/Hung, do you see

19   an arrow leading to the defendant?

20   A.  I do.

21   Q.  What is the date listed on that arrow?

22   A.  June 2, 2010.

23   Q.  What is the amount listed under that?

24   A.  $2 million.

25   Q.  Does that represent the $2 million that was transferred

H4r1thi3

1    from the account of Sam Pa Nang and Lo Fung Hung to the

2    defendant on June 2, 2010, that we just reviewed in the bank

3    records?

4    A.  Yes.

5    Q.  Now going all the way to the right, back to the box that

6    has the defendant's name, do you see a date in that box?

7    A.  I do.

8    Q.  What is that date?

9    A.  June 2 of 2010.

10   Q.  Do you see a number underneath that date?

11   A.  I do.

12   Q.  What is that number?

13   A.  $8 million.

14   Q.  What does that number represent?

15   A.  That's the sum total of the transfers into the HSBC Hong

16   Kong account of the defendant on September 25 of 3 million,

17   March 15 of 3 million, and June 2 of 2 million, so for a total

18   of 8 million.

19   Q.  All from Sam Pa, Sam Pa/Hung, and Xiang-Fei's bank

20   accounts, is that correct?

21   A.  Correct.

22        MS. LARYEA:  Mr. Beer, can you please publish

23   Government Exhibit 305N.

24   Q.  Agent Killeen, have you reviewed this document?

25   A.  I have.

H4r1thi3

1    Q.  What is it?  Before you answer that --

2         MS. LARYEA:  Mr. Beer, can you please enlarge the top

3    third of this page.  Thank you.

4    Q.  What is this document?

5    A.  It's an account statement for the HSBC Hong Kong bank

6    account of the defendant.

7    Q.  And what are the last four digits of the account number?

8    A.  0888.

9    Q.  What is the date of this account statement?

10   A.  December 23 of 2010.

11        MS. LARYEA:  Mr. Beer, can you please go to the second

12   page and enlarge the section titled "foreign currency savings."

13   Q.  Agent Killeen, do you see a deposit into this account on

14   November 29, 2010?

15   A.  I do.

16   Q.  How much was deposited into the defendant's account on that

17   date?

18   A.  $500,000.

19        MS. LARYEA:  Mr. Beer, can you please publish

20   Government Exhibit 305O.

21   Q.  Agent Killeen, have you seen this document before?

22   A.  I have.

23   Q.  What is it?

24   A.  This is a, what they call a counter deposit form.  It's

25   basically to transfer funds from one account to another.

H4r1thi3

1    Q.   Looking at this account, the printed section --

2    A.   OK.

3    Q.   -- what is the date of this transfer?

4    A.   November 29 of 2010.

5    Q.   And who is receiving this transfer?  What are the last four

6    digits of the account number listed?

7    A.   0888.

8    Q.   And what is the amount that is being received?

9    A.   $500,000.

10   Q.   And who received this $500,000?

11   A.   Thiam Mahmoud.

12   Q.   And on the top section of this wire transfer form, it has

13   an account number.  There are two account numbers?

14   A.   There are.

15   Q.   Do you see the account number on the top?

16   A.   I can.

17   Q.   Do you see the account number on the bottom?

18   A.   I can.

19   Q.   What are the last four digits of the account number?

20   A.   On the top or the bottom?

21   Q.   The bottom.

22   A.   The bottom is 1888.

23   Q.   Is that number, 1888, the same account -- last four digits

24   of the account number of the Lo Fung Hung and Sam Pa Nang

25   account we just reviewed?

H4r1thi3

1   A.  It is.

2          MS. LARYEA:  Mr. Beer, can you please publish

3   Government Exhibit 305P.

4   Q.  Agent Killeen, have you seen this document?

5   A.  I have.

6   Q.  What is it?

7   A.  This is the account statement for an HSBC Hong Kong bank

8   account in the name of Lo Fung Hung and Pa Sam Nang.

9   Q.  And what is the account number, the last four digits?

10  A.  1888.

11  Q.  What is the date of this bank statement?

12  A.  December 7 of 2010.

13         MS. LARYEA:  Mr. Beer, will you please enlarge the

14  bottom part of this page titled "foreign currency savings."

15  Q.  Agent Killeen, do you see a withdrawal from this account on

16  November 29?

17  A.  I do.

18  Q.  And how much was withdrawn from Sam Pa and Lo Fung Hung's

19  account on this date?

20  A.  $500,000.

21  Q.  And above this withdrawal, do you see a deposit on November

22  26, 2010?

23  A.  I do.

24  Q.  How much was deposited into the Lo Fung Hung and the Pa Sam

25  Nang account on this date?

H4r1thi3

1    A.  $10,587,499.03.

2           MS. LARYEA:  Mr. Beer, will you please publish

3    Government Exhibit 305Q.

4    Q.  Agent Killeen, have you seen this document?

5    A.  I have.

6    Q.  What is it?

7    A.  This is another HSB statement that provides a summary of a

8    wire.

9    Q.  And on this statement, do you see a section called ordering

10   customer?

11   A.  I do.

12   Q.  And who is sending the money?

13   A.  China Sonangol International Ltd.

14   Q.  And do you see on the amount how much was sent on that day?

15   A.  $10,587,500.

16          MS. LARYEA:  And if you could please enlarge the

17   bottom part of this document, Mr. Beer.

18   Q.  Do you see the beneficiary customer, the person who

19   received this amount?

20   A.  Yes, I do.

21   Q.  And who received this amount?

22   A.  Ms. Lo Fung Hung and Mr. Pa Sam Nang.

23   Q.  What are the last four digits of the account number?

24   A.  1888.

25   Q.  And this is the same account that we just reviewed the bank

H4r1thi3

1  statement for?

2  A.  It is.

3       MS. LARYEA:  Mr. Beer, can you please publish

4  Government Exhibit 1002, page 8.

5  Q.  Agent Killeen, we've gone over the first three transfers of

6  money from Sam Pa, Sam Pa/Hung, and Xiang-Fei into the

7  defendant's account, is that correct?

8  A.  We have.

9  Q.  Now to the fourth transfer, do you see under, next to, to

10  the left of Sam Pa/Hung an arrow on the bottom?

11  A.  I do.

12  Q.  What is the date of that amount?

13  A.  November 26 of 2010.

14  Q.  What is the amount listed?

15  A.  $10,587,499.

16  Q.  Does this represent the $10,587,499 that the Sam Pa and Lo

17  Fung Hung account received from China Sonangol on November 26,

18  2010?

19  A.  Yes, it does.

20       MS. LARYEA:  Mr. Beer, can you please go to the

21  following page.

22  Q.  Do you see an arrow to the right of Sam Pa/Hung on the

23  bottom?

24  A.  I do.

25  Q.  What is the date on that arrow?

H4r1thi3

1    A.  November 29 of 2010.

2    Q.  And what is the amount listed?

3    A.  $500,000.

4    Q.  And what does that arrow represent?

5    A.  That arrow represents the transfer of funds from the

6    account of Sam Pa and Lo Fung Hung to the defendant's.  Both

7    had HSBC Hong Kong accounts.

8    Q.  And how much was transferred from that account to the

9    defendant on November 29, 2010?

10   A.  $500,000.

11   Q.  Now do you see the box all the way to the right with the

12   defendant's name?

13   A.  I do.

14   Q.  Do you see a date in that box?

15   A.  I do.

16   Q.  What is that date?

17   A.  November 29 of 2010.

18   Q.  And do you see a number underneath that date?

19   A.  I do.

20   Q.  What is that number?

21   A.  $8,500,000.

22   Q.  What do that date and number represent?

23   A.  That represents the sum of the four transfers into the

24   account that are detailed in this form: 3 million, 2 million,

25   500,000, and 3 million.

H4r1thi3

1    Q.  All from the Sam Pa, Sam Pa and Lo Fung Hung accounts and

2    Xiang-Fei into the defendant's HSBC Hong Kong account, is that

3    correct?

4    A.  Correct.

5          MS. LARYEA:  Mr. Beer, can you please publish

6    Government Exhibit 535.

7    Q.  Agent Killeen, have you seen this document before?

8    A.  I have.

9    Q.  What is it?

10   A.  This is an email from the defendant to Remee Aring at

11   ChaseBank.

12   Q.  What is the subject line of this email?

13   A.  The word "answers."

14   Q.  What date was this email sent?

15   A.  March 26 of 2010.

16   Q.  Are there any attachments listed?

17   A.  There are.

18   Q.  What is the first attachment listed?

19   A.  Chase -- I'll say compl.doc.

20   Q.  Can you please read the message from the defendant to Remee

21   Aring?

22   A.  "Dear Remee, please find the attached answer to your

23   questionnaire.  I have requested some invoices from Nick

24   Dearden.  I will send you a separate email with a full

25   description of my business relationship with Baker Al-Sadi.

1    Best, Mahmoud Thiam."

2    Q.  Can you remind the jury who Remee Aring is?

3    A.  Remee Aring was an investigator with ChaseBank.

4         MS. LARYEA:  Mr. Beer, could you please go to the

5    second page of this document.  Could you please enlarge the top

6    half of this page.  No, including the address.

7    Q.  What is the name listed on the top of this document?

8    A.  Mahmoud Thiam.

9    Q.  Can you please read the first two lines after the address?

10   A.  34 --

11   Q.  Sorry.  After the address, after the account number, can

12   you please read the first two lines, starting "Dear Remee"?

13   A.  "Dear Remee, please find below answers to your questions."

14        MS. LARYEA:  Mr. Beer, can you please go to the bottom

15   of the page.

16   Q.  Agent Killeen, can you please read that paragraph?

17   A.  I can.  "Over the past 15 months I have taken a leave from

18   my banking job at UBS and accepted an 18-month position as

19   minister of mines and energy in the Republic of Guinea.  I take

20   no salary for that job and have been maintaining my family in

21   New York from my savings, hence the wires from my HSBC account

22   to my Chase account.  The funds in that account are derived

23   from business transactions done over the years with

24   Mr. Al-Sadi."

25        MS. LARYEA:  Mr. Beer, can you please publish

H4r1thi3

1   Government Exhibit 533.  Could you please highlight the top

2   half of this document.

3   Q.  Agent Killeen, have you seen this document before?

4   A.  I have.

5   Q.  What is it?

6   A.  This is an email from the defendant to Baker Al-Sadi.

7   Q.  What is the date of this email?

8   A.  March 26 of 2010.

9   Q.  What does it say under the line?

10  A.  Which line?

11  Q.  The line underneath the date.

12  A.  Mahmoud Thiam.

13  Q.  And can you please read the first two lines starting with

14  "Dear Remee"?

15  A.  "Dear Remee, please find below answers to your questions."

16  Go ahead.

17  Q.  Now, you said the date of this email is March 26, 2010, is

18  that correct?

19  A.  That's correct.

20  Q.  Is that the same date we just saw on the email we just

21  reviewed from the defendant to Remee Aring?

22  A.  Yes.

23          MS. LARYEA:  Mr. Beer, can you please publish

24  Government Exhibit 534.

25  Q.  Agent Killeen, have you seen this document before?

H4r1thi3

1    A.  I have.

2    Q.  What is it?

3    A.  This is a string of emails back and forth between the

4    defendant and Baker Al-Sadi.

5         MS. LARYEA:  Mr. Beer, can you please go to the, can

6    you please enlarge the bottom half -- sorry, the last third of

7    this document.

8    Q.  Who is this email from?

9    A.  This is from the defendant to Baker Al-Sadi.

10   Q.  What is the date of this email?

11   A.  March 26 of 2010.

12   Q.  And who is -- is this the same date of the email we just

13   saw?

14   A.  Yes, it is.

15        MS. LARYEA:  Mr. Beer, could you please go to the

16   second page of this document and enlarge the first third.

17   Q.  Can you please read the first two lines?

18   A.  "Dear Remee, please find below answers to your questions.

19        "Hello, Mahmoud.  Thank you for providing us your

20   information.  Please use the above email address to send your

21   document."

22        MS. LARYEA:  Mr. Beer, can you please return to the

23   first page of this document.  Can you enlarge the document up

24   until the email string we just reviewed.

25   Q.  I want to start from the bottom working our way up

H4r1thi3

1   chronologically.

2   A.   OK.

3   Q.   The email on the bottom, who is it from?

4   A.   That's from Baker Al-Sadi to the defendant.

5   Q.   What is the date of that email?

6   A.   March 26, 2010.

7   Q.   Can you please read the response of Baker Al-Sadi to the

8   defendant?

9   A.   "Looks fine if they don't dig too deep.  We can justify

10   sogora gabon, etc., to show real transactions."

11   Q.   Do you see the next email chain?

12   A.   Yes.

13   Q.   Who is it from?

14   A.   That's from the defendant to Baker Al-Sadi.

15   Q.   What is the date of that email?

16   A.   March 26, 2010.

17   Q.   Can you please read the defendant's response?

18   A.   "Cool.  How do I treat your answers, just attach them?"

19   Q.   Do you see the next email in the string?

20   A.   I do.

21   Q.   The top email, who is that from?

22   A.   That's from Baker Al-Sadi to the defendant.

23   Q.   What is the date of that email?

24   A.   March 26, 2010.

25   Q.   Can you please read what Baker Al-Sadi said to the

H4r1thi3

1    defendant?

2    A.   "Buy some time by saying you asked me to send them to you,

3    and we'll see if they follow up."

4            MS. LARYEA:  Now, Mr. Beer, can you please publish

5    Government Exhibit 1002, the last page.

6    Q.   Agent Killeen, we just went through the transfers that came

7    into the defendant's account during this time period, is that

8    correct?

9    A.   Yes.

10   Q.   Is the name Baker Al-Sadi on this document?

11   A.   No.

12   Q.   Now I want to talk about expenditures from the defendant's

13   Hong Kong account.

14   A.   OK.

15           MS. LARYEA:  Mr. Beer, will you please publish

16   Government Exhibit 1001.

17   Q.   Agent Killeen, you testified that you reviewed the HSBC

18   bank records when you reviewed them, is that correct?

19   A.   I did.

20   Q.   Now, starting with this document, all the way to the left,

21   do you see the defendant's name, M. Thiam?

22   A.   I do.

23   Q.   And underneath, do you see HSBC-0888?

24   A.   I do.

25   Q.   Is that the last four digits of the defendant's Hong Kong

H4r1thi3

1   bank account that we just reviewed recently?

2   A.   Yes.

3   Q.   Bank records?

4   A.   Yes.

5   Q.   And underneath do you see four transactions?

6   A.   I do.

7   Q.   Starting from September 25, 2009, to November 29, 2010, is

8   that correct?

9   A.   That's correct.

10  Q.   What do those four transactions represent?

11  A.   Those four transactions represent what we just reviewed,

12  the four transactions into the account of Mahmoud Thiam from

13  accounts of Sam Pa, Sam Pa/Lo Fung Hung, and Wang Xiang-Fei.

14  Q.   Now moving to the right of this document, there are a

15  number of arrows.

16  A.   Yes.

17  Q.   What do these -- let's start with, do these arrows

18  represent expenditures from the defendant's Hong Kong HSBC

19  account?

20  A.   Yes.

21  Q.   Now, I wanted to take one example, the second example.

22  What is the number listed there?

23  A.   Second from the top?

24  Q.   Second from the top.

25  A.   $133,721.

H4r1thi3

1    Q.  And to the right of that arrow?

2    A.  It says interior design and houseware.

3    Q.  And what does that arrow, that section, second section from

     the top represent?

4

5    A.  Expenditures relating to basic goods inside of a -- or

6    interior design or goods that go inside of a home.

7    Q.  Is that saying that there was $133,721 spent on interior

8    design and houseware from the defendant's Hong Kong HSBC bank

9    account?

10   A.  It does.

11         MS. LARYEA:  Mr. Beer --

12   Q.  Do you see the second logo in the section, next to interior

13   design and houseware.

14   A.  I do.

15   Q.  What does that logo say?

16   A.  Steinway.

17         MS. LARYEA:  Mr. Beer, would you please publish

18   Government Exhibit 1501.  Could you please go to the second

19   page.  Could you enlarge that middle section.

20   Q.  Do you see a date, that first date listed?

21   A.  The first, the date listed?

22   Q.  Yes.

23         MS. LARYEA:  Your Honor, may I view the screen?

24   Q.  What is the first item listed under description?

25   A.  "O GRD," or grand, "ebony."

H4r1thi3

1    Q.  And what is the price of this item?

2    A.  $62,600.

3    Q.  And going to the third item on the list, what is it?  Can

4    you please read that next to the number, under description, the

5    one that starts with GP?

6    A.  "GP-163ES (MES) satin ebony."

7    Q.  And does that appear to be a credit all the way to end of

8    that negative sign?

9    A.  Yes.

10   Q.  Can you read that number, minus?

11   A.  -15260.

12   Q.  And what is the total listed at the very bottom of this

13   invoice?

14   A.  Including tax, $47,375.41.

15          MS. LARYEA:  Mr. Beer, could you please enlarge the

16   top part of this document.  Sorry.  Including the logo.

17   Q.  Agent Killeen, who is -- what is this document?

18   A.  This is an invoice from Steinway & Sons.

19   Q.  And who is the invoice billing?

20   A.  Fatim Thiam.

21   Q.  What is the address listed under Fatim Thiam's name?

22   A.  340 East 64th Street, apartment 14H, New York.

23   Q.  What is the date of this invoice?

24   A.  September 9 of 2010.

25   Q.  And you just testified that the invoice total was

H4r1thi3

1    $46,375.41, is that correct?

2    A.   47,000.

3    Q.   Sorry.  47,000.

4    A.   Yes.

5    Q.   $47,375.41, is that correct?

6    A.   That's correct.

7              THE COURT:  Counsel, choose a good time for our

8    afternoon recess.

9              MS. LARYEA:  Now is a perfectly good time, your Honor.

10             THE COURT:  Ladies and gentlemen, let Ms. Rojas know

11   when you're ready to resume.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

H4r1thi3

1           (In open court; jury not present)

2           THE COURT:  Mr. Kobre, anything to discuss during the

3    break?

4           MR. KOBRE:  No, your Honor.

5           THE COURT:  Mr. Goldsmith.

6           MR. GOLDSMITH:  No, your Honor.

7           THE COURT:  Thanks.

8           (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  The jury is ready.  We have an issue?

3          MR. GOLDSMITH:  Yes, your Honor.  The government

4     reminded me a few moments ago, or showed me a portion of

5     cellphone extractions of a text conversation from the

6     defendant's phone that it was going to address in the remaining

7     portion of the agent's testimony today.  And it was apparently

8     an oversight of mine earlier.  I did not notice that it

9     mentioned the incarceration of Sam Pa.  The parties have

10    discussed previous, in preparation of the trial and during the

11    engagement, to try and avoid the mentioning of Mr. Pa's

12    incarceration for obvious prejudicial reasons.

13          THE COURT:  Where is he incarcerated?

14          MR. KOBRE:  Your Honor, our understanding is that he's

15    incarcerated in China.

16          MR. GOLDSMITH:  My concern at this point is, now

17    seeing the mention, not only of having the matter an exhibit

18    but also of having the agent highlight it by testifying at

19    trial before the jury, that it would be unduly prejudicial for

20    the mentioning of Mr. Pa's incarceration, at least with the

21    jury, because it would (A) lead to speculation and (B) allow

22    for the jury to speculate as to why Mr. Pa was incarcerated.

23    It's a host of issues that have previously been totally

24    unaddressed before the jury through the witnesses.

25          THE COURT:  So this is a 2016 communication in 601-A,

H4r1thi5

1    if I understand that correctly, November 8, 2016.

2              What's the government's position here?

3              MR. DiMASE:  Your Honor, a couple of points.  I don't

4    recall actually having the discussion about keeping the arrest

5    of Sam Pa out of the trial with Mr. Goldsmith.  I understand

6    the potential issue implicated by that evidence coming out.

7              That said, a couple, of additional things.  It is

8    currently in evidence.  It doesn't mean it can't be redacted,

9    but it was introduced pursuant to the stipulation.  And I think

10   the bottom line is, the defendant's statement -- and to be

11   clear, this came from a cellphone that was recovered by the FBI

12   from the defendant's residence on the day of the defendant's

13   arrest.  So these are messages that were on his phone, and it

14   is clear that the messages that say MHT, that phone number is

15   the phone number associated with Mr. Thiam and that those are

16   messages sent by Mr. Thiam and then there's another party to

17   this conversation, obviously, Nyonga Fongang.  The defendant's

18   final statement, or I should say What's App message, cannot be

19   understood without the context of the statement made by

20   Mr. Nyonga Fongang regarding the fact that Mr. Sam Pa was

21   locked up.  So it's absolutely necessary for the jury to

22   understand the defendant's response.

23             That being said, the government would not object to a

24   limiting instruction that the jury is not to speculate or draw

25   any negative inference against this defendant because Mr. Sam

1    Pa has been arrested or that there's been evidence presented to

2    that effect.  I don't think that would be inappropriate.  But I

3    do think it's necessary to explain the context of this text

4    message.

5            THE COURT:  Well, you know, is it coming into the

6    record why Mr. Pa was arrested?

7            MR. KOBRE:  No.

8            MR. DiMASE:  No, your Honor.

9            THE COURT:  Okay.

10           MR. DiMASE:  I think the clear implication of the

11   messages is that it may have something to do with what happened

12   here because Mr. Thiam says, "He predicted I would be locked

13   up.  Life has its twists."

14           And this is, by the way, in the context of a

15   discussion about a book, which is referred to as Looting in

16   Africa, which the name of the book is contained in the second

17   message here.  So there are linkages back to this case even

18   though these messages are in 2016.

19           THE COURT:  Well, it's highly probative to admit the

20   defendant's statement at the bottom of 601-A.  "He predicted I

21   would be locked up.  Life has its twists."  And so I am going

22   to admit this, or allow it to remain admitted.  I'm not going

23   to require it to be redacted.

24           Do you want a limiting instruction, Mr. Goldsmith, or

25   not?

1          MR. GOLDSMITH:  Yes, under the circumstances.

2          THE COURT:  And should it be something along these

3    lines, that the jury is not to speculate as to the reasons for

4    Mr. Pa being incarcerated?

5          MR. GOLDSMITH:  Yes.  Not to speculate and that it is

6    not part of their -- they are not to speculate and it is not

7    part of their analysis of the evidence in this case.

8          THE COURT:  That latter one is a little confusing to

9    me.  I'm trying to understand.  If it's coming in, then the

10   statement is considered to put in context the defendant's

11   statement.  I'd be happy to say that.

12         MR. GOLDSMITH:  That's fine.

13         THE COURT:  Okay.  And they're not to speculate as to

14   how, when, or why Mr. Pa ended up being incarcerated; or,

15   indeed, that he is.  I mean, they don't have to take this

16   statement for the truth.

17         MR. GOLDSMITH:  Right.  Yes.

18         THE COURT:  Great.  Bring in the jury.

19         (Continued on next page)

20

21

22

23

24

25

```
 1              (Jury present)

 2              THE COURT:  Counsel, you may proceed.

 3              MS. LARYEA:  Thank you, your Honor.

 4   BY MS. LARYEA:

 5   Q.  Agent Killeen, we were in the middle of reviewing some

 6   expenditures from the defendant's HSBC Hong Kong account, is

 7   that correct?

 8   A.  Yes.

 9              MS. LARYEA:  Mr. Beer, could you please display

10   Government's Exhibit 1001.

11              THE WITNESS:  Not coming up on my screen.

12              THE COURT:  Does the jury have 1001 on your screen?

13   No.

14              THE WITNESS:  Hold on.  It's fixed.

15              THE JURORS:  No.  Now yes.

16              THE COURT:  Okay.  It's fixed.  Thank you.

17   BY MS. LARYEA:

18   Q.  Agent Killeen, from the top, the top section, with the

19   amount 440658, do you see that section?

20   A.  I do.

21   Q.  And to the right of it, what does it say?

22   A.  Airfare, luxury hotel, and transportation.

23   Q.  So what does that amount represent?

24   A.  Expenditures related to flights, hotel stays, and other

25   forms of transportation.
```

1    Q.  And how much was spent on those items?

2    A.  440,658.

3           MS. LARYEA:  Mr. Beer, can you please publish

4    Government's Exhibits 1502.

5    Q.  Special Agent Killeen, have you seen this document?

6    A.  I have.

7    Q.  What is it?

8    A.  This is a receipt, an invoice for a stay at The Mark.

9           MS. LARYEA:  And Mr. Beer, could you please enlarge

10   the top third of this document.

11   Q.  And what is the name on this invoice?

12   A.  Mr. Thiam Mahmoud.

13   Q.  What is the address listed?

14   A.  340 East 14th.

15   Q.  What is the arrival date at The Mark Hotel?

16   A.  January 31, 2011.

17   Q.  And the departure date?

18   A.  February 4, 2011.

19          MS. LARYEA:  Mr. Beer, can you please publish the

20   second to last page of this document.  Could you please enlarge

21   the top part.

22   Q.  And is this another invoice of the defendant, Mr. Thiam?

23   A.  Yes.

24   Q.  And what is the arrival date listed here?

25   A.  July 19th of 2011.

H4r1thi5                      Killeen - Direct

1    Q.  And a departure date?

2    A.  July 22nd of 2011.

3             MS. LARYEA:  Mr. Beer, could you please go to the next

4    page.  Could you please enlarge the text.

5    Q.  Agent Killeen, does it say how much the defendant spent

6    during his visit to The Mark hotel?

7    A.  Yes, it does.

8    Q.  How much did the defendant spend?

9    A.  $6,667.79.

10   Q.  And does it say how many days the defendant was at this

11   hotel?

12   A.  The 19th versus -- beginning the 19th, checking out the

13   22nd.

14   Q.  Thank you.  Agent Killeen --

15            MS. LARYEA:  Mr. Beer, could you please publish

16   Government's Exhibit 1001.

17   Q.  Agent Killeen, do you see the number listed fourth from the

18   top?

19   A.  I do.

20   Q.  And next to that arrow, what does it say?

21   A.  Designer apparel.

22   Q.  And how much was spent on designer apparel from the

23   defendant's HSBC Hong Kong account?

24   A.  $46,481.

25   Q.  Do you see a logo next to the text designer apparel?

1   A.  I do.

2   Q.  What is written underneath that logo, in small print?

3   A.  Louis Vuitton.

4          MS. LARYEA:  Mr. Beer, can you please publish

5   Government's Exhibit 1503.

6   Q.  Agent Killeen, have you seen this document?

7   A.  I have.

8   Q.  What is it?

9   A.  This looks like a receipt for a purchase at Louis Vuitton.

10  Q.  What is the date listed on this?

11  A.  April 16th of 2011.

12  Q.  Can you read the description of the items purchased.

13  A.  Top one, "PILOT CASE TAIGA ARDOISE."

14  Q.  And how much was that item?

15  A.  $3,300.

16  Q.  Can you please read the next item purchased.

17  A.  I'll just spell it.  "ETUI 5 CRAVATES TAIGA ARD."

18  Q.  How much was that?

19  A.  835.

20  Q.  What was the total amount on this receipt?

21  A.  Total amount including tax was $4,501.98.

22         MS. LARYEA:  Mr. Beer, will you enlarge the bottom

23  part of this document.

24  Q.  Special Agent Killeen, does it mention the name of the

25  individual who spent about $4,500 at Louis Vuitton?

H4r1thi5                          Killeen - Direct

1   A.  It does.

2   Q.  Who is that person?

3   A.  Mr. Mahmoud Thiam.

4           MS. LARYEA:  Mr. Beer, could you please publish

5   Government's Exhibit 1001.

6   Q.  Agent Killeen, do these expenditures represent all the

7   expenditures out of the defendant's HSBC Hong Kong account?

8   A.  No.

9   Q.  Is it just a representative set?

10  A.  Yes.

11          MS. LARYEA:  Mr. Beer, can we return to the last page

12  of Government's Exhibit 1002.  Last page.

13  Q.  Agent Killeen, you testified that you reviewed all of the

14  HSBC Hong Kong bank records for the defendant's account ending

15  in 0888, is that correct?

16  A.  I did.

17  Q.  And that includes a review of the records between the date

18  opening, which the exhibits demonstrated was September 24th,

19  through this November 29, 2010 date, is that correct?

20  A.  Correct.

21  Q.  And during your review of those bank records did you ever

22  see the name Baker Al-Sadi?

23  A.  I did not.

24          MS. LARYEA:  Mr. Beer, can you please publish

25  Government's Exhibit 540.

1    Q.  Agent Killeen, have you seen this document?

2    A.  I have.

3    Q.  What is it?

4    A.  This is an email exchange between the defendant and an

5    individual named Sanath, Kumar Sanath.

6              MS. LARYEA:  Mr. Beer, can you please enlarge the

7    bottom email on the first page.

8    Q.  Agent Killeen, who is this email from?

9    A.  This is from Kumar Sanath, from a Yahoo email address of

10   Kumar Sanath.

11   Q.  Who is the email to?

12   A.  The defendant.

13   Q.  And is there an email -- the first e-mail on the CC line,

14   can you read that?

15   A.  Email address, you mean?

16   Q.  Yes.

17   A.  It says Aquil and the address is m.aquil@teledata.mz.

18   Q.  What is the date that this email was sent?

19   A.  November 1st of 2010.

20   Q.  What is the subject of this email?

21   A.  Swift Copy US dollars, 375,000.

22   Q.  Agent Killeen, can you please read the text of the email.

23   A.  "Dear Sir, Sorry for the delay in providing Swift copy.

24   The delay because of network problem in bank.  Please find

25   attached Swift copy for the amount of US dollars 375,000."

1          MS. LARYEA:  Mr. Beer, can you please publish page 3

2     of this document.  Can you please enlarge the text that starts

3     Message Text to the bottom of the document.

4     Q.  Agent Killeen, looking all the way on the bottom, Creation

5     Time, do you see that?

6     A.  I do.

7     Q.  What is the date that this Swift was created?

8     A.  November 1st of 2010.

9     Q.  Is that the same date as the email that was sent that we

10    just reviewed?

11    A.  It is.

12    Q.  Now going back to the top.  How much was sent in the Swift?

13    A.  375,000 US dollars.

14    Q.  Who sent the Swift?

15    A.  Sociedade Saboeira De Nacala, or SSN.

16    Q.  Is there an address listed for Sociedade Saboeira De

17    Nacala?

18    A.  Yes, P.O. Box 346 Nacala.

19    Q.  And the document, the section that discusses the recipient

20    of this, does it list the beneficiary customer?

21    A.  Yes, it does.

22    Q.  Who received this money?

23    A.  Thomas McGregor.

24          MS. LARYEA:  Mr. Beer, could you please go to page 2

25    of this document.  Sorry.  Please go to page 1, bottom of that

1  email.  Could you please enlarge the bottom email again.

2  Q.  This is the email you just read, is that correct, Agent

3  Killeen?

4  A.  Yes.

5  Q.  The email appears to continue on the next page.

6        MS. LARYEA:  Mr. Beer, could you please go to the next

7  page.

8  Q.  And you testified before this was an email from Sanath

9  Kumar to the defendant, is that correct?

10  A.  Correct.

11  Q.  Can you please read the remainder of that email.

12  A.  "And it's our request kindly instruct payment amount of US

13  dollars 375,000 for below mentioned bank details."

14  Q.  Who is the supplier?  Where is the money to be sent?

15  A.  Pacific Inter-Link Sdn. Bhd.

16  Q.  Where is Pacific Inter-Link based?  Does it have an

17  address?

18  A.  It's in Kuala Lumpur, Malaysia.

19  Q.  Agent Killeen, we just looked at a Swift, is that correct?

20  A.  Yes.

21  Q.  What is a Swift?

22  A.  A Swift is an international wire transaction report that

23  shows the details of when you wire money internationally.

24  Q.  It's transfers of money from one person to another, is that

25  correct?

1    A.  Yes.

2              MS. LARYEA:  Mr. Beer, can we return to the first page

3    of this email.  Can you please enlarge the first section.  The

4    first email.

5    Q.  Who is this email from?

6    A.  This email is, again, from Kumar Sanath to the defendant.

7    Q.  And is there anyone on the CC line?

8    A.  Again, Aquil, m.aquil@teledata.mz.

9    Q.  What is the subject line?

10   A.  Subject line is "Fwd: Swift Copy USD 375000."

11   Q.  And what is the date of this email?

12   A.  November 2, 2010.

13   Q.  Is that the date after the first email was sent?

14   A.  Yes, it is.

15   Q.  Can you please read the email.

16   A.  "Dear Sir, kindly process the payment ASAP.  Bank details

17   mentioned below.  Kindly process today and provide Swift copy

18   ASAP."

19   Q.  What is the supplier name, the entity to receive the money?

20   A.  Pacific Inter-Link, Sdn. Bhd.

21   Q.  Now do you see the signature block for Sanath?

22   A.  I do.

23   Q.  What does it say underneath the signature block?

24   A.  It's -- first line it says G.S. Group, SA; underneath that,

25   in parentheses, G.S. Holdings Lda., SSN Lda., Farinal Lda. IPAN

1    Lda.

2    Q.  Does it also have a p.o. box number?

3    A.  Yes.

4    Q.  What is the p.o. box number?

5    A.  P.O. Box 346.

6    Q.  Is that the same p.o. box number you just saw in the Swift

7    that we reviewed?

8    A.  Yes.

9         MS. LARYEA:  Mr. Beer, can you please publish

10   Government's Exhibit 105-A.

11   Q.  Agent Killeen, have you reviewed this document?

12   A.  I have.

13   Q.  What is it?

14   A.  This is a bank statement of Wachovia Bank for an account in

15   the name of Thomas C. McGregor.

16   Q.  And is Thomas McGregor the same name we just saw on the

17   Swift we just reviewed?

18   A.  It is.

19   Q.  And what does it say underneath the name Thomas C.

20   McGregor, Esq.?

21   A.  If we could --

22   Q.  Oh.

23        MS. LARYEA:  Mr. Beer, could you please enlarge that.

24   A.  It reads, "IOLA Attorney Special Account, 100 south Bedford

25   Road, Suite 340, Mount Kisco, New York 10549."

1          MS. LARYEA:  Mr. Beer, can you please enlarge the

2     section titled Deposits and Other Credits.

3     Q.  Do you see that first entry underneath the title?

4     A.  I do.

5     Q.  What is the date of that entry?

6     A.  November 3rd.

7     Q.  What is the amount listed?

8     A.  $374,950.

9     Q.  What is the description?  Can you please read that.

10    A.  "Funds transfer, received from Wells Fargo Bank,

11    originator, Sociedade Saboeira de Nacala, or SSN.  RFB None.

12    OBI, RFD.  Invoice No. PO --" those are titles.  "PO-P.

13    Reference No. 1011034256000110, November 3, 2010, at 5:41 a.m.

14    Eastern."

15    Q.  So that is 374,950 deposited into the account of Thomas

16    McGregor on November 3rd, is that correct?

17    A.  Yes, it is.

18    Q.  From Sociedade Saboeira de Nacala?

19    A.  Yes.

20    Q.  Is that correct?

21    A.  Yes.

22         MS. LARYEA:  Mr. Beer, can you please go to the second

23    page.

24    Q.  Looking at the section called Other Withdrawals and Service

25    Fees, do you see the first item listed under that heading?

H4r1thi5                        Killeen - Direct

1    A.  I do.

2    Q.  What is the date of that item?

3    A.  November 5th.

4    Q.  And what is the description?

5    A.  It's a counter withdrawal or withdrawal of $375,000.

6    Q.  From this Thomas McGregor account, is that correct?

7    A.  Correct.

8            MS. LARYEA:  Mr. Beer, can you please publish

9    Government's Exhibit 105-B.

10   Q.  Agent Killeen, have you seen this document?

11   A.  I have.

12   Q.  What is it?

13   A.  This is a withdrawal slip.

14   Q.  Does it list the name of the account on this withdrawal

15   slip?

16   A.  Yes, it does.

17   Q.  What is the name listed?

18   A.  Thomas McGregor.

19   Q.  What is the date listed?

20   A.  See if we can find the --

21   Q.  Can you see that?

22   A.  November 4, 2010.

23   Q.  And what is the amount that was withdrawn?

24   A.  $375,000.

25   Q.  And is this the withdrawal on November 4, 2010 --

H4r1thi5                          Killeen - Direct

1    A.  Yes.

2    Q.  Sorry.  Withdrawn.

3           MS. LARYEA:  Mr. Beer, can you please publish

4    Government's Exhibit 305-B, page 27.  Sorry.  301-B, page 27.

5    Q.  Mr. Killeen, I'm handing you Exhibit 301-B, page 27.

6    A.  This is 305-R.

7    Q.  Yes, but that's -- have you seen this document before?

8    A.  I have.

9    Q.  What is it?

10   A.  This is the bank account statement for the defendant's HSBC

11   account in Hong Kong.

12   Q.  What is the last four digits of the account number?

13   A.  0888.

14   Q.  What is the date of the account statement?

15   A.  Account statement date is November 23rd of 2010.

16   Q.  I'd like you to turn to the second page.

17   A.  Okay.

18   Q.  Do you see a section that says Foreign Currency Savings?

19   A.  Yes.

20   Q.  Do you see a withdrawal on November 12, 2010?

21   A.  I do.

22   Q.  How much is that withdrawal for, the second withdrawal

23   listed?

24   A.  $375,000.

25          MS. LARYEA:  Mr. Beer, can we publish Government's

1    Exhibit 301-C, the Bates number that ends 4666.

2              No?  Okay.

3    Q.  I'm handing you Government's Exhibit 301, Bates No. ending

4    4666.

5              Special Agent Killeen, have you seen this document?

6    A.  I have.

7    Q.  What is it?

8    A.  This is a HSBC account statement, a summary statement for a

9    wire.

10   Q.  And does it list the person sending the wire?

11   A.  Yes, it does.

12   Q.  Can you read the name of the person sending the wire.

13   A.  Mr. Thiam Mahmoud.

14   Q.  On that document you have, does it list the beneficiary

15   customer, the entity receiving the wire?

16   A.  Yes, it does.

17   Q.  Can you read the name of the entity receiving the wire.

18   A.  Pacific Inter-Link.

19   Q.  What city is Pacific Inter-Link based in?

20   A.  Kuala Lumpur, Malaysia.

21   Q.  On the document, does it list how much was sent?

22   A.  It does.

23   Q.  How much is listed under the title Amount?

24   A.  $375,000.

25   Q.  And what is the date that this $375,000 was sent from the

1   defendant to Pacific Inter-Link?

2   A.  November 12th of 2010.

3           MS. LARYEA:  Mr. Beer, can you please publish

4   Government's Exhibit 541.

5   Q.  Special Agent Killeen, have you seen this document?

6   A.  I have.

7   Q.  What is it?

8   A.  This is an email chain between the defendant and --

9   starting with the defendant and M. Aquil Rajahussen.

10          MS. LARYEA:  Mr. Beer, can you please enlarge the

11  bottom email.

12  Q.  You stated that the email is from the defendant?

13  A.  Yes.

14  Q.  And it's to an M. Aquil Rajahussen, is that correct?

15  A.  Yes.

16  Q.  What is the subject?

17  A.  The subject is "Fwd: Outward Payments Notification,

18  Reference E1112164917."

19  Q.  What is the date that this email was sent?

20  A.  November 12th of 2010.

21  Q.  Do you see a reference to USD 375 on this document?

22  A.  I do.

23          MS. LARYEA:  Mr. Beer, can you highlight that

24  reference.

25  Q.  Can you read the section, third line down, that says To:

1    mahmoud.thiam@gmail.com.  Can you read that till the end of

2    that sentence.

3    A.  "To: mahmoud.thiam@gmail.com.  Subject: Outward Payments

4    Notification.  MT.  If you cannot view this email properly,

5    please configure your email program so that it can support HTML

6    formatted emails.  MT.  Thank you for registering for this

7    email alert service.  Your account has been debited for an

8    outward payment.  Please see the details below.  EAlert

9    Reference Number E1112164917."

10   Q.  And do you see Bank Staff Beneficiary Bank?

11   A.  Yes.

12   Q.  What is the Bank Staff Beneficiary Bank listed?

13   A.  RHB Bank, Berhad.

14         MS. LARYEA:  Mr. Beer, could you put side by side next

15   to this Government's Exhibit 540.  Can you enlarge the section

16   of the top email that says Supplier Name.

17   Q.  Special Agent Killeen, am I correct that this is the email

18   we just reviewed from Sanath Kumar to Mr. Thiam regarding the

19   $375,000 Swift?

20   A.  It is.

21   Q.  And you just read the section that asked what -- Sanath

22   Kumar asked Mr. Thiam to send 375 to Pacific Inter-Link, is

23   that correct?

24   A.  That's correct.

25   Q.  And what is the bank name for Pacific Inter-Link that is

1    listed there?

2    A.   RHB Bank Berhad.

3          MS. LARYEA:   Mr. Beer, can you please enlarge

4    Government's Exhibit 541, the bottom email.

5    Q.   And do you see the RHB Bank Berhad listed there as well?

6    A.   Yes, it's the third line from the top.

7    Q.   Now going back to Government's Exhibit 541.

8          MS. LARYEA:   Mr. Beer, can you enlarge the top half of

9    the email chain.

10   Q.   That second email from the bottom, From, who is that email

11   from?

12   A.   M. Aquil Rajahussen.

13   Q.   What is the date of that email?

14   A.   November 16, 2010.

15   Q.   What is the subject?

16   A.   "Fwd: Fwd: Outward Payments Notification."

17   Q.   And can you read the first -- the "Dear Abdullah."  Can you

18   read that line and the following line.

19   A.   "Dear Abdullah, Please find below -- Please find below the

20   debit advice from HSBC on the value of USD 375K."

21   Q.   And going back to the top email, who is it from?

22   A.   That's from M. Aquil Rajahussen.

23   Q.   Sorry.  The very top email on this page?

24   A.   Oh, okay.  That's from Kumar Sanath.

25   Q.   Email is from Kumar Sanath?

1   A.  It's to Kumar Sanath.

2   Q.  Who is it from?

3   A.  Gopi Manoharan.

4   Q.  And is Kumar Sanath the same name we saw that sent

5   Mr. Thiam that email on November 1st asking for the

6   remittance of 375 to Pacific Inter-Link?

7   A.  It is.

8   Q.  And what is the date of this top email?

9   A.  December 22nd of 2010.

10  Q.  And what does the email say?  Can you just read that.

11  A.  It says "FYI."

12          MS. LARYEA:  Okay.  Mr. Beer, can you please publish

13  Government's Exhibit 201.

14  Q.  Agent Killeen, have you seen this document?

15  A.  I have.

16  Q.  What is it?

17  A.  This is a deed transfer report for Dutchess County.

18  Q.  Under Record and Return To, what is listed underneath --

19          MS. LARYEA:  Mr. Beer, can you please enlarge the

20  text.

21  A.  Under Record and Return To, it says Thomas McGregor.

22  Q.  Is that the same name we saw on the Swift for $375,000 we

23  just reviewed?

24  A.  Yes.

25  Q.  Under the section Grantee, can you please read what's

H4r1thi5                          Killeen - Direct

1    written next to it.

2    A.   Sociedade Saboeira de Nacala Lda.

3    Q.   And under Instrument Type, can you review -- can you please

4    read the taxes that are paid.

5    A.   15,000 transfer tax and $37,500 mansion tax.

6    Q.   Going back to the top of this email, what is the date that

7    the deed is recorded?

8    A.   The date the deed was recorded was on December 6th of

9    2010.

10   Q.   Going to the second page of this document, the deed lists

11   who the buyer is of this property?

12   A.   It does.

13   Q.   Who is the buyer?

14   A.   Sociedade Saboeira de Nacala.

15   Q.   What is the address of the buyer?

16   A.   340 East 64th Street, Apartment 14H, New York, New York.

17   Q.   And what is the date of the sale?

18   A.   13th of November 2010.

19   Q.   Going to page 4 of this document.  On the bottom underneath

20   the signature, do you see the street address of the property

21   that is the subject of this deed?

22   A.   I do.

23   Q.   What is the street address of the property being purchased?

24   A.   771 Duell Road.

25            MS. LARYEA:  Mr. Beer, can you please publish

 1   Government's Exhibit 2000 -- I'm sorry, 202.

 2            Publish Government's Exhibit 205-A.

 3   Q.  Special Agent Killeen, have you seen this document?

 4   A.  I have.

 5   Q.  What is it?

 6   A.  This is the real property transfer report for the State of

 7   New York.

 8   Q.  Does it list when the date of the deed was recorded?

 9   A.  Yes, it does.

10   Q.  What is that date?

11   A.  Can you highlight.

12            This deed was recorded on December 6th of 2010.

13   Q.  Is that the same date of the deed we just looked at?

14   A.  Yes.

15   Q.  What is the property that is being transferred?

16   A.  771 Duell Road.

17   Q.  And who is the buyer of 771 Duell Road?

18   A.  Sociedade Saboeira de Nacala.

19            MS. LARYEA:  And Mr. Beer, can you please enlarge the

20   second half of this document.

21   Q.  Does this document list the date of the sale of 771 Duell

22   Road?

23   A.  It does.

24   Q.  What is the sale price for 771 Duell Road?

25   A.  $3,750,000.

1    Q.  Under the section titled Buyer, do you see that section,

2    Special Agent Killeen?

3    A.  I do.

4    Q.  Who is the buyer listed under that section?

5    A.  Sociedade Saboeira de Nacala Lda.

6    Q.  And is there a signature for the buyer?

7    A.  It is -- there is.

8    Q.  Can you read that signature?

9    A.  Fatim Thiam.

10   Q.  What is the address listed for the buyer?

11   A.  340 East 64th Street, Apartment 14H, New York.

12   Q.  And what is the buyer's attorney listed?

13   A.  Thomas McGregor.

14        MS. LARYEA:  Mr. Beer, can you please publish

15   Government's Exhibit 305-C.  205-C.

16        Could you please go to page 2.

17   Q.  Special Agent Killeen, have you seen this document?

18   A.  I have.

19   Q.  What is it?

20   A.  This is the articles of organization for 771 Duell Road,

21   LLC.

22   Q.  What is the date that these articles of incorporation were

23   filed?

24   A.  December 10th of 2010.

25        MS. LARYEA:  Mr. Beer, can you please move to the next

1   page.

2   Q.  Who is the authorized person listed on this certification

3   of publication for 771 Duell Road, LLC?

4   A.  Fatim Thiam.

5          MS. LARYEA:  Mr. Beer, can you please publish

6   Government's Exhibit 106-C.

7   Q.  Agent Killeen, have you seen this document?

8   A.  I have.

9   Q.  What is it?

10  A.  This is a bank opening statement, signature card for a bank

11  account under the name of 771 Duell Road, LLC.

12         THE COURT:  Is this 106-T?

13         MS. LARYEA:  This is 106-C.

14         THE COURT:  Has this been offered into evidence?

15         MS. LARYEA:  I believe it has.  Can we take it down

16  now.

17         I'll move on.

18         Mr. Beer, please publish Government's Exhibit 203.

19  BY MS. LARYEA:

20  Q.  Special Agent Killeen, have you seen this document?

21  A.  I have.

22  Q.  What is it?

23  A.  This is a deed transfer report for Dutchess County.

24  Q.  And what is the --

25         MS. LARYEA:  Mr. Beer, can you please enlarge this

1   document.

2   Q.  What is the name of the individual listed under Record and

3   Return?

4   A.  Thomas McGregor.

5   Q.  And what is the date that this deed is recorded?

6   A.  October 29th of 2012.

7   Q.  And who is selling the land, the property?

8   A.  The grantor is Sociedade Saboeira de Nacala Lda.

9   Q.  What is the name of the grantee?

10  A.  Amer Holdings, PTE LTD.

11  Q.  Going to the second page of this document, what is the date

12  of the sale of this property, or transfer of this property?

13  A.  May 11th of 2012.

14  Q.  And you mentioned the buyer was Sociedade Saboeira de

15  Nacala Lda.?

16  A.  Yes.

17  Q.  What is the address listed for the buyer -- sorry -- for

18  the seller?

19  A.  Yeah.  Seller is 340 East 64th Street, New York.

20  Q.  And what is listed as the buyer of this property?

21  A.  Amer Holdings PTE LTD.

22  Q.  And what is the address listed for the buyer?

23  A.  Same address, 340 East 64th Street, New York.

24  Q.  And on the bottom, is there a signature for Sociedade

25  Saboeira de Nacala Lda.?

1   A.  Yes, there is.

2   Q.  Can you read that signature?

3   A.  Fatim Thiam.

4   Q.  And what does it say underneath that signature?

5   A.  Member, Fatim Thiam.

6           MS. LARYEA:  Mr. Beer, could we please go to page 5 of

7   this document.

8   Q.  Agent Killeen, does this page list the address of the

9   property being transferred?

10  A.  Yes, it does.

11  Q.  What is the address listed?

12  A.  771 Duell Road.

13          MS. LARYEA:  Mr. Beer, could you please publish

14  Government's Exhibit 204.

15          Please take that down.

16          Could you please publish Government's Exhibit 1003.

17  Q.  Special Agent Killeen, you mentioned that you reviewed some

18  summary exhibits relating to the HSBC account expenditures, is

19  that correct?

20  A.  That's correct.

21  Q.  So I want to walk through this document.  On the very far

22  right, starting on the right-hand side --

23  A.  Okay.

24  Q.  -- what is the name listed there?

25  A.  McGregor.

1    Q.  And is that the same Thomas McGregor that we have seen in

2    the documents we just reviewed?

3    A.  Yes, it is.

4    Q.  And there is a bank account listed underneath.  What is

5    that, the last four digits of that bank account?

6    A.  4901.

7    Q.  Who is that account with?

8    A.  Wachovia Bank.

9    Q.  Is that the same account we reviewed of Thomas McGregor in

10   Wachovia Bank previously?

11   A.  It is.

12   Q.  Now moving one to the left, what is the date written there?

13   A.  November 1, 2010.

14   Q.  And what is the amount?

15   A.  $375,000.

16   Q.  Moving one more to the left, what is the name of the entity

17   written?

18   A.  SSN Lda., Sociedade Saboeira de Nacala Lda., and G.S.

19   Holdings Lda.

20   Q.  And what does this exhibit, this page represent, the arrow

21   from SSN to McGregor?

22   A.  It shows the wire represented by the previously shown Swift

23   report of $375,000 from a bank account of SSN to McGregor's

24   account at Wachovia Bank on November 1, 2010.

25   Q.  And the email that is depicted beneath, is that the email

1    we just reviewed?

2    A.  It is.

3    Q.  The email from Sanath Kumar to the defendant?

4    A.  Yes.

5            MS. LARYEA:  Mr. Beer, can we move on to the next

6    page, please.

7    Q.  Now moving one to the left of SSN Lda., do you see that

8    arrow?

9    A.  I do.

10   Q.  And that arrow is pointing to the defendant's name, M.

11   Thiam, is that correct?

12   A.  Correct.

13   Q.  And underneath the email, is that the email we just

14   reviewed from Sanath Kumar to the defendant?

15   A.  Yes, it is.

16   Q.  On November 1st and again on November 2nd, is that

17   correct?

18   A.  That's correct.

19   Q.  And that email asked the defendant to send $375,000 to

20   Pacific Inter-Link Sdn. Bhd., is that correct?

21   A.  That's correct.

22           MS. LARYEA:  The next page, please, Mr. Beer.

23   Q.  Going back to the right-hand side of this document, there's

24   an arrow from Thomas McGregor pointing down.  Do you see that

25   arrow?

H4r1thi5                    Killeen - Direct

1   A.  I do.

2   Q.  What is the date listed on that arrow?

3   A.  November 5th of 2010.

4   Q.  And the amount?

5   A.  $375,000.

6   Q.  And is that the withdrawal we just reviewed when we

7   reviewed the accounts of Thomas McGregor?

8   A.  It is.

9   Q.  Withdrawal of $375,000 on November 5th, 2010, is that

10  correct?

11  A.  That's correct.

12  Q.  And all the way to the left, do you see an account number

13  next to the name M. Thiam?

14  A.  Not right now.  I believe it's on the next page.

15  Q.  Sorry.  The next page.  Do you know see an account number

16  listed next to the defendant's name, M. Thiam?

17  A.  I do.

18  Q.  What is the last four digits of that account number?

19  A.  0888.

20  Q.  Is that the same last four digits of defendant's HSBC Hong

21  Kong account?

22  A.  It is.

23  Q.  Now do you see the arrow pointing down from that account?

24  A.  I do.

25  Q.  What is the date listed on that arrow?

1    A.  The date listed is November 12th of 2010.

2    Q.  And what is the amount listed?

3    A.  $375,000.

4    Q.  And who is the arrow pointing to?

5    A.  Pacific Inter-Link.

6    Q.  What does that arrow from the defendant's HSBC Hong Kong

7    account to Pacific Inter-Link represent?

8    A.   It represents the wire from the HSBC account of the

9    defendant to the bank account of Pacific Inter-Link in the

10   amount of $375,000 on November 12th.

11   Q.  Is that the wire we just reviewed?

12   A.  It is.

13   Q.  And next to that wire there is an email.

14   A.  Yes.

15   Q.  Is that the email from the defendant to M. Aquil Rajahussen

16   that we reviewed from November 12, 2010?

17   A.  Yes.

18   Q.  The email that forwards the information about the wire

19   transfer from the defendant's Hong Kong bank account to Pacific

20   Inter-Link.

21   A.  Yes.

22          MS. LARYEA:  The next page, please, Mr. Beer.

23   Q.  Now going all the way to the top right-hand corner of this

24   document, do you see an arrow pointing from Mr. McGregor

25   upward, or to the right and then up?

1    A.  Yes.

2    Q.  What is the date listed on that arrow?

3    A.  The 13th of November of 2010.

4    Q.  What is the amount listed?

5    A.  $3,750,000.

6    Q.  And it's pointing to a house, is that correct?

7    A.  Correct.

8    Q.  What does that arrow represent?

9    A.  The purchase of 771 Duell Road.

10   Q.  And it was purchased for $3.75 million, is that correct?

11   A.  It was, yes.

12   Q.  And Agent Killeen, is $375,000 10 percent of $3.75 million?

13   A.  It is.

14   Q.  Agent Killeen, you mentioned earlier that you reviewed the

15   videotape of the defendant's interview with FBI after his

16   arrest, is that correct?

17   A.  That is correct.

18          MS. LARYEA:  Mr. Beer, can you please play clip 5 from

19   Government Exhibit 801-A.

20          (Video played)

21   Q.  Agent Killeen, during the interview, did the defendant

22   discuss his role in the negotiations with CIF in the Guinea

23   deal we've been discussing?

24   A.  Yes.

25          MS. LARYEA:  Mr. Beer, can you please play clip 7 of

H4r1thi5                          Killeen – Direct

1   Government Exhibit 801-A.

2            (Video played)

3            MS. LARYEA:  Mr. Beer, can you also play clip 18 from

4   Government's Exhibit 801-A.

5            (Video played)

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Agent Killeen, during the interview, did the defendant

2    mention anything about payments from Sam Pa to other government

3    officials?

4    A.  Yes, he did.

5         MS. LARYEA:  Mr. Beer, can you please play clip 8 from

6    Government Exhibit 801A.

7         (Video played)

8    Q.  Agent Killeen, during the interview, did the defendant

9    discuss the source of the money in his Hong Kong HSBC account?

10   A.  He did.

11        MS. LARYEA:  Mr. Beer, can you please publish clip 9

12   of Government Exhibit 801A.

13        (Video played)

14   Q.  Special Agent Killeen, in listening to this video clip, did

15   you hear the defendant mention that he asked people who owed

16   him money to deposit money into the Hong Kong bank account?

17   A.  I did.

18   Q.  He said he could give a list of 50 people, is that correct?

19   A.  That's correct.

20   Q.  You testified that you reviewed that Hong Kong bank account

21   of the defendant, is that correct?

22   A.  I did.

23   Q.  When you reviewed that account, how many people had

24   deposited money into that account?

25   A.  I would say five or six.  Less than ten.

1  Q.   Special Agent Killeen, did the defendant provide any other

2  explanations regarding the amount in the HSBC Hong Kong

3  account?

4  A.   He did.

5          MS. LARYEA:   Mr. Beer, can you please publish clip No.

6  10 from Government Exhibit 801A.

7          (Video played)

8          MS. LARYEA:   Can you also play clip 11, same

9  government exhibit, 801A.

10          (Video played)

11          MS. LARYEA:   Mr. Beer, can you please also play clip

12  12 from Government Exhibit 801A.

13          (Video played)

14          MS. LARYEA:   Can you please also play clip 13 from

15  government Exhibit 801A.

16          (Video played)

17          MS. LARYEA:   Mr. Beer, after clip 13, can you also

18  please play clip 14.

19          (Video played)

20  Q.   Agent Killeen, did the defendant, during this interview

21  also explain who sent him the money into his Hong Kong bank

22  account?

23  A.   Yes.

24          MS. LARYEA:   Mr. Beer, can you please play clip 15 of

25  government 801A.

H4rWthi6

1           (Video played)

2   Q.  Agent Killeen, during the interview with the defendant, did

3   he explain how he got the money?

4   A.  Yes.

5           MS. LARYEA:  Mr. Beer, can you please play clip 17

6   from Government Exhibit 801A.

7           (Video played)

8           THE COURT:  Counsel, I think we'll probably end here

9   for the day.

10          Ladies and gentlemen, we're not going to sit tomorrow.

11  We'll resume the trial Monday morning at 9:30.  I want to

12  remind you if you see any press report about the topic of

13  bribery generally, hear anything on the news, television,

14  radio, just switch the channel.  I've told you before never to

15  do any research about this case; rely on the lawyers to present

16  to you the information in this courtroom that you need to

17  render a verdict.

18          With that, I remind you not to discuss the case with

19  anyone and have a great weekend.  See you Monday morning, 9:30.

20          (Continued on next page)

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  I know we're going to talk about the

3    videotaped testimony from Momo Sakho now.  Is there anything

4    else besides that that we need to address this evening?

5              Mr. Kobre.

6              MR. KOBRE:  No, your Honor.

7              THE COURT:  Mr. Goldsmith.

8              MR. GOLDSMITH:  No, your Honor.

9              THE COURT:  OK.  I received letters on Sunday

10   regarding this issue.  We had discussion Monday morning at the

11   beginning of trial about this issue, and I reserved decision

12   until we had testimony from the two Guinean witnesses.

13             Let me ask you, Mr. Goldsmith, is there anything you

14   wish to add now to your application?

15             MR. GOLDSMITH:  Well, I think that the testimony of

16   the witnesses conforms with what my anticipation was.  In fact,

17   the government also opened on the opportunity for Mr. Thiam to

18   promote that deal to the government.  Accordingly, I think that

19   highlights the necessity for Mr. Sakho to rebut that argument

20   and that testimony.

21             THE COURT:  Does the government wish to be heard?

22             MR. KOBRE:  Just briefly, your Honor.  I think, in

23   fact, quite the opposite.  The testimony the government

24   elicited from the Guinean witnesses is actually entirely

25   consistent, it sounds like, with what the defense has proposed

H4rWthi6

to have Mr. Sakho testify about.  The testimony was that other

individuals were involved; that there was a committee; that

actually the signatures on the documents were commanded by

others.  And the government's view continues to be as it was

set forth in the letter, that there was certainly nothing

exculpatory in what's proposed to be the testimony of

Mr. Sakho.

As the Court instructed the jury and as I think the

Court has said several times, it's not the government's burden

here to prove that the defendant was the ultimate decision

maker -- in fact, he may have even had a small role, so long as

the government proves that he used his position to promote the

agreement in exchange for the money that was given to him.  So

the government opposes any allowance for this witness to

testify by CCTV or otherwise.

THE COURT:  OK.  I laid the legal standard on the

record earlier, and in that connection, I just remind you that

I'm applying the standards under Rule 15 of the Federal Rules

of Criminal Procedure and the Second Circuit case law I cited

on Monday.  Among other things, I have to decide whether the

witness's testimony is material and whether it is necessary to

prevent a failure of justice.

I don't find it is material or necessary to prevent a

failure of justice, and I will not allow the videotaped

testimony of Momo Sakho to be received at this trial.

1              What we've heard in largely undisputed evidence, and I

2      think the descriptions of the number of people involved and the

3      process in connection with the ultimate execution of a

4      shareholders agreement is really pretty undisputed.  The

5      president was the most powerful person in the country.  At this

6      period of time, under him was a prime minister and a council of

7      ministers.  There were various advisers to the ministers and to

8      the president.  Committees were appointed.  There was a

9      technical committee.  There was a smaller committee to handle

10     the negotiations.  In essence, there were many players, many

11     people involved.  The defendant was one of many.  He had a very

12     important role but not the only role of importance.  In fact

13     the most significant committee he was on he was not the chair

14     of.  Someone named Minister Barry was the chair of that

15     committee.

16             We've heard that Mr. Barry had a personal relationship

17     with the president.  We've heard that the president was the one

18     who makes all the final decisions here.  It's the president who

19     decides who's appointed as a minister, who's appointed to the

20     critical committees, whether or not a power of attorney form

21     would be signed, whether or not an agreement would be entered.

22     The agreements that were at issue here, including the

23     shareholders agreement, was subject to review by the council of

24     ministers.  And the cross-examination of the first Guinean

25     witness that we had was used to underscore a number of these

1  points, and they include that the council of ministers was

2  required to review the shareholders agreement and had to decide

3  whether or not it would be approved; that both the defendant as

4  well as Mr. Barry held that exalted position of ministers of

5  the presidency; that Minister Barry had a personal relationship

6  with the president, and it was standard procedure for him to be

7  alone with the president; and that everyone, including the

8  defendant, had to follow the president's directions.

9          I point those out as just a few of the themes that

10 came through in the examination of critical witnesses here, but

11 let's turn to the law and the legal standard with respect to

12 the violation of Guinean law.  I think the critical term is

13 that the payment be made under article 192 in return for -- I

14 just want to confirm that.  Yes.  It's an element of a

15 violation of article 192, the passive corruption statute under

16 Guinea's penal code, that a defendant's receipt of a thing of

17 value be in return for engaging in an act or refraining from

18 engaging in an act.  So the proffer with respect to Momo

19 Sakho's proposed testimony as contained in the letter of April

20 23 and elaborated on today has really nothing to do with

21 whether or not a violation of article 192, much less 194,

22 occurred here, and it has nothing to do with, of course, the

23 elements under the two money-laundering statutes.  I don't

24 think it's either material or in the interests of justice.

25 It's not going to be exculpatory; it's really about things that

1    are largely undisputed.

2              It's undisputed that the defendant didn't have the

3    ultimate decision-making authority and it's irrelevant under

4    the law in any event.  And it's undisputed that the president

5    was the final decision maker and had many important

6    relationships, many committees and individuals advising him.

7    Indeed, no one here at any point was acting alone.

8              Thank you, counsel.  I'll see you Monday morning at

9    9:00.  Thank you.

10             Counsel, I'm so sorry.  I forgot to ask you about a

11   charging conference.  When does the government expect to rest?

12             MR. KOBRE:  Your Honor, I think our best estimate now

13   is Monday before lunch or lunch at the latest, in the morning

14   at some point.  It will depend obviously to some degree on how

15   long the crosses are, but assuming they're fairly moderate,

16   around lunchtime, give or take.

17             THE COURT:  Will there be a defense case?

18             MR. GOLDSMITH:  Your Honor, I anticipate a defense

19   case.

20             THE COURT:  How long?

21             MR. GOLDSMITH:  Probably a day and a half or a day,

22   but not longer.

23             THE COURT:  OK.  This is the situation.  We're moving

24   right into summations after the parties rest, so if the parties

25   are going to rest on Monday, we need to have the charging

H4rWthi6

1   conference Monday morning so that you can sum up Monday

2   afternoon.  If there's a defense case, we can have the charging

3   conference Tuesday morning.

4           MR. GOLDSMITH:  I think we can have it Tuesday

5   morning.

6           THE COURT:  OK.  Let us just say, just say, that over

7   the weekend you decide there will be no defense case or a

8   shorter defense case, I'll be here Sunday, I can finalize the

9   charge and leave it for everyone early Monday morning, so we

10  can handle it that way and give the defendant extreme

11  flexibility in making these decisions.  And I know,

12  Mr. Goldsmith, you're so cooperative that you're telling me

13  there will be a defense case, but I know life is filled with

14  surprises.

15          MR. GOLDSMITH:  Oh, sure.  There's always a final

16  decision, especially since Agent Killeen is still on the stand.

17  We've got a couple more bank witnesses, as I understand it.

18  I've got at least one fact witness, who is not going to be very

19  long, who is ready and available and who is here.  I'm still

20  awaiting word on another fact witness that I'm hopeful will

21  work out.  That's why I say I'm fairly confident between the

22  government finishing around lunch, obviously Rule 29 arguments

23  may obviate everything --

24          THE COURT:  No.  They're not going to take up jury

25  time, I'll assure you of that.

1          MR. GOLDSMITH:  OK.  Beyond that, a short defense case

2     I'm relatively confident of, depending on, as the Court just

3     mentioned, how short or long it is, is clearly a series of

4     decisions that will get made Monday.

5          THE COURT:  Will get made Monday?

6          MR. GOLDSMITH:  Yes, or by Monday.  Your Honor,

7     obviously you would like more guidance between the parties as

8     to whether or not there will be a lengthier defense case over

9     the weekend?

10         THE COURT:  This is the situation.  I want to move.  I

11    want to fill Monday until 5:00.

12         MR. GOLDSMITH:  Right.

13         THE COURT:  I'm happy to have a defense case all the

14    rest of Monday and all of Tuesday.  I don't care, absolutely

15    neutral, but I need to give you a charging conference.

16         MR. GOLDSMITH:  Right.

17         THE COURT:  So let us say you'll communicate with each

18    other and with chambers by noon on Sunday if you think we

19    should have a charging conference Monday morning.

20         MR. GOLDSMITH:  Very well.

21         THE COURT:  Good.  And that will give me enough time

22    to put everything in final for you and make copies and be able

23    to conduct that, and the charging conference would be 9:00 on

24    Monday morning.  When do you want the charge?  There are only

25    two counts, but obviously everything is important.  Do you want

H4rWthi6

1    it at 8:00, copies on your desk, or 8:30?  What do you prefer?

2            MR. GOLDSMITH:  8:00.

3            THE COURT:  Great.  And if we don't hear anything from

4    you by noon on Sunday, we're just going to have the charging

5    conference Tuesday.

6            MR. GOLDSMITH:  Very well.

7            THE COURT:  At 9:00, and the charge will be left for

8    you Tuesday morning at 8 a.m.

9            MR. GOLDSMITH:  Thank you, your Honor.

10            THE COURT:  Great.  Have a great weekend.

11            (Adjourned to May 1, 2017, at 9:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MAMADOU SANDE

Direct By Mr. DiMase . . . . . . . . . . . . . 349

Cross By Mr. Goldsmith . . . . . . . . . . . 376

Redirect By Mr. DiMase . . . . . . . . . . . 390

Recross By Mr. Goldsmith . . . . . . . . . . 391

PATRICK KILLEEN

Direct By Ms. Laryea . . . . . . . . . . . . 399

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

1402, 106, 106A and 106B  . . . . . . . . . . 433

1404, 601A and 601B   . . . . . . . . . . . 434

1410 and 1503   . . . . . . . . . . . . . . 435

1413 and 1502   . . . . . . . . . . . . . . 436

1412 and 1501   . . . . . . . . . . . . . . 437

 1415 and 105   . . . . . . . . . . . . . . 438

1001-1003   . . . . . . . . . . . . . . . . 442

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300