H511thi1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                            17 Cr. 47 (DC)

MAHMOUD THIAM,

             Defendant.           Trial

------------------------------x

                                 New York, N.Y.
                                 May 1 , 2017
                                 9:00 a.m.

Before:

                   HON. DENISE COTE,

                                District Judge,
                                 and a Jury

                    APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  ELISHA J. KOBRE
     CHRISTOPHER J. DiMASE
     Assistant United States Attorney

      -and-

U.S. DEPARTMENT OF JUSTICE
BY:  LORINDA I. LARYEA

LAW OFFICE OF AARON GOLDSMITH, PC
     Attorneys for Defendant
BY:  AARON M. GOLDSMITH, ESQ.
     MICHAEL DELAKAS, ESQ.

ALSO PRESENT:  PATRICK KILLEEN, Special Agent, FBI
               ALEXANDER BEER, Paralegal Specialist, USAO
               KATHERINE BOSLEY, Paralegal Specialist, DOJ
               JENNIE CARMONA, Defense Paralegal
               EMMANUEL I. ORJI, Interpreter (French)

H511thi1

1            (Trial resumed; jury not present)

2            THE COURT:  Good morning, everyone.

3            ALL COUNSEL:  Good morning.

4            THE COURT:  I have one issue to raise with counsel,

5       before I ask if you have issues to raise with me.  It concerns

6       Juror No. 10, who was formerly Juror No. 11.  It's Ms. Dunbar.

7       About 5:30 on Thursday, Ms. Dunbar approached me on the

8       sidewalk.  I hate to admit to counsel I was leaving at around

9       5:30 Thursday, but she was still around.  I didn't recognize

10      her at first.  It says more about my eyesight than anything

11      else, and for all I knew she was just someone who was going to

12      ask directions somewhere.  But when she said "Judge" -- I was

13      about a block away from the courthouse -- I realized she knew I

14      was a judge and became more alert to the fact that she was

15      talking to me.  And she said something about her employer, and

16      I said, "I cannot talk with you.  There is no court reporter

17      here."  She called Ms. Rojas then the next day, or that same

18      day, later, and reported that her employer would not pay her

19      for this week's jury service.  As I understand the law, an

20      employer is only required to follow their customary procedures.

21      Obviously anyone serving as a juror gets a daily stipend, but

22      there is no other source of compensation.

23            So that was what I was planning to raise with you

24      today.  But Ms. Rojas received another call from the same

25      juror, who reported that she is very ill, cannot attend court

1    today.  Her voice -- it was a voicemail message -- sounded

2    horrible to Ms. Rojas.  It sounded like it was genuine illness.

3    And the message in effect indicated that she would make every

4    effort to come in tomorrow if she felt better and I wanted her

5    to do so.  So let me just confirm with Ms. Rojas that I've

6    accurately conveyed that.

7             Good.  So counsel, I obviously want you to discuss

8    these issues with each other, but my recommendation is, since

9    we have three alternates, that we excuse Ms. Dunbar and are

10   left with two remaining alternates.  And I'll give you a moment

11   after we complete today's discussion of any other issues to

12   consult with each other regarding that.

13            So does the government have any issues today?

14            MR. KOBRE:  We do, your Honor.  Three issues on some

15   evidence that was offered on Thursday, and I'll go through the

16   issues one by one.

17            THE COURT:  Offered and received?

18            MR. KOBRE:  Offered and received, your Honor.

19            So the first concerns what was Government's

20   Exhibit 1401, which is a stipulation involving several property

21   records.  The stipulation referred to exhibits -- well, let me

22   step back.  During the course of the direct examination of

23   Agent Killeen, two exhibits were displayed to the jury.  The

24   numbers, those exhibits were not in evidence.  However --

25            THE COURT:  Which exhibit numbers?

H511thi1

1        MR. KOBRE:  They were Exhibit Nos. 202 and 206.  Your

2    Honor, those exhibits are in evidence but they were under a

3    different exhibit number, so in essence, they were referred to

4    under the wrong exhibit numbers.  The way this came about was

5    that the exhibit numbers in the stipulation had been changed

6    but the sticker numbers on the actual exhibits themselves had

7    not been.

8        THE COURT:  Okay.  So 202 and 206 have been received

9    in evidence on the record, but the numbers belong to different

10   documents.

11       MR. KOBRE:  So 205A is 202 and 205C is 206.  And 202

12   and 206 were both received into evidence, but they were

13   referred to and had been stickered and put up before the jury

14   as 205A and 205C.

15       We discussed this with defense counsel, your Honor,

16   and we've prepared a revised stipulation, and we are in

17   agreement between the parties to just correct those numbers.

18   It's essentially the same stipulation.

19       THE COURT:  Okay.  Thank you.

20       MR. KOBRE:  Did your Honor want us to read that, the

21   revised stip with the new numbers, on the record as well and

22   offer the revised stip?

23       THE COURT:  Yes.

24       MR. KOBRE:  Thank you, Judge.

25       We would ask to replace this stipulation.  In other

H511thi1

1    words, would the Court be agreeable to actually replacing the

2    stipulation so that it would have the same number, the

3    stipulation itself would be the same numbered exhibit?

4              THE COURT:  Okay.  So any admission or receipt of

5    evidence has to happen on the record before the jury, number

6    one.

7              Number two, clarity of the record is important, both

8    for the jury, for me, for you, potentially for the Court of

9    Appeals.

10             I am not sure I understand what the substitution of

11   the stipulation is going to achieve.  I think it should be a

12   separate numbered stipulation that explains the substitutions.

13   Otherwise, I think it's going to be utterly confusing.  I am

14   slightly confused myself now and I've been taking notes.

15             Okay.  So, next.

16             MR. KOBRE:  Yes, your Honor.  So the next issue

17   pertains to Government Exhibit 1405.  That was a stipulation

18   which involved emails.  And again, we discussed this with

19   defense counsel.  The stipulation was, in a sense, with respect

20   to several of the emails that were offered, factually incorrect

21   insofar as it stated that five of the roughly 45 emails that

22   were offered under the stipulation had come from a particular

23   email account when in fact only those five had come from

24   different email accounts.  So we have now revised that

25   stipulation as well to explain where those five emails had in

H511thi1

1    fact come from and also, in agreement with defense counsel,

2    added a new email that the government wishes to offer.

3              THE COURT:  Okay.

4              MR. KOBRE:  So that's with respect to the email

5    stipulation.

6              And then finally, your Honor, Government Exhibit 1415,

7    which was a stipulation regarding bank records from Wachovia

8    Bank, that stipulation offered Exhibit 105, which is a CD

9    containing bank records.  During the direct examination of

10   Special Agent Killeen, Exhibits 105A and 105B were referred to.

11   They are pages from Government Exhibit 105, which is in

12   evidence, but Government Exhibit 105 does not contain any items

13   designated 105A and 105B.  For that, your Honor, we don't think

14   a new stipulation is required.  We've marked Exhibits 105A and

15   105B now, which are from 105, and we plan to, during the direct

16   examination of Special Agent Killeen, simply show them to him

17   and have him explain that these are from the bank records that

18   he had reviewed, which are in evidence.

19             THE COURT:  I think you should separately offer them

20   on the record so there's clarity there.

21             MR. KOBRE:  We will do that, your Honor.

22             THE COURT:  Fine.

23             MR. KOBRE:  If I can just come back for one moment?

24             THE COURT:  Now as I remember, we had confusion about

25   106C and D, or at least 106C on the record during the testimony

H511thi1

1    of the witness.

2              MR. KOBRE:  Your Honor, we have cleared that issue up.

3    There will not be a 106C or D.  There will simply be a 106A and

4    a 106B.  I'm sorry.  I'm sorry.  Just one moment, your Honor.

5              Your Honor, I'm going to take a look at the

6    stipulation right now.

7              THE COURT:  I want to thank you, Mr. Goldsmith, with

8    your cooperation with the government as it figures out what

9    exhibit numbers apply to its documents.

10             MR. GOLDSMITH:  Thank you, your Honor.  Clearly these

11   are immaterial issues.

12             THE COURT:  Yes.  But some counsel would be tempted to

13   make a fuss about it, so thank you.

14             MR. KOBRE:  Thank you, Judge.  So it is 106A and B,

15   and there will not be a C and D.  And 106A and B are included

16   in the stipulation.

17             THE COURT:  Yes.  They were received in evidence on

18   the record.

19             MR. KOBRE:  That's right, your Honor.

20             THE COURT:  Okay.  Any other issues from the

21   government?

22             MR. KOBRE:  Your Honor, if I can just come back, in

23   terms of -- I mean, we've modified the stipulations, the ones

24   we discussed regarding the property records and the email

25   account, to designate them with the correct exhibit numbers.  I

1    think your Honor had suggested before that maybe the

2    stipulation would make some recitation about the substitution.

3    We can do that now very quickly.

4              THE COURT:  What do you mean "we can do that now very

5    quickly"?

6              MR. KOBRE:  In other words, the stipulations as we've

7    revised them now don't explain that they are substitute

8    stipulations.  They simply contain the correct exhibit numbers.

9              THE COURT:  Okay.  So for instance, why don't you say

10   1401A and add in handwriting, "This stipulation is a substitute

11   for 1401."

12             MR. KOBRE:  Yes, your Honor.

13             THE COURT:  Okay.  Or I'm sure you'll come up with a

14   better solution, but whatever you think of that just adds some

15   clarity.

16             Great.  Anything else, Mr. Kobre?

17             MR. KOBRE:  No, your Honor.

18             THE COURT:  Mr. Goldsmith, anything to raise this

19   morning?

20             MR. GOLDSMITH:  The government informed me over the

21   weekend that there were going to be some summary charts, some

22   additional summary charts they were going to seek to admit

23   through Agent Killeen in the remainder of his testimony this

24   morning.  In sum and substance they are pie charts.  There are

25   two pie charts that evidence the proportionate share of

H511thi1

1    deposits into the Hong Kong account.  They come from Mr. Pa or

2    Ms. Feng versus other sources.  There is a third summary chart

3    that is essentially a timeline.

4           I'm sorry.  I'm being corrected.  They're not going to

5    seek to introduce the timeline.

6           So as far as the two pie charts go, again, the defense

7    would object to the admission of any summary charts into

8    evidence, and again, they are simply demonstrative pieces that

9    have been created by the government.  They are not evidence.

10   And we feel that they may in some way prejudice the jury as it

11   relates to Mr. Thiam.

12          THE COURT:  Thank you.  I will accept the pie charts

13   as evidence so long as they accurately reflect the underlying

14   evidence that they summarize, and hearing no dispute that they

15   do, they will be received in evidence when offered.

16          Okay.  So do you want to briefly consult with each

17   other about our ill juror who also has salary issues?

18          MR. KOBRE:  Yes, Judge.

19          Your Honor, I've spoken with defense counsel, and

20   given the circumstances, we agree with your Honor's suggestion

21   that the juror be dismissed and an alternate be substituted.

22          THE COURT:  Any objection from counsel to having

23   Ms. Rojas communicate that with her so while she's ill, she's

24   not feeling pressure to try to show up tomorrow?

25          MR. KOBRE:  No objection.

H511thi1

 1          MR. GOLDSMITH:  No objection.

 2          THE COURT:  Thank you so much.  Good.

 3          So we'll see you at 9:30 or as soon as Ms. Rojas tells

 4  us the remaining jurors have assembled.

 5          THE DEPUTY CLERK:  All rise.

 6          (Recess)

 7          (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H51Wthi2

1              (In open court; jury not present)

2              THE COURT:  Please be seated.  The witness is on the

3      stand.

4              THE COURT:  Bring in the jury.

5              (Jury present)

6              THE COURT:  Good morning, ladies and gentlemen.  I

7      want to apologize that our morning refreshments, for some

8      reason beyond Ms. Rojas' control, did not appear.  We'll take a

9      morning recess earlier than normal this morning.

10             Sadly, we've lost one of your number, through no fault

11     of her own, and again, this underscores how important our

12     alternates are.  We have two jurors who originally were

13     alternates now among the 12, and we have two remaining

14     alternates, so I want to do a couple of things.  I want to

15     thank you all for being so prompt this morning.  It is deeply

16     appreciated.  We know how important your time is.  Counsel have

17     worked very hard to try this case efficiently so you can get

18     back to your regular lives, but you've made a commitment to

19     jury service, and of course, it's only through that commitment

20     that our court system deliver justice for the parties.  So

21     thank you.

22             And secondly, remember, alternates, listen as

23     carefully as everyone else does, because you may be

24     deliberating jurors.  Thank you so much.

25             I remind the witness he's still under oath.

1          Counsel.

2     PATRICK KILLEEN, resumed.

3          MR. DiMASE:  Your Honor, before we begin with the

4     witness, we do have several additional stipulations to read to

5     the jury.  Should I do that now?

6          THE COURT:  Yes.

7          MR. DiMASE:  Thank you.  I'll use the podium.

8     Initially, I have two revised stipulations, which I can read.

9          At the end of the preliminary paragraph, and this is

10    marked as Government Exhibit 1401R for identification, it

11    indicates that:

12         "This stipulation revises and replaces Government

13    Exhibit 1401, and further, that:

14         "Government Exhibit 201 is a true and correct copy of

15    a Dutchess County clerk recording page and deed, dated November

16    13, 2010, for the sale of real property located at 771 Duell

17    Road, Millbrook, New York, 12545, which is in the town of

18    Stanford, New York, the Dutchess County property.

19         "Government Exhibit 203 is a true and correct copy of

20    a Dutchess County clerk recording page, dated May 11, 2012, for

21    the sale of the Dutchess County property.

22         "Government Exhibit 204 is a true and correct copy of

23    a form RP5217, New York State real property transfer report,

24    dated May 11, 2012, for the May 11, 2012, sale of the Dutchess

25    County property.

H51Wthi2

1          "Government Exhibit 205 is a true and correct copy of

2     an application for a building permit for the Dutchess County

3     property, which is filed with the town of Stanford, New York.

4          "Government Exhibit 205A is a true and correct copy of

5     a form RP5217, New York State real property transfer report,

6     dated November 19, 2010, for the November 13, 2010, sale of

7     Dutchess County property; and

8          "Government Exhibit 205C is a true and correct copy of

9     formation documents for a New York State limited liability

10    corporation named 771 Duell Road LLC.

11         "It is further stipulated and agreed that this revised

12    stipulation, which is marked as Government Exhibit 1401R, and

13    Government Exhibits 201, 203, 204, 205, 205A and 205C may be

14    received as Government Exhibits at trial.

15         Your Honor, we would offer this Exhibit, 1401R.

16         THE COURT:  Yes, and those enumerated exhibits.  They

17    are received.

18         MR. DiMASE:  Thank you.

19         (Government Exhibits 1401R, 201, 203, 204, 205, 205A,

20    and 205C received in evidence)

21         MR. DiMASE:  Then a second revised stipulation, which

22    also reads at the end of the paragraph:

23         "This stipulation revises and replaces Government

24    Exhibit 1405, and further, that:

25         "Google Inc. operates a web-based electronic mail

537

H51Wthi2

1    (hereafter 'email') service known as Gmail.

2              "In or about January 2015, a search warrant

3    (hereinafter the 'Thiam Google search warrant') issued by a

4    United States magistrate judge for the Southern District of New

5    York was served on Google."

6              And by the way, I'm reading from what has been marked

7    as Government Exhibit 1405R for identification.

8              "The Thiam Google search warrant directed Google to

9    produce all stored emails and other stored content information

10   from the email account mahmoud.thiam@gmail.com.  Google

11   complied with the Thiam Google search warrant by providing a

12   true and accurate copy of the stored emails and other stored

13   content information in that account to the Federal Bureau of

14   Investigation, New York, New York.

15             "Government Exhibit 500 is a thumb drive containing

16   true and correct copies of emails from the email account

17   mahmoud.thiam@gmail.com produced by Google in response to the

18   Thiam Google search warrant.

19             "Government Exhibits 501 through 506, Government

20   Exhibits 508 through 514, Government Exhibits 516 through 540,

21   and Government Exhibit 544 are certain emails copied from

22   Government Exhibit 500.

23             "Government Exhibits 506T, 509T, 510-T, 511-T, 512-T,

24   514-T, 517-T, 519-T, 525-T, 527-T, 530-T, 531-T, and 536-T are

25   true and accurate English translations of the French-language

portions of the corresponding government exhibits.

"Google user information records show that the email account mahmoud.thiam@gmail.com has, since on or about April 8, 2005, been registered to 'Mahmoud Thiam.'.

In or about July 2015, a search warrant (hereinafter the 'Dioum Google search warrant') issued by a United States magistrate judge for the Southern District of New York was served on Yahoo -- I'm sorry, on Google.  Thiam Google search warrant directed Google.  The Dioum Google search warrant directed Google to produce all stored emails and other stored content information in the email account dioum.amadou@gmail.com.  Google complied with the Dioum Google search warrant by providing a true and accurate copy of the stored emails and other stored content information in that account to the Federal Bureau of Investigation, New York, New York.

"Government Exhibit 515 is a true and correct copy of an email from the email account dioum.amadou@gmail.com, produced by Google in response to the Dioum Google search warrant.

Yahoo! Inc. operates a web-based electronic mail service.

"In or about July 2015, a search warrant (hereinafter the 'Yahoo! search warrant') issued by a United States magistrate judge for the Southern District of New York was

H51Wthi2

served on Yahoo!.  The Yahoo! search warrant directed Yahoo! to
present all stored emails and other stored content information
in the email account kumar_sanath2003@yahoo.com.  Yahoo!
complied with the Yahoo! search warrant by providing a true and
accurate copy of the stored emails and other stored content
information in that account to the Federal Bureau of
Investigation in New York, New York.

        "Government Exhibits 541, 542, 543, and 545 are true
and correct copies of certain emails from the email account
kumar_sanath2003@yahoo.com by Yahoo! in response to the Yahoo!
search warrant.

        "Government Exhibit 507 is a true and correct copy of
an email sent from Fatim Thiam's fthiam@saheliahome.com F too
many and saheliahome.com email account to the defendant's
mahmoud.thiam@gmail.com email account, dated October 13, 2010.

        "It is further stipulated and agreed that this revised
stipulation, which is marked as Government Exhibit 1405R, and
Government Exhibits 501 through 545" --

        THE COURT:  I take it each of the exhibits whose
numbers you've already read.

        MR. DiMASE:  Yes, your Honor, 501 through 545, and the
enumerated T exhibits I've already mentioned.  We would offer
all of those exhibits to the extent they are not already in
evidence.

        THE COURT:  Received.

H51Wthi2

1          MR. DiMASE:  Thank you.

2          (Government Exhibits 1405R, 501-545, 506-T, 509-T,

3     510-T, 511-T, 512-T, 514-T, 517-T, 519-T, 525-T, 527-T, 530-T,

4     531-T, and 536-T received in evidence)

5          MR. DiMASE:  Also, your Honor, we would offer 1405R,

6     the revised stipulation, into evidence.

7          THE COURT:  Yes.

8          MR. DiMASE:  I'm now going to read what's been marked

9     for identification as Government Exhibit 1408:

10          "Government Exhibit 101 is a CD containing true and

11     correct records maintained by HSBC Bank U.S.A., N.A. ('HSBC

12     U.S.A.') pertaining to HSBC U.S.A. checking account number

13     6287466733 and associated savings account number 628624816,

14     both in the name of Mahmoud Thiam (the 'Thiam HSBC U.S.A.

15     accounts').

16          Government Exhibits 102A, 102B, 102C, 102D, 102E,

17     102F, 102G, and 102H consist of true and correct

18     account-opening, account-closing, and due diligence records

19     maintained by HSBC U.S.A. in connection with the Thiam HSBC

20     U.S.A. accounts.  The information contained in Government

21     Exhibit 101 and Exhibits 102A through 102H was recorded by

22     someone with knowledge at HSBC U.S.A. at or near the time the

23     activity took place, was kept in the course of regularly

24     conducted activity at HSBC U.S.A., and was made as a regular

25     practice of that activity.

H51Wthi2

1          "It is further stipulated and agreed that this

2      stipulation, marked as Government Exhibit 1408, and Government

3      Exhibits 101 and 102A through 102H may be received as

4      Government Exhibits at trial."

5          And your Honor, the government would offer

6      aforementioned exhibits, including the stipulation marked 1408.

7          THE COURT:  Received.

8          (Government Exhibits 1408, 101, and 102A-102H

9      received in evidence)

10         MR. DiMASE:  Finally, a stipulation marked for

11     identification as Government Exhibit 1414:

12         "At all times relevant to the charges in this case,

13     the defendant, Mahmoud Thiam, was a United States citizen and

14     maintained a valid United States passport.  At all times

15     relevant to the charges in this case, the defendant, Mahmoud

16     Thiam, was also a Guinean citizen.  From in or about January

17     2009 through in or about December 2010, Mahmoud Thiam

18     maintained a valid Guinean passport identifying him as a

19     minister in the Republic of Guinea."

20         This is signed by the parties, and the government

21     would offer Government Exhibit 1414, this stipulation, into

22     evidence.

23         THE COURT:  Received.

24         (Government Exhibit 1414 received in evidence)

25         MR. DiMASE:  Thank you.

1    DIRECT EXAMINATION (cont'd)

2    BY MS. LARYEA:

3    Q.  Special Agent Killeen, during your testimony last Thursday,

4    you reviewed some documents about the purchase of the 771 Duell

5    Road property in Dutchess County.  Is that correct?

6    A.  That's correct.

7    Q.  As part of that testimony, you read portions of bank

8    records of a Thomas McGregor, is that correct?

9    A.  That is correct.

10   Q.  Agent Killeen, could you remind the jury who Thomas

11   McGregor is, based on the records we reviewed last Thursday?

12   A.  Thomas McGregor was the attorney for the buyer of the

13   property on Duell Road up in Dutchess County.

14   Q.  Agent Killeen, I'm handing you what has been marked as

15   Government Exhibits 105A and 105B.  Could you please review

16   these documents.  Agent Killeen, what is Government Exhibit

17   105A?

18   A.  105A is a bank account statement for a Wachovia Bank

19   account under the name of Thomas C. McGregor, Esq.  It's for

20   the month of October 30, 2010, to November 30, 2010.

21   Q.  And what is Government Exhibit 105B?

22   A.  105B is a withdrawal slip for that account I just mentioned

23   at Wachovia Bank by Thomas McGregor for $375,000.

24   Q.  Where did these pages come from?

25   A.  I'm sorry?

1   Q.   Where did these pages come from, these -- 105A and 105B?

2   A.   They came from the records received from Wachovia Bank per

3   a legal request.

4   Q.   And the records received for a Thomas McGregor from

5   Wachovia Bank has already been admitted as Government Exhibit

6   105.  Is that correct?

7   A.   That's correct.

8           MS. LARYEA:  At this time, your Honor, the government

9   offers Government Exhibits 105A and 105B into evidence.

10          THE COURT:  Received.

11          MR. GOLDSMITH:  No objection.

12          THE COURT:  Thank you.

13          (Government Exhibits 105A and 105B received in

14   evidence)

15          MS. LARYEA:  Mr. Beer, will you please publish

16   Government Exhibit 507.

17  Q.   Agent Killeen, have you reviewed this document?

18  A.   I have.

19  Q.   What is it?

20  A.   This is an email string.  This page is an email from Fatim

21  Thiam to Mahmoud Thiam.

22  Q.   And what is the date of this email?

23  A.   The date is October 13, 2010.

24  Q.   And what is the subject of the email?

25  A.   Subject Reinhardt to SSNL premises Stanford and Washington.

1    Q.  Now, the first word, Reinhardt, based on the documents you

2    reviewed on Thursday, did you see that name written?

3    A.  Yes.

4    Q.  And what was, where did you see that name?

5    A.  That was the representative of the seller of the property.

6    Q.  Now, under subject, it mentions an attachment.  Was there a

7    document attached to this email?

8    A.  There was.

9          MS. LARYEA:  Mr. Beer, will you please publish page 4

10   of Government Exhibit 507.

11   Q.  Agent Killeen, have you seen this document?

12   A.  I have.

13   Q.  What is it?

14   A.  This is a letter from Shawn Borrelli Pratt, the attorney

15   for the seller of this property, to Thomas C. McGuire.

16   Q.  McGuire?

17   A.  McGregor.  I'm sorry.

18   Q.  What is the date of this letter?

19   A.  October 12 of 2010.

20   Q.  And could you read the section, the first line of this

21   letter under "Dear Mr. McGregor"?

22   A.  "Attached please find a draft of contract of sale for the

23   above-captioned matter."

24   Q.  And what is, if you go back up to the above-captioned

25   matter, what is the re?  Do you see where it says re?

1   A.  Yes.

2   Q.  What is written next to that?

3   A.  Sociedade Saboeira de Nacala Lda.

4   Q.  What is the property listed?

5   A.  591 Prospect Hill Road, town of Pine Plains.

6   Q.  Now, would you please read the first sentence of the second

7   paragraph?

8   A.  "Please make three copies and have your client sign all

9   three copies and return them to this office with the requisite

10  down payment of $375,000 in bank or certified funds payable to

11  Shawn B. Pratt, as attorney."

12  Q.  And in the documents you reviewed on Thursday, did you see

13  the name Shawn Pratt on any of those documents?

14  A.  I did.

15  Q.  Where did you see that?

16  A.  It was listed on the withdrawal slip for the $375,000 from

17  the account of Thomas C. McGregor.

18          MS. LARYEA:  Mr. Beer, could you publish side by side

19  Government Exhibit 105B.  Can you please enlarge the text of

20  Government Exhibit 105B.

21  Q.  Agent Killeen, is this the withdrawal slip you just

22  referenced?

23  A.  It is.

24          MS. LARYEA:  Mr. Beer, can you please side by side

25  also enlarge the second paragraph of this letter and the

1   withdrawal slip next to it.

2   Q.  And Agent Killeen, do you see 375 mentioned in both of

3   those enlargements?

4   A.  I do.

5          MS. LARYEA:  Mr. Beer, will you please go to page 5 of

6   Government Exhibit 507.  You can remove those side by side,

7   Mr. Beer.

8   Q.  Now, you just testified that the letter mentioned an

9   attached contract of sale?

10  A.  It did.

11  Q.  What is this document?

12  A.  This is the contract of sale --

13  Q.  And --

14  A.  -- attached to that letter.

15  Q.  And the letter we just looked at mentioned the property

16  address 591 Prospect Hill Road.  Is that correct?

17  A.  It did.

18  Q.  Do you see that property address --

19  A.  I do not.

20  Q.  -- anywhere in this contract of sale?

21  A.  I do not.

22         MS. LARYEA:  Mr. Beer, will you please enlarge it.

23  Q.  What is the property address that you see on this contract

24  of sale?

25  A.  771 Duell Road, town of Stanford and town of Washington,

1    Dutchess County, New York.

2    Q.  And this is the same contract of sale that was attached to

3    the letter we just reviewed, is that correct?

4    A.  That is correct.

5    Q.  What is the seller listed on this contract of sale?

6    A.  The seller is listed on this contract of sale as Antonio

7    Gebauer for the listed trust of Reinhardt.

8    Q.  And the buyer?

9    A.  The buyer is listed as Sociedade Saboeira de Nacala Lda.

10   Q.  What is the address of the buyer listed on this contract?

11   A.  340 East 64th Street, No. 14H, New York, New York.

12   Q.  And in the records reviewed last Thursday, did you see this

13   address listed anywhere?

14   A.  I did.

15   Q.  Where did you see that address listed?

16   A.  Multiple locations, but the residence of the defendant.

17             MS. LARYEA:  Mr. Beer, can we please go to page 12 of

18   this document.  Can you please enlarge the section with the

19   signature lines.

20   Q.  Agent Killeen, who is listed as the purchaser of, on this

21   contract for 771 Duell Road?

22   A.  The defendant, Mahmoud Thiam.

23   Q.  Who is listed as the attorney for the seller?

24   A.  For the seller?  Shawn B. Pratt.

25   Q.  And who is listed as the attorney for the buyer?

1    A.   Thomas C. McGregor.

2            MS. LARYEA:   Mr. Beer, can you please publish

3    Government Exhibit 543.

4    Q.   Agent Killeen, have you seen this document before?

5    A.   I have.

6    Q.   What is it?

7    A.   This is an email from Kumar Sanath to Aquil Rajahussen.

8    Q.   What is the subject of this email?

9    A.   Subject reads, "Mahmoud Thiam account new and in Tally in

10   USD & Mtn statement."

11   Q.   What is the date of the email?

12   A.   The date of this email is May 25 of 2012.

13   Q.   Can you please read that first line under "Dear sir"?

14   A.   "Find attached Mahmoud Thiam account.

15   Q.   Were there any attachments to this document?

16   A.   Yes, there were.

17           MS. LARYEA:   Mr. Beer, will you please go to page 5 of

18   this document.

19   Q.   Special Agent Killeen, have you seen this document before?

20   A.   I have.

21   Q.   What is it?

22   A.   This is a ledger with, under the heading of G.S. Holdings

23   Lda. at the top.

24           MS. LARYEA:   Mr. Beer, can you please enlarge from the

25   top through the second entry on the ledger.

1   Q.  You mentioned this is a ledger held by G.S. Holdings, is

2   that correct?

3   A.  That's correct.

4   Q.  Who is the ledger for?

5   A.  The defendant, Mahmoud Thiam.

6   Q.  Can you please read the first entry in this ledger?

7   A.  The first entry is dated at November 1 of 2010 to SSNL, a

8   debit of $375,000.  It is listed as being the amount paid to

9   Thomas C. McGregor PS -- PC Esq. IOLA for U.S. dollars 375,000

10  at 36.10 ABC transfer.

11  Q.  During your testimony last Thursday, did you see any

12  documents that referenced this payment?

13  A.  Yes, I did.

14  Q.  What document was that?

15  A.  This SSNL, that is the document that showed the SWIFT

16  transfer of the funds of $375,000 from SSNL to Thomas C.

17  McGuire.

18  Q.  Now moving on to the second entry in this ledger, can you

19  read what that says?

20  A.  Yes.  It is dated November 15 of 2010.  It's for a credit

21  of $375,000.  It's by Pacific Inter-Link SDN BHD with the

22  additional text "being the amount transferred to PIL account

23  U.S. dollars 375,000."

24  Q.  And in the documents we reviewed last Thursday, did you see

25  documents that referenced Pacific Inter-Link?

1    A.   I did.

2    Q.   What document was that?

3    A.   That document was the location of the, of the bank account,

4    the bank account listed that was request -- the request was

5    made of the defendant to send $375,000 to that account.

6    Q.   And in the bank records we reviewed last Thursday, did you

7    see anything regarding whether the defendant sent $375,000 to

8    Pacific Inter-Link?

9    A.   Yes.  The defendant forwarded a confirmation of the payment

10   via email.

11   Q.   Agent Killeen, last Thursday you testified that you had the

12   opportunity to examine all of the HSBC records in this case, is

13   that correct?

14   A.   That's correct.

15   Q.   Did you also examine all of the Wachovia Bank account

16   records for Mr. McGregor?

17   A.   I did.

18   Q.   And approximately how many pages were all of those bank

19   records?

20   A.   Thousands.

21   Q.   After you examined them, did you also examine some summary

22   charts depicting the relevant transactions in the HSBC and

23   Wachovia bank records?

24   A.   Yes, I did.

25   Q.   Do the summary charts fairly and accurately duplicate and

1   summarize the information on those bank records?

2   A.  They do.

3           MS. LARYEA:  At this time, your Honor, the government

4   offers Government Exhibit 1005 and Government Exhibit 1006 to

5   the record.

6           THE COURT:  Received.

7           (Government Exhibits  1005 and 1006 received in

8   evidence)

9           MS. LARYEA:  Mr. Beer, can you please publish

10  Government Exhibit 1005.

11  Q.  Special Agent Killeen, what is this document?

12  A.  This document is a -- shows the transactions, multiple

13  transactions, on the left side and the right side, and the

14  connection between the two in the center, via the ledger we

15  just reviewed.

16  Q.  Agent Killeen, could you explain these transactions

17  starting from the top left.

18  A.  I will.  The top you see G.S. Holdings Lda. SSN Lda. --

19  that's Sociedade Saboeira de Nacala -- on November 1, 2010, a

20  $375,000 wire, which we saw the SWIFT report for, was sent to

21  Thomas C. McGregor's account at Wachovia Bank.  It was

22  received.  On the 5th of November 2010, so approximately four

23  days later, a withdrawal of $375,000 was made.  We saw the

24  withdrawal slip a couple of minutes ago and was used for the

25  purchase of that estate.

1          Moving to the right now, at the top right you see the

2     name of the defendant and the HSBC account in Hong Kong,

3     controlled by the defendant.  On the 12th of November 2010, a

4     $375,000 wire was sent from that HSBC account in Hong Kong to

5     the account of Pacific Inter-Link, which was located in Kuala

6     Lumpur, Malaysia.

7       In the center you'll see, at the top of the ledger we just

8     saw, that showed the two transactions related to the $375,000.

9     The second transaction right there, dated November 15, 2010, by

10    Pacific Inter-Link, shows the amount $375,000 essentially

11    netting out the payment above it by SSNL, or Sociedade de

12    Nacala.

13    Q.  Thank you, Agent.

14          Last Thursday, during your testimony, we left off

15    reviewing the videotape of the defendant's interview with the

16    FBI after his arrest.  Is that correct?

17    A.  That is correct.

18    Q.  We reviewed a portion of that videotape about a loan from

19    Sam Pa.  Is that correct?

20    A.  That is correct.

21          MS. LARYEA:  Mr. Beer, can you please publish clip 11

22    from Government Exhibit 801A.

23          (Video played)

24    Q.  Special Agent Killeen, based on the video we just watched,

25    when did the defendant say he first asked Sam Pa for a loan?

1   A.  He said it was in Hong Kong, well after the signing of the

2   agreement in 2010.

3   Q.  Based on the bank records we reviewed last Thursday, when

4   was the first payment from Sam Pa to the defendant?

5   A.  It was in September of 2009.

6   Q.  And how did this, when did this payment occur in comparison

7   with the CIF --

8   A.  This payment was from Sam Pa to the defendant, was made

9   approximately two weeks before the signing of the shareholder

10  agreement.

11        MS. LARYEA:  Mr. Beer, will you please publish

12  Government Exhibit 1006.

13  Q.  Agent Killeen, what is this exhibit?

14  A.  This exhibit shows, it's a pie chart, obviously.  It shows

15  the percentage of deposits in the account from either the

16  payments received that we reviewed last week, the four

17  payments, and any other deposits in the account and showing the

18  percentage of the total amount of deposits into the Hong Kong

19  account at HSBC controlled by the defendant.  This chart right

20  here shows, as of March 26 of 2010, of all the deposits into

21  that account, 99.9 percent were represented by those four

22  payments we reviewed last week from the executive of CIF.

23  Q.  Based on the documents we reviewed last week, what is the

24  significance of March 26, 2010?

25  A.  This was the approximate date where the defendant was

1    communicating with Remee Aring, the Chase investigator, in

2    fact, approximate date that he sent the answers regarding the

3    source of funds in this account.

4         MS. LARYEA:  Mr. Beer, will you please publish

5    Government Exhibit 535.

6    Q.  Agent Killeen, what is this exhibit?

7    A.  This is an email, with attachments, from the defendant to

8    Remee Aring at ChaseBank.

9    Q.  Is this the email you just referenced?

10   A.  It is.

11        MS. LARYEA:  Mr. Beer, will you please go to page 3 of

12   this exhibit.

13   Q.  In this email, where did the defendant say the money from

14   his Hong Kong HSBC account came from?

15   A.  You can see reference in the last line:  "The funds in that

16   account are derived from business transactions done over the

17   years with Mr. Al-Sadi."

18        MS. LARYEA:  Mr. Beer, will you please return to

19   Government Exhibit 1006.

20   Q.  On that date, March 26, 2010, in your review of the bank

21   records, how much of the $5,475,000 that did not come from CIF

22   came from Mr. Al-Sadi?

23   A.  From the documents I've reviewed, we received and I

24   reviewed, none of that amount originated with Mr. Al-Sadi.

25        MS. LARYEA:  Mr. Beer, will you please go to page 2 of

1    this document.

2    Q.  What does this pie chart represent, Agent Killeen?

3    A.  This shows the exact percentages of deposits in the

4    defendant's account at HSBC in Hong Kong.  As of this date,

5    July 20 of 2010, 99.3 percent of all the deposits originated

6    from those four payments we reviewed last week.

7            MS. LARYEA:  Mr. Beer, will you please go to the

8    following page, page 3.

9    Q.  What does this pie chart represent, Special Agent Killeen?

10   A.  Same, same basic chart.  The date on this one is November

11   20 of 2010.  It shows that the four payments received from the

12   CIF executives still represent 99.3 percent of all deposits

13   into that account.

14   Q.  What is the significance of this date, November 20, 2010?

15   A.  This was the approximate date the property in Dutchess

16   County was purchased, 771 Duell Road.

17   Q.  Agent Killeen, in connection with that purchase, we

18   discussed the 375 that went from the defendant's HSBC account

19   to Pacific Inter-Link, is that correct?

20   A.  That's correct.

21   Q.  Looking at this pie chart, was there $375,000 that came

22   from deposits other than CIF?

23   A.  No.  There were insufficient -- sufficient deposits from

24   other sources to cover that amount.

25           MS. LARYEA:  Mr. Beer, can you please go to the

1    following page.

2    Q.  What does this represent, Agent Killeen?

3    A.  Pie chart, same as the previous charts, showing the

4    percentage of deposits into the account as of a certain date

5    coming from the four payments from the CIF executives.  This

6    date is November 29 of 2010, and at this point 99.4 percent of

7    all deposits in the account came from the payments from the CIF

8    executives.

9    Q.  What is the significance of this date, November 29, 2010?

10   A.  This is the approximate date where the defendant received

11   his last payment of $500,000 from CIF executives.

12   Q.  Agent Killeen, during the defendant's interview with the

13   FBI after the arrest, did he explain when he got the loan?

14   A.  He did.

15          MS. LARYEA:  Mr. Beer, could you please play clip 17

16   from Government Exhibit 801A.

17          (Video played)

18   Q.  Agent Killeen, during that interview, did the defendant

19   also discuss whether he got loans from anyone else while he was

20   minister of mines?

21   A.  No, he didn't.

22          MS. LARYEA:  Mr. Beer, will you please play clip 16

23   from Government Exhibit 801A.

24          (Video played)

25   Q.  Agent Killeen, after the defendant was arrested, did the

1   FBI conduct a search of his apartment?

2   A.  We did.

3   Q.  As part of this search, did you seize any telephones?

4   A.  We did.

5   Q.  Did you review the content of the phone?

6   A.  We did.

7   Q.  Did you review any chat messages that were on the phone?

8   A.  Yes, we did.

9           MS. LARYEA:  Mr. Beer, will you please publish

10   Government Exhibit 601A.  Will you please enlarge the text.

11   Q.  Agent Killeen, have you reviewed this document?

12   A.  I have.

13   Q.  What is it?

14   A.  This is a chat between a number, a WhatsApp account

15   utilized by the defendant, and an account under the name of, I

16   apologize if I pronounce this incorrectly Nyonga Fongang,

17   separate number.

18   Q.  And is this chat --

19   A.  Yes.

20   Q.  What is the date of this chat?

21   A.  This is in November, November 8 of 2016.

22   Q.  And which message is from the defendant and which one is

23   from the other individual?

24   A.  The messages that are next to the blue icon, you can see on

25   the left, are from the defendant, and the messages from the

1     other party are next to the green icon, which you can see on

2     the right.

3     Q.  Agent Killeen, will you read this chat indicating who is

4     speaking?

5     A.  I will.  The defendant wrote, "How are you?"  The other

6     individual said:  I'm good.  Watching the U.S. from cold

7     Amsterdam.  And you?  Just been reading a book 'looting on

8     Africa,' and you are being quoted all over it."  The defendant

9     responded with a smiley face combination, then:  "Yes, tricky

10    guy."  It continued:  "He collected all the interviews from

11    2009 and presented them as if I cooperated on his book."

12    Continuing with, by the defendant:  Am in Dubai"; finally,

13    "Have you spoken to our friend?  The other party responded,

14    "Hahahahaha, at least Sam Pa is locked up, so you are fine."

15    The defendant responded:  "He predicted I would be locked up.

16    Life has its twists."

17              THE COURT:  Excuse me, ladies and gentlemen.  I want

18    to give you an instruction with respect to one comment made.

19    First of all, it's the defendant's comments in this email that

20    are being received as evidence here.  The other comments from

21    the other person are simply being received to give context to

22    the defendant's remarks.

23              Let me direct your attention to the last statement

24    made by this other person.  It refers to Sam Pa being locked

25    up.  That statement is not being offered for the truth.  It is

1    not evidence as to whether Mr. Pa is locked up or not, and

2    you're not to speculate at all with respect to whether he is

3    locked up, where he's locked up, why he's locked up, or whether

4    he isn't locked up.  It's not being received for the truth.

5              Thank you.

6              MS. LARYEA:  No further questions, your Honor.

7    CROSS-EXAMINATION

8    BY MR. GOLDSMITH:

9    Q.  Special Agent Killeen, you testified at length on Thursday

10   and a bit this morning about several charts, those being

11   Exhibits 1001, 1002, 1003, 1005, and 1006.  Did you create

12   those charts?

13   A.  I created with other individuals and then sum -- and then

14   checked them and verified them.

15   Q.  You also testified quite extensively about a number of

16   emails and bank statements on Thursday and a bit this morning.

17   How many pages of bank statements did you review related to

18   Mr. Thiam?

19   A.  I would say at least a couple hundred, probably over a

20   thousand.

21   Q.  How many bank pages of bank statements did you review

22   regarding the matters that you were testifying about on

23   Thursday and this morning?

24   A.  How many pages specifically?

25   Q.  No.  In total.

1   A.  Significant amount.  I don't have an exact number, counsel.

2   Q.  Thousands, fair to say?

3   A.  Thousands -- the total amount of bank statements, yes.

4   Q.  And the emails that you reviewed prior to your testimony

5   today, fair to say at least hundreds of emails?

6   A.  I'd say I saw well over hundreds of emails, might be in the

7   thousands as well.

8   Q.  You also, as you testified briefly this morning, had a cell

9   phone, was taken during the arrest and seizure from Mr. Thiam's

10  apartment.  Is that correct?

11  A.  That is correct.

12  Q.  Also had a computer that was taken at that time?

13  A.  Yes.

14  Q.  Now, there are, do you recall testifying about Exhibit 506?

15  A.  Can I see 506 real quick?

16  Q.  Sure.

17          MR. GOLDSMITH:  In fact, Mr. Beer, can you publish

18  506-T.

19  Q.  Are you able to see it on the monitor?

20  A.  Yes.

21  Q.  Take a look at it quickly.

22          MR. GOLDSMITH:  And if you could, Mr. Beer, if you

23  could highlight the second half of the email, starting with

24  "because."  Just enlarge the second half.

25  Q.  Now, if you could read what's included in the second large

1    paragraph of 506-T?

2    A.   OK.   Would you like me to read the entire thing?

3    Q.   Please.

4    A.   "Another variable made this wait necessary, the documents

5    presented were again listing the initially discussed sharing of

6    85 percent for CIF and 15 percent for Guinea.   It seemed to me

7    that the commission eventually chose to offer 20 percent or 25

8    percent.   When I brought this up, I was told that considering

9    they will deploy or raise 100 percent of the funding, this

10   sharing out is imposed on them.   I then suggested, as

11   compensation, that ADC not own 100 percent of these local GDG

12   subsidiaries but only up to 80 or 90 percent.   Therefore it

13   would allow the state to recover what was given apropos the

14   holding company."

15   Q.   Could you read the final sentence in that email?

16   A.   "I left the board to assess the situation and notify us of

17   their decision."

18           MR. GOLDSMITH:   Could we also have Exhibit 305J,

19   Mr. Beer.   I'm sorry.   Publish that.

20   Q.   Do you recall testifying about this exhibit on Thursday?

21   A.   I do.

22   Q.   Could you read the notation -- I'm sorry.   Let's back up a

23   little bit.

24        This document represents one of the wire transfers that you

25   testified about on Thursday?

```
 1   A.  Yes.
 2   Q.  And could you read the word on the far left at the bottom
 3   appearing in print?
 4   A.  Are you talking about the very last, under the print, right
 5   there under June 2?
 6   Q.  Yes.
 7   A.  OK.  "Loan."
 8              MR. GOLDSMITH:  Could you also, Mr. Beer, pull up
 9   3050.
10   Q.  And this document you also recall testifying about on
11   Thursday?
12   A.  Yes.
13   Q.  And this also represents one of the payments that you
14   testified about on Thursday?
15   A.  Yes.
16   Q.  And could you also read the word under the date that
17   appears at the bottom on the left side?
18   A.  "Loan."
19              MR. GOLDSMITH:  No further questions.
20              THE COURT:  Any redirect?
21              MS. LARYEA:  Yes, your Honor.
22              Mr. Beer, will you please publish Government Exhibit
23   305B can you please enlarge the top section.
24   REDIRECT EXAMINATION
25              MS. LARYEA:
```

1    Q.  Agent Killeen, this is the first transfer from Sam Pa of $3

2    million to the defendant, is that correct?

3    A.  That is correct.

4    Q.  Does it say loan on this document?

5    A.  It does not.

6              MS. LARYEA:  Mr. Beer, will you please publish

7    Government Exhibit 305E.  Sorry.  Could you please publish

8    Government Exhibit 305F.  Please enlarge that top section.

9    Q.  And this is a second transfer of $3 million to the

10   defendant from Wang Xiang-Fei, is that correct?

11   A.  That's correct.

12   Q.  Does it say loan on this document?

13   A.  It does not.

14             MS. LARYEA:  No further questions.

15             MR. GOLDSMITH:  No questions, your Honor.

16             THE COURT:  You may step down.

17             (Witness excused)

18             THE COURT:  Next witness.

19             MR. KOBRE:  The government calls Stacey Hayes.

20    STACEY HAYES,

21         called as a witness by the Government,

22         having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. KOBRE:

25   Q.  Good morning, Ms. Hayes.

1    A.   Good morning.

2    Q.   Where do you work?

3    A.   HSBC bank.

4    Q.   What's your current position with HSBC?

5    A.   Branch service manager.

6    Q.   Where are you based at?

7    A.   1002 Madison Avenue, New York, New York, 10075.

8    Q.   Around when did you first start working at HSBC bank?

9    A.   In 1994.

10   Q.   What was your position when you first got hired?

11   A.   I was a teller.

12   Q.   Could you briefly describe your progression in your work at

13   HSBC?

14   A.   Yes.  I started as a teller, then I was an assistant head

15   teller, then I became the head teller.  Then I was a consumer

16   banker, then I was a senior consumer banker.  Then I was a

17   branch operations officer, and now I'm currently branch service

18   manager.

19   Q.   At which HSBC branch were you branch manager?

20   A.   At 1002 Madison Avenue.

21   Q.   OK.  Is it OK if we call that the Madison Avenue branch?

22   A.   Yes.

23   Q.   Did there come a time that you left HSBC for a period of

24   time?

25   A.   Yes, there was.

1    Q.  And when did that happen?

2    A.  That was in 2005.

3    Q.  And why did you leave?

4    A.  Because the branch I was working in was going to have

5    Saturday and Sunday hours, and I couldn't work.

6    Q.  And did you find other employment during that period?

7    A.  I did.

8    Q.  What was that?

9    A.  I worked at National Bank of Pakistan and RH Realty LP.

10   Q.  What kind of work did you do in connection with Bank of

11   Pakistan?

12   A.  I worked in the wire department area and the compliance

13   department.

14   Q.  Describe a little bit about your work in the compliance

15   department at that bank.

16   A.  I would review transactions for unusual and suspicious

17   activity.

18   Q.  At some point did you return back to HSBC?

19   A.  Yes, I did.

20   Q.  And around what year was that?

21   A.  That was in 2009.

22   Q.  Did you return to the same branch, Madison Avenue branch?

23   A.  Well, when I left, I was at a different location.  When I

24   came back in 2009 is when I started at 1002 Madison Avenue.

25   Q.  And when you returned back in 2009, what was your position?

1    A.  At that time, it was branch operations officer.

2    Q.  And could you explain to us what some of your duties and

3    responsibilities were as branch operations officer at the

4    Madison Avenue branch?

5    A.  It was being in control of managing operations of the

6    branch, supervising tellers, reviewing new accounts for

7    accuracy and approving them.

8    Q.  As part of your work with HSBC, have you become familiar

9    with the term "know your customer," or sometimes KYC for short?

10   A.  Yes, I did.

11   Q.  Can you describe what that is, generally?

12   A.  It's generally making sure that the bank understands and

13   know who the customer is and how they will be using the bank.

14   Q.  And what's the purpose of that?

15   A.  So we can understand what type of transactions the customer

16   will be using.

17   Q.  Are there particular risks the bank is concerned about?

18   A.  Yeah, we're looking for unusual activity, anything that may

19   be linked to money laundering.

20   Q.  Does HSBC have a particular know-your-customer program?

21   A.  Yes.

22   Q.  And during the course of your employment, have you received

23   training in HSBC's procedures for that?

24   A.  Yes.

25   Q.  And did your responsibilities as a branch operations

1  officer include duties with respect to the know-your-customer

2  program?

3  A.  Yes.

4  Q.  In your work as branch operations officer in 2009, did you

5  become familiar with the term "special category of client"?

6  A.  Yes.

7  Q.  What is that?

8  A.  These are clients who are linked to governments throughout

9  the world and they have political connections.

10  Q.  Does the bank have any special know-your-customer

11  procedures when a prospective customer is identified as a

12  special category of client?

13  A.  Yes.  These clients would need prior approval before

14  opening the account through compliance, and their account is

15  handled with more enhanced due diligence.

16  Q.  And through your work and through the training that you

17  received, could you tell us why that is?

18  A.  Because they're looking to make sure that the bank is being

19  used properly and that there's no risk involved with the

20  customers that we are on-boarding.

21  Q.  What sort of risks is the bank concerned about with respect

22  to special category of clients?

23  A.  They're looking at possible money laundering, make sure

24  they're not linked in any way.

25  Q.  Now, before I ask you a bit about HS, more about HSBC's

H51Wthi2                          Hayes - Direct

1   know-your-customer program, could you briefly describe the

2   process when a customer opens a new bank account at a branch

3   such as the one that you worked at in 2009?

4   A.  Yes, the person will sit down with a banker and the banker

5   will go through multiple questions regarding their use of the

6   account, and in my role, once the account is opened, the

7   documents that were received by the banker is given to me and I

8   would review that.

9   Q.  I think you testified about this earlier.  Am I correct

10  that as the branch operations officer at your branch, you are

11  in charge of the know-your-customer program at the branch?

12  A.  Yes, I'm responsible for reviewing all new accounts that

13  are opened.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. KOBRE:

2  Q.  And describe what exactly that entails.

3  A.  What I do is I look at the identification that's provided.

4  If there's any proof of address provided, I verify that on the

5  system that was inputted, I look at their company name, I look

6  at their company's address, I look at what type of work that

7  they do.

8  Q.  You mentioned you look at the company name and address.

9  Can you explain that a little bit more.  What's the purpose of

10  that?

11  A.  Because by the company's name, we should be able to know

12  what type of company it is and what type of position that

13  person holds in that company and what type of work they do in

14  that company.

15  Q.  Okay.  And beyond looking at the name of the company, is

16  there any other additional steps that you take to verify the

17  information?

18  A.  Can you rephrase that.

19  Q.  Sure.  Once you look, once you see the name of the company

20  on the documents that are provided to you, do you do any

21  further research relating to the particular name of the company

22  or the employer?

23  A.  Only if the name of the company -- if I can't tell what

24  type of business it is.

25  Q.  What other sorts of things do you look at when you review

1  the account at the time of opening?

2  A.  I look at a screen where we see what type of activity will

3  be coming in and out of the account.

4  Q.  And what's the purpose of that?

5  A.  Just to see where the money is coming and going.

6  Q.  What about the source of the funds?  Is that something you

7  look at as well?

8  A.  Yes, that's the question that the banker would ask and will

9  provide that information.

10  Q.  And when you say that the banker will ask, are you

11  referring to the person -- you're not referring to yourself.

12  A.  No.

13  Q.  Who are you referring to?

14  A.  The person who opened the account.

15  Q.  The bank employee who opens the account?

16  A.  Yes.

17  Q.  Can you give some examples that have come up in your

18  experience in terms of verifying information that's provided by

19  customers as part of the Know Your Customer program.

20          MR. DELAKAS:  Objection, your Honor.

21          THE COURT:  Overruled.  You may answer.

22  A.  Can you repeat the question.

23  Q.  Sure.  Can you just give us an example of the sorts of

24  things that have arisen, in your experience, in verifying

25  information that's provided by customers.

1    A.  Well, there was a -- an account where I didn't review the

2    account, it was from another branch, but the individual was a

3    owner of a frankfurt -- frank stand in Central Park, and he

4    would come in and make multiple cash deposits in the amounts of

5    9,000, 9500 --

6              MR. DELAKAS:  Objection, your Honor.

7              THE COURT:  Yes.  Ladies and gentlemen, I'm going to

8    strike this question and answer and you shall disregard it.

9    Q.  Is the review process that you just described sometimes

10   referred to as due diligence?

11   A.  Yes.

12   Q.  And is this process, your review process, conducted for all

13   new accounts?

14   A.  Yes.

15   Q.  Turning your attention to June 2010.  As part of your

16   responsibilities as the branch operations officer at the

17   Madison Avenue branch, did you learn that an individual named

18   Mahmoud Thiam had visited the branch to open a new account?

19   A.  Yes.

20   Q.  And how did you learn that?

21   A.  Because I was given the new account documents.

22   Q.  And who gave you those documents?

23   A.  Ajay Damle.

24   Q.  Who is Ajay Damle?

25   A.  He was a former employee of HSBC.

1    Q.  Was he a banker at the bank?

2    A.  Yes, he was.

3             MR. KOBRE:  And at this point Mr. DiMase is

4    approaching the witness with what are in evidence as Government

5    Exhibits 102-A through 102-H.

6    Q.  Ms. Hayes, if we could just start -- if you could take a

7    look at 102-A, B, C, and D briefly, and just look up when

8    you're done doing that.

9             Do you recognize those documents?

10   A.  Yes.

11   Q.  And if you can just, going in order, just describe what

12   they each are.

13   A.  102-A is the master deposit agreement, which is our

14   signature card.

15            102-B is a copy of a US passport and a New York State

16   driver's license.

17            And 102-C is a screenshot of our CIF screens on the

18   employment.

19   Q.  If I can just interject there, what does CIF stand for?

20   A.  Customer Information File.

21   Q.  Thank you.  And just referring now to Government Exhibit D.

22   Sorry.  102-D.

23   A.  B?

24   Q.  D.  I think that was just the one that you were going to --

25   A.  Okay.

H511thi3                          Hayes - Direct

```
 1    Q.  What is that?

 2    A.  And 102-D is the workshop -- workshop -- the worksheet that

 3    is printed out once the account is opened.

 4              MR. KOBRE:  And Mr. Beer, if we can publish for the

 5    jury Government Exhibit 102-A.

 6              And Ms. Hayes, you can follow along on the screen.

 7              If we can just enlarge the upper portion.

 8    Q.  And what is this form?

 9    A.  This is the master deposit agreement.

10    Q.  And for who?

11    A.  For Mahmoud Thiam.

12    Q.  And what's the date that's indicated here?

13    A.  June 7, 2010.

14    Q.  What does that date signify?

15    A.  The date the account was opened.

16              MR. KOBRE:  Okay.  If we can go now, Mr. Beer, and

17    publish Government Exhibit 102-B.

18              And if we can go to 102-B, the second page.  And

19    enlarge the portion with the writing.

20    Q.  What are we looking at here?

21    A.  A copy of a New York State driver's license.

22    Q.  For who?

23    A.  Mahmoud Thiam.

24    Q.  And there is some writing on the left-hand side of that

25    page.  Do you recognize the handwriting?
```

1    A.   Yes.

2    Q.   Whose handwriting is it?

3    A.   Ajay Damle.

4    Q.   And is there a date indicated there?

5    A.   Yes.  June 7, 2010.

6    Q.   Thank you.

7         MR. KOBRE:  Mr. Beer, if we can publish Government

8    Exhibit 102-C.

9         And enlarge the upper half of the page.

10   Q.   You mentioned earlier that this is a printout from the

11   customer information file.  Can you explain what we're looking

12   at here.

13   A.   This is the screen where it would have the customer's

14   employment information.

15   Q.   And where does the information that's here on this

16   screenshot here, where does that come from?

17   A.   Comes from the banker who opened the account.

18   Q.   And where does that person get the information from?

19   A.   Speaking with the client.

20   Q.   And you mentioned earlier that your role in the KYC process

21   involves reviewing certain documents that were provided to you.

22   A.   Yes.

23   Q.   Which documents are the ones that are provided to you for

24   your review?

25   A.   It's the customer identification, it's the worksheet, and

1     if the customer provided proof of address.

2     Q.  Okay.  So is Government Exhibit 102-A included in the

3     documents that you received?

4     A.  Yes.

5     Q.  And what about 102-B?

6     A.  Yes.

7     Q.  And how about 102-C, which is up on the screen right now?

8     A.  This information I would get when I'd go into our computer

9     system to review the account.

10    Q.  So it's not actually provided to you by the banker, but you

11    would pull it up on your own in order to conduct your review.

12    A.  Yes.

13    Q.  Okay.  And looking at 102-C, what did Mr. Thiam tell

14    Mr. Damle was his employer?

15    A.  AMER.

16    Q.  And what did Mr. Thiam tell the bank was his occupation

17    with AMER?

18    A.  He was the chairman.

19              THE COURT:  Is that A-M-E-R?

20              THE WITNESS:  Yes.

21    Q.  Is there a field here that describes additional info?

22    A.  Yes.

23    Q.  And what does it say?

24    A.  Mining and natural resources consulting.

25    Q.  And that information comes from where?

H511thi3                        Hayes - Direct

1    A.   This is the information the banker would have input into

2    the system.

3    Q.   In your review of 102-C -- are there several pages to

4    102-C?

5    A.   Yes.

6    Q.   In your review of 102-C, did you see anywhere any

7    indication that Mr. Thiam was the minister of mines of a West

8    African country?

9    A.   No.

10   Q.   Now was there any indication anywhere on 102-C that

11   Mr. Thiam was a public official?

12   A.   No.

13   Q.   One more item on 102-C.

14          What did Mr. Thiam indicate was the employer's

15   address?

16   A.   340 East 64th Street, Apartment 14H, New York, New York

17   10065.

18   Q.   Did you see that address anywhere else on the documents

19   that you reviewed as part of your KYC process?

20   A.   Yes.

21   Q.   Where did you see it?

22   A.   On the driver's license.

23   Q.   Did you later learn that the individual, Mahmoud Thiam,

24   whose documents you had reviewed was at that time the minister

25   of mines for the Republic of Guinea?

1    A.  Yes.

2    Q.  Can you describe how you learned that.

3    A.  I learned that by -- I saw him on TV in our branch lobby.

4    Q.  Explain how that came about.

5    A.  HSBC has a lobby where customers wait until they're being

6    seen by a banker, and we have a TV there that we keep for

7    customers to be able to look at the stock market.  And in doing

8    so, when I went out into the lobby area, I saw the name Mahmoud

9    Thiam on TV and under his name it said Minister of Mines of

10   Guinea.

11   Q.  When did you see him on TV in the nature of what you're

12   talking about now?

13   A.  I believe it was a day or two later.

14   Q.  It just so happened that you saw it on TV.

15   A.  Yes.

16            MR. KOBRE:  My colleague Mr. DiMase is approaching the

17   witness with what's marked Government Exhibit 1101.

18   Q.  Please take a look at that.  Do you recognize that?

19   A.  Yes.

20   Q.  And what is it?

21   A.  It's a screenshot of a interview on TV.

22   Q.  And does Government Exhibit 1101 appear to you to be

23   similar to what you saw on TV a day or two after Mr. Thiam came

24   in to open the account at HSBC at Madison Avenue?

25   A.  Yes.

1          MR. KOBRE:  Your Honor, the government offers

2     Government Exhibit 1101.

3          THE COURT:  Received.

4          (Government's Exhibit 1101 received in evidence)

5          MR. KOBRE:  Mr. Beer, if we can publish Government

6     Exhibit 1101.

7     BY MR. KOBRE:

8     Q.  Now when you saw this on TV at your branch, did you

9     actually recognize the defendant's face?

10    A.  It was the name.

11    Q.  So had you actually seen the defendant at the bank in

12    person?

13    A.  No.

14    Q.  Did you recognize it from any of the identifications that

15    you had reviewed?

16    A.  Yes.

17    Q.  Now after you learned from seeing this on TV that Mr. Thiam

18    was the minister of mines, did you notify any other division of

19    the bank?

20    A.  Yes.

21    Q.  What was that?

22    A.  I first told Ajay that we needed to escalate this because

23    of the title, and then I reached out to my operations manager

24    and then to the compliance department.

25    Q.  If you could take a look at Government Exhibit 102-F.

1    A.  Yes.

2    Q.  If you can describe generally what is 102-F.

3    A.  These are emails that were sent by myself to our -- the

4    operations manager and compliance.

5         MR. KOBRE:  And Mr. Beer, if we can publish Government

6    Exhibit 102-F, just the first page.

7         And if we can highlight starting from the email that

8    starts Stacey A. Hayes or just, you know, underneath there.

9    Q.  This is an email from you to who?

10   A.  Jon Fagin.

11   Q.  And who is Jon Fagin?

12   A.  He's the operations manager.

13   Q.  Okay.  And if you can just read the first few lines for us.

14   A.  "Hi, Jon, An account was opened for Mahmoud Thiam, Account

15   No. 6287487333.  Mahmoud Thiam is HSBC Hong Kong group premier

16   customer.  He provided the following information at account

17   opening."

18   Q.  Okay.  I'll just stop you right there.  Then you go on to

19   recite some information that Mr. Thiam had provided, correct?

20   A.  Yes.

21   Q.  That information that's listed there, where did that come

22   from?

23   A.  That was the information that was input into the system at

24   the time the account was opened.

25   Q.  Was also some of that information provided to you verbally

1     by Mr. Damle, or was it all from what was input?

2     A.  Some of it was verbal.

3     Q.  Okay.  As a result of your conversations with the bank's

4     compliance department, did you take any further steps with

5     respect to the account for Mr. Thiam?

6     A.  Yes.  We needed to get additional information.

7     Q.  And so what steps did you take to get that additional

8     information?

9     A.  I provided some questions for Ajay to follow up.

10    Q.  If you could take a look at what's marked Government

11    Exhibit 102-E, Ms. Hayes.  Just flip through that and I'll have

12    additional questions.

13              What are 102-E?

14    A.  These are handwritten questions that we needed answers to.

15    Q.  Okay.  We're not going to go through this in any detail.

16              MR. KOBRE:  But Mr. Beer, if you could publish

17    Government Exhibit 102-E, page 1.

18    Q.  Just briefly describe, what are we looking at on this page

19    1 here?

20    A.  These are my handwritten questions that I needed answers

21    to.

22    Q.  And you had gotten those questions from compliance?

23    A.  Yes.

24    Q.  If we can go to page 2.

25              It appears here, Ms. Hayes, that there are two sets of

1    handwriting.  Can you describe what we're looking at.

2    A.  Yes.  The larger handwriting is my handwriting, and the

3    smaller one is Ajay Damle.

4    Q.  And without reading what's actually here, what did you

5    write down here?

6    A.  Questions that needed to be answered.

7    Q.  And what did Mr. Damle write?

8    A.  He provided the answers.

9    Q.  Okay.  And if we could look at page 3 of Government

10   Exhibit 102-E.

11             What is this?

12   A.  These are the same questions with answers in my

13   handwriting.

14   Q.  Okay.  And page 4?

15   A.  My handwriting with questions and the answers.

16   Q.  Now going back to page 2, you mentioned that Mr. Damle

17   provided you with answers?

18   A.  Yes.

19   Q.  Do you know whether Mr. Damle in fact met with Mr. Thiam

20   again, as was required?

21   A.  I'm not sure if these answers were provided in person or by

22   telephone or by email.

23             MR. KOBRE:  Okay.  If we can go to Government

24   Exhibit 102-F, page 6.

25             Mr. Beer, if we can just go one page back.  And if we

H511thi3                         Hayes - Direct

1   can just enlarge the lower email.

2   Q.  What are we looking at here?

3           Is it easier for you to look on the paper?

4   A.  No, this is okay.

5   Q.  Okay.

6   A.  This is an email that I sent to Mary Visiko, who is in the

7   compliance department.

8   Q.  And what's the date of the email?

9   A.  July 20, 2010.

10  Q.  If you can just read the first line of email.

11  A.  "Hi, Mary.  Mahmoud Thiam came into the branch yesterday

12  and provided the following details."

13  Q.  So based on this document, did Mr. Thiam come into the

14  branch for a follow-up interview?

15  A.  Yes.

16  Q.  And what date did Mr. Thiam come into the branch?

17  A.  July 19th.

18  Q.  Going back to Government Exhibit 102-E, page 2, are the

19  answers here those that you learned Mr. Thiam provided to

20  Mr. Damle on July 19, 2010?

21  A.  Yes.

22          MR. KOBRE:  Okay.  And if we can just, Mr. Beer, go

23  back to the email we were just looking at, which is 102-F,

24  page 5.

25  Q.  Could you describe what's contained in this email.

1    A.   Answers to the follow-up questions.

2    Q.   Okay.  And you wrote this email.

3    A.   Yes.

4    Q.   And where did you send this email to?

5    A.   To our compliance department, to Mary.

6    Q.   As a result of your sending this email and the other steps

7    you took, what happened --

8    A.   The bank --

9    Q.   -- to Mr. Thiam's account?

10   A.   The bank decided to close the account.

11   Q.   Before that, were you required to fill out any additional

12   forms?

13   A.   Yes.

14   Q.   And describe what that was.

15   A.   It's the SCC form.

16   Q.   What does SCC stand for?

17   A.   Special Category of Clients.

18   Q.   Why were you required to fill out the SCC form based on

19   this information?

20   A.   Because he was an SCC, and the compliance department

21   requires that form for their review.

22   Q.   And why was he an SCC?

23   A.   Because of his title in Guinea.

24        MR. KOBRE:  Mr. Beer, if we can publish Government

25   Exhibit 102-G.

H511thi3                          Hayes - Direct

 1  Q.  What are we looking at here?

 2  A.  The SCC form.

 3  Q.  If you could just read the heading of that document.

 4  A.  Special Category of Client, SCC, Public Officials,

 5  Connected Persons, Individuals That May Pose Reputational Risk.

 6  Q.  And who completed this form?

 7  A.  I did.

 8  Q.  And who is the SCC indicated on this form?

 9  A.  Mahmoud Thiam.

10  Q.  Just briefly --

11          MR. KOBRE:  Mr. Beer, if you can enlarge the lower

12  half.

13  Q.  On this form, who is the name of Mr. Thiam's employer?

14  A.  Government of Guinea.

15  Q.  What is his title and occupation?

16  A.  Minister of mines in Guinea.

17  Q.  And what were his source of income and wealth?

18  A.  Accumulated savings from previous employment and sale of

19  land in Africa.

20          MR. KOBRE:  If we can go, Mr. Beer, to page 4 of this

21  SCC form.

22  Q.  What was the level of public position held?

23  A.  SCC 01.

24  Q.  And in looking at Item No. 4, Level of Public Position?

25  A.  Minister of mines in Guinea.

1  Q.  And finally, the last page, page 5.  It asks whether there

2  is a new relationship and, if bank relationship, provide name

3  of bank.  What is the answer there?

4  A.  It's a new relationship, and the bank is HSBC Bank Hong

5  Kong.

6  Q.  Can you describe why you indicated that.

7  A.  Because we needed to know if the customer had a existing

8  relationship with our group cus -- our group banks, branches.

9  Q.  And why did you indicate, when it says bank relationship,

10  HSBC Bank Hong Kong?

11  A.  Because that's his previous banking information.

12  Q.  Okay.  Who did you submit this form to?

13  A.  To the compliance department.

14  Q.  And what was the result of that?

15  A.  The bank decided to close out the account.

16          MR. KOBRE:  Mr. Beer, if you can publish, please,

17  Government Exhibit 102-H.  And if we can just enlarge the text.

18  Q.  If you can just read this letter for us, Ms. Hayes,

19  starting from "Dear Sir."

20  A.  "Dear Sir, Based upon our rules for deposit accounts, we

21  will be closing your checking account, Account No. 628746733

22  and 628624816, effective August 26, 2010."

23  Q.  That's fine, Ms. Hayes.  Thank you very much.

24          MR. KOBRE:  Just one moment, your Honor?

25          No further questions, your Honor.

1            THE COURT:  Okay.  Ladies and gentlemen, we'll take

2       our midmorning recess.  Let Ms. Rojas know when you're ready to

3       resume.

4            (Jury not present)

5            THE COURT:  Mr. Kobre, any issues to discuss?

6            MR. KOBRE:  No, your Honor.

7            THE COURT:  Mr. Goldsmith?

8            MR. GOLDSMITH:  No, your Honor.

9            THE COURT:  Counsel, there is one thing I noticed.  I

10      think some emails were displayed this morning that had certain

11      material redacted; that is, portions of the page appeared

12      blacked out on the screen.  And I don't think we've said

13      anything to the jury yet about redactions, and I think I should

14      just tell them when they resume that the parties have

15      cooperated together to redact information that is irrelevant to

16      the issues at this trial and that they should not speculate as

17      to what might be blackened out or not available for them to

18      read.  Any objection?

19           MR. KOBRE:  No, your Honor.

20           MR. GOLDSMITH:  No, your Honor.

21           THE COURT:  Thank you.

22           THE DEPUTY CLERK:  All rise.

23           (Recess)

24           (In open court; jury present)

25           THE COURT:  Counsel.

H511thi3                        Hayes - Cross

1    CROSS EXAMINATION

2    BY MR. DELAKAS:

3    Q.  Good morning, Ms. Hayes.

4    A.  Good morning.

5    Q.  I just have a few questions.

6            When Mr. Thiam came into the bank in June, that's the

7    first time you saw him, is that correct?

8    A.  I didn't see him in the bank.

9    Q.  Just the name raised flags of who he was when you saw him

10   on CNBC, is that correct?

11   A.  Correct.

12   Q.  Okay.  Part of your job is to review information that Ajay

13   Damle would give you, is that correct?

14   A.  Correct.

15   Q.  And what documents were given to you?

16   A.  It was the driver's license, the passport, the master

17   deposit agreement, and the new account worksheet.

18   Q.  The driver's license that he gave you, that address is 340

19   East 64th Street, is that correct?  102-B.

20   A.  Yes.

21   Q.  What other identification did he show you?  Or not you

22   specifically.  What other identification did you have to

23   review?

24   A.  Passport.

25   Q.  What country was that passport from?

1    A.  United States.

2    Q.  Okay.  Was there an issue of having dual citizenship at

3    all?

4    A.  No.

5    Q.  Can you open up an account at HSB with dual citizenship?

6    A.  Yes.

7    Q.  So that doesn't ring any bells.

8              MR. KOBRE:  Objection.

9              THE COURT:  Sustained.  Form.

10   Q.  World-Check, we were discussing about World-Check earlier,

11   you previously testified.  What other --

12             MR. KOBRE:  Objection.

13             MR. DELAKAS:  I'll withdraw that.  I'm sorry.

14   Q.  Did you do a World-Check search on Mr. Thiam?

15   A.  I do not --

16             MR. KOBRE:  Objection.

17             THE COURT:  Overruled.

18   A.  I do not have access to do World-Check searches.

19   Q.  Okay.  Who would have access to that?

20   A.  The compliance department.

21   Q.  And it would be, you would give information to the

22   compliance department to do a World-Check.

23   A.  They will review the information I give them, and then a

24   part of their procedures, they would do World-Check.

25   Q.  Okay.  When he came in on or about June 7th -- is that

H511thi3                              Hayes - Cross

1   correct?

2   A.  That's when the account was opened, June 7th.

3   Q.  Okay.  If you look at -- Government Exhibit 102-C is the

4   customer information file?

5   A.  Yes.

6   Q.  Okay.  On the upper right-hand corner, it says 6/8, is that

7   correct?

8   A.  Yes.

9   Q.  June 8th?  And I know now your files back then, having

10  paper and writing down notes was common practice back then.

11  A.  Yes.

12  Q.  So as you learned information, you put it on these

13  documents, is that correct?

14  A.  Just to make notes, yes.

15  Q.  Okay.  If you look at the second page, it has the date of

16  June 8th on top?

17  A.  Yes.

18  Q.  Okay.  And what company is that?

19          Down on the bottom on the handwritten notes.  I'm

20  sorry.

21  A.  It says American Middle Eastern Resources.

22  Q.  Okay.  Would that be the long name for AMER?

23  A.  Yes.

24  Q.  To your knowledge.  Okay.  When he came into the bank,

25  Mr. Thiam, basically he gave information that he was, as you

H511thi3                    Hayes - Cross

1   testified earlier, he was opening up an account for AMER, is

2   that correct?

3   A.  No.

4           MR. KOBRE:  Objection.

5           THE COURT:  Sustained.

6   Q.  When he came into the bank, what did he say he was opening

7   the account for?

8   A.  His personal account.

9   Q.  Okay.  Now when you Googled him later --

10  A.  Yes.

11          MR. KOBRE:  Objection.

12          THE COURT:  Sustained.  Form.

13  Q.  Did you Google him?

14  A.  Yes.

15  Q.  Okay.  Is this after you saw the CNBC?

16  A.  Yes.

17  Q.  And you found out he was the minister of mines.

18  A.  Yes.

19  Q.  Okay.  All right.  Now when you found out that he was

20  minister of mines, you had to do the SCC search that you said

21  before, you testified to, is that correct?

22  A.  Can you rephrase that.

23  Q.  Yes, sure.  You did an SCC?

24  A.  I completed a form.

25  Q.  A form.  Okay.  Is that the same thing as a politically

1    exposed person, or PEP?

2    A.  It's similar.

3    Q.  Now when Mr. Thiam came into the bank, does he have to tell

4    you he's a PEP?

5    A.  Yes.

6    Q.  If his business results from mining, is that correct?

7    A.  Can you rephrase that.

8    Q.  Sure.  Let me go back some.

9            When you get information from a new client --

10   basically, as you testified earlier, there was no relationship

11   because he already had an account in Hong Kong.

12   A.  Correct.

13   Q.  So from that information alone and from the driver's

14   license and the passport, he could have opened the account.

15   A.  Yes.

16   Q.  Then it came to your knowledge that he might have been a

17   PEP, politically exposed person.

18   A.  Yes.

19   Q.  Okay.  Now was he called back in to verify certain

20   information?

21   A.  Yes.

22   Q.  Okay.  If you go to 102-F, your emails.  Let's go to the

23   second page.

24           And this email basically is an email string, you

25   answering to Nancy Polinski, Pokinski?

1   A.  Pokriki.  P-O-K-R-I-K-I.

2   Q.  Pokriki.  Is that correct?

3   A.  Yes.

4   Q.  Okay.  So your response to her, there's a part here where

5   it says that the company AMER has not opened yet.

6   A.  Yes.

7   Q.  Where did you get that information?

8   A.  From Ajay.

9   Q.  Do you know how he got that information?

10  A.  I'm not a hundred percent sure how.  I would think he spoke

11  with the client.

12  Q.  That would be Mr. Thiam.

13  A.  Yes.

14  Q.  Okay.  And what date was that on this email?

15  A.  That was June 14th.

16  Q.  Okay.  So approximately a week after he first came in, is

17  that correct?

18  A.  Yes.

19  Q.  Okay.  If you go to two pages later, there's another email.

20  It's basically -- it's from Stacey.  Excuse me.  I'm sorry.

21  It's from Nancy?

22  A.  Yes.

23  Q.  Okay.  Did Nancy want more information about his ID?

24  A.  Yes.

25  Q.  Okay.  Then if you go to the next page -- oh, I'm sorry.

1    Can we go back one.  What date is that email?

2    A.  This is June 21st.

3    Q.  So if you go to the next page, the same exhibit, Government

4    Exhibit 102-F.  So after your investigation, your findings, you

5    had to answer her what the People published earlier on your

6    email on the bottom.

7    A.  Yes.

8    Q.  Okay.  Does it say Mahmoud Thiam is the minister of mines?

9    A.  Yes.

10   Q.  How did that information come about?

11   A.  This is information provided to Ajay.

12   Q.  Would that be from Mr. Thiam?

13   A.  Yes.

14   Q.  Okay.  Did he tell you the purpose of the account?

15   A.  The purpose of the account?

16   Q.  Yes.  On this email.

17          If you look in the bottom section where there's like a

18   space between the bullet points.

19   A.  Yes.

20   Q.  Okay.  It's like the fourth line down?

21   A.  Mm-hmm.

22   Q.  What does that say?

23   A.  "Purpose of Account:  New York is his primary residence.

24   The account will be used for his personal use and bill paying.

25   Appointments will be made -- will be the FA," which is

1  financial adviser, "will be set to speak about financial

2  planning."

3  Q.  Okay.  Now when he was asked about being the minister of

4  mines, you may not know this, but there was some information

5  that Ajay relayed to you, is that correct?

6  A.  Can you rephrase that.

7  Q.  Sure.  You now know that he's the minister of mines.

8  A.  Yes.

9  Q.  And you have to make your investigation so you can get more

10  information, as you testified earlier, that there's some

11  enhanced investigation on certain individuals who are SCC

12  status, is that correct?

13  A.  Yes, I provide information for compliance to do that

14  investigation.

15  Q.  Okay.  If you look at the same email that we're discussing

16  about, second part, where it starts, "Mahmoud Thiam is the

17  minister of mines in Guinea," what is the next sentence, if you

18  can read it to me, please?

19  A.  "He has held this position for the last 18 months.  His

20  position is expected to end in October 2010.  There will be

21  elections for a new minister of mines.  He was asked to stay on

22  as minister until a new minister is renamed."

23  Q.  Okay.  And this information you received before this email

24  was sent, is that correct?

25  A.  I received it the day before.

1   Q.  Okay.  Can we go back to 102-D, customer info.  It's the

2   customer information file.

3   A.  102-D?

4   Q.  Yeah.

5         THE COURT:  Do you have a question, counsel?

6   Q.  Are you ready?

7   A.  Yes.

8   Q.  Okay.  There's a date under what we discussed before,

9   American Middle Eastern Resources.  What is that?

10  A.  I'm sorry.  Are you sure this is 102-D?

11  Q.  Yes.  Second page.

12  A.  102-D is the worksheet.

13  Q.  Is that the customer information file?

14  A.  No, it's not.

15  Q.  Do I have it wrong?

16        C.  Sorry.  102-C.  It's the second page.

17  A.  Yes.

18  Q.  What is that date?

19  A.  What is the date?

20  Q.  No.  Excuse me.  Underneath American Middle Eastern

21  Resources, there's a date there.  What is that?

22  A.  September 10th.

23  Q.  And what date would that refer to?

24  A.  I believe it's the date that he was ending his position.

25  Q.  With the minister of mines?

1    A.  I'm sorry.  September 10th is the date when American

2    Middle Eastern Resources were to begin.

3    Q.  So that's the information that -- is that your handwriting?

4    I'm sorry.

5    A.  Yes, it is.

6    Q.  Okay.  And where did you get that information from?

7    A.  From Ajay.

8    Q.  And he got that information from?

9    A.  Mr. Thiam.

10   Q.  So September 10th is the date that AMER, for short, is

11   going to end.

12   A.  It's going to begin.

13   Q.  Begin.  Excuse me.  Going to begin.  And what date on the

14   top of that customer information file do you have?

15   A.  June 8th.

16   Q.  So would it be fair to say sometime a few days after you

17   found out he was a minister of mines, he gave this information

18   to Ajay?

19   A.  June 8th is the day after the account was opened.  So

20   that information would -- I would have gotten the information

21   on June 8th.

22   Q.  Okay.  All righty.  Now you've never met Mr. Thiam, is that

23   correct?

24   A.  No.

25   Q.  Okay.  And all the information that you got was from Ajay?

H511thi3                         Hayes - Cross

1   A.  Yes.

2   Q.  And the compliance conference.

3   A.  Yes.

4   Q.  So would it be fair to say that all the information that

5   Ajay got was from Mr. Thiam?

6   A.  Yes.

7   Q.  I just have one more question.

8           Do you know why AMER had to open in September 10th?

9   A.  No, I do not.

10  Q.  Okay.  Would it be fair to say that Mr. Thiam might have

11  had a conflict?

12          MR. KOBRE:  Objection.

13          THE COURT:  Sustained.

14          MR. DELAKAS:  Just give me a moment, your Honor?

15  Q.  All right.  One more item.

16          When he opens the account again, you don't need to

17  open up an account with a utility bill, is that correct?

18  A.  Only if you need to provide proof of address.

19  Q.  And how did he provide proof of address?

20  A.  On his New York State driver's license.

21  Q.  Okay.  And that had the address of?  If you remember.

22  A.  340 -- I don't know -- I don't remember the full address.

23  Q.  Okay.  It's 340 East 64th.  Would that refresh your

24  recollection?

25  A.  I would have to look at the document.  I don't remember off

H511thi3                          Hayes - Cross

1    the top of my head.

2    Q.   Okay.  So 102-B.  It's the first one.

3    A.   Can it be put up on the screen?

4           MR. DELAKAS:  Mr. Beer, can you do that, please.

5    A.   If I can just look at the CIF screen, because that's the

6    address.

7           340 East 64th Street, Apartment 14H, New York, New

8    York.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. DELAKAS:

2    Q.  Do you have that information from the CIF where you got

3    from the New York State driver's license, is that correct?

4    A.  Yes.

5    Q.  While we have that screen up there, on the bottom, do you

6    have something, customer be classified as a special category of

7    client, what's the answer to that?

8    A.  It has an N for no.

9    Q.  And then right after that, is the customer PEP, per se,

10   politically exposed person?

11   A.  Correct.  The answer is no.

12   Q.  Then "politically exposed person automatic scan," the

13   answer is blank?

14   A.  Yes.

15   Q.  Those questions weren't asked when he first came into the

16   bank.  Is that correct?

17           MR. KOBRE:  Objection.

18           MR. DELAKAS:  I'll rephrase it.

19           THE COURT:  Overruled.

20   Q.  Were those questions asked when he first came in to open

21   the account?

22   A.  I wasn't in the interview, but whenever the, that question

23   is on the screen, the banker is required to ask that question.

24   Q.  So there's a possibility those questions weren't asked?

25           MR. KOBRE:  Objection.

1          THE COURT:  Sustained.

2          MR. DELAKAS:  I have no further questions, your Honor.

3          MR. KOBRE:  Just briefly.

4    REDIRECT EXAMINATION

5    BY MR. KOBRE:

6    Q.  Ms. Hayes, based on your review of the documents that

7    Mr. Damle provided to you for your initial review, was there

8    any indication anywhere --

9          THE COURT:  Excuse me, counsel.

10         You may be seated.

11         MR. DELAKAS:  Yes.

12   Q.  Based on your review of the documents that Mr. Damle

13   provided to you for your review from his initial encounter with

14   Mr. Thiam, was there any indication anywhere that Mr. Thiam was

15   a government official?

16   A.  No.

17         MR. KOBRE:  Nothing further.

18         THE COURT:  Any recross?

19         MR. DELAKAS:  No, your Honor.

20         THE COURT:  You may step down.

21         (Witness excused)

22         THE COURT:  Next witness.

23         MR. DiMASE:  The government calls Ajay Damle.

24    AJAY DAMLE,

25       called as a witness by the Government,

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MR. DiMASE:

4     Q.  Good morning, Mr. Damle.

5     A.  Good morning.

6     Q.  Where do you currently work?

7     A.  I work for Citibank.

8     Q.  What's your current position at Citibank?

9     A.  I work in sales operations.

10    Q.  How long have you been there?

11    A.  About three weeks.

12    Q.  Say that again.

13    A.  Three weeks.

14    Q.  So you just started recently?

15    A.  Yes.

16    Q.  Did you work at any other banks prior to Citibank?

17    A.  Yes, I worked for M&T Bank.  I worked for Wachovia Bank,

18    and then HSBC.

19    Q.  When did you start at M&T Bank?

20    A.  I started in the summer of 2004.

21    Q.  How long did you work there?

22    A.  Roughly two years.

23    Q.  What was your position there?

24    A.  I went through a management-and-sales-development program,

25    by the end of which I was an assistant branch manager and

1   eventually a branch manager.

2   Q.  What were your basic duties and responsibilities at M&T

3   Bank?

4   A.  I worked with the bank's customers.  I helped them open

5   various types of accounts, established loans, and invest their

6   money if they needed it.

7   Q.  You said two years you were there, is that right?

8   A.  Roughly, yes.

9   Q.  So am I right that it was around 2006 that you went to

10  Wachovia?

11  A.  Yes.

12  Q.  Why did you leave M&T Bank?

13  A.  I received a better offer from Wachovia to go work in the

14  city.

15  Q.  What did you do at Wachovia?

16  A.  I was what was called a financial specialist.  I was

17  basically like a personal banker.

18  Q.  What were your duties in that job?

19  A.  They were similar.  I worked with the bank's customers.  I

20  helped them open different types of accounts, do lending and

21  investments.

22  Q.  How long were you at Wachovia for?

23  A.  Roughly two years.

24  Q.  Now we're into approximately 2008, is that right?

25  A.  Yes.

1    Q.   Where did you go after Wachovia?

2    A.   I went to work for HSBC bank.

3    Q.   And specifically what location of HSBC bank did you move

4    to?

5    A.   I was at the branch on Madison Avenue and 78th Street, New

6    York.

7    Q.   And how long did you work at HSBC at that branch?

8    A.   Roughly three years.

9    Q.   And so is it fair to say that you were working there, so

10   you were working there in 2010 --

11   A.   Yes, I was.

12   Q.   What was your position at HSBC?

13   A.   I was what was called a premier relationship manager.

14   Q.   Could you describe for the jury what that position entails?

15   A.   Yes.  Premier relationship manager worked with what HSBC

16   referred to as premier customers, who are high-net-worth

17   clients with certain assets with the bank, and I worked with

18   them around their banking, lending, and investment needs.

19   Q.   Just to go back to your transition from Wachovia to HSBC,

20   why did you make that move?

21   A.   Once again, I received a better offer from HSBC to join the

22   company.

23   Q.   Who did you report to at the HSBC Madison Avenue branch?

24   A.   I reported to both a branch manager, who worked at the

25   branch, and I also reported to a sales manager, who managed

1  premier relationship managers within New York.

2  Q.  Did anyone work in the area of compliance?

3  A.  Yes, we had an assistant branch manager by the name of

4  Stacey Hayes.

5  Q.  And could you, very briefly, describe what functions she

6  performed at the branch?

7  A.  It was her job to validate identification and

8  account-opening documents that were collected during account

9  opening.

10  Q.  Now, in your position at the HSBC branch, did you have

11  involvement setting up bank accounts for high-net-worth clients

12  from time to time?

13  A.  Yes.

14  Q.  I'm going to direct your attention now to June 7 of 2010.

15  Did you have occasion on that day to meet with any such

16  clients?

17  A.  Yes.

18  Q.  Who did you meet with that day?

19  A.  I met with Mr. Mahmoud Thiam.

20  Q.  Had you ever met Mr. Thiam before June 7, 2010?

21  A.  No.

22  Q.  What was the purpose of the meeting on June 7, 2010?

23  A.  Mr. Thiam had come to our branch to establish a premier

24  relationship with HSBC in the United States.

25  Q.  And when you say establish a premier relationship, what

1     does that mean?

2     A.  He needed to open bank accounts in the United States with

3     HSBC.

4     Q.  Were you able to check HSBC's systems to see if Mr. Thiam

5     had any preexisting relationship with HSBC?

6     A.  Yes.  I did.

7     Q.  And what did you find out from running that check?

8     A.  Within the HSBC directory, I did establish that Mr. Thiam

9     was a premier client in Hong Kong.

10    Q.  Other than that fact, in other words, that he was a premier

11    client in Hong Kong, were you able to access any other

12    information about the bank account in Hong Kong?

13    A.  No, I don't believe so.

14    Q.  Were you able to access any account-opening documents, to

15    the best of your recollection?

16    A.  No.

17    Q.  And account statements from that HSBC Hong Kong account?

18    A.  No.

19    Q.  Generally speaking, Mr. Damle, during that June 7 meeting,

20    what did you and Mr. Thiam discuss?

21    A.  We discussed what his needs would be for a banking

22    relationship insofar as what types of accounts he would need,

23    what type of process he would need to go through to open those

24    accounts, and that's what we discussed.

25    Q.  Were, in fact, accounts opened following the meeting?

H51Wthi4                          Damle - Direct

1   A.  Yes, they were.

2   Q.  What kind of accounts?

3   A.  We opened a checking and savings account.

4   Q.  Can you just briefly describe the process of when a

5   customer comes in to meet with you to open a bank account when

6   you were at HSBC?

7   A.  Sure, so after the initial discussion that I described

8   earlier where we discussed what types of accounts would be

9   appropriate, if we moved forward to account opening, I would

10  collect certain information and documents from the customer,

11  verifying his identity and other personal details.  I would put

12  those into a system.  An account and multiple accounts would be

13  opened and subsequently signed by the client.

14  Q.  So you mentioned a couple of different things there.  You

15  said that you obtained identifications from the client?

16  A.  Yes.

17  Q.  And what kinds of identification do you usually request?

18  A.  Ordinarily, there would be government-issued IDs in the

19  form of passports, driver's licenses, things like that.

20  Q.  And you also mentioned certain pieces of information that

21  you would obtain from the client.  Could you describe some of

22  the different pieces of information you would seek in your

23  initial meeting?

24  A.  Yes, I needed information like the customer's employment

25  information, the source of wealth, their citizenship status,

1   tax ID information, if that were applicable.

2   Q.  What's the purpose of gathering that information about a

3   client when they set up an account?

4   A.  To understand the clients whose money that we're housing.

5   It's to understand if there's any conflicts of interests with

6   regards to the types of accounts we're setting up, and

7   understand how they're going to be using the accounts.

8   Q.  Are you familiar with the terms KYC and CIP?

9   A.  Yes.

10  Q.  Can you briefly describe what those terms mean?

11  A.  KYC stands for know your customer, and CIP involves

12  customer identification policy.

13  Q.  And so what kind of information falls under the bucket of

14  know your customer?

15  A.  That involves questions around what type of expected

16  transactions we, the bank should be expecting; understanding,

17  as I said before, the source of wealth of the client.  Just

18  basically understanding who we are working with on a

19  customer–bank relationship.

20  Q.  What kinds of information fall under the bucket of CIP?

21  A.  CIP involves the actual identification of the client,

22  things like a tax ID number, social security number, and the

23  forms of identification like passport, driver's license, as I

24  said.

25  Q.  Now, with respect to the information you gathered during

1    your meeting, what do you do with that information?  Do you

2    input it anywhere?

3    A.   Yes, there is a bank system that we would use.  I would

4    input the client's answers to my questions around know your

5    customer, and I would also have to collect copies of the

6    identification documents the client presented.

7    Q.   Is there any process in place for the -- or, withdrawn.

8         Was there any process at HSBC at that time in place for the

9    review of new accounts opened at the bank?

10   A.   Yes.  After collecting the information and collecting the

11   documents, I would pass those on to the operations or assistant

12   manager, Stacey.

13   Q.   In this case, was that Ms. Hayes?

14   A.   Yes.  Yes, it was.

15   Q.   Was that review process conducted for just a select group

16   of new accounts or for all accounts?

17   A.   It's for all accounts.

18   Q.   I'm going to ask you now to look at Government Exhibit 102A

19   in evidence.

20            MR. DiMASE:  And Mr. Beer, would you please publish

21   that exhibit for the jury.

22   Q.   Do you recognize that document?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's what's called a master deposit agreement for personal

1    accounts.  This is also referred to as a signature card.

2    Q.  And when was this completed?

3    A.  This would have been generated as soon as the account was

4    opened, that same day.

5    Q.  So was this filled out during the meeting of June 7 with

6    Mr. Thiam?

7    A.  Yes, it was.

8    Q.  Whose signature is here in the middle of the page where it

9    says signature?

10   A.  That's Mr. Thiam's signature.

11   Q.  And it has the date of June 7, 2010?

12   A.  It does.

13   Q.  Did he sign in your presence?

14   A.  He did.

15   Q.  And whose signature is at the bottom of the page?

16   A.  That is also his signature.

17           MR. DiMASE:  Let me turn to Government Exhibit 102B in

18   evidence, and I'll ask Mr. Beer to publish that.

19   Q.  Do you see that on the screen, Mr. Damle?

20   A.  Yes.

21   Q.  What is this?

22   A.  This is a copy of Mr. Thiam's passport that he presented at

23   account opening.

24   Q.  And from what country is this passport?

25   A.  It's a United States passport.

1   Q.  Turning your attention to page 2 --

2           MR. DiMASE:  Mr. Beer, scroll down to page 2.

3   Q.  -- what is this?

4   A.  That is a New York State driver's license that Mr. Thiam

5   presented.

6   Q.  And there are notes here in the bottom left-hand corner of

7   the document.  Do you see those, Mr. Damle?

8   A.  Yes.

9   Q.  Whose notes are those?

10  A.  Those are mine.

11  Q.  What is the purpose of the notes you wrote there?

12  A.  Those are to verify both the client's name, the location

13  that branch 682 -- 628 was the branch the account was opened

14  at, the date I reviewed the documents, and that's my signature.

15  Q.  That's a verification that you received those documents on

16  that date?

17  A.  Correct.

18          MR. DiMASE:  Let's turn now to Government Exhibit

19  102C.

20  Q.  Do you recognize these two -- well, the document that's in

21  front of you now, do you recognize that, Mr. Damle?

22  A.  I do.

23  Q.  What is it?

24  A.  That's a screenshot from a system called customer

25  identification -- sorry, customer information file.

1    Q.  What is the customer information file system?

2    A.  That's the system or database where the information I would

3    have input at account opening would be displayed.

4    Q.  So with respect to Government Exhibit 102C, where did the

5    information inputted into this screenshot come from?

6    A.  It came from the answers Mr. Thiam gave to me as I was

7    opening his account.

8    Q.  What did Mr. Thiam say regarding his then employment during

9    the meeting?

10   A.  He said that he was employed with a company called AMER.

11   He described his occupational role within that company as the

12   chairman.  He gave his address as 340 East 64th Street address

13   and the phone number you see there, and he explained that his

14   source of wealth was from his employment, and that the business

15   that AMER was involved in was mining and natural resources

16   consultant.

17   Q.  Where did he say that his employer was located?

18   A.  He listed his location at 340 East 64th Street.

19   Q.  And did you see that address earlier in the interview?

20   A.  Yes.  That was also the address on his driver's license.

21   Q.  Now, I'll draw your attention to the bottom of the page --

22   not the bottom, the middle of the page.  Do you see those

23   notes?

24   A.  Yes.

25   Q.  Whose notes are those?

1   A.  I believe those are Ms. Hayes'.

2   Q.  And turning to page 2 of Government Exhibit 102C, there are

3   notes there as well?

4   A.  Yes.

5   Q.  Whose notes are those?

6   A.  Those, I believe, are also Ms. Hayes'.

7   Q.  We'll turn to what you did after meeting, after this June 7

8   meeting in a moment, but briefly did you provide information

9   from the meeting to Ms. Hayes after the meeting with Mr. Thiam?

10  A.  I did.

11  Q.  And where did the information in the notes at the bottom of

12  pages 1 and 2 of this exhibit come from?

13  A.  They came from Mr. Thiam's information that he gave me at

14  account opening.

15  Q.  And with respect to the notes on the first page, where it

16  says "rocks, precious metals," what does that mean?

17  A.  That would be further clarification for Ms. Hayes with

18  regards to what exactly mining natural resources entailed, that

19  he was mining rocks and precious metals.

20  Q.  Turning -- and that was in connection with the additional

21  information he provided, is that right?

22  A.  Yes.

23  Q.  Which was that he was a consultant in mining and natural

24  resources?

25  A.  Yes.

1    Q.  And second page of the document, what does American Middle

2    Eastern Resources mean?

3    A.  That would, that would be the, what A-M-E-R stands for.

4    Q.  And underneath it, do you see where it says former

5    employer, banker of Hong Kong?

6    A.  Yes.

7    Q.  What does that mean?

8    A.  That speaks to what Mr. Thiam did in before his position as

9    chairman of AMER.

10   Q.  Do you recall when he said that AMER was going to be

11   operating?

12   A.  I believe at the time that I opened the account, he was

13   saying that he was already the chairman.

14         MR. DiMASE:  I'm going to show you Government Exhibit

15   102F and ask Mr. Beer to publish it, page 1 of that document.

16   Q.  Drawing your attention down near the middle of the page

17   regarding the information provided at account opening.

18   A.  Oh, I'm sorry.  Yes.  This makes clear that, yes, he did

19   say during account opening that he had not opened yet but that

20   he would be working as chairman of AMER.

21   Q.  This email here in 102F refreshes your memory of that?

22   A.  Yes.  Yes, it does.

23   Q.  When you asked the question about employment, did you ask

24   Mr. Thiam what his current employment was?

25   A.  I can't remember exactly how I phrased the question.

1   Q.  What's your best recollection of how you phrased it?

2   A.  My best recollection is I would be asking for current

3   information.

4   Q.  And did Mr. Thiam ever mention during the meeting on June

5   7, 2010, that he was presently the minister of mines of the

6   country of Guinea?

7   A.  No.

8   Q.  Would there have been a place where you would indicate that

9   position for that role, that governmental role in the CIF

10  system?

11  A.  Yes.

12  Q.  Where would you have indicated that?

13  A.  I would have indicated that at the bottom of the CIF page

14  where it specifically asked if they're affiliated with any

15  government entities or political entities.

16          MR. DiMASE:  Could I ask, Mr. Beer, to publish 102C

17  again for the jury, and expand the portion beginning "is

18  customer to be classified as."

19  Q.  Can you just indicate to the jury, using what's on the

20  screen, what you were discussing a moment ago?

21  A.  Yes.  It says there:  "Is the customer to be classified as

22  a special category of client?  Yes or no."  Here we've entered

23  no.  "Is he a politically exposed person or foreign government

24  related?"  And again the answer is no.

25  Q.  Had he said that he was at the time the minister of mines

1    of Guinea, what additional steps would you have taken?

2    A.  There would be other paperwork and other questions that

3    would need to be asked and then subsequently filed with regards

4    to the nature of the position he holds.

5    Q.  And what is the purpose of that additional paperwork and

6    collection of information?

7    A.  The purpose is to make sure that the funds that that bank

8    is housing are not the result of any ill-gotten gains or

9    corruption or anything that would put the bank at risk.

10   Q.  What kinds of documents would need to be filled out,

11   specifically?

12   A.  There would need to be questions with regards to exactly

13   what the nature of the client's role is within the government

14   or government agency.  We'd need to understand things as far as

15   the expected transactions, wire transfers, cash deposits and

16   things like that.

17            MR. DiMASE:  Let me now turn to Government Exhibit

18   102D and ask Mr. Beer to publish page 1 of that document to the

19   jury.

20   Q.  Do you recognize this document?

21   A.  Yes.

22   Q.  What is it?

23   A.  This was a worksheet that we printed out along with the

24   signature card at account opening.

25   Q.  And where did the information come from?

1    A.   This all came from Mr. Thiam's answers to my questions.

2    Q.   And generally speaking, what kind of information is

3    inputted into these worksheets?

4    A.   General demographic information around his address, social

5    security number, identification number, and employment.

6    Q.   The first page of the document, what account does this

7    refer to?

8    A.   There's an account number at the top left ending in 816.

9    This would either be the checking or savings account number

10   that we set up.

11   Q.   And turning to page 2, what account does this document

12   refer to?

13   A.   So this is the account ending in 733.  This is either --

14   the opposite, either the checking or savings we opened that

15   day.

16   Q.   So one of the two pages relates to the checking account and

17   one the savings account?

18   A.   Correct.

19   Q.   And turning your attention to the third and fourth pages,

20   taking a look at the third page first, what is that?

21   A.   This simply reflects the relationship that we opened, all

22   the products and services that were signed up for for the

23   client.

24   Q.   And this is in connection with one of the two accounts in

25   particular?

1    A.   It involves both of them.  There's the HSBC premier, which

2    is the checking.  There's the HSBC premier investor, which is

3    the savings.  And then checks, master -- debit card, statement

4    summary, and placement summary.

5    Q.   Turning your attention to page 4, what's reflected in this

6    page of Government Exhibit 102D?

7    A.   This is the same information, the HSBC premier account,

8    checks and debit card.

9    Q.   So you indicated earlier that the two accounts were opened

10   at the conclusion of this meeting?

11   A.   Yes.

12   Q.   Do you recall if the account was funded on the day that it

13   was opened?

14   A.   I do not believe it was.

15   Q.   Was it funded at some point thereafter?

16   A.   Yes.

17   Q.   I'll ask you -- I'm showing you what's in evidence as

18   Government Exhibit 101.  Did you have a chance to look at that

19   exhibit, Mr. Damle?

20   A.   Yes, I have.

21   Q.   What is it?

22   A.   This is a statement from the account that we opened up.

23   Q.   And to be clear, is there more than one statement contained

24   in that exhibit?

25   A.   Yes, there are multiple statements.

1   Q.  And fair to say these are account statements relating to

2   the two accounts set up at HSBC on June 7?

3   A.  Yes.

4   Q.  I'm going to ask you to look at page 2 of Government

5   Exhibit -- actually, withdrawn.

6           I'll ask you to take a look at page 1 of Government

7   Exhibit 101.

8           MR. DiMASE:  I ask Mr. Beer to publish that to the

9   jury.

10  Q.  Can you tell the jury which statement this is, what period

11  it covers?

12  A.  Yes, this is from the -- this is the first statement from

13  when the account was opened until June 22 of 2010.

14  Q.  And looking at the second page of the document, you

15  indicated a moment ago that you don't believe the account was

16  funded on the day it was opened?

17  A.  Yes.

18  Q.  But you said it was funded sometime thereafter?

19  A.  Yes.

20  Q.  Can you tell from page 2 of Government Exhibit 101 when it

21  was funded?

22  A.  Yes.

23  Q.  Initially?

24  A.  Yes, it was funded two days later on June 9.

25  Q.  How was it funded?

1   A.  It was funded via wire transfer of $300,000.

2   Q.  Can you tell from the document you're looking at where that

3   money originated from?

4   A.  Yes, it came from HSBC in Hong Kong from an account housed

5   in Mr. Thiam's personal name.

6   Q.  Let me just ask you a couple of questions about wire

7   transfers.  What is a wire transfer?

8   A.  A wire transfer is an electronic transmittal of funds

9   between bank accounts.

10  Q.  Can you explain how wire transfers are generally initiated?

11  A.  Yes, they need to be initiated by the party that is sending

12  the funds out of the bank account.  Depending on the

13  institution there is various different ways it can be done,

14  either online or in person, via written authorization.

15  Q.  And what happens once that request is made by the

16  individual wanting to send the money?

17  A.  The bank, the bank, financial institution will put those

18  details into their system and the funds will be remitted

19  electronically, depending on whether it's international or

20  domestic, via different channels to the recipient institution.

21  Q.  And ultimately, the money will be sent from the requesting

22  customer's account to the account to which they've directed the

23  funds?

24  A.  Yes.

25  Q.  And you said that those wire transfers can be either

1   domestic, meaning in the United States, or international?

2   A.  Yes.

3            MR. DELAKAS:  Objection, your Honor.

4            THE COURT:  Overruled.

5   Q.  Is that right?

6   A.  Yes, it is.

7   Q.  Let me also ask you to look at page 4 -- actually,

8   withdrawn, page 3 of Government Exhibit 101.  Can you tell the

9   jury what period this statement covers?

10  A.  Yes, it covers the period from June 23, 2010, to July 23,

11  2010.

12  Q.  And drawing your attention to the second page of that

13  statement or page 4 of the document, were there any

14  transactions from the account on June 29 of 2010?

15  A.  Yes, there was an outgoing wire transfer in the amount of

16  $35,808.60.

17  Q.  And can you tell where that money was directed?

18  A.  Yes.  It indicates it was directed to the Dalton School.

19  Q.  Do you know, have you heard of the Dalton School?

20  A.  Yes, I have.

21  Q.  What is it?

22  A.  My understanding it's a very prestigious private school in

23  New York.

24            MR. DELAKAS:  Objection, your Honor.

25            THE COURT:  Sustained.  The answer is stricken.

1  Q.  Is it fair to say that, to your knowledge, it's a private

2  school located in New York?

3  A.  Yes, to my understanding.

4  Q.  And were there any other transactions the day before that?

5  A.  Yes.  There was one transaction on June 28.

6  Q.  What was that transaction for?

7  A.  That's a $21,000 payment to FIA Cardservices, a credit card

8  payment.

9  Q.  It says pay by phone.  What does that mean?

10  A.  That means the client would initiate the phone, the payment

11  via the telephone with their bank, with their credit card

12  company.

13  Q.  Now, you indicated that -- actually, withdrawn.

14      At the end of your initial meeting on June 7 with

15  Mr. Thiam, what did you do with the information that you

16  collected?

17  A.  I collected all the signed documents and the identification

18  documents into a file and presented them to Stacey, or Ms.

19  Hayes, for inspection.

20  Q.  And did there come a time that Ms. Hayes came back to you

21  with additional questions regarding these accounts?

22  A.  Yes.

23          MR. DiMASE:  Let's turn to 102E in evidence, and I'll

24  ask Mr. Beer to publish page 1.

25  Q.  Do you recognize page 1 of 102E, Mr. Damle?

1  A.  Yes.

2  Q.  What is it?

3  A.  It's a list of questions or requests for information from

4  Ms. Hayes to myself.

5  Q.  And the notes on this page, whose notes are they?

6  A.  I believe they're Ms. Hayes'.

7  Q.  Turning to the second page of the document, whose notes are

8  those?

9  A.  They are Ms. Hayes' questions.

10 Q.  And when you say questions, are there answers listed here

11 on this sheet of notes?

12 A.  Yes, to the right of the questions and below.

13 Q.  Whose handwriting is to the right of the questions and

14 below?

15 A.  That's my handwriting.

16 Q.  And turning to the third page, whose notes are these?

17 A.  These are Ms. Hayes'.

18 Q.  Do you know when the four questions at the top of that page

19 were -- well, when those notes were taken?

20 A.  I don't know the exact date.  It was sometime after account

21 opening.

22 Q.  And then there are additionally questions listed at the

23 bottom of that page, one, two, three, and four?

24 A.  Yes, those would be some of the responses from the

25 preceding questions.

1    Q.  When you say preceding questions, you mean the questions

2    that were posed on the second page of notes?

3    A.  Yes.

4           MR. DiMASE:  Turn to the final page.

5    Q.  Whose notes are these?

6    A.  These are Ms. Hayes' notes.

7    Q.  And are these answers also in connection with the questions

8    posed on page 2 of the notes?

9    A.  Page 1 and 2.

10   Q.  And these are Ms. Hayes' notes, you said?

11   A.  Yes.

12   Q.  So in terms of communicating information to Ms. Hayes, how

13   did you do that with respect to these questions?

14   A.  I would collect the information from the client and then I

15   would pass those along to Ms. Hayes verbally.

16   Q.  And you indicated that some of the notes are actually your

17   notes as well, right?

18   A.  Yes.

19   Q.  And did you provide those, in addition to your verbal

20   communications with Ms. Hayes, did you provide your handwritten

21   notes to her as well?

22   A.  I did.

23          MR. DiMASE:  Let me turn to 102F.

24   Q.  I'm going to hand you that exhibit.  Take a look through

25   that for a moment.  Do you recognize those documents?

```
 1   A.  Yes, I do.

 2   Q.  What are they?

 3   A.  They are email communications from Ms. Hayes to various

 4   members of our compliance unit.

 5   Q.  Where did the information contained about -- in those

 6   emails about Mr. Thiam come from?

 7   A.  They came from the interview I had with Mr. Thiam on

 8   account opening.

 9   Q.  OK.  And are there emails that concern a second meeting

10   with Mr. Thiam in those emails as well?

11   A.  Yes, there are.

12   Q.  So that brings me to the question, how did you go about

13   getting information to answer the questions that Ms. Hayes had?

14   A.  I arranged a second meeting with Mr. Thiam.

15   Q.  Do you recall when that second meeting occurred?

16   A.  Yes, I believe it was July 19.

17   Q.  2010?

18   A.  2010.

19   Q.  What was the purpose of that interview?

20   A.  It was to collect the further information that the bank was

21   requesting.

22           MR. DiMASE:  So let me ask Mr. Beer to again publish

23   page 2 of Government Exhibit 102E.

24   Q.  I'll also show you hard copies of Government Exhibit 102E

25   in evidence, which you're free to refer to.
```

1          What's the first question that Ms. Hayes wrote here on

2     page 2 of 102E?

3     A.   She asked, What type of company is AMER?

4     Q.   And based on your notes and the notes Ms. Hayes made of

5     your verbal communications with her, can you tell the jury what

6     Mr. Thiam told you in answer to that question?

7               MR. DELAKAS:   Objection, your Honor.

8               THE COURT:   Foundation.

9     BY MR. DiMASE:

10    Q.   You said that you had a meeting with Mr. Thiam on July 19,

11    2010, is that right?

12    A.   Yes.

13    Q.   Did you ask the questions that Ms. Hayes wanted you to ask

14    to Mr. Thiam?

15    A.   I did.

16    Q.   And drawing your attention to the first question, What type

17    of company is AMER, did you ask Mr. Thiam that question?

18    A.   I did.

19    Q.   What did he say?

20    A.   He said, he said that the company was involved in mining

21    natural resources, real estate as well as tourism and

22    consulting, and that they were purchasing assets in all of

23    those interests.

24    Q.   With respect to the second question, did you ask that

25    question to Mr. Thiam as well?

1    A.  I did.

2    Q.  What was the question?

3    A.  "What type of clients will he deal with?"

4    Q.  And the word "he" there, does that refer to Mr. Thiam?

5    A.  It refers to Mr. Thiam, yes.

6    Q.  During the meeting on July 19, what did Mr. Thiam say in

7    answer to that question?

8    A.  He explained that his clients will be institutional and

9    personal, international, both institutions as well as people.

10   Q.  Moving on to the third question, what was the third

11   question?

12   A.  Whether the company had been established.

13   Q.  And did you ask that question of Mr. Thiam?

14   A.  I did.

15   Q.  What did he say?

16   A.  He said that the company had been established, but he was

17   not affiliated with the company yet.

18   Q.  What was the fourth question?

19   A.  Fourth question was, Where is the location of the company?

20   Q.  Did you ask that question of Mr. Thiam as well?

21   A.  I did.

22   Q.  What did he tell you in response?

23   A.  That the location was headquartered in Dubai and New York,

24   but it was a multinational company.

25   Q.  The fifth question here appears to be crossed out, but what

1   was the question?

2   A.  What type of clients --

3              MR. DELAKAS:  Objection, your Honor.

4              THE COURT:  Overruled.

5   A.  "What type of clients will he deal with?"

6   Q.  And did you ask that question of Mr. Thiam as well?

7   A.  Yes, it was a duplicate of the previous question.

8   Q.  What information did you get in connection with that

9   question?

10  A.  That he'd be working with international -- international

11  individuals and institutions.

12  Q.  Drawing your attention to the fourth page of Government

13  Exhibit 102E, is there an answer --

14  A.  Yes.

15  Q.  -- that relates to that question in particular?

16  A.  Yes, that he'd be working with clients in the Middle East

17  and Africa about 90 percent.

18  Q.  Meaning that approximately 90 percent of the clients would

19  be in that region of the world?

20  A.  That's correct.

21  Q.  What was the sixth question?

22  A.  Sixth question was, What was the purpose of the account?

23  Q.  And what did Mr. Thiam say?

24  A.  He explained that New York would be his primary place of

25  residence, that the account would be largely operational for

H51Wthi4                          Damle - Direct

1   personal use and to pay bills.

2   Q.   What was the following question?

3   A.   The source of the funds, $300,000.

4   Q.   Now, did this refer to the $300,000 that had been wired in

5   from Hong Kong on June 29?

6   A.   June 9.

7   Q.   June 9?

8   A.   June 9.

9   Q.   I'm sorry.

10   A.   Yes.

11   Q.   And this meeting happened on July 19?

12   A.   Yes.

13   Q.   So those funds were already in the account at this point?

14   A.   They were.

15   Q.   And what did Mr. Thiam say about the source of that

16   $300,000?

17   A.   He explained that they were savings from past employment

18   and that he had sold land in Africa about three to four months

19   prior.

20   Q.   Meaning approximately three to four months before your

21   meeting with him that day?

22   A.   Correct.

23   Q.   What was the next question?

24   A.   The next question was, How long has he been banking with

25   HSBC in Hong Kong?

1   Q.  And what did Mr. Thiam say about that?

2   A.  That he'd been banking with HSBC in Hong Kong for roughly

3   18 months.

4   Q.  Let me turn back to the third question about AMER.  Did you

5   ask Mr. Thiam why he said at the first meeting that he was

6   chairman of AMER?

7   A.  I did.

8   Q.  What did he say?

9   A.  He explained that he would shortly be assuming the post as

10  chairman of AMER but that he was not presently.

11  Q.  Why did he explain he wasn't?

12  A.  He explained that he was currently the minister of mines in

13  Guinea and that as long as he held that position, he could not

14  hold the position of chairman of AMER.

15  Q.  Let me turn to the last question.  What was that question?

16  A.  "Is he the minister of mines in Guinea?"

17  Q.  Do you recall when during the meeting with Mr. Thiam on

18  July 19 you posed that question to him?  In other words, was it

19  early in the meeting, late in the meeting?

20  A.  I believe it was early in the meeting.

21  Q.  Why was that?

22  A.  Because it was contradictory to the information he had

23  given me at account opening.

24  Q.  Do you have a memory of that discussion?

25  A.  I believe so, yes.

1  Q.  What do you recall him saying?

2  A.  I recall him explaining that it would be a conflict of

3  interest for him to serve as both the chairman of AMER as well

4  as the minister of mines of Guinea; that he was in the process

5  of transitioning out of that role, and when the transition was

6  complete, he would assume the position of chairman of AMER.

7  Q.  Let me ask it another way.  When he came in on July 19, did

8  he volunteer without a question that he was the minister of

9  mines?

10 A.  No.

11 Q.  How did you find out he was?

12 A.  I explained to him that it had come to our attention that

13 he could possibly hold the position, and I explained to him the

14 bank needed to know exactly what his position was and whether

15 he was the minister of mines in Guinea.

16 Q.  What did he say in answer to that question?

17 A.  He said he -- he did say that, yes, he was in the minister

18 of mines and that he was in the process of transitioning out of

19 that role, but currently he was the minister of mines.

20 Q.  Did you ask him why he didn't talk about that at the first

21 meeting?

22 A.  I did ask for him to just clarify why he explained that

23 was the chairman of AMER, and he explained that he would be

24 assuming that role upon the transition out of his current

25 position.

1   Q.  As a result of his reporting in that July 19 meeting that

2   he was, in fact, the minister of mines, was his classification

3   changed in HSBC's systems?

4   A.  It was.

5   Q.  Explain that for the jury.

6   A.  From the previous slide we had seen where it asked if the

7   person was a politically exposed individual or special category

8   of client, we had to change that answer to yes, and we had to

9   fill out the additional paperwork.

10  Q.  Did you fill out that paperwork?

11  A.  No.

12          MR. DiMASE:  I'll ask you to look at 102G and ask

13  Mr. Beer to publish it to the jury.

14  Q.  What is that form?

15  A.  That's the special-category-of-client form.

16  Q.  And this is the paperwork that was required once you

17  learned that he was, in fact, the minister of mines?

18  A.  Yes.

19  Q.  And who filled this out?

20  A.  Ms. Hayes.

21  Q.  Were there any additional transfers of money into the

22  account after that second meeting with Mr. Thiam on July 19?

23  A.  Yes, there were.

24  Q.  I'm going to ask you to look at page 6 of Government

25  Exhibit 101.

1    A.  Yes.

2    Q.  When was that additional transfer?

3    A.  That came -- sorry.  That came in on July 26 of 2010.

4             MR. DiMASE:  I'd ask Mr. Beer to publish the sixth

5    page of Government Exhibit 101.  Mr. Beer, could you highlight

6    the transaction on, at the top of page July 26?  Do you have

7    that?

8    Q.  Where did those funds -- first of all, how much money was

9    it?

10   A.  It was $100,000.

11   Q.  Where did those funds originate from?

12   A.  They originated from HSBC Hong Kong.

13   Q.  How do you know that?

14   A.  The description states the global transfer with Hong Kong.

15   Q.  Is there a difference between a, quote, global transfer and

16   a standard wire transfer?

17   A.  There are differences, yes.

18   Q.  What is a global transfer?

19   A.  A global transfer refers to a transfer made within HSBC

20   systems between linked accounts in different countries.

21   Q.  And so it refers to a transfer of money from a Hong Kong,

22   HSBC account elsewhere in the world?

23   A.  Yes.

24   Q.  How does one go about initiating a global transfer of money

25   in the HSBC system, or at least how would one have done it in

1    2010?

2    A.  One would access their respective accounts in both

3    countries online and link the two through a system called HSBC

4    Global View.  Once that linkage has been established, they're

5    able to transfer funds between their accounts.

6    Q.  And you said that this came from Hong Kong.  Does that mean

7    from an HSBC account in Hong Kong?

8    A.  Yes.

9    Q.  Can you tell who was the beneficial owner of that account

10   in Hong Kong?

11   A.  It would only be able to -- it would only be possible to

12   come from the client's own account in the foreign country.  The

13   linkages can only be made between your own accounts.

14   Q.  So based on that, you can tell that this would have come

15   from a HSBC Hong Kong account that was owned by Mr. Thiam?

16   A.  Yes.

17   Q.  Were there any additional meetings which you attempted to

18   arrange with Mr. Thiam after the July 19 meeting?

19   A.  Yes.  At the time of the July 19 meeting, we had agreed to

20   meet the following week, I believe on the 26th, for a follow-up

21   meeting.

22   Q.  And what was the purpose of that follow-up meeting?

23   A.  The purpose of that meeting was for him, for me to

24   introduce him to our financial adviser partner to discuss

25   allocating some of the funds in the account and -- you know, in

1   different ways.

2   Q.   Were you attempting to seek investment of some of the money

3   at HSBC?

4   A.   Yes.

5   Q.   Was that part of your job at HSBC at the time?

6   A.   Yes.

7   Q.   What happened with respect to that meeting?

8   A.   Mr. Thiam never showed up for that meeting, so it was

9   canceled.

10  Q.   Did he, in fact, communicate with you and tell you he was

11  not going to be able to make it that day?

12  A.   Yes.  Yes, he did.

13  Q.   Do you know what ultimately happened with the two accounts,

14  the checking and the savings accounts, at HSBC's Madison Avenue

15  branch?

16  A.   Yes.  Eventually the decision was made to close those

17  accounts.

18  Q.   Were you yourself involved in the closing of the accounts?

19  A.   I was not involved in the decision.  I was involved in

20  communicating the fact that they were going to be closed.

21  Q.   How did you communicate with Mr. Thiam about that matter?

22  A.   There was initially a letter sent to Mr. Thiam indicating

23  that, and then I -- I communicated with him as -- to confirm

24  the fact that that was the decision made and to confirm what

25  would be done with the funds left in the account prior to

1    closure.

2    Q.  What did Mr. Thiam instruct you to do with the funds

3    remaining in the account?

4    A.  He wanted the funds transferred to another bank account.

5    Q.  Do you remember as you sit here today what account that

6    was?

7    A.  I believe that it was a account held at TD Bank in the

8    United States under, I believe, his wife's name.

9    Q.  I'll ask you to take a look at the eighth page of

10   Government Exhibit 101.

11            MR. DiMASE:  And I'll ask Mr. Beer to publish that

12   eighth page to the jury as well.  Mr. Beer, could you

13   highlight, or I'm sorry, expand the bottom of the page there,

14   transactions of 8/24 and 8/25, and could you highlight the 8/25

15   transaction.

16   Q.  Can you explain to the jury, Mr. Damle, the meaning of this

17   entry?

18   A.  Yes.  This is an entry in regards to an outgoing wire

19   transfer of $130,000 being sent to a beneficiary Fatim Sow

20   Thiam.

21   Q.  Was that a wire of that amount?

22   A.  Yes, it's a wire to TD Bank.

23   Q.  That was $150,000?

24   A.  130.

25   Q.  130,000, correct.

 1      Just a few final questions for you, Mr. Damle.  Early in

 2  your testimony, you mentioned a question you asked about the

 3  source of the $300,000 that was deposited into the account at

 4  HSBC New York.  Do you remember testifying about that?

 5  A.  Yes.

 6  Q.  And you said that you asked Mr. Thiam during the second

 7  meeting about the source of that money?

 8  A.  Yes.

 9  Q.  And I think you testified that he said it was from prior

10  employment earnings and the sale of land in Africa

11  approximately three or four months ago?

12  A.  Yes.

13  Q.  Did Mr. Thiam ever, in connection with that money and the

14  source of that money, ever mention a person named Sam Pa?

15  A.  No.

16  Q.  Did he ever mention a person named Lo Fung Hung?

17  A.  No.

18  Q.  Did he ever mention a person named Wang Xiang-Fei?

19  A.  No.

20  Q.  Did he ever mention a company called China International

21  Fund, or CIF?

22  A.  No.

23  Q.  Did he ever mention a company named China Sonangol?

24  A.  No.

25  Q.  Did he ever mention companies by the names of Gabon,

H51Wthi4                         Damle - Cross

1    Bellvue, or Upper Side Management?

2    A.  No.

3    Q.  Did he ever mention a person by the name of Baker Al-Sadi?

4    A.  No.

5    Q.  Did he ever say that the money that was transferred into

6    the HSBC New York account was the proceeds of a personal loan?

7    A.  No.

8         MR. DiMASE:  Nothing further, your Honor.

9    CROSS-EXAMINATION

10   BY MR. DELAKAS:

11   Q.  Good afternoon, Mr. Damle.

12   A.  Good afternoon.

13   Q.  Your position at the bank, at HSBC is basically to deal

14   with high-rank customers, is that correct?

15   A.  Yes.

16   Q.  Having a transfer of $300,000, is that uncommon?

17   A.  No.

18   Q.  Now, when you first initiated the conversation with

19   Mr. Thiam, you asked him for certain IDs, is that correct?

20   A.  Yes.

21   Q.  And he provided you?

22   A.  He provided me with the driver's license and passport.

23   Q.  What country was the passport from?

24   A.  It was the United States.

25   Q.  And the New York -- excuse me.  Let me rephrase that.

1      What other ID did he show you?

2      A.   New York State driver's license.

3      Q.   Do you remember the address on the driver's license, by any

4      chance?

5      A.   I believe it was the same address that was on the customer

6      identification file that we looked at.

7      Q.   OK.  After you collected all this information, you gave it

8      to Stacey Hayes, is that correct?

9      A.   Yes.

10     Q.   Did there come a time where she actually asked you to, she

11     needed you to investigate Mr. Thiam a little bit more?

12     A.   Yes.

13     Q.   And when did you do that originally?

14     A.   The first time I had the opportunity to do that was the

15     July 19 meeting.

16     Q.   'cause if you look at, I believe it was given to you, the

17     customer information file, that would be 102C and D -- do you

18     have it?

19     A.   I don't have a hard copy, but I believe I know what you're

20     talking about.

21     Q.   OK.  I'm going to give you Government Exhibit 102C and

22     102D.

23          THE COURT:  Counsel, maybe you could have an assistant

24     walk those documents for you.

25          MR. DELAKAS:  Sorry, your Honor.

1    A.  Yes, sir.

2    Q.  OK.  At 102C, that's the customer information file, is that

3    correct?

4    A.  Yes.

5    Q.  And the notes that are underneath, "rocks, precious

6    metals" --

7    A.  Yes.

8    Q.  -- is that your handwriting?

9    A.  No.  Ms. Hayes' handwriting.

10   Q.  Now, this document's dated on the top?

11   A.  June 8.

12   Q.  So there was information coming in of who Mr. Thiam might

13   have been?

14   A.  This was further information when Stacey asked me for

15   clarification on his, the nature of business is mining and

16   natural resources consulting, which I clarified for her.

17   Q.  So when -- the following day or few days later after the

18   initial meeting, Ms. Hayes wants more information, right?

19   A.  This was the following day, yes.

20   Q.  OK.  So the following day -- OK.  If you look at 102D,

21   there's some more information there?  That's the customer

22   information file.  There's more --

23   A.  102 --

24   Q.  No?

25   A.  D is the worksheet.

H51Wthi4                         Damle - Cross

1   Q.   102C?

2   A.   Yes.

3   Q.   OK.   There's some more written notes there, is that

4   correct?

5   A.   Yes.

6   Q.   So there's more information that you were able to obtain

7   for Ms. Hayes, is that correct?

8   A.   Yes, at account opening, from account opening.

9   Q.   OK.   There is a date there.   What does that date say?

10  A.   June 8.

11  Q.   No, no.   Down at the bottom, with the handwritten notes?

12  A.   June 10.

13  Q.   Do you know what that date signifies?

14  A.   I would say yeah.

15  Q.   And I believe you have 102F, is that correct.

16  A.   Yes.

17  Q.   The emails?

18  A.   Yes.

19  Q.   You're cc'd on a lot of these emails, is that correct?

20  A.   Yes.

21  Q.   Look at 102F.   There's an email on the second page, is that

22  correct?

23  A.   Yes.

24  Q.   This is dated what date?

25  A.   I believe that's June 14.

H51Wthi4                        Damle - Cross

1    Q.   The information in this email, I know that you didn't write

2    the email, but who wrote this email?

3    A.   I believe Ms. Hayes did.

4    Q.   And how did Ms. Hayes get this information?

5    A.   She obtained it from the account information I input and

6    spoke to her about at account opening.

7    Q.   As to the 7th, would that be correct?

8    A.   Yes.

9    Q.   Going forward, there's another meeting -- email, about two

10   pages later.

11   A.   Yes.

12   Q.   Again, I know you did not write this email, but who is this

13   email from?

14   A.   I believe it says from Nancy Pokriki.

15   Q.   And basically, who is that person?  Do you know that

16   person?

17   A.   I believe she worked in antimoney laundering compliance for

18   HSBC.

19   Q.   Would it be fair to say she's a person that needs more

20   information?

21   A.   I believe so.

22   Q.   And you would not deal with her, would you?

23   A.   Not directly, no.

24   Q.   Could you go to the next page?

25   A.   Yes.

H51Wthi4                            Damle - Cross

1    Q.  This email you're cc'd on, is that correct?

2    A.  Yes.

3    Q.  OK.  Now, do you recognize this email?

4    A.  Yes, I have.

5    Q.  OK.

6    A.  I've seen it.  Sorry.

7    Q.  Who is this email from?

8    A.  This is from Stacey.

9    Q.  OK.  To the compliance department, correct?

10   A.  Yes, I would say yes.

11   Q.  How did Stacey get this information?

12   A.  This information came from my second meeting with Mr. Thiam

13   on the 19th of July.

14   Q.  And if you go down to the second page -- excuse me.  I'm

15   sorry, the second part of the email, where it says Mahmoud

16   Thiam is the minister?

17   A.  Yes.

18   Q.  There was no other conversations prior to the 19th?

19   A.  Not that I recall.

20   Q.  Was there any telephone conversations?

21          MR. DiMASE:  Objection.

22          THE COURT:  Overruled.

23   A.  Not that I can really.

24   Q.  So your first conversation after the 6/7 opening of the

25   account, the next time that you spoke to Mr. Thiam was July 19,

H51Wthi4                        Damle - Cross

1   is that correct?

2   A.  No.  No, not in regards to this information.  I had spoken

3   with him prior.

4   Q.  OK.

5   A.  On servicing issues.

6   Q.  That's what I was getting at.

7   A.  OK.

8   Q.  So you had some information prior to July 19, is that

9   correct?

10  A.  I had conversations with him.

11  Q.  OK.  Would it be fair to say that when you approached

12  Mr. Thiam -- was this -- I'm sorry.  Was this a telephone or

13  was this an in-person meeting?

14  A.  Which, which meeting are you referring to?  I'm sorry.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H511thi5                         Damle - Cross

1    BY MR. DELAKAS:

2    Q.  The one before July 19th.

3    A.  I'm sorry.  I'm not understanding which meeting

4    specifically you're speaking about.

5    Q.  Okay.  I'll go back.

6            July 19th, you got some information that was the day

7    before this email was sent.

8    A.  Yes.

9    Q.  Then you testified that you met him before that to get some

10   more information.

11   A.  I did not meet him for that information.  I either

12   communicated via email or phone call.

13   Q.  Okay.  So it would be fair to say that after your initial

14   meeting of the opening of the account, you had another

15   conversation with him.

16   A.  I had communications with him, yes.

17   Q.  Communications.  Better word.  Now that communication was

18   because Ms. Hayes told you to reach out to Mr. Thiam?

19   A.  I can't recall if it was Ms. Hayes or a different part of

20   the bank that was asking me to reach out to him.  But I did

21   reach out to him.

22   Q.  And you needed to ask if he was a minister of mines.

23   A.  No.  That -- that conversation before July 19th was with

24   regards to the wire transfer to the Dalton School.

25   Q.  I don't think -- Let me rephrase the question.

1           When you had the initial conference with Mr. Thiam at

2    the bank, you gave your information file to Ms. Hayes.

3    A.  Correct.

4    Q.  Ms. Hayes then asked you to get some more information.

5    A.  Yes.

6    Q.  And from what you testified earlier, when I showed you

7    102-C -- that's the customer information file.

8    A.  Oh, yes, yes.

9    Q.  Okay.

10   A.  Sorry.

11   Q.  And there's some information where it's the American Middle

12   Eastern Resources.

13   A.  Yes.

14   Q.  And I asked you about a date earlier too, September 10th?

15   A.  Yes.

16   Q.  Okay.  And if you look on top of the customer information

17   file, you got a date of June 8th?

18   A.  8th, yes.

19   Q.  Okay.  So this information is more information that

20   Ms. Hayes needed to get from Mr. Thiam via you.

21   A.  Correct.  She wanted clarification of what was presented at

22   account opening.

23   Q.  Okay.  Now is it my understanding at the time, when this

24   incident then happened, that a lot of notes were taken

25   handwritten?

H511thi5                    Damle - Cross

1    A.  Yes.

2    Q.  It wasn't all computerized.

3    A.  Correct.

4    Q.  Okay.  So a lot of the notes that you would take, you would

5    have to transfer into emails, transfer into, you know, computer

6    system.

7    A.  Yes.

8    Q.  Okay.  If you look at 102-E, which are notes.

9    A.  Yes.

10   Q.  Okay.  Who wrote this?

11   A.  The questions are from Ms. Hayes.

12   Q.  Okay.  And this was given to you?

13   A.  From what I recall, yes.

14   Q.  Okay.  And what date is that?

15   A.  The date printed at the top is 6/24, June 24th.

16   Q.  So approximately, after you met him, approximately two,

17   three weeks later, you needed to get more information from

18   Ms. Hayes.

19   A.  Yes.

20   Q.  And the following page, you did get some more information.

21   A.  Yes.

22   Q.  Okay.  And what did he tell you in the information, that

23   what kind of company was he opening?

24   A.  That he was opening a company involved with mining, natural

25   resources, real estate, and tourism.

H511thi5                          Damle - Cross

1  Q.  But he could not be part of that company.

2  A.  Yes.

3  Q.  Why couldn't he be part of that company?

4  A.  Because he was currently the minister of mines in Guinea.

5  Q.  I believe you testified earlier that he might have

6  conflicts?

7  A.  Yes.

8  Q.  And do you know why he told you that?

9  A.  Excuse me?

10 Q.  Do you know why he told you that?

11 A.  I believe as an exclamation -- as an explanation --

12         MR. DiMASE:  Objection.

13         THE COURT:  Sustained.  Stricken.

14 Q.  I'll rephrase.  When he opened this account for AMER, did

15 he tell you what was the purpose?

16         MR. DiMASE:  Objection.

17         THE COURT:  Sustained.

18 Q.  What was the purpose of opening this account?

19 A.  The purpose was, it was to be a personal account to pay his

20 personal bills and expenses.

21 Q.  Now if he was -- we discussed earlier in -- excuse me.  Let

22 me rephrase that.

23         What is a politically exposed person?

24 A.  It's a person with political -- who's been appointed to a

25 political position or a position in a cabinet, that type of

1    thing.

2    Q.  And there's another scrutiny, a level when somebody is

3    considered a PEP.

4    A.  Yeah, it's enhanced due diligence that's required.

5    Q.  Okay.  Now did Mr. Thiam claim that he was opening this

6    account because of his position?

7    A.  No.

8    Q.  Did he need to?

9            THE COURT:  I'm sorry.  Did he need to what, counsel?

10   Do you want to make a complete question.

11           MR. DELAKAS:  Yes.

12   Q.  Did he need to identify himself to open this account as

13   being somebody that was politically exposed?

14   A.  He would -- he needed to explain what his job was, what

15   his -- yes, he would have had to explain that.

16   Q.  And his job was being chairman of AMER.

17   A.  That's what he told me.

18   Q.  And that company was not open yet.

19   A.  I honestly cannot recall whether it was open or not.  I

20   believe that it was -- or his explanation was that it was.

21   That was his position.

22   Q.  All right.  If you look at 102-E.  No. 3.  It's the

23   handwritten notes.

24   A.  "The company has been established.  Not affiliated with

25   company at this time."

1  Q.  Would it be fair to say that he was not a member yet?

2  A.  Yes, based on your conversation on July 19th, yes.

3  Q.  Okay.  So this was a July 19th conversation.

4  A.  Yes.

5  Q.  Okay.  Now these notes, I asked you earlier if they're

6  usually summed up and put in computer form or email form

7  because at that time, handwritten notes were common.

8  A.  Yes.

9  Q.  Then I refer you to 102-F.

10  A.  Yes.

11  Q.  Now basically in the bottom section, where Stacey's

12  reporting her findings --

13  A.  Yes.

14  Q.  -- this is all information that you got from Mr. Thiam, is

15  that correct?

16  A.  Yes.

17  Q.  This information that you had communication with and a

18  meeting on July 19th?

19  A.  Yes.

20  Q.  Okay.  Now you mentioned some transfers.

21  A.  Yes.

22  Q.  Okay.  Now if the account is put on alert or flagged, would

23  you take transfers?

24  A.  I believe so, but I can't speak specifically to what would

25  be allowed or not allowed.

H511thi5                         Damle - Cross

1    Q.  If you looked at the Government Exhibit 102-G, which is the

2    Special Category of Client --

3    A.  I don't have a hard copy, but okay, yeah.

4    Q.  Okay.  That was filled out by Ms. Hayes.

5    A.  Yes.

6            THE COURT:  So I think you've just been handed a hard

7    copy of a document.  Could you read the number.

8            THE WITNESS:  Yes.  Exhibit 102-G.

9    Q.  Now when was that document filled out; do you remember?  Or

10   does it refresh your recollection by looking at it?

11   A.  I don't remember the specific date.  I know it was after

12   our July 19th meeting, my meeting with Mr. Thiam.

13   Q.  Now the information that he was minister of mines happened

14   much earlier.

15           THE COURT:  What do you mean, counsel?  Can you

16   rephrase that question.  What information?

17   Q.  The information of him being minister of mines was found

18   out earlier than July 19th?

19   A.  It was brought --

20           MR. DiMASE:  Objection.

21   A.  -- to our attention that he might be the minister of mines,

22   and it was confirmed by Mr. Thiam on the 19th.

23   Q.  Okay.  Now when you fall into this category, there's a good

24   chance, in your experience, that the account might get closed,

25   is that correct?

1           MR. DiMASE:  Objection.

2           THE COURT:  Sustained as to form.

3   Q.  What happens when you're considered a special category of

4   client?

5   A.  There can be enhanced scrutiny with regards to transactions

6   within the account.

7   Q.  And ultimately if there's a danger, what happens?

8   A.  I've not had the instance in my career to know on a routine

9   basis what happens.  So I can't specifically clarify as to what

10  would constitute a closure or not, but it is -- it is given

11  enhanced scrutiny with regards to the transactions.

12  Q.  Was this account closed?

13  A.  Yes.

14  Q.  Okay.  Do you remember when that account was closed, off

15  the top of your head?

16  A.  Not off the top of my head.  I can't say the specific date.

17  I believe it was sometime in August.

18  Q.  From your recollection, were there any kind of other

19  notifications system beyond that his account would be closed?

20  A.  There was -- there was a letter sent out to him very soon

21  after our meeting on the 19th, initial notification that his

22  account was going to be closed.  That was -- the letter was

23  sent out before we had the meeting on the 19th, because it

24  had been so long since the information had been requested and

25  we had not heard back.  After we had the meeting, we kept the

H511thi5                        Damle - Cross

1    account open on the basis of the fact he had provided further

2    information.

3    Q.  When you say further information, I'm confused, because

4    there was information given on July 19th --

5    A.  Correct.

6    Q.  -- but you had some communication prior to that where some

7    other information was given to you.

8    A.  Not information with regards to the request from the bank.

9    It was information about the wire transfer to the Dalton

10   School.

11   Q.  And that was -- I'm sorry.  But when you were discussing --

12   when I showed you Exhibit 102-E and you said June 24th, do

13   you remember that?

14   A.  Yes, yes.

15   Q.  It was information that you needed to know.

16   A.  Yes.

17   Q.  And then that information you got before the 19th.

18   A.  No.  That information was given to me on the 19th.  From

19   the 24th -- June 24th it was requested.  On July 19th I

20   met with him and he provided the information.

21   Q.  Okay.  Understood.  Now when you're an HSBC bank and your

22   account is closed because of the SCC status --

23                MR. DiMASE:  Objection.

24                THE COURT:  Sustained.

25   Q.  His account was closed, was it not?

1    A.  Yes, it was closed.

2    Q.  And why was it closed?

3    A.  I -- I can't say why.  I mean, that I don't know.  The

4    decision was made over my head.

5    Q.  Okay.  Now when you are in that special scrutiny status, do

6    you scrutinize accounts that are related to that account?

7    A.  I don't understand the question.

8            MR. DiMASE:  Objection.

9    A.  Sorry.

10   Q.  Mr. Thiam had an account.

11   A.  Yes.

12   Q.  And how long did he have the account there?

13   A.  All told, about two -- little more than two months.

14   Q.  Okay.  But there was no relationship with that bank but

15   there was a relationship someplace else.

16   A.  A relationship with which bank?  I'm sorry.

17           MR. DiMASE:  Objection.

18           THE COURT:  Sustained.  Stricken.

19   Q.  Did Mr. Thiam have an account in Hong Kong?

20   A.  Yes.

21   Q.  And what bank was that?

22   A.  HSBC Hong Kong.

23   Q.  Okay.  And it's fair to say that both HSB Hong Kong and HSB

24   New York, US, have affiliations?

25   A.  Yes, within the same bank holding company.

H511thi5

1    Q.  Okay.  Now when this scrutiny happened, did you have any

2    information from the Hong Kong account?

3    A.  Not that I know of.  I mean, other than the fact that it

4    existed, I did not have any other information about his Hong

5    Kong account.

6    Q.  Now from your experience and your knowledge, when you

7    closed this account, does this account affect his other

8    accounts?

9    A.  I don't know.

10   Q.  All right.

11           THE COURT:  How much longer, counsel?

12           MR. DELAKAS:  Oh, not long.  Another five, ten

13   minutes, tops.

14           THE COURT:  Okay.  So we'll break for lunch.

15           Ladies and gentlemen, let Ms. Rojas know -- well, no.

16   2:00.  Don't discuss the case.  Thanks so much.

17           (Continued on next page)

18

19

20

21

22

23

24

25

H511thi5

```
 1              (Jury not present)

 2              THE COURT:  Mr. Kobre, anything else we need to

 3    discuss right now?

 4              MR. KOBRE:  No, your Honor.

 5              THE COURT:  Mr. Goldsmith?

 6              MR. GOLDSMITH:  No, your Honor.

 7              THE COURT:  Ms. Rojas mentioned that there is another

 8    French interpreter we'll be using in this trial, I understood

 9    from her, this afternoon.  Should I be qualifying that

10    interpreter now?

11              MR. GOLDSMITH:  He is not in the courtroom at the

12    moment, but when we have a chance, he can be qualified very

13    quickly.  He's on the interpreter's list.  He's from our

14    office.

15              THE COURT:  Wonderful.  Wonderful.  Thank you.

16              Have a nice lunch.

17              THE DEPUTY CLERK:  All rise.

18              (Luncheon recess)

19

20

21

22

23

24

25
```

H511thi5

|   |   |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | 2:00 p.m. |
| 3 | (In open court; jury not present) |
| 4 | THE COURT:  Counsel? |
| 5 | MR. GOLDSMITH:  Yes, your Honor.  A couple of issues |
| 6 | to raise. |
| 7 | First is that in this last witness, there was some |
| 8 | testimony about the bank's perceived conflict of interest |
| 9 | between an account holder being the minister of mines and |
| 10 | working in the mining sector, and I would suggest, and the |
| 11 | government has -- |
| 12 | THE COURT:  I don't think it was the bank's conflict |
| 13 | of interest; it was the defendant's conflict of interest. |
| 14 | MR. GOLDSMITH:  Well, it was the bank testifying that |
| 15 | that would have been a conflict of interest.  The bank |
| 16 | witnesses testified that would have been a conflict of |
| 17 | interest.  So I discussed it with the government.  They have no |
| 18 | objection that we think a limiting instruction to the jury at |
| 19 | the close of the witness is appropriate for them to understand |
| 20 | that the perceived conflict of interest from the bank is not |
| 21 | for them to consider in whether or not the elements have been |
| 22 | raised. |
| 23 | THE COURT:  I'm sorry.  The defendant's not here. |
| 24 | MR. GOLDSMITH:  I just realized it too. |
| 25 | THE COURT:  I'm sorry.  We'll just wait until the |

H511thi5

1    defendant is produced.

2           So, counsel.

3           MR. GOLDSMITH:  Yes.

4           THE COURT:  Now that the defendant has arrived, so

5    you're requesting what?

6           MR. GOLDSMITH:  I'm requesting a limiting instruction

7    from the Court at the close of the witness stating that the

8    conflict of interest, as testified by bank witnesses, is not

9    something for the jurors to speculate about in determining

10   whether or not the government has proved the elements of the

11   bribery and money laundering in this particular case.  I don't

12   want the jurors to be confused that somehow the bank conclusion

13   that a conflict of interest, which is not a crime --

14          THE COURT:  So I have to tell you, I really want to

15   look at the transcript here.  I'm not sure that this is a

16   correct recitation of the testimony that was given, and I don't

17   want to further confuse the jury about these issues.  Really

18   the last two witnesses reported, from their various vantage

19   points, that when the defendant opened his account, he did not

20   reveal he was the minister of mines; he instead talked about

21   being chairman of a company involved in mining.  When he was

22   later confronted with the fact that the bank had learned he was

23   the minister of mines, he admitted he was the minister of mines

24   and said he had not yet taken the position of being chairman

25   and expected to later in the fall.  That's at least what I

1    remember the testimony from the two witnesses, the bottom line

2    of it all, would be.  Who testified about it being a conflict;

3    I'd have to check whether or not that was actually what the

4    defendant reported saying when he was confronted in the second

5    meeting to explain that he couldn't take the position until the

6    fall as chairman of this mining company or consultancy in the

7    mining industry because for him to hold it at that point of

8    time while he was minister of mines would have represented a

9    conflict.  If I'm correctly remembering the testimony, there is

10   no limiting instruction to be given whatsoever and it's

11   entirely appropriate for the jury to consider it, as

12   consciousness of guilt, among other things.  Now I would have

13   liked to have reviewed the transcript if I'd known that this

14   issue was going to be raised, so I'm going to ask counsel to

15   review it and I'll give you another opportunity to be heard.

16            MR. GOLDSMITH:  Thank you.

17            THE COURT:  Next issue.

18            MR. GOLDSMITH:  Next issue is how the Court would

19   prefer scheduling for any legal arguments, as I presume the

20   government is nearing the end of its case, and the Court did

21   comment on Thursday that it did not wish to take up the time of

22   the jury.  So I wanted to know how we were going to proceed.

23            THE COURT:  Absolutely, counsel.  And if the

24   government rests before a break or before the moment we're

25   taking a break, sort of in the midst of our schedule with the

 1    jury in the courtroom, you can simply stand and say, "Your

 2    Honor, I have a motion," and I'll say, "I'll hear you at the

 3    next break."

 4                MR. GOLDSMITH:  All right.

 5                THE COURT:  Anything else?

 6                MR. GOLDSMITH:  Finally, Mr. Momo Sakho, who is the

 7    subject of the video teleconference motion --

 8                THE COURT:  Yes.

 9                MR. GOLDSMITH:  -- was actually able to obtain a visa

10    and is here and is prepared to testify in person.  The Court

11    had mentioned, in response to the letter addendum that I

12    provided, that it felt that there was a portion of it that

13    possibly reflected upon expert testimony, that being that

14    Mr. Sakho would testify or could testify that the 85/15 percent

15    split on the CIF deal was within the Guinean code of mining; it

16    was appropriate.  So before we got there, I would like to know

17    if the Court felt that that was expert conclusion, although I

18    would note that Mr. Sakho was the legal adviser to the

19    president on mining and was well experienced in government

20    about what would have been appropriate, especially considering

21    the fact that the government, in its direct examinations of

22    Mr. Camara and Mr. Sande, seemed to raise the issue of whether

23    these CIF deals were legal.

24                THE COURT:  Look, I can't put my hands right now on

25    the document you're referring to that had my markup.

H511thi5

1          Aha.  I have it.

2          You're referring to the April 23rd letter.  And it's

3   for the government to raise the issue.  I'm not going to object

4   if the government doesn't object.  If the government objects,

5   then I'll hear everybody.

6          MR. GOLDSMITH:  Very well.

7          THE COURT:  So this was originally presented as an

8   expert witness.  That was withdrawn.  Then he was offered as a

9   fact witness.  So --

10          MR. GOLDSMITH:  Well, I'm just trying to raise any

11   issues before they happen in furtherance of the Court's

12   directives.

13          THE COURT:  Thank you, thank you, Mr. Goldsmith.  I

14   appreciate that.  Okay.

15          MR. DiMASE:  Your Honor, of course we do intend to

16   object to that testimony, so I'm not sure if it's something the

17   Court wants to address before the witness is on the stand.  We

18   can address it now or we can simply make the objection at the

19   time the testimony is proffered.

20          THE COURT:  Okay.  Well, the jury's been ready for ten

21   minutes.  So let me understand.  When is the government

22   resting?

23          MR. KOBRE:  Right after this witness, your Honor.

24          THE COURT:  Okay.  And who is your first witness,

25   Mr. Goldsmith?

1          MR. GOLDSMITH:  Mr. Sakho.

2          THE COURT:  And how long will his testimony take, on

3     direct?

4          MR. GOLDSMITH:  I anticipate his direct will probably

5     be a half hour.

6          THE COURT:  Okay.  So we'll take a break at the end of

7     the -- well, we can't do that.  So the government will object

8     where it wishes to during the direct testimony, and if I don't

9     allow the testimony, we'll take a break after the end of the

10    direct, I'll rule on any objections, and if I permit the

11    testimony based on those rulings, then after the break, you'll

12    be able to complete the direct.

13         MR. GOLDSMITH:  Thank you.

14         THE COURT:  Good.  Good.  Good.  And by the way, I'm

15    sorry.  Is it Mr. Delakas?  I want to think that you had a

16    lovely weekend playing soccer and -- but I hope it's nothing

17    more serious.

18         MR. DELAKAS:  No, it's not anything serious, your

19    Honor.  Thank you.

20         THE COURT:  Good.  Thanks.

21         Bring in the jury.

22         (Continued on next page)

23

24

25

 1            (Jury present)

 2            THE COURT:  Ladies and gentlemen, I have a brief

 3    comment to make to you that's entirely unrelated to the

 4    witness' testimony, something I wanted to tell you earlier this

 5    morning.

 6            Earlier this morning, you saw some emails on a screen

 7    and some blacked-out portions.  I think it's pretty obvious to

 8    you that there was material that the parties had redacted and

 9    agreed to redact.  And that's customary, entirely ordinary.

10    Those passages from documents that are irrelevant to the record

11    need not be received into evidence and presented to you, and

12    you aren't to speculate whatsoever as to what material might

13    have been redacted.  That's the normal procedure in any trial.

14    Thank you so much.

15            Counsel.

16            MR. DELAKAS:  Thank you, your Honor.

17    CROSS EXAMINATION CONTINUED

18    BY MR. DELAKAS:

19    Q.  Mr. Damle, welcome back.

20    A.  Thank you.

21    Q.  I just have a few questions.

22            When Mr. Thiam came into the bank, he offered you the

23    IDs that we mentioned earlier.

24    A.  Yes.

25    Q.  And that information, you were able to produce a CIF, or

1    the customer information form.

2    A.  The IDs, I made copies of.  With the answers to my

3    questions, that's what I put into the CIF.

4    Q.  Okay.  And it would be fair to say that the CIF was dated

5    June 8th; do you remember?

6    A.  The information was input June 7th, but yes, the

7    printouts were dated June 8th.

8    Q.  Is it also fair to say that all the information that you

9    obtained after your initial meeting and the last email that was

10   on July 19th was offered by Mr. Thiam?

11   A.  Yes.

12   Q.  And as you know, his account was closed, is that correct?

13   A.  Yes.

14   Q.  Okay.  Now on the CIF there are questions there about being

15   a PEP, or politically exposed person?

16   A.  Yes.

17   Q.  And they were answered both no.

18   A.  Yes.

19   Q.  Okay.  And lastly, because his account was closed, other

20   than filing the SCC or the special category that Ms. Hayes --

21   on July 20th, there's no other reason to articulate that the

22   fact that this account was closed other than that.

23               MR. DiMASE:  Objection.

24               THE COURT:  Sustained.  You may lay a foundation.

25   Q.  Ms. Hayes filled out a SCC form, is that correct?

1    A.  Yes, she did.

2    Q.  And that happened on July 20th.

3    A.  I'm not sure what the date was.

4    Q.  But because of that investigation, do you know if the

5    account was closed based on that?

6    A.  I know that the account was closed.  I do not know what the

7    reason was for the closure.

8    Q.  Okay.  But prior to that, there would be no other reasons

9    to close that account.

10          MR. DiMASE:  Objection.

11          THE COURT:  Prior to what?

12          MR. DELAKAS:  I'm sorry, your Honor?

13          THE COURT:  I'm just trying to understand your

14   question.  Prior to what?

15          MR. DELAKAS:  Prior to that SCC filing that Ms. Hayes

16   did on July 20th.

17          MR. DiMASE:  Objection.

18          THE COURT:  Sustained.

19   BY MR. DELAKAS:

20   Q.  No other documents would lead for the closure of that

21   account, is that true?

22          MR. DiMASE:  Objection.

23          THE COURT:  Sustained.

24   Q.  Why was the account closed?

25   A.  I don't know.

1          MR. DELAKAS:  Okay.  Nothing further, your Honor.

2          THE COURT:  Thank you.

3          Redirect?

4          MR. DiMASE:  Very briefly, your Honor.

5    REDIRECT EXAMINATION

6    BY MR. DiMASE:

7    Q.  Mr. Damle, you've testified a little bit today about SCCs

8    and PEPs, or PEPs?

9    A.  Yes.

10   Q.  And again, what is a PEP?

11   A.  It's what's considered a politically exposed person.

12   Q.  What's an SCC?

13   A.  Special category of client.

14   Q.  Okay.  And is a PEP sort of a subcategory of an SCC?

15   A.  To my understanding, yes.

16   Q.  So SCCs are a broader group of people who -- why don't you

17   explain.  What's your understanding of the relationship between

18   the SCC category and the PEP category?

19   A.  So SCC, the special category of client, is a broad

20   terminology for clients who need to have their accounts and

21   transactions monitored on a close, more scrutinized basis.

22   There are different reasons that a client might fall into that

23   basis, one of which is that they are a politically exposed

24   person.

25   Q.  Okay.  And that's why you said that politically exposed

H511thi5

1   person is a subcategory of SCC.

2   A.  Yes.

3   Q.  And can a person who is an SCC maintain an open account --

4   A.  Yes.

5   Q.  -- at HSBC?

6   A.  Yes.

7   Q.  In fact, isn't the last initial of that acronym for the

8   word "client"?

9   A.  Yes.

10  Q.  And can PEPs also maintain open bank accounts at HSBC?

11  A.  Yes.

12  Q.  Is it fair to say that what you've testified about today is

13  that those accounts simply get a greater level of scrutiny due

14  to the categorization within these categories?

15  A.  That is correct.

16  Q.  But simply because you are a PEP or an SCC does not mean

17  your account is automatically closed, is that right?

18  A.  No.

19          MR. DELAKAS:  Objection, your Honor.

20          THE COURT:  Sustained.  Stricken.

21  Q.  And Mr. Damle, you were asked some questions about that

22  initial meeting with Mr. Thiam during your cross.

23  A.  Yes.

24  Q.  When you asked Mr. Thiam what his job was during that

25  initial meeting on June 7th, did Mr. Thiam say he was the

1    minister of mines?

2    A.   No.

3             MR. DiMASE:  Nothing further.

4             THE COURT:  Recross.

5             MR. DELAKAS:  Nothing further, your Honor.

6             THE COURT:  You may step down.

7             (Witness excused)

8             THE COURT:  Next witness.

9             MR. KOBRE:  The government rests, your Honor.

10            THE COURT:  Mr. Goldsmith.

11            MR. GOLDSMITH:  Your Honor, the defense would have a

12   motion for the Court.

13            THE COURT:  I'll take that at the next break.

14            MR. GOLDSMITH:  Very well.  Thank you.

15            At this time, your Honor, the defense would like to

16   mount a case before the Court.

17            THE COURT:  I'm sorry?  You have a witness to call?

18            MR. GOLDSMITH:  I do have a witness who is here and

19   available.  Defense would now call Momo Sakho.

20            We're retrieving him, your Honor.

21            THE COURT:  Thank you.  You may be seated,

22   Mr. Goldsmith.

23            I believe we have an interpreter to serve as an

24   interpreter between French and English today.  Is that true,

25   sir?

1              THE INTERPRETER:  Yes, your Honor.

2              THE COURT:  If you could please identify yourself for

3      the record.

4              THE INTERPRETER:  Yes.  My name is Emmanuel I. Orji.

5              THE COURT:  And Mr. Orji, how did you learn English?

6              THE INTERPRETER:  I learn English from primary school.

7      I'm from Nigeria originally.

8              THE COURT:  From?

9              THE INTERPRETER:  Nigeria.

10             THE COURT:  Thank you.  And is French your native

11     language?

12             THE INTERPRETER:  French is not my native language.

13             THE COURT:  How did you learn French?

14             THE INTERPRETER:  I started French in second grade

15     school, high school, and I went to school in Paris, France.

16             THE COURT:  And how long have you served as an

17     interpreter between English and French?

18             THE INTERPRETER:  In the United States, about ten

19     years.

20             THE COURT:  Thank you.

21             Counsel, is there any objection to finding Mr. Orji

22     qualified to serve as an interpreter between French and

23     English?

24             MR. DiMASE:  No, your Honor.

25             MR. GOLDSMITH:  No, your Honor.

1             THE COURT:  Thank you.  Please place the interpreter

2     under oath.

3             (Interpreter sworn)

4             (Witness sworn through interpreter)

5             MR. GOLDSMITH:  May I inquire?  Thank you.

6      MOMO SAKHO,

7         called as a witness by the Defendant,

8         having been duly sworn, testified as follows (through the

9         interpreter):

10    DIRECT EXAMINATION

11    BY MR. GOLDSMITH:

12    Q.  Mr. Momo, where do you live?

13    A.  In Guinea, Conakry.

14    Q.  How long have you lived there?

15    A.  I was born -- I was absent from Guinea for about 30

16    years -- 1972 to 2002.  I returned in 2002, and since then I

17    have lived in Guinea.

18    Q.  What do you do for a living?

19    A.  I am an attorney.

20    Q.  In Guinea?

21    A.  Yes, yes, in Guinea.  I'm an attorney in the Guinea bar.

22    Q.  Where did you receive your law degree from?

23    A.  I had a master's degree in juridical law.

24    Q.  From where?

25    A.  In Abidjan, Côte d'Ivoire.

1   Q.  And when did you receive that degree?

2   A.  1998.

3   Q.  In 2009 what was your occupation?

4   A.  In 2009 I was adviser to the president in charge of natural

5   resources, and development.

6   Q.  For the government of Guinea?

7          THE INTERPRETER:  I'm sorry?

8   Q.  Were you in that capacity for the government of Guinea?

9   A.  Yes.

10  Q.  Was that your first job in government for Guinea?

11  A.  No.

12  Q.  What other experience did you have before then with the

13  Guinean government?

14  A.  I was legal adviser for ministry of geology and mines from

15  2003 to 2008.

16  Q.  In 2008 did anything happen in regards to the Guinean

17  government?

18  A.  In December of 2008, the president passed away.  The

19  president of the republic died.  Then the military seized

20  power.  That was on the 22nd of December 2008.

21  Q.  What, if any, changes were made to the Guinean government

22  when the new regime took over at the end of 2008?

23  A.  I did not understand.

24  Q.  Could you describe the structure of the Guinean government

25  in 2009.

 1   A.  It was a classic structure.  When the military seized

 2   power, there was a shift of the military junta.  His name is

 3   captain Moussa Dadis Camara.

 4   Q.  Did people refer to him as Dadis?

 5   A.  Yes, Dadis.

 6   Q.  Okay.  Please continue to explain.

 7   A.  He formed his government, on January 15, 2009, naming a

 8   prime minister, Kabiné Komara.  There were other members of the

 9   government.  He constituted his cabinet, and on January 15th,

10   2009, at that time I was appointed adviser in charge of

11   resource, natural resources.

12   Q.  Were there any portions of the government that President

13   Dadis suspended when he took office?

14   A.  There were republic -- republican institutions were in

15   force, but the Constitution at that time was suspended.  The

16   function of the ministers, some of them, the previous

17   government were arrested at the time, and subsequently they

18   were relieved.

19   Q.  Could you describe the role that President Dadis played in

20   the government in 2009.

21   A.  There was no specific or particular role.  He took power.

22   The administration was functioning in a very difficult way.

23   Q.  What do you mean by that?

24   A.  The president was never presiding over the Council of

25   Ministers.  He worked only at night.  He doesn't work during

1     the day.  So he did not have the aptitude to lead a government.

2     There were young officers without any state experience.  So he

3     appointed a prime minister who was the head of government.

4     Q.  Who did he appoint?

5             THE INTERPRETER:  Sorry?

6     Q.  Who did he appoint as the prime minister?

7     A.  Mr. Kabiné Komara.

8     Q.  Did President Dadis appoint other ministers at the time?

9     A.  I did say that on January 15, he formed his government, and

10    all the ministers were appointed at that time.

11    Q.  Now how did -- withdrawn.

12            Please describe how President Dadis performed his job

13    as the president at the time.

14    A.  As I was just saying to you, he worked -- he worked at

15    night.

16    Q.  How would you characterize his behavior?

17            MR. DiMASE:  Objection.

18            THE COURT:  Sustained.

19    Q.  Please describe President Dadis' behavior when he was

20    working.

21    A.  He was very angry, very -- a little bit always easily

22    provoked.  He did not entertain contrary opinions,

23    contradictions.

24    Q.  What do you mean by he did not entertain contradictions?

25    A.  For example, we, the counselors, the advisers, he had

1   problem being able to submit to advices.  In previous

2   functions, because he was a military person, he was not used to

3   that.  We tried to guide him to explain different functions

4   people performed -- for example, diplomatic functions, military

5   functions, and the head of, you know, administration, civil,

6   civil administration.

7   Q.  Was that within your role as the presidential adviser?

8   A.  Yeah, as an adviser.  That is a college, a pool of

9   advisers.  There are advisers responsible for legal issues,

10  others function in the political and diplomatic area, we also

11  had advisers on economic, others responsible for natural

12  resources and development.  The totality of this group's work,

13  they work as a team.  Then their recommendations or advices on

14  how a president should carry out his duties were made together

15  by these various parties.  But we were unable to make him

16  understand the way we want him to work, but he functioned the

17  way he liked.  He always said that you -- that's we the

18  advisers -- that you cannot keep him in your own -- subject to

19  him to fulfill your own way, the way you function.  This

20  angered him so much that the second day, he arrested and

21  detained all the advisers except myself.

22          MR. DiMASE:  Objection.

23          THE COURT:  Yes.  I think we're traveling a little far

24  away from your question, Mr. Goldsmith.  We'll have the last

25  portion of this answer stricken.  Do you want to place another

1    question.

2                MR. GOLDSMITH:  Sure.

3    BY MR. GOLDSMITH:

4    Q.  So what would happen if an adviser like yourself advised

5    President Dadis about something that he did not agree with?

6                MR. DiMASE:  Objection.

7                THE COURT:  Sustained.

8    Q.  Did you ever have to advise the president on something that

9    he disagreed with your opinion on?

10               THE COURT:  That's a yes or a no.

11   A.  Yes.

12               THE COURT:  That's it then.

13   Q.  How did he react when you advised him in that way?

14   A.  Like I was just saying, he liked to work the way he feels

15   like.  He doesn't submit to advice, he doesn't submit -- he

16   doesn't like to be put in a box.  He does whatever he likes.

17   Q.  Did that appear to be the same for all advisers?

18               MR. DiMASE:  Objection.

19               THE COURT:  Sustained.

20   Q.  Did you see him behave that way toward other advisers?

21               THE COURT:  That's a yes or a no.

22   A.  No, I never saw him.

23   Q.  Are you familiar with who Boubacar Barry is?

24   A.  Yes, he was government minister.

25   Q.  Do you recall what his role was in 2009?

1  A.  He was the minister of state.  He was responsible for

2  organization, urbanization.

3  Q.  What do you mean when he was a minister of state for the

4  organization?

5  A.  The structure of government at the time, there was a prime

6  minister in the hierarchy, minister of state, ordinary

7  ministers, and secretaries of state.

8  Q.  So minister of state is higher in power than a ordinary

9  minister.

10  A.  Yes.

11  Q.  Was a minister of mines a minister of the state or ordinary

12  minister in 2009?

13  A.  Ordinary minister.

14  Q.  And were there particular ministers that President Dadis

15  respected more than others?

16         MR. DiMASE:  Objection.

17         THE COURT:  Sustained.

18  Q.  Are you aware of whether President Dadis respected the

19  opinions of certain ministers over others?

20         MR. DiMASE:  Objection.

21         THE COURT:  Sustained.

22  Q.  Did President Dadis treat certain ministers better than

23  others?

24         MR. DiMASE:  Objection.

25         THE COURT:  Sustained.

1  Q.  Other than being a minister of state, did Boubacar Barry

2  have any other responsibilities in 2009?

3  A.  He presided over an entire ministerial commission in charge

4  of projects.

5  Q.  Do you know why Boubacar Barry was chosen as that position?

6          MR. DiMASE:  Objection.

7          THE COURT:  That's a yes or a no.  Overruled.

8  A.  In his function as minister of state or the work he does

9  within the commission?

10  Q.  Within the commission.

11         THE COURT:  Why don't you make that a complete

12  question then.

13         MR. GOLDSMITH:  Sure.

14  Q.  Do you know why Boubacar Barry was placed in the position

15  of being in charge of the individual commissions?

16         THE COURT:  That's a yes or a no.

17  A.  Yes, I know.

18  Q.  What do you know?

19  A.  He was a very personal friend of Dadis, who grew up with

20  him from infancy, so he is a man he had confidence in.

21  Q.  Within your role as the legal adviser to the minister of

22  mines and the adviser to the president regarding resources and

23  geology, are you familiar with how mining deals were structured

24  with Guinea?

25  A.  Concerning the functioning of government, of the

1    administration --

2                MR. DiMASE:  Objection.

3                THE COURT:  Overruled.

4    A.   When I was both the adviser to the mines minister and to

5    the presidency, we functioned as a community, as a college.

6    That is, we have interministerial commissions, and this is

7    where -- the decisions I made.  So it's like a group making

8    decisions and recommendations.

9    Q.   Did you see projects created between the government of

10   Guinea and private companies to develop natural resources?

11   A.   Yes, of course.

12   Q.   Did you see more than one such an organization?

13   A.   Yes.

14   Q.   Did you see projects that allowed the Guinean government to

15   own a portion of those projects?

16               MR. DiMASE:  Objection.

17               THE COURT:  Overruled.  Just a yes or a no.

18               THE INTERPRETER:  Can you repeat the question, please.

19               MR. GOLDSMITH:  Sorry.  Could I have an answer?

20               THE INTERPRETER:  Repeat the question.

21               MR. GOLDSMITH:  Sure.

22   BY MR. GOLDSMITH:

23   Q.   Did you see any deals that allowed the Guinean government

24   to own and control a portion of the projects?

25   A.   Yes, I saw such projects.

H511thi5                                    Sakho - Direct

1   Q.  And did you witness those projects that allowed the Guinean

2   government to have a minority or small share of the projects?

3   A.  It went like weak participation of the state, less

4   participation of the state.

5   Q.  So have you seen joint projects between the Guinean

6   government and a private entity where the Guinean government

7   would hold as little as 15 percent ownership?

8            MR. DiMASE:  Objection.

9            THE COURT:  Sustained.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   BY MR. GOLDSMITH:

 2   Q.  Within your role as the legal adviser to the minister of

 3   mines and to the president, were you familiar with the laws in

 4   Guinea regarding mining projects?

 5            THE COURT:  That's a yes or a no.

 6   A.  Yes.

 7   Q.  And within that experience, would it be improper for the

 8   Guinean government to only own 15 percent of a mining project?

 9            MR. DiMASE:  Objection.

10            THE COURT:  Sustained.

11   Q.  Would it be improper in 2009 for the Guinean government --

12   withdrawn.  Let me rephrase.

13            Under the laws that were in existence in 2009, would

14   it have been improper for the Guinean government to only own 15

15   percent of a mining project?

16            MR. DiMASE:  Objection.

17            THE COURT:  Sustained.

18   Q.  Within the years that you were working as the legal adviser

19   to both the minister of mines and to the president, what were

20   the normal percentage ratios of ownership that you saw in the

21   deals that were joint projects --

22            MR. DiMASE:  Objection.

23   Q.  -- between the government and industry of mining?

24            THE COURT:  Overruled.

25   A.  According to the tradition, the usage and practice of

1    Guinea government --

2              MR. DiMASE:  Objection, your Honor.

3              THE COURT:  Please don't interrupt the witness's

4    answer.

5    A.  The government of Guinea has always had a minority

6    participation in all deals with people, with other people.  The

7    mining codes in force at the time provided for 15 percent of

8    participation by the state of Guinea.  When they got in the

9    stage of exploring, exploration, the government of Guinea has

10   always had very low, 15 percent, when they got in the

11   exploration of gold, diamond and other minerals.  There is no

12   participation in the other solid minerals, like bauxite, iron,

13   uranium; there's no right of participation by the states under

14   the code of 1915 -- 1995.

15   Q.  And that was the applicable code in 2009?

16   A.  Yes.

17   Q.  Did you know Mr. Thiam in 2009?

18   A.  Yes.  I knew him as a member of government.

19   Q.  What was his role in government in 2009?

20   A.  He was minister of mines, geology and hydro -- and energy,

21   and hydraulic.

22             MR. GOLDSMITH:  No further questions.

23             THE COURT:  Cross-examination.

24             MR. DiMASE:  Thank you, your Honor.

25   CROSS-EXAMINATION

H51Wthi6                              Sakho - Cross

```
 1   BY MR. DiMASE:
 2   Q.  Good afternoon, Mr. Sakho.
 3   A.  Good afternoon.
 4   Q.  I'd like to ask you some yes-or-no questions about some of
 5   the things you testified on direct.  So you began by testifying
 6   about President Dadis, is that right?  You began your direct
 7   testimony speaking about President Dadis, is that correct?
 8   A.  Yes.
 9   Q.  And you indicated that he had little prior governing
10   experience, am I right?
11   A.  Yes.
12   Q.  He was really a military man, correct?
13   A.  Yes.
14   Q.  And he wanted to bring in people who had some experience in
15   various different fields to his government, correct?
16   A.  Yes.
17   Q.  Have you heard of the term "technocrat"?
18   A.  Yes, I know, I heard it.
19   Q.  And the idea of that term is somebody who has particular
20   experience and background in an area, correct?
21              MR. GOLDSMITH:  Objection.
22              THE COURT:  Overruled.
23   A.  Yes.
24   Q.  And, in other words, to bring somebody with that kind of
25   experience into government, that would be a technocrat?
```

1    A.  Yes.

2    Q.  And Mr. Thiam was brought on by President Dadis as the

3    minister of mines, right?

4    A.  Yes.

5    Q.  And you have some familiarity with Mr. Thiam's background,

6    right?

7    A.  Yes, I -- I learn of it.

8    Q.  And so back in 2009, when he was appointed, you were aware

9    that he had experience in the area of negotiating agreements,

10   correct?

11   A.  Yes.

12   Q.  He had been involved in the banking sector, correct?

13   A.  Yes.

14   Q.  And in that work, he also had some experience with the

15   natural resource sector, correct?

16   A.  I cannot affirm this one.

17   Q.  Fair enough, but you knew -- you did know that he had

18   experience in drafting and negotiating agreements in his prior

19   work as, in the banking sector?

20   A.  Yes.

21   Q.  And in fact, President Dadis appointed Mr. Thiam to the

22   minister of mines position in part because of his prior

23   experience, right?

24   A.  Yes.

25   Q.  And I think you talked on direct examination about the

1    various different levels of ministers in the Guinean government

2    at the time, correct?

3    A.  Yes.

4    Q.  And you mentioned people who were, quote, ministers of

5    state, right?

6    A.  Yes.  One other one.

7    Q.  Only one, and that was Mr. Barry, as you testified?

8    A.  Yes.

9    Q.  And wasn't there another category of minister called

10   minister at the presidency?

11   A.  Yes.  Minister counselors, yes.

12   Q.  Well, specifically a title of minister at the presidency.

13   Are you familiar with that term?

14   A.  Yes, now.  Yes, now.

15   Q.  Well, back in 2009, isn't it accurate that even then there

16   were also ministers at the presidency?

17   A.  Yes, that is -- yes.  Yes, minister at president's, yes.

18   Q.  That's a different category of minister than your ordinary

19   minister, correct?

20   A.  No.  Just the -- will you let me explain a little?

21   Q.  Well, let me ask you, sir, were there ministers that were

22   not ministers at the presidency?

23   A.  Yes.

24   Q.  And then some were ministers at the presidency, correct?

25   A.  Yes.

1    Q.  And then you said that Minister Barry was the minister of

2    state, right?

3    A.  This is, he's connected.  It was like, yes, he was also

4    minister of state and then at the presidency.

5    Q.  So Minister Barry was minister of state at the presidency?

6    A.  These are ministers attached to the presidency, just like

7    the minister of mining and natural resources, minister of

8    economics and finance, just ministers connected to the

9    presidency and also the minister for defense, at the time.

10   Q.  OK.  And you just named some of the very most important

11   ministries in the country of Guinea, is that right?

12           MR. GOLDSMITH:  Objection.

13           THE COURT:  Overruled.

14   A.  At the time.

15   Q.  Defense, finance, mines, etc.?

16   A.  Yes.

17   Q.  So ministers who are ministers at the presidency hold

18   ministry positions that are especially important, right?

19   A.  Yes, just like I've said, it is attached to it for, to be

20   able to control how the function of the department, direct

21   control by the presidency.

22   Q.  Let's talk about that.  Mr. Thiam headed the ministry of

23   mines, correct?

24   A.  Yes.

25   Q.  And in that position, he oversaw Guinea's mining sector,

1   right?

2   A.   In the mineral -- in the mining sector, it is the highest,

3   highest -- that's a lady, secretary of state responsible for

4   energy and hydraulic.  There was minister of mines, geology,

5   hydraulic and energy.  There was secretary of state, energy and

6   hydraulic.

7   Q.   Well, at the time, Mr. Thiam was the minister at the

8   presidency in charge of mines and energy, correct, in 2009?

9   A.   Yes.

10  Q.   And as I said, in that position, he oversaw the mining

11  sector in Guinea, right?

12  A.   Yes.

13  Q.   And he, in fact, was appointed to a commission by President

14  Dadis in 2009, right?

15  A.   Will you permit me?

16          THE COURT:  Excuse me.  Excuse me.  If you can fairly

17  answer a question yes or no, you must answer yes or no.

18  A.   Yes, yes.

19  Q.   Let me be more specific, Mr. Sakho, to avoid confusion.

20  Mr. Thiam was appointed to a commission to negotiate with CIF,

21  a Chinese company, in 2009, correct?

22  A.   No, he was not at the head of the commission.

23  Q.   Sir, my question is, isn't it true that he was appointed to

24  serve on the commission to negotiate with CIF?

25  A.   Yes.

1    Q.  And he traveled to Singapore or to Asia in order to

2    negotiate on behalf of the Guinean government, correct?

3    A.  This I do not know.

4    Q.  So you have no knowledge of his negotiations with the

5    Chinese companies in Asia, correct?

6    A.  I'm not aware.

7    Q.  And you have, you are not aware of any agreement that they

8    negotiated while -- withdrawn.

9            You were not aware of any agreement that Mr. Thiam was

10   involved in negotiating on that trip to Asia in 2009?

11   A.  I know that he took part in the negotiation with CIF, but

12   that was in Guinea.

13   Q.  You're not aware of any negotiations conducted by Mr. Thiam

14   in Asia with CIF?

15   A.  No.

16   Q.  Just very briefly, you mentioned -- withdrawn.

17           And Mr. Sakho, is it fair to say you had no

18   involvement at all in negotiating the agreements with CIF in

19   2009?

20   A.  Me, I did not play any role in the negotiations.

21   Q.  And you don't really know exactly what role Mr. Thiam

22   played in those negotiations either, correct?

23   A.  No.

24           MR. DiMASE:  No further questions.

25           THE COURT:  Redirect.

             MR. GOLDSMITH:  Brief, your Honor.  Thank you.

REDIRECT EXAMINATION

BY MR. GOLDSMITH:

Q.  Do you remember being asked some questions by the

government attorneys, on cross-examination now, about the

differences between state and presidential ministers?

A.  Yes.

Q.  Could you explain what the difference is?

A.  Ministers at presidency are always responsible for specific

functions.  They have connection to the presidency.  That is

done because of a simple objective; that is, the force of that

is direct control and supervision by the president.  That is

why the minister, ministry for economics and finance directly

linked to the presidency; the natural resources and mines also

were linked to the presidency; defense issues, the minister of

defense was also directly linked to the presidency.

Q.  When you say directly linked to the presidency, could you

explain that?

A.  Administrative and directive, what that meant was that the

president could directly instruct the ministers to do what he

wanted done.  It depends that he is directly responsible.  For

example, the prime minister, in this, in this, in that

circumstance, the instructions of the president has more effect

on them -- that is, this group of ministers who are attached to

him -- than instructions from the prime minister.

1    Q.   Was that the case in 2009?

2    A.   Yes.

3    Q.   Now, you also had questions on cross-examination about

4    whether the defendant oversaw mines as the minister of mines?

5    A.   Yes.

6    Q.   Who had more control over mining and geology, the minister

7    of mines or the president, in 2009?

8    A.   The minister is in charge of his department, with what

9    happens, what concerns ongoing management, administration.  But

10   if the president has some specific interest, he gives

11   instruction.  Since the ministry or ministers are directly

12   related to the president, he gives direct instruction without

13   going through, passing through the prime minister.

14   Q.   Now, within your role -- withdrawn.

15            You were asked several questions about specific

16   committees regarding mining and CIF in 2009.  Do you recall who

17   was in charge of the CIF committee in 2009?

18   A.   It was, it was the minister of state, Boubacar Barry, who

19   was also at the head of the ministry, the commission.

20   Q.   You were asked a number of questions on cross about the

21   hierarchy of ministers in 2009.

22   A.   Yes.

23   Q.   In 2009, who, if anyone, was more powerful than Minister

24   Barry?

25            MR. DiMASE:   Objection.

1           THE COURT:  Overruled.

2   A.   The minister of defense, the general, General Konaté, the

3   military.  He's a personal friend, just like Barry, who was

4   also a personal friend of the president.  He was very

5   influential, also as the minister of defense and the

6   commission.

7           MR. GOLDSMITH:  I have no further questions.

8           MR. DiMASE:  Nothing further, your Honor.

9           THE COURT:  You may step down.

10          (Witness excused)

11          THE COURT:  Next witness.

12          MR. GOLDSMITH:  Your Honor, at this time we call the

13  defendant, Mahmoud Thiam.

14          THE COURT:  You know what?  Ladies and gentlemen,

15  we're going to take a break.  We're going to take our afternoon

16  recess.  Would everyone please be seated.  Thank you.

17          Ladies and gentlemen, let Ms. Rojas know when you're

18  ready to resume.

19          (Continued on next page)

20

21

22

23

24

25

1                    (In open court; jury not present)

2                    THE COURT:  Mr. Goldsmith, did you have a motion?

3                    MR. GOLDSMITH:  Yes, your Honor.  I would move,

4       pursuant to Rule 29, for the indictment to be dismissed against

5       Mahmoud Thiam as the government failed, even in the light most

6       favorable to the government, to raise evidence before the jury

7       that would have proven, beyond a reasonable doubt to any

8       reasonable juror, all of the necessary elements of the offense.

9                    In this particular case, the government has raised

10      evidence of certain payments that were made to a Hong Kong bank

11      account that he established in 2009.  The government has

12      established that the defendant was the minister of mines who

13      was engaged in some degree in negotiating a deal with Chinese

14      conglomerates known as CIF and Sonangol.  However, the

15      defendant is charged in this case, in the United States of

16      America, with laundering the proceeds of a bribe, which means

17      that the foundational elements of those offenses of the two

18      counts in the indictment require the government to prove beyond

19      a reasonable doubt that there was a bribe.

20                   The government did not elicit any testimony from a

21      fact witness that could have attested as to whether or not, in

22      fact, those payments were bribes.  Given that significant

23      vacuum of evidence, the evidence and testimony that was

24      presented at trial is, at best, circumstantial but most likely

25      is only speculative, and under those standards, even a

1    reasonable juror would not be permitted to speculate as to the

2    purpose of those payments, and accordingly, the government has

3    failed to meet the elements necessary to prove both Counts One

4    and Two.

5            THE COURT:  Thank you.  Your motion is denied.

6            Are there any other issues that we should raise during

7    the break?  Does the government have any issue?

8            MR. KOBRE:  Your Honor, I think we do have one.  One

9    is just one that we discussed before trial, which is with

10   respect to the benefits of the deal with CIF, and I think the

11   Court had resolved that issue with respect to other potential

12   witness testimony but left the possibility that there might be

13   a little bit more leeway granted to defendant, and I think it

14   would be helpful to get guidance from the Court.  I think if I

15   understood the discussion earlier, testimony regarding the

16   actual benefits that accrued to the Republic of Guinea after

17   the deal was entered into, I think it was agreed, would not be,

18   the defendant would not be permitted to testify about that.  I

19   think the one issue that was sort of left unresolved was

20   whether the defendant could testify about what he believed the

21   benefits would be to the Republic of Guinea.

22           THE COURT:  I don't think I gave any ruling with

23   respect to the scope of the defendant's testimony at all on any

24   point.  I reserved that explicitly.  I did draw lines with

25   respect to other witness testimony, so that's one issue to

H51Wthi6

1    address.

2              Mr. Goldsmith, did you have an issue?

3              MR. GOLDSMITH:  The government provided a letter to

4    the Court, dated April 5 of 2017, which was the government's de

5    facto 404(b) application.  It does not include any particulars

6    other than that it may seek to introduce evidence "regarding a

7    scheme to grant mining license and permits to a company Thiam

8    had a an interest in named Almara Group Ltd.

9              THE COURT:  Do I have a copy of that, or is that a

10   letter that was submitted to defense counsel?

11             MR. GOLDSMITH:  This was -- I'm sorry.  You're

12   correct, I believe.  This was submitted directly to me by

13   email.  This was not ECF; I thought it was.  My mistake.

14             THE COURT:  That's OK.  I just don't know.  It's not

15   sounding very familiar.

16             MR. GOLDSMITH:  Right.

17             THE COURT:  Your application with respect to the

18   404(b) letter?

19             MR. GOLDSMITH:  Without having any further information

20   as to what the government intends to seek to introduce, I would

21   seek that it be denied in its entirety.

22             THE COURT:  I don't have the letter.  Are you asking

23   something with respect to the scope of the cross of your

24   witness or with respect to a rebuttal case?

25             MR. GOLDSMITH:  Well, I think, frankly, we should

H51Wthi6

```
 1   probably have a little more information from the government

 2   before I make a decision as to any application on the 404(b).

 3            THE COURT:  Have you asked the government for more

 4   information?

 5            MR. GOLDSMITH:  No, I have not the time.

 6            THE COURT:  I'm sorry?

 7            MR. GOLDSMITH:  No, I have not had the occasion.

 8            THE COURT:  OK.  Well, I don't have an application on

 9   that then.

10            MR. GOLDSMITH:  Right.

11            THE COURT:  Great.  Any other issue before I address

12   the benefits of the deal?

13            MR. GOLDSMITH:  No other issues.

14            THE COURT:  OK.  Good.  Let's return to the one issue

15   the government has identified, and that is the scope of the

16   defendant's testimony with respect to the benefits that Guinea

17   was expected to or did receive from the CIF shareholders

18   agreement.  Let me ask you first, Mr. Goldsmith, are you

19   planning to inquire of your client on direct examination, in

20   his judgment, after the fact, whether Guinea did or did not

21   benefit from the shareholders agreement?

22            MR. GOLDSMITH:  I'm not going to address any questions

23   about after the fact.

24            THE COURT:  OK.  Is the government objecting to the

25   defendant testifying on his direct examination to his beliefs
```

1    and expectations as to how Guinea would benefit from entering

2    into the shareholder agreement?

3           MR. KOBRE:  Your Honor, not with respect to his

4    beliefs at the time.

5           THE COURT:  That's right.  OK.  As far as I understand

6    it, there is no dispute here.  I'll let counsel just pin that

7    down during our break, but it sounds like the government's not

8    objecting to any testimony from the defendant as to his

9    mind-set in 2009, at the time of the negotiations, up until the

10   time that the shareholder agreement was signed or approved and

11   executed as to the benefits that Guinea would achieve through

12   execution of the shareholder agreement.

13          Good.  Thank you.  We'll take a break.  Ms. Rojas will

14   let us know when you're ready to resume.

15          MR. DiMASE:  Your Honor, I do have one other, very

16   brief issue.

17          THE COURT:  Yes.

18          MR. DiMASE:  I take it the Court has already

19   essentially ruled on this, but the government would renew its

20   objection to testimony about the dictates of the Guinean mining

21   code, as testified about through Mr. Sakho.  It seems really

22   clear that that was more in the nature of expert testimony and

23   not lay witness testimony.  There was much discussion prior to

24   the outset of the trial regarding whether Mr. Sakho would be

25   qualified as an expert, whether his testimony was being offered

1    as expert testimony.  Mr. Goldsmith clearly stated, prior to

2    the beginning of the case, that he was withdrawing any expert

3    notice and not seeking to call Mr. Sakho as an expert, and I

4    think even though the question that was posed to Mr. Sakho,

5    which ultimately led to an answer about percentages and Guinean

6    mining law, may not have been intended to elicit that response,

7    it nonetheless did, and I think it's fair to characterize that

8    testimony as really expert testimony, impermissible given the

9    lack of notice and the decision by Mr. Goldsmith before the

10   beginning of this trial to withdraw any intention of calling an

11   expert witness.

12          THE COURT:  I think you're right, counsel, that the

13   question that Mr. Goldsmith put to the witness did not actually

14   necessarily call for the answer, the extended answer, that was

15   given.  That said, I'm denying your motion to strike.

16          Now, the 15 percent number, to the extent it's a

17   description of Guinean law, can't come through this witness or

18   any other witness, whether there was expert notice or not.

19   It's for the Court to instruct as a matter of law what Guinean

20   law requires, and if counsel wish to have me include something

21   in the charge with respect to that, that's fine with me.  Come

22   up with some proposed language, discuss it with each other.

23   But in context, I think the testimony was actually pretty

24   inscrutable.  It wasn't clear to me whether that witness was

25   saying there was a 15 percent minimum required by the law that

H51Wthi6

1   no agreement could go below, or whatever, and in the context of

2   the whole answer, I don't think it's necessary for me to strike

3   it.  But if you want a limiting instruction as part of the jury

4   charge, I'll be happy to consider it.  Just draft it and show

5   it to your adversary.

6            Thank you.  Take a brief recess.

7            (Recess)

8            MR. GOLDSMITH:  Your Honor, could we have Mr. Thiam

9   take the stand, or do we need to wait for the government?

10           THE COURT:  Yes.  We're certainly not going to bring

11  in the jury until we've all reassembled.

12           Please be seated.  Bring in the jury.

13           MR. GOLDSMITH:  Your Honor, should the defendant take

14  the stand first or after?

15           THE COURT:  Afterwards.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Mr. Goldsmith, again, I believe you were

3     about to call the witness.

4          MR. GOLDSMITH:  Yes, your Honor.  We were about to

5     call the defendant, Mahmoud Thiam, to the stand.

6      MAHMOUD THIAM,

7          the defendant herein, called as a witness on his own

8          behalf, having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. GOLDSMITH:

11    Q.  Mr. Thiam, where do you live?

12    A.  I live 170 East End Avenue, New York.

13    Q.  Could you bring that microphone just a little bit closer to

14    you.  Very good.

15          How long have you lived in New York?

16    A.  New York City, since 1992.

17    Q.  Where did you live prior to that?

18    A.  I lived in Ithaca, New York, upstate.

19    Q.  Are you a United States citizen?

20    A.  Yes, I am.

21    Q.  Where were you born?

22    A.  I was born in Guinea, Conakry.

23    Q.  How long did you live in Guinea after your birth?

24    A.  I lived in Guinea for the first five years of my life.

25    Q.  Where did you go at the age of five?

H51Wthi6                          Thiam - Direct

1    A.   Age five I went into exile, first in Ethiopia and then in

2    France and Belgium, and I lived in a few countries in between.

3    Q.   Why were you in exile?

4    A.   I was in exile, like about 2 million other Guinean

5    citizens, because there was a fairly brutal Communist

6    dictatorship at the time, and they killed most of my family and

7    I had to be smuggled out of the country to save my life.

8    Q.   When did you return to -- withdrawn.

9                When did you first come to the United States?

10   A.   1987.

11   Q.   How old were you?

12   A.   I was in my late teen, maybe 20.

13   Q.   What did you do when you first came to the United States?

14   A.   I first went to the Washington, D.C. area, where I took

15   classes of English as a foreign language to improve my English

16   before I could start college-level classes.

17   Q.   What did you do to support yourself during that time?

18   A.   Well, at that time the student visas did not allow a holder

19   of a student visa to hold a job, so I relied on my family, my

20   uncle who raised me, to provide me with financial help in the

21   beginning.

22   Q.   Where did you live in 1987?

23   A.   In 1987, I lived at a relative's house in, in part of

24   Maryland, in the suburbs of Washington, D.C.

25   Q.   What, if anything, did you do after you completed those

1    English-as-a-second-language courses?

2    A.  I applied for a transfer to Cornell University.

3    Q.  Did there come a time when you attended Cornell?

4    A.  Yes.  I transferred to Cornell, I believe, in 1989 or late

5    '88.

6    Q.  Did you graduate from Cornell?

7    A.  Yes, I did.

8    Q.  What did you do after you graduated Cornell?

9    A.  After Cornell, I spent one year in what was then called the

10   practical training program, which allows you one, one-year visa

11   to get experience with a company in the U.S. before you have to

12   leave, and I worked for a company called Pitney Bowes.

13   Q.  What did you do for Pitney Bowes that year?

14   A.  I trailed the senior copier salesman through New York,

15   knocking door to door on offices and trying to sell copiers and

16   fax machines to people.

17   Q.  What, if anything, did you do after that year with Pitney

18   Bowes?

19   A.  After my year with Pitney Bowes, I joined a company in New

20   York called Trillium International, specialized in selling U.S.

21   agricultural products abroad under a program by the U.S.

22   government that was geared to help compete with the European

23   Union subsidy programs.

24   Q.  What did you do while you were working at Trillium?

25   A.  Mostly traveled.  Traveled abroad to countries where I had

1    contacts and tried to find clients for Trillium.

2    Q.  What do you mean you had contacts within your role at

3    Trillium?

4    A.  Well, because of my international background and upbringing

5    and my language skills, I grew up in several countries, I went

6    to school in many places, I'd made friends, and I had contacts

7    in a few countries where they were interested in doing

8    business, basically.

9    Q.  How many languages did you speak at that point of your

10   life?

11   A.  I had lost a few by then, so I was down to three, I

12   believe.

13   Q.  Which languages?

14   A.  I spoke French, English by then.  Fula is my native

15   language, and I had some solid Spanish.

16   Q.  And what specifically did you do within that role for the

17   company?

18   A.  Well, they sent me to countries where, that were known to

19   be big importers of agriculture commodities.  They sent me to

20   meet people I knew or people who I could be introduced to by

21   people I knew who were the known importers of those

22   commodities, and my role was to try to convince them to buy

23   American commodities as opposed to the European ones.

24   Q.  How long did you work there?

25   A.  I worked there a year and a half.

1   Q.   And where did you go after you left Trillium?

2   A.   I got a job at Merrill Lynch, in New York.

3   Q.   What was your first role and responsibility at Merrill

4   Lynch?

5   A.   It was almost the same.  Merrill Lynch was --

6   Q.   Let me back up a little bit.  What was the role you got

7   hired at at Merrill Lynch?

8   A.   I was -- the official title was that of a financial

9   consultant and relationship manager, and I was hired by the

10   international division of the private client group, and the

11   goal was to grow Merrill's international business by going out

12   and finding international, an international clientele for them

13   to advise on their finances.

14   Q.   How long did you work at Merrill Lynch?

15   A.   Ten years.

16   Q.   And by the time that you left Merrill Lynch, what were the

17   roles and responsibilities that you had?

18   A.   Well, they were varied.  I, by then, was a senior vice

19   president.  I had built a team in the division that had

20   originally hired me that were still under my responsibility and

21   was working fairly autonomously, and I was doing more

22   investment banking work, advisory to governments and large

23   corporations abroad.

24   Q.   Did there come a time when you left Merrill Lynch?

25   A.   Yes.  In August of 2004, we accepted an offer by UBS to buy

1    my team, so I sold -- I effectively sold my team to UBS in

2    August of 2004.

3    Q.  Well, did you sell it, or did Merrill Lynch sell it?

4    A.  I sold.  It's my team.  I sold -- basically, in the

5    parlance of the industry, basically sell your business, they

6    bought our ability to generate revenue, so they paid us to

7    move.

8    Q.  How long did you work with UBS?

9    A.  Four years, from 2004 to 2 -- to late 2008.

10   Q.  By the time that you had left Merrill Lynch, approximately

11   how much were you earning every year through Merrill Lynch?

12   A.  It varies, because it was commission based, but at Merrill

13   itself, I had, I think, a few years close to a million.  It

14   really varies; good years, bad years.

15   Q.  Now, you said that you had left UBS around 2008.  Is that

16   correct?

17   A.  Yes.

18   Q.  Where did you go after UBS?

19   A.  Well, I accepted an offer to, to go back to Guinea to serve

20   as the minister of mines by the new government of Guinea.

21   Q.  When you were working at UBS -- well, let me clarify.  Just

22   before you left UBS --

23   A.  Yes.

24   Q.  -- approximately how much were you earning a year?

25   A.  From my revenue at UBS, it's hard to say.  I -- there again

H51Wthi6                         Thiam - Direct

1    we had good and bad years.  Those were bad times, but because

2    of my signing bonus from my move from UBS, I still had a few

3    substantial checks, I think, one of a million and a few of half

4    a million dollars to, to make up for what I was not making from

5    the actual business.  So I would say not far from the million.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. GOLDSMITH:

2    Q.  So when you say which you were not actually making from the

3    business, is there a reason why you were making less?

4    A.  Yes.  We -- we were really at the height of the financial

5    crisis.  The world was technically coming to an end from an

6    economic standpoint.  And revenues dropped.  Basically, the

7    financial industry was in disarray, and people who were salary

8    based were getting fired and people who were commission based

9    like me, or performance based, were making much, much less.

10   Q.  Did you have any other sources of income while you were

11   working at UBS?

12   A.  Yes.  I had the private ventures that I was involved with,

13   with a few partners outside of the bank.

14   Q.  Could you describe the private ventures that you were

15   involved in.

16   A.  They were of various natures, but the majority of them were

17   transactions that the banks would not or could not perform, and

18   if I had the means to have them done or to help the client who

19   wanted the transaction done elsewhere, we had it done

20   elsewhere, basically, and I earned money like that.

21   Q.  What do you mean the bank couldn't or would not get

22   involved?

23   A.  Well, the bank has limited resources.  There are

24   transactions that they take on, there are transactions they

25   don't want to take on.  There are regions they want to effect

1   less resources to than others, so if it's a transaction that

2   the bank, for any reason, doesn't want to do and I have,

3   through my contacts, the ability to do it elsewhere, I was free

4   to do it.

5   Q.  And how many different partners did you have on these

6   ventures?

7   A.  There again, it varies.  I had, I'd say, two or three main

8   partners with whom I did most things, but then others came into

9   place because most transactions were with different countries

10  or different industries.

11  Q.  And who were those two or three main partners that you had?

12  A.  Main one was, at the time, a gentleman called Baker

13  Al-Sadi, based in London.

14  Q.  How did you know Baker?

15  A.  I had met him I think in the early 2000s through a

16  childhood friend of his who was one of my colleagues at -- at

17  Merrill Lynch.  They had grown up together, and he introduced

18  him to me because he had one such transaction that the bank

19  could not do and asked me if I could help find investors for a

20  transaction he was promoting.  And from then on we developed a

21  friendship and -- and a partnership.

22  Q.  So getting back to the time that you left UBS, you

23  testified a moment ago that you accepted a position with the

24  Guinean government.  Could you please describe how that came

25  about.

1    A.  Well, what happened is that I would have to go back in

2    history a little bit to put it in perspective, if that's okay.

3    Q.  Sure.

4    A.  It's -- as I explained earlier, we -- I lived in exile

5    because of the first 26 years of Guinea's history were under a

6    very brutal communist dictatorship.  That dictator died in 1984

7    and he was replaced basically by who was his presidential

8    guard.  The soldiers took over from him after he died, started

9    another type of dictatorship, which lasted another 25 or 26

10   years.  That one was less brutal.

11   Q.  Excuse me.  Was that the ruler who died right before the

12   junta-led coup?

13   A.  Yes.  That's Lansana Conté regime started in 1984, and the

14   only difference between the two dictatorships is that one was a

15   brutal killer and we could not go back to Guinea or we would

16   get killed; this one did not kill but was no less a dictator.

17   Did not hold elections for a long time and then held fake

18   elections, and basically stayed in power for another 26 years.

19   And he died in December 2008.  He had been sick for about three

20   years, and everyone had been predicting his death for the three

21   years, but he was not dying.  And finally, last week of

22   December 2008, he died.  And the government or the country had

23   turned into basically a drug cartel, the whole country.

24   Q.  So how did this develop into your being asked to join the

25   Guinean government?

1    A.  At his death, a group of young soldiers took over.  They

2    retired the senior military officers and all of his family

3    members who thought they were taking over from him and

4    continuing in his -- in his footsteps, and those young soldiers

5    surprised everybody overnight, took over, retired all of them,

6    and declared that they would run the country for two years,

7    clean out the drug trade, clear corruption, and organize

8    elections within two years, leading to an elected civilian

9    government.  They named a technocrat as the prime minister, a

10   gentleman by the name of Kabiné Komara, and asked him to form

11   the civilian half of the new government while the military

12   ruling committee would appoint the military half of it, and the

13   military ruling committee would basically oversee the civilian

14   government of Mr. Komara.  Mr. Komara --

15   Q.  What do you mean when you say the military would oversee

16   the civilian government?

17   A.  They created a council, I believe it was mentioned before,

18   called the CNDD, which was made of I would say about 30 senior

19   military officers.  The group that effectively seized power

20   collectively.  And that body was actually the ruling body in

21   the country.  They over -- they oversaw the entire government.

22   So they're -- the president was the president of the CNDD and

23   he ruled over a military committee that oversaw the government.

24   So the government had the boss, basically.

25   Q.  And the president of the new government, who was that?

1    A.  That was Moussa Dadis Camara.  They called him Dadis.

2    Q.  And describe his position related to the military aspect of

3    the government.

4    A.  Well, he, I would say, was one of the three top leaders of

5    the -- of the coup that ensued.  He, you know -- heated

6    debates, from what we were told by the soldiers themselves

7    after the coup, deciding who would take over.  He prevailed.

8    There was a democratic decision-making process inside the coup

9    apparently, and -- and he prevailed and was named president.

10   The most powerful man in the military at the time became his

11   number two and was named minister of defense.

12   Q.  Who was that?

13   A.  That was then -- he was Colonel Sékouba Konaté.  He's now

14   General Sékouba Konaté.

15   Q.  And did there come a point in time where you were

16   reached -- or withdrawn.

17          Did there come a point in time where someone reached

18   out to you to join the Guinean government?

19   A.  Yes.  Within I would say -- when he found out --

20          THE COURT:  I'm sorry.  That was just a yes.

21   A.  Yes.  Sorry.  Yes.

22   Q.  When was that?

23   A.  That was, I would say, about a week or more after they took

24   over, I think Mr. Komara was contacted and told that he was on

25   a short list of potential prime ministers.

1    Q.  When you say Komara --

2    A.  Kabiné Komara, the person who then became prime minister.

3    He was contacted by military junta and was asked if he would

4    consider becoming prime minister.  When he accepted, he called

5    me and asked me if I would, as a banker, agree to advise him on

6    how to restructure the mining sector.

7    Q.  Had you met Mr. Komara before?

8    A.  Yes, I -- we were acquainted.  I met him a few times and we

9    knew each other and we knew of each other.

10   Q.  What were the circumstances that you knew each other and

11   knew of each other?

12   A.  Mr. Komara was -- had been in and out of the Guinean

13   government for many years.  I -- I first met Mr. Komara when I

14   was a student, when I was scheduled to move to Cornell from

15   Washington, DC, and I could not pay for -- for my tuition at --

16   at Cornell because our -- our property that had been seized by

17   the first dictatorship confiscated, was not returned to us when

18   they returned property to everyone else, and therefore, the

19   rental income I was counting on to pay my studies was not

20   available to me because the Guinean government had not returned

21   our -- our property.  So I went to Guinea and asked Mr. Komara

22   as ministry at the time to put me on the list of scholarships

23   that he had just obtained to compensate for me not having my

24   property returned to me.

25   Q.  And what happened?

A.   Well, they agreed to -- to give me a scholarship.  They had
been granted a number of scholarships, so they put me on the
list, considering that it was their fault that I could not
collect rent for my -- from my property.  And I came to -- I
came back, moved to Cornell.  They paid the first year, and
then there was a change of minister, and the new minister
struck my name off the list immediately because he wanted to
give that scholarship to his girlfriend.  So I found myself
penniless at Cornell.

Q.   And how were you able to continue your education?

A.   Family, family and friends, but mostly family that came
together.  My uncle who raised me, my grandfather had some
cattle and land that he had to sell and things like that, and
they -- they kept me going for a few years.

Q.   When was the next time that you met soon-to-be-some-day
Prime Minister Komara?

A.   I met him I think in the late '90s.  I was then a banker,
and at Merrill Lynch we had -- we obtained two mandates in
Guinea, the first one in 1997 to work with the Central Bank and
help them restructure and manage their gold reserves.  And then
later on, I believe in '98, with the ministry of mines, we had
the mandate to help the ministry of mines restructure the iron
ore sector, so we interacted then and -- and I believe he had
heard of things we had done in mining, advising other countries
successfully and was interested in what we could do for him.

1    Q.  Was that your only experience with mining related to your

2    work at Merrill Lynch?

3    A.  It was my main experience.  I evolved at Merrill through

4    different divisions and did different things, and there was a

5    time where mining and commodities in general was very active

6    around the world, so Merrill was very active in it, so I got

7    involved in that.  I helped Merrill pursue mandates in mining

8    countries around the world.  We -- I helped Merrill obtain a

9    lot of mandates, and we basically made a name for ourselves in

10   the mining industry, as bankers, and so they knew what we had

11   done for some other countries and how we had helped some other

12   countries.

13   Q.  Okay.  So now let's fast forward again to the soon-to-be

14   Prime Minister Komara contacting you about the new Guinean

15   government.

16   A.  Yes.

17   Q.  Describe that for us.

18   A.  He asked me -- I'm sorry.  He asked me if I could -- if I

19   would agree to advise them as a -- as an adviser, as a

20   consultant.  I said yes, under a few conditions.

21   Q.  What were they?

22   A.  The conditions -- there was really one main condition was

23   that he appoints minister of mines who knew how the financial

24   world works, who was not just a miner from a technical

25   standpoint, not a geologist, but who knew how the world of

1   business interacted with the world of mining, so that our
2   advice would not be wasted, because from experience, we had
3   problems with other governments where people did not understand
4   how the financial world related to the mining world and you
5   would spend weeks or months waiting for information that you
6   needed to do your work.  It frustrated you until the mandate
7   went unsuccessful and it was a failure.  So I wanted to avoid
8   that.
9   Q.  And just to be clear, what kind of a position were you
10  discussing with Prime Minister Komara at that point?
11  A.  As a -- at Merrill or my team at Merrill advising the
12  Guinean government on how to restructure the mining sector.
13  Q.  Okay.  What or how did the prime minister respond?
14  A.  He asked me to recommend three names of people whom I
15  thought would be good ministers so that he could -- he could
16  recommend them to the -- to his boss, the president, and see if
17  he could have them appointed in order for -- for my condition
18  to be met.
19  Q.  And did you do that?
20  A.  Yes, I asked around, because I did not know the people
21  either so I asked around, I was given three names, which I
22  forwarded to him.  He took the three names to -- to the
23  soldiers, to the president, and they told him basically no,
24  they told him that if he wanted his plan to work, he had to
25  convince me to come as minister, not as an adviser.

1    Q.   How do you know that?

2    A.   Because he called me back asking me to come as a minister

3    and not as an adviser because his bosses would not do it any

4    other way.

5    Q.   And how did you feel about that?

6    A.   Well, I wasn't too excited.  I told him no, I told him it

7    wasn't a good time for me, I could not do it at the time.

8    Q.   Why would that have been different than being the adviser?

9    A.   Because the adviser, I would still be based in New York

10   with my family, working at the bank, and Guinea would be one of

11   a few clients we have.  And either myself, members of my team,

12   or other members of -- sorry, it was UBS by then, not

13   Merrill -- or other members of -- of UBS would travel to Guinea

14   periodically to conduct the mission.

15   Q.   Okay.  And what was your financial condition at that time

16   versus what it had been in the previous years?

17   A.   As far as my revenue from my primary job, which is banking,

18   it was fairly disastrous.  As I said, the world had collapsed,

19   from our standpoint, at least, as bankers, so the revenue,

20   revenues had dropped.  Any savings or investments anyone had,

21   not only bankers but I think around the world, had melted, all

22   the way to our 401(k)s, and everyone was suffering.

23   Q.   So what happened next in your discussions regarding a

24   position with the Guinean government?

25   A.   Well, I told him I could not, it wasn't a good time for me,

1    that it wasn't a good time for me personally from a family

2    standpoint, I had young children in school that I did not want

3    to leave here, I had a family that I had to care for, and my

4    financial situation was unstable, as I said.  And also, I had

5    clients at the bank who were suffering a lot.  They were at the

6    bank because they trusted me and followed me to -- from Merrill

7    Lynch to UBS.  And I did not feel comfortable abandoning them.

8    I had a team at UBS I did not want to abandon either.  So I

9    told him it was a bad time.

10   Q.  And how did he react?

11   A.  Well, he persisted.  He did not take no for an answer.  He

12   insisted.  He lobbied, he called people that were close to me

13   and he thought had influence on me, asked them to intervene.  I

14   was the subject of some friendly pressure for a few days.  And

15   ultimately I -- people were putting moral pressure on me:  It's

16   your country; you should come help; you owe it to your country.

17   And ultimately I told him, okay, I'll ask my wife.  If she says

18   yes, I'll come; if she says no, I won't.  And I was fairly

19   confident she would say no.

20   Q.  And what happened?

21   A.  She said yes.  So I went.

22   Q.  And what happened next?

23   A.  Well, it was a -- it was like being thrown into a -- into a

24   washing machine, basically.  It's -- I had my apprehensions.

25   Besides my personal concerns that I just mentioned, it was

1   military regime, after all.  Those were people we've -- had

2   used them before.  The whole world was enthusiastic because

3   they were -- they had ended 50 some years of dictatorship.

4   They came with very high declarations about what they wanted to

5   do and the population was elated.  But still, they were

6   soldiers, and no one knew where it would lead, so I was a bit

7   nervous.  I had -- have a brutal family history in that

8   country.  My father, uncle, most of their friends were tortured

9   and killed in that country, and the country is known to be rife

10  with ethnical -- ethnic tensions.  Usually one ethnic group

11  controls the Army.  And so that's -- those were the guys who

12  were in power and those are the guys who were in power when my

13  father was killed, so I had my -- my apprehensions.

14  Q.  Did you go?

15  A.  I did.

16  Q.  Approximately when did you go to Guinea?

17  A.  I believe I arrived in Guinea around the -- the beginning

18  of the second week of January.  I first went to Europe to meet

19  with Baker and some of my business partners.

20  Q.  Why?

21  A.  Because my business with them was the only source of income

22  I had, or savings I had.  I wanted to make sure that my family

23  was maintained while I was away and that I was maintained while

24  I was away because I went in having decided not to take a

25  salary, not to take government housing, not to get housed by

1    the government, to pay for my travel and my hotels myself, and

2    I wanted to make sure that Baker would make those funds

3    available as needed, so that I could survive and my family

4    could survive.

5    Q.  Let me stop you.  You agreed not to accept a salary?

6    A.  Yes.  I decided; I didn't agree.  I wasn't asked.  I

7    decided not to take a salary.

8    Q.  And you decided not to accept any government room and

9    board.

10   A.  Yes.

11   Q.  Why?

12   A.  Because I went, first of all, in the spirit of helping.  It

13   was reportedly a poor country and it was a poor country.  I

14   think it was mentioned before, it didn't become poor overnight.

15   It had been poor for the 50 some years of its independence, and

16   it was getting poorer, and this government came in saying, we

17   want to clean up and -- and return power, and I decided I

18   was -- that was one of my contributions.  That was the first

19   reason.

20          The second reason was a little more calculated.  The

21   second reason was that I knew how internal politics worked in

22   Guinea and in Africa in general, and you want to be as remote

23   from points of pressure as possible.

24   Q.  What do you mean by that?

25   A.  If people feel that you need your government salary, your

1   government income, your trappings of power, etc., to survive,

2   they tend to try to put pressure on you, and I wanted to go in

3   there giving the impression that I needed no one or needed

4   nothing from anyone, I was self-sufficient.

5   Q.   Okay.  So when you said trappings of power, etc., what do

6   you mean?

7   A.   Trappings of power as what comes with being a member of a

8   government in any country, and more specifically in a poor

9   country, it gives you -- you have a title, you're -- you

10  automatically are considered more important than others because

11  of your government title.  It's exactly like here.  If you're a

12  member of the cabinet for the Secretary of State or Secretary

13  of Defense, you automatically have a government car,

14  bodyguards, etc., etc., your expenses are taken care of.  It's

15  all those things.

16  Q.   So you're describing in Guinea.

17  A.   Yes.  But I was describing here, actually, right now.

18  Q.   Okay.  What about in Guinea?

19  A.   It's that but in an even more visible way, because the

20  discrepancy between the people who have and the people who

21  don't are -- is even bigger, so any little advantages you can

22  get from government is considered a lot.

23  Q.   So let's go back to your meeting with Baker.

24  A.   Yeah.

25  Q.   What did you discuss or what was the purpose of those

1    meetings?

2    A.   The purpose was to instruct him on whatever monies he had

3    for me then, monies he was expecting from our ongoing

4    businesses to be directed in two ways: one, to take care of my

5    family in New York; and two, to take care of me in Guinea,

6    paying my rent and my expenses, etc.

7    Q.   Now could you describe the kind of monies that you had or

8    were expecting as related to Baker at that time.

9    A.   If I described them, you said?

10   Q.   Could you clarify and describe what you mean by that.

11   A.   Well, we had been in business for, I don't know, maybe six

12   years, a little more.  We had done some transactions together

13   that had made us money.  We had just signed a few contracts

14   that were scheduled to make us money.  So he had accumulated

15   money and he had money that was supposed to come.  My business

16   relationship with him was that most of the time he was the lead

17   because I was at the bank and so payments were made to him,

18   both his share and my share and, if we had other partners,

19   their share, and it was his responsibility to hold and share

20   that money, and he would periodically send me part of what he

21   owes me, and if I owed other people, like some of my

22   colleagues, I would basically then share what I received with

23   them as well.

24   Q.   How were you to take care of your living expenses while you

25   were in Guinea?

1   A.  100 percent through what Baker would be able to provide

2   through various things.  I had -- we had people who owed us

3   money that we were hoping we had promises that they would pay

4   back within that time period, so I was fairly confident that I

5   could support myself and my family through that -- through that

6   channel.

7   Q.  All right.  So let's go back to the time where you actually

8   started working with the Guinean government.  What happened

9   when you first got to Guinea?

10  A.  I landed I believe on -- on a Friday night, at the airport.

11  The prime minister had a car and one of his advisers waiting

12  for me to take me straight to the military camp, where the

13  president stays.  And so I arrived in the middle of a military

14  camp just after a coup, so everybody was on high alert,

15  everyone was armed to the teeth, and the soldiers that are

16  considered the -- the action guys, those who went to combat and

17  things like that, were on hand, and those were the scarier

18  ones, usually, and I basically landed in the middle of that.  I

19  had just come out of an emergency because I had a sudden

20  massive attack of diabetes that I was later told was stress

21  induced, so I could barely see.  I had lost about 15 pounds.  I

22  was weak and stressed.  And I went to the camp to meet Dadis.

23  Q.  What happened at the meeting with Dadis?

24  A.  Well, I was ushered into what I thought would be his office

25  but turned out to be his bedroom.  I entered with the prime

1    minister, who introduced me as Mahmoud Thiam, the person he had

2    recommended and Dadis had agreed to appoint as minister of

3    mines.  I introduced myself.  I told him in a sentence or two

4    what I planned to do for the mining sector in Guinea within --

5    Q.  Who was at that meeting?

6    A.  Dadis, the prime minister, and myself.

7    Q.  Anyone else?

8    A.  No.  The three of us.

9    Q.  Okay.  So what happened after you gave him the one- or

10   two-sentence explanation of what you hoped to accomplish?

11   A.  He said he liked the plan and that I had -- he had -- I had

12   his support.

13   Q.  What was the plan at that point?

14   A.  At that point the plan -- because I accepted the post for

15   12 to 18 months, the soldiers said they would be there for two

16   years, so the idea was to put things in place within those 12

17   to 18 months that would clear the way for the future

18   democratically elected government to benefit from what we had

19   done, to clean up what we had done.  It was about getting

20   Guinea out of a situation where Guinea was supposedly sitting

21   on massive wealth underground, but that wealth had never been

22   proven by anyone because the work and investment needed to

23   prove that the wealth is there was never done, so Guinea always

24   lived on the theory that Guinea was extremely rich in

25   potential, but no one actually went and did the work to

1   transform that potential into real wealth.  So the goal was to

2   pick the most advanced project in mining, pick five or six that

3   would -- had the potential to transform Guinea, or Guinea's

4   economy, and clear the way for them to be in production or that

5   they would be on a path that no one could reverse to produce

6   and export and actually start generating revenue for the

7   country by the time the soldiers leave.

8   Q.  Now when you said to pick the five most promising projects,

9   were those five that were already in place?

10  A.  Yes.

11  Q.  And how were you aware of what projects were already in

12  place?

13  A.  They are not many, and if you follow the mining industry,

14  they are known.  It's -- some of them are world famous.  Some

15  of them are world infamous.  But everyone knows.  I knew the

16  few main ones, and I discovered, I have to go at the ministry

17  now, get debriefed and find out what else was there so my staff

18  and I could decide which projects we would pick and push.

19  Q.  What, if anything else, happened on that first meeting with

20  Dadis?

21  A.  That was the gist of it, I'd say.  I told him that in my

22  sense he had made some declarations regarding mining the few

23  days prior that could be hurtful to the country because it

24  could scare investors away, and I suggested we soften that

25  message a bit.

1   Q.  What message was that?

2   A.  Well, as many new governments in the mining or oil country

3   that come to power, they declare that they're going to review,

4   review and cancel all existing contracts because the country

5   has been raped, etc., etc., and I told him you could achieve

6   the same result without declaring that and having the entire

7   world say that you're nationalizing, and I asked him for

8   permission to change the message a little bit so we could

9   achieve the same result without having the companies run away

10  or start suing us.

11  Q.  What did you want the message changed to?

12  A.  Instead of revising and virtually canceling all existing

13  contracts, I wanted the message to say that we are a country

14  that respects the law and respects its existing contracts.  All

15  existing contracts are valid.  However, we reserve the right to

16  call our partners and renegotiate any clause of a contract that

17  is illegal, that's outrageous, that's abusive, or that's not in

18  par with existing international standards.

19  Q.  Now the five existing projects that you mentioned a moment

20  ago, did any of them include a project with CIF?

21  A.  No.

22  Q.  Could you describe how you were introduced to the project

23  with CIF.

24  A.  Well, that came months after.  I started hearing the name

25  Sam Pa I would say late January, mid February, probably closer

1    to mid February, in the president's circle, but I was wondering

2    who Sam Pa was.  And then late spring, early summer, I would

3    say around May, May/June, I received a call.  I had guests.  I

4    had I believe board members of one of the mining projects who

5    were working on -- in town for a board meeting, and I was

6    hosting them.  And I received a call from the minister of

7    state, Boubacar Barry, asking me to immediately go to -- to a

8    hotel downtown to meet a group of Chinese investors the

9    president wants me to meet immediately.  I told him I could not

10   because I had guests at home.  He said, It's not a request;

11   it's an order.  This is a military regime.  You get to the

12   hotel.  So I got to the hotel.

13   Q.  Now you said that it took some time before you first were

14   introduced to the CIF representatives.  Describe what you'd

15   been doing in Guinea as the minister of mines up until that

16   point.

17   A.  A multitude of things.  It's -- first of all, we started

18   working on those five companies, called them in, asked them

19   what they needed in order to progress, we told them we would

20   give them all the help and support we could but in return we

21   would stick them to a chronogram, because mining companies in

22   Guinea were renowned for committing and then dragging it out so

23   they could sit on the deposit for years, sometimes decades,

24   without having to invest in developing them.  In the meantime

25   they make money because they list those reserves on their

1   balance sheet and it affects positively their stock markets

2   abroad, but as long as they don't invest and transform those

3   reserves into production, the country makes no money, so the

4   country remains poor while they make money.

5   Q.  Was there an urgency to get those countries into production

6   at the time?

7   A.  Oh, yes, yes.

8   Q.  Could you describe that, please.

9   A.  Well, it comes out to what we were saying in the beginning.

10   It was a very poor country.  It had the potential to make

11   money, but work on investments needed to be made to make that

12   money.

13        The other thing is, very quickly the international

14   community started putting pressure on the military to agree to

15   relinquish power in less than the two years they had announced.

16   The tensions between the military and the international

17   community started growing, and the international community

18   imposed sanctions in Guinea, which virtually dried out all

19   sources of financial help from outside for Guinea.

20   Q.  What do you mean by that?

21   A.  Guinea, like most developing countries, lives on -- besides

22   what they can produce and export, the country lives on

23   international aid from the World Bank, from the IMF, from the

24   European Union, etc., so when they are unhappy with you, they

25   have a very effective tool of pressure, which is to stop

1   funding you.  Those countries borrow a lot.  That's how they

2   survive.  And if they stop lending you -- lending to you,

3   you're -- you're done.

4   Q.  Was there anything about those sanctions that would have

5   affected you as an individual when you took the government

6   position?

7   A.  Yes, absolutely, because the sanctions, in order to put

8   pressure, they used the tool of sanctions to put pressure on

9   every member of the government, so as an individual member of

10  the government, you automatically became under sanctions, which

11  means all your financial and economic means -- that's the exact

12  text of the sanction text -- are frozen.  Your ability to

13  travel outside of Guinea into countries that respect the

14  sanctions regime is stopped, so you cannot travel anymore.

15  Q.  Now there's been some evidence in the case so far about

16  your traveling.

17  A.  Yes.

18  Q.  So how is it that you were able to travel extensively

19  despite the sanctions you're describing?

20  A.  There were two reasons why.  The -- the international law,

21  I don't know if it's still the case, but at the time said that

22  if a group takes power by means other than democratic, the

23  international community has to put pressure on them for them to

24  leave, and therefore sanctions are -- follow fairly quickly

25  after.  When it's a coup that in reality is welcomed by

1    everyone -- because everyone was relieved that Lansana Conté

2    and his entourage did not take over.  The drug dealers did not

3    take over, basically.  They gave them some leeway, so they --

4    the law says they have to impose sanctions in the beginning, so

5    they imposed the sanctions, but they don't implement them as

6    aggressively as they should.  So that gave us a bit of leeway

7    in the beginning.  But as things -- as tensions mounted between

8    the soldiers and the international community, because the

9    soldiers would not yield, they tightened the sanctions regime.

10   Luckily I had passports other than my Guinean passport.  I had

11   my French and my US passport.  And as a French or US citizen, I

12   was not sanctioned, so I could travel.

13   Q.  Okay.  So let's return to the moment where you were brought

14   to the hotel to first meet representatives of CIF.  Describe

15   that for us.

16   A.  Well, I went downstairs, I -- I do not remember, but I

17   believe Boubacar Barry met me there.  I met downstairs with two

18   ladies, one who later turned out to be Madam Lo, and an

19   interpreter, who introduced CIF.  I first misunderstood and I

20   thought it was CIC.  CIC is a Chinese sovereign wealth fund, a

21   very rich sovereign wealth fund that I had planned on visiting

22   in China to see if I could convince them to come invest in

23   Guinea, so I was very happy to be sitting with CIC, until I

24   realized it wasn't CIC but CIF, and I asked them what CIF was.

25   They said, we are very well funded as well.  We are not state

1   owned, we are a private entity, and there's nothing that CIC

2   can do that we cannot do.  They explained that they had a

3   series of meetings with my bosses.  That's how they put it.

4   And --

5   Q.  And do you have an understanding as to what they meant by

6   your bosses?

7   A.  Well, the president.  I -- I received a call from Bouba the

8   president wants me to meet them.

9   Q.  Who is Bouba?

10  A.  Boubacar Barry.  I'm sorry.  Minister Boubacar Barry.  And

11  it's in the president's office or his waiting room that I had

12  heard the name Sam a few times before, so I knew that the

13  president and Sam had been meeting for a while and Sam had been

14  meeting with people in the president's entourage.  I did not

15  know what the subject of the talks were, but I was aware of his

16  existence.

17          Then Sam came down -- a gentleman came down, who

18  introduced himself as Sam Pa, and I think his title was either

19  CEO or chairman of CIF, and proceeded to tell me what they

20  wanted to do in Guinea.  I told him that there's room for

21  everyone in Guinea.  We had plans to go and invite some

22  sovereign wealth funds from the gulf and from China to come and

23  invest in Guinea, possibly into a state-owned mining company

24  that we wanted to create, and we sought investment from

25  sovereign and private funds.

1    Q.  Did you have any familiarity with state-owned mining

2    companies before that moment?

3    A.  Yes, yes, yes, yes.

4    Q.  How did you gain that familiarity or understanding?

5    A.  Well, in my work as a banker, we worked with, we advised,

6    we sought business from many state-owned mining and oil

7    companies.

8    Q.  So describe what you mean by a state-owned mining

9    corporation.

10   A.  A state-owned mining company is a -- basically, it's a

11   mining company, but instead of being a privately-owned mining

12   company, it's owned by the government of the country where it

13   operates.  Most poor or developing countries that did well in

14   mining or in oil and generated wealth for their populations at

15   some point or the other created a state-owned mining company to

16   take control of more and more of the mines and the production

17   in their country so they could benefit from more and more of

18   the revenue, and examples like Vale in Brazil, Saudi Aramco in

19   Saudi Arabia, Abu Dhabi, Qatar companies, Malaysia state-owned

20   mining companies, oil companies, all of those were very

21   successful examples.

22   Q.  Okay.  So what else happened at the first meeting with

23   representatives from CIF?

24   A.  Well, I described what I had in mind in terms of attracting

25   investments into the -- into the sector.  He told me that they

1    had a more global or strategic approach; it wasn't a pure

2    mining approach.  They wanted to invest in the country in

3    general.  That's what his discussions with the president had

4    been about, that they had done it successfully in Angola and

5    wanted to repeat the model in Guinea.  Because I wasn't 100

6    percent sure that he was who he said he was, I asked him about

7    the few names of people he was dealing with in Angola.  He

8    dropped a few names, and I -- he told me about Mr. Manuel

9    Vicente from Sonangol, which is the state-owned oil company in

10   Angola, and I said, well, if this gentleman is your partner,

11   can you come back with him so he can vouch with you the next

12   time, he said yes.  And I said, okay, I'll go report back to my

13   bosses, and if they instruct me, we'll -- we'll proceed, bring

14   Manuel back, and I went to report back.

15   Q.  Did you perform any other research after that meeting?

16   A.  Yes.  I sent messages to a few friends who live or do

17   business in China, who are connected in China, I sent messages

18   to a few friends who are in Angola or do business in Angola to

19   ask if they had heard of Sam Pa.

20         MR. GOLDSMITH:  Mr. Beer, could I have you publish

21   what's already in evidence as Government Exhibit 502.

22   Q.  Now, Mr. Thiam, did you, other than contacting certain

23   individuals -- withdrawn.

24         I'm sorry.  Do you see Exhibit 502?

25   A.  Yes.

1   Q.  And could you describe what Exhibit 502 is.

2   A.  It's an email from myself to Bao-Wen Chen in -- in --

3   basically introduced -- I said, "Hi, it's Mahmoud.  Sorry.  How

4   are you?  I'm now in Guinea, Conakry, as minister of mines and

5   energy.  We have a visit from a group called China Investment

6   Fund headed by Sam Pa and Lo Fung Hung.  Can you tell me if you

7   know them or can you find out.  Much appreciated."

8   Q.  And who is Ms. Chen?

9   A.  Ms. Chen is a friend of mine who is based in Shanghai,

10  between Shanghai and Hong Kong, who is connect -- well

11  connected in China, and she is in the business community.  She

12  would know.  I thought if they were known, she would know of

13  them.

14  Q.  How did you know her?

15  A.  I met her few years back through personal friends.

16  Q.  What, if any, other research had you done other than

17  contacting some individuals like Ms. Chen?

18  A.  Well, we did the standard Google searches and things like

19  that.  It's a very secretive organization so we could not find

20  a lot of public information.  So I sent a few other emails to

21  some other individuals.  Some people came back saying, yes,

22  it's a very big group.  Some people described how big and

23  successful they had been in Angola and other countries.  And so

24  my only recommendation to the president was to see if he would

25  come back with Mr. Manuel Vicente.  Mr. Vicente was known to be

1    a very important and hard-to-reach person, and if this guy

2    could make him travel to Guinea, it would say a lot about his

3    relationship in Angola.

4    Q.  Again, who is Mr. Vicente?

5    A.  So Vicente was at the time the chairman of Sonangol, the

6    Angolan national oil company, state-owned oil company.

7    Q.  So what happened next?

8    A.  I went back with I believe Mr. Boubacar Barry to the

9    president's office, because he apparently was expecting us to

10   come and report back.  I came back and I told him that I had

11   met them, that as far as I was concerned, there was no issue

12   with them joining into -- to the Guinean economy and investing,

13   but I suggested we do a few more checks about them to make sure

14   that they are who they say they are, and I told him that I had

15   asked of them to come back with Mr. Vicente so if Mr. Vicente

16   returns, then we will have a bit more confidence.

17   Q.  How did President Dadis react?

18   A.  He said -- he said that he agreed with the approach and

19   that we would wait for Mr. Vicente to come, but he had had

20   several meetings with them, he had had an envoy travel to

21   China, with the Guinean ambassador to China, and they had done

22   their checks already and they were pretty much decided that

23   they were going to do business with CIF.

24   Q.  When you say they were pretty much decided, what do you

25   mean?

1   A.  I mean, the decision was made that I was being informed

2   that I'm being brought on now because I will play a role in the

3   future, but I'm being called not to decide if we will do

4   business but to be told that we will be doing business.

5   Q.  So what did you do next in regards to the CIF project?

6   A.  Nothing then.  I waited until I would say ten days later,

7   Minister Barry called me again and said, Pa Sam is landing this

8   afternoon.  We have to be at the airport.  I asked him at what

9   time, he told me 4 p.m.  I said, okay, I'll be there.  And he

10  said, He's coming with Mr. Vicente.  I said I had my doubts,

11  but I said okay, that would be a good thing.  So at 4 we were

12  at the airport to wait for Sam because we had to take him to

13  the president's office.  He landed indeed at 4 as planned in

14  his plane, and he came off the plane with someone who was not

15  Manuel Vicente.  I -- it was Manuel Vicente's number two.  And

16  I told him that's not number one.  He said, number one is

17  coming.  And 20 minutes later Manuel Vicente's plane landed and

18  we took them to the president.

19  Q.  So what happened at that meeting?

20  A.  Well, the president was very happy.  He gave -- Manuel

21  Vicente came with a message from the Angolan president to the

22  president, salutation message, and a recommendation message of

23  CIF, telling the president how well CIF had done for Angola,

24  the billions of dollars they had invested in Angola, the trips

25  they had created, and that they recommended them.

1    Q.  Where is Angola?

2    A.  Angola is on the West Coast of Africa, in the central

3    region of Africa, in the region called the Gulf of Guinea.

4    It's a very well-known region for its oil reserves.  It's very

5    rich in oil.

6    Q.  What happened after that meeting between Mr. Vicente, the

7    president, Mr. Pa, and yourself?

8    A.  The president asked him to stay a few days, asked the prime

9    minister to host them, and had a massive reception, official

10   reception organized I believe the next day or two days later

11   for them at one of the official presidential villas, because

12   Mr. Vicente came as an envoy of the president of Angola, so he

13   hosted them.  There was a massive reception where -- there's a

14   group called the Guinean National Ballet.  It's a national

15   dance troupe from the revolutionary time that's trained in

16   singing in every language of former communist countries, so

17   they knew songs in Chinese, so they sang in Chinese to our

18   Chinese guests.  It was a big -- a big event.

19   Q.  Anything else important happen at that particular event?

20   A.  It was decided that the prime minister would take over from

21   there, the talks, and it was agreed that a delegation would

22   leave almost immediately on a further due diligence trip to

23   countries where CIF was active to look at what they had done,

24   ending in meetings in Singapore, where we would start working

25   on the implementation of the first agreements.

1    Q.   You said that the prime minister was going to be going.
2    Would he go alone?
3    A.   No.  The prime minister would be put in charge of the
4    process from then on, of implementation.  He was not -- the
5    prime minister doesn't travel for those things.  He sends
6    ministers.
7    Q.   So who got sent?
8    A.   It was decided that Minister Boubacar Barry would lead the
9    delegation.  I would accompany him.  The president was sending
10   one of his closest adviser -- advisers and the Guinean
11   ambassador to China who I now -- then understood was the origin
12   of introducing CIF to the president, was also part of the
13   Guinean delegation that was to travel.
14   Q.   Who was considered the -- or who were you referring to when
15   you say one of his closest advisers?
16   A.   It's a gentleman called Theodore -- I forgot his last name.
17   He was basically, if you come with the prime minister or the
18   minister and you want to see the president, you have to go
19   through that gentleman or else you won't see the president.
20   That's how close he was.
21   Q.   Did you end up going on that trip?
22   A.   Yes, I did.
23   Q.   And what did you do on that trip?
24   A.   We -- well, I don't remember if it's on that trip that we
25   went to Angola first, but I know that we ended up in Singapore.

1    We had to split up.  I went with the first group, which

2    included Mr. Theodore and Guinean ambassador, we traveled with

3    Sam and his -- and his people in their plane.  Boubacar Barry

4    stayed behind because he was waiting for some documentation to

5    be completed by the government and some decisions to be made

6    and some power of attorney to be drafted and granted to him.

7    So he was asked to stay behind and follow up.  And we went

8    almost as an advance team, basically.

9    Q.  What, if anything, happened on that trip?

10   A.  When we ultimately reached Singapore -- I don't remember if

11   we stopped someplace else -- we had initial meetings and

12   presentations in the Singapore headquarters of CIF.  Mr. Manuel

13   Vicente was already there because some agreements were supposed

14   to be signed, some of the initial agreements.

15   Q.  When you say initial agreements, what do you mean?

16   A.  I mean, I don't remember which exact agreements were

17   supposed to be signed there, but the agreements were signed in

18   stages.  I believe there was a -- an MOU first and then what

19   they call an *accord-cadre*, which is a -- a master agreement.

20   There was a series of agreements that would lead then to the

21   shareholder agreement, which was the last one to be signed.

22   Q.  Do you recall approximately what month that trip took

23   place?

24   A.  I would say it's around June, July 2009.

25   Q.  Were you responsible for drafting any of those initial

1  agreements?

2  A.  No, no.  The drafting was left to -- for the technical

3  team, one set up by the Guinean side and one set up by the

4  Chinese side, and the two teams were exchanging corrected

5  versions of the -- of the agreements.

6  Q.  Were you on that technical team for Guinea?

7  A.  No.  No minister was on the technical team, on the

8  technical committee.

9  Q.  Do you remember when, in relation to that trip that you

10 were just describing, the technical committee had been

11 established?

12 A.  It would have been established shortly prior to the trip

13 itself.  I believe there were -- there were two meetings I

14 remember.  I remember a meeting where a few ministers -- a few

15 ministers were -- met in the prime minister's office to discuss

16 the contours of the deal, and then the next day, the full

17 cabinet meeting was organized, where the technical committee, I

18 believe, the technical team presented -- presented the

19 transaction, the contemplated transaction, decisions were voted

20 on, I believe, we were authorized to travel by their cabinet,

21 so --

22 Q.  Let me stop you.  Were you at that meeting of the Council

23 of Ministers you just described?

24 A.  Yes, I was.  I was.

25 Q.  Do you recall approximately when that took place?

1    A.   In the first time -- in the first half of June 2009.

2    Q.   And at that particular meeting of the Council of Ministers,

3    was there a discussion of the shareholder agreement?

4    A.   I do not remember specifically, but I know at some point it

5    was agreed that the shareholder agreement would ultimately be

6    arrived at, but there were a few steps to -- to go through

7    before we reached a shareholder agreement.

8    Q.   Okay.  And who was -- well, let me rephrase that.

9             What was the technical committee comprised of?  Who

10   was in it?

11   A.   There were a few technical committees.  The first level

12   technical committee, nonministerial -- I mean, I think the

13   prime minister appointed one of the senior advisers -- was

14   Mr. Camara, who has testified here, to lead the committee that

15   would review the contract and negotiate it.  The president had

16   at least two of his top advisers on the committee, I'm sure the

17   two names that Mr. Camara mentioned.  And there might have been

18   a few other people.  Probably one of my -- the legal advisers

19   from the ministry of mines would have been on.  Someone from

20   the ministry of finance, someone from the ministry of justice.

21   Every minister or ministry would have contributed members.  I

22   remember the PM writing me and instructing me to issue a decree

23   naming the committee, and I was sent a list of 17 people, so I

24   remember the number 17 as a number of members of that

25   committee.

1   Q.   Did you have a role in negotiating?

2   A.   No.  I had the role --

3   Q.   Let me back up a little bit.  Did you have a role in

4   negotiating the memorandum of understanding or the master

5   agreement you just described?

6   A.   The MOU, I had the contribution, not a role, because it was

7   early stages and it was important that the contours of the

8   transaction or the structure of the transaction be determined.

9   If I can expand, it's -- it was important to do that because

10  the original plan that the Chinese had was what was commonly

11  known as a global deal.  A global deal had become --

12          THE COURT:  Excuse me.  I don't think we have a

13  question pending to which this is an answer.

14          MR. GOLDSMITH:  Sure.

15  Q.   So please describe what a global deal is.

16  A.   A global deal is the way the Chinese government and Chinese

17  companies had been approaching African countries, resource-rich

18  African and Latin American countries in the previous years,

19  which, in a nutshell, meant, we know you have natural

20  resources.  They usually went into countries where the extent

21  or the value of the natural resources was more or less known.

22  We know you are cash strapped.  We will come in and build

23  roads, railways, ports for you.  In return, you give us these

24  reserves.  And those deals had been signed in the DRC and other

25  countries and had not been --

1    Q.  What is the DRC?

2    A.  The Democratic Republic of Congo.  And they had not been

3    successful.

4    Q.  In what sense were they not successful?

5    A.  They were not successful because the countries usually have

6    a very poor knowledge of how much natural resources they truly

7    have, so they enter into a deal where those resources are

8    valued mostly based on what the Chinese investor tell them they

9    are worth.  So they'll come and tell you, we'll build

10   $2 billion worth of railroads for you, you give us $2 billion

11   worth of reserves.  No one knows if those reserves are not

12   worth $10 billion.  Then the $2 billion worth of railroads very

13   often end up being half a billion dollars' worth of railroads,

14   but no one is really able to value those, those railroads, so

15   the deals were never -- never led to sustainable development in

16   the country, basically.  So we were trying to avoid that.

17   Q.  All right.  And what did you do from there?

18   A.  From there -- so my contribution was just to make sure that

19   it wasn't a global deal, that the spirit of the deal was that

20   China, the CIF, would come co-invest with the Guinean

21   government, they would fund -- they would spend the money in

22   advance, and they would only get back profits from projects we

23   do together if and when those projects are profitable.  And we

24   would only pay them back from our share of the investment from

25   those future profits.

1    Q.  So if you could simplify that a little bit.  Please

2    describe what you hoped to attain with a CIF deal.

3    A.  What we hoped was for a massive injection of cash into the

4    Guinean economy.  That cash would go into areas that were

5    crucial for getting Guinea out of poverty.  It would be crucial

6    for building our rail infrastructure, our road infrastructure,

7    because all the private mining projects that were being

8    developed in Guinea, I would say 80 percent of them were not

9    being developed because there was no rail or road

10   infrastructure to extract that mineral.  The cost of building

11   that infrastructure was so high that the private companies that

12   were developing the mines could not support the cost of the

13   infrastructure and the Guinean government could not support the

14   cost of the infrastructure.  So if another investor came, CIF

15   in this case, and built those rails, those roads, the airports,

16   the hospitals, etc., automatically those mining projects that

17   up to then could not go into development would be able to go

18   into development, export, generate revenue, and pay Guinea its

19   fair share of its revenues.

20   Q.  Is it fair to say that the logistics or the infrastructure

21   would help the profitability of the mining sector?

22   A.  It would help the existence of the mining sector.  It

23   wasn't a matter of the mining sector existing and not being

24   profitable.  It was a matter of the mining sector not being

25   existent.  It was a -- an idea or a kernel of a mining sector.

1   Everything was potential.  And there was no real mining sector.

2   There were few mines that actually exported.  Everything else

3   was exploration project that could take ten years to come into

4   production.

5   Q.  So let's get back to the first trip to Singapore.

6   A.  Mm-hmm.

7   Q.  What, if anything, happened in Singapore on that trip?

8   A.  Well, we landed, and as I said, Boubacar Barry was delayed

9   because the paperwork was not there, and he was the head of the

10  delegation, the only one allowed to negotiate and agree and

11  sign, and he was not there yet.  So we went through a series of

12  presentations.

13  Q.  Why was Mr. Barry the only one who was able to sign?

14  A.  Because he was the chairman of the committee and he's the

15  person that the president knew and trusted and he's the person

16  who had the powers, basically.

17  Q.  Okay.  Please continue.

18  A.  Then so I reported back after the initial meeting to the

19  prime minister, after two days, I reported back to him, about

20  our progress, about who came in the delegation, and about a

21  change that the Chinese side had asked be made in one of the

22  things we had an understanding on prior to the trip.

23  Q.  What's the change?

24  A.  Originally we had agreed with the Chinese that Guinea would

25  take 25 percent of the local joint venture companies that were

1    created, GDC, and China or CIF would take 75 percent.  When we

2    reached there, I believe after they checked with their lawyers

3    and their bankers, apparently there's a provision in their

4    bylaws or in the laws there that said that if they are to front

5    100 percent of the project, 75 percent ownership was too low or

6    not practicable.  I don't know if it was a financial issue, I

7    don't remember, or legal issue.  So I reported that news back

8    to the PM, proposed a fix for the problem.

9    Q.  What did you propose as a fix for the problem?

10   A.  I asked -- if we were asked to reduce from 25 to 10 or

11   15 percent, I asked -- I asked CIF that we are allowed to, in

12   compensation, take 10 to 15 percent into the parent company in

13   Singapore that owns their share of the local company.  So

14   instead of 25 percent of the local company, we would get

15   15 percent of the local, and 15 percent of the parent company.

16   Effectively that would give us 27 percent of the local company

17   as opposed to the 25 percent we had agreed on.  So instead of

18   going down, we were actually going up by two points through

19   that fix.  So I asked the prime minister, I informed the prime

20   minister, I proposed, I suggested a solution, and I asked him

21   to convene the cabinet, vote on it, decide on it, and send me

22   instructions on how to handle it.

23            MR. GOLDSMITH:  Now, Mr. Beer, could you please bring

24   up Government Exhibit 506.

25   Q.  And when you said you had asked the prime minister, what

1  authority did you have to make or enter into those changes at

2  the time?

3  A.  I had no authority.  That's why I had to take -- to advise

4  and take instruction.

5  Q.  All right.  Could you take a look at 506.  Is that on the

6  screen in front of you?

7  A.  Yes.

8  Q.  And could you describe what this communication is.

9  A.  It's an email from me to the prime minister dated July 9,

10 2009.

11 Q.  And what is the purpose of the communication?

12 A.  Well, I was reporting back, I -- informing him that -- that

13 I'm reporting back on our current mission in Asia with CIF,

14 that I traveled with Mr. Kourouma, the personal representative

15 of the president, and --

16 Q.  Is that the individual you were discussing earlier that you

17 couldn't remember the name of?

18 A.  Yes.  I say representative of the PRG, which is the

19 President of the Republic of Guinea, PRG.  Our ambassador in

20 China, Mr. Diare, and myself arrived in Singapore, and I am

21 informing that Mr. Manuel Vicente, the chairman of Sonangol,

22 was already there waiting for us.

23 Q.  And if you skip down to the second to last, and last large

24 paragraph.

25 A.  The last large paragraph, yes.

1    Q.  Yes.

2    A.  Should I read it?

3    Q.  What is this describing?

4    A.  This is describing what I just explained, where we hit the

5    point of disagreement about the fee, the sharing of the equity

6    in the local GDCs, and the Chinese felt that 25 percent was too

7    high and that we should go down to 15.

8    Q.  What does the last line state?

9    A.  The very last line of the email?

10   Q.  Yes.

11   A.  I left -- "I left the board to assess the situation and

12   notify us of the decision."  If I may, this --

13           THE COURT:  Excuse me.  Do you have a question,

14   counsel?

15           MR. GOLDSMITH:  Yes.

16   Q.  And what did you mean by stating that last line?

17   A.  I did not say that.

18   Q.  Well --

19   A.  That was a bad translation.

20   Q.  What did you say?

21   A.  I said I leave it to the cabinets, I leave it to him and

22   the cabinets to assess the situation and instruct me of their

23   decision.

24   Q.  All right.  So instead of "I left the board," it was "I

25   leave it to the board."

1    A.  No.  "I leave it to the cabinet," not the board.  It's the

2    cabinet of ministers, the government.

3    Q.  What, if anything else, happened on that trip to Singapore?

4    A.  Well, then we waited.  I was in touch with Guinea.  I was

5    receiving from CIF draft documents that I forwarded to the

6    prime minister's advisers in Guinea and vice versa, so I was

7    kind of a messenger between the two sides.

8    Q.  Ultimately what happened on that trip?

9    A.  Ultimately Mr. Boubacar Barry came with all the documents

10   and the powers, after what I understand are a few more meetings

11   in Guinea, and -- and I believe we did -- he did execute some

12   of the documents.  He did sign some of the documents.  Some of

13   the documents were sent to sign, yes.

14   Q.  Now when you say that Mr. Barry arrived with the documents,

15   which documents are you talking about?

16   A.  He was supposed to come with first of all powers; he was

17   supposed to have legal official powers to be the signatory.  He

18   was supposed to come with some documents from Guinea that were

19   necessary for us to take shares into the -- into the JV as per

20   Singaporean law.

21   Q.  What do you mean the JV?

22   A.  The joint venture between Guinea and Singapore had to be

23   created, and some documents on -- legal documents from the

24   Guinean side would have been required under Singaporean law to

25   permit Guinea to take -- to take participation in that company.

1   Q.  And when you say the joint venture, is that what we've

2   commonly been referring to at this trial as the CIF investment

3   project?

4   A.  As ADC, yes, African Development Corporation, which is a

5   JVC between CIF and the government of Guinea.

6           MR. GOLDSMITH:  Mr. Beer, could you please publish

7   Exhibit 504.

8   Q.  Mr. Thiam, is 504 up on your monitor?  Do you see it?

9   A.  Yes.

10  Q.  And what is this document?

11  A.  Seems to be an email from myself to my secretary, where I

12  ask her to please print, and it seems to have attachments,

13  China Guinea Development PTE LTD and Singapore bank account

14  opening documents.

15  Q.  If you look directly below the top portion, is there what

16  appears to be a forward email?

17  A.  Yes.  It looks like.  It's an email from Jimmy Leong.

18  Q.  Who is Jimmy Leong?

19  A.  Jimmy Leong was one of the senior employees of CIF.  He

20  could have been the CI -- the CEO of their Singapore

21  operations.

22  Q.  All right.  Quickly review the email sent to you from

23  Mr. Leong.  You don't have to read it out loud.  If you could

24  just read it and let me know you've finished reading it.

25  A.  Okay.

1              Okay.

2    Q.  And what does this email reference?

3    A.  Well, it's -- I believe they are sending us a list of the

4    documents they require that Guinea needs to have to satisfy its

5    part of the -- of the incorporation, and it says that it's --

6    that he's calling Mr. Cheung in Guinea and will help us collect

7    those materials if necessary.

8    Q.  Okay.  What happened next after Mr. Barry executed the

9    agreements in Singapore on this trip?

10   A.  I -- I don't remember.  We might have returned home, we

11   might have traveled onto other places with CIF.  I know there

12   were several trips, but I don't remember the chronology.

13   Q.  Do you recall ever going back to Singapore after that first

14   trip?

15   A.  Yes.  We went to Singapore and Hong Kong several times,

16   yes.

17   Q.  How many times do you recall going to Singapore and Hong

18   Kong?

19   A.  I don't know.  Over what period of time?

20   Q.  Over the period of time from let's say June of 2009 to

21   October of 2009.

22   A.  I would say maybe three, four times.  I might be wrong, but

23   I -- I think.

24   Q.  And who were you traveling to Singapore and Hong Kong with

25   on those trips from June to October of 2009?

H511thi7

1    A.  Most times Sam Pa.  We were traveling most times in his

2    plane.  He would stop by Guinea, pick us up, we would go to

3    Angola, we would go to other places and end up in Singapore and

4    Hong Kong.

5    Q.  What were the purpose of those trips?

6    A.  It was a combination of due diligence trips, implementation

7    trips, continued conversations that -- visiting factories and

8    industries in China and Chinese provinces that would be

9    suppliers of -- under the agreements we had.

10   Q.  How long were you -- or were these trips taking?

11   A.  Could go from few days to a few weeks.

12          THE COURT:  Counsel, is this a good time to break?

13          MR. GOLDSMITH:  Yes, your Honor.  Thank you.

14          THE COURT:  Yes.  So ladies and gentlemen, remember,

15   do not discuss the case.  We'll start tomorrow morning at 9:30.

16   Have a good night.

17          (Continued on next page)

18

19

20

21

22

23

24

25

H511thi7

1           (Jury not present)

2           THE COURT:  You may step down.

3           THE WITNESS:  Thank you.

4           THE COURT:  So Mr. Goldsmith, how much longer do you

5      expect your direct to take?

6           MR. GOLDSMITH:  Probably an hour.

7           THE COURT:  And do you have any other witnesses?

8           MR. GOLDSMITH:  No.

9           THE COURT:  And it sounds like we should have the

10     charging conference then tomorrow morning.  As I remember,

11     counsel wanted the draft charge at 8 a.m.  We'll have the

12     charging conference at 9.

13           Is there anything we need to discuss this evening?

14           MR. DiMASE:  Your Honor, with respect to the charge, I

15     was wondering whether the Court could share just one part of it

16     earlier than 8 a.m. tomorrow, possibly this evening?  That is

17     the Court's instruction on Guinean bribery law.  As the Court

18     is well aware, that is really where the dispute lies in this

19     case, and having an idea of where the Court stands on that

20     instruction I think would help us frame our closing arguments,

21     which I understand will also be sometime tomorrow.

22           THE COURT:  Well, there was basically no dispute on

23     the elements of Guinean law so I'm not planning to surprise

24     you.

25           MR. DiMASE:  Fair enough.

1          THE COURT:  I have looked at your requests to charge.

2     I plan to give a more detailed instruction that follows the

3     expert's testimony that you presented to me and that was

4     undisputed.  And I give separate charges on 192 and 194.  I am

5     going to say, in terms of the elements about whether or not the

6     act was fair or not, and that's language that comes out of the

7     statute, that it is irrelevant whether the defendant might have

8     lawfully or properly engaged or refrained from engaging in the

9     act.  It is also irrelevant whether the defendant was the final

10    decision maker or even able to achieve the objective of the

11    bribe.

12          I also, separately from that, am toying with a charge

13    on the benefit to Guinea and planning to say something like the

14    following:  "You've heard testimony about the extent to which

15    Guinea did or did not benefit or was expected to benefit or not

16    from its agreements with China International Fund and related

17    entities and the extent to which those agreements complied with

18    certain provisions of Guinea's laws.  As I've told you, it

19    violates of the law of Guinea for a public official to be

20    offered, solicited, or receive a bribe in return for engaging

21    or refraining from engaging in an act connected with his

22    official position.  This is true whether the acts will or will

23    not benefit Guinea.  Similarly, if you find that the government

24    carried its burden of proving beyond a reasonable doubt each of

25    the elements of the crimes charged in Counts One and Two, each

H511thi7

```
1     of which charges a violation of United States law, it is
2     irrelevant whether Guinea did or did not benefit from its
3     agreements with China International Fund and others."  But I'm
4     still working on that language.
5              Does the government have anything else to discuss
6     tonight?
7              MR. KOBRE:  No, your Honor.
8              THE COURT:  Mr. Goldsmith.
9              MR. GOLDSMITH:  Nothing, your Honor.
10             THE COURT:  Okay.  Now, Mr. Goldsmith, you had raised
11    the issue earlier about 404(b) issues, and I know you wanted to
12    talk about that with the government.
13             MR. GOLDSMITH:  Yes.  We started some conversations
14    about it earlier.  In a nutshell, the government's views -- the
15    material that they had globally referred to earlier as
16    impeachment material, appropriate for their cross-examination,
17    I think obviously we'll continue to discuss things this evening
18    to narrow that down.
19             THE COURT:  Thanks so much.
20             Have a nice evening.
21             THE DEPUTY CLERK:  All rise.
22             (Adjourned to May 2, 2017, at 9:00 a.m.)
23
24
25
```

INDEX OF EXAMINATION

Examination of:                                          Page

PATRICK KILLEEN

Direct By Ms. Laryea . . . . . . . . . . . . 542

Cross By Mr. Goldsmith . . . . . . . . . . . 559

Redirect Ms. Laryea  . . . . . . . . . . . . 562

STACEY HAYES

Direct By Mr. Kobre  . . . . . . . . . . . . 563

Cross By Mr. Delakas . . . . . . . . . . . . 587

Redirect By Mr. Kobre  . . . . . . . . . . . 600

AJAY DAMLE

Direct By Mr. DiMase . . . . . . . . . . . . 601

Cross By Mr. Delakas . . . . . . . . . . . . 637

Redirect By Mr. DiMase . . . . . . . . . . . 665

MOMO SAKHO

Direct By Mr. Goldsmith  . . . . . . . . . . 669

Cross By Mr. DiMase  . . . . . . . . . . . . 681

Redirect By Mr. Goldsmith  . . . . . . . . . 687

MAHMOUD THIAM

Direct By Mr. Goldsmith  . . . . . . . . . . 697

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 1401R, 201, 203, 204, 205, 205A, and  . . . . 536

          205C

 1405R, 501-545, 506-T, 509-T, 510-T,  . . . . 540

1                  511-T, 512-T, 514-T, 517-T,

2                  519-T, 525-T, 527-T, 530-T,

3                  531-T, and 536-T

4      1408, 101, and 102A-102H   . . . . . . . . . 541

5      105A and 105B   . . . . . . . . . . . . . . 543

6       1005 and 1006 . . . . . . . . . . . . . . 551

7      1101    . . . . . . . . . . . . . . . . . . 578

8      1414    . . . . . . . . . . . . . . . . . . 541

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25