H521thi1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                            17 Cr. 47 (DC)

5  MAHMOUD THIAM,

6                  Defendant.             Trial

7  ------------------------------x

8                                         New York, N.Y.
                                          May 2, 2017
9                                         9:00 a.m.

10

   Before:
11
                         HON. DENISE COTE,
12
                                          District Judge,
13                                          and a Jury

14                            APPEARANCES

15 JOON H. KIM
        Acting United States Attorney for the
16      Southern District of New York
   BY:  ELISHA J. KOBRE
17      CHRISTOPHER J. DiMASE
        Assistant United States Attorney
18
           -and-
19
   U.S. DEPARTMENT OF JUSTICE
20 BY:  LORINDA I. LARYEA

21 LAW OFFICE OF AARON GOLDSMITH, PC
        Attorneys for Defendant
22 BY:  AARON M. GOLDSMITH, ESQ.
        MICHAEL DELAKAS, ESQ.

23
   ALSO PRESENT:  PATRICK KILLEEN, Special Agent, FBI
24                ALEXANDER BEER, Paralegal Specialist, USAO
                  KATHERINE BOSLEY, Paralegal Specialist, DOJ
25                JENNIE CARMONA, Defense Paralegal

H521thi1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning, everyone.

3           ALL COUNSEL:  Good morning.

4           THE COURT:  Let's mark the draft jury charge and

5    verdict form as court exhibits.

6           THE DEPUTY CLERK:  Court Exhibit 2.

7           THE COURT:  And the verdict form?

8           THE DEPUTY CLERK:  Court Exhibit 3.

9           THE COURT:  Does the government have any requests or

10   objections with respect to the jury charge?

11          MR. KOBRE:  Your Honor, I think we have two small

12   requests.  I haven't had a chance to discuss them with defense

13   counsel yet.  If we might have another few minutes just to do

14   that.  Or I can just raise them with the Court right now.

15          THE COURT:  Well, let me ask Mr. Goldsmith, do you

16   have any requests or objections?

17          MR. GOLDSMITH:  I have two very small requests.  I'm

18   sorry.  Three very small requests.

19          THE COURT:  Okay.  So everyone will chat and then

20   you'll tell Ms. Rojas when you're ready.  Thank you.

21          MR. GOLDSMITH:  Thank you.

22          THE DEPUTY CLERK:  All rise.

23          (Recess)

24          (In open court; jury not present)

25          THE COURT:  So, counsel, we only have about six

H521thi1

1    minutes, so you might want to break.  We need to be ready to

2    proceed at 9:30 if we have a jury, so we'll spend a few minutes

3    here addressing these issues and then we'll take a brief recess

4    and resume.

5         Okay.

6         MR. KOBRE:  Judge, yes, thank you.  So the government

7    has two issues, and then we're going to discuss a few that

8    defense counsel was going to raise.

9         So the first one, from the government's perspective,

10   is on page 14, and the government asks that the Court include

11   the words "or only" after the word "final," so --

12        THE COURT:  Where are you?  What paragraph?

13        MR. KOBRE:  I'm sorry, Judge.  Paragraph 3, the last

14   sentence.  "It is also irrelevant whether defendant was the

15   final," and then the government would ask that the words "or

16   only" be inserted.

17        THE COURT:  Fine.

18        MR. GOLDSMITH:  We have no objection, your Honor.

19        THE COURT:  Thank you.

20        MR. KOBRE:  And the next one is on page 18.  It does

21   concern a matter of dispute between the parties, so --

22        THE COURT:  Then it should have been addressed at 9.

23   Anyway, keep going.

24        MR. KOBRE:  Yes, Judge.

25        The first element on page 18, that the defendant

H521thi1

conducted or attempted to conduct a financial transaction in

November 2010 through a bank account in New York, the

government doesn't believe that that is a necessary part of the

element, that the financial transaction be conducted through a

bank account in New York, and asks that that last phrase be

stricken.

THE COURT:  Count Two?

MR. KOBRE:  Yes, Judge.

THE COURT:  And Count Two in the "To Wit" section

describes a transfer of $375,000 from the Hong Kong account

through Malaysia, through Mozambique, to New York, to conceal

or disguise ownership or control of the Dutchess County estate

and the tortious proceeds used to purchase the Dutchess County

estate.  So I agree it's not a requirement of the statute, but

it was the focus of the indictment charge.

MR. KOBRE:  Your Honor, I think with respect to the

first part of the "To Wit" clause, it refers to a transaction

from the Hong Kong account to an account in Malaysia, and that

transaction -- there are two transactions sort of described in

the "To Wit" clause, but the government's position is that the

first transaction, which is not itself through a bank account

in New York, would be sufficient -- namely, the transfer from

Hong Kong to Malaysia in furtherance of the concealment.

THE COURT:  So if it's an entirely foreign

transaction, how does it affect interstate or foreign commerce?

H521thi1

1            MR. KOBRE:  Your Honor, it would be a parallel

2     transaction.  In other words, the defendant is transferring

3     money from Hong Kong, and that the proof at trial thus far has

4     shown that the defendant was transferring that money in

5     exchange for, and by agreement with another, a related and

6     parallel transaction from the bank account in Mozambique to the

7     lawyer, to Mr. McGregor, who is the buyer's attorney for the

8     house, so it affects that.  There is a transaction that's part

9     of this.  It's a two-stage transaction, in essence, involving a

10    bank account in Dutchess County and involving a property in

11    Dutchess County.

12            THE COURT:  So you agree that there has to be a

13    financial transaction through a bank account in New York.

14            MR. KOBRE:  But not that the defendant himself

15    conducted it.

16            THE COURT:  That's true.  That's true.

17            MR. KOBRE:  And I would just add, your Honor, if I

18    might --

19            THE COURT:  Hold on.

20            MR. GOLDSMITH:  Your Honor, if I may.

21            THE COURT:  Hold on one second.

22            Yes.  Mr. Goldsmith.

23            MR. GOLDSMITH:  My concern is about the government's

24    request on page 18, where, similar to what the Court expressed,

25    which is: (1) Count Two in the indictment is directed at the

H521thi1

1    Dutchess County transaction; and (2) that without the element,

2    without the description of the transaction coming into New York

3    that the government lacks jurisdiction on it, and it is my

4    concern that eliminating the characterization line of "in New

5    York" makes the charge too broad and that it could potentially

6    allow for the jury to be solely considering only the

7    international aspect of any transactions in November of 2011 --

8    or 2010.

9           THE COURT:  Okay.  It's 9:30.  Let me consult with

10   Ms. Rojas.

11          Okay.  So I think I have a way to resolve this, but

12   we're going to take a brief recess, unless you tell me that you

13   don't need a recess for an hour and a half to two hours.

14          MR. KOBRE:  No.  The government does not require a

15   recess.

16          THE COURT:  Mr. Goldsmith.

17          MR. GOLDSMITH:  No.

18          THE COURT:  Okay.  Great.

19          So with respect to Mr. Goldsmith's concern, I think

20   the charge on the fifth element reduces that risk, but let's

21   talk about the first element.  And how about if I amend it to

22   say, "The defendant conducted or attempted to conduct a

23   financial transaction in November 2010 related to the Dutchess

24   County residence"?

25          MR. KOBRE:  I think that would be fine, your Honor.

H521thi1

```
 1              MR. GOLDSMITH:  Yes, your Honor, that's fine.

 2              THE COURT:  Next.

 3              MR. KOBRE:  That was all for the government, your

 4    Honor.

 5              THE COURT:  Mr. Goldsmith.

 6              MR. GOLDSMITH:  The first minor issue I had was

 7    page 10, second element of Count One.

 8              THE COURT:  Yes.

 9              MR. GOLDSMITH:  And the government I believe consents

10    with me to add language that mirrors the language used in the

11    Count Two charge where, following the end of the paragraph

12    under the second element, the Court would say something to the

13    effect of, "as I will instruct you on shortly."

14              THE COURT:  Okay.  I'm sorry.  I'm not following you.

15    I'm on page 10, second element?

16              MR. GOLDSMITH:  "At least 10,000 of the property that

17    was the subject of that monetary transaction was criminally

18    derived property from specified unlawful activity," "as I will

19    instruct you on shortly," to better clarify the specified

20    unlawful activity.

21              That the transaction of $10,000 in and of itself is

22    not unlawful activity.

23              THE COURT:  So as revised, it would read, that is, on

24    page 10, second element, "that at least $10,000 of the property

25    that was the subject of the monetary transaction was criminally
```

H521thi1

```
1    derived property from the specified unlawful activity, on which

2    I will instruct you shortly."

3              MR. GOLDSMITH:  Yes.

4              THE COURT:  Thank you.  Next.

5              MR. GOLDSMITH:  Next is page 16.  The last sentence of

6    the charge on Count One, which currently reads, "constitutes a

7    criminal offense under a nation's laws."  I would request --

8    and I believe the government consents to changing "a nation's"

9    to "Guinean."

10             THE COURT:  Thank you.  Let me just read it.

11             So the last line on page 16 would read, "constitutes a

12   criminal offense under the laws of Guinea."

13             MR. GOLDSMITH:  Yes.

14             THE COURT:  Is there a consent?

15             MR. KOBRE:  Yes, your Honor.

16             THE COURT:  Great.  Next?

17             MR. GOLDSMITH:  Finally, your Honor, on page 29 --

18             THE COURT:  Yes.

19             MR. GOLDSMITH:  -- under the first paragraph, first

20   sentence, under Consciousness of Guilt From False Exculpatory

21   Statements, the charge includes, under the second line,

22   "statements to law enforcement authorities and bank employees

23   in which defendant claimed that his conduct was consistent with

24   innocence."  I would request that the terms "and bank

25   employees" be deleted.
```

H521thi1

1              THE COURT:  Why?

2              MR. GOLDSMITH:  Because there's not been evidence that

3    the defendant denied any bribery or illegality in the country

4    of Guinea within his interviews with the bank employees.

5              THE COURT:  Oh, I don't know about that.  I don't know

6    about that.  No.  I think actually the record is that one could

7    find from this record that he deliberately lied to the bank

8    employees to disguise the fact that he was engaged in illegal

9    activity in Guinea while receiving bribe money while the

10   minister of mines in that country.

11             MR. GOLDSMITH:  I think that the record is perhaps

12   showing that he made misstatements about him being the minister

13   of mines, but I don't think that it relates back to the

14   impropriety related to his being the minister of mines.

15             THE COURT:  Okay.  Well, that's an argument for the

16   jury and summation, and you're free to make that.

17             Good.  Anything else, Mr. Goldsmith?

18             MR. GOLDSMITH:  Nothing, your Honor.

19             THE COURT:  Okay.  Good.  And any objections or

20   requests with respect to the verdict form?  From the

21   government?

22             MR. KOBRE:  No, your Honor.

23             THE COURT:  Mr. Goldsmith?

24             MR. GOLDSMITH:  No.

25             THE COURT:  Okay.  Good.  So let me just make sure

H521thi1

1   that I didn't have any issues to raise with you.

2              As you'll note, on page 32, I had bolded -- I bolded

3   several passages, really.  I bolded material on 25, 26, and 32

4   because I'm not sure I need any of that material in this

5   charge.

6              On 25, I'm not sure we have impeachment yet with

7   inconsistent prior statements of a witness.  I mean, there was

8   some brief reference, but I don't think it would really rise to

9   this level yet, but we're not done with the cross-examination

10  of the defendant.  We haven't begun the cross-examination of

11  the defendant.  So anyway, if I don't feel that there's

12  anything in the record that would support this, I'm just going

13  to cut it out, and that's why I bolded it.

14             With respect to 32, investigative techniques, I don't

15  actually think it's been a big focus of this trial.  Are you

16  expecting to sum up on that theme, Mr. Goldsmith?

17             MR. GOLDSMITH:  Not the techniques themselves, no.

18             THE COURT:  Or the --

19             MR. GOLDSMITH:  What I would say is --

20             THE COURT:  -- absence of proof?

21             MR. GOLDSMITH:  -- keep it in for now.  If at the

22  close of summations the Court feels it's appropriate to keep

23  in --

24             THE COURT:  Well, actually, it's a little more

25  complicated than that because we make the copies during

H521thi1

1    summations so that the jury can have copies, as is indicated in

2    the charge, in their hand as I read it to them.  So I can't

3    wait --

4              MR. GOLDSMITH:  Obviously I'll be attacking evidence

5    but I'm not going to be attacking the means and methods that

6    the government used, which is I think more what's charged on

7    page 32 goes after.

8              THE COURT:  I guess the thrust of the summation

9    argument would be that there's been a failure of proof because

10   they didn't use particular techniques.  And I'm not asking you

11   to -- well, I guess I am asking you to foreshadow your

12   summation.  I'll keep it in unless you tell me that -- okay.

13   I'll just keep it in, not hearing a commitment.  So I'll unbold

14   that.

15             And I'll be able, after the close of the evidence,

16   before summations, to decide whether or not the bolded material

17   on 25 to 26 should come out.

18             Okay.  Good.  I guess that's it.

19             You saw what I did with respect to translations.  A

20   little surprising to me, but the defendant yesterday took issue

21   with one of the translations that had been stipulated to, so

22   you saw at 31, I sort of played with that language at the

23   bottom of 31.  I think it's pretty soft.  I don't think it's

24   objectionable.  But that's what prompted that change.

25             Good.  Well, thank you for your comments, and

H521thi1                          Thiam - Direct

1   Ms. Rojas will tell us when we have a jury.

2              THE DEPUTY CLERK:  All rise.

3              (Recess)

4              (In open court; jury not present)

5              THE COURT:  The witness may take the stand.  The

6   defendant may take the stand.

7              Bring in the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.

3              THE JURORS:  Good morning.

4              THE COURT:  I remind the defendant he is still under

5     oath.

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  Counsel.

8              MR. GOLDSMITH:  Thank you, your Honor.

9      MAHMOUD THIAM, resumed.

10    DIRECT EXAMINATION CONTINUED

11    BY MR. GOLDSMITH:

12    Q.  Mr. Thiam, we finished yesterday afternoon with you

13    describing the number of trips that you had between Guinea and

14    Singapore and China.  How many trips did you have in total?

15    A.  I cannot remember, but many; multiple trips.

16    Q.  And how long were these trips, typically?

17    A.  Anywhere from three, four days to two weeks.  I've had

18    trips that lasted six weeks, touring China with --

19             THE COURT:  Okay.  Excuse me.  If you could pull your

20    chair up, keep your voice up, pull that mic up under your chin.

21    We need to hear you.  Thank you.

22             THE DEFENDANT:  Yes, your Honor.  I'm sorry.

23    Q.  Were you working the entire time?

24    A.  No.  There was a lot of down time.  Those were very long

25    trips.  We were hosts of CIF, and most of the time we basically

1    spent all day together, either visiting factories, visiting

2    sites, hosted for lunches, dinners, sometimes sightseeing

3    trips.

4    Q.  So were you discussing the CIF investment project all day?

5    A.  No, no, not -- there was a lot of, as I said, social time.

6    Q.  What do you mean social time on those trips?

7    A.  General conversations, spans anything from global affairs

8    to family affairs to future, what we will do later, my life

9    after, after I leave government and so on.

10   Q.  I'd like you to take a look at Government Exhibit 401.

11   While that's coming up, have you seen this document before?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's the memorandum of understanding between China

15   International Fund and the government of Guinea dated June 6,

16   2009.

17   Q.  And did you sign it?

18   A.  No.

19   Q.  Did you have any role in drafting it?

20   A.  Not in the drafting, no.

21   Q.  What was your role in regards to the memorandum of

22   understanding?

23   A.  It's -- I was involved earlier on in helping set the

24   general contours of our -- of our understanding with CIF, how,

25   from the Guinean side, we understood it should be and what it

H521thi1                        Thiam - Direct

 1   should not be.

 2   Q.  I'd like you to take a look at Government Exhibit 402.

 3           MR. GOLDSMITH:  Mr. Beer, if you could bring that up.

 4   Q.  Do you recognize this document?

 5   A.  Yes.

 6   Q.  What is it?

 7   A.  It's the master agreement between the Republic of Guinea

 8   and the CIF.  It's dated June 12, 2009.

 9   Q.  Did you sign it?

10   A.  No.

11   Q.  What was your -- withdrawn.

12           Did you have any role in drafting it?

13   A.  Not in the drafting, no.

14   Q.  What was your role in regards to the master agreement dated

15   June 12th of 2009?

16   A.  Same as the MOU, just make sure that the spirit of our

17   understanding is -- is included in.

18   Q.  I'd like you to take a look at Government Exhibit 403.

19           MR. GOLDSMITH:  Mr. Beer, if you could please show

20   that.

21   Q.  Do you recognize this document?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's loan agreement between the Republic of Guinea and CIF

25   dated June 12, 2009.

1    Q.   Did you sign this agreement?

2    A.   I would have to see the rest of the body because there is a

3    few loan agreements.  I don't know which one this is.  I do not

4    see my initials.

5    Q.   Could you take a look at page 6.

6              There we go.

7    A.   Yes.  No, I did not sign this agreement.

8    Q.   Did you have any role in drafting the agreement?

9    A.   No.

10   Q.   Was this agreement a loan agreement regarding the

11   $78 million that CIF provided the government of Guinea?

12   A.   Yes.  Yes, although it could be just a 50 million portion

13   that went to the ministry of finance or the full 78.  I don't

14   remember if it was one agreement or two agreements.

15   Q.   Could you please take a look at Government Exhibit 404.

16             MR. GOLDSMITH:  Mr. Beer, if you could also bring that

17   up as well.

18   Q.   Do you recognize this agreement?

19   A.   Yes.

20   Q.   What is it?

21   A.   This is the agreement -- it's a production sharing

22   agreement for oil exploration between China Sonangol, CIF, and

23   the government of Guinea.

24   Q.   If you recall, did you sign this agreement?

25   A.   I believe I did, yes.

H521thi1                          Thiam - Direct

1    Q.  Did you have a role in drafting the agreement?

2    A.  Not in the drafting, no.

3    Q.  Now you testified that you signed it.

4    A.  Yes.

5    Q.  Why did you sign this particular agreement but not the

6    others so far?

7    A.  Because this one specifically relates to the ministry I was

8    in charge of.  It's -- it's an oil-sharing, production-sharing

9    agreement, and as minister of mines and energy, I was in charge

10   of the oil sector so this is -- would be my responsibility.

11   The others were not.  The others were not mining agreements so

12   I had no role in signing them.

13   Q.  Well, let's just clarify the distinction between the

14   memorandum of understanding and master agreements from June and

15   this agreement, also dated June, which you did sign.

16   A.  Yes.

17   Q.  So why is it that you signed this one but not the

18   memorandum of understanding or the master agreement?

19   A.  The memorandum of understanding and the master agreement

20   were agreements between Guinea as a country and CIF, spanning

21   multiple sectors of Guinea, the Guinean economy, from

22   agriculture to fisheries to transportation, to clean water, to

23   power, and mining was one of maybe seven sectors out of the

24   sectors that were concerned.  Then those agreements state that

25   CIF and the government of Guinea will then choose together

H521thi1                          Thiam - Direct

1    which specific projects to pursue and the minister in charge of

2    the sector of the individual projects then would sign

3    individual agreements related to their own sectors.  This is an

4    individual agreement relating to my sector, which was mines.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. GOLDSMITH:

2    Q.  I'd like you to take a look at Government Exhibit 405.

3          MR. GOLDSMITH:  Mr. Beer, would you show 405.

4    A.  Yes.

5    Q.  What is this?

6    A.  This is a cover sheet that accompanies a letter between a

7    minister and another minister or the prime minister and one of

8    his ministers, and this is a cover letter of -- a cover letter

9    from the prime minister's office to the minister of state,

10   Boubacar Barry.

11   Q.  If you could look at the next page, is this the letter you

12   were just referring to?

13   A.  Yes.

14   Q.  And what is the purpose of the letter?

15   A.  This is a letter that the prime minister addresses to the

16   minister of state, and basically he states that as he has

17   informed him before, he has asked Minister Mahmoud Thiam, which

18   is me, currently in Asia with the president of CIF, Mr. Sam, to

19   please send us a list of all the documents required to finalize

20   the creation of the ADC Holding Company.

21         MR. GOLDSMITH:  Is there another page on that exhibit,

22   Mr. Beer?

23   Q.  And if you could describe what this is, Mr. Thiam.

24   A.  This is an email from, it seems to be a forward of an email

25   from me to the prime minister -- no.  Sorry.  It's an email

1    from me to the prime minister -- I'm sorry -- with the July 9,

2    2009, and where I refer to my previous telephone conversation

3    with him, and I submit to him the list of the documents

4    necessary for us to conduct our mission in Asia.

5    Q.  And were these documents at the request of the Chinese or

6    at the request of the Guineans?

7    A.  Those are the documents the prime minister referred to in

8    the previous email where he asked me to make, to give him a

9    list, to obtain from the Chinese a list of all the documents

10   required to complete the, the creation of the joint venture

11   company.  It asks for documents that would allow the Guinean

12   central bank to open a bank account in Singapore or in China,

13   all the documents that would be required to justify, to legally

14   justify Guinea's taking participation in ADC; the power of

15   attorneys to the minister of state that will allow him to sign

16   the different agreements, and all the documents that would be

17   required for ADC and CIF to be able to open and maintain a bank

18   account at the central bank of Guinea.

19   Q.  Did you have any role in determining which documents were

20   necessary?

21   A.  No.  I was just sent basically a list of requirements from

22   both side, and I transmitted it to each side.

23   Q.  If I could have you take a look at Government Exhibit 406,

24   have you seen this document before?

25   A.  Yes.

1    Q.   What is it?

2    A.   This is the master agreement between the government of

3    Guinea, CIF, and China Sonangol, dated July 18, 2009.

4    Q.   Did you sign this agreement?

5    A.   No.

6    Q.   Did you draft the agreement?

7    A.   No.

8    Q.   Did you have any responsibilities associated with the

9    creation of this version of the master agreement?

10   A.   No.

11   Q.   Now, are you aware of whether or not there was a meeting or

12   convening of the council of ministers in or about October 8,

13   2009, related to the shareholders agreement?

14   A.   Yes.

15   Q.   Were you at that meeting?

16   A.   Yes, I was.

17   Q.   And there was testimony earlier in this trial that the

18   technical committee raised concerns about the draft of the

19   shareholders agreement?

20   A.   Yes.

21   Q.   First of all, what was the technical committee?

22   A.   The technical committee was a committee of advisers headed

23   by the prime minister's senior adviser, a few of the prime

24   minister's advisers, advisers from the president's office, and

25   advisers from various ministries.

1   Q.  Did they express any of their concerns to you directly?

2   A.  After the, after the cabinet meeting, the prime minister

3   called me and informed me that he was sending the technical

4   committee to visit me and to discuss some of their comments and

5   concerns.

6   Q.  Do you remember what their specific concerns were at the

7   time?

8   A.  In general, yes.  In general terms, they were concerned

9   about certain clauses of the contract that they felt either

10  violated Guinean law or gave exclusivity in some areas that

11  apparent -- that the law did not permit.

12  Q.  And what, if any, response did you give them?

13  A.  Well, I couldn't give them much of a response, because that

14  decision was way over my head.  I took notes and told them that

15  we would discuss it with my bosses, which is the prime

16  minister, Boubacar Barry, and the president.

17  Q.  Did you discuss those concerns with Mr. Barry, the prime

18  minister, and the president?

19  A.  Yes.

20  Q.  And what, if any, reaction did you receive?

21  A.  Well, there were two levels of reaction.  Between

22  Mr. Barry, the prime minister and myself, we looked at the

23  document again, and we found that some of the concerns were a

24  misreading of the text of the agreement.  The exclusivities

25  were not blanket exclusivities, but standard exclusivities,

1   clauses relating to specific projects, which were not only

2   normal but necessary, and so we took those to the president and

3   basically instructed the prime minister to proceed.

4            MR. GOLDSMITH:   Could we please take a look at

5   Government Exhibit 408.

6   Q.   Do you recognize this document?

7   A.   Yes.

8   Q.   What is it?

9   A.   It's a shareholder agreement between the Republic of

10  Guinea, CIF, and China Sonangol International, dated October

11  10, 2009.

12  Q.   Is this the -- withdrawn.

13       Were the concerns that were addressed by the technical

14  committee changed at all by the time this document was signed?

15  A.   I'm not 100 percent sure.   I know that there was a lot of

16  back-and-forth between the two negotiating teams, and the final

17  document that was brought by the Guinean technical team is this

18  one to the signature table.   I know that some of the concerns,

19  that the decision makers have decided that were not justified

20  and were ignored and some of them were just misreadings, so I'm

21  not sure what made it and what did not make it.

22  Q.   Do you see your initials on this document?

23  A.   Yes.

24  Q.   And where are they?

25  A.   At the bottom right, the MT.

1   Q.  Did you sign this document?

2   A.  No.

3   Q.  Did you draft the document?

4   A.  No.

5   Q.  Other than what you've already described, did you have any

6   additional role in how the document was created?

7   A.  No.  No minister had the role in that.

8   Q.  Why did you initial but not sign?

9   A.  Frankly, I'm not sure.  I must just have been around and as

10  one of the ministers present they asked me to initial it, but

11  it's not a document as a minister of mines I was supposed to

12  sign.

13  Q.  Did you receive any bribe from anyone at CIF or Sonangol

14  related to the shareholder agreement that is Government Exhibit

15  408?

16  A.  No.

17  Q.  Did you receive any bribe related to the master agreements

18  that you've discussed earlier, whether they be June or July

19  2009 --

20  A.  No.

21  Q.  -- from CIF or Sonangol?

22  A.  No.

23  Q.  Did anyone approach you at any time from CIF or Sonangol to

24  offer you money or other benefits to do something related to

25  those agreements?

1   A.  No.

2   Q.  Did anyone from CIF or Sonangol ever offer you any money or

3   benefits to not do something in relation to those agreements?

4   A.  No.

5            MR. GOLDSMITH:  Could we please take a look at

6   Government Exhibit 409.

7   Q.  Have you seen this document before?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's another loan agreement between the Republic of Guinea

11  and CIF as the lender.

12  Q.  Did you sign this loan agreement?

13  A.  There's no indication as to the subject, so I'm not sure if

14  this one is one I signed or not.

15           MR. GOLDSMITH:  Could we highlight page 19, Mr. Beer.

16  Thank you.

17  A.  Yes.  Yes, I signed this document.

18  Q.  Do you remember anything else about this particular

19  agreement?

20  A.  Yes.  It's a loan agreement between the Republic of Guinea

21  and CIF as per our general agreement, and this was a short-term

22  loan of about, I think, I believe $3.3 million to pay for an

23  emergency audit of a mining company with which the government

24  of Guinea was in conflict.

25  Q.  Why, if you recall, is the government of Guinea requesting

1   a loan to pay for auditing expenses?

2   A.   Because we have, as I mentioned, a conflict with the mining

3   company.  The government of Guinea was claiming that the

4   company owed Guinea about $2 billion in back taxes, rent, and

5   other, and other receivables.  The Russian company was denying

6   it.  The audits that were performed were performed by local

7   auditors that we did not feel would be acceptable to an

8   international tribunal, and we planned to go to an

9   international tribunal, and we needed on an emergency basis a

10  full audit done by a reputable international firm so that we

11  could use that, the results of the audit, abroad.

12  Q.   In short, the government of Guinea did not have the money

13  on hand to pay for the audit?

14  A.   No.

15  Q.   Did there come a time when you stopped your, or stopped

16  working for the government of Guinea?

17  A.   Ultimately, yes.

18  Q.   When was that?

19  A.   December 2010.

20  Q.   When did you start your position as the minister of mines?

21  A.   January, mid-January, 2009.

22  Q.   How long of a period of time were you the minister of

23  mines?

24  A.   About two years, a little under two years.

25  Q.   Do you recall yesterday testifying about your acceptance to

1    the role of minister of mines?

2    A.  Yes.

3    Q.  Was there a different time frame that you had in mind when

4    you accepted the position?

5    A.  Yes.  My personal time frame originally was six months, and

6    they asked me to commit to at least 12 to 18 months, which I

7    did.

8    Q.  And you stayed longer than the 12 to 18 months, though,

9    correct?

10   A.  Yes.

11   Q.  Why?

12   A.  When the first 12 months came along, I tried to resign.  I

13   was asked to stay on because the country was going through

14   turmoil.

15   Q.  Who asked you to stay on?

16   A.  The head of state of France.

17   Q.  What was the turmoil that was going on at the time?

18   A.  There was massive civil unrest.  The tensions between the

19   military and the population and the politicians were rising.

20   The pressure was mounting on the military to shorten their

21   announced two-year stay, and the sanctions regime was taking

22   its toll, and people were really concerned that it might

23   disintegrate into civil unrest or even civil war or something

24   worse.

25   Q.  Why did the French government ask you to stay on?

1    A.  Because they were concerned about the ability of President

2    Dadis to maintain calm and avoid a massacre.  They asked my

3    opinion.  I told them that really I was not in a position to

4    answer then, but since I was flying from France, once I

5    reached, I would try to appraise the situation.  They suggested

6    sending an observation team to come help assess.  I informed

7    the president that an observation team would be coming, and

8    that if they felt he was in a position to maintain calm and

9    avoid a disaster, they would not press on their threat to send

10   in international troops, which we felt would further

11   destabilize the country if it was done, because we did not know

12   how the soldiers would react.

13   Q.  Did you ultimately make a decision based on that request?

14   A.  Based on that request, yes, I agreed to stay.

15   Q.  Had you continued to have discussions with the

16   representatives from CIF and Sonangol after the October

17   shareholders agreement was executed?

18   A.  Yes, but less for a period, because as I said, things were

19   getting very tense.  They led to the president being shot in

20   the head by his own head of security, and everything went

21   downward from there, so no one was really focused on anything

22   else but the survival of the country and their own survival at

23   that time.

24   Q.  Did you receive a payment of any funds from Sam Pa?

25   A.  Yes, I did.

1   Q.  How much money did you get from Sam Pa?

2   A.  In totality, $8.5 million.

3   Q.  Why did you get money from Sam Pa?

4   A.  Because I asked him on a few occasions for a personal loan.

5   Q.  Personal loan of $8-1/2 million?

6   A.  Originally, no.  Originally it was five, and then I asked,

7   and then I asked him for another loan.

8   Q.  Why did you ask Sam Pa?

9   A.  Because he's the only person I knew then who had virtually

10  unlimited funds and could do it.  He's the only person I could

11  ask without it looking like I was asking for something in

12  return for something else I could give him in Guinea, where I

13  was a minister.

14  Q.  Let me stop you.  You were in ongoing business

15  relationships with Mr. Sam Pa as the minister of mines of

16  Guinea?

17  A.  I would not call it a business relationship.  My role as

18  minister was also to take Mr. Pa to countries outside of Guinea

19  as per our agreement and to help CIF in their venture with

20  Guinea get contracts in those other countries.

21  Q.  Why did you believe that it was appropriate for you to ask

22  Sam Pa for a personal loan?

23  A.  Well, I don't know about appropriate.  It was a desperate

24  situation, and he's the only person I could ask, as I said,

25  again, without compromising myself.

H52Wthi2                          Thiam - Direct

```
 1    Q.  Why did you need $5 million?

 2    A.  Because my financial situation as I went into Guinea had

 3    basically deteriorated.  The moneys that Baker had collected on

 4    my behalf out of the moneys he owed me we spent between him

 5    maintaining me in Guinea and maintaining my family in New York.

 6    Q.  Let me stop you.  Who is Baker again?

 7    A.  Baker Al-Sadi, my business partner I mentioned yesterday.

 8    Q.  So you had ongoing business relationships with Mr. Al-Sadi

 9    while you were the minister of mines?

10    A.  I have had an ongoing business relationship with Baker from

11    before I was a minister.

12            THE COURT:  So is that a yes?

13            THE WITNESS:  Yes -- no.  That's a no.

14    Q.  Let me clarify.  Did you have an existing business

15    relationship with Baker Al-Sadi prior to becoming the minister

16    of mines?

17    A.  Yes.

18    Q.  What was that relationship?

19    A.  It was a personal and business relationship.  We had

20    multiple transactions and business deals together.  Some of

21    them had materialized and generated profits.  Some of them were

22    still pending, and so basically when I decided to go to Guinea

23    and I decided to cover my own expenses for everything, I went

24    to him and asked him to make sure that both my expenses and my

25    family's expenses were taken care of.
```

1    Q.   And why did you need $5 million from Sam Pa if you had an

2    existing business relationship with Baker Al-Sadi?

3    A.   Because the money with Baker ran out.   The businesses that

4    we were counting on to keep surviving during my stay in Guinea,

5    because of the crisis, virtually all went belly-up, and I had

6    accumulated extraordinary debt, and I needed to repay that debt

7    urgently, and the money I asked as a loan from Sam was mostly

8    to pay for that, for debt.

9    Q.   What did Sam get in return from you for lending the money?

10   A.   A promise to repay, and I believe from what he himself

11   said, he was confident that he would make it back with the

12   business we'd do outside of Guinea.

13   Q.   Did he ask you to do anything within your role as the

14   minister of mines in exchange for lending you those millions of

15   dollars?

16   A.   No.

17   Q.   Did you promise to do anything as the minister of mines for

18   the Republic of Guinea in exchange for him lending you that

19   money?

20   A.   No.

21   Q.   Did you, in fact, do anything as the minister of mines in

22   exchange for Sam lending you all that money?

23   A.   No.

24   Q.   Did you, in fact, not do or abstain from doing something

25   within your role as the minister of mines in exchange for Sam

1    giving you that loan?

2    A.  No.

3    Q.  When was the last time you spoke to Sam Pa?

4    A.  Sometimes in -- I would say a little late 2011 or mid-2012,

5    I would think.

6    Q.  How was your relationship with Sam Pa the last time you

7    spoke with him?

8    A.  By the last time we spoke, it had started deteriorating or

9    was at the tail end, I would say.

10   Q.  How did it deteriorate?

11   A.  It deteriorated because Sam and I had developed a very

12   close personal relationship.  We spent a lot of time together.

13   He really had a lot of hope that he could count on my help and

14   my expertise in the mining industry to help him do mining

15   business elsewhere, after I leave my post in Guinea.  At some

16   point he, from one of his top employees, I heard that he saw me

17   like kind of a, of a son, and he asked me to come and join CIF

18   as the vice president of international operations, and I told

19   him I could not.  And that's when things started going south.

20   Q.  Let me back up a little bit.  When you asked for the loan

21   from Sam, did he give you the loan?

22   A.  Yes.

23   Q.  Did you ask how he got the money to give you the loan?

24   A.  No.

25   Q.  Did you know anything about where the money came from when

1    he gave you the loan?

2    A.  No.

3    Q.  Did you open a bank account in Hong Kong?

4    A.  Yes, I did.

5    Q.  Did you open that bank account in Hong Kong with Sam or any

6    other representative of CIF or Sonangol around you?

7    A.  I opened it with Sam.  I opened it with Sam's help.

8    Q.  Why did you open the bank account in Hong Kong?

9    A.  I opened the bank account in Hong Kong because of the

10   sanctions regime.  For the same reason the central bank of

11   Guinea and the government of Guinea was trying to open a bank

12   account in Asia, we were under sanctions.  All our assets,

13   economic assets and financial assets were being frozen, and in

14   my conversation with the French government when I agreed to

15   stay on, they suggested I find an alternative banking account

16   because my assets were about to be frozen.  So I asked Sam to

17   help me open an account first in Singapore, but then there,

18   because of my PEP status, the Singaporean bank refused to open

19   the account, and Sam suggested helping me open an account at

20   HSBC Hong Kong because he had a very large relationship with

21   them and they could open it under -- with his recommendation.

22   Q.  Did you open the account in Hong Kong to hide the source of

23   the funds in any way?

24   A.  No.  I opened the account in Hong Kong to have an account

25   that I could get funded with some money so I could survive.

1    Q.  Now, on the topic of PEP status and the bank accounts, you

2    opened a bank account in the Hong Kong Singapore bank, HSBC, in

3    the New York branch on Madison Avenue.  Do you recall that?

4    A.  Yes, I do.

5    Q.  And do you recall how you filled out the information on the

6    application for that, to open that account?

7    A.  Yes, I do.

8    Q.  Did you alert the bank at the time that you were the acting

9    minister of mines for Guinea?

10   A.  No, I did not.

11   Q.  Why?

12   A.  Because that's exactly what I was trying to avoid, being

13   classified as a PEP, because from my experience as a banker,

14   being classified as a PEP is an automatic bank closure, and I

15   needed to maintain an open bank account so I could feed my

16   family while I was abroad.

17   Q.  Did you lie about being the minister of mines in any way to

18   hide the source of the loan money?

19   A.  No.

20   Q.  There was also at the time -- well, in response to your

21   application, there were some follow-up questions?

22   A.  Yes.

23   Q.  Do you recall having either telephone calls or meetings

24   with other HSBC New York bank representatives?

25   A.  I had other meetings but with the same bank representative.

1    Q.  Did they ask you if you were the minister of mines?

2    A.  Yes, they did.

3    Q.  What was your response?

4    A.  I said yes.

5    Q.  Once you told them that you were the minister of mines for

6    the Republic of Guinea, what happened with the account?

7    A.  What I expected it to happen.  It ultimately got closed.

8    Q.  There was also an investigation from ChaseBank.  Do you

9    recall that?

10   A.  Yes.

11   Q.  Do you recall the representatives from ChaseBank asking you

12   several questions about your position or -- withdrawn, about

13   your employment?

14   A.  Yes.

15   Q.  Do you also recall them asking questions about the source

16   of money that you were receiving in your accounts?

17   A.  Yes.

18   Q.  What did you explain to the employees of Chase about your

19   work?

20   A.  I believe I told them I was a consultant and that -- yes,

21   that's what I think I said.

22   Q.  Did you tell them that you were the minister of mines?

23   A.  No.

24   Q.  Why?

25   A.  For the same reason.  I had the bank account with Chase

 1   since 1993, when I started my professional life.  That account

 2   grew to be my only family account, and once I game a PEP, I was

 3   concerned that that account might be closed and I would not be

 4   able to maintain my family in New York while I was away.  And

 5   my prime concern was to be treated as Mahmoud Thiam, private

 6   citizen, who opened an account in 1993 and took a 12- or

 7   18-month break to go help his country, as opposed to Mahmoud

 8   Thiam, minister of mines, who is a PEP and whose account will

 9   be closed.

10   Q.  Do you recall that you had to provide some answers with the

11   assistance of Baker Al-Sadi to questions from ChaseBank?

12   A.  Yes.

13   Q.  And do you recall working with Baker to provide those

14   answers?

15   A.  Yes.

16   Q.  Why were you working closely with Baker to provide answers

17   on the source of funds for that account?

18   A.  Because, to -- once again, to avoid being linked to the PEP

19   status, I needed to show that the true transactions I had

20   conducted over the years with Baker were the ones we

21   documented, justify, to justify the money in the account and

22   that it's not linked to me and minister of mines.

23   Q.  Did your answer to any of the questions in the ChaseBank

24   review have anything to do with Sam Pa?

25   A.  No.

1   Q.  Did your answers in the ChaseBank review have anything to

2   do with your wanting to hide the source of the money --

3   A.  No.

4   Q.  -- from Sam Pa?

5   A.  No.

6   Q.  What happened with the Chase account?

7   A.  It was closed.

8   Q.  Now, you also testified a few moments ago that you were

9   concerned about carrying on the ability to support your family?

10  A.  Yes.

11  Q.  Did your wife have a bank account at the time?

12  A.  She had -- that was our joint account.  She had a business

13  account.  I don't know if she had a separate personal -- I

14  think she did have a personal account.

15  Q.  Why not just have the money that you needed to survive put

16  into your wife's account?

17  A.  Because, for the same reasons, it would be linked to me and

18  it would be closed once it was found out that I was a PEP,

19  which is what happened.  All her accounts relating to me

20  ultimately were closed as well.

21  Q.  Do you recall how many of your bank accounts got closed in

22  or around 2010 or '11?

23  A.  2010 and '11?  Every bank account I ever had was closed in

24  the U.S. at some point or the other.  During that specific

25  period, I don't know; maybe three or four already.  It's not

1   that I had three or four accounts at the same time.  It's that

2   every time I opened one and my PEP status or former PEP status

3   popped up, it was closed, to the point where I was unable to

4   maintain a bank account.

5   Q.  Did that happen even after you had resigned from being the

6   minister of mines for the Republic of Guinea?

7   A.  Absolutely.  It happened up to my very last account that I

8   was ever able to be -- to open closed, I believe, on December

9   13, 2016, and I haven't been able to have an account since.

10  Q.  Now, you spent how many years working in the banking

11  industry?

12  A.  I spent 14 years.

13  Q.  Did you have any experience in those 14 years with

14  customers that had a PEP status?

15  A.  Yes, extensive.

16  Q.  What was your experience when you were working in the

17  banking industry about how people with PEP status were treated?

18  A.  Well, before September 11, 2001, a person with a PEP status

19  was treated with additional scrutiny, and I would say 70

20  percent of the time their accounts ended up being closed by the

21  banks, but the bank would go through the effort of asking them

22  questions and see if they could maintain it somehow.  After the

23  Patriot Act in 2011, the government put the burden on the

24  banks, made them responsible in case money that was supposed to

25  be at the bank made it in, and therefore the bank took the

1  position whereby, by default, if you're a PEP, especially if

2  you're a PEP from an African or Latin-American country, the

3  bank will close your account.

4  Q.  Why?

5  A.  It's a risk they weren't willing to take.  You could be a

6  PEP and have a perfectly legitimate reason to have money in the

7  account, but the bank compliance had as a rule that it's safer

8  not to maintain the account.

9  Q.  Did there come a time when you were involved in a purchase

10  of a house up in Dutchess County?

11  A.  Yes.

12  Q.  What was your involvement in the purchase of the house in

13  Dutchess County?

14  A.  I was involved at two levels.  I was involved in the

15  recommendation and the choice of the house.  I recommended to

16  my friend and business partner Aquil to buy the house as an

17  investment.  He had approached me and said that because of the

18  crisis, real estate -- he had read or heard in the news that

19  real estate prices in the U.S. were very depressed, and as a

20  result he wanted to buy some property.  I believe it was either

21  in North Carolina or in the Washington, D.C. area.  I suggested

22  to him to try a market like New York, because when the markets

23  or the prices come back, New York was likely to benefit more

24  and faster.  And I suggested, a little selfishly, the Millbrook

25  area, because that's where we had been vacationing and renting

1    summer houses and I suggested that he buy someplace there.

2    That way I would be able to rent it from him and then when the

3    markets recovered and he wanted to take his profit, if I was in

4    a position to buy it, I would buy it from him.

5    Q.  And why were you -- withdrawn.

6              Were you the one paying all of the rehabilitation

7    costs on the house?

8    A.  Yes, as per our agreement.  Yes.

9    Q.  Why were you the one paying it rather than your partner?

10   A.  The understanding was as follows:  He acquires the house.

11   I rent it at a, at a monthly rate that's below market, and in

12   return, I -- in return for using the house and having a

13   submarket rent, I was responsible for the renovations.  And

14   then after a while, once the renovations were done and I had

15   re-, I had recovered that money, we would bring it back to a

16   market rent.

17   Q.  Now, what was the name of the company that bought the house

18   up in Dutchess?

19   A.  It's Sociedade Saboeira de Nacala.

20   Q.  Can I call it SSNL for short?

21   A.  Yes.

22   Q.  What's your relationship with SSNL?

23   A.  SSNL is the company that my partner Aquil and his family

24   own and operate in Mozambique.

25   Q.  What kind of a company is it?

1  A.  It's primarily a soap- and detergent-making company.

2  Q.  Now, you also heard some testimony about an organization,

3  PIL, or Pacific Inter-Link?

4  A.  Yes.

5  Q.  What is PIL?

6  A.  PIL is one of the world's largest exporters of crude and

7  oil, based in Malaysia.

8  Q.  Do you have any idea about the business relationship of PIL

9  and SSNL?

10  A.  Yes.  PIL is -- was at the time; I don't know if it's still

11  the case -- the sole or largest supplier of crude palm oil to

12  SSNL.  Crude palm oil is the raw material, the most used in the

13  making of soap and detergents and the making of food products,

14  which SSNL also makes.

15  Q.  Did you pay for any part of the house, for the purchase

16  price?

17  A.  No.

18  Q.  Who paid for it?

19  A.  Aquil.  SSNL, basically.

20  Q.  Did you provide any money to Aquil related to that house?

21  A.  Related to the purchase of the house, no.  I saw in the

22  presentations a wire that I sent to PIL at his request.  I

23  believe I understand what happened there and that probably

24  that, in the payment of his deposit, I might have advanced him

25  that money on a temporary basis.

1    Q.   What do you mean "advanced"?

2    A.   Well, Aquil and I have had a business relationship.  We

3    made money and paid for our expenses.  Whoever had the cash on

4    hand at the time would pay, the other would refund him and

5    things like that, so sometimes he would ask me to pay,

6    sometimes I would ask him to pay.  In this particular

7    situation, my understanding is that he was supposed to pay for

8    the deposit.  The deposit was supposed to come fast.  He paid

9    it from their account at SSNL in Mozambique, and I also

10   understand that he owed payment to PIL for invoices on supplies

11   he had received, and most likely he deprived -- he took that

12   375 from the money he was supposed to send PIL, and he asked me

13   if I could replace it if I had it on hand.  I had it on hand

14   and I sent it.

15   Q.   You testified a moment ago that you would loan money back

16   and forth with Aquil?

17   A.   Yes.

18   Q.   Over what period of time have you been loaning money back

19   and forth with Aquil?

20   A.   I would say from late 2009 to about a year ago, or actually

21   even less than a year ago.

22   Q.   Did you guys ever have any formal loan agreements?

23   A.   No.  It was an understanding between partners and friends.

24   Most of the money we earned together he earned and therefore he

25   collected my share, and he could pay himself back from my share

1   whenever he got it.

2   Q.  Did you have any formal writings that would express your

3   ability to loan money back and forth with each other?

4   A.  No.  It was an informal understanding.

5   Q.  Did you have any loan agreements or documents with the

6   loans you asked for from Sam Pa?

7   A.  No, no.

8   Q.  Why not?

9   A.  Because it was the same thing.  It was a personal loan.  It

10  was a verbal understanding.  We agreed that I would pay him

11  back, and -- either from money we would make together later or

12  from money I was hoping to make soon.  And when I discussed it

13  with him again, he said he's not concerned because as far as

14  he's concerned, he's made that money back through the help I

15  gave him on two, in two different countries.

16  Q.  Did you have any other loan exchanges or agreements with

17  other people in your life at this time?

18  A.  Yes, yes, yes.

19  Q.  And who were those people?

20  A.  Same.  Typically, friends, business partners, personal

21  friends, family friends.  We help each other.  We loan money

22  back and forth to each other; there's never or rarely

23  paperwork.  From time to time there's paperwork.

24  Q.  I'd like to show you what's been marked as Defense Exhibit

25  D for identification.  Do you recognize Defense Exhibit D, the

H52Wthi2                        Thiam - Direct

1   data?

2   A.  Yes.

3   Q.  What is it?

4   A.  It's an email from a gentleman called Desire Seka to me.

5           THE COURT:  D-E-S-I-R-E, S-E-K-A.

6   A.  And subject is, it's in French.  It says --

7           MR. KOBRE:  Objection, your Honor.

8           THE COURT:  Sustained.

9           THE WITNESS:  OK.

10  BY MR. GOLDSMITH:

11  Q.  Let me show you what's been marked as -- well, withdrawn.

12          What is the email?

13  A.  Sorry?

14  Q.  What is the email?

15  A.  It's an email from Desire to me.

16          MR. KOBRE:  Objection.

17          THE COURT:  Sustained.

18  Q.  I'd like to show you what's been marked as Exhibit E, for

19  identification only.  I'll take this back.  Do you recognize

20  Exhibit E?

21  A.  Yes.

22  Q.  What is it?

23  A.  It's an email from the same Desire Seka to me.

24  Q.  Who is Desire Seka?

25  A.  Desire Seka is an old friend of mine.

1   Q.   Where does he live?

2   A.   He lives in the Washington, D.C. area.

3   Q.   And what is your relationship with Mr. Seka, other than

4   being an old friend?

5   A.   We're just very old friends.  We also have the type of

6   relationship when either of us runs out of cash or needs cash

7   for something and the other has it, we advance it back and

8   forth to each other.

9   Q.   Do you have any formal agreements with Mr. Seka when you

10  loan each other cash?

11  A.   No, we never have any.

12  Q.   How long have you had a relationship with each other where

13  you've loaned each other cash?

14  A.   Oh, for many years, I would say.  A good ten years.

15  Q.   Could I ask you to take a look at Government Exhibit 519-T.

16  Do you see 519-T?

17  A.   Yes.

18  Q.   What is it?

19  A.   It's an email from me to -- I see an email address.  I

20  cannot recognize it.

21  Q.   Back up a little bit or push the microphone.  It's going

22  into your shirt.

23  A.   Sorry.

24       It's an email from myself to an email address I don't

25  recognize, and it looks like --

1    Q.   Is there a date on it?

2    A.   October 13, 2009.

3    Q.   If you could read to yourself what the body of the email is

4    discussing.

5    A.   I'm sorry.  What?

6    Q.   Read to yourself the body of the email.

7    A.   OK.

8         OK.

9    Q.   Do you remember this email?

10   A.   Yes, I do.

11   Q.   What is it?

12   A.   It's an email with a list of questions from a journalist,

13   inquiring about the CIF deal.

14   Q.   I'd like to show you what's been marked as Defense Exhibit

15   A, for identification only.  This is a two-page document.  Do

16   you recognize Defense Exhibit A?

17   A.   Yes, I do.

18   Q.   What is it?

19   A.   It's -- seems to be the same questionnaire from that same

20   journalist.

21   Q.   Is it in English or French?

22   A.   In English.

23   Q.   What is the second page?

24   A.   The second page --

25             MR. KOBRE:  Objection, your Honor.

1              THE COURT:  Overruled.

2              You can describe it generally.

3   A.  The second page is an email from me, responding to the same

4   journalist.

5   Q.  You can put it down.

6              At any time when you were acting as the minister of

7   mines, did you accept any kind of benefit from any member or

8   representative of China International Fund or Sonangol in

9   exchange for favor?

10  A.  No.

11  Q.  Have you made any misrepresentations to any banks in the

12  U.S. or in Hong Kong about what your work status was?

13  A.  Yes.

14  Q.  Why did you make those misrepresentations?

15  A.  To avoid being classified as a PEP and having my accounts

16  closed.

17  Q.  Were there any other reasons?

18  A.  No.

19             MR. GOLDSMITH:  No further questions at this time.

20  CROSS-EXAMINATION

21  BY MR. KOBRE:

22  Q.  Good morning, Mr. Thiam.

23  A.  Good morning.

24  Q.  You testified on direct examination about your J.P. Morgan

25  Chase account?

1   A.  Yes.

2   Q.  And you had that account, it was in your name and in your

3   wife's name?

4   A.  Yes.

5   Q.  And you also talked about your bank account in Hong Kong,

6   correct?

7   A.  Correct.

8   Q.  And in fact, you directed several wire transfers from the

9   Hong Kong account to your J.P. Morgan account, is that right?

10  A.  That's correct.

11  Q.  In fact --

12          MR. KOBRE:  Mr. Beer, if we can pull up, please,

13  Government Exhibit 104, page 3, and if you could enlarge the

14  upper half of that.  If you could even enlarge it just a little

15  bit more, the list, the list of --

16  Q.  -- these are some of the wire transfers.  For example,

17  let's just focus on the first one.  You wired, on November 16,

18  2009, about $119,000 from Hong Kong to J.P. Morgan?

19  A.  Yes.

20  Q.  Correct?

21  A.  Correct.

22  Q.  And in part, as a result of this, you received a call from

23  an employee at J.P. Morgan, correct?

24  A.  Much later, yes.  But, yes.

25  Q.  Later.  And in fact, that was in about March of 2010?

```
 1   A.  Yes.

 2   Q.  And you spoke with that employee; her name was Ms. Aring,

 3   correct?

 4   A.  Yes.

 5   Q.  She testified here?

 6   A.  Yes.

 7   Q.  And she asked you some questions about the source of your

 8   funds?

 9   A.  Yes.

10   Q.  In the Hong Kong account, right?

11   A.  Yes, uh-huh.

12           MR. KOBRE:  If we could go, Mr. Beer, to Government

13   Exhibit 104, page 12, and if we can just enlarge the top entry.

14   Q.  In fact, she specifically asked you, during a phone

15   conversation on March 25, the funding source of the wires from

16   your account in Hong Kong, is that correct?

17   A.  Yes, I believe so.

18   Q.  I'm referring to point 2.

19   A.  Yes.

20   Q.  And you told her that it was from, funded by several

21   sources of income, business transactions, and prior years'

22   consulting jobs, correct?

23   A.  Yes.

24   Q.  You did not tell her it was a loan?

25   A.  No.
```

1    Q.  And you also told her that it was not from recent

2    consulting that you had done, correct?

3    A.  True.

4    Q.  And you told her, in fact, that you had not done any

5    consulting in the last 15 months?

6    A.  Yes.

7    Q.  And so what you told Ms. Aring was not true, correct?

8    A.  Correct.

9    Q.  Now, Mr. Thiam, before -- you then were asked by Ms. Aring

10   to follow up with some, provide some additional information to

11   the bank, correct?

12   A.  Correct.

13   Q.  And you subsequently sent a letter to Ms. Aring to answer

14   some of the questions?

15   A.  Yes.

16   Q.  And before you sent that letter to Ms. Aring, you sent it

17   to this individual, Baker Al-Sadi?

18   A.  Correct.

19           MR. KOBRE:  And if we can pull up Government Exhibit

20   534, and if we can enlarge the text in the emails.

21   Q.  You engaged in an exchange with Mr. Al-Sadi on March 26,

22   2010?

23   A.  Yes.

24   Q.  And that was the same day as you later provided Ms. Aring

25   with the answers to her questions, correct?

1    A.  Correct.

2    Q.  And Mr. Al-Sadi, after you forwarded the, after you

3    forwarded your proposed responses, Mr. Al-Sadi said, replied to

4    you, "Looks fine if they don't dig too deep," correct?

5    A.  Yes.

6    Q.  You replied, "Cool.  How do I treat your answers, just

7    attach them?"  Correct?

8    A.  Yes.

9    Q.  And Mr. Al-Sadi replied, "Buy some time by saying you asked

10   me to send them to you, and we'll see if they follow up"?

11   A.  Yes.

12   Q.  And then after that exchange, you, in fact, sent the letter

13   to Ms. Aring?

14   A.  Yes -- well, before, actually, I think.

15   Q.  I'm sorry?

16   A.  It could be even before the exchange I had sent it to her.

17   Q.  Well, but I mean, the date of this exchange is,

18   Mr. Al-Sadi's final reply to you was March 26, 2010, at 1810?

19   A.  OK.

20   Q.  That's 6:10 p.m.

21           MR. KOBRE:  And if we can pull up, Mr. Beer,

22   Government Exhibit 5 -- well, let's go back for a moment to

23   Government Exhibit 104, page 12.

24   Q.  You testified earlier that one of the, a reason that you

25   lied to J.P. Morgan was you were concerned about them closing

1   your account, is that right?

2   A.  Yes.

3   Q.  And you were concerned about that because they would --

4   because of your, they might find you to be a PEP, correct?

5   A.  Yes.

6   Q.  And a PEP is a politically exposed person, right?

7   A.  Yes.

8   Q.  And nothing about -- well, withdrawn.

9           Your answer about the source of income to Ms. Aring

10  and it having come from prior consulting jobs, that would not

11  have revealed to J.P. Morgan Chase alone that you were a PEP,

12  correct?

13  A.  No.

14  Q.  Had you told Ms. Aring that it was a loan, she would not

15  have known just from that statement alone that you were a PEP,

16  right?

17          MR. GOLDSMITH:  Objection.

18          THE COURT:  Overruled.

19  A.  A loan from where?

20  Q.  Well, I'm simply asking, had you truthfully, under your

21  testimony today, told Ms. Aring that the money was -- from the

22  Hong Kong account was a loan, that fact alone would not have

23  revealed to Ms. Aring that you were a PEP.  Correct?

24  A.  No, not correct.

25  Q.  I'm sorry?

1  A.  Not correct.  It would have.

2  Q.  The fact that it was a loan alone?

3  A.  Yes.

4  Q.  A loan, just simply that it was a loan, that would not have

5  revealed to Ms. Aring that you were the minister of mines or a

6  public official, correct?

7  A.  It would have led to the question, A loan from whom, from

8  where?

9  Q.  I understand that, but just the fact that it was a loan?

10  A.  No, no.

11  Q.  Now, Mr. Thiam, you filed tax returns in 2009, correct?

12  A.  Yes.

13          THE COURT:  Sir, it's hard to hear your voice.  Thank

14  you.

15  Q.  Is it your testimony that you were careful when you filed

16  those tax returns in --

17  A.  No.

18  Q.  I'm sorry?

19  A.  It's not my testimony that I was careful.

20  Q.  You were not careful when you filed the tax returns?

21  A.  No.

22  Q.  In fact, you filed tax returns in 2009, correct?

23  A.  Yes.

24  Q.  And you had received $3 million in 2009 from Sam Pa,

25  correct?

1   A.  Yes.

2   Q.  And you did not report those on your 2009 tax returns?

3   A.  No.

4   Q.  Correct?

5   A.  No.

6   Q.  And you're also aware, sir, that there is a requirement for

7   something called an FBAR?

8   A.  Yes.

9   Q.  And FBAR stands for foreign bank account -- relates to

10  foreign bank accounts, correct?

11  A.  Yes.

12  Q.  And it's a requirement that, under the law, if you have a

13  person with an interest in a foreign bank account that has more

14  than $10,000 --

15          MR. GOLDSMITH:  Objection.

16          THE COURT:  Overruled.  Don't object until the

17  question's answered.

18  BY MR. KOBRE:

19  Q.  -- you understand that a person with a foreign bank, with

20  an interest in a foreign bank account, under certain

21  circumstances, must file a form with the government?

22  A.  Yes.

23          MR. GOLDSMITH:  Objection.

24          THE COURT:  I'm sorry.  I meant to say do not object

25  in a way that interrupts the question.  Of course you may

1    object as soon as the question is posed.

2              The objection is overruled.

3    BY MR. KOBRE:

4    Q.  Are you aware of that?

5    A.  Yes, I am.

6    Q.  And in the year 2009, you had an interest in a foreign bank

7    account with more than $10,000 in it, correct?

8    A.  Yes.

9    Q.  In fact, you had an interest in a foreign bank account that

10   had at some point $3 million in it, correct?

11   A.  True.

12   Q.  That's the Hong Kong HSBC account?

13   A.  Yes.

14   Q.  And you did not file the required FBAR that year, correct?

15   A.  No.

16   Q.  Now, it's your testimony -- let's talk a little bit about

17   your 2010 tax return.  You filed a tax return in 2010 as well,

18   correct?

19   A.  I did.

20   Q.  And on that tax return, you reported several million

21   dollars in income, correct?

22   A.  Yes.  I don't remember, but I assume you're right.

23   Q.  OK.  And you were, in fact, you reported some of the money

24   that you had received from Sam Pa on that 2010 tax return, is

25   that correct?

1    A.  I don't remember, but it's possible.

2            MR. KOBRE:  My colleague, Mr. DiMase, is approaching

3    the witness with what's marked as Government Exhibit 1802 for

4    identification.

5    Q.  I'm going to direct your attention to the middle of the

6    first page, and I'm going to ask you again.  Do you now recall

7    reporting about $5.8 million in income on your 2010 tax return?

8    A.  Yes.

9    Q.  And that money included some of the money that you had

10   received from Sam Pa, correct?

11   A.  Most likely, yes.

12   Q.  Most of it was the money you had received from Sam Pa,

13   correct?

14   A.  Yes.

15   Q.  And in fact, when you reported that money on your 2010 tax

16   return, you reported to the IRS that that money had come from

17   consulting work that you had performed, correct?

18   A.  Uh-huh.

19            THE COURT:  Is that yes?

20            THE WITNESS:  Yes.

21   A.  Yes.

22   Q.  You did not report to the IRS on your tax return that it

23   was money from a loan, as you testified here today?

24   A.  No.

25   Q.  And in fact, as a result of your reporting this income on

1    your 2010 tax return, you had a tax liability that year,

2    correct?

3    A.  Yes.

4    Q.  Not a small tax liability, but roughly a $2 million tax

5    liability, is that right?

6    A.  Yes.

7    Q.  Despite your testimony here today that the money was a

8    loan?

9    A.  Yes.

10   Q.  And to be clear, if it was a loan, you would not have to

11   pay taxes on a loan, correct?

12           MR. GOLDSMITH:  Objection.

13           THE COURT:  Overruled.

14   A.  Not if I could document it.

15   Q.  You would not have had to pay taxes if it was a loan if you

16   could document it, correct?

17   A.  If it was a loan that I could document, yes.

18   Q.  Now, you testified earlier about your opening up, your

19   opening this bank account in Hong Kong, correct?

20   A.  Yes.

21   Q.  And I believe you testified that you opened it up in

22   person, correct?

23   A.  Yes.

24   Q.  When you were in Hong Kong, correct?

25   A.  Yes.

1    Q.  And in fact, Mr. Sam Pa came with you to open up the

2    account, right?

3    A.  Yes.

4    Q.  And you opened it up in the bank that he himself would bank

5    in?

6    A.  Yes.

7    Q.  Which is that branch, correct?

8    A.  Yes, that's correct.

9    Q.  In fact, that bank account was close by to the offices of

10   CIF?

11   A.  Yes.

12   Q.  It was in the same building, correct?

13   A.  Yes.

14   Q.  And you, at the time you opened up -- you opened up that

15   account on September 24, 2009, correct?

16   A.  I -- yes, I take it.

17           MR. KOBRE:  Ok.  Why don't we put up Government

18   Exhibit 304A.  I'm sorry.  301A, and if we could just enlarge

19   the first half of that page.

20   Q.  And if you look at the upper portion of the upper left-hand

21   corner of the page, date, do you see that's September 24, 2009?

22   A.  Yes.

23   Q.  And in fact, you had traveled to Hong Kong -- that was in

24   Hong Kong, correct?

25   A.  That was in Hong Kong.

H52Wthi2                        Thiam - Cross

1   Q.  And you had traveled to Hong Kong the prior day, September

2   23, correct?

3   A.  I don't recall.

4   Q.  And you left Hong Kong the day after this, September 25,

5   2009, correct?

6   A.  It's possible.

7   Q.  And when you opened up the bank account, you, on this day,

8   were a citizen of the United States?

9   A.  Yes.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H521thi3                          Thiam - Cross

1    BY MR. KOBRE:

2    Q.   You were a citizen of the Republic of Guinea?

3    A.   Absolutely.

4    Q.   You had a valid United States passport, correct?

5    A.   Yes.

6    Q.   And you had a valid Guinean passport.

7    A.   Yes.

8    Q.   In fact, it wasn't simply a regular Guinean passport, it

9    was a Guinean diplomatic passport.

10   A.   Yes.

11   Q.   And the Guinean diplomatic passport indicated that you were

12   a minister in Guinea, correct?

13   A.   Yes, yes.

14   Q.   And you didn't present to the bank your US passport,

15   correct, in opening up this account, when they asked you?

16   A.   I don't know if I presented it or not.  I did not use it.

17   Q.   You didn't use it?

18   A.   I might have presented it.

19   Q.   You might have presented it but you didn't use it.

20   A.   No.

21   Q.   And you didn't use your Guinean diplomatic passport,

22   correct?

23   A.   No, no.

24   Q.   And in fact, you told them that your nationality was

25   from -- was France.

1    A.  I gave them my French passport, yes.

2    Q.  Okay.  And you were also asked, as part of the process --

3    as you stood there, I assume, with Mr. Pa?

4    A.  Yes.

5    Q.  Okay.  You were asked what your employment status was and

6    you told them you were full-time employed.

7    A.  Yes.

8    Q.  And you were asked what's the nature of your job, correct?

9    A.  Yes.

10   Q.  And you told them that you were a -- "other professional

11   jobs," and when you were more specifically asked your job

12   title, you told them consultant, correct?

13   A.  Yes.

14   Q.  In fact, at this time you were the minister of mines of the

15   Republic of Guinea.

16   A.  Yes.

17   Q.  And you were standing together with an individual who had

18   business before the Republic of Guinea, correct?

19   A.  Yes.

20   Q.  Now you testified that the money that you received, the

21   $8.5 million that you received was a loan, correct?

22   A.  Yes, I did.

23   Q.  And that loan was from Sam Pa.

24   A.  Yes.

25   Q.  And that money came in three separate or rather four

1    separate parts, correct?

2    A.  Yes.

3    Q.  And we've seen testimony of that during this trial,

4    correct?

5    A.  Mm-hmm, yes.

6    Q.  And the first payment of $3 million came on this date,

7    September 24, 2009, correct?

8    A.  Yes.

9    Q.  I'm sorry.  That was the following day; it was the 25th,

10   correct?

11   A.  That same period, yes.

12   Q.  Okay.  Well, so we can all be on the same page, why don't

13   we put up Government Exhibit 1002 and go to the last page.

14          So looking at that, you received the first payment on

15   September 25, 2009, correct?

16   A.  Yes.

17   Q.  And that was a payment of $3 million.

18   A.  It was, yes.

19   Q.  It was money that was from an account in the name of Sam

20   Pa, correct?

21   A.  Yes.

22   Q.  And then just going down to the bottom transfer, the next

23   transfer you received was on March 15, 2010, correct?

24   A.  Yes.

25   Q.  And that money was from a different individual, correct?

H521thi3                         Thiam - Cross

1    A.   Yes.

2    Q.   It was from an individual named Wang Xiang-Fei?

3    A.   Yes.

4    Q.   And Wang Xiang-Fei is also an executive of China Sonangol,

5    correct?

6    A.   I assume so, yes.

7    Q.   Okay.  You've met Wang Xiang-Fei before.

8    A.   I'm not sure.

9    Q.   You're not sure if you met him.

10   A.   No.

11   Q.   Okay.  But we can be sure that Wang Xiang-Fei is a

12   different person than Sam Pa, correct?

13   A.   Absolutely, yes.

14   Q.   And you had not asked Wang Xiang-Fei for a loan.

15   A.   No.

16   Q.   Okay.  And then after that you received the fourth transfer

17   on June 2, 2010, correct?

18   A.   Yes.

19   Q.   I'm referring to the middle of that exhibit.  Do you see

20   that?

21   A.   Yes, I do, yes.

22   Q.   Okay.  And that was a $2 million transfer.

23   A.   Mm-hmm, yes.

24   Q.   And that was from an account in the name of both Sam Pa and

25   Lo Fung Hung.

```
 1   A.  Yes.

 2   Q.  Okay.  And Lo Fung Hung was somebody you had met before.

 3   A.  Yes.

 4   Q.  But you had not asked Lo Fung Hung for the loan.

 5   A.  No.

 6   Q.  The conversation about the loan was simply with Sam Pa.

 7   A.  Yes.

 8   Q.  And then after that, you received another $500,000 transfer

 9   later.

10   A.  Yes.

11   Q.  Okay.  So you had received this loan from three different

12   individuals, correct?  A total of three individuals.

13   A.  I had requested the loan from one individual, yes.

14   Q.  Yes.  You requested the loan from one individual; that was

15   Sam Pa.

16   A.  Yes.

17   Q.  And you received the loan in four separate transfers,

18   correct?

19   A.  I find that out here.  I did not know that before.

20   Q.  You didn't know that before.

21   A.  No.

22   Q.  So you had not looked at your bank statements.

23   A.  It does not say who send the money.

24   Q.  It doesn't say who sent the money on your bank statement.

25   A.  No.  But yes.
```

1   Q.  And we'll take a look at that in a moment.

2          Do you recall, sir, you testified today there were no

3   documents to back up this loan, is that right?

4   A.  No.

5   Q.  And it was a verbal agreement.  Correct?

6   A.  Yes.

7   Q.  And it was a verbal agreement between you and Sam Pa.

8   A.  Yes.

9   Q.  And there was no interest rate agreed on, correct?

10  A.  No.

11  Q.  And there was no date by which you would need to repay this

12  loan, is that right?

13  A.  No.

14  Q.  And now after you left your position as minister of mines,

15  you still maintained contact for some period of time with

16  Mr. Pa, correct?

17  A.  Yes.

18  Q.  And you asked Mr. Pa at some point after you left your

19  position for additional loans.

20  A.  Yes.

21  Q.  And he refused to extend additional loans to you at that

22  point.

23  A.  Yes.

24  Q.  Now let's turn a bit to your work as minister of mines.

25  A.  Mm-hmm.

1    Q.  You took the position as minister of mines roughly in

2    January 2009, correct?

3    A.  Yes.

4    Q.  And your position as minister of mines was of great

5    importance, correct, to the mining sector?

6    A.  Yes.  Yes.

7    Q.  Okay.  And you also testified that you first met Mr. Sam Pa

8    in May or June of 2009, correct?

9    A.  I did not remember exactly, but that's what your agent

10   testified to.

11   Q.  Well, I think you testified yesterday as to when you first

12   met Mr. Pa, right?

13   A.  I said late spring, early summer.  I didn't remember the

14   date exactly.

15   Q.  Okay.  Late spring, early summer of 2009, is that right?

16   A.  Yes.

17   Q.  Okay.  And that was the first time you had ever met Mr. Pa

18   in person.

19   A.  Yes.

20   Q.  Or spoken to him on the phone, correct?

21   A.  Yes.

22   Q.  And in fact, we looked at an email yesterday where you were

23   inquiring, on June 6, 2009, you were asking an associate about

24   Sam Pa, correct?

25   A.  Yes.

1    Q.  And your testimony was that you were directed to negotiate

2    with Mr. Pa, correct?

3    A.  Yes.

4    Q.  And I'm correct that you were the technical head of those

5    negotiations, correct?

6    A.  I was a technical arm, not the technical head.

7    Q.  So is it your testimony now that you were not the head, the

8    person in charge of the technical negotiations?

9    A.  I was not the person in charge of the negotiations.  I

10   handled the technical aspect of it, yes.

11   Q.  And when you say you handled, that means you were the

12   senior person in terms of the technical negotiations, is that

13   right?

14   A.  I'm not sure that's a correct characterization, but I'll

15   accept it.

16            MR. KOBRE:  Okay.  Well, can we play, Mr. Beer, if we

17   can publish for the jury Government Exhibit 801-A, clip 14,

18   which is in evidence.

19            (Video played)

20   Q.  So there was a delegation of two, as you said, correct?

21   A.  Yes.

22   Q.  And you were the technical head of that delegation,

23   correct?

24   A.  I believe I said the technical guy.

25   Q.  The technical guy of that delegation.  Okay.

1   A.   Okay.

2   Q.   And this loan that you testified about today, you haven't

3   paid that back, correct?

4   A.   Well, according to Sam, yes, but I haven't physically paid

5   it, but he told me that he considered it paid back.

6   Q.   Okay.  But you haven't actually transferred any money to

7   Sam Pa, correct?

8   A.   No.

9   Q.   And you didn't transfer any money back to Wang Xiang-Fei,

10  correct?

11  A.   I was never -- I was transferring money back to Sam Pa, not

12  to Wang Xiang-Fei.

13  Q.   You have not personally paid any money to an executive of

14  CIF, correct?

15  A.   Correct.

16  Q.   Okay.  You testified yesterday a little bit about the

17  events that led to your coming to be the minister of mines.

18  A.   Yes.

19  Q.   And you testified that you decided not, when you -- you

20  accepted the position, correct?

21  A.   Yes.

22  Q.   And when you accepted the position, you decided not to take

23  a salary, is that right?

24  A.   Yes.

25  Q.   And you didn't take a salary.

1  A.  I did not take it, no.

2  Q.  You recall we talked a little bit earlier about your 2010

3  tax return, correct?

4  A.  Yes.

5  Q.  And you recall that you reported having received income on

6  that tax return, correct?

7  A.  Yes.

8  Q.  So in fact, you reported having received $85,000 in income

9  from the ministry of mines on your 2010 tax return, correct?

10  A.  I don't recall, but it's possible, yes.

11  Q.  So in fact you did take a salary as part of your work for

12  your work in Guinea?

13  A.  I did not.  I received a salary.  I did not take it.  I did

14  not take any money from the government of Guinea.

15  Q.  You didn't take it but you nonetheless reported it on your

16  2010 tax returns.

17  A.  Yes, because it was paid, but I did not take it.

18  Q.  It was paid but you didn't take it.

19  A.  Exactly.

20  Q.  Okay.  And so your testimony today is that you actually

21  received that money, correct?

22  A.  No.  I just said I did not receive it.  I did not take it.

23  It was paid into a Central Bank account.  I did not take it.

24  Q.  Okay.  It was paid to another bank account not in your

25  name.

H521thi3

1    A.  It was paid to a Central Bank account where all the

2    ministers had their accounts, and I decided not to take mine.

3    All mine was given away.

4    Q.  So it went into an account, it did go into an account in

5    your name, is that your testimony?

6    A.  Yes, yes.

7    Q.  But it was given away subsequent to that.

8    A.  Yes.

9    Q.  Now we talked a little bit about your work with CIF.

10             THE COURT:  Counsel, choose some time to break between

11   now and 11:30.

12             MR. KOBRE:  I think now would be just fine.

13             THE COURT:  Okay.  Ladies and gentlemen, let Ms. Rojas

14   know when you're ready to resume.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1        (Jury not present)

2            THE COURT:  You may step down.

3            THE WITNESS:  Thank you.

4            THE COURT:  Does the government have any issues to

5     raise at this break?

6            MR. KOBRE:  No, your Honor.

7            THE COURT:  Mr. Goldsmith?

8            MR. GOLDSMITH:  Not at this time, but I do want to

9     bring up, we were in the middle of discussing the possibility

10    of a limiting instruction regarding conflict of interest from

11    the bank representatives.  We don't need to do that this

12    second, but I did just want to remind the Court that we will

13    need to set aside some time for it later on.

14           THE COURT:  Okay.  I actually thought I'd ruled on

15    that.  I didn't know we had an open issue.

16           MR. GOLDSMITH:  You had asked me --

17           THE COURT:  If counsel want to pull up transcript

18    references.  My recollection of the issue that was raised was

19    the context in which the discussion of a conflict came up

20    between HSBC bank officials and the defendant and whether or

21    not it was the defendant who was talking about, in essence, I

22    didn't tell you I was the minister of mines because of the

23    issue of conflicts.

24           MR. GOLDSMITH:  Right.  I had a chance --

25           THE COURT:  Have you checked the transcript?

H521thi3

1              MR. GOLDSMITH:  Yes.

2              THE COURT:  And can you give me the page references

3    or --

4              MR. GOLDSMITH:  There are a number, so --

5              THE COURT:  Great.

6              MR. GOLDSMITH:  -- I'll provide them to the Court to

7    address later on today?

8              THE COURT:  I'm happy to have your description of them

9    now.

10             MR. GOLDSMITH:  Ms. Hayes --

11             THE COURT:  Page?

12             MR. GOLDSMITH:  Page 607.

13             THE COURT:  And have counsel discussed this with each

14   other?

15             MR. GOLDSMITH:  No.  We haven't had time because of

16   the requests to charge earlier.

17             THE COURT:  Oh, okay.  Good.  Then it is premature,

18   and thank you very much.

19             MR. GOLDSMITH:  Yes.

20             THE COURT:  Why don't you just give me the page cites

21   and I'll look at them too.

22             MR. GOLDSMITH:  Thank you.  So it's page 607,

23   line 5 --

24             THE COURT:  Just give me the pages.  I'll read the

25   whole page.

1           MR. GOLDSMITH:  And it's Mr. Damle, page 630.

2           THE COURT:  Great.

3           MR. GOLDSMITH:  And earlier testimony, Ms. Aring, was

4    page 76.

5           THE COURT:  76?

6           MR. GOLDSMITH:  76.  79, 87, and 95, and 98.

7           THE COURT:  Okay.  Now that was prior; that was

8    earlier in the trial.

9           MR. GOLDSMITH:  Correct.

10          THE COURT:  Okay.  Good.  Thanks.

11          MR. GOLDSMITH:  Thank you.

12          (Recess)

13          (In open court; jury not present)

14          THE COURT:  The defendant may retake the stand.

15          Bring in the jury.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Counsel.

3    BY MR. KOBRE:

4    Q.  You testified yesterday about some meetings that you had

5    with Sam Pa and other members of CIF.  Do you remember that?

6    A.  Yes.

7    Q.  And in particular, you described one in which you asked

8    Mr. Pa to bring Mr. Vicente to Guinea, is that right?

9    A.  Yes.

10   Q.  And Mr. Vicente in fact came to Guinea.

11   A.  Yes.

12   Q.  And he met with you and other members of the Guinean

13   government --

14   A.  Yes.

15   Q.  -- together with Sam Pa.

16   A.  Yes.

17          MR. KOBRE:  And I'm going to ask Mr. Beer to publish

18   Government Exhibit 503.

19          If we can just highlight the bottom email, or rather

20   enlarge it.

21   Q.  And this is an email that you sent to Baker Al-Sadi,

22   correct?

23   A.  Mm-hmm.

24          THE COURT:  Is that yes?

25          THE WITNESS:  Sorry.  Yes.  Sorry.

1   Q.  And you sent it on June 13, 2009, correct?

2   A.  Correct.

3   Q.  And that's the day after the signing of the framework

4   agreement, correct?

5   A.  Yes.

6   Q.  Okay.  And in this email you tell Baker Al-Sadi that you

7   "had chairman of Sonangol here for two days with chairman of

8   China International Fund.  Great prospect.  More important,"

9   and then Mr. Beer, if we can go to the next page, and enlarge

10  that.  "Developed great relationship with both.  And you know

11  how hard it is to get Sonangol guy."

12  A.  Yes.

13  Q.  You wrote that email, right?

14  A.  I did, yes.

15  Q.  And when you said you developed great relationships with

16  both, you were referring to Manuel Vicente and Sam Pa, correct?

17  A.  Yes, absolutely.

18  Q.  So on June 13, 2009, during the June trip, during this

19  trip, you had developed relationships with both of these

20  individuals, correct?

21  A.  No, I developed it over -- from May, June, when we first

22  met to then, because we had several meetings with Sam, and then

23  Manuel came for the first time and -- yes, I developed -- I had

24  the first -- good first encounter, great relationship, I think.

25  Q.  Great.  And then after that you also talked about taking a

1   trip to Singapore, correct?

2   A.   In the email?

3   Q.   No, no.  After this.  After this email.  Later.

4   A.   Well, the trip was planned, yes, for the delegation.

5   Q.   Okay.  Maybe it's confusing.

6            MR. KOBRE:  Mr. Beer, can we just take down that

7   email.

8   Q.   At some later point you took a trip, you took several trips

9   to Singapore, correct?

10  A.   Yes.

11  Q.   And some of those trips to Singapore were for the purpose

12  of the CIF deal.

13  A.   Yes.

14  Q.   Okay.  And one of those trips was in July of 2009.

15  A.   Yes, possible.

16  Q.   Well, yes or possible?

17  A.   Yes.

18  Q.   Okay.  And in fact, on one of those, you traveled to

19  Singapore on July 7, 2009, do you recall that?

20  A.   I don't recall the date, but --

21           MR. KOBRE:  Okay.  Well, can we, Mr. Beer, publish

22  Government Exhibit 506-T.  And if we can just enlarge first the

23  heading.

24  Q.   This is an email from yourself to the prime minister,

25  correct?

```
 1   A.  Correct.

 2   Q.  And it says "Subject: Trip," correct?

 3   A.  Correct.

 4   Q.  And it's dated July 9, 2009, correct?

 5   A.  Correct.

 6            MR. KOBRE:  And now, Mr. Beer, if we can enlarge the

 7   first -- well, just enlarge the text of the whole email.

 8   Q.  And I'm going to be reading in a moment from the second

 9   paragraph, after the -- well, let me just read from the

10   beginning.  "Your Excellency Prime Minister.  I have the honor

11   to report back to you on our current mission to Asia at the

12   CIF."

13            And then you go on to say, "Mr. Theodore Kourouma,

14   representative of the PRG," that's the People's Republic of

15   Guinea?

16   A.  No.

17   Q.  I'm sorry.  The President of the Republic of Guinea.  Thank

18   you.  "Our ambassador in China, and myself arrived in Singapore

19   two days ago."  Do you see that?

20   A.  Yes, I see it.

21   Q.  So you arrived in Singapore on July 7, 2009, is that right?

22   A.  Right.

23   Q.  And you were there on July 9$^{th}$, still in Singapore,

24   correct?

25   A.  Correct.
```

1    Q.  And at this time Mr. Barry was not in Singapore.

2    A.  Not yet, no.

3    Q.  Okay.  And Mr. Sande was not in Singapore, correct?

4    A.  No.

5    Q.  Okay.  So of the negotiating committee that was comprised

6    of yourself, Mr. Sande, and Mr. Barry, it was only you that was

7    in Singapore at this moment.

8    A.  Yes.

9    Q.  And when you got to Singapore, you had some discussions

10   about the deal with representatives of the Chinese companies.

11   A.  Yes.

12   Q.  And in particular, they pointed out to you an issue they

13   had with the framework agreement as it was currently written.

14   Correct?

15   A.  Yes, correct.

16   Q.  And the way the framework agreement was in place at that

17   point was a 75/25 split, correct?

18   A.  Correct.

19   Q.  And they wanted, for whatever reason, to have a greater

20   share of the joint venture, correct?

21   A.  Yes.

22   Q.  And they told that to you, correct?

23   A.  Yes.

24   Q.  And you came up with a suggestion, correct?

25   A.  Correct.

1   Q.  It was your suggestion.

2   A.  Yes.

3   Q.  Okay.  And that was the idea of rejiggering the percentages

4   with respect to the GDCs, correct?  Is that fair to say?

5   A.  Yes, both the ADC and the GDCs, yes.

6   Q.  Both the ADCs and the GDCs.  And you then forwarded that

7   suggestion to the prime minister, correct?

8   A.  Yes.

9   Q.  And you forwarded that to him for his consideration and the

10  consideration of others, correct?

11  A.  Yes.

12  Q.  And during this same July -- let's call it the July trip to

13  Singapore --

14  A.  Mm-hmm.

15  Q.  -- is that -- there was a second framework agreement

16  discussed, correct?

17  A.  I don't remember.

18          MR. KOBRE:  Okay.  Mr. Beer, if we can post Government

19  Exhibit -- publish, rather, Government Exhibit 406.

20          And if we can just enlarge this page.

21  Q.  This is a framework agreement, right?

22  A.  Yes, correct.

23  Q.  And it's a framework agreement for the deal, for the

24  venture between CIF and the Republic of Guinea, correct?

25  A.  Yes.

H521thi3                          Thiam - Cross

1    Q.  And it's dated July 18, 2009, correct?

2    A.  Yes.

3    Q.  And so this agreement was negotiated in Singapore, correct?

4    A.  No, correct -- not correct.

5    Q.  Okay.  This agreement contains the revised percentages that

6    you described a moment ago, correct?

7    A.  Yes, yes, correct.

8    Q.  And so your suggestion was accepted, correct?

9    A.  Yes, correct.

10   Q.  And the suggestion that you made was made at least no later

11   than July 9th, correct, because that was the date of the

12   email?

13   A.  On July 9, yes.

14   Q.  On July 9th.  And by July 18th, it had been

15   incorporated in a subsequent framework agreement, correct?

16   A.  Correct.

17   Q.  Okay.  And in fact, you're aware that there was one

18   agreement, there was one framework agreement that was signed on

19   June 12, 2009, correct?

20   A.  Yes, correct.

21   Q.  And that's Government Exhibit 402-T.

22            MR. KOBRE:  If we can put that up briefly.

23   Q.  And that one was signed in Conakry, correct?

24   A.  Yes.

25   Q.  And then there was a second framework agreement that we

1    just looked at which was signed in Singapore, correct?

2    A.  Yes, mm-hmm.

3             MR. KOBRE:  So if we can go back to 406-T now.

4    Q.  This is the second framework agreement, correct?

5    A.  Correct.

6    Q.  The one that was signed in Singapore, correct?

7    A.  Yes.

8    Q.  Okay.  And it was signed in Singapore while you were in

9    Singapore, correct?

10   A.  Yes.

11   Q.  Okay.  And this agreement was not in English, correct?

12   A.  Yes, correct.

13   Q.  And if you like, we can hand it up to you.

14   A.  No, no, it's fine.  I can see it.

15   Q.  And it was never translated to French, to your knowledge,

16   correct?

17   A.  I don't know.

18   Q.  Okay.  And this agreement was signed during the same trip

19   when you were present in Singapore, correct?

20   A.  Correct.

21   Q.  Okay.  And just so we're clear, it incorporated your

22   July 9th suggestion.

23   A.  I assume so.  I haven't seen the text, but yes, I assume

24   so.

25            MR. KOBRE:  Well, Mr. Beer, if we can publish page 3

1    of Government Exhibit 406 and enlarge the -- I'm sorry, not

2    page 3, page 5.  There are.  If we can enlarge page 4, the

3    table?

4    Q.  Government Exhibit 406, which is, let's call it the

5    Singapore master framework agreement, did incorporate your

6    suggestion.

7    A.  Yes.

8    Q.  Okay.  In fact, there are other differences between the

9    Singapore framework agreement and the -- let's call it the

10   Conakry framework agreement, is that right?

11   A.  Yes.

12   Q.  Okay.  And in particular, let's first look at Government

13   Exhibit 402-T, which is the Conakry framework agreement.

14          MR. KOBRE:  And if we can go to page 3.  And if we can

15   enlarge paragraph A.  I'm sorry.  No, 3, please.  And if we can

16   enlarge paragraph A and B.

17   Q.  Now just so we're clear, we're looking at the framework

18   agreement that was signed on June 12, 2009, right?

19   A.  Yes.

20   Q.  And it's the one that was signed in Conakry, correct?

21   A.  Yes.

22   Q.  And it has a list here of specific -- and I'm reading from

23   paragraph B -- specific projects identified by common agreement

24   to invest.  Do you see that in paragraph B?

25   A.  Yes.

1  Q.  And there's a list of various projects and it starts with

2  energy, water treatment, electricity, transportation, housing,

3  and so on.  Do you see that?

4  A.  Yes.

5  Q.  And in this particular paragraph B there is no mention of

6  mining, correct?

7  A.  Yes, correct.

8           MR. KOBRE:  Mr. Beer, if we can now pull up the

9  Singapore framework agreement, Government Exhibit 406.  406,

10  please.  Not side by side yet.

11          And if we can go to page 3.  And if we can pull up the

12  paragraph A and B under "Whereas."

13  Q.  Now we're looking here at the framework agreement signed on

14  July 18, 2009 in Singapore, correct?

15  A.  Correct.

16  Q.  And paragraph B here also has a list of projects.

17  A.  Yes.

18  Q.  Okay.  But the list of projects here is different in

19  certain respects from the list of projects that were listed in

20  the June 12th Conakry framework agreement, correct?

21  A.  Yes, yes.

22  Q.  And in particular, one of those changes is that, reading

23  from the second line of paragraph B, this agreement includes as

24  projects the following, and I'm quoting:  "Minerals and mining

25  (including diamond, coal, bauxite, cobalt, iron ore)."  Do you

1    see that?

2    A.  Yes, I see it.

3    Q.  So that was added to this agreement, correct?

4    A.  Yes.

5    Q.  And it was added in Singapore, correct?

6    A.  No, not correct.

7    Q.  Okay.  It was added to the Singapore framework agreement,

8    correct?

9    A.  Yes.

10   Q.  Okay.  And it had not been contained in the Conakry

11   framework agreement.

12   A.  Correct.

13   Q.  Okay.  And this agreement was signed in Singapore, correct?

14   A.  Yes.

15   Q.  Okay.  And it was signed in Singapore while you were there.

16   A.  Yes.

17   Q.  Okay.  Now at some point you were asked during direct about

18   an email that you had sent to the prime minister while you were

19   in Singapore.  Do you remember that?

20   A.  Yes.

21   Q.  And in fact, while you were in Singapore, you had one,

22   maybe more phone calls with the prime minister, correct?

23   A.  One at least, yes.

24   Q.  At least one phone call.  And that phone call concerned the

25   CIF deal, correct?

1   A.  Yes.

2   Q.  And then after that you sent a list of items that were

3   needed to facilitate the CIF deal to the prime minister,

4   correct?

5   A.  At his request, yes, a list of documents that he needed,

6   yes.

7   Q.  Right.  It was sent from you, correct?

8   A.  Yes.

9   Q.  To the prime minister.

10  A.  Yes.

11  Q.  It was not sent to Mr. Barry, correct?

12  A.  No.

13  Q.  It was not sent to -- and in fact, no one else was copied

14  on that email; it was just simply you to the prime minister,

15  correct?

16  A.  Yes.

17  Q.  Okay.  And after that email you had some email

18  communications with other individuals in Guinea regarding

19  obtaining these documents, is that right?

20  A.  It's possible, yes.

21       MR. KOBRE:  Okay.  Well, Mr. Beer, if we can publish

22  Government Exhibit 509-T.

23       And if we can enlarge just the top email.

24  Q.  Now this email is from yourself to an individual by the

25  name of -- I don't know how to pronounce it, but -- Alhassane

H521thi3                         Thiam – Cross

1    Barry?

2    A.   Alhassane Barry.

3    Q.   And Alhassane Barry was at the time an employee of the

4    Central Bank of Guinea, is that correct?

5    A.   The governor of the Central Bank of Guinea.

6    Q.   The governor of the Central Bank of Guinea.  Okay.  And he

7    was a person who you needed documents from, correct?

8    A.   Yes.

9    Q.   Okay.  And -- for the CIF deal.

10   A.   No.  No.

11   Q.   Okay.  Well --

12   A.   Well, yes, partially, yes.  Partly, yes.  Sorry.

13   Q.   So you did need documents from Mr. Barry for the CIF deal,

14   correct?

15   A.   Yes.

16   Q.   And that was to enable CIF to open bank accounts in Guinea,

17   correct?

18   A.   Yes, yes.

19   Q.   Okay.  And then you also needed to provide some documents

20   to individuals of CIF as well.  Those were the ones you

21   requested from the prime minister.

22   A.   Yes.

23   Q.   Okay.  And so in this email -- you sent this email on

24   July 14, 2009, correct?

25   A.   Correct.

1  Q.  And the subject is "Re: request for documents," correct?

2  A.  Yes.

3  Q.  And you say in this email, "Thank you, Mr. Governor.  We

4  are going to request the documents in question and send them.

5  I sent you the bylaws by email last week but my message wasn't

6  sent.  I am sending them."  Do you see that?

7  A.  Yes.

8  Q.  So you were going to obtain documents that were needed by

9  the governor of the Central Bank of Guinea, correct?

10  A.  Correct.

11  Q.  And they were needed to facilitate the deal with CIF,

12  correct?

13  A.  They were needed to open the accounts, the CIF accounts at

14  the Central Bank, yes.

15  Q.  Right.  And those CIF accounts were going to be used for

16  the purposes of the joint venture, correct?

17  A.  Yes, absolutely.

18  Q.  So that was the deal with CIF.

19  A.  Yes.

20  Q.  Okay.  While you were in Singapore during that July trip,

21  you also forwarded some emails to an individual by the name of

22  Jimmy Leong, correct?

23  A.  Yes.

24  Q.  And Jimmy Leong is the CEO of China Sonangol, correct?

25  A.  Correct.

1  Q.  Okay.  And some of your discussions about the deal with CIF

2  and with China Sonangol with were Jimmy Leong, correct?

3  A.  Yes.

4  Q.  You worked together with him to help facilitate the deal,

5  correct?

6  A.  He was there, yes.

7  Q.  The answer is yes.

8  A.  Yes.

9  Q.  Okay.  And in fact, it wasn't just Jimmy Leong; we've

10  talked about Sam Pa today, correct?

11  A.  Yes.

12  Q.  We've talked about Jimmy Leong.

13  A.  Yes.

14  Q.  There was also an individual by the name of Jack Cheung,

15  right?

16  A.  I think he was not in Singapore.  I think he was in Guinea.

17  Q.  Right.  But you also had discussions with him about the CIF

18  deal, correct?

19  A.  I don't know if that's accurate.  He was a member of the

20  CIF team.  I don't remember having any discussions with him.

21  He was -- I transmitted documents back and forth, but he

22  probably talked at the technical level with the technical

23  committee, yes.

24  Q.  Okay.  And you're familiar with the name of an individual

25  named Adrian Liang (ph), correct?

H521thi3                        Thiam - Cross

1    A.  Yes.

2    Q.  And Adrian Liang is also a member of China Sonangol?

3    A.  Yes.

4    Q.  And you had email communications with Adrian Liang,

5    correct?

6    A.  Yes.

7    Q.  And those were about the deal with CIF, correct?

8    A.  Yes.

9    Q.  And at some point after your trip to Singapore in July --

10   A.  Mm-hmm.

11   Q.  -- there came a time when a period passed where you hadn't

12   had any communications with Mr. Pa, correct?

13   A.  Correct.

14   Q.  And as a result of that, the president had become concerned

15   about what was happening with this deal, correct?

16   A.  Correct.

17   Q.  And as a result of that, you reached out to Madam Lo to

18   inquire what was up with Sam Pa, why he wasn't in touch.

19   A.  Correct.

20            MR. KOBRE:  Okay.  And Mr. Beer, if we can post

21   Government Exhibit 516.  And if we can enlarge the lower email,

22   so starting from that -- no, a little bit lower.  A little bit

23   higher.  Starting from the email.  That would be great.

24   Thanks.  Okay.

25   Q.  And this is an email that was sent by you to Lo Fung Hung,

1    correct?

2    A.  Yes.

3    Q.  And by the way, as we've seen here in this trial, she's one

4    of the people who you received money from, correct, personally

5    into your Hong Kong account, correct?

6    A.  Yes, yes.

7    Q.  Okay.  And the email is dated August 30, 2009, correct?

8    A.  Correct.

9    Q.  And it's titled Information, correct?

10   A.  Mm-hmm, yes.

11   Q.  And I'll just read it.  It says, "Dear Mme. Lo, It has been

12   a long time since we last communicated and I thought I would

13   enquire.  I hope all is well with you.  We are a bit concerned

14   about the silence from cif side and the president is starting

15   to ask questions.  Can you please advise us as to Sam's

16   whereabouts."  Do you recall sending that email?

17   A.  Yes, I do.

18   Q.  Okay.  And Mr. Barry is not copied on that email, is he?

19   A.  No, no.

20   Q.  And when you say "We are a bit concerned," you're talking

21   about the negotiating team on behalf of Guinea, correct?

22   A.  Talking about Mr. Barry and the president, who asked me to

23   reach out here.

24   Q.  Okay.  And not including yourself.

25   A.  I reached out.  I was asked to reach out and I reached out,

1   yes, so I'm included.

2   Q.  I mean, when you said "We are a bit concerned," you were

3   not one of the people who was concerned?

4   A.  I said "we."  I am speaking so I am, yes.

5   Q.  So you and Mr. Barry and the president were all concerned.

6   A.  Yes.

7   Q.  As part of the negotiation --

8   A.  We, Guinea, are concerned.

9   Q.  Sure.

10  A.  So the whole country is concerned.

11  Q.  Okay.  You also testified about some more formal meetings

12  that you attended concerning the CIF deal.  Do you recall that?

13  A.  Yes.

14  Q.  And in particular, you were present at an October 7th

15  meeting concerning the deal, correct?

16  A.  Yes.  Yes, correct.

17  Q.  And at that meeting, it wasn't a full Council of Ministers

18  meeting.

19  A.  No.

20  Q.  It was a meeting of the ministers who were most directly

21  affected by the deal, correct?

22  A.  Correct.

23  Q.  Okay.  And that included you.

24  A.  Yes.

25  Q.  The mining sector was an important part of the deal,

1   correct?

2   A.   It was, yes.

3   Q.   It was.  And other ministers, correct?

4   A.   Yes.

5   Q.   Okay.  And at that meeting concerns were presented about

6   certain provisions in the proposed shareholders agreement, is

7   that correct?

8   A.   I don't recall if it's at that meeting, but yes, I think

9   it's in the cabinet meeting the next day, but --

10  Q.   Okay.  Let's look at Government Exhibit 407-T.

11          MR. KOBRE:  And if we can just first enlarge the

12  bottom from introduction.

13  Q.   Following -- and I'm reading here from Government

14  Exhibit 407-T, the bottom of the first page.  "Following the

15  meeting of October 7, 2009 held in the office of the prime

16  minister, relating to the presentation of the recommendations

17  of the negotiating committee of the --"

18          MR. KOBRE:  And then if we can, Mr. Beer, just publish

19  the top of the next page.

20  Q.   "-- shareholders agreement with the Chinese partners."  And

21  then I'll just stop reading, but it goes on to list some of the

22  ministers who were there, including yourself.

23  A.   Mm-hmm.

24  Q.   The prime minister asked to hold a special session of the

25  Council of Ministers on the following day, October 8, 2009.  Do

1    you see that?

2    A.  Yes, yes.

3            MR. KOBRE:  Okay.  And now if we can just enlarge the

4    rest of the page all at once.

5    Q.  And it says here that the recommendations of the

6    negotiating committee dealt with the following three points,

7    and then it goes on to list three points, correct?

8    A.  Yes.

9    Q.  So am I right that October 7th, certain concerns were

10   raised by the committee, correct?

11   A.  Yes.

12   Q.  Okay.  And one of those points -- if we look at point 2,

13   one of those points related to the exclusivity, what we'll call

14   an exclusivity provision in the shareholders agreement,

15   correct?

16   A.  Mm-hmm.

17           THE COURT:  Is that yes?

18   A.  Sorry.  Let me read it.

19   Q.  Do you want me to repeat the question?

20   A.  No, no.  I understand the question.  I just want to read it

21   and understand it.

22   Q.  Oh, of course.

23   A.  Yes.

24   Q.  Okay.  And in particular, one of the concerns that was

25   raised was that the Chinese party -- which I take it refers to

H521thi3                          Thiam - Cross

1    CIF, correct?

2    A.   Mm-hmm, yes.

3    Q.   Okay.  -- has requested that it be granted exclusivity over

4    the rights currently held in Guinea in exploration, mining,

5    mining concessions, oil and gas activities, and commercial

6    rights and rights over existing and future mining

7    opportunities.  Is that right?

8    A.   Yes, correct.

9    Q.   And do you recall that?  Do you recall those concerns being

10   raised?

11   A.   Absolutely.

12   Q.   Okay.  And in fact, that concern was raised again at the

13   Council of Ministers meeting the following day, correct?

14   A.   Yes.

15   Q.   And it was raised again in a letter that was sent to you

16   after the signing of the shareholders agreement by the prime

17   minister, correct?

18   A.   Yes.

19        MR. KOBRE:  And I'm going to ask Mr. Beer to publish

20   Government Exhibit 408.

21   Q.   You've seen this before.  This is the final signed

22   shareholders agreement, correct?

23   A.   Yes.

24   Q.   And your testimony today was that you initialed each page

25   of this agreement, correct?

1   A.   Yes.

2   Q.   And this final agreement contains an exclusivity provision,

3   correct?

4   A.   Yes.

5   Q.   And in fact, that exclusivity provision is found on

6   page 12.

7           MR. KOBRE:   And if we can just enlarge 4.2.9.

8   Q.   And so the exclusivity provision remained in the final

9   signed shareholders agreement, correct?

10  A.   No.  Not as it was described in the complaint from the

11  commission, from the -- this is a different exclusivity

12  provision.  It's not --

13  Q.   But there is an exclusivity provision, correct?

14  A.   Like in any contract, yes.

15  Q.   And this exclusivity provision indicates that full

16  exclusivity is given to ADC and the GDCs in respect of the

17  sectors identified and approved by the parties, as set out in

18  the proposed projects to be undertaken by the GDCs in this

19  agreement and the master agreement.  Is that what it says?

20  A.   Project sectors, absolutely, which means for the --

21          THE COURT:   You've answered.  Thank you.

22          MR. KOBRE:   I'm going to ask Mr. Beer to publish

23  Government Exhibit 408, page 3.  And if we can just enlarge

24  paragraph C.

25  Q.   And I'm going to read a brief portion of this.  I'm going

1     to ask you to tell me if that's accurate.  "The parties propose

2     that ADC and the GDCs should be used as their joint venture

3     vehicle to, *inter alia* --" *inter alia* means among other things,

4     right?

5     A.  Yes.

6     Q.  Okay.  And then I'm skipping down to (ii).  "(ii) invest

7     and operate diamond, iron, bauxite, gold, oil and gas and

8     minerals concessions."  Is that what is written here?

9     A.  Yes.

10         MR. KOBRE:  Okay.  Now if we can take that down.

11    Q.  Let's talk a little bit about what happened -- we talked a

12    little bit before about your JPMorgan account.  Do you recall

13    that?

14    A.  Yes, I recall that.

15    Q.  And you were asked some questions by Ms. Aring on a phone

16    call, correct?

17    A.  Correct.

18    Q.  You provided some answers, correct?

19    A.  Correct.

20    Q.  And after that, at some point after that that account was

21    shut down.

22    A.  Yes.

23    Q.  And you then decided to open up another bank account in the

24    United States, correct?

25    A.  Correct.

1    Q.  And that bank account, or at least one of those bank

2    accounts was an HSBC bank account here in the United States.

3    A.  Yes.

4    Q.  In fact, it was a bank account on Madison Avenue, correct?

5    A.  Correct.

6    Q.  And on June 7, 2010, you went into that HSBC branch on

7    Madison Avenue, correct?

8    A.  Correct.

9    Q.  And you told them you wanted to open up a checking account,

10   correct?

11   A.  Correct.

12   Q.  And you were asked several questions in connection with

13   opening up the account, correct?

14   A.  Correct.

15   Q.  And among the questions that you were asked was about your

16   current occupation, correct?

17   A.  Correct.

18              (Continued on next page)

19

20

21

22

23

24

25

1   Q.  And you lied about your current occupation, correct?

2   A.  Yes.

3          MR. KOBRE:  Mr. Beer, could we publish Government

4   Exhibit 102C, and if we could just enlarge that.

5   Q.  You told Mr. Damle, who testified here during this trial,

6   that you were employed by an employer named AMER, correct?

7   A.  Correct.

8   Q.  And you told him that your position at AMER was that you

9   were the chairman?

10  A.  Correct.  I believe I told Mr. Damle that I was planning on

11  starting something with AMER, but correct.

12  Q.  Well, you didn't tell Mr. Damle that you were the minister

13  of mines of the Republic of Guinea?

14  A.  No.

15  Q.  Could we agree on that?

16  A.  No, I did not.

17         THE COURT:  OK, sir.  Can you pull your chair closer,

18  please, and keep your voice up and use the microphone.

19         THE WITNESS:  Yes.

20         THE COURT:  Thank you.

21  BY MR. KOBRE:

22  Q.  At some later point you were called back in to answer some

23  additional questions at HSBC, correct?

24  A.  Yes.

25  Q.  And on July 19, 2010, you came back to that same branch,

1    correct?

2    A.  Correct.

3    Q.  And you met there again with Mr. Damle, correct?

4    A.  Yes.

5    Q.  And it was only at that point that you told him that you

6    had been -- that you were, in fact, at the time the minister of

7    mines of the Republic of Guinea, correct?

8    A.  I'm not sure.  I believe I -- I think I had told him

9    before, because I think we had a conversation prior to that,

10   but --

11   Q.  You didn't tell Mr. Damle, until you were specifically

12   confronted with the fact that you were the minister of mines,

13   that you were the minister of mines?

14   A.  True.

15   Q.  Correct?

16   A.  True.

17   Q.  And on that conversation with, that July 19 conversation

18   with Mr. Damle, you were asked some additional questions, after

19   you admitted -- you admitted during that conversation that you

20   were the minister of mines, correct?

21   A.  Correct.

22   Q.  And you were asked some other questions about things the

23   bank wanted to know, right?

24   A.  Correct.

25   Q.  And in fact --

1          MR. KOBRE:  Mr. Beer, if we could publish Government

2    Exhibit 102F, fifth page, and enlarge the body.  Thank you.  We

3    don't even need to enlarge the subject, just the body of the

4    email.

5    Q.  -- you were asked during that conversation about the source

6    of the funds from the account?

7    A.  Yes.

8    Q.  And during this conversation with Mr. Damle, you told

9    Mr. Damle that it was from savings from past employment and

10   proceeds of the sale of land in Africa, correct?

11         MR. KOBRE:  Could we just highlight that.

12         MR. GOLDSMITH:  Objection.

13         THE COURT:  Overruled.

14   A.  Yes.

15   Q.  And that was different from what you had told Ms. Aring a

16   few months earlier, correct?

17   A.  Correct.

18   Q.  So you had told Ms. Aring that it was from dealings with

19   Baker Al-Sadi, correct?  Correct?

20   A.  Correct, yes.

21   Q.  And now you're telling the HSBC branch bank that it was

22   from savings from past employment and proceeds of sale of land

23   in Africa, correct?

24   A.  Correct.

25   Q.  And that was not true, correct?

H52Wthi4                              Thiam - Cross.

1    A.  That was not true.

2    Q.  In fact, the money was from Sam Pa, correct?

3    A.  Yes.

4    Q.  And you told Mr. Damle, you made these statements to

5    Mr. Damle about the source of the funds in the same

6    conversation as you told him that you were the minister of

7    mines, correct?

8    A.  Yes.

9    Q.  Now, Mr. Thiam, you're aware that corruption is a problem

10   in certain African countries, correct?

11   A.  Absolutely.

12   Q.  And at least one part of the problem with corruption is

13   that it results in the -- it may result in the countries not

14   receiving the real value that is contained in their economy, in

15   their economic sectors --

16            MR. GOLDSMITH:  Objection.

17   Q.  -- is that correct?

18            THE COURT:  Overruled.

19   A.  Yes.

20   Q.  Because if someone gives away, if someone were to take a

21   bribe and were to, and that would affect the way they would

22   make certain decisions, that could result in harm to the

23   country, to their country, correct?

24            MR. GOLDSMITH:  Objection.

25   A.  Correct, yes.

1            THE COURT:  Overruled.

2     Q.  And you also were aware that Sam Pa was someone who had

3     paid bribes before, correct?

4            MR. GOLDSMITH:  Objection.

5            THE COURT:  Overruled.

6     A.  No.

7     Q.  You were not aware that Sam Pa was someone who paid bribes?

8     A.  No.  I had heard rumors, but I was not aware.

9     Q.  OK.  You heard rumors that Sam Pa was someone who paid

10    bribes?

11    A.  Yes.

12    Q.  In fact, you heard rumors that Sam Pa had paid President

13    Dadis, correct?

14    A.  Yes.

15    Q.  OK.  You saw Sam Pa hand a suitcase, which you believed

16    contained cash, to an official of the Republic of Guinea,

17    correct?

18    A.  To a political candidate of, of an election, yes.

19    Q.  To someone who was working for a political candidate,

20    correct?

21    A.  Yes.

22    Q.  But the cash was actually handed to someone who was at the

23    time an employee of the government of Guinea, correct?

24    A.  Yes.

25    Q.  So you were aware of those things, and you also knew that

1   he -- or you had at least heard rumors that he paid off heads

2   of state, correct?

3   A.  I've heard rumors, yes.

4   Q.  And you were aware of that, correct?

5   A.  Yes.

6   Q.  You testified earlier that you needed the money from Sam

7   Pa, correct?

8   A.  Correct.

9   Q.  And you needed it because you had to feed your family,

10  correct?

11  A.  And pay down debt, yes.

12  Q.  Pay down debt and feed your family, correct?

13          MR. KOBRE:  Mr. Beer, if we can publish Government

14  Exhibit 301C, page 159.  If we could enlarge the entire text.

15  Q.  Now, Mr. Thiam, this is a, it's entitled "interbank fund

16  transfer."  Do you see that?

17  A.  Yes.

18  Q.  And it's a wire, it's a, this is a document that you need

19  to fill out if you want to wire transfer funds from your HSBC

20  account, correct?

21  A.  Yes.

22  Q.  And it's signed on the bottom left-hand corner by you,

23  correct?

24  A.  Correct.

25  Q.  And in fact, there's your phone number listed there and

1   your email address as well, correct?

2   A.  Yes.

3   Q.  You filled this form out, right?

4   A.  Absolutely.

5   Q.  And this is a wire transfer from the Hong Kong account,

6   correct?

7   A.  Correct.

8   Q.  And it's a fund transfer on August 5, 2010, correct?

9   A.  Correct.

10  Q.  And it's a fund transfer to Steinway Inc., correct?

11  A.  Yes.

12  Q.  Steinway Inc. is a piano company, correct?

13  A.  Correct.

14  Q.  And this was for the purchase of a piano for your

15  apartment, correct?

16  A.  Yes.

17  Q.  Mr. Thiam, what's the amount of money listed on this

18  transfer?

19  A.  $46,375.41, I believe.

20  Q.  Thank you.

21          MR. KOBRE:  Mr. Beer, if you can publish for the jury

22  Government Exhibit 301C, page 118.

23  Q.  This is another wire transfer from your HSBC Hong Kong

24  account?

25  A.  Yes.

H52Wthi4                        Thiam - Cross.

1    Q.   You filled it out?

2    A.   Yes.

3    Q.   It's directed to Simba Lane LLC?

4    A.   Yes.

5    Q.   And it's in the amount of $25,000?

6    A.   Yes.

7    Q.   And this is for your payment for a vacation rental?

8    A.   Yes.

9              MR. KOBRE:   Mr. Beer, if we can publish Government

10   Exhibit 301C, page 250.

11   Q.   This is another wire transfer from your HSBC Hong Kong

12   account?

13   A.   Yes.

14   Q.   You filled it out?

15   A.   Yes, I did.

16   Q.   And it's a wire transfer on March 14, 2011?

17   A.   Yes.

18   Q.   And it's to Scardaci Building Co., correct?

19   A.   Yes.

20   Q.   And this is for work that was to be performed at the 771

21   Duell Road property?

22   A.   Yes.

23   Q.   And it's in the amount there of 55,092, correct?

24   A.   Correct.

25             MR. KOBRE:   Mr. Beer, if you can publish Government

1    Exhibit 301C, page 167.

2    Q.   This is another wire transfer from your HSBC Hong Kong

3    account?

4    A.   Yes.

5    Q.   And it's a wire transfer that occurred on October 5, 2010?

6    A.   Uh-huh.  Yes.

7    Q.   And you made that wire transfer, right?

8    A.   I did, yes.

9    Q.   And it's to Interior Design Studio, correct?

10   A.   Yes.

11   Q.   What is Interior Design Studio?

12   A.   Probably an interior-design house.

13   Q.   For the 771 Duell Road?

14   A.   No, I don't think so.

15   Q.   OK.  For your apartment in Manhattan?

16   A.   Yes, probably.

17   Q.   And the amount there is $51,203, correct?

18   A.   Correct.

19   Q.   And by the way, this is -- the wire transfers we just

20   looked at now, this is money that was transferred to you as

21   part of your loan from Sam Pa, correct?

22   A.   Correct.

23   Q.   Now, you also, as part of the bank account that you had --

24        MR. KOBRE:  You can take that down.  Thank you.

25   Q.   As part of the bank account that you had at HSBC Hong Kong,

1   you also had a credit card, correct?

2   A.  Yes.

3   Q.  And that credit card was able to be used, it didn't only

4   have to be used in Asia; it could be used anywhere, correct?

5   A.  Yes.

6           MR. KOBRE:  Mr. Beer, if you can publish for the

7   members of the jury Government Exhibit 301D, page 14 -- rather,

8   page 18.  And if we could enlarge, you could even enlarge it a

9   little bit more.

10  Q.  And am I correct, Mr. Thiam, that you used this HSBC credit

11  card in Whistler?

12  A.  Yes.

13  Q.  And Whistler is a ski resort?

14  A.  Yes.

15  Q.  And you used it to pay for ski schools there?

16  A.  Yes.

17          MR. KOBRE:  We can take that down.

18  Q.  Now, let's talk a little bit about Duell Road; I think you

19  testified about that.

20  A.  Yes.

21          MR. KOBRE:  Now, if we can publish, Mr. Beer,

22  Government Exhibit 1005.

23  Q.  You testified that you do recall transferring $375,000 to a

24  company called Pacific Inter-Link, correct?

25  A.  Yes, uh-huh.

1    Q.  And that money was transferred from the Hong Kong account,

2    correct?

3    A.  Correct.

4    Q.  And the purpose of that money was to repay money that was

5    laid out by a company called SSNL, correct?

6    A.  To repay?

7    Q.  Yes, in exchange for.

8    A.  I'm not sure if I would characterize it like that.

9    Q.  OK.  Well, let's look at an email, Government Exhibit 545.

10           MR. KOBRE:  I'm sorry.  We can take that down.  Just

11   one moment.  Just one moment.

12           Yes, Government Exhibit 543, please.  I apologize.

13   Take this down.

14   Q.  You're familiar with an individual named Thomas McGregor,

15   correct?

16   A.  Yes.

17   Q.  And Thomas McGregor is an attorney, correct?

18   A.  Correct.

19   Q.  And Thomas McGregor acted -- and you're also aware that

20   this company called SSNL purchased, was the purchaser of the

21   771 Duell Road, correct?

22   A.  Yes.

23   Q.  And that occurred in November of 2010, correct?

24   A.  Yes.

25   Q.  And SSNL is a company that was based at an address in

1  Manhattan, correct?

2  A.  No, not correct.

3  Q.  OK.

4          MR. KOBRE:  If we could take a look at Government

5  Exhibit 201, page 2, and if we can enlarge just the top

6  portion, starting from the beginning through the first or

7  second paragraph.

8  Q.  This is a deed for the transfer of the property from -- to

9  SSNL, correct?

10  A.  Correct.

11  Q.  And that deed is dated the 13th day of November 2010,

12  correct?

13  A.  Yes, correct.

14  Q.  And SSNL, am I correct, stands for Sociedade Saboeira de

15  Nacala?

16  A.  Yes.

17  Q.  Correct?

18  A.  Yes.

19  Q.  And that is listed here on this deed, and I'm looking at

20  the very bottom of the text, with an address at 340 East 64th

21  Street, 14H, New York, New York.  Do you see that?

22  A.  I see that, yes.

23  Q.  And 340 East 64th Street, that was your home address,

24  correct?

25  A.  Precisely, yes.

H52Wthi4                              Thiam - Cross.

1    Q.   Precisely.  And in fact, your wife, Fatim Thiam, was

2    someone who was an authorized signer for SSNL, correct?

3    A.   She had the power of attorney for the purpose of buying the

4    property for SSNL, correct.

5          MR. KOBRE:  If we could look at Government Exhibit

6    205A, and if we could just enlarge the bottom signature page.

7    Q.   Do you see that?

8    A.   Yes, I see that.

9    Q.   And that's a real property transfer report, correct?

10   A.   Yes.

11   Q.   And it's signed.  It says buyer, and there's listed as SSNL

12   as the buyer, correct?

13   A.   Yes.

14   Q.   And Fatim Thiam is your wife, and she signed as the buyer,

15   correct?

16   A.   Yes, as the power of attorney.  Yes.

17   Q.   So it's a company that's listed at your home address,

18   correct?

19   A.   No.  The company's not listed at my home address.  The

20   power of attorney's at my home address because my wife is under

21   power of attorney.  The company is domiciled in Mozambique.

22   Q.   Let me -- I'm sorry.  Thank you.  Let me rephrase my

23   question.  The company, SSNL, is listed on this deed as having

24   an address at your home address, correct?

25   A.   Yes.

1   Q.  And your wife signed as the buyer on the real property

2   transfer report, correct?

3   A.  Signed for the buyer.

4   Q.  For the buyer?

5   A.  Yes.

6   Q.  And so, now this property is owned by SSNL, correct?

7   A.  Yes.

8           MR. KOBRE:  And if we could just, Mr. Beer, enlarge

9   the purchase price as reflected here.

10  Q.  The full sale price of this property is $3,750,000,

11  correct?

12  A.  Correct.

13          MR. KOBRE:  Now, if we can pull up Government Exhibit

14  540 and enlarge the bottom portion, to start with.

15  Q.  This is an email on November 1, 2010.  Do you see that?

16  A.  Yes.

17  Q.  And it's an email from Sanath Kumar?

18  A.  Yes.

19  Q.  And Sanath Kumar is someone who is an employee of Mr.

20  Rajahussen, is that correct?

21  A.  I'm not sure if he's an employee of Mr. Rajahussen or PIL.

22  I don't know.

23  Q.  OK.  But he's associated with Mr. Rajahussen?

24  A.  Yes.

25  Q.  Is that fair?

1    A.  Yes.

2    Q.  And he sends you an email on November 1, 2010, correct?

3    A.  Yes.

4    Q.  And the subject is SWIFT copy USD 375,000, correct?

5    A.  Yes.

6    Q.  And SWIFT is a document that's generated by the bank

7    sometimes when there's a wire transfer, under certain

8    circumstances, correct?

9    A.  Yes.

10   Q.  And he says here the following:  "Dear sir, sorry for the

11   delay in providing SWIFT copy, the delay because of network

12   problem in bank.  Please find attached SWIFT copy for the

13   amount of $375,000."  Correct?

14   A.  Yes.

15            MR. KOBRE:  Now if we could go to the next page and

16   enlarge the next page.

17   Q.  And it continues now:  "And it's our request kindly,

18   instruct payment amount of USD 375,000 for below-mentioned bank

19   details."  Do you see that?

20   A.  Yes.

21   Q.  So he tells you, am I correct that in this email, Mr. Kumar

22   is telling you that he or his company had wired $375,000 to

23   Mr. McGregor?  Correct?

24   A.  Yes.

25   Q.  And a little bit further in the email, he requests that you

 1    instruct payment of the same amount to Pacific Inter-Link,

 2    correct?

 3    A.  Correct.

 4    Q.  And I'm correct that you subsequently did wire $375,000 to

 5    Pacific Inter-Link?

 6    A.  I did, yes.

 7    Q.  And in fact --

 8            MR. KOBRE:  If we could pull up Government Exhibit

 9    301C, page 184.

10    Q.  -- this is another one of those wire transfer reports from

11    your Hong Kong account, correct?

12    A.  Yes.

13    Q.  It's signed by you, correct?

14    A.  Correct.

15    Q.  And it's to -- this is the wire transfer to Pacific

16    Inter-Link, correct?

17    A.  Yes.

18    Q.  And it's for $375,000, correct?

19    A.  Yes.

20    Q.  And it's dated November --

21            MR. KOBRE:  Could we get a little bit more.

22    Q.  November 8, 2010, correct?

23    A.  Yes.

24    Q.  Now, at some point in 2000 -- so we've talked about the

25    transfer of the property to SSNL?

H52Wthi4                          Thiam - Cross.

1    A.  Yes.

2    Q.  OK.  And that happened in November 2010, correct?

3    A.  Yes.  The -- talked about -- sorry?

4    Q.  Sorry.  The transfer of the 771 Duell property to SSNL

5    occurred in November of 2010, correct?

6    A.  The purchase by SSNL.

7    Q.  Yes.

8    A.  There's no transfer.

9    Q.  The purchase by SSNL?

10   A.  Yes.

11   Q.  Am I correct?

12   A.  Yes.

13   Q.  And then at some later point in 2012, the property was

14   transferred again from SSNL to another entity, correct?

15   A.  Correct.

16   Q.  And that other entity is called Amer Holdings, correct?

17   A.  Yes.

18   Q.  AMER is spelled the same way as it's spelled, A-M-E-R,

19   correct?

20   A.  Correct.

21   Q.  And that's the same way that the company that you told HSBC

22   you were employed by is spelled as well, correct?

23   A.  Absolutely, yes.

24   Q.  AMER and AMER, correct?

25   A.  Correct.

H52Wthi4                          Thiam - Cross.

1    Q.  And AMER, as it's listed in the deed for the 2012 transfer,

2    is also listed as having your residential address, correct?

3    A.  Yes.

4              MR. KOBRE:  In fact, Mr. Beer, if we could publish

5    Government Exhibit 102C -- I'm sorry.  Take that down.  203,

6    rather, second page, please.  And if you could enlarge the

7    upper portion.

8    Q.  So what we have here, so this is a deed reflecting a

9    transfer of the property in 2012, correct?

10   A.  Correct.

11   Q.  And it's transferring the property from SSNL, correct?

12   A.  Correct.

13   Q.  Listed as having, listed here as having an address of 340

14   East 64th Street, correct?

15   A.  Correct.

16   Q.  Your home address?

17   A.  Yes.

18   Q.  Correct?

19   A.  Yes.

20   Q.  And it's been transferred now to Amer Holdings Pte. having

21   an address at the same address, correct?

22   A.  Correct.

23   Q.  Your residence, correct?

24   A.  Yes.

25             MR. KOBRE:  And if we go to, if we can enlarge the

1    bottom of that page, the signature.

2    Q.  This deed is signed by Fatim Thiam?

3    A.  Yes.

4    Q.  And as a member of SSNL?

5    A.  As the power of attorney.

6    Q.  OK.  But I'm just going to ask, I'm just reading from the

7    document.  It says "by member."  Is that what it says there?

8    A.  Yes.

9    Q.  OK.

10   A.  You --

11   Q.  Thank you.

12          Now, you testified that you paid a certain amount of

13   money for some work to be done on 771 Duell Road, correct?

14   A.  Yes.

15   Q.  And in fact, you paid money to several different companies

16   that did work on that home, correct?

17   A.  Possibly, yes.  At least the contractor, Scardaci.

18   Q.  Yes, at least Scardaci, right?

19       Are you familiar with an entity called Christopher Peacock

20   Home?

21   A.  Yes.

22   Q.  What is Christopher Peacock Home?

23   A.  It's a kitchen maker.

24   Q.  Sorry?

25   A.  It's a kitchen-cabinet maker.

H52Wthi4                         Thiam - Cross.

1   Q.  Cabinetmaker, and you paid them to do work on 771 Duell

2   Road as well?

3   A.  Yes.

4   Q.  Are you also familiar with an entity called Pygma Group?

5   A.  Pygma Group?

6   Q.  P-Y-G-M-A.  Does that sound familiar?

7   A.  I'm not sure.  No.

8   Q.  OK.  We'll come back.

9   A.  I just don't remember.

10  Q.  Sure.

11  A.  I'm not saying I don't know.

12  Q.  Sure.

13  A.  I just don't remember.

14  Q.  In fact, you paid Scardaci over a million dollars to do

15  work on that house, isn't that correct?

16  A.  Over a seven year, six-, seven-year period, yes.

17  Q.  Over a million dollars?

18  A.  Yes.

19  Q.  You used the house, correct?

20  A.  Yes.

21  Q.  In particular, you stayed there on occasion?

22  A.  When we had a chance, on vacations, yes.

23  Q.  And your wife stayed there as well?

24  A.  My family stayed there, yes.

25  Q.  You hosted other people there on occasion?

H52Wthi4                          Thiam - Cross.

1    A.  On occasion, yes.

2           MR. KOBRE:  If I might just have one moment, your

3    Honor?

4           Mr. Beer, if you can publish Government Exhibit 301C,

5    page 269.  You can enlarge that.

6    Q.  That's another wire transfer from your Hong Kong account?

7    A.  Yes.

8    Q.  And it's to, it's dated March 24, 2011?

9    A.  Yes.

10   Q.  And this is to the kitchen designer, Christopher Peacock

11   Home?

12   A.  Yes.

13   Q.  And it's for $17,000, correct?

14   A.  Correct.

15          MR. KOBRE:  And Mr. Beer, if we can publish Government

16   Exhibit 1001.

17   Q.  Some of the other things that you spent, you used the money

18   in your Hong Kong account for are at Barney's New York?

19   A.  Yes.

20   Q.  Correct?

21   A.  Yes.

22   Q.  And for airfare to various places?

23   A.  Yes.

24   Q.  And Cipriani, correct?

25   A.  Yes.

1    Q.  That's a fancy restaurant?

2    A.  It's a restaurant, yes.

3    Q.  And for, you used it at Chopard?

4    A.  Yes, possible.

5    Q.  What is Chopard?

6    A.  It's a watch or jewelry store.

7             MR. KOBRE:  No further questions.

8    REDIRECT EXAMINATION

9    BY MR. GOLDSMITH:

10   Q.  Mr. Thiam, you were asked some questions on

11   cross-examination regarding your taking a salary as minister of

12   the mines.  Did you accept the salary while you were minister

13   of mines?

14   A.  No, I did not.  I was told the salary had, by law, to be

15   paid to my account at the central bank, and I was free to give

16   it away or not take it, which I did.

17   Q.  Why did you not accept it?

18   A.  Because when I decided to go in for the purpose of helping,

19   I decided that not only the country was, had enough financial

20   problems and I would take care of my own expenses and not

21   burden the country with it, which was true for my travel, my

22   living expense and any other expenses, and also because I

23   wanted to give, at least give the appearance that I was

24   independently wealthy and not subject to the traditional needs

25   and the traditional pressures that the politician or government

H52Wthi4                    Thiam - Redirect

1    official is sometimes subject to in an African country.

2    Q.  You were asked some questions on cross-examination about a

3    person named Wang Xiang-Fei?

4    A.  Yes.

5    Q.  Who is that person?

6    A.  I understand he's an employee of Sam Pa or of CIF, but I

7    don't know the person personally.

8    Q.  Do you have any independent recollection of who that person

9    was?

10   A.  No.

11   Q.  And you were shown some documents that money was

12   transferred to your account from that individual?

13   A.  Yes.

14   Q.  Prior to being shown those documents, did you realize the

15   money had been transferred from that individual?

16   A.  No -- no.  Sorry.

17   Q.  Do you know why the money was transferred from that

18   individual?

19   A.  Probably on the instruction from Sam Pa.

20   Q.  You were asked several questions about your tax returns --

21   A.  Yes.

22   Q.  -- 2009 and 2010, on cross-examination?

23   A.  Yes.

24   Q.  Did you prepare your own taxes?

25   A.  No.

 1   Q.  Did you rely upon the advice of a tax professional?

 2   A.  Yes.

 3   Q.  You were asked several questions about Government Exhibit

 4   406-T, which is the master agreement?

 5   A.  Yes.

 6   Q.  And if you recall you were asked several questions about

 7   the changes from the June version of the master agreement to

 8   the July version of the master agreement.  Do you recall those

 9   questions?

10   A.  Yes.

11   Q.  Were you responsible for drafting the changes?

12   A.  No.

13   Q.  Who was responsible for drafting the changes?

14   A.  The technical committee and the negotiating commission,

15   which I was not part of.

16   Q.  Did you have any authority to insist upon the suggestions

17   that were referred to in your email being incorporated into the

18   master agreement?

19   A.  No.  I could only suggest and ask for the cabinet to decide

20   and instruct me on how to respond.

21   Q.  Are you aware of whatever government actions took place as

22   a result of your suggestion?

23   A.  Well, I know there were conversations between the prime

24   minister and other members of the committee and the government

25   in Guinea, and the negotiating committee was instructed --

1    commission, sorry, was instructed as to what to, what to amend

2    and what not to amend, and there were emails of amended text

3    flying around between Singapore and Guinea until the final,

4    agreed text arrived in Singapore.

5    Q.  Do you recall why the percentages of 85 percent and 15

6    percent were discussed during your meetings with the Chinese?

7    A.  The meeting in Singapore?

8    Q.  Yes.

9    A.  I do not recall the exact justification, but there seems to

10   be -- seemed to be, either in their by-laws or in Singapore

11   law, or in their ability to raise financing, I believe, if --

12   my understanding was that if, from what they explained, if they

13   have to front 100 percent of the cost of the project, carrying

14   the government at a level of 24 percent was too high and would

15   make it financially prohibitive, or something, something to

16   that effect.

17   Q.  Do you recall being asked questions about the exclusivity

18   clause in the shareholders agreement?

19   A.  Yes.

20   Q.  And you started to provide an answer using the term

21   "project sector"?

22   A.  Yes.

23   Q.  Could you please describe what the project sector is?

24   A.  The agreement states that the government of Guinea and CIF

25   will jointly choose specific projects to invest in in various

```
 1    sectors.  Once a project is chosen, there is a standard
 2    exclusivity clause where none of the two parties can go and
 3    talk to another party about that specific project.  It's not an
 4    exclusivity about everything in mining, everything in
 5    transport, everything in fishery, in Guinea.  It's once Guinea
 6    and China picks a project in mining or in fisheries or in
 7    transportation, they are exclusive to that project until one of
 8    the two parties decides they are no longer interested, which is
 9    standard in contract law.
10    Q.  You were asked some questions about the Duell Road
11    property?
12    A.  Yes.
13    Q.  In upstate New York?
14    A.  Yes.
15    Q.  Why was your wife the power of attorney on behalf of SSNL?
16    A.  Because the, Aquil, the owner of SSNL, is a foreigner and
17    lives abroad and was not traveling to the U.S. at the time of
18    the closing.  Neither was I.  I believe both my wife and I were
19    granted power of attorney to close on their behalf.  I believe
20    I was traveling, so she was the one remaining.  The address of
21    record on the power of attorney was our home address, and it's
22    the address, of course, used for all the documentation.
23    Q.  You were asked some questions on cross-examination about
24    several expenditures that you wired money from the Hong Kong
25    account to pay?
```

1    A.   Yes.

2    Q.   Now, could you describe why you used the loan money for

3    those expenses?

4    A.   I took the loan for my personal use and expenses as well as

5    to support myself in Guinea while I was living, during my

6    remaining time in Guinea, to pay for my travel as a minister,

7    as I started paying out of my own pocket when I had the money.

8    When I ran out of money, I borrowed money.  I used that money

9    that I borrowed to pay for that.  So my travel as a minister,

10   sometimes the cost of hotels from fellow ministers traveling

11   with me that I would pay for and my personal travel and my

12   family travel was included in that.  All my family and living

13   expenses was, were paid for by that money.  That's the purpose

14   of the loan.

15   Q.   Why were you paying for travel expenses related to your

16   work in the government of Guinea?

17   A.   Because, for the same reason I chose not to take a salary,

18   I chose to house myself, pay for my own travels.  I even, at

19   some point when budget was tight, covered some of the expenses

20   of the ministry, of my cabinet at the ministry itself.

21   Q.   Do you recall being asked some questions about certain

22   luxuries or amenities that you were spending money on --

23   A.   Yes.

24   Q.   -- in 2010?

25   A.   Yes.

1   Q.  Why were you spending money on what would be considered

2   luxuries instead of necessities?

3   A.  The answer to that would depend on the category.  When it's

4   referred to hotels and restaurants and things of that sort, I

5   stayed as a minister at hotels that ministers, on an official

6   mission, travel to.  A minister, as per the way the government

7   functioned, would stay in a suite and not a room, because he

8   was sometimes asked to receive foreign delegations in his suite

9   for meetings and things of that sort, and those were hotels

10  that I used to stay at before I, I, I was minister, some of the

11  hotels for ten years, and I just continued going to the same

12  hotels.  As long as I was not charging the government for it, I

13  did not see what the problem would be.

14  Q.  What about expenses unrelated to just travel?

15  A.  Yes.

16  Q.  Why were you spending money on what would be considered

17  luxuries instead of necessities?

18  A.  I borrowed an amount large enough to maintain my standard,

19  the standard of living I had before, and I lived the way I

20  lived before.

21  Q.  When you say before, what period of time are you

22  discussing?

23  A.  The period of time before I was a government official.

24  Q.  When you were working at Merrill Lynch and UBS?

25  A.  Yes.  The piano I purchased was a replacement of an

1    existing piano.  The schools I paid for were the same schools

2    my kids had been going to before, since kindergarten, years

3    before I was minister.  It's not something that just happened

4    because I became minister and I borrowed money.

5    Q.  You were also asked some questions on cross-examination

6    about the rumors that Sam Pa had made bribes to other

7    government officials?

8    A.  Yes.

9    Q.  Did Sam Pa ever offer to bribe you?

10   A.  No.

11   Q.  Did you ever accept a bribe from Sam Pa or others at CIF?

12   A.  No.

13           MR. GOLDSMITH:  No further questions.

14   RECROSS-EXAMINATION

15   BY MR. KOBRE:

16   Q.  Mr. Thiam, you testified just now that you used some of the

17   money on luxuries because you wanted to maintain the standard

18   of living that you had had, correct?

19   A.  Correct.

20   Q.  You have never earned $8.5 million in a year, have you?

21   A.  No, not in a year.  No.

22   Q.  Now, you also testified about, you were also asked some

23   questions about your salary as minister of mines, correct?

24   A.  Yes.

25   Q.  And your testimony is that you did not take a salary while

1    you were -- you did not actually receive the money that was

2    paid to you by the ministry of mines?

3    A.   It was paid to me in my account, so I received it, but I

4    did not use it.  I distributed it.

5    Q.   And despite that, you paid income tax on it?

6    A.   Yes, because I -- the tax return -- yes.

7    Q.   OK.  And you also testified that tax professionals helped

8    you to fill out your tax return?

9    A.   Yes.

10   Q.   You told the tax professionals that this was a loan,

11   correct?

12   A.   Yes.

13   Q.   And despite the fact that you told the tax professionals

14   that the millions of dollars you'd received was a loan, they

15   insisted on reporting it as income, correct?

16   A.   It was a joint decision because we could not document it

17   because it was an undocumented loan, so we decided to file it

18   as income.

19   Q.   But you didn't put it down as undocumented loan; you put it

20   down as consulting, correct?

21   A.   I put it down as income, yes.

22   Q.   As income from a business of consulting, correct?

23   A.   I don't remember, but yes.

24            MR. KOBRE:  If we could --

25   A.   I'm not denying.  I'm saying --

1    Q.  OK.  Well, I can refresh your recollection, I think.

2              MR. KOBRE:  Could we --

3    Q.  Oh, I think it's in front of you, Government Exhibit 1802.

4    A.  OK.

5    Q.  And I can point you to the page.  Do you see a page there,

6    it bears page No. 7 on the bottom of it, and it says profit or

7    loss from business?

8    A.  Page 7?

9    Q.  But it's actually, on the bottom it's listed as page 7, but

10   it's actually, I think, the third piece of paper.  The third.

11   A.  I see the third piece of paper, yes.

12             THE COURT:  Ms. Laryea, why don't you approach the

13   witness and point out the page.

14   A.  OK.  I have the page.

15   Q.  OK.  And that's what's called schedule C, correct, on the

16   upper left-hand corner?

17   A.  Yes.

18   Q.  And it says profit --

19             THE COURT:  Excuse me.  I don't think the document is

20   in evidence.

21             MR. KOBRE:  I'm sorry.  You're right.  Correct, your

22   Honor.

23   Q.  Am I right, Mr. Thiam, that based on your review of this

24   document, you reported this as money from consulting?  Correct?

25             THE COURT:  Just look at the document.

1          THE WITNESS:  Yes.

2          THE COURT:  Read it to yourself, put it aside, and

3     then answer the question.

4          THE WITNESS:  OK.

5     A.  Yes.

6     Q.  And that you had a consulting business that was located at

7     340 East 64th Street, correct?

8          MR. GOLDSMITH:  Objection.

9          THE COURT:  Sustained as to form.

10    BY MR. KOBRE:

11    Q.  Am I correct that you -- am I correct, sir, that you

12    reported this as -- you reported having a business located at

13    340 East 64th Street?

14         MR. GOLDSMITH:  Objection.

15         THE COURT:  Look at the document, read it to yourself,

16    put it aside.  Does it refresh your recollection?

17    A.  Yes.

18    Q.  Yes, you -- yes, when you reported this on your 2010 tax

19    returns, you reported having a consulting business located at

20    your home address, correct?

21    A.  Yes.

22    Q.  And you never repaid, actually paid back any of the $8.5

23    million you received, correct?

24    A.  No.

25         MR. KOBRE:  Nothing further.

```
 1                THE COURT:  Any redirect?

 2                MR. GOLDSMITH:  Very brief.

 3   REDIRECT EXAMINATION

 4   BY MR. GOLDSMITH:

 5   Q.  You were asked some questions about whether or not you'd

 6   ever received $8-1/2 million annual salary.  Do you recall

 7   that?

 8   A.  Yes.

 9   Q.  How much were you earning on average in the years before

10   you became the minister of mines?

11   A.  From my --

12   Q.  2006 to 2008.

13   A.  From all sources combined?

14   Q.  All sources combined.

15   A.  Depends on the year.  A few million, I'd say, a year.

16                MR. GOLDSMITH:  No further questions.

17                MR. KOBRE:  Nothing further.

18                THE COURT:  Ladies and gentlemen, we'll take our

19   afternoon recess, lunch break.  And we went a little past

20   12:45, so come back here at 2:05.  Thank you.

21                Do not discuss the case.

22                (Continued on next page)

23

24

25
```

H52Wthi4

```
 1            (In open court; jury not present)
 2            THE COURT:  You may step down.
 3            (Witness excused)
 4            THE COURT:  Let's talk about our schedule this
 5    afternoon.  Will the defendant be resting when we resume?
 6            MR. GOLDSMITH:  Yes.
 7            THE COURT:  And will there be a rebuttal case?
 8            MR. KOBRE:  No, your Honor.
 9            THE COURT:  So we will then move to summations.  Is
10    there any open issue that the government needs to discuss
11    during the lunch break?
12            MR. KOBRE:  No, your Honor.
13            THE COURT:  Mr. Goldsmith.
14            MR. GOLDSMITH:  No, your Honor.
15            THE COURT:  Mr. Goldsmith, you have that one open
16    issue.
17            MR. GOLDSMITH:  I did have the open issue, but I was
18    waiting for more direction from the Court.  Actually, you said
19    we were going to have a chance to look it over.  I think the
20    government is now just getting a chance to review their version
21    of the transcript, so hopefully when we get back, we can
22    finalize that.
23            THE COURT:  Good.  Great.  I've looked at these pages,
24    and nothing pops out to me as what I could give as an
25    instruction, but I am happy to consider any proposed
```

H52Wthi4

1    instruction that anyone has and look forward to discussing

2    these issues with you further.

3            Let's meet back here at 2:00.  That will give us five

4    minutes.  Does that sound about a right amount of time,

5    Mr. Goldsmith?

6            MR. GOLDSMITH:  Sure.

7            THE COURT:  Great.  Have a nice lunch.

8            (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         AFTERNOON SESSION

2                             1:59 p.m.

3            (In open court; jury not present)

4            THE COURT:  Counsel.  Mr. Goldsmith.

5            MR. GOLDSMITH:  Yes, your Honor.  My understanding is,

6    having spoken with the government, that they are objecting to

7    my request for the curative instruction on the confusion that

8    could be related to the conflict of interest from the bank

9    witnesses.

10           THE COURT:  So can you give me a proposed instruction.

11           MR. GOLDSMITH:  My proposed instruction simply is, the

12   Court should advise the jury that the conflict of interest as

13   discussed by the banking witnesses was not for their

14   consideration as it relates to the elements of the crimes

15   charged herein.

16           THE COURT:  Okay.  So I read the passages, including

17   some passages in the pages around those you identified to me,

18   and as I was thinking through this issue, I thought, what could

19   I say that would be accurate and helpful?  And I couldn't come

20   up with anything.  And I don't think this -- and I know you

21   tried to be careful in constructing your proposal.  I don't

22   think this is accurate or helpful.  The conflict of interest

23   laws and indeed the whole Know Your Client series of

24   regulations or practices and the suspicious activity report

25   system, which the jury hasn't really even heard about, is all
```

1    designed to protect the integrity of the banking system in part

2    from just the kind of activity that the government is alleging

3    occurred here.  And so these are extraordinarily connected and

4    relevant, asking how you are employed and what is your source

5    of money, particularly when you are a, as the defendant has

6    described himself and others have described him, a PEP, P-E-P,

7    is at heart, among other things, a protection against corrupt

8    money flowing through the banking system and money laundering

9    flowing through the banking system, and American bank

10   regulations are designed to help protect our institutions from

11   corrupt money.  Again, in part.  And so you can't really

12   isolate the series of questions the bank was asking of the

13   defendant when he was opening accounts and doing big-ticket

14   item transfers through accounts from the money laundering

15   charge that is at the core of this case or the bribery laws of

16   Guinea.  And indeed the defendant admitted on the stand several

17   things that underscore this relationship and connection.  So I

18   couldn't come up with a charge that would correctly caution

19   against any improper use of the conflict of interest testimony,

20   and I don't think this does it either.  And in fact I know this

21   doesn't do it.  It is for their consideration, that is, the

22   jury's consideration, as it relates to the charged crimes.

23   That is precisely why it is relevant.

24          And I looked again and thought about my jury charge

25   with respect to the elements of the crime, the two violations

Gh52thi5

1   of federal law, US law, and my charges with respect to Articles

2   192 and 194 of the Guinean bribery laws.  I don't think there

3   can be any confusion about the various elements and that simply

4   having a conflict of interest or disclosing or hiding a

5   conflict of interest does not by itself make someone violate

6   the Guinean laws or either the US statute.  So I'm going to

7   decline to charge this.

8            Let me look, counsel, real quickly at the charge

9   pages 25 and 26, and that has to do with the apparent

10  inconsistency between testimony offered at this trial and

11  previous statements made by the witness.

12           I don't think we need this paragraph.  Does anyone

13  think we do?

14           MR. KOBRE:  No, your Honor.

15           MR. GOLDSMITH:  No, your Honor.

16           THE COURT:  Okay.  So that's coming out.

17           How long will the government's opening summation be?

18           MR. DiMASE:  Your Honor, I'd estimate approximately 45

19  minutes to an hour.

20           THE COURT:  And the defense summation?

21           MR. GOLDSMITH:  I would estimate about 45 minutes.

22           THE COURT:  Great.  Thanks.

23           Ms. Rojas must be checking on the jury.  We'll just

24  wait for a minute.

25           And Mr. DiMase, is the podium where you want it?

Gh52thi5

 1              MR. DiMASE:  I may move it a bit to the right, if

 2     that's all right.

 3              THE COURT:  Why don't you do that now.

 4              MR. DiMASE:  I just don't know how far it will go with

 5     the monitor here.

 6              MR. KOBRE:  Your Honor, if I might?

 7              THE COURT:  Yes.

 8              MR. KOBRE:  I raised briefly with Ms. Rojas, I'll be

 9     giving the rebuttal summation, and if it's okay with the Court,

10     we would just move the podium to the side and I would deliver

11     my rebuttal from this table here.

12              THE COURT:  That's just fine.  And Mr. Goldsmith, you

13     can deliver your summation from whatever point in this

14     courtroom you'd like --

15              MR. GOLDSMITH:  Thank you.

16              THE COURT:  -- with or without a podium.  Your choice.

17              MR. DiMASE:  Your Honor, would it be all right if I

18     move this table here and put the screen on the table?

19              THE COURT:  Sure.

20              MR. DiMASE:  Okay.  Thank you.

21              THE COURT:  The jury is ready.  Bring in the jury.

22              (Continued on next page)

23

24

25

1          (Jury present)

2          THE COURT:  So, Mr. Goldsmith.

3          MR. GOLDSMITH:  Yes, your Honor.  Defense rests at

4     this time.

5          THE COURT:  So ladies and gentlemen, you have the

6     entire evidentiary record.  All of the evidence that is being

7     presented at this trial for your consideration during your

8     deliberations has already been provided to you.  During your

9     deliberations, many of the documents, really all of the

10    documents that have been received into evidence, will be

11    provided to you in the jury room for your consideration.  I'll

12    give you more detailed instructions about all these matters

13    later.

14          At this point in the trial we move to the attorneys'

15    summations, or closing arguments.  What they have to say is not

16    evidence, but I know you will give them your full attention.

17    This is their opportunity to speak to you and describe to you

18    what they believe the evidence has shown, to point your

19    attention to what they think are the most critical parts of the

20    evidentiary record for you to consider during your

21    deliberations.  It's a chance for them to suggest to you that

22    you can draw certain inferences from one piece of evidence or

23    several pieces of evidence and make a conclusion from putting

24    those pieces of evidence together.  So obviously this is an

25    important part of the trial as well.  If anything a lawyer says

1    is different from your recollection of what the evidence

2    showed, remember, what they say is not evidence, and it is your

3    recollection of the evidence that will control.

4              Counsel.

5              MR. DiMASE:  Thank you, your Honor.

6              Ladies and gentlemen, in 2009, the defendant, Mahmoud

7    Thiam, this man, returned to his home country of Guinea, one of

8    the poorest countries in the world, to serve as minister of

9    mines.  It was a position of great power in that country.  And

10   the defendant had the opportunity to effect positive change, to

11   help the citizens of Guinea, but greed is a powerful force.

12   Greed led the defendant to abuse that position for his own

13   benefit.  Greed led him to take $8.5 million in bribes, in

14   exchange for helping those Chinese companies win the exclusive

15   right to mine Guinea's most valuable resources.  And we are

16   here in this courtroom today because the defendant took that

17   money and he laundered that money right back here into New York

18   to spend it on himself and to spend it on his family.

19             Let me just briefly talk about what I expect to speak

20   with you about today.  First I want to cover a little bit of

21   the background that you heard during the course of this trial,

22   about Guinea and the defendant, then I want to briefly discuss

23   with you the charges that you'll be tasked with analyzing when

24   you go back to the jury room to deliberate, and finally, and

25   most importantly, I want to take you through the evidence that

1    proves those two counts beyond a reasonable doubt.  And I won't

2    be, I should caution, going through every piece of evidence.

3    This is a trial of over a week, and I'm not going to spend

4    another week of your time going through every detail, but I'd

5    like to cover the key facts.

6              So what do we know about the defendant?  Well, you may

7    recognize this picture, by the way, from Stacey Hayes'

8    testimony.  The defendant was the minister of mines, and that

9    was an incredibly important position in Guinea.  You heard that

10   from both Mr. Camara and Mr. Sande.  And that's because of the

11   critical importance of the mining sector to that country.  Both

12   of those witnesses, and the defendant himself during his

13   testimony, noted the incredible mineral wealth of the country

14   of Guinea and the value of the resources that it has.  And as

15   you heard from many witnesses during this case, it was the

16   defendant's position, the minister of mines, that oversaw the

17   mining sector in the country of Guinea worth literally hundreds

18   of billions of dollars.

19             On the other hand, you heard about the financial

20   condition of the country of Guinea.  It is a poor country.  You

21   heard Mr. Sande talking to you about how people live there on a

22   dollar to $2 a day.  So very wealthy from a mineral perspective

23   but, on a day-to-day basis for its citizens, a poor country.

24             And what did the defendant do when he took on this

25   position of minister of mines?  He used it to enrich himself.

1        So let's talk just for a moment about the general

2    overview of the defendant's scheme.  He received $8.5 million

3    in bribe payments from these two Chinese companies, CIF and

4    China Sonangol.  He helped those two companies with a major

5    deal, and we'll talk about a number of the different official

6    acts that he performed in connection with that deal.

7        The ultimate agreements that he helped to negotiate

8    and work on with the Chinese company granted exclusive and

9    valuable rights to mining in Guinea.  And as we've seen

10   throughout this trial, the defendant wired that bribe money

11   back into New York to fund his lifestyle, and he also hid some

12   of that money in a very complicated real estate transaction

13   involving Dutchess County, and we'll come back to that as well.

14       Before we move on to the charges, I would point out

15   here the true irony of the defendant's claim during his

16   testimony at this trial that he wouldn't take money from his

17   own government -- the government that he was working for and

18   supposed to act as a fair and impartial arbiter, a fair and

19   impartial decision maker for, yet he was willing to take money

20   from Sam Pa and other executives of this Chinese conglomerate

21   that he was working on a deal with as part of the Guinean

22   government.

23       Let's turn to the charges in this case.  You'll hear

24   at the end of both of our summations the judge's instructions

25   on the law, and you have to follow those instructions, and you

1   should listen to them carefully.  But what I'd like to do now

2   is just briefly summarize what I expect Judge Cote will

3   instruct you to help you frame the evidence that you heard in

4   this trial.

5          THE COURT:  I think we can skip this part.

6          MR. DiMASE:  Okay.  Let's talk about what's not in

7   dispute when it comes to the elements.

8          You're going to hear that one of the elements requires

9   proof of transfers in excess of $10,000.  That's Count One.

10  And you heard many, many transactions.  You heard about many

11  transactions involving $10,000 or more.

12         You're also going to hear that there has to be some

13  interstate or foreign commerce element to the transactions, and

14  I expect that you'll hear from Judge Cote that merely sending a

15  wire from one country into another is sufficient to meet that

16  requirement, and that includes, in particular here in the

17  United States, a wire coming from a foreign country into the

18  United States.  There is no dispute here that there were many

19  wires of that kind.

20         And finally, there is no dispute that that money was

21  ultimately sent here into New York.  There were many, many

22  transactions, again, that you saw that involved New York, and

23  this was raised during the cross-examination this afternoon,

24  but here is the Steinway & Sons receipt, or I should say

25  invoice for about $47,000 for a grand piano that Mr. Thiam

1    bought using the bribe proceeds in this case, and it's an

2    example of a wire, because he wired the money from the Hong

3    Kong account, where he received the money, into a bank account

4    in New York to direct it to Steinway.  This is just one of many

5    examples, but it demonstrates the lack of any dispute over

6    those issues.

7              And also, you're going to hear that there is a

8    requirement that for one of the two counts, that the defendant

9    is a US person.  Very simply, that means a US citizen.

10             THE COURT:  Counsel, could you just not give the law

11   and I'll do that, and just describe the facts.

12             MR. DiMASE:  Very good, your Honor.

13             You obviously heard testimony during the trial that

14   Mr. Thiam, the defendant, is a US citizen and that many, many

15   transactions were directed into the United States.

16             So what's left?  Basically the issues that are in

17   dispute in this trial are whether the money that was paid to

18   Mr. Thiam was a bribe and whether that transaction that

19   occurred with respect to the house was meant to conceal the

20   source of the funds.  Those are really the only two issues in

21   dispute in this case.

22             How do you know that the money was a bribe?  Well, you

23   have to look to Guinean bribery laws, and the evidence

24   establishes in this case that the defendant violated those

25   laws.  And essentially, without getting into the detail of the

1  law, there is a law that criminalizes giving a bribe in

2  exchange for performing an act of an official and there's a law

3  against taking money in exchange for performing an act.  So

4  exactly the same sorts of bribery --

5        THE COURT:  Mr. DiMase, I'm just going to ask you

6  again just to focus on the facts.

7        MR. DiMASE:  Yes, your Honor.

8        So how do you know that this was in fact a bribe?  I'm

9  going to take you through some of the evidence in detail, but

10  here's the bottom line.  It's very simple.  It's a one plus one

11  equals two type of calculation.  One, the defendant was a key

12  player in this major deal with CIF and China Sonangol as the

13  minister of mines, and two, the defendant received $8.5 million

14  from the other party in that deal, CIF and China Sonangol.  It

15  was a bribe, plain and simple.

16        But let's get into the details.  Let's get into what

17  makes very clear that this money was paid in exchange for acts

18  that the defendant took, and let's start with what the

19  defendant did, what the defendant did as part of these

20  negotiations and work on the deal.

21        First of all, you heard testimony in this case that he

22  advocated for the deal, and this is a clip here on your screen

23  from Mr. Camara, who talked about Mr. Thiam in those early

24  meetings discussing the various agreements, standing up and

25  making statements in support of pursuing the deal with China

1    Sonangol and CIF.

2             And you also heard testimony about how Mr. Thiam was

3    on the committee to negotiate with the Chinese, and you heard

4    that there were three members of that committee -- Mr. Sande

5    told you that -- but essentially the only two people who did

6    the work of negotiating with the Chinese were Mr. Barry and

7    Mr. Thiam.  And you actually heard testimony today that

8    Mr. Thiam, when he went to Singapore, the defendant, that first

9    time, he was alone.  He was working directly with his

10   counterparts on the Chinese side of that deal, without

11   Mr. Barry there, the person who he claims is really the leader,

12   the top guy in these negotiations.  He was the one sending

13   emails, copying no one else back to Guinea when he was there

14   working with them, and the defendant said himself in a

15   postarrest statement that he was one of the two main guys on

16   the deal.  Why don't we listen to that.

17             (Video played)

18             MR. DiMASE:  He was one of two main guys, the

19   defendant said.  And he told you himself about some of the

20   things that he did as one of those two main guys going to

21   Singapore, negotiating the deal, and so on.

22             There's also evidence in this case that he worked to

23   make this agreement with CIF happen.  Even if you don't

24   believe -- and I want to come back to this in a minute -- that

25   the deal necessarily got worse for Guinea in that second master

1   agreement, and I would submit to you that it did, they lost

2   10 percent of the holding company in the deal that Mr. Thiam

3   negotiated in Singapore.  But even if there is some explanation

4   for how it wasn't so bad, he made the deal possible.  He's the

5   one who took the Chinese suggestion that that percentage was

6   not going to work and he crafted an email, he sent it back to

7   the prime minister, and he said, look, the Chinese aren't

8   buying this 25 percent deal, they want us to take only 15, and

9   I think we should do that and here's the reasons why.  This is

10  Mr. Thiam, the defendant, facilitating this deal with China

11  Sonangol and CIF that ultimately leads to the shareholders

12  agreement.  It is one of many, many acts that Mr. Thiam took in

13  the course of his negotiations on this deal.

14          And turning back to whether or not the deal changed or

15  somehow got better or worse for Guinea, I think it's critical

16  to look at the provisions of the agreement that deal with the

17  purpose of the agreement.  The defendant, during his testimony

18  before you, really tried to distance himself from the second

19  master agreement, and this is why.  Because it did benefit the

20  Chinese company and he does not want to attach himself to this

21  agreement.  He admits being there in Singapore.  He admits

22  sending emails back to clarify at different points of the deal,

23  negotiating with the Chinese, but as far as drafting it, being

24  there when it's signed, he doesn't want to admit to that.  And

25  here we have a piece of that agreement.  The first master

1    agreement, Government Exhibit 402-T, on the top, discussing the

2    sectors, and the bottom, the second master agreement, 406,

3    discussing the sectors that were negotiated in Singapore.

4          It makes no sense to conclude that Mr. Thiam was not

5    heavily involved in the second master agreement.  The second

6    master agreement specifically addresses mining.  That is the

7    big addition to this language, and Mr. Thiam is the minister of

8    mines there in Singapore on the ground, negotiating the

9    agreement.

10         And what do you know about the ultimate agreement?

11   Well, you know it granted invaluable rights to CIF and China

12   Sonangol.  And the language is clear.  The language is quite

13   clear.  Exclusive rights to mining operations and the creation

14   of a national mining council which would take profits from all

15   mining operations, past and present, in Guinea.  The agreement

16   speaks for itself.

17         And what did the defendant do with the agreement?

18   Well, again, he wants to distance himself from this to some

19   extent, but at the end of the day he can't, because guess whose

20   initials are at the bottom of it?  His.  Among others.  He

21   initialed it, he was involved in its negotiation, he

22   facilitated the agreement being reached with the Chinese, he

23   went to Singapore, he advocated for the deal.  These are just a

24   small sample of the many acts he took in favor of this deal.

25         And remember, there is no requirement that he be the

 1  only person involved, and there is testimony here in this trial

 2  that there were certainly other people involved.  All that is

 3  required is that he accepted money to take an act in his

 4  official position, whatever that act may be.

 5          Nor does he need to be the final decision maker.  He

 6  does not need to be the one who signs the dotted line so long

 7  as he takes an act, and he clearly did so here.

 8          So let's talk about the money and how the money and

 9  the way that it arrived to the defendant and how he used it

10  shows that it was a bribe.

11          First, and pretty obviously, is the timing of the

12  payments, and I'm going to get into each one of these things in

13  a little bit more detail, but you know that just weeks before

14  the signing of the shareholders agreement that first payment

15  came in.

16          Second, the nature of the payments which were sent in

17  a way that seems clearly designed to conceal the nature of the

18  money.  The reason for the money, which we've already talked

19  about to some extent, but what the parties had to gain from it.

20          And finally -- not finally -- the defendant's clear

21  and repeated lies, lies that were meant to hide the fact that

22  this was bribe money.

23          And now, finally, the consciousness of guilt evidence;

24  in other words, evidence that the defendant knew that he had

25  committed this crime.

1         I expect that Mr. Goldsmith, as he did in his opening,

2    is going to get up here during his summation and argue you

3    haven't heard from a witness that said this money was a bribe,

4    or the term *quid pro quo* has been thrown around, you know,

5    monies in exchange for something.  You don't need a witness.

6    There is overwhelming evidence in the trial record that this

7    money was a bribe in exchange for Mr. Thiam's work on the deal.

8    So let's go through that evidence.

9         First, the Hong Kong account.  Mr. Thiam, the

10   defendant, opens that account on September 24, 2009, and here

11   is the account opening information and there is the date.

12   9/24/09.  And you all know -- and we'll talk about it more in a

13   minute -- that was the day before the first $3 million arrived

14   into the account.  And you also know from the defendant's

15   testimony and also from the records that the defendant opened

16   it in the same building where CIF is located, and that he in

17   fact did it in the presence of Sam Pa, the guy who the

18   defendant knows from, quote, rumors pays out bribe money in

19   suitcases, standing right next to him in the bank.

20        What about the timing of these payments?  Well, he

21   opens the account on September 24th -- and by the way, I

22   should just mention at this point, some of the things, a lot of

23   what we're discussing here today is in evidence.  You're

24   welcome to take it back with you to the jury room when you

25   deliberate.  And where possible, we've included exhibit

 1    stickers, and you're free to write that down to help you

 2    remember.  This particular exhibit here is not in evidence and

 3    so you're not going to be able to bring it back into the jury

 4    room, so take a close look at it.  And let's talk about it for

 5    a minute.

 6           The blue boxes on the bottom represent the account

 7    opening and payments to the defendant.  The sort of

 8    grayish-green boxes on the top represent the two agreements.

 9    Now we all know that earlier on there was a memorandum of

10    understanding and there was also a first master agreement, and

11    you heard testimony from the defendant himself that he had some

12    involvement in those agreements, not necessarily drafting them,

13    but he did participate in the discussions, and that is

14    supported by Mr. Camara's testimony as well.

15           On July 18th, while he's in Singapore, the master

16    agreement is signed, and then on September 24th, the account

17    is opened.  September 25th, Sam Pa transfers $3 million into

18    that account, and two weeks later the shareholders agreement is

19    signed, initialed by the defendant.  And then, as you all know,

20    in 2010, there are a series of additional payments to the

21    defendant that add up to another $5½ million from executives at

22    CIF and China Sonangol.  The timing of those payments makes

23    clear that this was a bribe.  The timing is so clear that even

24    the defendant himself, when he was speaking to the FBI during

25    his statement after his arrest, he knew he had to lie about it.

1    Here's a clip from that portion of the statement.

2              (Video played)

3              MR. DiMASE:  The contract was signed and done a long

4    time ago.  Well, you know, ladies and gentlemen, that's not

5    true.  The contract was signed after the first $3 million was

6    deposited into that account.  And the reason why is because it

7    was a bribe.  And the defendant knows how damning that evidence

8    is and that's why he can't admit to it.

9              And I would also point out that at the beginning of

10   this clip, the defendant struggles, really struggles to answer

11   the question, and only eventually comes to an answer at the

12   end.  It's clear that he knows how damaging this evidence is.

13             But it's not just the timing.  It's also the way the

14   payments were made.  And we've seen this slide before.  It's

15   Government Exhibit 1002 in evidence.  You can pretty much -- a

16   picture is worth a thousand words in this case.  You've got the

17   Chinese conglomerate, which refers to China Sonangol and CIF,

18   on the left making these payments to Sam Pa -- Sam Pa, Lo Fung

19   Hung, and Xiang-Fei, and then they filter the payments along to

20   the defendant.  This is not the way that legitimate money would

21   be passed along.  It's certainly not the way -- and I'll get

22   back to this later -- that a loan would be provided.  A loan

23   does not need to be passed from a company through three

24   executives to an account set up for the sole purpose of

25   receiving the money.  If it were a loan, why not an arrow from

1    Sam Pa to an account that Mr. Thiam had in the US?  It's that

2    simple.

3              And just to briefly address something regarding a

4    couple of the transfers, several of these transfers that were

5    later -- in fact the last two, the two that came from the Sam

6    Pa/Hung account in 2010, you saw evidence that they had "Loan"

7    written in on them.  Well, guess what?  That was after the

8    defendant had already experienced some problems with his bank

9    accounts in the United States.  That was after JPMorgan Chase

10   and Remee Aring had already closed his JPMorgan account, and so

11   he was on notice, and probably he told the folks from China

12   Sonangol and CIF that they should be on notice.  The first two

13   payments that happened before these accounts started getting

14   closed in September and in March, they don't have "Loan"

15   written on them.

16             But the bottom line is, this is not a diagram showing

17   the flow of legitimate money being provided to the defendant.

18   This is a diagram that shows the course of a bribe.

19             So why don't we talk about the reasons for the bribe,

20   and I don't really -- obviously, for the defendant, the reason

21   is clear.  It's money.  It's a lot of money.  But I do think it

22   bears pointing out how the defendant has characterized this

23   money versus the reality.  He said the money was to feed his

24   family.  You heard that from him on the witness stand here.

25   But you all know from seeing the exhibits in this trial that

1       the money was really used to fund a very lavish lifestyle.

2               And this is Government Exhibit 1001.  It's just one

3       piece of evidence that shows you that.  On the left you have

4       the payments, and on the right you have a series of very large

5       dollar amounts going to everything from Chopard, a watch store,

6       to interior designers and luxury apparel and Cipriani.  This is

7       not money that's being used to feed a family.  This is money

8       that's being used for luxury goods, to lead a very lavish

9       lifestyle.  That's what this money is being used for.  And

10      ultimately, this is only a tiny portion.  If you add up this

11      money here, it's probably under -- it's definitely under a

12      million dollars.  And the agent, you heard Patrick Killeen

13      testifying about how this only was a representative sample of

14      what he spent the money on.  And in fact you heard, you

15      actually saw some records, which I'm not going to show you

16      today, but the Steinway transaction, the Louis Vuitton $3,000,

17      appeared to be some sort of attaché case that he bought with a

18      credit card, and a three-day hotel stay that cost $7,000.

19      Those are the sorts of things that this money was being used

20      for.

21              And let's turn to the other side of the equation.  CIF

22      and China Sonangol, why did they pay the bribes?  The evidence

23      is clear that what they wanted was the minister of mines, in

24      the colloquial way, in their pocket.  A guy on their side.  Not

25      just any guy; the minister of mines, the area that they cared

1    most about, the most lucrative sector in Guinea.  They wanted

2    exclusive access to future mining rights.  They wanted a share

3    in all mining profits.  And this is a quote from Mr. Camara:

4    "Rights for the new projects, the dividends that might come

5    from that, and for the operational and the future projects, the

6    commercial and taking-off rights, and the commercial rights of

7    marketing," and here's the most important part, "it represents

8    an incredible and enormous --" I think that was supposed to be

9    "amount," "of rights and benefits."  And this isn't coming from

10   somebody who's uninvolved in the deal.  This is one of the

11   technical negotiators who voiced objections to this ultimate

12   shareholders agreement.  He is saying what an incredible and

13   enormous amount of rights were granted under the agreement.

14        And it's important here to note, again, CIF and China

15   Sonangol wanted somebody on their side, somebody powerful and

16   somebody who could actually effect the negotiation.

17        And there is evidence in this case that there were

18   objections raised at the governmental level to the shareholders

19   agreement.  This letter from the prime minister after the

20   agreement was signed saying, hey, wait a minute, we had these

21   discussions in the Council of Ministers and, you know, there's

22   still problems.  It hasn't been fixed.  And you've got the

23   testimony of Mr. Camara as well.  And this is about specific

24   conversations that Mr. Camara had, or at least things that he

25   presented to the defendant about his concerns.

1          "Q.  So if I have you right, you presented to

2     Mr. Thiam the concerns about the exclusivity.  Is that correct?

3          "A.  Yes, we did that briefly.  Yes.

4          "And the national asset company, the concerns

5     regarding that?

6          "Yes.

7          "And you also presented a third concern, which you

8     just mentioned now, about something relating to the way the

9     Chinese company would receive payments?

10          "And do you remember anything that Mr. Thiam said in

11     response to your raising these concerns with him?

12          "A.  Well, when we presented those concerns, we didn't

13     get very detailed response.  It was very quick, and he only

14     said that it would be the object of discussions at the higher

15     level, either with the prime minister or Barry regarding these

16     questions."

17          Ultimately, these high-level decisions involved the

18     defendant.  He was involved in negotiating, he was involved in

19     advocating, he was involved in suggesting ways to move forward

20     with the deal, and CIF and China Sonangol wanted him on their

21     side, or at least not in their way, but even more on their

22     side.

23          And you've all heard the phrase, there's no such thing

24     as a free lunch?  They had to pay for that.  This is the

25     minister of mines.  I mean, this is not some low-level

1   functionary in Guinea.  This is the minister of mines, and the

2   amount of money that was paid is commensurate, is

3   appropriate -- well, I don't know if appropriate is the right

4   word -- it makes sense, given the value of the resources that

5   this company was looking to obtain.

6            There's no such thing as a free lunch, and CIF and

7   China Sonangol had to pay.

8            Let's talk about the defendant's lies to the bank.

9   Lies to HSBC Hong Kong, JPMorgan Chase in New York, HSBC in New

10  York, and the FBI interview.  You heard the defendant actually

11  testify during the trial that he lied.  He admitted to lying

12  repeatedly to these banks.  And the lies, contrary to what the

13  defendant testified, were to cover up the bribe and to get

14  access to the bribe money.

15           How do you know?  I'm going to go through some of the

16  lies, but one reason you know is that there came a couple of

17  times in these meetings with the bank representatives where he

18  was ultimately forced to admit that he was the minister of

19  mines.  Stacey Hayes walked by, you know, the CNBC video, and

20  it's hard to deny it then.  But even after that's found out,

21  even after it's clear to the bank that he is minister of mines,

22  he keeps lying about the source of the funds.  He keeps lying

23  about where the money came from.  So it's not about a concern

24  about being a PEP or being a high-level minister with scrutiny.

25  I mean, obviously you heard from Mr. Damle at HSBC that higher

1    scrutiny does come with being designated in those categories.

2    That's sort of the point, because the banks need to know who

3    their customers are and what the money is coming in and out of

4    the account.  But Mr. Damle said very clearly that being a PEP

5    doesn't mean your account is shut down; just means it has

6    enhanced scrutiny.  That's it.  He even said that a PEP is a

7    subsidiary of an SCC, and the last initial, as you may remember

8    this, is Client.  I mean, that people can maintain client

9    relationships as PEPs.  And using your common sense, you know

10   that, because you know that there are people all over the

11   United States who hold governmental roles, and they have to be

12   able to have bank accounts.  So after hearing Mr. Damle and

13   using your common sense, it's just not accurate that saying I'm

14   a PEP immediately shuts down your bank account, and coming back

15   to the facts here, that's not why the defendant lied.  He lied

16   to cover up the bribe.  That's why he lied.

17          Let's talk about the different lies.  He lied to Hong

18   Kong.  The first one wasn't really a lie, the French passport,

19   but he was very careful not to use a US passport or a Guinean

20   passport, anything that would suggest that he was a minister of

21   mines.  He uses a US home address, again, not referring at all

22   to Guinea.  He lists himself as a self-employed consultant, and

23   he admitted on the stand that he lied about that.  Obviously he

24   was the minister of mines at the time.  He said that he was

25   making $200,000 a month.  And this may not appear to be really

1    too important on first blush, but there is a reason behind it.

2    There is a rationale, and here it is.  The bank was going to be

3    looking at money that came into his account to see if it made

4    sense.  He knows he's getting a lot of money from China

5    Sonangol and CIS, a lot of money, and what's the easiest way to

6    make all that money make sense?  You tell them when you're

7    opening up your account you're earning a lot, $200,000 a month,

8    over a million a year.  Well over a million a year.  Over

9    2 million a year, actually.  So again, there's no mention of

10   Guinea, no mention of being the minister of mines, and during

11   his testimony he said he opened his account here because of

12   sanctions because he didn't have other places to bank, and he

13   needed an account.  How do you know that's not true?

14           And by the way, I should pause for a moment here and

15   say something that's very important.  The defendant did not

16   have to put on a case.  The defendant did not have to testify.

17   He has a right not to testify.  He did not have to call other

18   witnesses.  The burden is and always remains on the government,

19   this table here, to prove the defendant's guilt beyond a

20   reasonable doubt.  That said, when a defendant or a defense

21   witness testifies, it's your obligation to analyze that

22   testimony and decide whether it's credible or not, whether you

23   can believe it.  And so you've heard me a number of times talk

24   about his testimony today, and that's something that you should

25   do.  Apply common sense and all of the other things that you

1    would normally use to evaluate a witness' testimony in deciding

2    whether the witnesses, including the defendant, were truthful.

3    And one thing that you'll notice is oftentimes when the

4    defendant was uncomfortable answering a question, he moved back

5    from the witness stand, he became quiet.  Those are things you

6    can consider, his demeanor, the way he answers questions, but

7    most importantly really is your common sense and comparing what

8    he says to the rest of the evidence in the case.

9         So let's compare the evidence about the Hong Kong

10   account to what he said.  He said, I need an account because

11   sanctions were imposed and I didn't have other places to bank.

12   But throughout 2009 and 2010, but for about $5,000, the only

13   money that came into that account was the bribe money from the

14   Chinese companies.  That's it.  I mean, I'll come to a couple

15   of the pie charts you saw during the trial, but that's it.

16   This wasn't a regular banking account that he needed to handle

17   his financial affairs; this was an offshore account set up

18   outside of the United States and Guinea for the purpose of

19   receiving illegal bribes.  That's what it was.

20        Here's one of those pie charts.  And the date on it is

21   important, because the date is the day, approximately the day

22   that he was in touch with Remee Aring.  March 26, 2010.  About

23   99.9 percent of the money in the account is from the Chinese

24   executives.  And what does he say?  He says, several sources of

25   income, business transactions and prior years' consulting jobs.

1   Over the past ten years.  Income from business with my partner,

2   Baker Al-Sadi.  And again, he says again in the 3/26 email the

3   funds were derived from business transactions with Mr. Al-Sadi.

4   You heard from Special Agent Killeen.  He looked at all these

5   records.  At this time not a dime of money, not a dime, was

6   from Baker Al-Sadi.

7         And then there's this email.  He's communicating, you

8   remember, with Baker Al-Sadi right around this time, trying to

9   get guidance on how he can best respond to the JPMorgan Chase

10  folks.  And he sends him this email, exhibit.  Doesn't include

11  the answers that he sent to Mr. Al-Sadi, but after the answers,

12  there's a response, "Looks fine if they don't dig too deep."

13  And Mr. Thiam says, "Cool.  How do I treat your answers, just

14  attach them?"  And Mr. Al-Sadi responds, "Buy some time by

15  saying you asked me to send" the answers.  These are not the

16  communications of somebody who is getting legitimate money into

17  their account.  I mean, the defendant has admitted to lying to

18  JPMC, but not only that, he's looping in other people to help

19  him explain the source of the funds, the source of the funds,

20  after JPMorgan Chase has already spoken to his wife and learned

21  that he was minister of mines.  This was not about the PEP

22  status, this was about the source of the money.

23        Now you remember it was HSBC where he lied about his

24  position.  He admitted again here in court that he lied; he did

25  not disclose being the minister of mines.  It took a CNBC

1    interview for anyone to find out there.  Just one thing that is

2    probably obvious but you might not have focused on.  He went

3    into HSBC and lied after he'd already lied to JPMorgan Chase

4    and they'd closed his account.  He'd already been through this

5    process once.  Now he's coming to a second bank and he's lying

6    to them, and he doesn't even tell them the same story.  He says

7    the sale of land in Africa and prior employment income.  That's

8    what he said.

9           We're going to get to the loan story in a minute or

10   two, but all of these lies to the banks beg the question:  If

11   it really were a loan, why didn't he just tell them it was a

12   loan?  That wouldn't have implicated him as the minister of

13   mines.  A personal loan.  It's because he wasn't lying to the

14   banks to hide who he was; he was lying to the banks to hide the

15   source of the money.  And he gave them his date of birth, his

16   name and so on.  It's the source of the funds that he didn't

17   want people to find out about.  And you know what?  Ultimately

18   it was the source of funds, according to Ms. Aring, that led to

19   the closure of his account, not the fact that he was the

20   minister of mines.  They couldn't explain where that money was

21   coming from and they thought his answers didn't make sense.

22   And you know what?  They didn't, because they were lies.  He

23   admitted it on the stand.  They were doing their job.  And they

24   found the answers to be unacceptable and closed the account.

25           So let's talk about HSBC New York, July 20, 2010.

1    Another pie chart, approximately around the time of his

2    conversations -- you all remember that he spoke to Mr. Damle on

3    the day before.  99.93 percent of all the deposits that had

4    been made into the account at that point had come from the

5    three executives, .1 percent from other.  And, again, this is

6    from an email, but there are also handwritten notes which you

7    can look at.

8          They're in evidence.  Government Exhibit 102-F is the

9    email, source of funds, saving from past employment and

10   proceeds of sale of land in Africa, and he actually even went a

11   lot further and said, within the last three to four months.  If

12   you look at the notes, you'll see that as well.  So he's lying,

13   again and again, telling different stories about where this

14   money came from, and it's all to cover up the bribe.

15         So let's turn to the big issue.  The defendant

16   testified that he lied repeatedly to others, in particular the

17   banks, about where this money came from, but he wants you to

18   believe that you can trust him that it was a loan.  That's

19   basically what it is.  It's not a loan.  Let's listen to what

20   the defendant actually said in his statement to the FBI, which

21   largely mirrors what he said in court.

22         (Video played)

23         MR. DiMASE:  So let's recap.  He said there was no

24   interest rate, no repayment date, no documentation, he never

25   paid it back, $8½ million.  What do you know about real loans?

1    Real loans have interest rates.  People don't give away money

2    for free.  Not $8.5 million especially.  Real loans have

3    repayment dates because people want their money back, and they

4    want it back in a timely fashion.  Real loans are documented.

5    People don't just go around giving each other $8½ million

6    without writing something down.  That is a tremendous amount of

7    money to just hand over without something in writing.  And real

8    loans have to be paid back.  An $8.5 million loan that isn't

9    paid back is an $8.5 million payment.  This one, even the

10   defendant told you, never paid a penny of this money back.

11          The Chinese company and Sam Pa, if you believe the

12   defendant, just didn't mind not getting that $8½ million back.

13          Real loans aren't filtered from a company through

14   executives in this manner.  We've already talked about this so

15   I'm not going to dwell on it, but if this were a loan, you

16   wouldn't need ten arrows.  One would suffice.  They did it this

17   way because it was a bribe.

18          (Video played)

19          MR. DiMASE:  So he met Sam Pa -- and I think the

20   testimony in court was pretty clear about this as well -- late

21   spring, early summer.  No real dispute about when he first met

22   with Sam Pa, in person.

23          Let's talk about real loans, because he says he got

24   $3 million in September and a bunch more later from Sam Pa.

25   Real loans come from banks, and maybe sometimes they come from

1    your friends and family.  Maybe.  $8.5 million is a lot of

2    money, but if you have a family member that can pay that

3    amount, maybe they'd be willing to loan it to you.

4                    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. DiMASE:  Loans of this sort do not come from

2     people you've never met before or have known for a couple of

3     months.  It just doesn't add up.  Applying your common sense to

4     this idea that he would take, that Sam Pa would be willing to

5     give this much money to the defendant, not knowing him really

6     at all, doesn't make sense.  It doesn't add up.  And actually,

7     the defendant provided a great counterexample during his

8     testimony.  He talked about another person who did loan him

9     money from time to time.  He said that person was a good

10    friend.  They had known each other for a long time and they had

11    loaned each other back and forth for ten years.  Maybe, maybe

12    that would make sense.  This doesn't.

13          And what else does he know about Sam Pa?  He doesn't

14    know him well, but what he does know about him is this:

15          (Video played)

16          MR. DiMASE:  So the defendant wants you to believe

17    that he got an $8-1/2 million loan from the guy on the other

18    side of a transaction that granted massive rights to Guinea,

19    who he didn't know well, and what he did know was he bribed

20    people.  It doesn't add up.

21          I don't think that after reviewing all this

22    evidence -- withdrawn.

23          The evidence doesn't support that this was a loan.

24    The evidence clearly supports that this was a bribe.  But even

25    if it were a loan, it would still be a bribe.  A six-year,

1    interest-free loan of $8-1/2 million, giving something of value

2    in exchange for an act, that's bribery.  An $8-1/2 million

3    loan, with no interest, for six years, by the way, that he

4    never paid back, but even if he did pay it back, that's a giant

5    benefit.  Imagine all the interest that would have to otherwise

6    be paid on that money over those years.  That's just as much a

7    benefit as if it was a straight-up payment with no expectation

8    of repayment.

9            Let's talk about consciousness of guilt, which is

10   really just a fancy way of saying "knowing that you're guilty."

11   You heard at the end of Agent Killeen's testimony about text

12   messages that were found on the defendant's cell phone.  That

13   cell phone was in his house when he was arrested, and there

14   were a couple of really important messages on that phone:

15   "Hahahahaha," says the other party to the conversation; "At

16   least Sam Pa's locked up, so you are fine."  And the defendant

17   responds:  He predicted I would be locked up.  Life has its

18   twists."

19           "He," it's very clear from the context of this

20   conversation, is Sam Pa, and it's clear from this message that

21   the defendant knew he was guilty of taking a bribe from Sam Pa.

22   Sam Pa "predicted I would be locked up.  Life has its twists,"

23   the defendant admitting his guilty knowledge about his

24   involvement in these events in 2009.

25           Before I address the last issue, so we've taken a lot

1    of time to really focus on the bribe and whether it was a

2    bribe, and I submit to you the evidence clearly establishes,

3    beyond a reasonable doubt, that that $8.5 million, for all the

4    reasons that we've talked about, and just basic common sense,

5    was a bribe.

6              The second issue that we talked about being disputed

7    was the concealment, hiding some of the bribe proceeds.  So the

8    sending there's, sending the money that was derived from crime,

9    and then there's a second count that alleges concealing, hiding

10   some of the money.

11             Before we talk about the defendant's convoluted

12   explanation of what the evidence shows, I want to point out one

13   more thing about the defendant's testimony, one place where he

14   himself, in front of you, was clearly caught in a lie, and that

15   was on the tax -- I'm sorry, on the payment of his government

16   salary.  He said, clear as day -- you can check the

17   transcript -- didn't receive any salary, turned it down, didn't

18   need it, again, going back to really what I think is the

19   central irony of his testimony: that he claims that he wanted

20   to remain independent by not taking money from his own

21   government, but he would take money from a Chinese company

22   executive who wanted mining rights in Guinea.  But the point

23   is, on cross-examination, when confronted with evidence of his

24   tax return, showing that he reported earning income, earning a

25   government salary from Guinea, he changed his story.  All of a

1    sudden now he received it but he didn't take it or he took it

2    and he didn't receive it.  I'm not really clear on what the

3    difference between those two things is, and that he paid taxes

4    on it, even though he didn't, even though he didn't use it

5    himself or earn it, a clear example of the defendant lying,

6    right in front of you, from the witness stand.  And that should

7    color your view of his testimony and his statements about the

8    source of this money and about the issue of were where the

9    money came -- sorry, about the reality of this transaction

10   involving the Dutchess County house.

11            So let's just talk about that quickly.  Another fancy

12   pie chart telling you that as of November 20, which is around

13   the time that he bought the house, or that the house was

14   bought, 99.3 percent of the money in the account was from the

15   Chinese executives.  And as you know, the payment that was made

16   that is at issue with this house is the $375,000 payment.  So

17   you know that much, if not the vast majority, of the payment

18   had to be funded by the money that originated from the Chinese

19   company.  There's no way you can fund a $375,000 wire with the

20   55,000 or so in other deposits that were in the account.  So he

21   funded this wire with money in the account.

22            All right.  Here is the graphic that you saw,

23   Government Exhibit 1005, showing how the money got from the

24   defendant to the house.  So it went from him, in his Hong Kong

25   account, to his Pacific Inter-Link account in Malaysia.  The

1   defendant says that that was a company that the G.S. Holdings

2   company, a soap company, in Mozambique would buy some sort of

3   petroleum used in making soap.  And so you have an email from

4   the folks at G.S. Holdings saying:

5        Hey, we're going to send this money down to the house

6   here, to McGregor, and he'll use it to pay the down payment,

7   essentially.  You need to send the money, the same money, to

8   Pacific Inter-Link.  You know, you cover our debt at Pacific

9   Inter-Link, and we'll shoot some money over to the attorney and

10  it will go down to the house.

11       So in order for the defendant to get this money to the

12  house, he sent money, essentially, through two different

13  countries.  He didn't take care of this transaction between;

14  that was a transaction handled internally at G.S. Holdings, and

15  you see the ledger here that describes the $375,000 credit that

16  came in through the Pacific Inter-Link account and the $375,000

17  debit that was related to the payment to McGregor.  And then,

18  of course, McGregor closes on the property in Dutchess County,

19  using that $375,000 as a deposit, and the company nominally, in

20  name, that owns the house at this point is SSN.

21       By the way, there was substantial testimony in this

22  case about the defendant using that house and basically owning

23  that house.  I mean, he is going there.  He is spending

24  weekends there with his family.  He is hiring contractors.  He

25  is hiring designers.  He is buying materials.  The house, even

1    after it's moved to AMER, which is by the way, a company which

2    he has said he's the chairman of, when it's switched to that

3    company, it's still under his home address in New York.  You

4    know, in name, this house is under SSN.  SSNL, I guess we

5    should say.  But it was really the house of the Thiams.

6          But the process of sending that $375,000 was intended

7    to conceal that portion of the bribe money.  There is no other

8    reason to send money through such a complicated chain just to

9    pay a down payment on a house, to Malaysia, to Mozambique, to

10   the seller's attorney, and then to the house.  That is evidence

11   of the defendant's desire to hide the source of this money,

12   where it came from, the same reason that he lied to the banks,

13   the same reason he wants you to believe it's a loan: to conceal

14   its illegal origin.

15         Let me show you a graphic of what it would look like

16   if it wasn't money laundering, if it wasn't concealing the

17   source of the proceeds of a crime.  That's what it would look

18   like.  It's not rocket science, one arrow from him to the

19   house.  He'd sent money to the United States before.  This was

20   a needlessly complicated transaction unless it was intended to

21   hide the proceeds of a crime; here, the bribe.

22         Ladies and gentlemen, the evidence in the case has

23   proven that the defendant abused his position of power and took

24   bribes.  He abused his office, an office he was entrusted to

25   make fair, impartial decisions on behalf of the people of

1   Guinea, and he deprived the citizens of that country of a fair

2   and neutral decision maker of matters, on matters of critical

3   national importance, matters involving one of the most

4   important sectors, if not the most important sector, in their

5   country.  He took that money.  He laundered it into the United

6   States, and he spent it.  He spent it with abandon.  He spent

7   it in ways to hide where it came from.  He used it to support a

8   lavish lifestyle for himself and his family.  And today, you,

9   the jury, can finally hold the defendant responsible for those

10  crimes.

11          As you retire to the jury room to deliberate, we ask

12  that you decide this case on the principles that Judge Cote

13  will explain to you, without fear, without favor, without

14  prejudice, without sympathy.  Decide this case on the evidence

15  you've seen and heard in this trial.  Bring your common sense,

16  the same common sense you use every single day, to bear on that

17  evidence: the bank records; the agreements; the many other

18  exhibits you saw; the testimony of the witnesses; and the

19  defendant's many lies, the very evidence which proves the

20  defendant guilty of the two crimes with which he's charged,

21  beyond a reasonable doubt.  And after considering that

22  evidence, I ask you to return the only verdict that is

23  consistent with what you've heard during this trial, and that

24  is a verdict of guilty on both counts.

25          THE COURT:  Ladies and gentlemen, we'll take our

1    midafternoon recess.  Let Ms. Rojas know when you're ready to

2    resume.

3              (Jury not present)

4              THE COURT:  Mr. Goldsmith, feel free to arrange this

5    furniture any way you'd like.

6              MR. GOLDSMITH:  Thank you.

7              THE COURT:  And I'm sure the government will assist

8    you with some of that equipment that is theirs.  Thanks.

9              (Recess)

10             THE COURT:  Bring in the jury.

11             (Jury present)

12             THE COURT:  Mr. Goldsmith.

13             MR. GOLDSMITH:  Thank you.

14             There's no such thing as a free lunch and one plus one

15   is two.  Years of investigating around the world by the awesome

16   and all-powerful United States government, one week of trial

17   and the best they give you is, There's no such thing as a free

18   lunch, and a bunch of fancy, colored flow charts, not evidence.

19   The best they gave you was a couple of cliches, because that's

20   all they had.

21             To build a structure, you start with the foundation,

22   the bottom.  The foundation has to support the structure.  It

23   supports it so it doesn't collapse on itself.  In this

24   particular case, the government built its case.  They built

25   their foundation of a massive structure, of a massive building

1   worthy of the skyscrapers out these windows, but they built the

2   foundation on a bunch of paper.  They built thousands of pages

3   of bank records, thousands of pages of emails.  But they didn't

4   have one of these.  They didn't have a witness to put it in

5   context, to tell you what those thousands of pages of emails

6   and thousands of pages of bank records mean.  They didn't have

7   someone who could come in had here and tell you that the

8   payment, the money that Mr. Thiam got from Mr. Pa was a bribe.

9   The best that you got was one plus one is two.  Here was a

10  payment, here was a guy who was working with the government, so

11  it must have been a bribe.

12          It was a guess.  It was speculation.  It was

13  conjecture.  It was the equivalent of walking down the street

14  and seeing somebody and saying, You're hanging out with the

15  wrong crowd, so you must have done something.  That's not what

16  happens in this courtroom.  That is not what you as jurors are

17  supposed to consider as evidence.  This is not a math problem.

18  This is not a cliche about free lunch.  This is a human, who is

19  charged in court with a crime that the government, after years

20  of investigating, did not have conclusive evidence to provide

21  to you, the jurors, to make a decision about whether or not he

22  committed the crimes he was charged with.

23          Mr. Thiam, as you know, is charged with a scheme to

24  launder bribery money, and he's charged with the actual

25  laundering of that money.  As the judge is going to instruct

1   you, with the laws and how they are to be applied, you don't

2   get to decide guilt or innocence about things that happened in

3   the United States, transactions of money that happened here,

4   and whether or not Mr. Thiam tried to hide the source of those

5   funds until you have enough evidence to have been proven beyond

6   a reasonable doubt that the money given from Sam Pa to

7   Mr. Thiam was a bribe.  And there wasn't any evidence of that

8   in this courtroom for the last week.

9              So what was the evidence that you saw in the case?

10  You heard witnesses.  You saw papers, not the pictures that the

11  government drew for you, but the actual emails and the actual

12  bank records and the actual agreements from the government of

13  Guinea.

14             By the way, both sides in this case went into a lot of

15  detail about all those documents back and forth from the

16  government of Guinea, all of those agreements that went in

17  place with China International Fund and Sonangol, the

18  government of Guinea, getting into ridiculous details about

19  what this paragraph means and what that paragraph means.  And

20  guess what?  In every one of those agreements, it doesn't talk

21  about the human relationship that Mr. Thiam had with Sam Pa.

22             The first witness that you heard from was Ms. Aring.

23  She was from J.P. Morgan Chase.  She talked to you about the

24  investigation that J.P. Morgan did into Mr. Thiam's bank

25  account when you saw some transactions.  She talked about what

1    their investigation led to and what Mr. Thiam's responses were.

2    She didn't talk to you at all about Mr. Thiam and Sam Pa,

3    didn't talk to you at all or provide you with any evidence

4    about whether there was a bribe, and didn't tell -- and could

5    not tell you -- whether or not Mr. Thiam lied to a bank for the

6    sole purpose of hiding the fact that he had money from an

7    illegal source.

8           The next witness that you heard, the following two

9    witnesses, were from Guinea, from the government.  They acted

10   alongside Mr. Thiam in 2009 in the ministry.  You heard from

11   Mr. Camara, who was an adviser to the prime minister at the

12   time.  You heard from Mr. Sande, who was the minister of

13   finance at the time.  You heard a lot of testimony from

14   Mr. Camara about governmental structure, about the coup that

15   happened, about how there were several ministers and Mr. Thiam

16   being one of them, the minister of mines.  You heard about the

17   minister of state.  You heard about a negotiating committee,

18   the technical committee it was called, the technical committee

19   that was composed of several individuals that were appointed to

20   help negotiate the deal, the deal with CIF.

21          You heard Mr. Camara tell you about President Dadis,

22   about how he had his hand in everything, about how the public

23   wanted to deal with CIF, about how the government was all

24   enthusiastic about the deal with CIF.  You heard about the how

25   the fact that it was a poor country that needed cash, it wanted

H52Wthi6                    Summation - Mr. Goldsmith

1    to work with the investors from CIF to make the project happen.

2    You heard about how President Dadis had his hands in

3    everything.  You heard about his meeting with the council of

4    ministers, and much was made out of the fact that the technical

5    committee had some disagreements with portions of the

6    shareholders agreement, that they voiced their concerns to the

7    prime minister and to Mr. Thiam, and that a day later, some of

8    those changes weren't made.  That's not a crime.  It's not a

9    bribe.  It's part of the government function that they had at

10   the time.

11           You heard Mr. Camara discuss the fact that he felt

12   Mr. Thiam was professional, and his criticism of Mr. Thiam was

13   that he couldn't get those last changes tweaked on that

14   shareholders agreement.  He didn't testify to you about a

15   bribe, didn't testify to you about anything that Mr. Thiam did

16   or didn't do on that deal with CIF that could have been

17   construed as a bribe.

18           Mr. Sande, who was the finance minister, testified

19   about the government at the time, what the conditions were like

20   at the time.  The country was terribly poor; it needed cash.

21   Several witnesses, including those two gentlemen, discussed the

22   fact that this CIF deal was there to bring cash into Guinea at

23   the time.  It was called an investment vote.  Mr. Camara and

24   Mr. Sande kept calling it an investment project, CIF investing

25   money into Guinea and expects a return on it.  That's a

1   simplified explanation of an investment, and that's what was

2   ultimately arrived at in that shareholders agreement.  But

3   nothing but a bribe.  And nothing from Mr. Sande about

4   Mr. Thiam taking advantage of his position, like the government

5   told you in their opening argument, like they told you about

6   earlier this afternoon about taking advantage of the

7   opportunity to help such a poor country.  Guess what?  That

8   doesn't matter here.  Doesn't matter for what happened in this

9   courtroom.

10           I don't mean to sound harsh about it, but it's true.

11   And for all of the massive numbers of dollars and pictures of

12   Louis Vuitton and Chopard and the Four Seasons hotel, that

13   doesn't matter either, because whether it's 5 billion or $5, a

14   bribe is a bribe is a bribe.  The government didn't have

15   someone over there, so they gave you a bunch of pictures of the

16   Four Seasons and Chopard and asked about Cipriani, but they

17   didn't have that.

18           Mr. Sande also talked to you about the process that he

19   went through as being part of that subcommittee, that

20   delegation, with CIF, going back and forth and not being able

21   to be present during those conversations.  There was that power

22   of attorney that he had to give to Mr. Barry.  What was

23   important about that?  Nothing, as it relates to a bribe.

24           What was important about it was that, as Mr. Sande

25   told you, he didn't want to give up his right to be present

1  when Guinea was contracting for massive amounts of money and

2  giving up something of great value.  He felt responsible for

3  having been there.  He wanted to make sure he was going to

4  fulfill his role and his duty as the finance minister to be

5  there.  And when he objected to the prime minister's request

6  and said, I'm not going to do that, he went and he met with

7  President Dadis.  And what did President Dadis do?  President

8  Dadis said, No, you're going to give it to my friend Barry and

9  he's going to go and he's going to sign for you.

10         And that came through, not only with Sande, but also

11  with another witness, a witness for the defense, Momo Sakho,

12  who you heard testify about how much influence and power the

13  president had.  That's only important for one reason, because

14  the government spent a week trying to convince you that

15  Mr. Thiam had the authority and the power to do something, or

16  not do something, in relation to that investment project with

17  CIF.  But to hear the witnesses, to hear Sande, to hear Camara,

18  to hear Momo Sakho tell you about what Mr. Thiam had the power

19  to do, or not to, puts it in perspective.  President Dadis was

20  running that deal.

21         You also heard testimony from Mr. Scardaci, the

22  contractor, who talked about all the things that the Thiams

23  were putting into that house up in Dutchess County, that he got

24  paid over a million dollars for the build-doubt that happened,

25  for the high-end plumbing and whatever the fancy technique of

1    painting that supposedly got done there.

2          Did he tell you about what happened in Hong Kong seven

3    years ago between Sam Pa and Mahmoud Thiam?  No.  Did he tell

4    you about whether the owner of the property, SSNL, was supposed

5    to be a front so that Mahmoud Thiam could hide the fact that he

6    was using money from Sam Pa to buy a house?  No.  Did he tell

7    you anything other than he did work, eventually he got paid,

8    there were delays in the payment, he stopped the work, and

9    after a very expensive build-out, he only found out after the

10   fact that the name of the house was in SSNL rather than

11   Mr. Thiam personally?

12         Mr. Thiam testified today and yesterday.  He told you

13   the specifics of why that house was not in his name, that it

14   wasn't his.  He was paying money for the renovations.  He was

15   paying money in rent.  He was paying that money in renovations

16   because he got a deal from his friend, business associate,

17   partner, to pay less rent than the house was worth.  He said:

18   I'm a tenant.  We had a deal.

19         Does that tell you anything about a bribe?

20         The judge is going to instruct you on the law in this

21   case.  You cannot speculate.  You can't guess.  You have to

22   have been convinced beyond a reasonable doubt about every

23   element of every aspect of the crimes charged in this case.

24   You just can't guess.  You can't just guess like the government

25   did and like now they want you to.

1          Who else did we hear from as witnesses at the trial?

2     We heard from Ms. Hayes, we heard from Mr. Damle.  The

3     investigators -- well, not investigators, a bank manager and a

4     private-client associate at HSBC in New York.  You heard them

5     testify about their investigation into whether Mr. Thiam had

6     any reason for them to restrict his bank accounts.  Ms. Hayes

7     saw the interview on TV that got blown up and shown to you on

8     the wall.  Mr. Thiam lied about what his work was, and you

9     heard him testify in front of you that when they called him out

10    on it, he admitted that he was the minister of mines.

11         Ms. Hayes and Mr. Damle testified about the fact that

12    the accounts were closed.  Ms. Aring told you that his J.P.

13    Morgan Chase account was closed.  They were closed after there

14    was suspicion that Mr. Thiam was a politically influenced

15    person, that he had ties to politics, he had ties to the

16    government.  Not about a bribe.  The accounts that got closed,

17    as Mr. Thiam told you, they were all closed.  They were all

18    closed after they found out about his PEP status.  And as he

19    told you about today and yesterday, yes, he did lie, yes, he

20    did lie to the banks about his job.  He lied to the banks about

21    his job because a man who worked in banking for 14 years of his

22    life before he decided to go work for the government of Guinea

23    knew that as a PEP, that as someone who's classified as having

24    any level of political interest, his accounts were going to get

25    shut down; and that as a person who was at the time living

1   halfway around the world that had a wife and kids here in New

2   York, that he wanted to make sure that there was an account

3   available for them to use, and that he was concerned not just

4   about his account, and as he put it, his account in his name,

5   as an individual, not Mahmoud Thiam, minister of mines, he also

6   knew, from the 14 years of banking that he did before he worked

7   for the Guinean government, that when his account would get

8   closed, that the associated accounts of people associated with

9   him, their accounts were likely to get closed too.  And that's

10   what happened.  That's why his wife didn't just open up a bank

11   account and use her bank account for everything, because he

12   knew there was a domino effect.

13          He didn't do it to hide the proceeds.  He didn't do it

14   to hide the source of the proceeds.  He did it because he knew

15   if he was tied to any government, he wasn't going to have the

16   use of a bank account to pay his bills, to pay for the things

17   that he needed in his life and that he wanted in his life.  And

18   let's face it, he spent a lot of money on things that are not

19   needs.  They're luxuries.  He went to nice restaurants, he went

20   on nice vacations.  He also spent money, as he told you, on a

21   lot of travel while he was working as the Guinean minister of

22   mines.  But he spent money on private schools, as the

23   government told you.  He bought a piano.  It doesn't matter.

24   Whether it's $5 or $5 million, it doesn't matter.  And it

25   doesn't matter what he spent his money on from a private loan

1    that he got from someone that he knew.  And even if there was

2    concrete evidence showing that there was a bribe, it still

3    wouldn't matter what the man spent his money on.

4            The only people who care about what the money got

5    spent on are the U.S. government, people at this table, because

6    they don't have that person over there to tell you it was a

7    bribe.  Do not let the fact that Mr. Thiam spent money on

8    expensive things, that he had an expensive lifestyle, cloud

9    your vision and your scrutiny of the evidence and lack of

10   evidence in this case.

11           You finally heard from Mr. Thiam.  As the government

12   explained, he didn't have to go up.  He had a right not to say

13   anything, but he wanted to.  What he told you about was his

14   life before working at the ministry of mines, those 14 years

15   that he spent working at Merrill Lynch, UBS, where he was

16   working in international banking, where he was helping clients

17   around the world get more money, manage more money, where he

18   was helping Merrill Lynch and UBS.  He also testified about his

19   lifestyle, that he was earning, as you heard, depending on the

20   year, about $3 million a year between his banking and his

21   private business arrangements.

22           (Continued on next page)

23

24

25

1          MR. GOLDSMITH:  In the fancy flow charts that the

2     government showed you -- and Special Agent Killeen was spinning

3     through the thousands of pages of bank records -- they didn't

4     show you anything from before 2009.  They didn't show you that

5     the man had a particular lifestyle before he became the

6     minister of mines in the government of Guinea.  They didn't

7     want you to see that.

8          He told you about his experience going over to Guinea,

9     about what the structure of the government was like, about

10    pressures that he felt from the president to follow up on that

11    deal, about the travel back and forth around the world at the

12    request of the Guinean government, on behalf of the Guinean

13    government.  He told you about spending anywhere from three or

14    four days to weeks with the people from CIF, with Sam Pa.  Not

15    working all the time, not negotiating a deal back and forth

16    every second that they were together, about going out to lunch,

17    going out to dinner, being at a play together, talking about

18    each other's families, talking about what they want to do in

19    the future, talked about developing the relationship that they

20    had, where Sam looked at Mr. Thiam almost like a son, wanted

21    Mr. Thiam to work with him after Mr. Thiam left the government

22    of Guinea.  That relationship that the human beings had amongst

23    each other, to be close enough to ask when you needed money for

24    a loan, to be close enough to ask for a very large loan, an

25    amount of money that most people can't really compute for their

1    daily life.  But it doesn't matter.  Because Mr. Thiam had

2    debts.  He had other business deals he expected to get money

3    on, he expected to grow and prosper.  He expected to be able to

4    repay Mr. Pa.  He expected that he needed money for his family,

5    for things that they were doing.  And the bottom line is that

6    he asked.  And Sam Pa said yes.  He told you that.  But there

7    was no other evidence.  Somehow there was the *quid pro quo*, you

8    do for me and I do for you, that there was an exchange, that

9    that loan was for something.  But it can't just be for

10   something.  That loan has to be for something from Guinea.  No

11   evidence.

12       He told you about the fact that the world changed in

13   2008.  For those millions of dollars that he was making before

14   he went into work for the government of Guinea, that money

15   wasn't the same anymore after the financial crisis.  He needed

16   to pay back loans.  Loans that he, some of his business

17   partners, some of his friends and family, freely were loaning

18   each other back and forth for years.  So he went to Sam Pa, the

19   only person that he knew at the time had the cash to be able to

20   give him, so that he could take care of his loans, take care of

21   his family.

22       You heard him testify about him not taking a salary.

23   He had this vision that he didn't want to be construed as

24   taking money from the government at the time, but he also told

25   you that he didn't want to have other members of the government

1   put him in a position so they could exert influence on him

2   other than just the basic structures of the government.  And

3   maybe it's difficult to believe; maybe it's something that the

4   government wants to keep harping on, the irony of it.  Doesn't

5   matter.  It's not about a bribe.

6        Mahmoud Thiam also testified about his PEP status.

7   You've heard a lot about it.  As I've said before, and as you

8   heard the witnesses say, he knew that once that account got

9   closed, or rather once that account was labeled as a PEP, once

10   it was classified, it was going to get closed, and it did.

11   Every one of them.  Not before he was the minister of mines in

12   the government of Guinea.  It happened, just like he knew it

13   would happen.

14        Let's talk about the accounts.  The accounts that were

15   opened were in his name.  Hong Kong:  His name, passport, New

16   York driver's license, his home address.  HSBC New York:  His

17   name, his address, his identification.  Mahmoud Thiam was not

18   hiding under a shell company.  He wasn't putting a fake name

19   under those accounts.  It was his name, his ID, his personal

20   information, out there for the banks to know, up front.  What

21   the government is suggesting is that the money in the fancy

22   flow charts about there should be one arrow instead of three

23   arrows instead of eight arrows instead of -- who cares, his

24   accounts, from at least one transfer, Sam Pa's account, from

25   another transfer, account jointly held by Sam Pa.  So the arch

criminal sitting at the second table over there, the man with

14 years of international banking experience, in conjunction

with the leader, the CEO of a large Chinese conglomerate who

had been rumored to bring suitcases of cash to dignitaries to

bribe them and pay them off, those two men, in orchestrating a

bribe, decided the best way to do it was to use their personal

bank accounts with their information on it, it banks using wire

transfers that were going to be recorded that had paper files

following each one of those bank's transfers that was open,

that was notorious, that everyone in that bank could find and

get and see.  They decided that the best way to handle an $8½

million bribe was to create as much of a paper trail as

possible, instead of the rumored way of Sam Pa showing up on a

private plane with a suitcase full of cash being handed to a

political candidate.  That wasn't going to work.  We were going

to do it so that we were open and notorious and out for the

world to see.

        Mr. Thiam is presumed innocent.  He pled not guilty.

The judge is going to instruct you on the law.  At the opening

I told you that he was presumed innocent, and at ten after 4 on

this Monday afternoon, or Tuesday afternoon -- it's been a long

trial -- he's still presumed innocent.  And he stays innocent

until you, as the jury, determine that you are convinced that

the government has proven each and every element of the few

crimes charged against him beyond a reasonable doubt.  Not,

1    well, I guess he might have done it.  Well, he was the minister

2    of mines and he got paid some money so he must have.  Proven

3    beyond a reasonable doubt.  Not a guess, not a conjecture, not

4    a maybe, or it looks like it.  Beyond a reasonable doubt.  And

5    the burden of that proof rested with the government.  So they

6    had to prove to you not just that there was a bribe, that he

7    also lied about those sources of those banks in the US for the

8    purpose of hiding the fact that it was a bribe.  They didn't do

9    it.

10          Mahmoud got money from Sam Pa.  Mahmoud lied about his

11   work.  That's about all the evidence you've got in this case

12   related to those charges.  Mahmoud got money from Sam Pa,

13   Mahmoud lied about his work.  He told you why he lied about his

14   work.  And there wasn't anybody here, and there isn't any

15   paper, that's going to prove whether that payment was a bribe.

16   In fact, Mr. Thiam told you it was a loan.

17          Special Agent Killeen testified for a long time.  He

18   read you a lot of pieces of paper.  They would put them up on

19   the screen in front of you, they'd highlight portions.  They'd

20   show you an email, then they'd show you a bank record, then

21   they'd show you an email, then they'd show you a bank record.

22   Special Agent Killeen from the FBI would read whatever was on

23   the screen in front of him.  And they did that for a few hours

24   in front of you.  They did that, picking out a few of those

25   pieces of paper out of the thousands that he told you were

1  there.  Cherry picking.  They didn't have the proof that's

2  needed.  They tried to construct it for you.  The thousands of

3  pages of emails, the thousands of pages of bank records, the

4  computer, the cellphones.  And you got "no such thing as a free

5  lunch."

6          This whole case, this huge Hollywood script of a

7  background story, about a man from New York who goes to Guinea

8  to be a minister over there, his banking background, the

9  millions of dollars that he made in the past, coming up from

10 being a refugee in the country, talking about all of these

11 different agreements talking about billions of dollars' worth

12 of agreements between a country and the Chinese company, all of

13 these dealings between the president, a military coup, who the

14 hierarchy of the ministers and who had more power.  All of

15 this, it's worthy of a Hollywood movie, but it doesn't give you

16 enough.  Because all that story boils down to in this case is

17 what we have between this man and another man that happened in

18 Hong Kong seven years ago, and the government didn't have

19 enough to show you that it was a bribe.  They didn't have

20 anything to show you it was a bribe.

21         When you go into the jury room, you're going to have a

22 chance to deliberate, to read through the transcripts if you

23 think it's necessary, to recall the testimony that you read, to

24 read through the exhibits, the documents, if you feel they're

25 necessary, to think and scrutinize about what every witness

1    said, think what they had the ability to tell you, what they

2    did not have the ability to tell you.  You're going to go in

3    the jury room, and there's a cliché that lawyers like to say.

4    We like to say think about it as if you were sitting at that

5    table.  Think about the most serious decisions in your life,

6    all right?  We say it all the time because it is a tremendously

7    important decision to make, and you are required to scrutinize

8    everything that happened in this trial, all of the evidence

9    that happened in this trial, what the witnesses said, what they

10   could not say, what the papers say and what they do not say.

11           So with that, I leave you with a request.  Forget

12   about all I just said.  Don't listen to me.  Don't listen to

13   what Mr. DiMase said earlier and don't listen to what

14   Mr. Kobre's about to tell you, because we're the lawyers, and

15   we're here for this trial right now.  It doesn't matter what we

16   say.  What matters is what they said.  And there wasn't anybody

17   who could tell you that there was a bribe.

18           Thank you.

19           THE COURT:  Mr. Kobre.

20           MR. KOBRE:  Thank you, Judge.

21           THE COURT:  Mr. DiMase, if you would move that podium.

22           MR. DiMASE:  Oh, of course.

23           THE COURT:  Thank you, Mr. Goldsmith.

24           MR. KOBRE:  Ladies and gentlemen, there is a mountain

25   of evidence in this case that the defendant, Mahmoud Thiam,

1    took bribes from executives of the Chinese companies and

2    laundered those monies into the United States in a way to try

3    to conceal the source of the funds.

4           We're almost done.

5           I'm going to speak for a little while, Judge Cote will

6    instruct you on the law, and you'll finally be able to begin

7    your deliberations.

8           I just want to start with a few small points.

9           First, the defendant has no obligation to do anything

10   at this trial.  As Judge Cote has told you, the government has

11   the burden of proof.  That is our responsibility.  But if the

12   defense makes arguments, like Mr. Goldsmith just did, it's

13   perfectly appropriate for you to consider whether those

14   arguments make any sense at all.  And it's perfectly

15   appropriate for the government to respond to those arguments.

16          The defense talked a little bit about beyond a

17   reasonable doubt.  That's the standard, of course.  It's the

18   standard that's applied every day in criminal cases across this

19   country and it's been applied for the history of this country.

20   We embrace that standard, and there is no reasonable doubt that

21   the defendant accepted bribes from members of a Chinese

22   conglomerate, from the Chinese companies, and laundered the

23   money into the United States.

24          Now I'm not going to have time right now and I'm not

25   going to take your time to talk about every one of

Mr. Goldsmith's arguments, so I'm just going to talk about the

major points and then I'll leave it to you, of course, to

review the evidence when you go to your deliberations.

        Mr. Goldsmith argued that you haven't been presented

with a particular witness who got up on the witness stand and

told you that this was a bribe.  There is an enormous amount of

evidence that this is a bribe.  And I'm going to review a

little bit of that with you, but let me just take a step back.

        At the beginning of this trial, Ms. Laryea asked you

to do several things, and one of them was to use your common

sense.  And common sense tells you that when people enter into

a bribery relationship, when somebody offers another person a

bribe in return for an act, that they don't do that in a public

forum, in the presence of witnesses.  That's just common sense.

        So how do you know, what is the evidence, that this is

a bribe?  You look at what you know about the nature of the

payments.  You've heard testimony and you heard the defendant's

interview with the FBI that there was no interest, there was no

repayment date for this money, that the money was transferred

in, through three different accounts, from the Chinese company

to three accounts and then all to the defendant, that there was

no date specified to repay this money, and that in fact the

money was in fact never repaid.  What do you call money that's

transferred that doesn't have to be repaid for which there is

no interest rate, there is no date that it has to be repaid by,

1   and that it's never repaid?  You call that a payment.  You

2   don't call that a loan.  There's not a shred of paper to back

3   up this loan.  People don't loan $8.5 million without putting

4   it on a document somewhere.

5           You also heard testimony during this trial about the

6   defendant's repeated lies.  I think you can almost lose count

7   of how many lies the defendant has told and has now admitted to

8   telling.  He lied to the Hong Kong bank when he opened up the

9   account.  He lied to JPMorgan Chase when they asked him

10  questions, when Ms. Aring asked him questions.  He lied to HSBC

11  in the United States when they asked him questions.  He lied,

12  now we know, to the IRS and didn't report this as a loan to the

13  IRS, choosing instead to pay $2 million, or at least accept

14  liability of a $2 million tax payment because he reported it as

15  fees from consulting.  He lied to the FBI, repeatedly, when he

16  was confronted by this money.  He lied to the FBI in one way by

17  saying that the money had come from more than -- from 50

18  different people.  In fact, you saw the pie chart, ladies and

19  gentlemen.  This money came from the Chinese companies.  And he

20  lied again to the FBI when he said, no, the agreement had been

21  long signed by the time he got the money.  False.  In fact, he

22  received the first $3 million two weeks before that agreement

23  was signed.  Why all these lies?

24          You heard from Mr. Goldsmith that everything was open

25  and notorious, it was all out there.  Really?

1          Lie after lie after lie to hide the source of this

2     money.  The defendant tried to explain this away in part by

3     saying he was concerned that his PEP status would lead to the

4     closing of the account.  But what he couldn't explain, and what

5     Mr. Goldsmith didn't explain, is why he had to lie about the

6     source of the money after he already told the bank that he was

7     the minister of mines.  Why did he tell Ms. Aring, after

8     admitting to her that he was the minister of mines, why did he

9     tell her that it was from these transactions with Baker

10    Al-Sadi?  That was false, and unexplained.  Why did he tell

11    Mr. Damle that this money was from the sale of land in Africa,

12    from prior business deals?  That had nothing to do with the PEP

13    status.  That was about the source of the money.  And the

14    defendant wanted to conceal the source of the money because he

15    knew that once it was determined, once it was figured out that

16    the money came from the same executives as he was negotiating

17    with, as he was negotiating the CIF deal with, that would

18    expose the bribe.

19         You saw, ladies and gentlemen, Mr. Goldsmith didn't

20    talk to you about those text messages that were in Government

21    Exhibit 601-A, where the defendant said, repeated that Sam Pa

22    had told him that he would be locked up first, that the

23    defendant would be locked up.  People who are engaged in

24    legitimate transactions don't joke about getting locked up.  If

25    you know you're not doing anything wrong, where does getting

1   locked up enter into the picture?  It's because the defendant

2   knew, when he was dealing with Sam Pa and getting the

3   $8.5 million, that this was a bribe.  This was illegal.  And

4   that was what he meant.  That's what Sam Pa meant and that's

5   what the defendant meant about getting locked up.

6          Let me talk to you a little bit about the defendant's

7   testimony today.  The defendant said things on the witness

8   stand that are just clearly lies -- things that simply make no

9   sense.  Mr. DiMase pointed out one to you, but Mr. Goldsmith

10  addressed it and I want to talk about it briefly.  The

11  defendant testified that he took money from Sam Pa because that

12  was the only person who there would be no suspicion about a

13  conflict of interest.  Does that make any sense to you?  If

14  there was anyone who there would be a reason to suspect

15  illegality from, it would be taking money from Sam Pa, the

16  person who you're negotiating a deal with.  It just makes no

17  sense.

18         Mr. Goldsmith mentioned, he said it's irrelevant that

19  the defendant spent a lot of this money on luxury.  And you

20  heard a fair amount of testimony about that.  But it is

21  relevant, ladies and gentlemen.  The defendant testified that

22  he needed this money to feed his family.  He tried to explain

23  away why he was getting this money, why he needed the money,

24  why he, according to his version, requested this money.  He

25  didn't need the money to feed his family.  What he needed it

1    for was to feed his lavish lifestyle.  And that's why it's

2    relevant.

3           And one more point on the defendant's testimony.  And

4    this goes back to the IRS.  That's a lie that you heard from

5    the defendant on the witness stand.  On his 2010 tax return, he

6    reported more than $5 million, consulting, from a consulting

7    business that he was supposedly conducting out of his home

8    address.  Another lie, ladies and gentlemen.

9           Defense counsel spoke to you a bit about the witnesses

10   in this case and what they testified to.  You heard from

11   Mr. Camara and Mr. Sande, the Guinean officials, and you heard

12   the defense witness, Momo Sakho.  You heard from Momo Sakho

13   that he had no involvement in the CIF deal.  He didn't know, he

14   didn't have direct knowledge about that.  But you heard from

15   Mr. Camara, who did have direct involvement, and you heard from

16   Mr. Sande, who did have direct involvement.  And you heard, and

17   you saw earlier during Mr. DiMase's presentation, that

18   Mr. Camara testified that the defendant was the chief

19   negotiator, was the chief person dealing directly with the

20   Chinese.  And you saw that in the government exhibits.  You saw

21   that, ladies and gentlemen, in the emails.  You saw that it was

22   the defendant who proposed -- when the Chinese said that the

23   percentages were unacceptable, it was the defendant who came up

24   with the suggestion of how to fix it, the defendant who

25   proposed that to the prime minister, the defendant who

1    initialed the agreement, the defendant who corresponded on

2    other emails with other executives.

3           Let me just talk for a moment about the house, the

4    771 Duell Road, Dutchess County house.  You heard from the

5    defendant today that this was not his house.  But ladies and

6    gentlemen, it simply makes no sense in light of the evidence.

7    You saw on the deed that SSNL, the company that nominally, in

8    name, bought the house, was at his address.  It's his wife who

9    signed for it.  Two years later the property is transferred to

10   a company called AMER, the same company that the defendant

11   reported to HSBC was his employer, falsely, also located on the

12   deed at the defendant's address.  And again, that deed is

13   signed for by the defendant's wife as a member of SSNL.  And to

14   top it off, you heard from Mr. Scardaci, the contractor, that

15   the defendant spent over a million dollars doing construction

16   work on that house.  The defendant himself testified that he

17   knew the house.  He lived there on weekends.

18          Ladies and gentlemen, let me just close with this.

19   This is an important case.  It's an important case for the

20   defendant for obvious reasons, and it's an important case for

21   the government.  And I know from the close attention that

22   you've all paid over the past week that this case is important

23   to you.  But make no mistake, this is a simple case.  And it is

24   not a close case.  The defendant abused the government

25   position, he took $8.5 million in bribes, and then transferred

H521thi7                    Charge

those millions to enrich himself here in the United States and

elsewhere.  We ask that you return the only fair and just

verdict in this case, and that is a verdict of guilty.

        Thank you.

        THE COURT:  Ms. Rojas, will you please announce the

jury charge.

        THE DEPUTY CLERK:  The Court is about to charge the

jury.  Any spectator wishing to leave the courtroom will do so

now or remain seated until the completion of the Court's

charge.

        THE COURT:  Ms. Rojas, will you please provide to the

members of the jury copies of the charge.

        THE DEPUTY CLERK:  Yes, your Honor.

        THE COURT:  Ladies and gentlemen, you've each been

given a copy of the charge.  I am going to read this to you

now, and you must listen to me as I do so.  Some people find it

easier to understand things if they can read along.  If you're

one of those folks, you have a copy and you can read along.  If

you'd rather just listen to me, that's fine.  Just put it under

your chair and that's just fine.  You'll have a copy to take

with you into the jury room during your deliberations.

        Now we're going to end at 5:00 so I may not finish

reading this to you.  I'll begin again tomorrow morning at 9:30

at our regular time to finish my charge on the law.

        It is my duty at this point to instruct you as to the

1    law.  It is your duty to accept these instructions of law and

2    apply them to the facts as you determine them.  Regardless of

3    any opinion that you may have as to what the law may be -- or

4    ought to be -- it would violate your sworn duty to base a

5    verdict upon any rule of the law other than the one I give you.

6    If an attorney has stated a legal principle different from any

7    that I state to you in my instructions, it is my instructions

8    that you must follow.

9          You should not single out any instruction alone as

10   stating the law, but you should consider my instructions as a

11   whole when you retire to deliberate in the jury room.  And as I

12   said, you may take a copy of these instructions with you into

13   the jury room.

14         Your role is to decide the fact issues that are in the

15   case.  You are the sole and exclusive judges of the facts.  You

16   must determine the facts based solely on the evidence received

17   in this trial.

18         In determining the facts, you must rely upon your own

19   recollection of the evidence.  What the lawyers have said --

20   for instance, in opening statements, in closing arguments, in

21   objections or in questions -- is not evidence.  You should bear

22   in mind particularly that a question put to a witness is never

23   evidence.  It is only the answer that is evidence.

24         I remind you that nothing I have said during the trial

25   or will say during these instructions is evidence.  Similarly,

1    the rulings I have made during the trial are not any indication

2    of my views of what your decision should be.

3            The evidence before you consists of the answers given

4    by the witnesses, the exhibits, and the stipulations that were

5    received in evidence.  If I have sustained an objection to a

6    question or stricken testimony, the answers given by the

7    witness are no longer part of the evidence in this case and may

8    not be considered by you.

9            Your verdict must be based solely upon the evidence or

10   the lack of evidence.  It would be improper for you to consider

11   any personal feelings you have about the defendant's race,

12   religion, or national origin.  It would be equally improper for

13   you to allow any feelings you might have about the nature of

14   the crimes charged to interfere with your decision-making

15   process.

16           The fact that the prosecution is brought in the name

17   of the United States of America entitles the government to no

18   greater consideration than that given to any other party.  By

19   the same token, the government is entitled to no less

20   consideration.

21           The defendant has pleaded not guilty to the charges

22   against him.  As a result of a plea of not guilty, the burden

23   is on the government to prove guilt beyond a reasonable doubt.

24   This burden never shifts to a defendant for the simple reason

25   that the law never imposes upon a defendant in a criminal case

1  the burden or duty of testifying or calling any witness or

2  locating or producing any evidence.

3          The law presumes the defendant to be innocent of the

4  charges against him.  This presumption of innocence alone is

5  sufficient to acquit the defendant.  This presumption was with

6  the defendant when the trial began and remains with the

7  defendant unless and until you are convinced that the

8  government has proven the defendant's guilt beyond a reasonable

9  doubt.

10          The question that naturally arises is:  What is a

11  reasonable doubt?  What does that term mean?  The words almost

12  define themselves.  It is a doubt based in reason and arising

13  out of the evidence in the case, or the lack of evidence.  It

14  is a doubt that a reasonable person has after carefully

15  weighing all the evidence in the case.

16          Reasonable doubt is a doubt that appeals to your

17  reason, your judgment, your experience, and your common sense.

18  If, after a fair and impartial consideration of all the

19  evidence, you can candidly and honestly say that you are not

20  satisfied of the guilt of the defendant, that you do not have

21  an abiding and firm belief of the defendant's guilt -- in other

22  words, if you have such a doubt as would reasonably cause a

23  prudent person to hesitate in acting in matters of importance

24  in his or her own affairs -- then you have a reasonable doubt,

25  and in that circumstance it is your duty to acquit.

1           On the other hand, if, after a fair and impartial

2     consideration of all the evidence, you can candidly and

3     honestly say that you do have an abiding belief of the

4     defendant's guilt, such a belief as a prudent person would be

5     willing to act upon in important matters in the personal

6     affairs of his or her own life, then you have no reasonable

7     doubt, and under such circumstances it is your duty to convict.

8           One final word on this subject:  Reasonable doubt is

9     not whim or speculation.  It is not an excuse to avoid the

10    performance of an unpleasant duty.  Nor is it sympathy for the

11    defendant.  Beyond a reasonable doubt does not mean a positive

12    certainty, or beyond all possible doubt.  After all, it is

13    virtually impossible for a person to be absolutely and

14    completely convinced of any contested fact that by its nature

15    is not subject to mathematical proof and certainty.  As a

16    result, the law in a criminal case is that it is sufficient if

17    the guilt of the defendant is established beyond a reasonable

18    doubt, not beyond all possible doubt.

19          The indictment in this case contains two counts or

20    charges that the defendant violated two different United States

21    criminal laws.  Each count constitutes a separate offense which

22    must be considered separately by you and for which you must

23    return a separate verdict.

24          Count One charges that between 2009 and August 2011,

25    Mahmoud Thiam engaged in a monetary transaction in criminally

derived property in excess of $10,000.

Count Two charges that Thiam engaged in money laundering in November of 2010.

Count One charges Thiam with violating Section 1957 of Title 18 of the United States Code.  Section 1957 states:

"Whoever... knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity [and does so either] in the United States or... outside the United States... but the defendant is a United States person" shall be guilty of a crime.

In order for you to find the defendant guilty of the crime charged in Count One, the government must prove each of the following elements beyond a reasonable doubt:

First:  That during the period between 2009 and August 2011, the defendant knowingly engaged or attempted to engage in a monetary transaction with a value in excess of $10,000.  You must unanimously agree upon at least one such monetary transaction with respect to which each of the following elements is met.

Second:  That at least $10,000 of the property that was the subject of that monetary transaction was criminally derived property from the specified unlawful activity on which I will instruct you shortly.

Third:  That the defendant knew that the property

1    involved in the financial transaction represented the proceeds

2    of some form of unlawful activity.

3            Fourth:  That the transaction either took place in the

4    United States or took place outside the United States but the

5    defendant is a United States person.  You must be unanimous as

6    to which of these conditions was satisfied.  A transaction

7    takes place in the United States if any part of the monetary

8    transaction occurs in a United States financial institution.

9    This includes the transfer of funds from a foreign country into

10   a United States financial institution.  A United States person

11   is a United States national or a person within the United

12   States.

13           Fifth:  That the transaction had an effect on

14   interstate or foreign commerce.

15           The term "monetary transaction" means the deposit,

16   withdrawal, transfer, or exchange, in or affecting interstate

17   or foreign commerce, of funds or a monetary instrument by,

18   through, or to a financial institution.  A monetary instrument

19   includes the currency of the United States or of any other

20   country.  A financial institution includes any commercial

21   United States or foreign bank.

22           Specified unlawful activity includes an offense

23   against a foreign nation involving bribery of a public official

24   in that nation.  Count One charges a violation of the bribery

25   laws of the Republic of Guinea, specifically Articles 192 and

194.  A violation of either of these laws is specified unlawful activity.  It is for you to determine whether a violation of either antibribery law occurred and whether the funds in the monetary transaction at issue in Count One were derived from this unlawful activity.

Article 192 of Guinea's Penal Code criminalizes passive corruption, or the receipt of bribe payments by a public official.  Article 194 of Guinea's Penal Code criminalizes active corruption, or the payment of bribes by other persons to a public official.

Article 192, subsection 1, entitled "Passive Corruption," provides:

"Whoever has solicited or accepted offers or promises, solicited or received donations or gifts in order to:

1) being an elected public official, a public official of the administrative order, agent or official of a public administration or citizen in charge of a public service ministry, to perform or refrain from performing an act within the scope of his/her functions or job, fair or not, but not subject to salary," shall be guilty of a crime.

To prove a violation of Article 192, the government must prove each of the following elements beyond a reasonable doubt:

(1) At the time of the alleged offense, the defendant was an agent or official of a public administration or a

citizen in charge of a public service ministry.  I instruct you
that the Minister of Mines and Geology of the Republic of
Guinea, which I'll refer to as the minister of mines, is both
an agent or official of a public administration and a citizen
in charge of a public service ministry.

(2) The defendant knowingly solicited or received
something of value outside of or beyond the defendant's
government salary.

(3) The defendant's solicitation or receipt of the
thing of value was in return for engaging in an act or
refraining from engaging in an act.  It is irrelevant whether
the act in question was "fair... or not."  In other words, it
is irrelevant whether the defendant might have lawfully and
properly engaged (or refrained from engaging) in the act.  It
is also irrelevant whether the defendant was the final or only
decision maker or even able to achieve the objective of the
bribe.

(4) The act fell within the scope of the defendant's
job or function as the minister of mines.

Article 194, entitled "Active Corruption," provides:

"Whoever, to obtain, either performance of an act or
the refraining from performance of an act or one of the favors
or advantages set forth in Article 192, having employed
assaults or threats, promises, offers, donations or gifts or
given in to entreaties aimed at bribery, even if he/she has not

1    taken the initiative, whether or not the force or bribery has

2    had an effect," shall be guilty of a crime.

3          To prove a violation of Article 194, the government

4    must prove each of the following elements beyond a reasonable

5    doubt:

6          (1) A person or entity, whether directly or through a

7    third party, knowingly offered or gave something of value to a

8    public official -- even if in response to the solicitation of

9    the public official -- outside of or beyond the public

10   official's government salary.  I instruct you that the minister

11   of mines is a public official.

12         (2) The thing of value was offered or given to the

13   public official to influence that public official to engage in

14   an act or to refrain from engaging in an act.  It is irrelevant

15   whether or not the public official actually performed the act

16   or refrained from performing the act.  It is also irrelevant,

17   as I have already explained to you, whether the act in question

18   was "fair... or not."

19         (3) The act in question was within the scope of the

20   public official's job function or position.

21         A person acts "knowingly" if he acts intentionally,

22   voluntarily, and deliberately, and not because of mistake or

23   accident, mere negligence or other innocent reason.  The

24   government is not required to prove that the defendant knew

25   that the criminal offense from which the property was derived

1   was in fact a violation of Article 192 or 194 of Guinea's Penal

2   Code.  You must find, however, that the defendant knew that the

3   proceeds were derived from some form of activity that

4   constitutes a criminal offense under the laws of Guinea.

5          Interstate or foreign commerce includes any

6   transmission, transfer, or transportation of goods, services,

7   communication, or persons, between one state and another state

8   or foreign country, regardless of whether or not it is done for

9   a business purpose.  The effect on interstate or foreign

10  commerce can be minimal.  Any involvement, however slight, will

11  satisfy this element.  You do not have to decide whether the

12  effect on interstate or foreign commerce would be harmful or

13  beneficial.

14         It is not necessary for the government to show that

15  the defendant actually intended or anticipated an effect on

16  interstate or foreign commerce by his actions or that commerce

17  was actually affected.  All that is necessary is that the

18  natural and probable consequences of the acts a person agreed

19  to take would affect interstate or foreign commerce.

20         Count Two charges defendant Thiam with violating

21  Section 1956(a)(1)(B)(i) of Title 18 of the United States Code.

22  Section 1956(a)(1)(B)(i) provides:

23         "Whoever, knowing that the property involved in a

24  financial transaction represents the proceeds of some form of

25  unlawful activity, conducts or attempts to conduct such a

1   financial transaction which in fact involves the proceeds of

2   specified unlawful activity...

3            "(B) Knowing that the transaction is designed in whole

4   or in part.

5            "(i) to conceal or disguise the nature, the location,

6   the source, the ownership, or the control of the proceeds of

7   the specified unlawful activity," shall be guilty of a crime.

8            In order to find the defendant guilty of the crime

9   charged in Count Two, the government must prove each of the

10  following elements beyond a reasonable doubt:

11           First:  That the defendant conducted or attempted to

12  conduct a financial transaction in November 2010 related to the

13  Dutchess County residence.

14           Second:  That the transaction involved the proceeds of

15  specified unlawful activity.  As I've already instructed you, a

16  violation of either Article 192 or 194 under the laws of the

17  Republic of Guinea is specified unlawful activity.

18           Third:  That the defendant knew that the property

19  involved in the financial transaction represented the proceeds

20  of some form, though not necessarily which form, of unlawful

21  activity that constitutes a felony under state, federal, or

22  foreign law.  I instruct you that a violation of either Article

23  192 or 194 is a felony under the laws of the Republic of

24  Guinea.

25           Fourth:  That the defendant knew that the purpose or

intended aim of the transaction was to conceal or disguise a

specified attribute of the funds, such as its nature, location,

source, ownership, or control; and

      Fifth:  That the transaction had an effect on

interstate or foreign commerce.

      You may use the same definition here as those given in

Count One for the terms that appear in both counts.

      The term "conducts" includes the act of initiating,

concluding, or participating in initiating or concluding a

transaction.  A "transaction" includes a purchase, sale, loan,

pledge, gift, transfer, delivery, or other disposition of

property.

      The term "financial transaction" means (1) a

transaction involving a financial institution which is engaged

in or affects interstate or foreign commerce, or (2) a

transaction which affects interstate or foreign commerce and

involves the movement of funds by wire or other means, or

involves one or more monetary instruments, or involves the

transfer of title to any real property.

      You have heard testimony about the extent to which

Guinea did or did not benefit, or was expected to benefit or

not, from its agreements with China International Fund and

related entities, and the extent to which these agreements

complied with certain provisions of Guinea's laws.  As I've

told you, it violates the law of Guinea for a public official

1    to be offered, solicit or receive a bribe in return for

2    engaging or refraining from engaging in an act connected with

3    his official position.  This is true whether the act will or

4    will not benefit Guinea.  Similarly, if you find that the

5    government carried its burden of proving beyond a reasonable

6    doubt each of the elements of the crime charged in Counts One

7    and Two, each of which charges a violation of United States

8    law, it is irrelevant whether Guinea did or did not benefit

9    from this agreement with China International Fund and others.

10           And with that, I'm going to end for today.  So we'll

11   pick up tomorrow at page 22.  Okay?

12           So some final instructions.  I want you to leave those

13   charges right on your chairs.  We'll start tomorrow morning at

14   9:30 promptly.  Please make every effort to be here on time

15   tomorrow.

16           I also want to remind you, you may not discuss this

17   case.  You can't discuss this case with anyone, even with each

18   other.  This case will be submitted to you, the jury, tomorrow,

19   after I've finished giving you my charge.  At that point the

20   deliberating jurors must discuss the case with each other, but

21   until then, you may not.

22           And with that, I wish you a good night.  We'll see you

23   tomorrow morning.

24           (Jury not present)

25           THE COURT:  So counsel, I'd like you to work together

1    this evening, if you would, please, or early tomorrow morning

2    to gather together the indictment and all the exhibits that

3    were received in evidence that can be submitted to the jury in

4    the jury room, because we'll send those in directly after I

5    finish the charge.  I want you to make sure that you review

6    this stack of material with each other so that you've both

7    signed off on the fact that what was sent in to the jury room

8    has been received in evidence.  Or the indictment.  And, you

9    know, we should have a redacted indictment, I think, because

10   there's a forfeiture charge in it, I think.  That should come

11   out of what we send to the jury.

12        MR. KOBRE:  Yes, we'll redact that and prepare that.

13        THE COURT:  Right.  And then share it with each other,

14   and then once you've signed off on this pile of documents,

15   we'll give it to Ms. Rojas and she'll give it to the Marshal

16   tomorrow, and I'd like to have that ready for the jury when

17   deliberations begin.

18        And I don't know of anything else we need to discuss

19   this evening.  Mr. Kobre?

20        MR. KOBRE:  Just on the issue of the exhibits, so some

21   of the exhibits were on discs.  How did your Honor want us to

22   deal with those?

23        THE COURT:  I don't know.

24        MR. KOBRE:  Because there are a substantial number of

25   documents on some of those discs -- the voluminous bank

H521thi7

1    records, for example.

2              THE COURT:  Well, I mean, we can't provide the jury,

3    in the jury room, anything that wasn't received in evidence, so

4    theoretically, if there was an absolutely clean laptop and only

5    admitted exhibits could be accessed on it, theoretically, we

6    could send that in to the jury.  But I'd want to have agreement

7    by both sides on that.  But otherwise I think it's just like

8    many other pieces of evidence.  If they ask for it, they'll

9    have to be in the courtroom under my supervision looking at

10   them during deliberations.  So I leave it to the parties to

11   discuss that.

12             MR. KOBRE:  Thank you, Judge.

13             THE COURT:  Okay.  Mr. Goldsmith, anything we should

14   discuss this evening?

15             MR. GOLDSMITH:  No, your Honor.

16             THE COURT:  Good.  Great.  Great.  So we'll pick up

17   with the venue charge tomorrow.  Thank you, all.

18             THE DEPUTY CLERK:  All rise.

19             (Adjourned to May 3, 2017, at 9:30 a.m.)

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MAHMOUD THIAM

Direct By Mr. Goldsmith  . . . . . . . . . . . 767

Cross By Mr. Kobre . . . . . . . . . . . . . . 801

Redirect By Mr. Goldsmith  . . . . . . . . . . 873

Recross By Mr. Kobre . . . . . . . . . . . . . 880

Redirect By Mr. Goldsmith  . . . . . . . . . . 884