H8PPTHIS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              17 CR 0047 (DLC)

MAHMOUD THIAM,

           Defendant.

------------------------------x

                         New York, N.Y.
                         August 25, 2017
                         11:34 a.m.

Before:

                HON. DENISE COTE,

                         District Judge

                  APPEARANCES

JOON H. KIM,
    Acting United States Attorney for the
    Southern District of New York
ELISHA KOBRE
CHRISTOPHER DiMASE
    Assistant United States Attorneys
LORINDA LARYEA
    Department of Justice Attorney

AARON M. GOLDSMITH
JONATHAN ISIDOR EDELSTEIN
    Attorneys for Defendant


ALSO PRESENT:  SPECIAL AGENT CHRISTOPHER MARTINEZ, FBI
               ALEXANDER BEER, Paralegal to AUSAs

               JENNIE CARMONA, Paralegal to Mr. Goldsmith

H8PPTHIS

1           (In open court)

2           (Case called)

3           MR. KOBRE:  Good morning, your Honor.  Elisha Kobre,

4  Lorinda Laryea and Christopher DiMase for the government, and

5  with us at counsel table, as well, Special Agent Christopher

6  Martinez with the FBI, and Alex Beer, a paralegal from our

7  office.

8           THE DEPUTY CLERK:  Thank you.  And for the defendant,

9  are you ready?

10          MR. GOLDSMITH:  Ready.  Aaron Goldsmith on behalf of

11  Mr. Thiam, who's present in court this morning.  With me at

12  counsel table is also Jennie Carmona, paralegal, and Jonathan

13  Edelstein, who recently appeared.

14          THE COURT:  Thank you.  Can I see counsel at the

15  sidebar, please.

16          (At the side bar)

17          THE COURT:  So I wanted to raise with counsel what I

18  understand happened before I came on the bench in which the

19  defendant's counsel's paralegal greeted, in a warm embrace, one

20  of the marshals --

21          MR. GOLDSMITH:  Okay.

22          THE COURT:  -- in this public courtroom.  That should

23  never happen again.

24          MR. GOLDSMITH:  Okay.  Very well, your Honor.

25          THE COURT:  Thank you very much.

H8PPTHIS

```
 1              (In open court)

 2              THE COURT:  Let me ask you, Mr. Goldsmith, have you

 3   and your client both read the presentence report?

 4              MR. GOLDSMITH:  We have.

 5              THE COURT:  Have you both discussed it with each

 6   other?

 7              MR. GOLDSMITH:  Yes.

 8              THE COURT:  Do you have any objections to it, other

 9   than what might be contained in your written sentencing

10   submissions?

11              MR. GOLDSMITH:  No.

12              THE COURT:  Thank you.  The presentence report will be

13   made part of the record in this case and placed under seal.  If

14   an appeal is taken, counsel on appeal may have accessed to the

15   sealed report without further application to this Court.

16              You may be seated.  Thank you, Mr. Goldsmith.

17              MR. GOLDSMITH:  Well, I guess I should clarify that in

18   my objections, I raised the loss value calculation based upon

19   the three-and-a-half million figure.  In going back in

20   preparation of the sentencing, looking not only at the

21   complaint and all the way through, it appeared as though the

22   government had shown a number of about 3 million had actually,

23   for lack of a better term, entered U.S. soil.  That was

24   contained in my objection, using the lower figure, but I just

25   wanted to clarify that for the record.
```

H8PPTHIS

1          THE COURT:  Okay.  Let's circle back to that issue

2     because I'm not sure I understand its implications for this.

3     I'm not sure I understand what figures you're relying on, but

4     let me just get through the procedural framework first, and

5     then let's circle back to that.

6          MR. GOLDSMITH:  Thank you.

7          THE COURT:  Good.  So we have submissions from defense

8     counsel and from the government in connection with this

9     proceeding.  The government's sentencing memorandum was filed

10    on ECF on August 4th.  I have the following submissions from

11    defense counsel.  I have a letter of July 12th, July 28th,

12    August 23, and August 22 from Mr. Goldsmith.  I have a

13    submission of August 14th from Mr. Edelstein.

14          Now, Mr. Goldsmith, you're appointed counsel in this

15    case.

16          I understand, Mr. Edelstein, you are not?

17          MR. EDELSTEIN:  I am not, your Honor.  You are

18    correct, your Honor.  I am not appointed in this case.  I have

19    been engaged by the family to review the record for purposes of

20    a possible appeal, and that led me to get involved in some

21    aspects of the sentencing, as well.

22          THE COURT:  Okay.  I'm happy to take your submission,

23    Mr. Edelstein but, of course, public funds have been used to

24    pay for appointed counsel, and if the defendant comes into

25    possession of funds such that there should be a reimbursement

H8PPTHIS

1   to the government for those public funds invested in support of

2   his defense, obviously, that's something that I have a duty to

3   inquire into, and I'm sure you're aware of that.

4              MR. EDELSTEIN:  I am aware of that, your Honor.  Once

5   I became aware that Mr. Thiam had been appointed counsel, which

6   I hadn't initially been aware of, and when I found that out, I

7   inquired of Mrs. Thiam regarding the source the funding.  And

8   she has stated that the source of the funding comes from

9   relatives in various countries, that none of it is Mr. Thiam's

10  funds.

11             THE COURT:  Thank you so much for clarifying that.  I

12  appreciate it.

13             MR. GOLDSMITH:  If I may, for the record, it's also my

14  understanding, in conversations with Mr. Thiam's family and

15  with Mr. Edelstein, that he was only paid out of those funds

16  raised from family a very nominal amount for sentencing review

17  purposes and has not received further funds.

18             THE COURT:  Thank you, Mr. Goldsmith.

19             Mr. Goldsmith, I think my chambers raised with you the

20  fact that one of the letters submitted with the July 28th

21  submission is illegible.

22             MR. GOLDSMITH:  Yes.

23             THE COURT:  Now, you have, and I found them

24  extraordinarily helpful, submitted many letters to me.  This is

25  the only one I found to be illegible, but I understand you

H8PPTHIS

1    don't have a better copy of it.

2              MR. GOLDSMITH:  I do not.  Ms. Rojas and I reviewed my

3    copy this morning.  It is the same quality that the Court has,

4    but as the Court stated, there were numerous letters from

5    family and friends.

6              THE COURT:  Good.  Thank you so much.  So I think

7    we're ready to proceed without worrying further about that one

8    letter.

9              The probation department calculates the offense level

10   here as 32, the criminal history category as I, leading to a

11   guidelines range of 121 to 151 months in prison.

12             The government has raised an issue as to whether or

13   not there shouldn't be an obstruction of justice enhancement

14   under 3C1.1, which would give us an offense level of 34 and a

15   criminal history category of I, with a guidelines range of 151

16   months to 188 months in prison.

17             The defendant seeks a sentence of 60 months.  The

18   probation department recommends a sentence of 121 months on

19   Count Two and a concurrent sentence of 120 months on Count One,

20   and that would be at the lowest end of the guidelines range

21   that it calculated.

22             There is an issue of forfeiture here, with a proposed

23   order of forfeiture here from the government of $8.5 million.

24   Is there any objection to entry of the forfeiture?

25             MR. GOLDSMITH:  Your Honor, I don't believe Mr. Thiam

H8PPTHIS

1   has standing to enter an objection at this time because, as

2   there was testimony and exhibits put forth on the record, the

3   title is in another individual's name or corporation's name.

4          THE COURT:  Okay.  The defendant making no objection,

5   I will execute the proposed order of forfeiture.

6          Let's turn to those two issues that I flagged.  One,

7   Mr. Goldsmith, the issue that you raised before about the

8   amount of money.  There was proof here at trial, which was

9   really overwhelming, that the bribe amount paid was

10  eight-and-a-half million dollars, but I want to make sure I

11  understand your argument with respect to a lesser sum.

12         MR. GOLDSMITH:  My argument is very clear, that the

13  offense that Mr. Thiam is charged with and was convicted of was

14  laundering of proceeds from the bribe, not the bribe itself.

15         The U.S. had zero jurisdiction over that bribe.  The

16  bribe, taken upon the evidence that was adduced at face value

17  over the testimony of Mr. Thiam, was that that fund, the

18  eight-and-a-half million dollars' worth, remained in Hong Kong.

19  It was not transferred to U.S. soil.  There were not payments

20  made in those values to U.S. soil.

21         The only funds that can be considered by this Court as

22  a loss value, for sentencing purposes, are the funds that

23  actually enter U.S. jurisdiction.  Those funds, by the

24  complaint, all the way through the evidence that came forward

25  at trial, was in an amount of about $3 million, which is the

H8PPTHIS

1     lesser category, sentencing-wise, which would have been the

2     16-point enhancement.

3          So it would have meted out with a base offense level

4     of eight, 16-point enhancement, and the two points for

5     sophistication, which was conceded in the defense sentencing

6     memorandum, which is only metered out to a sentencing

7     guidelines of 63 months at a low end.

8          So those figures of the amount actually brought into

9     the U.S. versus the total amount alleged by the government to

10    have been received by Mr. Thiam internationally becomes a

11    significant issue in terms of the stipulated -- well, in terms

12    of the guidelines that are appropriate in this case.  That was

13    the one concern.

14         The other concern that I had, in response to the

15    government's calculations, were their request for abuse of

16    trust, which I don't think was proven out in any fashion, and

17    more specifically, this obstruction argument that it appears,

18    in my experience, the U.S. Attorney's Office always makes an

19    argument for if there's a defendant who is convicted after

20    testifying at trial, in some sort of a policy basis of trial

21    tacts, for lack of a better term, without substantial evidence

22    of same.

23         If they had really felt that Mr. Thiam perjured

24    himself in front of this jury, I have no doubt that the U.S.

25    Attorney's Office would have levied a perjury charge against

H8PPTHIS

1    him, as I've had that happen in one instance in the past.

2              Otherwise, I think that not only is this just a rote

3    policy argument by the U.S. Attorney's Office, but also the

4    Court could note that in their summation, the government made

5    reference to an alternative theory, following Mr. Thiam's

6    testimony, about the funds transferred to him from Mr. Pa and

7    his associates being a loan.  In which the government asserted

8    to the jury even if it was a loan, you know, it still would

9    have been a loan with no interest to an individual in political

10   office, should be taken, in sum and substance, as a bribe.

11             So the jury could have very well believed Mr. Thiam's

12   testimony that it was a loan and still believe that it was a

13   bribe, but for those reasons, that's why we take issue with the

14   probation's calculation and the government's argument for

15   enhancements.

16             THE COURT:  Thank you.  So let's look at the

17   presentence report.  I did not understand from your written

18   sentencing submissions precisely what you're telling me right

19   now, and I thank you for that explanation.  So I'm on page 6 of

20   the presentence report, and the paragraph 23 has a base offense

21   level of 26.  Now, that includes, from the presentence report's

22   calculation, a base offense level of 8 and then an adjustment

23   because of the amount of laundered funds, which it names as

24   $8.5 million.

25             And your argument is that only $3 million came into

H8PPTHIS

1    this country?

2              MR. GOLDSMITH:  Correct.

3              THE COURT:  Now, the presentence report indicates that

4    you had argued that 3.5 million had come into this country.

5              MR. GOLDSMITH:  The 3.5 was the threshold that I put

6    in under the guidelines, rather than the actual amount, and as

7    I went in to investigate the matter further in preparation of

8    the sentencing, the numbers that we found, not only from the

9    complaint that was filed in this case through the evidence that

10   was adduced at trial, the number is about 3 million.  So it

11   brings it to that lower threshold.

12             THE COURT:  So you would have an offense level of 24

13   as opposed to 26?

14             MR. GOLDSMITH:  Correct.

15             THE COURT:  Okay.  And then there is another

16   adjustment in the presentence report because of 1956, which is

17   a two-level adjustment.  You do not dispute that as

18   appropriate?

19             MR. GOLDSMITH:  No, we do not.

20             THE COURT:  And then special offense characteristics,

21   two levels for use of sophisticated means, et cetera; you do

22   not dispute that?

23             MR. GOLDSMITH:  The problem I have with that, your

24   Honor, is that the sophisticated -- I don't think the

25   transferring money from one account in your name to another

H8PPTHIS

1    account in your name is sophisticated.

2              THE COURT:  So you are disputing that?

3              MR. GOLDSMITH:  Yes.

4              THE COURT:  You are or not?

5              MR. GOLDSMITH:  We are.

6              THE COURT:  Okay.  Then there is a role in the offense

7    adjustment under 3(b)(1.3), where the probation department

8    includes a two-level enhancement for abuse of trust.  Are you

9    disputing that?

10             MR. GOLDSMITH:  Yes.

11             THE COURT:  What is your argument as to why the

12   position of Minister of Mines and taking a bribe in connection

13   with official duties while holding that position is not an

14   abuse of trust?

15             MR. GOLDSMITH:  There was no evidence adduced at trial

16   that Mr. Thiam affirmatively exploited his position, being that

17   he never went out to individuals promising a level of trust and

18   a level of fiduciary responsibility, to then take that money

19   like we might see if an attorney is indicted or if a

20   stockbroker or financial analyst is indicted; that while he had

21   a position that was high-ranking in the government, that, in

22   and of itself, doesn't make him abuse his trust.  The abuse of

23   trust is typically exposed when one preys upon the individuals

24   who are trusting of that fiduciary responsibility.

25             THE COURT:  Okay.  So I didn't see any of these

H8PPTHIS

1    arguments developed in the submissions or laws cited to me in

2    connection with these.  I'm sorry to take the time now to work

3    through it, but I want to make sure.

4         MR. GOLDSMITH:  I'm glad you are, your Honor.  It's

5    important.  I note that the only concession that we made in the

6    sentencing memo was the two points under 1956.

7         THE COURT:  Okay.  I'm looking at the application

8    notes to 3(b)(1.3), particularly application note one, and this

9    adjustment applies when the position of public trust is

10   characterized by professional or managerial discretion.  And,

11   of course, as Minister of Mines, the defendant was given vast

12   discretion in terms of using his position to advise other

13   government ministers and to negotiate on behalf of the nation

14   of Guinea.

15        Another component is that the position of trust must

16   have contributed in some significant way to facilitating the

17   commission or concealment of the offense.

18        I find this aspect is also met here with the proof

19   adduced at trial.  The bribe was paid by the Chinese officials

20   for the very purpose of influencing the defendant's execution

21   of his job as Minister of Mines during the negotiation of a

22   very lucrative contract that touched upon vast amounts of

23   natural resources of the government of Guinea.

24        The defendant's acceptance and support of the

25   transaction as Minister of Mines was critical to the

H8PPTHIS

1    transaction.  He was a necessary participant in those

2    discussions.  His signature appears on critical documents

3    associated with the transaction.  So I find that the two-level

4    enhancement for abuse of trust is appropriately entered by the

5    probation department, and I adopt it as my own.

6         Let's turn to the amount in connection with the

7    calculation of the base offense level.

8         MR. GOLDSMITH:  Your Honor, if I may briefly

9    interject?  I'm sorry to interrupt.

10        THE COURT:  No, I'm sorry, Mr. Goldsmith.  I gave you

11   an opportunity to be heard.

12        MR. GOLDSMITH:  Okay.

13        THE COURT:  We're going to move on.

14        With respect to the consideration of the amount of

15   money for assessing the base offense level, Count One had, and

16   as I charged the jury, five different elements.  Among those

17   was that the transaction at issue, the financial transaction at

18   issue, either took place in the United States or took place

19   outside the United States, but the defendant is a United States

20   person.  There's no dispute that the financial transaction

21   itself at issue here, the $8.5 million, was the amount of the

22   bribe paid to the defendant.

23        Again, I note that it would make a two-level

24   difference with respect to the probation department's

25   calculation, and I believe that the probation department has

H8PPTHIS

1      correctly calculated it.

2              Let's turn to the next issue, that specific offense

3      characteristics, the use of sophisticated means, and that is an

4      enhancement that is made under 2S1.1(b)(2)(C)(3).  That is an

5      offense level that applies if the defendant was convicted under

6      section 1956, and he was.  Therefore, that adjustment is

7      appropriate.

8              That leaves us the issue about the adjustment for

9      obstruction of justice, and as I understand it, this adjustment

10     is sought by the government for what it contends was the

11     defendant's perjury at trial.  That adjustment is under 3C1.1.

12             First issue, of course, is whether or not there was

13     perjury, and I find that there was, by clear and convincing

14     evidence, indeed, beyond a reasonable doubt, that the defendant

15     gave false testimony under oath at trial.  He did so with the

16     specific intent to deceive the jury and to mislead them about

17     what had happened here, and it was, of course, about a material

18     matter.  It was in connection with the circumstances under

19     which he received the $8.5 million.  So he hoped to obtain a

20     not guilty verdict by his testimony.  Therefore, I find that

21     enhancement under 3C1.1 to also be appropriate.

22             So I think I've addressed each of the guidelines

23     calculation disputes that have been raised, and so the offense

24     level is 34, the criminal history category is I, the guidelines

25     range is 151 to 188 months.

H8PPTHIS

1              There are a number of issues that have been

2      highlighted by the defendant's papers seeking a variance from a

3      guidelines range.  They include the great difficulties he

4      confronted when in Guinea; that Guinea is not materially worse

5      off because of the receipt of the bribe or the contract with

6      the Chinese; that a comparable defendant in an FCPA case

7      received a sentence of 24 months; that the receipt of the bribe

8      was an isolated act in an otherwise exemplary life and would be

9      considered properly aberrant behavior; and as well, that he's

10     engaged in a lifetime of good works, at least as an adult,

11     supporting many poor individuals in Africa to obtain higher

12     education, to obtain education in an environment that they

13     would not otherwise have had access to, and in a variety of

14     ways supporting the communities in Africa in which they live.

15     These, I think, are the principal themes of the request for a

16     non-guidelines sentence.

17              I'll hear from the government.

18              MR. KOBRE:  Just very briefly, your Honor.  If I could

19     just start by just addressing two issues that come up in the

20     context of the Court's guidelines rulings, not so much with

21     respect to those rulings, but just because I think they are

22     relevant to your Honor's consideration of the factors, the

23     sentencing factors under section 3553.

24              The first one relates to the enhancement for

25     sophisticated laundering, and I know that your Honor pointed

H8PPTHIS

out that it applies here because the defendant was convicted

under 18 USC 1956, and I would just point out for your Honor,

and I know we were all here for trial, that the defendant's

offense in this case involved offshore financial accounts and

transactions in several different foreign countries in an

effort to conceal the source of the proceeds that he was using

here in the United States.

           Just also to address briefly, with respect to the

obstruction, your Honor is correct that the government only

sought an obstruction enhancement here based on the defendant's

perjury at trial.  The government did not, but considered and

perhaps could have, sought obstruction here, as well, on the

basis of not only the defendant's lies to the FBI during his

post-arrest interview, but also as well, under the commentary

in the guidelines for the defendant's conduct even

pre-investigation, to the extent that it was intended to

ultimately thwart the eventual investigation and prosecution of

his crimes.

           For that, I would point your Honor to application note

one, the second paragraph of 3C1.1, which indicates that

obstructive conduct that occurred prior to the start of the

investigation of the instant offense of conviction may be

covered, as well under the obstruction guideline if the conduct

was purposely calculated and likely to thwart the investigation

or prosecution of the offense of conviction.

1            Again, the government has not sought obstruction on

2      that basis, or on the basis of the lies to the FBI.  I just

3      wanted to point out that that is conduct in the same nature as

4      what occurred here at trial.

5            I think, your Honor, the government generally just

6      rests on its submission, but I do want to sort of respond to

7      the submission that was put in by co-counsel regarding the harm

8      to Guinea and whether that existed or not.  I would just want

9      to make three points on that for your Honor's consideration.

10            The first is that the evidence at trial showed that,

11      in fact, there was harm to Guinea.  As we pointed out in our

12      submission and cited to the transcript, trial transcript, the

13      Court heard testimony from the Daouda Camara, who is a senior

14      advisor to the prime minister, and here is a quote that the

15      sovereign, under the exclusivity provision of the shareholders

16      agreement, the sovereign rights of the Republic of Guinea

17      regarding its natural resources were practically removed from

18      Guinea.  And, really, there was no evidence in the record that

19      really contradicted that.  So that's the first point.

20            I would just add to that, your Honor, that putting

21      that issue aside, whether the actual agreement itself was

22      harmful to Guinea, the $8.5 million that the defendant received

23      is money that deprived -- that could have gone to the citizens

24      of Guinea, as opposed to the defendant.  So, you know, I think

25      at some point in the defense submission, it is pointed out that

H8PPTHIS

1    this money did not come from the coffers of the Republic of

2    Guinea.  Nonetheless, it is essentially stealing honest

3    services essentially from the Republic of Guinea.  And as your

4    Honor heard here at trial, $8.5 million would go a long way in

5    the Republic of Guinea.

6            And then third, and last, your Honor, you know, the

7    only reason this issue of harm is before the Court, or only

8    reason why we have this question now, to the extent that it is

9    a question, is that the defendant chose to accept an $8.5

10   million bribe in exchange for taking the actions that he did.

11   There's a good reason why, under both Guinean law and under

12   U.S. bribery law, the question of harm, or whether the action

13   would have otherwise been taken, is not required to prove a

14   conviction, and that's because taking a bribe injects an

15   element of self-interest into that decision-making process that

16   shouldn't be there.

17           And just lastly, your Honor, I'll close with this.

18   You know, as we pointed out in our submission, we think that in

19   this case, one of the most important factors for the Court to

20   consider is deterrence.  These sorts of cases, as we pointed

21   out, are difficult to investigate.  They're difficult to

22   prosecute.  There are events that occur overseas, records have

23   to be obtained from overseas, and corruption is rampant.  And,

24   as the Patriot Act makes clear, Congress took very seriously,

25   in passing that provision, that the U.S. financial systems

H8PPTHIS

1   definitively not be used to allow the proceeds of that sort of

2   corruption to enter into the United States or to be laundered

3   by citizens of the United States.

4          So for that reason, your Honor, the government asks

5   that the Court impose a guidelines sentence, as the Court

6   calculated the guidelines earlier today.

7          THE COURT:  Thank you.

8          Mr. Goldsmith.

9          MR. GOLDSMITH:  If it please the Court, Mr. Edelstein

10  would like to respond to the government's response to his

11  submission as to the harm to Guinea.

12         THE COURT:  I'll just hear from you, Mr. Goldsmith.

13  Thank you.  I'm sure you and Mr. Edelstein have consulted

14  significantly on this.  Thank you.  Do you want a brief moment

15  to speak with him?

16         MR. GOLDSMITH:  One second.

17         (Pause)

18         Our brief response is going to the government's

19  argument in its sentencing submission and Mr. Kobre's comments

20  earlier, there was a notion of the loss to the Guinean people

21  about this eight-and-a-half million dollars.  There was no

22  indication whatsoever in any discovery, in any evidence, in any

23  testimony at this trial that Mr. Pa, Mr. Leong, or anyone else

24  associated with the Queensland Group entities, ever had any

25  opportunity or intention of taking that eight-and-a-half

H8PPTHIS

million dollars that were transferred to the Hong Kong account

and Mr. Thiam, and somehow giving that directly to the people

of Guinea or providing infrastructure or anything like that.

So for the government to argue that the Guinean people

have suffered a loss from the alleged bribe is without any

merit whatsoever, without even any consideration, especially --

THE COURT:  You mean a monetary loss?

MR. GOLDSMITH:  Any attempt of the loss because, as

the Court and the parties are well aware, we worked very

diligently to keep the issue of ultimacy away from the jury in

considering this case because, even as Mr. Kobre stated this

morning, it is irrelevant for this case.

There are issues on both sides.  Yes, there was an

eight-and-a-half million dollar payment to Mr. Thiam in a Hong

Kong account.  By the same token, there was testimony from the

two fact witnesses, who were members of government at the time,

that the government and the country of Guinea, that they needed

a massive cash influx in 2010 to operate; that the deal with

Chinese International Fund allowed for a $75 million loan from

CIF to the country of Guinea to happen immediately, that

allowed for them to operate, allowed for them to have the

services for the people, water, food, et cetera; that every

member of parliament at the time was in favor of the deal.

All that was isolated from the jury because it is

irrelevant to the crime itself, and beyond that scope, as I

H8PPTHIS

said, zero evidence at any stage of this case that Mr. Pa, or

his associates, had any intention of somehow taking other money

and giving it to the people of Guinea.

        Beyond that, the argument, as Mr. Kobre just brought

forth, Daouda Camara testified his concerns about the

exclusivity portions of the joint venture agreement were belied

on cross-examination because while he felt concern about any

exclusivity aspect, he also disclaimed a knowledge of whether

the severability clause that was included in the contract would

have permitted the Guinean government to get out of it.

        And it was clear contract law, although I'm professed

not an expert in contract law and the clauses in contract law

internationally.  The contract law was unequivocal in stating

that if there's anything that goes against Guinean law, it is

null and void in this agreement.  And that severability clause

was in every agreement that was brought into evidence at this

trial.

        So the notion that the government argued at trial, and

argued again this morning, that the government of Guinea

somehow lost any element of sovereignty through any clause that

may have promised exclusivity rights in these contracts, is

inappropriate and inaccurate because the severability clause

commands every contract that is written, it is universal and it

is explicitly in those contracts and executed by the parties

therein.

H8PPTHIS

1        So we have the arguments about a loss to the people of

2   Guinea.  To the contrary, whatever factually may have happened

3   in this case, it is indisputable from the fact witnesses who

4   testified at this trial from Guinea, that the public of Guinea

5   benefited, at least in the short term, from having a massive

6   influx of cash to run their country.  So to those ends, we

7   certainly argue against the arguments -- we oppose the

8   arguments brought forth by the government in their submission

9   and this morning.

10        And in terms of the level of deterrence, the Court

11   quite accurately characterized the defense sentencing arguments

12   that have been put forth in our submission.  Under 3553(a),

13   there are other cases that are similar.  This is a case that

14   should be taken in isolation, as an isolated incident, even if

15   accepted through the conviction.

16        The element of deterrence is a powerful one, even

17   under the circumstance.  Whether the Court were to give

18   Mr. Thiam a 60-month sentence or 12-month sentence sends a

19   strong message that anyone involved in laundering in the U.S.,

20   even if it involves activity overseas, far away from a time

21   distant in the past, will be held accountable.

22        And in the class of defendants that we typically

23   characterize as white collar that face these offenses,

24   deterrence has a much more profound meaning than we experience

25   in other more commonly characterized street crimes.  These are

H8PPTHIS

1    individuals typically of middle or upper class, typically

2    individuals like Mr. Thiam, who have never been in trouble with

3    the law before, typically who are professionals who face

4    numerous collateral consequences to any negative action in a

5    courtroom that far ripple out beyond the mere sentence.

6          So deterrence is here.  Deterrence has already

7    happened.  Mr. Thiam has been in jail since his indictment,

8    since his arrest.  He will stand, regardless of the Court's

9    consideration at sentencing, to be in jail for some time

10    longer.  He has lost his ability to earn income, lost his

11    ability to provide for his family, likely lost any future

12    opportunities to engage in the financial sectors in this

13    country, certainly in most countries in the world with this

14    particular case, especially with the media attention that it

15    drew internationally.

16          He is a man who will, whether the Court releases him

17    today, in 50 months, 60 months or a time after, will be a man

18    who has been forever significantly changed going forward as a

19    result of this case alone.  There is massive deterrence that is

20    here, even in a case that, under a guidelines calculation, my

21    arguments in submission would be a significant departure from.

22    So in that respect, I wanted to follow up not only with the

23    government's arguments, but also with our submissions

24    previously put forth.  Thank you.

25          THE COURT:  Thank you very much, Mr. Goldsmith.

H8PPTHIS

1    Again, I want to compliment you on your extraordinarily

2    impressive performance on behalf of your client at trial.

3              Mr. Thiam, I'll hear anything you have to say on your

4    own behalf in connection with the sentence.  I have read your

5    letter that you submitted to me.  I'm happy to have any further

6    statement that you'd like to make.

7              THE DEFENDANT:  Your Honor, if you had time to read my

8    letter, I thank you for that.  That's all I have to say.  Thank

9    you.

10             THE COURT:  You're welcome.

11             I found the defense submissions and the government's

12   submission very helpful, but I'm focusing in particular on the

13   many letters that were submitted by people who know and care

14   for the defendant.  They helped create a better picture in my

15   mind of who the defendant is and how to place this

16   extraordinarily serious violation of law in context.

17             I believe that the sentence I will announce here would

18   be the same whether the offense level was 32 or 34 or even 30.

19   I've tried to think holistically, consider the guidelines, but

20   then step back and consider, as I must under 3553(a),

21   everything that I have learned.

22             The defendant comes from a family that was itself the

23   victim of political upheaval in Guinea.  His father was

24   executed, and the defendant became a refugee at a young age.

25   He thrived abroad and in this country due to his talents, his

1   hard work and his wonderful family support.

2           He chose ultimately to settle in this country, to

3   raise his children because, as I understand it, he wanted to

4   give them the advantage of everything that this country might

5   be able to offer to them as they became adults.

6           At the time of our own country's financial crisis, he

7   was invited to return to Guinea and be its Minister of Mines.

8   That would require him to leave the comfort of home and family,

9   to leave the security of a life in the United States, give him

10  the opportunity to go to the nation of his birth, a desperately

11  poor country, but one that was very rich in natural resources

12  but that had no real ability to develop its resources without

13  outside investment.

14          The defendant, as I understand it, didn't find this an

15  easy decision to make, and he consulted with several other

16  people who have written to me.  Some advised him against this.

17  Some advised him to do it.  I believe he made the decision to

18  go to Guinea out of a desire to help others in his homeland.  I

19  believe it was a virtuous decision.

20          What he found there was a deeply dysfunctional

21  country.  Corruption was embedded in the country.  Violence was

22  known in the country by those in government and elsewhere.

23  There was an absence of stable government institutions, absence

24  of rule of law in the way that we know it and, of course, there

25  was deep poverty, which he expected to find and did find.

1          There was a desperate need for infrastructure.  There

2     was a desperate need for employment.  There was a desperate

3     need for development.  The defendant took upon himself this

4     pivotal position that he was offered.  He had the power in that

5     position to act good in the country or not.  I have evidence

6     that he tried in many circumstances to act honorably.  He saw

7     corruption all around him.  He decided ultimately to succumb to

8     corruption, and with that decision, deprived Guinea of his

9     honest services.

10          I certainly agree with what the defendant has argued

11     in its papers and again to me today, that I don't need to

12     decide whether the eight-and-a-half million dollar bribe he

13     took worsened Guinea's situation financially.  I don't even

14     feel I need to decide whether the existence of that bribe

15     altered in any meaningful way the kind of advice he gave Guinea

16     with respect to this contract.  I don't think I need to decide

17     whether the contract was in Guinea's interests.  I don't think

18     I need to decide whether if he had been a good and faithful

19     servant to Guinea, he could have improved upon its terms,

20     negotiated differently, supported others who were questioning

21     its wisdom at least to some of its provisions.

22          The undisputed fact is that he took a bribe over a

23     contract that was extraordinarily significant to Guinea and

24     significant to the investors who were pouring resources into

25     Guinea.  It was a huge bribe, eight-and-a-half million dollars.

H8PPTHIS

1   It deprived Guinea of his honest services.  It was a violation

2   of Guinean law.  It was a violation of American law.

3           The defendant knew immediately that what he was doing

4   was terribly wrong.  He took many steps to conceal what he was

5   doing.  He lied to banks repeatedly.  He engaged in convoluted

6   financial transactions to disguise what was happening with the

7   funds.  He absolutely knew he had betrayed Guinea.  And, of

8   course, that kind of corruption, as is reflected here, is

9   profound for any nation.  It's profound on different levels

10  when a public official accepts bribes in the performance of

11  their duties.

12          It deprives a nation of the good judgment and good

13  services and faithful services of its representatives, but

14  beyond that, it destroys a citizenry's confidence in its system

15  of governments, and with that loss of confidence, the

16  understanding within a nation that its officials are corrupt,

17  who are more engaged about looking out for their own financial

18  benefit than for the benefit of the country that they're

19  supposed to serve, the rule of law is undermined and a nation

20  is weakened.

21          Now, the opportunity for corruption exists everywhere.

22  The question is, how does a nation respond?  How does it care

23  about the rule of law and the honest services of its government

24  officials?  In the United States, our Congress has spoken.  It

25  will not be tolerated.  It is a violation of our law, and it's

1    a violation of our law even when the bribe is paid abroad to a

2    corrupt foreign official if that violation of the foreign

3    country's laws is sufficiently connected to the United States,

4    as the jury found it was here.  And, of course, we have a

5    United States citizen receiving that bribe, United States

6    financial institutions being involved in the transfer of those

7    monies, a United States property purchased with those monies.

8           So that brings me to the question of punishment.  What

9    is the appropriate punishment here for this very serious crime?

10   The defendant has done a great deal of good in his life.  He

11   has supported numerous charities in Africa.  He's helped to

12   educate impoverished youth.  I find he went to Guinea to help,

13   not to rob it.  I find he did help it in many ways.  Sometimes

14   when he spoke out with great courage and wisdom, it was at risk

15   to himself, and his advice was not heeded.

16          On the other hand, the defendant has shown no remorse

17   for what he did here.  I sense no acknowledgment of the deep

18   injury he has done to Guinea and to the rule of law.  I even

19   sense a whiff of entitlement.

20          He indicated -- there's dispute in the evidentiary

21   record about this, about whether he took a salary in Guinea,

22   but he at least took the position that he didn't take a salary

23   in some circumstances.  He didn't take reimbursement for travel

24   expenses.  He left the comfort of his family and friends in

25   New York and the relative security of life here, compared to

H8PPTHIS

1   the dangers he faced in Guinea, and so maybe he felt he was

2   entitled to take a bribe.  The fact is, he did take one,

3   eight-and-a-half million dollars.

4           I don't find the sentence outlined, even by revised

5   sentencing guidelines calculations, to be appropriate here.

6   Even if I found an offense level of 32 or an offense level 34,

7   whatever, I think that the sentencing range is too vast.  On

8   the other hand, I don't find that a sentence of 60 months, as

9   the defendant has requested, is appropriate either.

10          The defendant sentenced in the Eastern District is in

11  no material way comparable in role and circumstances to give

12  any guidance with respect to this.

13          Considering all the factors I've described here, I'm

14  prepared to impose sentence.  Mr. Thiam, please stand.  I

15  impose a term of imprisonment of 84 months, to be followed by a

16  term of supervised release of three years, with the following

17  special conditions.  You must cooperate in the collection of

18  DNA.  You must comply with the standard conditions of

19  supervision.  You are subject to the forfeiture order that I

20  have signed today.  You must submit to a reasonable search by

21  the probation department.  You must seek and maintain full-time

22  employment.  You shall provide the probation department access

23  to any and all requested financial information.  You may not

24  incur any new credit card charge or open any new credit line

25  without approval of the probation department.  You shall notify

H8PPTHIS

1    the U.S. Attorney's Office for this district within 30 days of

2    any change of mailing or residence address while any portion of

3    the forfeiture remains unpaid.

4            You shall be supervised by the district of your

5    residence.  You shall pay a special assessment of $200.  I

6    decline to impose a fine, given the enormity of the forfeiture

7    order that I have signed.

8            Counsel, is there any legal reason why I cannot impose

9    the sentence I've described as stated?

10           MR. KOBRE:  Not from the government.

11           MR. GOLDSMITH:  No, your Honor.

12           THE COURT:  I order the sentence I've described on the

13   record to be imposed as stated.  I don't believe there are any

14   open counts.

15           MR. KOBRE:  There are not.

16           THE COURT:  I need to advise you of your right to

17   appeal, Mr. Thiam.  If you're unable to pay the cost of an

18   appeal, you may apply for leave to appeal in forma pauperis.

19   Any notice of appeal must be filed within 14 days of the

20   judgment of conviction.

21           I'm going to recommend to the Bureau of Prisons that

22   you be given medical treatment for your diabetes.

23           Counsel, is there any other requests that you have?

24           MR. GOLDSMITH:  Further request the recommendation

25   that he be housed as close to the greater New York City area as

H8PPTHIS

1    possible.

2              THE COURT:  I will make that recommendation.  Anything

3    else?

4              MR. GOLDSMITH:  No, your Honor.

5              THE COURT:  All right.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25