UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNITED STATES OF AMERICA                         Docket No. 17-CR-47 (DLC)


      -- against --


MAHMOUD THIAM,
                       Defendant.

----------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)**


JONATHAN I. EDELSTEIN
EDELSTEIN & GROSSMAN
Attorney for Defendant
501 Fifth Avenue, Suite 514
New York, NY 10017
*Temporary Home Office*: (718) 846-9580
jonathan.edelstein.2@gmail.com

1

## **TABLE OF CONTENTS**

Preliminary Statement.................................................................................................3

Relevant Facts.............................................................................................................4

     A.     Mahmoud Thiam....................................................................................4

     B.     The Impact of COVID-19 on Jails and Prisons ....................................6

Reasons for Granting Release....................................................................................12

     A.     This Court Can and Should Waive Administrative Exhaustion ............13

     B.     Extraordinary and Compelling Reasons Warrant Reducing
            Mr. Thiam's Sentence ........................................................................16

     C.     Mr. Thiam Will Pose No Danger to the Community.............................21

Conclusion.….............................................................................................................22

## PRELIMINARY STATEMENT

New York is at the center of a worldwide pandemic.  People here and throughout the world – including the undersigned counsel, and no doubt the prosecution team and the Court – are doing their best to practice "social distancing," a term few people had heard even six weeks ago but which may now mean the difference between life and death.

Social distancing is not possible for Mahmoud Thiam – indeed, even less so for him than for other prisoners.  Not only is he in a detention facility, MDC Brooklyn, which is considerably more crowded and less ventilated and has a higher rate of inmate movement than most federal prisons, but he has the job of hospital orderly, which requires him to clean up after sick inmates and risk constant exposure to infection without adequate protective equipment.

That is an unacceptable risk for someone in Mr. Thiam's position.  He is 53 years old and suffers from a number of chronic conditions including Type II insulin-dependent diabetes, hypertension, hyperlipidemia, gout, and allergic rhinitis.  At least three of these – diabetes, hypertension and hyperlipidemia – are recognized risk factors for severe respiratory outcomes from COVID-19 infection.[1]  Every additional day of incarceration for Mr. Thiam is thus a gamble that may cost him his health or indeed his life.

When this Court sentenced Mr. Thiam for his nonviolent offense, it surely had no intention of exposing him to a potential death sentence.  Yet that is what his prison term has now become. Accordingly, for the reasons discussed in detail below, it is respectfully submitted that this Court should grant compassionate release and allow him to spend the balance of his prison term at home under such conditions as the Court may set.  Moreover, as further discussed below, this Court should waive administrative exhaustion in light of the urgency of the pandemic.

---

[1] See https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm (visited Apr. 16, 2020).

## RELEVANT FACTS

**A.     Mahmoud Thiam.**

As this Court is aware, defendant Mahmoud Thiam was the Minister of Mines and Geology of the Republic of Guinea during 2009.  Some eight years later, he was charged conducting transactions in criminally derived property (18 U.S.C. § 1957) and money laundering (18 U.S.C. § 1956(a)(1)(B)).  The gravamen of the charges was that during Mr. Thiam's tenure as minister, he (a) accepted bribes from a Chinese consortium, the China International Fund ("CIF"), that was bidding for mining concessions, and then (b) transferred bribe money to American bank accounts and spent some of the money in the United States for his personal benefit.

On May 3, 2017, at the conclusion of a jury trial before this Court, Mr. Thiam was convicted of both counts.  Subsequently, on August 25, 2017, this Court sentenced him to 84 months in prison.  (Doc. 141 at 29).  During the sentencing hearing, this Court noted that Mr. Thiam's family had been the victim of political upheaval in Guinea, and that when the military government that took power in 2008 invited him to return and become Minister of Mines and Geology, the Court "believe[d] he made the decision to go to Guinea out of a desire to help others in his homeland.  I believe it was a virtuous decision."  (Id. at 24-25).  The Court also found that, while Mr. Thiam unfortunately "saw corruption all around him [and] decided ultimately to succumb to corruption," it need not decide whether the mining contract that was the subject of the bribe was in Guinea's interests (id. at 26) as defendant's sentencing submission indicated it had been (Doc. 133 at 2).  Thus, although the Court found that Mr. Thiam had done wrong in depriving Guinea of his honest services and using the American financial system to move his gains, it determined that a below-Guideline sentence was warranted because Mr. Thiam had "done a great deal of good in his life.  He has supported numerous charities in Africa.  He's helped to educate

impoverished youth. I find he went to Guinea to help, not to rob it. *I find he did help it in many ways.*" (Doc. 141 at 28) (emphasis added).

Mr. Thiam has been detained since his arrest in December 2016, and the Bureau of Prisons web site currently projects his release date as November 30, 2022. This ordinarily means that he would be released to a halfway house in approximately May 2022, giving him slightly more than two years remaining in prison. However, Mr. Thiam has achieved a low PATTERN risk assessment score, meaning that absent the pandemic, he would be eligible to participate in First Step Act risk reduction programs (whose implementation is currently on hold) and obtain a 12-month reduction in his sentence. Accordingly, if events had happened otherwise and the COVID-19 pandemic had never struck, Mr. Thiam might be eligible for release to a halfway house in as little as one year.

Mr. Thiam is currently incarcerated at the Metropolitan Detention Center Brooklyn ("MDC"), where he is a member of the permanent inmate cadre. As shown on page 1 of the recent medical records annexed as Exhibit B to the accompanying Declaration of Jonathan Edelstein,[2] Mr. Thiam's job assignment at the MDC is as a hospital orderly. This requires him to clean up spaces that have been occupied by sick inmates. Mr. Thiam advises that, as an inmate at the MDC, he is not provided with personal protective equipment (which is in short supply even for staff) or hand sanitizer to use when performing this job. Moreover, Mr. Thiam advises that at one point, he was asked to clean up an area that had recently been occupied by a COVID-positive inmate and was disciplined when he refused. Mr. Thiam's job as hospital orderly was suspended during the BOP's recent two-week lockdown, but it is expected that he will now resume such duties.

---

[2] The undersigned is in possession of more than 200 pages of additional BOP medical records for Mr. Thiam, which can be provided to the Court upon request.

Also shown at page 2 of Exhibit B are Mr. Thiam's current medical diagnoses including Type II diabetes mellitus, hypertension, hyperlipidemia, gout, and allergic rhinitis. These are chronic conditions from which Mr. Thiam is not expected to recover. On page 1 of Exhibit B are Mr. Thiam's current medications which include insulin, showing that his diabetes mellitus is insulin-dependent.

On March 31, 2020, Mr. Thiam submitted an administrative request to be released in light of the COVID-19 pandemic. See Exhibit A to Edelstein Dec. As of the submission of this motion, the BOP has not acted upon that request.

**B.      The Impact of COVID-19 on Jails and Prisons.**

Annexed as Exhibits C through E to the Edelstein Declaration are three medical affidavits concerning the impact of COVID-19, two of them (Dr. Brie Williams and Dr. Jaimie Meyer) relating to jails and prisons generally and one (Dr. Jonathan Giftos) relating specifically to the Brooklyn MDC.

Dr. Meyer is an Assistant Professor of Medicine at Yale School of Medicine who served between 2008 and 2016 as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut and who has written and published extensively on infectious diseases among incarcerated persons. See Exhibit E to Edelstein Dec., ¶¶ 1-3 and attached curriculum vitae. Dr. Meyer, with citations to numerous authorities, describes COVID-19 as a highly infectious disease:

> The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces. People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet. Not only is the virus

6

very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for another year to the general public. Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer. People in prison and jail will likely have even less access to these novel health strategies as they become available.

Id., ¶ 20.  Although approximately 80 percent of cases are mild, some 16 percent of cases result in serious respiratory illness and may cause death, particularly in patients with underlying chronic conditions including diabetes.  Id., ¶ 21.

Dr. Meyer points to the following factors that heighten the risk of COVID-19 transmission and exposure in jails and prisons:

> \*    *Reduced prevention opportunities*: people who are in jail or prison must use common dining halls, shower facilities, recreation areas and other common areas, rendering them unable to protect themselves via social distancing.  In addition, spaces within jails and prisons are often poorly ventilated, resulting in increased spread of disease through droplets.

> \*    *Lockdowns are not an effective containment strategy* because except in specialized negative pressure rooms which are rarely if at all found in prisons, common ventilation systems mean that air continues to flow outward from rooms where infected prisoners reside to the rest of the facility.

> \*    *Reduced prevention opportunities* due to the lack of hand soap and sanitizer (the latter of which is contraband in prison due to its alcohol content), lack of protective gear, and infrequent washing and cleaning of high-touch surfaces.

> \*    *Heightened susceptibility* due to the fact that prisoners have a higher incidence of pre-existing conditions than people in the community – a category which, as noted above, includes Mr. Thiam.

> \*    *Jails and prisons are poorly equipped to manage infectious disease* due to, *inter alia*, insufficient medical facilities, lack

7

of negative pressure rooms, lack of access to community
health resources, reliance on outside facilities for care,
and/or strained resources due to staff becoming infected and
not showing up for work.

Id., ¶¶ 9-18.  These concerns have been borne out in previous epidemics, such as the spread of

influenza among incarcerated persons in 2012.  See id., ¶ 19.

It is Dr. Meyer's strong opinion that individuals who can safely remain in the community

not remain incarcerated, particularly those with pre-existing comorbidities such as diabetes.  See

id., ¶¶ 38-39.

Dr. Williams, who formerly consulted for the California Department of Corrections and

Rehabilitation and who has extensive experience "working with vulnerable populations, in

particular the incarcerated and the elderly," see Exhibit D to Edelstein Dec., ¶¶ 2-3, explains that

prisons and jails " are not actually isolated from our communities: hundreds of thousands of

correctional officers and correctional healthcare workers enter these facilities every day, returning

to their families and to our communities at the end of their shifts, bringing back and forth to their

families and neighbors and to incarcerated patients any exposures they have had during the day,"

id., ¶ 5.  Access to testing in prisons and jails is "extremely limited" with protective equipment in

short supply even for staff members.  Id.

Significantly, Dr. Williams indicates that the risk of infection "is particularly acute in pre-

trial facilities where the inmate populations shift frequently," because such facilities continually

accept new inmates.  See id., ¶ 6.  Inmates share small cells, eat together, share showers and sinks,

and have insufficient hygiene supplies.  Id., ¶ 7.  Effective social distancing is impossible and the

risk is compounded by the lack of hand sanitizer and/or sufficient opportunities to wash hands.  Id.

With citation to medical authority, Dr. Williams emphasizes the heightened risk to

prisoners with pre-existing conditions:

> An estimated 39-43% of all prisoners, and over 70% of older prisoners, have at least one chronic condition, *some of the most common of which are diabetes, hypertension*, and heart problems. According to the CDC, each of these conditions—as well as chronic bronchitis, emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any condition or treatment that weakens the immune response, current or recent pregnancy in the last two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease, and certain neurological and neurologic and neurodevelopment conditions—puts them at a "high-risk for severe illness from COVID-19."

Id., ¶ 9 (emphasis addded).  In addition, because inmates age faster than the general population – they "are considered geriatric by the age of 50 to 55 years" – the risk of serious illness is by no means limited to inmates who are senior citizens.  Id., ¶¶ 11-13.

Finally, Dr. Williams makes clear that if inmate populations are not reduced, the risk of infection is not only to the inmates themselves but to the community as a whole, because they can transmit the disease to correction officers (who are themselves highly vulnerable due to high rates of diabetes and heart disease) and from there to the community.  Id., ¶¶ 14-21.  In addition, reducing inmate population will " help medical professionals spread their clinical care services throughout the remaining population more efficiently."  Id., ¶ 21.

Dr. Giftos is a professor at the Albert Einstein College of Medicine who has previously worked in the Division of Correctional Health Services on Rikers Island.  See Exhibit C to Edelstein Dec., ¶ 2.  *Inter alia*, Dr. Giftos explains that "[p]eople with chronic medical conditions *(no matter their age)* are also at significantly greater risk from COVID-19 because their already-weakened systems are less able to fight the virus," with such conditions specifically including diabetes.  See id., ¶ 10 (emphasis added).  Mortality rate for COVID patients with diabetes is reportedly 9.2 percent as compared to less than 1 percent of all infected patients; mortality for those with hypertension is 8.4 percent. Id.

Like Dr. Meyer and Dr. Williams, Dr. Giftos emphasizes the risk to inmates in correctional settings because of crowding, inability to practice social distancing, poor ventilation, lack of adequate cleaning supplies, and poor ventilation.  Id., ¶ 11.  As to the MDC in particular, Dr. Giftos notes, with appropriate citations, as follows:

a.    Approximately 1700 inmates are held at the MDC, at least 10% of whom (and likely a higher percentage) fall into the high risk groups identified by the CDC.

b.    New inmates arrive at MDC Brooklyn from all over the world each week. These new inmates are screened only for fever and recent travel to designated hotspot countries.

c.    Correctional officers who live in New York, New Jersey, and Pennsylvania come in and out of the facility each day without medical screening. Significantly, in a March 18th CDC report, an epidemiological investigation revealed that coronavirus-infected staff members contributed to the outbreak in a nursing home facility with ineffective infection control and prevention and staff members working in multiple facilities. The Seattle nursing home outbreak demonstrates that individuals with underlying health conditions and advanced age, in a shared location, are at a high risk of death, especially when resources and staffing become inadequate.

d.    Inmates at MDC Brooklyn are housed either in small two-man cells (designed to hold a single inmate) with a single shared toilet and sink or in large open dormitory units housing up to 70 inmates with shared toilets and sinks.27 Windows in the units do not open.  Inmates cannot go outside.

e.    No hand sanitizer is available to inmates at MDC Brooklyn.

f.    Tissues are not readily available. Inmates use toilet paper to blow their noses. Each inmate is provided only one roll of toilet paper per week.

g.    Each inmate is given one small bar of soap a week, at most. Some units at MDC have received no soap since the lockdown of the facility began on March 13, 2020. Access to additional soap is limited to those inmates who have

> sufficient commissary funds to purchase it, and dependent on the commissary being open; it is routinely closed during lockdowns.
>
> h.    Inmates prepare all inmate meals and this meal preparation, with the exception of kosher and halal meals, is performed in a single kitchen.
>
> i.    Inmates eat meals in large groups.
>
> j.    Inmates are responsible for sanitizing the housing unit common areas, and frequently lack adequate cleaning supplies to do so.
>
> k.    Inmates have not been informed of the symptoms of COVID-19, or of how to prevent the spread of the infection.
>
> l.    Inmates who are at lower and higher risks (because of age and pre-existing medical conditions) of contracting the virus are not separated. Instead, they are mixed together in small two-man cells and locked together in those cells for at least 10 out of every 24 hours.
>
> m.    The facility has not informed the inmate population of what the protocol will be for symptomatic inmates; absent a transparent protocol, inmates in correctional settings often fear they will be confined in solitary if they volunteer that they are symptomatic.
>
> n.    MDC Brooklyn currently has no COVID-19 test kits.

Id., ¶ 15. While, upon information and belief, some of these conditions have improved since the date of Dr. Giftos' affidavit – for instance, screening procedures at the MDC have reportedly been heightened and more information has been made available to the inmates about COVID-19 – the majority of the conditions have not changed, critically including the high rate of inmate movement, lack of sufficient sanitary supplies, crowding, and poor ventilation.

Dr. Giftos further emphasizes that inmates who do contract COVID-19 at the MDC are at higher risk of serious illness than those who contract the disease within the general population, not only because of the lack of adequate medical supplies and personnel but because the MDC "has

no physical space in which an ill inmate can convalesce that is separate from other inmates, warm, clean and has access to fresh water and regular hand-washing." Id., ¶ 16.  As such, reduction of the inmate population in the MDC is an urgent public health measure.  Id., ¶ 18.

## REASONS FOR GRANTING RELEASE

Pursuant to 18 U.S.C. § 3582(c)(1)(A) as codified by the First Step Act, a district court may modify a sentence of imprisonment "in any case" where the following conditions are met:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Since Mr. Thiam is less than 70 years of age, this motion for compassionate release is brought under Section 3582(c)(1)(A)(1), which requires him to show that there are "extraordinary and compelling reasons" justifying release and that such release would be "consistent with applicable policy statements issued by the Sentencing Commission.

As applicable to this case, the Sentencing Commission's policy statement is embodied in U.S.S.G. § 1B1.13, which requires, in addition to "extraordinary and compelling reasons," that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." See U.S.S.G. § 1B1.13(1)(A), (2). "Extraordinary and compelling reasons" within the ambit of the policy statement include, *inter alia*, the following:

> (ii) The defendant is (I) suffering from a serious physical or medical condition… that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

See U.S.S.G. § 1B1.13, Application Note 1(A)(ii).

For the reasons set forth below, Mr. Thiam submits that his diabetes and other chronic conditions, from which he is not expected to recover, "substantially diminish [his] ability to provide self-care" in a prison setting during a pandemic environment, especially given his age and assignment as a medical orderly. This Court should accordingly grant this motion for compassionate release.

## A.      This Court Can and Should Waive Administrative Exhaustion.

As a threshold matter, this Court should not require Mr. Thiam to wait 30 days after seeking release through the administrative process. Pandemic conditions simply do not permit Mr. Thiam to wait for the BOP – which has custody of more than 160,000 prisoners and which is overwhelmed by the health crisis – to conduct deliberations. Indeed, given that COVID-19 spreads on an exponential curve, a 30-day wait – or even a wait of a further 14 days, given the 16 days that have passed since his administrative request for release was made – could literally represent a lifetime.

Defendant expects that the government will argue, as it has done in other recent cases, that the administrative exhaustion requirement is statutory and therefore this Court lacks discretion to waive it. But several courts faced with the same situation as this case – the need to provide

13

expeditious relief to at-risk inmates in pandemic conditions – have held that the administrative exhaustion requirement *is* waivable.  In <u>United States v. Colvin</u>, 2020 WL 1613943 (D. Conn. Apr. 9, 2020), the court noted that "[e]ven where exhaustion is seemingly mandated by statute, the requirement is not absolute." <u>Id.</u>, *2, <u>quoting</u> <u>Washington v Barr</u>, 925 F.3d 109, 118 (2d Cir. 2019).  The <u>Colvin</u> court noted that there are "generally three bases" for waiving exhaustion: (i) where exhaustion would be futile; (ii) where it would be incapable of providing adequate relief; and (iii) where it would subject plaintiffs to undue prejudice. <u>Id.</u>, <u>citing</u> <u>Washington</u>, <u>supra</u>.  The court then found as follows:

> The Court concludes that all three exceptions to the exhaustion requirement apply to Defendant's request. First, if Defendant contracts COVID-19 before her appeals are exhausted, that undue delay might cause her to endure precisely the "catastrophic health consequences" she now seeks to avoid. <u>See</u> CDC Guidance. Second, given the brief duration of Defendant's remaining term of imprisonment, the exhaustion requirement likely renders BOP incapable of granting adequate relief, as her sentence will likely already have expired by the time her appeals are exhausted and would certainly already have expired by the time the thirty-day waiting period ends. Third, Defendant would be subjected to undue prejudice—the heightened risk of severe illness—while attempting to exhaust her appeals.

<u>Id.</u>

Other courts have reached the same conclusion.  In <u>United States v. Perez</u>, __ F. Supp.3d__, 2020 WL 1546422, *2-3 (S.D.N.Y. Apr. 1, 2020), the Honorable Analisa Torres of the Southern District of New York waived the 30-day exhaustion requirement because COVID-19 presented unique circumstances rendering the administrative process inadequate).  The court in <u>United States v. Sawicz</u>, 2020 WL 1815851, *2 (E.D.N.Y. Apr. 10, 2020) similarly found that the existence of COVID-19 at FCI Danbury, where the defendant was incarcerated, warranted waiver of administrative exhaustion in light of "the fact that the defendant is at risk of suffering severe

complications if he were to contract COVID-19 because of his hypertension."

To be sure, the defendant in Colvin, supra, had only days to serve on her sentence, whereas Mr. Thiam has one to two years.  But the short duration of Colvin's sentence was only relevant to the second of the three bases for waiving administrative exhaustion.  The other two bases – the possibility that administrative exhaustion will be futile if Mr. Thiam contracts COVID-19 before the BOP can act on his request, and the likelihood of prejudice to his health if immediate relief is not granted – are just as applicable to a prisoner with one or two years to serve as to one with 11 days left.  Notably, the court in Sawicz, supra, waived exhaustion even though, under ordinary circumstances, Sawicz would not be eligible for release to home confinement until August.  And in United States v. Zukerman, 2020 WL 1659880, *1-3 (S.D.N.Y. Apr. 3, 2020), the court waived exhaustion even though Zukerman was in much the same situation as Mr. Thiam – i.e., a BOP-projected release date of 2022 with the possibility of release in 2021 under the First Step Act.

The Zukerman court specifically noted that waiver of exhaustion does not require that the defendant's sentence is about to end:

> Second, the fact that Zukerman's release is not scheduled to end "within days," Gov't Opp. at 4, misses the point and understates the gravity of the COVID-19 pandemic. Although Zukerman's original release date may be far off, the threat of COVID-19 is at his doorstep. And although the Government focuses on the potential differences between Perez and Zukerman, the Government fails to take into account the undisputed constants in their cases—they are both individuals with serious underlying illnesses who are (1) detained in jails where positive cases of the virus have been found, and (2) unable to take adequate measures to protect themselves.

Zukerman, 2020 WL 1659880, *4.  In this case, "administrative exhaustion would defeat, not favor, the policies underlying § 3582(c)," see id., and this Court should therefore find that Mr. Thiam was not required to exhaust administrative remedies before filing this motion and that its

merits are properly before the Court for review.[3]

**B.      Extraordinary and Compelling Reasons Warrant Reducing Mr. Thiam's Sentence.**

Turning to the merits, this Court should find that the combination of (i) the COVID-19 pandemic, (ii) Mr. Thiam's age and pre-existing medical conditions; and (iii) his position as hospital orderly, constitute "extraordinary and compelling reasons" for compassionate release.  As discussed extensively in the Statement of Facts, COVID-19 is a highly infectious disease for which particularly inmates – and inmates in facilities like the MDC, where the majority of inmates are pretrial detainees and where inmate movement will necessarily continue even under lockdown conditions.  Moreover, Mr. Thiam's job assignment as medical orderly puts him at greater risk of infection, and his pre-existing conditions – including diabetes, hypertension and hyperlipidemia – put him at higher risk of death or serious illness if he does become infected.  In a prison environment, where ventilation is poor, social distancing is impossible, and such goods as soap and hand sanitizer are either in short supply or actually contraband, this is clearly a situation which "diminishes [his] ability… to provide self-care within the environment of a correctional facility" within the meaning of U.S.S.G. § 1B1.13.  And the pandemic is not expected to end any time soon.

---

[3] Alternatively, if this Court were to find the administrative exhaustion requirement unwaivable, it should simply grant the motion on April 30 (the 30th day after Mr. Thiam's administrative request was filed) rather than requiring Mr. Thiam to re-file the motion and begin the judicial review process from scratch at that time.  See United States v. Gross, 2020 WL 1862251, *2-3 (S.D.N.Y. Apr. 14, 2020) (stating that although it considered its hands tied in waiving the exhaustion requirement, it intended to grant the motion on May 2, 2020, at the expiration of 30 days from the filing of Gross' administrative request).  As a further alternative, this Court could do as was done in United States v. Knox, No. 15-cr-445 (PAE), Dkt. No. 1078 at 1 (S.D.N.Y. Apr. 2, 2020), by ordering the government to file a sworn declaration from BOP setting forth a firm date by which it would resolve defendant's request and noting its expectation that BOP would finally resolve defendant's request within 8 days.  Finally, defendant notes that even courts like Gross that have declined to waive the exhaustion requirement have found that it is not jurisdictional and may be waived by the government and have strongly urged the government to do so.  See Gross, 2020 WL 1862251, *4.

Indeed, in two memoranda to the BOP, Attorney General Barr has himself recognized that it is imperative to reduce the population of incarcerated individuals, and has instructed the BOP to prioritize transfer to home confinement of nonviolent, low-risk inmates – a category which includes Mr. Thiam.  See Exhibits E-F to Edelstein Declaration.

It is thus not surprising that numerous courts have found the ongoing COVID-19 pandemic to constitute a compelling reason for compassionate release for inmates in Mr. Thiam's position. For instance, in Zukerman, supra, the court observed:

> Zukerman's age, combined with his diabetes, hypertension, and obesity, satisfy that requirement. According to the World Health Organization, the populations most at risk of suffering a severe form of the disease include "older people, and those with underlying medical problems like cardiovascular disease [and] diabetes." Coronavirus, World Health Organization (Mar. 23, 2020), https://www.who.int/healthtopics/coronavirus#tab=tab_1.     The CDC similarly has explained that individuals over the age of 65 and people of any age who have serious underlying medical conditions, including heart conditions, diabetes, and obesity, are at higher risk for severe illness from COVID-19. People Who Are at Higher Risk for Severe Illness, Centers for Disease Control and Prevention (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html. […] Given that inmates at Otisville live in close quarters, social distancing is impracticable if not impossible, making it difficult for Zukerman to protect himself from the spread of this dangerous and highly contagious virus.

Zukerman, 2020 WL 1659880, *5.  The Zukerman court also cited a litany of other cases in which compassionate release was granted due to COVID-19 risk:

> This Court and others have held that compassionate release is justified under such conditions. Perez, 2020 WL 1546422, at *4; see Colvin, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (finding "extraordinary and compelling reasons justifying ... immediate release under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13" where defendant has "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19" (internal quotation marks, citation, and alteration omitted)); Rodriguez, 2020 WL 1627331, at *7 (granting compassionate release where defendant was "in the higher risk

category for developing more serious disease" if exposed to COVID-19 because he "has Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease") (internal quotation marks and citations omitted); United States v. Jepsen, 19 Civ. 73, 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) (granting compassionate release to defendant who "is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19"); United States v. Gonzalez, No. 18 Cr. 1536155, 2020 WL 1536155, at *3 (approving compassionate release where defendant "is in the most susceptible age category (over 60 years of age) and her COPD and emphysema make her particularly vulnerable"); United States v. Muniz, 09 Cr. 199, 2020 WL 1540325, at *2 (finding extraordinary and compelling circumstances because "[d]efendant has been diagnosed with serious medical conditions that, according to reports from the Center[s] for Disease Control, make him particularly vulnerable to severe illness from COVID-19 ... includ[ing] inter alia, end stage renal disease, diabetes, and arterial hypertension."); United States v. Campagna, No. 16 Cr. 78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (approving compassionate release for defendant where his "compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify [d]efendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care").

Id.

In the two weeks since Zukerman was decided, courts throughout the country have reached similar conclusions.  See Sawicz, supra, 2020 WL 1815851, *2 ("The COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension, justifies waiver here [of the exhaustion/waiting period].... I agree with the defendant that the risk of serious illness or death that he faces in prison constitutes an extraordinary and compelling reason militating in favor of his release."); Miller v. United States, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) ("Miller squarely fits the definition of an individual who has a higher risk of falling severely ill from COVID-19

[due to his underlying conditions]... Continuing Miller's incarceration under the current circumstances could be a lethal decision. Therefore, the Court finds that extraordinary and compelling reasons exist for his immediate compassionate release."); United States v. Gentille, 2020 WL 1814158 (S.D.N.Y. Apr. 9, 2020) ("Gentille's remaining term of incarceration is short. And his medical conditions place him at a higher risk for developing serious medical complications were he to contract COVID-19. Gentille and his counsel have also put forward a plan for his reentry into society in a way that is aimed to protect him from exposure to COVID-19."); United States v. Hansen, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) ("Mr. Hansen's medical risk from the COVID-19 pandemic, taken alone, arguably constitutes 'extraordinary and compelling' circumstances justifying his release.  As discussed above, however, Mr. Hansen's circumstances are 'extraordinary and compelling' without regard to risks associated with the COVID-19 pandemic.... Requiring Mr. Hansen to serve out the rest of his sentence, which, in any event, may amount to no more than seven additional months, would be 'greater than necessary to serve the purposes' of 18 U.S.C. § 3553(a)(2)."); United States v. Trent, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020) ("Trent suffers from a number of serious physical or medical conditions including HIV/AIDS, diabetes, and obesity, from which he is not expected to recover. The Court finds that in the context of the COVID-19 pandemic, these medical conditions, which render Trent uniquely vulnerable to serious illness if he contracts COVID-19, substantially diminish his ability "to provide self-care within the environment of a correctional facility.").

Mr. Thiam's case is similar to the cases in which courts have granted relief.  He is 53 years old, which is not a senior citizen but which, as Dr. Williams' affidavit points out, is geriatric by prison standards and places him at higher risk of disease.  Even more to the point, he suffers from several chronic pre-existing conditions including diabetes, hypertension and hyperlipidemia,

which increase his risk of serious illness or death if he contracts COVID-19.  And it goes without saying that "realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself," United States v. Gross, 2020 WL 1862251, *3 (S.D.N.Y. Apr. 14, 2020), quoting United States v. Butler, 2020 WL 1689778, *2 (S.D.N.Y. Apr. 7, 2020) – a factor that goes double for Mr. Thiam, who is a hospital orderly and who *actually faces discipline* if he refuses to clean up after sick inmates with little if any protective gear.

Defendant expects that the government will argue, as it has in other recent cases, that he is at least as safe in the MDC as in the community and that the BOP has taken significant measures to control the spread of COVID-19 in the prisons.  But this is not so.  As pointed out by both Dr. Williams and Dr. Giftos, the MDC is a pretrial detention center where there is a constant transit of inmates in and out, rendering it difficult to prevent inmates from bringing COVID-19 exposure into the facility.  Staff members also move in and out of the facility from the community every day.  And measures such as lockdowns, which the BOP recently instituted, are, as the medical affidavits make clear, inadequate to protect against COVID-19 risk given that the locked-down inmates must still breathe air from a common ventilation system.  Soap continues to be in short supply and hand sanitizer nonexistent – and in Mr. Thiam's case, his resumed duties as hospital orderly will continue to place him at even higher risk than other inmates.

While the BOP's measures are certainly to be commended, they are not a panacea – as noted by Republican Rep. Fred Keller in his recent article, The Bureau of Prisons must do more to flatten the curve (https://thehill.com/blogs/congress-blog/politics/492452-the-bureau-of-prisons-must-do-more-to-flatten-the-curve") which calls upon BOP to halt *all* inmate movement and notes that hotspots in the BOP system are continuing to increase.

Moreover, as shown by Exhibits E and F to the Edelstein Declaration, Attorney General

Barr, on behalf of the BOP, has himself recognized that the risk of infection in prison is elevated and that low-risk inmates should be prioritized for release, meaning that despite the measures that the BOP has taken, the bureau itself acknowledges that a continuing threat to inmate safety exists.

In contrast, if Mr. Thiam were released, he would be able to shelter in his family's apartment and protect himself from the risk of infection. He would not have to share a ventilation system and shower facilities with hundreds of potentially-exposed prisoners. He would not face daily risk of exposure from staff. He would be able to use hand sanitizer and adequate qualities of soap, and to obtain protective masks. He would not have to clean up after sick inmates. And he would self-isolate for 14 days after release to prevent any risk that he might transmit infection back into the community. See United States v. Resnick, 2020 WL 1651508, *7 (S.D.N.Y. Apr. 2, 2020) (McMahon, C.J.) (finding that the defendant would not pose a risk of infection to the community where he intended to live with his family and would self-quarantine for 14 days after being released). Accordingly, this Court should find that any measures taken by the BOP do not obviate the high risk that Mr. Thiam will face as long as he remains in prison, and should find that extraordinary and compelling circumstances justify his release at this juncture.

**C.     Mr. Thiam Will Pose No Danger to the Community.**

Finally, releasing Mr. Thiam at this time would not pose the slightest danger to the community. The instant offense represents Mr. Thiam's sole contact with the criminal justice system, and the circumstances that permitted him to commit it – his position as Minister of Mines and Geology of the Republic of Guinea – no longer exist and will never again be replicated. Moreover, Mr. Thiam has a spotless prison disciplinary record with zero security points and has achieved a low PATTERN risk assessment score, see Exhibit A to Edelstein Dec., further indicating his intention and ability to play by the rules upon release. See, e.g., United States v.

Gross, 2020 WL 1862251, *3 (S.D.N.Y. Apr. 14, 2020) ("Mr. Gross does not pose any danger to the safety of others or the community. He is a 50-year-old, first-time offender who was convicted of non-violent offenses. There is not even so much as a suggestion in his record that he poses a danger to the community… Mr. Gross has been a model inmate at USP Canaan").[4]

Moreover, as this Court recognized at sentencing, Mr. Thiam is not an evil person – in fact, he is a profoundly good person who has conducted many charitable works, accepted his position as Minister of Mines and Geology with the intention "to help Guinea, not to rob it," and gave sound advice to the military government at personal risk.  Such is not the profile of a person who would endanger the public on release.

If released, Mr. Thiam will live with his wife and daughters in their two-bedroom apartment on the Upper East Side.[5]  He has a standing offer of employment as a consultant from Abdou Raman Soumanou, which he would be able to perform from home.  He is ready, willing and able to resume his role as a productive contributing member of society.  Accordingly, this Court should find that "the grave risk that the COVID-19 pandemic poses to Mr. [Thiam] outweighs any value to society by incarcerating him at [MDC Brooklyn] for [24] additional months while the COVID-19 pandemic continues to wreak havoc across the country and especially in its jails and prisons."  Gross, 2020 WL 1862251, *4.  Mr. Thiam is a compelling candidate for compassionate release and this Court should order that he be released now rather than being required to serve the balance of his prison term under pandemic conditions.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court should issue an Order granting

---

[4] In Gross, as in this case, the inmate seeking release had a projected release date in 2022.

[5] The exact address is not stated in this motion for reasons of privacy but will be provided to the Court and/or the government upon request.

compassionate release to defendant Thiam and granting such other and further relief as it may

deem just and proper.

Dated: New York, NY
       April 16, 2020

                                                    /s/ Jonathan I. Edelstein
                                                    JONATHAN I. EDELSTEIN