UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

            -v.-                            :        17 Cr. 47 (DLC)

MAHMOUD THIAM,                              :

                    Defendant.             :

---------------------------------------------------------------x


## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT MAHMOUD THIAM'S MOTION FOR RELEASE


                              GEOFFREY S. BERMAN
                              United States Attorney
                              Southern District of New York

                              ROBERT ZINK
                              Chief, Criminal Division, Fraud Section
                              United States Department of Justice


Elisha J. Kobre
Christopher J. DiMase
Assistant United States Attorneys

Lorinda Laryea, Assistant Chief
Criminal Division, Fraud Section

- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 2

ARGUMENT ............................................................................................ 6

I.    THE DEFENDANT'S MOTION MUST BE DENIED FOR FAILURE TO
      EXHAUST HIS ADMINISTRATIVE REMEDIES  ................................ 6

   A. The Statute's Exhaustion Requirement Is Mandatory and Contains No Exceptions.... 6

   B. The Defendant's "Waiver" Argument Fails ................................................. 12

II.   THE DEFENDANT HAS NOT DEMONSTRATED EXTRAORDINARY AND
      COMPELLING REASONS FOR HIS IMMEDIATE RELEASE ...................... 15

   A. Applicable Law .......................................................................... 15

   B. The BOP and COVID-19 ................................................................ 17

   C. Discussion ............................................................................... 20

      CONCLUSION ............................................................................. 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                :

      -*v.*-                                      :          17 Cr. 47 (DLC)

MAHMOUD THIAM,                          :

             Defendant.        :

-------------------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
<u>OPPOSITION TO DEFENDANT MAHMOUD THIAM'S MOTION FOR RELEASE</u>**

The United States respectfully submits this memorandum of law in opposition to the motion by defendant Mahmoud Thiam ("Thiam" or the "defendant") for a reduction of Thiam's term of imprisonment pursuant to Title 18, United States Code, Section 3582(c), which was filed on April 16, 2020 ("Def. Mem.").

<u>**PRELIMINARY STATEMENT**</u>

Following a seven-day trial before this Court, Thiam was convicted of two counts of money laundering in connection with his scheme to use his position as Minister of Mines for the Republic of Guinea to obtain, and then launder into the United states, approximately $8.5 million in bribes from a Chinese conglomerate. Thiam accepted and laundered these bribes in exchange for facilitating the transfer to the Chinese Conglomerate of valuable rights to Guinea's natural resources. As demonstrated at trial, Thiam lied repeatedly to banks and thereby laundered the bribes through an offshore account. He then used the proceeds to fund a lavish lifestyle, including expensive vacations, a mansion in Dutchess County, and private school tuition for his children.

On August 25, 2017, this Court sentenced Thiam principally to 84 months' imprisonment, well below the low end of his Guidelines range of 151-188 months' imprisonment. Thiam has

more than two-and-a-half years remaining on his sentence, with a projected release date from Bureau of Prisons ("BOP") custody of November 30, 2022.

Thiam now moves this Court for release pursuant to Title 18, United States Code, Section 3582(c) on the basis of his health conditions—including Type 2 diabetes, hypertension, and hyperlipidemia—and because his "job assignment as [a] medical orderly puts him at greater risk of infection." (Def. Mem. At 16).

Notably, Thiam has thus far not, to the Government's knowledge, made any request to the BOP that it bring a motion to reduce his term of imprisonment pursuant to Section 3582(c)(1)(A). Instead, it appears that Thiam submitted a request to the BOP on March 31, 2020 pursuant to a different statute—18 U.S.C. § 3624(c)(1), as modified by the recent Coronavirus, Aid, Relief and Economic Security Act ("CARES Act")—seeking placement on home confinement for the remainder of his prison term.   (Def. Mem., Ex. A) (the "March 31 E-Mail").   Counsel for MDC reports that this request for placement on home confinement pursuant to Section 3624(c)(1)—which is neither the subject of this motion nor reviewable by this Court—is under review by BOP. However, the distinction between Thiam's submission to BOP and to this Court is critical because Section 3582(c) and Section 3624(c)(1) have different criteria and wholly different effects.   A defendant placed on home confinement pursuant to Section 3624(c)(1) continues serving his or her sentence (and is deemed to remain in BOP custody) whereas relief under Section 3582(c)(1)(A)(i) actually reduces the defendant's prison term.[1]

Thiam's motion should be denied for three reasons.

---

[1] The BOP's decision whether to place a prisoner on home confinement under Section 3624(c)(1) is generally unreviewable by the courts.  *See, e.g., United States v. Fana*, No. 19 Cr. 11 (GHW), 2020 U.S. Dist. LEXIS 63403, at *9 (S.D.N.Y. Apr. 10, 2020) ("By statute, courts are prohibited from reviewing a designation by the BOP."); 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.").

*First*, Thiam has not exhausted his administrative remedies because he has not even made a request for compassionate release to BOP.[2]   Thiam's claim that the Court may simply waive that undisputed failure over the Government's objection is wrong.  It has been rejected by the Third Circuit, *see United States v. Raia*, No. 20-1033, --- F.3d ---, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020), by this Court, *United States v. Monzon*, 99 Cr. 157 (DLC), 2020 WL 550220, at *4 (S.D.N.Y. Feb. 4, 2020) ("It is unnecessary to resolve here whether § 3582(c) creates a jurisdictional bar to the modification of Monzon's sentence or simply sets forth a statutory exhaustion requirement. If it imposes the latter, it must be 'strictly enforce[ed].'") (quoting *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004)), and the overwhelming majority of the courts in this district to have been presented with it, *see, e.g.*, *United States v. Woodson*, No. 18 Cr. 845 (PKC), 2020 WL 1673253, at *4 (S.D.N.Y. Apr. 6, 2020) (collecting cases).

For good reason: "Lawmakers who created the statutory right of a convicted defendant to bring an application to reduce his sentence placed a limitation on his right to do so." *Id.* at *3. "[T]he Court is not free" to disregard that limitation by "infer[ring] a general 'unwritten 'special circumstances' exception'" that is irreconcilable with the statute's plain language. *United States v. Roberts*, No. 18 Cr. 528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016)) (denying motion of HIV-positive inmate)); *see also United States v. Rabadi*, 13 Cr. 353 (KMK) (S.D.N.Y. April 14, 2020) [Dkt. 93, at 5-6].

*Second*, Thiam fails to discharge his burden to demonstrate that he, personally and individually, falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release.  18 U.S.C. § 3582(c)(1)(A).  Thiam's medical

---

[2] He has also not exhausted his administrative remedies for his request for home confinement under the CARES Act because that request is still pending with BOP.

conditions, while undoubtedly real, predate his incarceration by years,[3] and are both reasonably common and stable, and do not distinguish him from numerous other defendants. And, as set forth below, counsel for the Metropolitan Detention Center ("MDC"), where Thiam is incarcerated, has informed the Government that Thiam is not required to serve as a medical orderly, a circumstance he cites as a basis for his motion, and that Thiam may at any time request to be removed from such duties.

*Third*, even assuming that the defendant were deemed to have otherwise met his burden, release would remain unwarranted. The law requires that the same Section 3553(a) factors considered at sentencing be considered in weighing a motion for release. As noted above, Thiam engaged in a brazen and corrupt scheme to use his position as an official of the Republic of Guinea to obtain approximately $8.5 million in exchange for giving away extraordinarily valuable mining and other rights belonging to Guinea. Thiam then laundered the proceeds of these bribes into the United States where he used the money to fund his lavish lifestyle.

Thiam has moreover never accepted responsibility for his conduct, first lying to the FBI then, as this Court found at sentencing, perjuring himself at trial "with the specific intent to deceive the jury," (Sentencing Tr. (Dkt. 141), at 14), and persisting, in the present motion, in failing to acknowledge or accept responsibility for his wrongdoing.

---

[3] Thiam noted in his sentencing submission that he "suffers from high blood-pressure, high cholesterol and diabetes" and that he "takes 'Metformin' daily in order to control the diabetes, and a 'statin' drug for his cholesterol." (Dkt. 130, at 3). According to the Presentence Investigation Report ("PSR"), Thiam was diagnosed with diabetes in 2008. (PSR ¶ 51).

## ARGUMENT

### I.   THE DEFENDANT'S MOTION MUST BE DENIED FOR FAILURE TO EXHAUST HIS ADMINISTRATIVE REMEDIES

Thiam does not dispute that he has failed to exhaust his administrative remedies.  Nor could he, because he has not yet submitted *any* request to the BOP asking BOP to file a motion on his behalf pursuant to Section 3582(c)(1)(A) as required by that statute.  Thiam's March 31 E-Mail to the BOP did not seek relief or even reference Section 3582(c), but rather expressly sought relief under a different statute, Section 3624(c)(1).  The statutes are wholly distinct and a request for home confinement under Section 3624(c)(1) does not qualify as a request for BOP to make a motion for a reduction in sentence under Section 3582(c).

Even if his March 31, 2020 e-mail were somehow deemed a valid request under Section 3582—and it is not—the BOP has not yet ruled on that request and 30 days have not elapsed from the receipt by the BOP of such request, which would trigger the right to make a motion to this Court.  Nor, of course, has Thiam availed himself of his right to appeal a denial within the BOP, *see* 28 C.F.R. §§ 542.15, 571.63.

Thiam asserts that, nonetheless, the Court should "waive" his failure to exhaust his administrative remedies.  (Def. Mem. 13).  The law is squarely to the contrary.

#### A. The Statute's Exhaustion Requirement Is Mandatory and Contains No Exceptions.

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances.  One such circumstance is the so-called compassionate release provision, under which the defendant here seeks relief, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling reasons."  *Id.* § 3582(c)(1)(A)(i).  A motion under this provision may be made by either the BOP or a defendant, but in the latter case only "after the defendant has *fully exhausted all*

*administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Accordingly, where a compassionate release motion is brought by a defendant who has not fully exhausted all administrative rights, the district court may not modify his term of imprisonment. In short, Section 3582(c)(1)(A)'s exhaustion requirement requires "ful[] exhaust[ion]." The defendant's assertion that this express, unambiguous requirement should be "waive[d]" has no basis in the statute.

That ends this matter at this time. Section 3582(c)'s exhaustion requirement is statutory, not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). Statutory exhaustion requirements "stand[] on a different footing." *Id.* "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Id.* Thus, where a statute contains mandatory exhaustion language, as it does here, the only permissible exceptions are those contained in the statute. *Id.*; *see also Bastek v. Fed. Crop. Ins.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text.").

As noted, Section 3582(c)(1)(A) has mandatory exhaustion language with no exceptions. The plain language of the statute states that a court "may not" modify a sentence unless the defendant has first "fully exhausted all administrative rights" or waited 30 days after transmitting his request to the warden. Unlike the Prison Litigation Reform Act ("PLRA"), for example, there is no statutory qualifier that a defendant need only exhaust all "available" remedies.[4] *Cf. Fry v.*

---

[4]  In particular, the PLRA demands that an inmate exhaust "such administrative remedies *as are available*," meaning that the only permissible exception to exhaustion is where the remedies are "unavailable." *Ross*, 136 S. Ct. at 1856-58 (emphasis added); *see also id.* at 1855 (criticizing the "freewheeling approach" adopted by some courts of appeals to exhaustion requirements, and

*Napoleon Community Schools*, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims).  For this reason, this Court and others have explained, this Court lacks the authority to grant the defendant's motion at this time.  *Monzon*, 2020 WL 550220, at *2.

In recent weeks, as the Court is aware, numerous defendants have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be waived or excused.  The only court of appeals to have addressed the question has rejected the argument and required exhaustion.  *See United States v. Raia*, No. 20-1033, --- F.3d ---, 2020 WL 1647922 (3d Cir. Apr. 2, 2020).  In *Raia*—a case that the defendant omits from his brief—the Third Circuit recognized the serious concerns presented by COVID-19, but held that, in light of these concerns, as well as the BOP's statutory role and its "extensive and professional efforts to curtail the virus's spread, . . . strict compliance with Section 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at *2.

This Court recently addressed the exhaustion issue in *United States v. Monzon*, 99 Cr. 157, 2020 WL 550220, at *4, denying Monzon's motion under section 3582(c)(1)(A) for failure to exhaust administrative remedies and observing that Section 3582(c) imposes at least a statutory exhaustion requirement which "must be 'strictly enforce[ed].'" (quoting *Theodoropoulos*, 358 F.3d at 172).  Consistent with this Court's determination in *Monzon*, the vast majority of district courts that have reached the issue have also required exhaustion.  *See, e.g.*, *United States v. Demaria*, No. 17 Cr. 569 (ER), 2020 WL 1888910, at *4 (S.D.N.Y. Apr. 16, 2020); *United States v. Ogarro*, 18 Cr. 373 (RJS) (S.D.N.Y. April 14, 2020) [Dkt. 666, at 6]. ("[S]ection 3582's exhaustion requirement is clear as day."); *United States v. Rabadi*, 13 Cr. 353 (KMK) (S.D.N.Y.,

---

overruling precedent from the Second Circuit and other circuits that had read additional exceptions into the rule).  Here, no such exception exists in the statute.

April 14, 2020) [Dkt. 93, at 5-6]. (noting "vast majority" of cases  holding that prisoners must exhaust administrative remedies); *Roberts*, 2020 WL 1700032, at *2; *United States v. Canale*, No. 17 Cr. 287 (JPO), 2020 WL 1809287, at *1 (S.D.N.Y. Apr. 9, 2020); *United States v. Woodson*, No. 18 Cr. 845 (PKC), 2020 WL 1673253, at *4 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, No. 18 Cr. 273 (LGS), 2020 WL 1674137, at *1 (S.D.N.Y. Apr. 6, 2020); *United States v. Arena*, No. 18 Cr. 14 (VM) (S.D.N.Y. Apr. 6, 2020) [Dkt. 354, at 2-3]; *United States v. Hernandez*, No. 18 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18 Cr. 602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020); *United States v. Johnson*, No. 14-CR-4-0441, 2020 WL 1663360, at *1 (D. Md. Apr. 3, 2020).[5,6]

To be sure, COVID-19 presents unusual circumstances, in which compassionate release decisions should be made expeditiously.  But the text of Section 3582 contains no exigency or similar exception, and indeed, the text refutes the availability of such an exception in two respects.

First, while many statutory exhaustion provisions require exhaustion of all administrative remedies before a claim may be brought in court, Section 3582 provides an alternative: exhaustion

---

[5] *See also United States v. Carver*, No. 19 Cr. 6044, 2020 WL 1604968, at *1 (E.D. Wa. Apr. 1, 2020); *United States v. Clark*, No. 17 Cr. 85 (SDD), 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020); *United States v. Williams*, No. 15 Cr. 646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020); *United States v. Garza*, No. 18 Cr. 1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v. Zywotko*, No. 19 Cr. 113, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Eberhart*, No. 13 Cr. 313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Gileno*, No. 19 Cr. 161, 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020); *United States v. Bolino*. No. 6 Cr. 806, 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020) (collecting cases).

[6]  *But see United States v. Perez*, No. 17 Cr. 513 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020).  However, both *Perez* and *Colvin* relied on *Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019), which, as discussed below, is inapposite because it involves *judge-made* exhaustion doctrine.  *Perez* and *Colvin* are also are inapposite because each was a case where delay amounted to denial because the defendant had a very short period (less than three weeks in *Perez*, and eleven days in *Colvin*) remaining on his or her sentence.  *See Perez*, 2020 WL 1546422, at *3; *Colvin*, 2020 WL 1613943, at *2.  In *Zukerman*, Judge Torres simply followed her own (incorrect) analysis from *Perez* and that case therefore provides no support for Thiam's position.

of all administrative rights *or* the lapse of 30 days from the warden's receipt of the inmate's request for compassionate release, whichever is earlier.  18 U.S.C. § 3582(c)(1)(A).  This statutory alternative suggests that the Congress recognized that even if compassionate release requests cannot always await the full administrative process to be completed, the BOP should have at least 30 days to act on such a request.  Legislative history is in accord.  *See Roberts*, 2020 WL 1700032, at *2 (legislative history "indicates that Congress recognized the importance of expediting applications for compassionate release and still chose to require a thirty-day waiting period").  As Judge Marrero recently recognized, there is "simply no authority that permits [the defendant] to circumvent the administrative exhaustion requirement" based on a claim of futility, because the ability to seek relief after 30 days constitutes "an express futility provision."  *Arena*, No. 18 Cr. 14 (VM) (Dkt. 354, at 2); *see also United States v. Gross*, No. 15 Cr. 769 (AJN), 2020 WL 1673244, at *2 (S.D.N.Y. Apr. 6, 2020) ("the case for carving out an equitable exception here is weak" because Section 3582(c) "provides a built-in futility exception in the form of the 30-day rule").

Second, in cases presenting the most urgent circumstance—inmates diagnosed with a terminal illness—Section 3582(d) requires the BOP to process any application for compassionate release in 14 days.  That Congress allowed 14 days to process the claims of even a terminally ill inmate suggests that it could not have intended to allow a shorter period (which excusing exhaustion would effectively provide) in a case, such as this, where the potential risk to the inmate, while serious, remains potential and opaque.

As the Third Circuit recognized, the mandatory exhaustion requirement accommodates the valuable role that the BOP plays in the compassionate release process.  Informed decisions about compassionate release require the collection of information, like disciplinary records, medical history, and facility details, which the BOP is uniquely suited to obtain and that will benefit both

the BOP and later a court evaluating such claims.  The BOP is also well situated to make relative judgments about the merits of compassionate release requests—particularly at a time like this when many inmates, in different circumstances, are making requests advancing similar claims—and adjudicate those requests in a consistent manner.  The Court may of course review the BOP's judgments, but Congress expressed its clear intent that such review would come second, after the benefit of the BOP's initial assessment.  *See United States v. Russo*, No. 16 Cr. 441 (LJL) (S.D.N.Y. Apr. 3, 2020) (Dkt. 54, at 4) (The statutory text "recognizes that the BOP is frequently in the best position to assess, at least in the first instance, a defendant's conditions, the risk presented to the public by his release, and the adequacy of a release plan.  That recognition is consistent with one of the bedrock principles underlying administrative exhaustion—to permit the agency, with its expertise and with its responsibility over the movant, to make a decision in the first instance."); *see also Woodson*, 2020 WL 1673253, at *3 ("If the BOP denies a defendant's application, the BOP's decision may inform the Court of why the agency does not consider the relief warranted.  The present national health emergency makes thoughtful and considered input from the BOP all the more valuable in avoiding unwarranted disparities among convicted defendants.").

In any event, to ignore the mandatory, express, statutory exhaustion requirement, whatever its merits, would be legal error.  *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1848 (2018) ("[T]his case presents a question of statutory interpretation, not a question of policy."); *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (Where a "statute's language is plain, the sole function of the courts is to enforce it according to its terms." (internal quotation marks omitted)); *cf., e.g.*, *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017)

11

("This is not a free-ranging search for the best copyright policy, but rather depends solely on statutory interpretation." (internal quotation marks omitted)).

### B.     The Defendant's "Waiver" Arguments Fail

In the face of unambiguous statutory language, and numerous cases applying it in this District and elsewhere, the defendant cites principally to *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), Judge Torres's opinions in *Perez* and *Zukerman*, and *Colvin*, a District of Connecticut case, and argues that this Court both can and should find that the exhaustion requirement is "waived" because he fits within certain unwritten, but allegedly applicable, exceptions. (Def. Mem. 13-16). That claim is wrong. The statute's plain language does not permit exceptions. And *Washington* is inapposite for precisely that reason.

*Washington* involved *judge-made*, not statutory, exhaustion. *See Washington*, 925 F.3d at 116 (stating that the statute in question "does not mandate exhaustion of administrative remedies" but finding that exhaustion requirement was nevertheless appropriate); *id.* at 118 ("Although not mandated by Congress, [exhaustion] is consistent with congressional intent."). Thus, it was appropriate for the court to consider judge-made exceptions to the judge-made exhaustion requirement, or, to put it differently, the scope of the judge-made requirement. *See Ross*, 136 S. Ct. at 1857. This case, on the other hand, involves an express mandatory statutory exhaustion requirement. That is entirely different. *See Bastek*, 145 F.3d at 95 (rejecting application of various exceptions to exhaustion requirement where clear statutory requirement exists); *Theodoropoulos*, 358 F.3d at 172 (rejecting futility exception to exhaustion requirement in Immigration and Nationality Act because such an exception is "simply not available when the exhaustion requirement is statutory," as opposed to judicial); *United States v. Gonzalez-Roque*, 301 F.3d 39, 46-48 (2d Cir. 2002) (rejecting argument that statutory exhaustion requirement for collaterally

12

attacking a removal order should be excused in light of defendant's *pro se* status in removal proceedings).

To be sure, *Washington* states: "Even where exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute.  The Supreme Court itself has recognized exceptions to the exhaustion requirement under 'three broad sets of categories.'" *Washington*, 925 F.3d at 118 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)).  But the inclusion of the foregoing phrase "by statute" is not supported by the citation that follows.  Indeed, *McCarthy*— the cited case—is another case involving a judge-made exhaustion requirement.  *See McCarthy*, 503 U.S. at 152 ("Congress has not *required* exhaustion of a federal prisoner's *Bivens* claim." (emphasis in original)).  It thus provides no support for the notion that exhaustion mandated "by statute" is not absolute.  *See Bastek*, 145 F.3d at 95 (rejecting application of *McCarthy* exceptions in a statutory case).  Moreover, while *Washington* goes on to discuss three recognized exceptions to exhaustion, it is again describing three exceptions recognized in *McCarthy* in the judge-made context, and as the Supreme Court made crystal clear in *Ross*, there is a critical distinction between statutory and judge-made exhaustion requirements.  Given that *Washington* was a judge-made exhaustion case, its unexplained statement that exhaustion mandated "by statute" is "not absolute" is dicta, and cannot supplant the clear statements to the contrary in cases like *Ross* and *Bastek*, and the plain language of the statute here.  *See Woodson*, 2020 WL 1673253, at *3 ("The passing reference to 'exhaustion [that] is seemingly mandated by statute . . . is not absolute' in [*Washington*] was not necessary to the Court of Appeals' holding." (ellipsis in original)); *Roberts*, 2020 WL 1700032, at *2 (rejecting argument that *Washington* permits excusing exhaustion under Section 3582(c); unlike those that are judge-made, "statutory exhaustion requirements, such as those set forth in Section 3582(c), must be strictly enforced" (internal quotation marks omitted)).

For the same reasons, Thiam's reliance on *Colvin*, *Perez*, and *Zuckerman* is wrong. Both *Perez* and *Colvin* relied on *Washington v. Barr*, which, as discussed, is inapposite because it involves judge-made exhaustion doctrine. *Perez* and *Colvin* are also are inapposite because each was a case where delay amounted to denial because the defendant had a very short period (less than three weeks in *Perez*, and eleven days in *Colvin*) remaining on his or her sentence. *See Perez*, 2020 WL 1546422, at *3; *Colvin*, 2020 WL 1613943, at *2. The fact that Judge Torres followed her own (incorrect) analysis from *Perez* in a later case, *Zukerman*, provides no further support for Thiam's position. It means only that the "exhaustion" issue was decided incorrectly again.[7]

In sum, the analysis of a statutory exhaustion requirement, like any other statutory requirement, must "begin[] with the text" and utilize "ordinary interpretive techniques." *Ross*, 136 S. Ct. at 1856 and 1858 n.2; *see also, e.g.*, *Ron Pair Enters.*, 489 U.S. at 241. The text of Section 3582(c) is unambiguous and provides for no exceptions. "[T]he Court is not free to infer" one that

---

[7] *Mathews v. Eldridge*, 424 U.S. 319 (1976) is similarly inapposite. There, the Supreme Court considered a provision of the Social Security Act providing that a claimant could bring a civil action challenging a decision by the Secretary of Health, Education and Welfare only after "a final decision of the Secretary made after a hearing." 42 U.S.C. § 405(g). The Supreme Court construed this provision to contain two requirements: (1) a non-waivable, "jurisdictional" element that a claim shall have been brought before the Secretary, and (2) a waivable element that the remedies prescribed by the Secretary be exhausted. *Eldridge*, 424 U.S. at 328. The claimant argued that the Due Process Clause of the Fifth Amendment requires that prior to termination of Social Security disability benefit payments, the recipient be afforded an opportunity for an evidentiary hearing. In evaluating whether the denial of his claim was sufficiently "final" so as to "satisfy the exhaustion requirement," the Supreme Court noted that (1) his Due Process claim was entirely "collateral" to his substantive claim of entitlement, and (2) his claim to a pre-deprivation hearing as a matter of constitutional right "rests on the proposition that full relief cannot be obtained at a post-deprivation hearing." *Id.* at 330-31. The Court accordingly concluded that the denial of the claimant's request for benefits "constitutes a final decision" for purposes of the exhaustion requirement. *Id.* at 332.

Thus, *Eldridge* did not excuse an exhaustion requirement; it found it to have been satisfied. *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 15 (2000) ("*Eldridge*, however, is a case in which the Court found that the respondent *had followed* the special review procedures set forth in § 405(g), thereby *complying with*, rather than *disregarding*, the strictures of § 405(h).").

is irreconcilable with that text.  *Roberts*, 2020 WL 1700032, at *2; *see also, e.g.*, *Woodson*, 2020 WL 1673253, at *3.

## II.   THE DEFENDANT HAS NOT DEMONSTRATED EXTRAORDINARY AND COMPELLING REASONS FOR HIS IMMEDIATE RELEASE

Because Thiam's motion must be denied at this time for failure to exhaust his administrative remedies, the Court need not reach the merits of his motion.  But if the Court chooses to reach the merits, it should reject the motion.  While COVID-19 is undoubtedly serious, and the situation is dynamic, Thiam has not met his burden to demonstrate compelling and extraordinary reasons warranting immediate release.  On the contrary, if the Court were to accept his apparent logic, every federal prisoner with diabetes and/or high blood pressure or similar conditions, regardless of the severity of those conditions, where the inmate is located, what the inmate did, the length of time left on his sentence, or what will follow release, would be entitled to immediate and permanent release.  That is infeasible, unwarranted, and inconsistent with the public interest, the applicable statutory framework, and the purpose underlying the framework.

### A.   Applicable Law

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13.  That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to

the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant. —

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances. —

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.
(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* § 1B1.13 Application Note 1.

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the Section 3553(a) factors are relevant to whether release is warranted.  *See* 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist.  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Gotti*, No. 02 Cr. 743 (CM), --- F. Supp. 3d ---, 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

### B.        The BOP and COVID-19

The BOP has made and continues to make significant efforts to respond to the threat posed by COVID-19.

Since at least October 2012, the BOP has had a Pandemic Influenza Plan.  *See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp.   In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel.       *See* BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.  As part of its Phase One response, the BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.*  In addition, the BOP established "an agency task force" to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the

Department of Justice (DOJ) and the Office of the Vice President.  BOP's planning is structured

using the Incident Command System (ICS) framework." *Id.*

On or about March 13, 2020, the BOP implemented its Phase Two response "to mitigate

the spread of COVID-19, acknowledging the United States will have more confirmed cases in the

coming weeks and also noting that the population density of prisons creates a risk of infection and

transmission for inmates and staff." *Id.*  These national measures are intended to "ensure the

continued effective operations of the federal prison system and to ensure that staff remain healthy

and available for duty." *Id.*  For example, the BOP (a) suspended social visits for 30 days (but

increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-

case accommodations); (c) suspended inmate movement for 30 days (with case-by-case

exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e)

suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those

performing essential services, such as medical treatment; (g) suspended volunteer visits for 30

days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified

operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.*  In

addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff

being subject to "enhanced screening" and inmates being subject to screening managed by its

infectious disease management programs. *Id.*  As part of the BOP's inmate screening process,

(i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and

symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and

(iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per

local health authority protocols." *Id.*

On or about March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event.  *See* BOP Update on COVID-19, *at* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

On or about March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.  *See* BOP COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

On or about April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to

facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.  *Id.*

The BOP has also "increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement."  Update on COVID-19 and Home Confinement, https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.  In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities [with COVID-19 outbreaks] to determine which inmates are suitable for home confinement."  *Id.*[8]

These and other steps belie any suggestion that the BOP is failing to meaningfully address the risk posed by COVID-19 to inmates.  To the contrary, they show that the BOP has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations, as well as directives from the Attorney General.

C.     **Discussion**

There is no dispute that the defendant has Type 2 diabetes, hypertension (high blood pressure), hyperlipidemia (a high level of fats in the blood), and certain other conditions.  There is also no dispute that at least diabetes is a COVID-19 risk factor.  *See* CDC, Groups at Higher Risk for Severe Illness https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.  However, serious though the defendant's conditions may be, either individually

---

[8] Per a filing today by the Warden of MDC with the United States District Court for the Eastern District of New York, as of today, MDC Brooklyn, where the defendant is housed, has six inmates (out of a total of approximately 1,679 inmates) and 23 staff members who have tested positive for COVID-19. *See also* https://www.bop.gov/coronavirus/index.jsp (last viewed April 21, 2020, at 5:11 p.m.).

or as a group, they pre-date his incarceration, and they are both stable and manageable.  Nor does the defendant allege that he is not being treated properly for any of his conditions.  In support of his motion, he notably encloses no medical examination or facts indicating that he faces a health crisis, acute or otherwise.

Hyperbole aside (*e.g.*, Def. Mem. 3 (warning of "a death sentence")), Thiam's argument reduces to the contention that he has certain reasonably common, though potentially serious health conditions; he is in prison; and there is a COVID-19 pandemic—so he should be immediately released.  That is not sufficient for the defendant to discharge his burden to demonstrate that he—personally and individually—falls into the narrow band of inmates who are "suffering from a serious physical or medical condition," "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."   U.S.S.G. § 1B1.13, Application Note 1(A).  *See Raia*, 2020 WL 1647922, at *2 ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like [the defendant].  But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *cf. Gileno*, 2020 WL 1307108, at *4 (finding that defendant who allegedly suffered from high blood pressure, high cholesterol, asthma, and allergies "has not shown that his medical issues, which remain largely the same as when he was sentenced, 'substantially diminish [his] ability . . . to provide self-care' within the correctional facility" (brackets in original)).

Indeed, the defendant does not persuasively demonstrate what is required for release, instead suggesting that anyone at high risk for COVID-19 complications should be immediately

released, regardless of what they did, how much time they have served, where they are housed, or any other individual factors, because the BOP purportedly has had a generally "ineffective" response to COVID-19.  That suggestion is not in accord with the facts or the law.[9]

Thiam also asserts as a basis for his motion that his "job assignment as [a] medical orderly puts him at greater risk of infection."  (Def. Mem. At 16).  But counsel for MDC has told the Government that Thiam could ask at any time to be reassigned from hospital orderly duties and that such a request would be granted.[10]  According to counsel for MDC, it does not appear that Thiam has requested reassignment from these duties.[11]  Thiam thus cites no circumstances qualifying him for a sentence reduction under Section 3582(c).

Finally, and in any event, the same Section 3553(a) factors that warranted the defendant's sentence counsel against release, particularly given that he has served well less than half of his sentence.  After presiding over the defendant's week-long trial, this Court observed at sentencing:

> The undisputed fact is that he took a bribe over a contract that was extraordinarily significant to Guinea and significant to the investors who were pouring resources into Guinea.  It was a huge bribe, eight-and-a-half million dollars.

---

[9]  Courts considering bail applications, where, unlike here, the defendant is presumed innocent, have rejected this kind of sweeping, non-case specific argument.  *See*, *e.g.*, *United States v. Chambers*, No. 20 Cr. 135 (JMF), 2020 WL 1530746 (S.D.N.Y. Mar. 31, 2020) (asthma); *United States v. Michael Valdez*, No. 19 Cr. 883 (JPO) (S.D.N.Y. Mar. 27, 2020) (asthma); *United States v. Rivera*, No. 20 Cr. 6 (JSR) (S.D.N.Y. Mar. 25, 2020) (asthma); *United States v. Gonzalez¸* No. 19 Cr. 123 (NRB) (S.D.N.Y. Mar. 25, 2020) (asthma); *United States v. Fofana*, No. 19 Cr. 447 (DLC) (S.D.N.Y. Mar. 30, 2020) (asthma); *United States v. Steward*, No. 20 Cr. 52 (DLC) (S.D.N.Y. Mar. 26, 2020) ("high-risk" list); *United States v. White*, No. 19 Cr. 536 (PKC) (S.D.N.Y. Mar. 25, 2020) (whooping cough); *United States v. Knight*, No. 20 Cr. 216 (CS) (S.D.N.Y. Mar. 27, 2020) (age and underlying health condition); *United States v. Bradley*, No. 19 Cr. 632 (GBD) (S.D.N.Y. Mar. 24, 2020) (recent stroke and high blood pressure).

[10]  Thiam has not reported to medical orderly duties for at least a week because his unit has been quarantined.
[11]  Counsel for MDC noted, however, that counsel had not been able to fully access records indicating whether Thiam had made such a request.

It deprived Guinea of his honest services.  It was a violation of Guinean law.  It was a violation of American law.  The defendant knew immediately that what he was doing was terribly wrong.  He took many steps to conceal what he was doing.  He lied to banks repeatedly.  He engaged in convoluted financial transactions to disguise what was happening with the funds.  He absolutely knew he had betrayed Guinea.  And, of course, that kind of corruption, as is reflected here, is profound for any nation.  It's profound on different levels when a public official accepts bribes in the performance of their duties.  It deprives a nation of the good judgment and good services and faithful services of its representatives, but beyond that, it destroys a citizenry's confidence in its system of governments, and with that loss of confidence, the understanding within a nation that its officials are corrupt, who are more engaged about looking out for their own financial benefit than for the benefit of the country that they're supposed to serve, the rule of law is undermined and a nation is weakened.

(Sentencing Tr. (Dkt. 141), at 27-28).

Significantly, this Court also found that "the defendant has shown no remorse for what he did here.  I sense no acknowledgment of the deep injury he has done to Guinea and to the rule of law.  I even sense a whiff of entitlement."  (*id.*, at 28).  And, in finding an obstruction of justice enhancement appropriate under the Guidelines, this Court found "beyond a reasonable doubt, that the defendant gave false testimony under oath at trial.  He did so with the specific intent to deceive the jury and to mislead them about what had happened here, and it was, of course, about a material matter.  It was in connection with the circumstances under which he received the $8.5 million.  So he hoped to obtain a not guilty verdict by his testimony." (*id.*, at 14).

Everything that the Court said remains true.  Thiam's criminal conduct was "profound" and deeply "corrupt," denying the citizens of Guinea—one of the poorest countries in the world— not only of their natural resources, but of basic confidence in their government.  Reducing Thiam's sentence by more than two-and-a-half years, particularly given the speculative basis of his motion, is unwarranted and utterly inconsistent with principles of deterrence.  *Cf.*, *e.g.*, *United States v. Credidio*, No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *1 (S.D.N.Y. Apr. 2, 2020) (explaining

23

denial of request to change a sentence of 33 months' imprisonment to home confinement for 72-year old defendant at MCC deemed by BOP to be at high risk of COVID-19 complications, because "a lengthy term of imprisonment is required for [the defendant] for all the reasons reviewed at sentencing," and recommending BOP expedite designation to a long-term facility); *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *5 (S.D.N.Y. Feb. 24, 2020) (denying motion of defendant suffering from, among other things, asthma and high blood pressure; "The sentencing factors weigh heavily against the reduction of [the defendant's] sentence to time served."), *reconsideration denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020).

Notably, even at this late stage, Thiam does not accept responsibility for his criminal conduct, failing to acknowledge anywhere in his motion his corrupt use of his official position to obtain bribes.  As he lied to the FBI and perjured himself before this Court "with the specific intent to deceive the jury," (Sentencing Tr. at 14), so Thiam persists even now in failing to acknowledge his wrongdoing.  It thus remains true what this Court stated at sentencing:  "I sense no acknowledgment of the deep injury he has done to Guinea and to the rule of law.  I even sense a whiff of entitlement."  (Sentencing Tr. at 28).  Such a defendant is particularly undeserving of "compassionate" release.

* * *

The defendant committed serious offenses, and rightly received a multi-year term of imprisonment, which represented a considerable downward variance from the applicable guidelines range.[12]  He appealed his conviction, and it was affirmed.  Real though his medical conditions are, they pre-date his sentencing and are stable, manageable, and being properly treated.

---

[12] At sentencing, the Court determined Thiam's Guidelines range to be 151-188 months' imprisonment.  (Sent. Tr., at 14).  As noted, the Court sentenced Thiam to 84 months' imprisonment, 67 months below the low end of his Guidelines range.

And real though the risk of COVID-19 is, the BOP has taken and continues to take meaningful steps to mitigate that risk.  The defendant is not entitled to immediate and permanent release, more than two-and-one-half years short of completing his sentence.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied.

Dated: New York, New York
        April 21, 2020

                              Respectfully submitted,

                              GEOFFREY S. BERMAN
                              United States Attorney

                    By:      _____//s//_____
                              Elisha J. Kobre
                              Christopher J. DiMase
                              Assistant U. S. Attorneys
                              (212) 637-2599/2433

                              ROBERT ZINK
                              Chief, Criminal Division, Fraud Section
                              United States Department of Justice

                    By:      _____/s/_____
                              Lorinda Laryea
                              Assistant Chief
                              Telephone: (202) 353-3439